**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

ARTHUR USHERSON,

               Plaintiff,

RICHARD P. LIEBOWITZ,
LIEBOWITZ LAW FIRM, PLLC,

               Miscellaneous-
               Appellants,

               v.

BANDSHELL ARTIST
MANAGEMENT,

               Defendant-Appellee.

No. 20-2304

**DECLARATION OF KEVIN GROSSINGER IN SUPPORT OF
EMERGENCY MOTION FOR STAY PENDING APPEAL**

I, Kevin Grossinger, declare the following under penalty of perjury pursuant

to 28 U.S.C. § 1746:

1.      I am an attorney licensed to practice law in the state of New York and

admitted to practice before this Court. I am an associate of the law firm of

Morvillo Abramowitz Grand Iason & Anello P.C., counsel to Richard Liebowitz

and Liebowitz Law Firm ("LLF") (collectively, "Appellants").

2.     I submit this Declaration in support of Appellants' emergency motion to stay pending appeal the enforcement of sanctions three, four, five, and six imposed by the District Court in its June 26, 2020 Opinion & Order, and Appellants' further request for an interim stay pending this Court's determination of Appellants' motion.

3.     Attached hereto as Exhibit A is a true and correct copy of the District Court Docket Sheet for Case No. 19 Civ. 6368 (JMF) (S.D.N.Y.), current as of July 22, 2020, 9:25 p.m.  As used in this Declaration, "Dkt." refers to an entry on the District Court's docket in that case.

4.     Attached hereto as Exhibit B is a true and correct copy of the District Court's Opinion and Order (the "Opinion") with respect to which Appellants now seek an emergency stay.  The Opinion is Dkt. 68 in Case No. 19 Civ. 6368 (JMF) (S.D.N.Y.), dated June 26, 2020, and may further be found at Docket No. 2 in this appeal, Case No. 20-2304.

5.     Attached hereto as Exhibit C is a true and correct copy of Appellants' Notice of Appeal, Dkt. 74, dated July 20, 2020.

6.     Attached hereto as Exhibit D is a true and correct copy of Appellants' Proposed Order to Show Cause To Stay Order Pending Appeal, Dkt. 76, dated July 20, 2020.

7.     Attached hereto as Exhibit E is a true and correct copy of the District Court's Order denying Appellants' Proposed Order to Show Cause To Stay Order Pending Appeal, Dkt. 81, dated July 22, 2020.

8.     Attached hereto as Exhibit F is a true and correct copy of Plaintiff Arthur Usherson's Complaint against Defendant Bandshell Artist Management, Dkt. 1, dated July 10, 2019.

9.     Attached hereto as Exhibit G is a true and correct copy of the District Court's Mediation Referral Order, Dkt. 6, dated July 15, 2019.

10.     Attached hereto as Exhibit H is a true and correct copy of Defendant's motion for sanctions against Plaintiff and Appellants, Dkt. 14, dated November 6, 2019.

11.     Attached hereto as Exhibit I is a true and correct copy of Defendant's memorandum of law in support of its motion for sanctions, Dkt. 15, dated November 6, 2019.

12.     Attached hereto as Exhibit J is a true and correct copy of the Declaration of Brad R. Newberg, counsel to Defendant, in support of Defendant's motion for sanctions, Dkt. 16, dated November 6, 2019.

13.     Attached hereto as Exhibit K is a true and correct copy of the District Court's Civil Case Management Plan and Scheduling Order, Dkt. 20, dated November 15, 2019.

14.     Attached hereto as Exhibit L is a true and correct copy of Plaintiff's memorandum of law in opposition to Defendant's motion for sanctions, Dkt. 21, dated November 18, 2019.

15.     Attached hereto as Exhibit M is a true and correct copy of the Declaration of Richard Liebowitz in opposition to Defendant's motion for sanctions, Dkt. 22, dated November 18, 2019.

16.     Attached hereto as Exhibit N is a true and correct copy of the Declaration of the Mediator in this case, Dkt. 39, dated December 11, 2019.

17.     Attached hereto as Exhibit O is a true and correct copy of the District Court's order for an evidentiary hearing, Dkt. 42, dated December 17, 2019.

18.     Attached hereto as Exhibit P is a true and correct copy of the District Court's Order directing that the evidentiary hearing will proceed, Dkt. 47, dated December 20, 2019.

19.     Attached hereto as Exhibit Q is a true and correct copy of the parties' stipulation of dismissal with prejudice, Dkt. 48, dated December 20, 2019.

20.     Attached hereto as Exhibit R is a true and correct copy of the District Court's order regarding its rulings at the close of the January 8, 2020 evidentiary hearing, Dkt. 52, dated January 8, 2020.

21.     Attached hereto as Exhibit S is a true and correct copy of Appellants' letter to the District Court regarding the copyright registration certificate, Dkt. 57, dated January 17, 2020.

22.     Attached hereto as Exhibit T is a true and correct copy of Defendant's letter to the District Court regarding the copyright registration certificate, Dkt. 58, dated January 18, 2020.

23.     Attached hereto as Exhibit U is a true and correct copy of Exhibit A to Defendant's letter to the District Court, Dkt. 58-1, dated January 18, 2020.

24.     Attached hereto as Exhibit V is a true and correct copy of the District Court's order regarding further submission of evidence regarding the motion for sanctions, Dkt. 59, dated January 24, 2020.

25.     Attached hereto as Exhibit W is a true and correct copy of the Affidavit of Arthur Usherson pursuant to the District Court's January 24, 2020 order, Dkt. 62, dated February 7, 2020.

26.     Attached hereto as Exhibit X is a true and correct copy of the Declaration of Richard Liebowitz pursuant to the District Court's January 24, 2020 order, Dkt. 63, dated February 7, 2020.

27.     Attached hereto as Exhibit Y is a true and correct copy of Exhibit A to the Declaration of Richard Liebowitz pursuant to the District Court's January 24, 2020 order, Dkt. 63-1, dated February 7, 2020.

28.     Attached hereto as Exhibit Z is a true and correct copy of the transcript of the District Court's January 8, 2020 hearing, Dkt. 66, dated February 12, 2020.

29.     Attached hereto as Exhibit AA is a true and correct copy of the certificate of service of the District Court's Opinion upon Plaintiff Arthur Usherson, Dkt. 69, dated July 6, 2020.

30.     Attached hereto as Exhibit AB is a true and correct copy of the Declaration of Richard Liebowitz in support of Appellants' motion by order to show cause for a stay of the District Court's Opinion, Dkt. 79, dated July 20, 2020.

31.     Attached hereto as Exhibit AC is a true and correct copy of the Declaration of Bruce Cotler in support of Appellants' motion by order to show cause for a stay of the District Court's Opinion, Dkt. 80, dated July 20, 2020.

32.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: July 23, 2020
     New York, NY

                                   /s/ Kevin Grossinger
                                   Kevin Grossinger

# Exhibit A

CLOSED,APPEAL,ECF,MEDTFR4

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:19-cv-06368-JMF

Usherson v. Bandshell Artist Management      Date Filed: 07/10/2019
Assigned to: Judge Jesse M. Furman      Date Terminated: 12/20/2019
Cause: 17:101 Copyright Infringement      Jury Demand: Plaintiff
Nature of Suit: 820 Copyright
Jurisdiction: Federal Question

**Plaintiff**

**Arthur Usherson**      represented by    **Richard Liebowitz**
Liebowitz Law Firm, PLLC
11 Sunrise Plaza, Suite 301
Suite 305
Valleystream, NY 11580
516-233-1660
Email: RL@LiebowitzLawFirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Bandshell Artist Management**      represented by    **Brad Richard Newberg**
*TERMINATED: 12/20/2019*      McGuireWoods LLP
1750 Tysons Blvd., Ste. 1800
Tysons Corner, VA 22102
703-712-5061
Email: bnewberg@mcguirewoods.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Richard Liebowitz**      represented by    **Brian A. Jacobs**
Morvillo, Abramowitz, Grand, Iason, &
Anello P.C.
565 5th Avenue
New York, NY 10017
212-856-9600
Fax: 212-856-9494
Email: bjacobs@maglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert James Anello**
Morvillo, Abramowitz, Grand, Iason, &
Anello P.C.
565 5th Avenue
New York, NY 10017

212 880 9320
Fax: 212 856 9494
Email: ranello@maglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Dennis Dillon**
Morvillo Abramowitz Grand Iason &
Anello PC
565 Fifth Avenue
New York, NY 10017
212-880-9550
Email: ddillon@maglaw.com
*ATTORNEY TO BE NOTICED*

**Kevin Grossinger**
Morvillo Abramowitz Grand Iason &
Anello PC
565 Fifth Avenue
New York, NY 10017
212-856-9600
Email: kgrossinger@maglaw.com
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

| | | |
|---|---|---|
| **Liebowitz Law Firm, PLLC** | represented by | **Brian A. Jacobs** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert James Anello**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Dennis Dillon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Grossinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/10/2019 | 1 | COMPLAINT against Bandshell Artist Management. (Filing Fee $ 400.00, Receipt Number ANYSDC-17216426)Document filed by Arthur Usherson. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Liebowitz, Richard) (Entered: 07/10/2019) |
| 07/10/2019 | 2 | REQUEST FOR ISSUANCE OF SUMMONS as to Bandshell Artist Management, re: 1 Complaint. Document filed by Arthur Usherson. (Liebowitz, Richard) (Entered: 07/10/2019) |
| 07/11/2019 | | ***NOTICE TO ATTORNEY TO ELECTRONICALLY FILE CIVIL COVER |

| | | |
|---|---|---|
| | | **SHEET. Notice to Attorney Richard Liebowitz. Attorney must electronically file the Civil Cover Sheet. Use the event type Civil Cover Sheet found under the event list Other Documents. (jgo)** (Entered: 07/11/2019) |
| 07/12/2019 | 3 | CIVIL COVER SHEET filed. (Liebowitz, Richard) (Entered: 07/12/2019) |
| 07/12/2019 | | ***NOTICE TO ATTORNEY REGARDING CIVIL CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney Richard Liebowitz. The following case opening statistical information was erroneously selected/entered: Nature of Suit code 720 (Labor: Labor/Mgt. Relations);. The following correction(s) have been made to your case entry: the Nature of Suit code has been modified to 820 (Copyright);. (jgo)** (Entered: 07/12/2019) |
| 07/12/2019 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Jesse M. Furman. Please download and review the Individual Practices of the assigned District Judge, located at http://nysd.uscourts.gov/judges/District. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at http://nysd.uscourts.gov/ecf_filing.php. (jgo) (Entered: 07/12/2019) |
| 07/12/2019 | | Magistrate Judge Debra C. Freeman is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: http://nysd.uscourts.gov/forms.php. (jgo) (Entered: 07/12/2019) |
| 07/12/2019 | | Case Designated ECF. (jgo) (Entered: 07/12/2019) |
| 07/12/2019 | 4 | ELECTRONIC SUMMONS ISSUED as to Bandshell Artist Management. (jgo) (Entered: 07/12/2019) |
| 07/15/2019 | 5 | ORDER REGARDING EARLY MEDIATION AND THE INITIAL PRETRIAL CONFERENCE: Initial Conference set for 10/10/2019 at 03:15 PM in Courtroom 1105, 40 Centre Street, New York, NY 10007 before Judge Jesse M. Furman. (As further set forth in this order) (Signed by Judge Jesse M. Furman on 7/15/2019) (ne) (Entered: 07/15/2019) |
| 07/15/2019 | 6 | MEDIATION REFERRAL ORDER: It is hereby ORDERED that this case, involving claims under the Copyright Act, 17 U.S.C. § 101 et seq., is referred for mediation to the Court-annexed Mediation Program. The parties are hereby notified that Local Rule 83.9 shall govern the mediation and are directed to participate in the mediation in good faith. The mediation should take place at least two weeks prior to the Initial Pretrial Conference, which is currently scheduled (by separate Order to be entered today) for October 10, 2019. The mediation will have no effect upon any scheduling Order issued by this Court without leave of this Court. The Court specifically requests a mediator with expertise in copyright matters be assigned. To facilitate prompt mediation, Plaintiff is hereby ORDERED to file proof of service no more than three days after service has been effected. Plaintiff is further ORDERED to produce to Defendant, by the earlier of 14 days after service of process or three business days in advance of any mediation session, (1) copies of records sufficient to show the royalty paid the last three times the work (e.g., the photograph or video) at issue in this case was licensed and (2) the number of times the work was licensed in the last five years. SO ORDERED. Please reference the following when corresponding with the Mediation Office. E-mail MediationOffice@nysd.uscourts.gov, telephone (212) 805-0643, and facsimile (212) 805-0647. Mediator to be Assigned by 7/25/2019. Mediator Expertise Request due by 7/22/2019. (Signed by Judge Jesse M. Furman on 7/15/2019) (ne) (Entered: 07/15/2019) |
| 07/29/2019 | | Terminate Mediation Case Tracking Deadlines: Mediator Assignment Deadline, Mediator Expertise Request Deadline (mf) (Entered: 07/29/2019) |

| | | |
|---|---|---|
| 09/21/2019 | 7 | AFFIDAVIT OF SERVICE. Bandshell Artist Management served on 9/5/2019, answer due 9/26/2019. Document filed by Arthur Usherson. (Liebowitz, Richard) (Entered: 09/21/2019) |
| 09/25/2019 | 8 | NOTICE OF APPEARANCE by Brad Richard Newberg on behalf of Bandshell Artist Management. (Newberg, Brad) (Entered: 09/25/2019) |
| 09/25/2019 | 9 | FIRST RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Bandshell Artist Management.(Newberg, Brad) (Entered: 09/25/2019) |
| 09/25/2019 | 10 | ANSWER to 1 Complaint. Document filed by Bandshell Artist Management.(Newberg, Brad) (Entered: 09/25/2019) |
| 10/03/2019 | 11 | INITIAL REPORT OF PARTIES BEFORE PRETRIAL CONFERENCE. Document filed by Arthur Usherson. (Attachments: # 1 Joint Letter)(Liebowitz, Richard) (Entered: 10/03/2019) |
| 10/04/2019 | 12 | LETTER MOTION to Adjourn Conference addressed to Judge Jesse M. Furman from Richard Liebowitz dated October 4, 2019. Document filed by Arthur Usherson.(Liebowitz, Richard) (Entered: 10/04/2019) |
| 10/07/2019 | 13 | ORDER granting 12 Letter Motion to Adjourn Conference. The Court is, to put it mildly, somewhat perturbed by counsel's statement that "[t]he mediation office did not assign a mediator because for some reason the mediation case track was terminated on July 29, 2019." Given how many cases counsel has had in this District, he knew or should have known that the Mediation Office routinely terminates the case-tracking deadlines in these cases pending the defendant's appearance and that the docket entry to that effect did not mean that the mediation would not be scheduled (let alone relieve counsel of the obligation to comply with the Court's order requiring mediation no later than two weeks before the initial pretrial conference. Further, to the extent it was difficult or impossible to schedule the mediation to take place by the deadline set by the Court, counsel has only himself to blame, as he waited until September 5, 2019 to serve Defendant. See ECF No. 7 . Given that, the prudent course would have been for counsel to timely seek an appropriate extension of the early mediation deadline, an adjournment of the initial pretrial conference, or both. All of that said, the Court continues to believe that early mediation in the normal course (i.e., in person) makes sense. Accordingly, the initial pretrial conference scheduled for October 10, 2019, is ADJOURNED to November 14, 2019, at 4 p.m. The parties shall conduct the in-person mediation no later than October 31, 2019. (HEREBY ORDERED by Judge Jesse M. Furman)(Text Only Order) (Furman, Jesse) (Entered: 10/07/2019) |
| 10/07/2019 | | NOTICE OF MEDIATOR ASSIGNMENT - Notice of assignment of mediator. Mediation is to be held by 10/31/2019.(mf) (Entered: 10/07/2019) |
| 10/10/2019 | | MEDIATION CONFERENCE SCHEDULED First Mediation Conference scheduled for 10/31/2019 at 12:00 PM in Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, NY 10007.(ah) (Entered: 10/10/2019) |
| 11/06/2019 | 14 | MOTION for Sanctions *against Plaintiff and Plaintiff's Counsel*. Document filed by Bandshell Artist Management.(Newberg, Brad) (Entered: 11/06/2019) |
| 11/06/2019 | 15 | MEMORANDUM OF LAW in Support re: 14 MOTION for Sanctions *against Plaintiff and Plaintiff's Counsel*. . Document filed by Bandshell Artist Management. (Newberg, Brad) (Main Document 15 replaced on 12/10/2019) (ab). (Entered: 11/06/2019) |
| 11/06/2019 | 16 | DECLARATION of Brad R Newberg in Support re: 14 MOTION for Sanctions *against Plaintiff and Plaintiff's Counsel*.. Document filed by Bandshell Artist Management. (Attachments: # 1 Exhibit Service and Licensing Discussion, # 2 Exhibit First Mediation Discussions, # 3 Exhibit Mediation Office Emails, # 4 Exhibit Mediation Office Emails, # |

| | | |
|---|---|---|
| | | 5 Exhibit Liebowitz draft letter to Court, # 6 Exhibit Emails Scheduling Mediation, # 7 Exhibit Mediator email, # 8 Exhibit Emails regarding proposal, # 9 Exhibit Early morning Oct 31 email, # 10 Exhibit Liebowitz Twitter Post, # 11 Exhibit Meet and confer email, # 12 Exhibit Receipts)(Newberg, Brad) (Main Document 16 replaced on 12/10/2019) (ab). (Entered: 11/06/2019) |
| 11/06/2019 | 17 | FINAL REPORT OF MEDIATOR #4...Report of Mediator to the Clerk that the court-ordered mediation in this case was held but was unsuccessful in resolving any issue in the case. The Mediation Unit will consider the referral to be completed and close its files at this time but the judge may re-refer parties to mediation at any point. To evaluate the effectiveness of our Mediators/Mediation Program please click on the following link: http://www.nysd.uscourts.gov/mediation_survey. A fillable PDF of the survey can also be found at www.nysd.uscourts.gov/mediation.(ah) (Entered: 11/06/2019) |
| 11/07/2019 | 18 | INITIAL REPORT OF PARTIES BEFORE PRETRIAL CONFERENCE. Document filed by Arthur Usherson. (Attachments: # 1 Joint Letter)(Liebowitz, Richard) (Attachment 1 replaced on 12/10/2019) (ab). (Entered: 11/07/2019) |
| 11/14/2019 | 19 | RESPONSE in Opposition to Motion re: 14 MOTION for Sanctions *against Plaintiff and Plaintiff's Counsel*. . Document filed by Arthur Usherson. (Liebowitz, Richard) (Entered: 11/14/2019) |
| 11/14/2019 | | NOTICE: Please be advised that the conference scheduled for today, November 14, 2019, will be held in **Courtroom 905 (note that this is NOT the Court's usual courtroom)** of the Thurgood Marshall United States Courthouse, 40 Centre Street, New York, NY. (ab) (Entered: 11/14/2019) |
| 11/14/2019 | | Minute Entry for proceedings held before Judge Jesse M. Furman: Initial Pretrial Conference held on 11/14/2019. Richard Liebowitz present for the Plaintiff. James Freeman present for Plaintiff's counsel. Brad Newberg present for Defendant. Court reporter present. (ab) (Entered: 11/14/2019) |
| 11/15/2019 | 20 | CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER: All parties do not consent to conducting all further proceedings before a United States Magistrate Judge, including motions and trial. 28 U.S.C. § 636(c). The parties are free to withhold consent without adverse substantive consequences. Amended Pleadings due by 11/22/2019. Unless otherwise ordered by the Court, depositions of fact witnesses shall be completed by the date set forth in paragraph 8(b). Each side is limited to one (1) deposition (assuming that the person who posted the photograph on defendant's behalf and its corporate designee are one and the same), absent leave of Court. This case is to be tried to a jury. Counsel for the parties have conferred, and the present best estimate of the length of trial is 2-3 days. Motions due by 12/13/2019. Responses due by 12/11/2019. Replies due by 12/18/2019. Fact Discovery due by 1/31/2020. Defendant shall file a motion for/to bond no later than 11/27/2019. Any Pretrial Conference set for 2/6/2020 at 03:30 PM in Courtroom 1105, 40 Centre Street, New York, NY 10007 before Judge Jesse M. Furman. Defendant is granted leave to file an amended answer no later than November 22, 2019. Plaintiff shall file a formal opposition to the motion for sanctions by November 18, 2019; Defendant shall file any reply by November 25, 2019. The parties should address in those submissions whether the Court should hold an evidentiary hearing and, if so, what witnesses should be called and how it should be conducted. SO ORDERED. (Signed by Judge Jesse M. Furman on 11/14/19) (yv) (Entered: 11/15/2019) |
| 11/15/2019 | | ***DELETED DOCUMENT. Deleted document number 21 ORDER SCHEDULING DEFAULT JUDGMENT BRIEFING AND SHOW CAUSE HEARING. The document was incorrectly filed in this case. (yv) (Entered: 11/15/2019) |
| 11/18/2019 | 21 | MEMORANDUM OF LAW in Opposition re: 14 MOTION for Sanctions *against Plaintiff* |

| | | *and Plaintiff's Counsel*. . Document filed by Arthur Usherson. (Liebowitz, Richard) (Main Document 21 replaced on 12/10/2019) (ab). (Entered: 11/18/2019) |
|---|---|---|
| 11/18/2019 | 22 | DECLARATION of Richard P. Liebowitz in Opposition re: 14 MOTION for Sanctions *against Plaintiff and Plaintiff's Counsel*.. Document filed by Arthur Usherson. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Liebowitz, Richard) (Main Document 22 replaced on 12/10/2019) (ab). (Entered: 11/18/2019) |
| 11/18/2019 | 23 | DECLARATION of James Freeman in Opposition re: 14 MOTION for Sanctions *against Plaintiff and Plaintiff's Counsel*.. Document filed by Arthur Usherson. (Liebowitz, Richard) (Main Document 23 replaced on 12/10/2019) (ab). (Entered: 11/18/2019) |
| 11/18/2019 | 24 | DECLARATION of Rebecca Liebowitz in Opposition re: 14 MOTION for Sanctions *against Plaintiff and Plaintiff's Counsel*.. Document filed by Arthur Usherson. (Liebowitz, Richard) (Main Document 24 replaced on 12/10/2019) (ab). (Entered: 11/18/2019) |
| 11/19/2019 | 25 | AMENDED ANSWER to 1 Complaint. Document filed by Bandshell Artist Management. (Newberg, Brad) (Entered: 11/19/2019) |
| 11/20/2019 | 26 | ORDER: Given the interest in maintaining the confidentiality of negotiations and discussions conducted as part of the Court-annexed Mediation Program, it is hereby ORDERED that the filings made in connection with Defendant's motion for sanctions, ECF No. 14, shall be temporarily sealed unless and until the Court orders otherwise. Within one week of the filing of Defendant's reply in support of its motion, the parties shall each file a letter brief on ECF stating their views on whether and to what extent the motion filings should remain under seal given the strong presumption in favor of public access to judicial documents. See generally Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119-20 (2d Cir. 2006). The Court will determine whether to keep the documents under seal when deciding the underlying motion. The Clerk of Court is directed to place ECF Nos. 14-16, 18-19, and 21-24 on "Court View Only." Further, Defendant shall follow the Court's Individual Rules and Practices for Civil Cases in submitting its reply papers under seal in the first instance. SO ORDERED. (Signed by Judge Jesse M. Furman on 11/20/2019) (ama) Transmission to Sealed Records Clerk for processing. (Entered: 11/20/2019) |
| 11/26/2019 | | ***DELETED DOCUMENT. Deleted document number 27 Transcript. The document was incorrectly filed in this case. (jca) (Entered: 01/06/2020) |
| 11/26/2019 | | ***DELETED DOCUMENT. Deleted document number 28 Notice of filing of Official Transcript. The document was incorrectly filed in this case. (jca) (Entered: 01/06/2020) |
| 11/27/2019 | 29 | MOTION for Bond *to Cover Defendant's Fees and Costs*. Document filed by Bandshell Artist Management.(Newberg, Brad) (Entered: 11/27/2019) |
| 11/27/2019 | 30 | MEMORANDUM OF LAW in Support re: 29 MOTION for Bond *to Cover Defendant's Fees and Costs*. . Document filed by Bandshell Artist Management. (Newberg, Brad) (Entered: 11/27/2019) |
| 11/27/2019 | 31 | DECLARATION of Mark J. McKenna in Support re: 29 MOTION for Bond *to Cover Defendant's Fees and Costs*.. Document filed by Bandshell Artist Management. (Newberg, Brad) (Entered: 11/27/2019) |
| 11/27/2019 | 32 | DECLARATION of Brad R Newberg in Support re: 29 MOTION for Bond *to Cover Defendant's Fees and Costs*.. Document filed by Bandshell Artist Management. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5, # 6 Exhibit Exhibit 6, # 7 Exhibit Exhibit 7) (Newberg, Brad) (Entered: 11/27/2019) |

| 12/04/2019 | 33 | LETTER addressed to Judge Jesse M. Furman from Brad Newberg dated 12/4/2019 re: Sealing of Sanctions Motion. Document filed by Bandshell Artist Management.(Newberg, Brad) (Entered: 12/04/2019) |
|---|---|---|
| 12/09/2019 | 34 | MEMORANDUM OPINION AND ORDER: The Court has reviewed the parties' motion papers and will file on the public docket versions of their submissions redacted in accordance with the discussion above. The unredacted versions shall be filed and maintained under seal. All future filings in connection with the sanctions motion shall be filed publicly, but, absent further order of the Court, shall (1) be limited to the issues of whether Liebowitz obtained advance permission from the Mediator for an associate to appear at the mediation instead of himself and for Plaintiff to participate in the mediation by telephone; and (2) not include the names of the Mediator or any court employees working in the Mediation Program (or, if need be, shall redact their names). No other filings in connection with the sanctions motion are permitted absent leave of the Court. The Director of the Court-annexed Mediation Program is directed to provide a copy of this Memorandum Opinion and Order to the Mediator, who shall submit a declaration, consistent with the directions above, by December 18, 2019. The Mediator should do so, in the first instance, by e-mail to Furman_NYSDChambers@nysd.uscourts.gov so that the Court can review the declaration and redact it as appropriate. Upon review of the Mediator's declaration, the Court will decide what, if any, further proceedings are necessary to resolve Defendant's motion and further set forth in this Order. (Signed by Judge Jesse M. Furman on 12/9/2019) (rro) (Entered: 12/09/2019) |
| 12/10/2019 | 35 | REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SANCTION: re: 14 MOTION for Sanctions against Plaintiff and Plaintiff's Counsel Document filed by Bandshell Artist Management. (ama) (Entered: 12/10/2019) |
| 12/10/2019 | 36 | SECOND DECLARATION OF BRAD R. NEWBERG IN SUPPORT OF DEFENDANT'S MOTION FOR SANCTIONS: 14 MOTION for Sanctions against Plaintiff and Plaintiff's Counsel. Document filed by Bandshell Artist Management. (ama) (Entered: 12/10/2019) |
| 12/10/2019 | 37 | DECLARATION OF MARK J. MCKENNA IN SUPPORT OF DEFENDANT'S MOTION FOR SANCTIONS: re: 14 MOTION for Sanctions against Plaintiff and Plaintiff's Counsel. Document filed by Bandshell Artist Management. (ama) (Entered: 12/10/2019) |
| 12/10/2019 | 38 | LETTER addressed to Judge Jesse M. Furman from Brad R. Newberg dated 11/25/2019 re: Per this Court's November 20, 2019 Order directing that the paper related to Defendant's Motion for Sanctions be temporarily Sealed. Document filed by Bandshell Artist Management.(ama) (Entered: 12/10/2019) |
| 12/11/2019 | 39 | ORDER: In accordance with the Court's Memorandum Opinion and Order dated December 9, 2019, the Mediator submitted to the Court the attached Declaration, which the Court has redacted to remove references to the Mediator's name. No later than noon on December 16, 2019, Mr. Liebowitz shall file a letter on ECF indicating if he believes that an evidentiary hearing is necessary to resolve Defendant's motion. In the absence of such a request, the Court will treat the facts set forth in the Mediators declaration as uncontested. SO ORDERED. (Signed by Judge Jesse M. Furman on 12/11/2019) (jca) (Entered: 12/11/2019) |
| 12/11/2019 | 40 | MEMORANDUM OF LAW in Opposition re: 29 MOTION for Bond *to Cover Defendant's Fees and Costs*. . Document filed by Arthur Usherson. (Liebowitz, Richard) (Entered: 12/11/2019) |
| 12/16/2019 | 41 | RESPONSE re: 39 Order,, . Document filed by Arthur Usherson. (Liebowitz, Richard) (Entered: 12/16/2019) |

| 12/17/2019 | 42 | ORDER, Unless the Court orders otherwise, the evidentiary hearing shall be held on January 8, 2020, at 9:30 a.m. in Courtroom 1105 of the Thurgood Marshall Courthouse, 40 Centre Street, New York, New York. Richard Liebowitz, Brad Newberg, and the Mediator must attend in person. The parties may, but do not have to, attend in person. Any party objecting to the foregoing or believing that a conference should be held to discuss these (or any other) matters shall submit a letter by noon on December 19, 2019. SO ORDERED. (Evidentiary Hearing set for 1/8/2020 at 09:30 AM in Courtroom 1105, 40 Centre Street, New York, NY 10007 before Judge Jesse M. Furman.) (Signed by Judge Jesse M. Furman on 12/17/19) (yv) (Entered: 12/17/2019) |
|---|---|---|
| 12/17/2019 | 43 | REPLY MEMORANDUM OF LAW in Support re: 29 MOTION for Bond *to Cover Defendant's Fees and Costs*. . Document filed by Bandshell Artist Management. (Newberg, Brad) (Entered: 12/17/2019) |
| 12/17/2019 | 44 | DECLARATION of Brad R Newberg in Support re: 29 MOTION for Bond *to Cover Defendant's Fees and Costs*.. Document filed by Bandshell Artist Management. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5, # 6 Exhibit Exhibit 6)(Newberg, Brad) (Entered: 12/17/2019) |
| 12/19/2019 | 45 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** STIPULATION OF VOLUNTARY DISMISSAL It is hereby stipulated and agreed by and between the parties and/or their respective counsel(s) that the above-captioned action is voluntarily dismissed, with prejudice against the defendant(s) Bandshell Artist Management pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure. Document filed by Arthur Usherson. **Proposed document to be reviewed and processed by Clerk's Office staff (No action required by chambers).**.(Liebowitz, Richard) Modified on 12/19/2019 (km). (Entered: 12/19/2019) |
| 12/19/2019 | 46 | LETTER addressed to Judge Jesse M. Furman from Brad Newberg dated 12/19/2019 re: Evidentiary Hearing. Document filed by Bandshell Artist Management.(Newberg, Brad) (Entered: 12/19/2019) |
| 12/19/2019 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT VOLUNTARY DISMISSAL. Notice to Attorney Richard Liebowitz. RE-FILE Document No. 45 Stipulation of Voluntary Dismissal. The filing is deficient for the following reason(s): The docket entry text needs to match the document. Please re-file document and when re-filing do not select that the document is pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii). (Your document does not state that it is pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii). Re-file the document using the event type Stipulation of Voluntary Dismissal found under the event list Other Documents. (km)** (Entered: 12/19/2019) |
| 12/20/2019 | 47 | ORDER denying as moot 29 Motion for Bond. Accordingly, the January 8, 2020 hearing will proceed as planned. At that hearing, the Court will hear sworn testimony from three witnesses in the following order: Mr. Liebowitz, Mr. Newberg, and the Mediator. As noted, the Court will treat their previously submitted declarations as their direct testimony and proceed directly to cross-examination limited to the issues of whether Mr. Liebowitz obtained advance permission from the Mediator for an associate to appear at the mediation instead of Mr. Liebowitz and for Plaintiff to participate in the mediation by telephone. See ECF No. 42. In the case of Mr. Liebowitz and Mr. Newberg, the Court will begin with cross-examination by opposing counsel and then proceed to its own questioning. In the case of the Mediator, the Court will engage in its own questioning first and then give counsel for both sides an opportunity to ask follow-up questions. Counsel should be prepared for brief oral argument at the close of the hearing. The Clerk of Court is directed to terminate ECF No. 29. SO ORDERED. (Signed by Judge Jesse M. Furman on 12/20/2019) (va) (Entered: 12/20/2019) |

| | | |
|---|---|---|
| 12/20/2019 | 48 | STIPULATION OF DISMISSAL OF CIVIL ACTION WITH PREJUDICE (FRCP 41(a)(1)(A)(ii) : It is hereby stipulated by Plaintiff Arthur Usherson and Defendant Bandshell Artist Management that the case has been settled and that the above case should be dismissed with prejudice with each side to bear its own costs and attorney's fees. SO ORDERED. To be clear, the Court retains jurisdiction to adjudicate Defendant's pending motion for sanctions and any other sanctions-related matters. See, e.g., Rice v. NBCUniversal Media, LLC, No. 19-CV-447 (JMF), 2019 WL 3000808, at *4 (S.D.N.Y. July 10, 2019) (noting, in imposing sanctions on Mr. Liebowitz, that voluntary dismissal does not preclude the district court from considering collateral issues such as sanctions. (quoting U.S. D.I.D. Corp. v. Windstream Commcns, Inc., 775 F.3d 128, 134 (2d Cir. 2014)). The Clerk of Court is directed to close this case but should NOT terminate ECF No. 14., (Bandshell Artist Management terminated.) (Signed by Judge Jesse M. Furman on 12/20/19) (yv) (Entered: 12/20/2019) |
| 12/20/2019 | | Terminate Transcript Deadlines (yv) (Entered: 12/20/2019) |
| 12/20/2019 | 49 | AO 121 FORM COPYRIGHT - CASE TERMINATED- SUBMITTED. In compliance with the provisions of 17 U.S.C. 508, the Register of Copyrights is hereby advised that a final decision was rendered on 12/20/19 in a court action filed on the following copyright(s) in the U.S. District Court Southern District of New York. Form e-mailed to Register of Copyrights. (yv) (Entered: 12/20/2019) |
| 01/06/2020 | 50 | TRANSCRIPT of Proceedings re: CONFERENCE held on 11/14/2019 before Judge Jesse M. Furman. Court Reporter/Transcriber: Jerry Harrison, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/27/2020. Redacted Transcript Deadline set for 2/6/2020. Release of Transcript Restriction set for 4/6/2020. (McGuirk, Kelly) (Entered: 01/06/2020) |
| 01/06/2020 | 51 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERECE proceeding held on 11/14/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 01/06/2020) |
| 01/08/2020 | | Minute Entry for proceedings held before Judge Jesse M. Furman: Evidentiary Hearing held on 1/8/2020. Richard Liebowitz present for the Plaintiff. James Freeman present as Mr. Liebowitz's counsel. Brad Newberg and Stephen Foresta present for Defendant. Court reporter present. -- Witnesses called. Decision reserved. -- See transcript. (ab) (Entered: 01/08/2020) |
| 01/08/2020 | 52 | ORDER: As stated on the record at the close of the evidentiary hearing held on January 8, 2020, Defendant shall serve via overnight courier a copy of the files obtained from the U.S. Copyright Office for the copyright registration by January 9, 2020, and file proof of service within one business day of service. No later than January 17, 2020, Plaintiff shall file a letter on ECF addressing (1) whether Paragraph 9 of the Complaint is accurate; and (2) if not, whether sanctions are warranted on this basis against either Plaintiff's counsel or Plaintiff himself. In addition, by January 13, 2020, Plaintiff shall submit a letter brief not to exceed threepages addressing the effect, if any, of the parties' stipulation of dismissal on Defendant's motion for sanctions and addressing the appropriate sanctions in the event that the Court deems sanctions to be appropriate. Defendant shall submit any reply to Plaintiff's submission, not to exceed three pages, by January 15, 2020. Finally, Defendant shall submit a detailed accounting of the costs and attorney's fees incurred (had counsel not been |

| | | |
|---|---|---|
| | | pro bono) in connection with the October 31, 2019 mediation and the pending motion for sanctions by January 17, 2020. SO ORDERED. (Signed by Judge Jesse M. Furman on 1/8/2020) (jca) (Entered: 01/08/2020) |
| 01/09/2020 | 53 | RESPONSE to Motion re: 14 MOTION for Sanctions *against Plaintiff and Plaintiff's Counsel. Service of Deposit Copy CD*. Document filed by Bandshell Artist Management. (Attachments: # 1 Exhibit Email regarding deposit copy CD)(Newberg, Brad) (Entered: 01/09/2020) |
| 01/13/2020 | 54 | LETTER addressed to Judge Jesse M. Furman from Richard Liebowitz dated 1/13/20 re: Amount of Sanctions to be Awarded (If Any). Document filed by Arthur Usherson. (Liebowitz, Richard) (Entered: 01/13/2020) |
| 01/15/2020 | 55 | RESPONSE to Motion re: 14 MOTION for Sanctions *against Plaintiff and Plaintiff's Counsel. Letter in Response to January 13 Letter*. Document filed by Bandshell Artist Management. (Newberg, Brad) (Entered: 01/15/2020) |
| 01/17/2020 | 56 | RESPONSE to Motion re: 14 MOTION for Sanctions *against Plaintiff and Plaintiff's Counsel. Summary of costs and fees for mediation and sanctions motion*. Document filed by Bandshell Artist Management. (Attachments: # 1 Exhibit Detailed Summary of costs and fees)(Newberg, Brad) (Entered: 01/17/2020) |
| 01/17/2020 | 57 | LETTER addressed to Judge Jesse M. Furman from Richard Liebowitz dated 1/17/20 re: Copyright Registration Certificate. Document filed by Arthur Usherson. (Attachments: # 1 Exhibit 272 Registration)(Liebowitz, Richard) (Entered: 01/17/2020) |
| 01/18/2020 | 58 | LETTER addressed to Judge Jesse M. Furman from Brad Newberg dated 01/18/2020 re: Response to Jan 17 letter on copyright registrations. Document filed by Bandshell Artist Management. (Attachments: # 1 Exhibit Transcript pages)(Newberg, Brad) (Entered: 01/18/2020) |
| 01/24/2020 | 59 | ORDER. no later than January 31, 2020, Mr. Liebowitz shall file a declaration, sworn under penalty of perjury, specifying: (1) the nature and cause of the "administrative mistake" or "clerical error" to which he refers in his January 17, 2020 letter, including who was responsible for the mistake or error; (2) the factual basis for his inclusion of the allegation set forth in Paragraph 9 of the Complaint and the source of that factual basis, including a detailed description of any investigation into the matter that he conducted prior to the filing of the Complaint; (3) what role, if any, he played in the filing of the application for Registration 272, when and by whom that application was filed, and why the decision to obtain that registration was made (including but not limited to whether it was made due to a realization that the Photograph had not been registered); (4) when Mr. Liebowitz became aware that the Photograph was not registered under Registration 046, how he learned of that fact, and whether Mr. Liebowitz knew on November 14, 2019 (the date of the initial pretrial conference in this matter) that the Photograph had been registered after this lawsuit was commenced; and (5) why Mr. Liebowitz failed to advise the Court and defense counsel that Paragraph 9 of the Complaint was inaccurate until his January 17, 2020 letter. No later than the same date, Mr. Freeman shall file a declaration, sworn under penalty of perjury, specifying (1) the factual basis for the representations he made at the January 8, 2020 hearing about the registration of the Photograph, including that the allegation in Paragraph 9 of the Complaint was based on information provided to counsel by Mr. Usherson and that counsel had confirmed, prior to filing the Complaint, that Mr. Usherson was the claimant for Registration 046; and (2) any personal knowledge he has of any 'administrative mistake" or "clerical error" related to the allegation in Paragraph 9 of the Complaint, and the basis for such knowledge. In addition, no later than the same date, Mr. Usherson shall also file a declaration, both notarized and sworn under penalty of perjury, specifying (1) whether, as of the date this lawsuit was filed, he was aware that the Photograph had not been registered; (2) what, if any, information he |

| | | |
|---|---|---|
| | | provided to Mr. Liebowitz, Mr. Freeman, or any other attorney from the Liebowitz Law Firm about the registration of the Photograph and the date(s) on which he provided such information; and (3) what role, if any, he played in connection with Registration 272, including but not limited to the decision to seek registration and the actual filing of the registration. Finally, by the same date, Mr. Liebowitz is granted leave (but not required) to file a supplemental letter, not to exceed three pages, addressing the question of whether sanctions should be imposed in light of any new information in the aforementioned declarations. Defense counsel is granted leave (but not required) to file a letter, not to exceed three pages, responding to the declarations and any supplemental letter no later than February 5, 2020. SO ORDERED. (Signed by Judge Jesse M. Furman on 1/24/20) (yv) (Entered: 01/24/2020) |
| 01/24/2020 | [60](#) | CONSENT LETTER MOTION for Extension of Time to File Response/Reply as to [59](#) Order,,,,,,,,,,,, *through 2/7/20* addressed to Judge Jesse M. Furman from Richard Liebowitz dated 1/24/20. Document filed by Arthur Usherson.(Liebowitz, Richard) (Entered: 01/24/2020) |
| 01/29/2020 | [61](#) | ORDER granting [60](#) Letter Motion for Extension of Time to File Response/Reply: Application GRANTED. Mr. Liebowitz, Mr. Freeman, and Mr. Usherson shall submit the declarations required by the Court's Order at ECF No. 59 by February 7, 2020. By the same date, Mr. Liebowitz may (but is not required to) file a supplemental letter as stated in the Court's Order, and defense counsel may (but is not required to) file a response by February 10, 2020. The Clerk of Court is directed to terminate ECF No. 60. (Signed by Judge Jesse M. Furman on 1/29/2020) (jwh) (Entered: 01/29/2020) |
| 02/07/2020 | [62](#) | AFFIDAVIT of Arthur Usherson re: [61](#) Order on Motion for Extension of Time to File Response/Reply,, . Document filed by Arthur Usherson. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B, # [3](#) Exhibit C, # [4](#) Exhibit D, # [5](#) Exhibit E, # [6](#) Exhibit F, # [7](#) Exhibit G, # [8](#) Exhibit H, # [9](#) Exhibit I).(Liebowitz, Richard) (Entered: 02/07/2020) |
| 02/07/2020 | [63](#) | DECLARATION of Richard Liebowitz re: [61](#) Order on Motion for Extension of Time to File Response/Reply,, . Document filed by Arthur Usherson. (Attachments: # [1](#) Exhibit A). (Liebowitz, Richard) (Entered: 02/07/2020) |
| 02/07/2020 | [64](#) | DECLARATION of James Freeman re: [61](#) Order on Motion for Extension of Time to File Response/Reply,, . Document filed by Arthur Usherson..(Liebowitz, Richard) (Entered: 02/07/2020) |
| 02/10/2020 | [65](#) | RESPONSE to Motion re: [14](#) MOTION for Sanctions *against Plaintiff and Plaintiff's Counsel. Letter in Response to February 7 filing*. Document filed by Bandshell Artist Management..(Newberg, Brad) (Entered: 02/10/2020) |
| 02/12/2020 | [66](#) | TRANSCRIPT of Proceedings re: HEARING held on 1/8/2020 before Judge Jesse M. Furman. Court Reporter/Transcriber: Martha Martin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/4/2020. Redacted Transcript Deadline set for 3/16/2020. Release of Transcript Restriction set for 5/12/2020..(McGuirk, Kelly) (Entered: 02/12/2020) |
| 02/12/2020 | [67](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a HEARING proceeding held on 1/8/2020 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 02/12/2020) |

| 06/26/2020 | 68 | OPINION AND ORDER re 14 MOTION for Sanctions: In this case and others, Mr. Liebowitz and his firm have fallen far short of that standard and failed to "conduct themselves in a manner compatible with the role of courts in the administration of justice." Id. at 645. Accordingly, and for the reasons stated above, the Court concludes that sanctions must be imposed on Mr. Liebowitz and his firm, as follows... In addition, as noted above, the Court will send a copy of this Opinion and Order to the Chair of the Court's Grievance Committee to take whatever action the Committee deems appropriate. The Clerk of Court is directed to terminate ECF No. 14.(See OPINION) (Signed by Judge Jesse M. Furman on 6/26/2020) (ab) (Entered: 06/26/2020) |
|---|---|---|
| 07/06/2020 | | CASHIERS OFFICE REMARK on 68 Memorandum & Opinion in the amount of $103,517.49, paid on 7/6/2020, Receipt Number 465401261556. (qs) (Entered: 07/06/2020) |
| 07/06/2020 | 69 | CERTIFICATE OF SERVICE. Document filed by Arthur Usherson..(Liebowitz, Richard) (Entered: 07/06/2020) |
| 07/06/2020 | 70 | NOTICE OF APPEARANCE by Robert James Anello on behalf of Richard Liebowitz, Liebowitz Law Firm, PLLC..(Anello, Robert) (Entered: 07/06/2020) |
| 07/06/2020 | 71 | NOTICE OF APPEARANCE by Brian A. Jacobs on behalf of Richard Liebowitz, Liebowitz Law Firm, PLLC..(Jacobs, Brian) (Entered: 07/06/2020) |
| 07/17/2020 | 72 | NOTICE OF APPEARANCE by Kevin Grossinger on behalf of Richard Liebowitz, Liebowitz Law Firm, PLLC..(Grossinger, Kevin) (Entered: 07/17/2020) |
| 07/17/2020 | 73 | NOTICE OF APPEARANCE by Andrew Dennis Dillon on behalf of Richard Liebowitz, Liebowitz Law Firm, PLLC..(Dillon, Andrew) (Entered: 07/17/2020) |
| 07/20/2020 | 74 | NOTICE OF APPEAL from 68 Memorandum & Opinion,,,. Document filed by Richard Liebowitz, Liebowitz Law Firm, PLLC. Filing fee $ 505.00, receipt number ANYSDC-20759359. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Anello, Robert) (Entered: 07/20/2020) |
| 07/20/2020 | 75 | LETTER addressed to Ruby Krajick from Robert J. Anello re: Enclosing copy of a Chase cashier's check (with LLF as remitter) in the amount of $103,517.49. Document filed by Richard Liebowitz, Liebowitz Law Firm, PLLC.(yv) (Entered: 07/20/2020) |
| 07/20/2020 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 74 Notice of Appeal. (tp) (Entered: 07/20/2020) |
| 07/20/2020 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 74 Notice of Appeal, filed by Liebowitz Law Firm, PLLC, Richard Liebowitz were transmitted to the U.S. Court of Appeals. (tp) (Entered: 07/20/2020) |
| 07/20/2020 | 76 | PROPOSED ORDER TO SHOW CAUSE WITHOUT EMERGENCY RELIEF. Document filed by Richard Liebowitz, Liebowitz Law Firm, PLLC. Related Document Number: 68 ..(Anello, Robert) **Proposed Order to Show Cause to be reviewed by Clerk's Office staff.** (Entered: 07/20/2020) |
| 07/20/2020 | 77 | DECLARATION of Brian A. Jacobs in Support re: 76 Proposed Order to Show Cause Without Emergency Relief,. Document filed by Richard Liebowitz, Liebowitz Law Firm, PLLC..(Jacobs, Brian) (Entered: 07/20/2020) |
| 07/20/2020 | 78 | MEMORANDUM OF LAW in Support re: 76 Proposed Order to Show Cause Without Emergency Relief, *re: Motion for Stay Pending Appeal*. Document filed by Richard Liebowitz, Liebowitz Law Firm, PLLC..(Anello, Robert) (Entered: 07/20/2020) |
| 07/20/2020 | 79 | DECLARATION of Richard Liebowitz in Support re: 76 Proposed Order to Show Cause |

| | | Without Emergency Relief,. Document filed by Richard Liebowitz, Liebowitz Law Firm, PLLC..(Anello, Robert) (Entered: 07/20/2020) |
|---|---|---|
| 07/20/2020 | 80 | DECLARATION of Bruce Cotler in Support re: 76 Proposed Order to Show Cause Without Emergency Relief,. Document filed by Richard Liebowitz, Liebowitz Law Firm, PLLC..(Anello, Robert) (Entered: 07/20/2020) |
| 07/21/2020 | | ***NOTICE TO COURT REGARDING PROPOSED ORDER TO SHOW CAUSE WITHOUT EMERGENCY RELIEF. Document No. 76 Proposed Order to Show Cause Without Emergency Relief was reviewed and approved as to form. (km) (Entered: 07/21/2020) |
| 07/22/2020 | 81 | OPINION AND ORDER: In sum, the Movants' eleventh-hour request for a stay of the Court's sanctions pending appeal is denied and the Courts sanctions remain in full force and effect, with the following modification: In any case in which the Movants have a good-faith belief that waiting for deposit copies might cause their client's claim to be barred by the statute of limitations, they may file, in lieu of the deposit copies, an affidavit (1) informing the court of such good-faith belief; (2) confirming that they have applied for, and are awaiting, deposit copies of the work(s) at issue; and (3) representing that they will promptly file such copies promptly upon their receipt. Nor will the Court grant the Movants' alternative request for an "administrative" stay pending the Circuits decision on whether to grant a stay pending appeal. Mem. 24-25. Granting an administrative stay would obviously ease the burden on the Circuit in the event that it is called upon to decide if a longer stay is warranted. In the Courts view, however, that virtue is outweighed by the vice of rewarding an appellant for dilatory conduct. Deadlines matter. And having given Mr. Liebowitz and his firm sufficient time to either comply or seek a stay, the Court should not be forced to alter its deadline merely because they waited until the last minute to do the latter. Instead, in the event of an appeal from this Order, the Court will leave it to Mr. Liebowitz and his firm to explain to the Circuit why they put that court in the position of deciding whether to grant a stay with only a few days remaining on the clock. (Signed by Judge Jesse M. Furman on 7/22/2020) (ab) (Entered: 07/22/2020) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/22/2020 21:22:34 | | |
| **PACER Login:** | kgrossinger | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-cv-06368-JMF |
| **Billable Pages:** | 12 | **Cost:** | 1.20 |

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                             :

ARTHUR USHERSON,                        :

                                          :

                   Plaintiff,         :            19-CV-6368 (JMF)

                                          :

        -v-                        :        OPINION AND ORDER

                                          :

BANDSHELL ARTIST MANAGEMENT,     :

                                          :

                   Defendant.     :

                                          :

-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Richard Liebowitz, who passed the bar in 2015, started filing copyright cases in this

District in 2017. Since that time, he has filed more cases in this District than any other lawyer: at

last count, about 1,280; he has filed approximately the same number in other districts. In that

same period, he has earned another dubious distinction: He has become one of the most

frequently sanctioned lawyers, if not *the* most frequently sanctioned lawyer, in the District.

Judges in this District and elsewhere have spent untold hours addressing Mr. Liebowitz's

misconduct, which includes repeated violations of court orders and outright dishonesty,

sometimes under oath. He has been called "a copyright troll," *McDermott v. Monday Monday,*

*LLC*, No. 17-CV-9230 (DLC), 2018 U.S. Dist. LEXIS 184049, at *9-10 (S.D.N.Y. Oct. 26,

2018); "a clear and present danger to the fair and efficient administration of justice," *Mondragon*

*v. Nosrak LLC*, No. 19-CV-1437 (CMA) (NRN), 2020 WL 2395641, at *1, *13 (D. Colo. May

11, 2020); a "legal lamprey[]," *Ward v. Consequence Holdings, Inc.*, No. 18-CV-1734 (NJR),

2020 WL 2219070, at *4 (S.D. Ill. May 7, 2020); and an "example of the worst kind of

lawyering," *id.* at *3.  In scores of cases, he has been repeatedly chastised, warned, ordered to complete ethics courses, fined, and even referred to the Grievance Committee.  And but for his penchant for voluntarily dismissing cases upon getting into hot water, the list of cases detailing his misconduct — set forth in an Appendix here — would undoubtedly be longer.

One might think that a lawyer with this record would tread carefully, particularly before a judge who had recently sanctioned him.  *See Rice v. NBCUniversal Media, LLC*, No. 19-CV-447 (JMF), 2019 WL 3000808, at *4 (S.D.N.Y. July 10, 2019).  But — as this case makes clear — not Mr. Liebowitz.  In November of last year, Mr. Liebowitz appeared, in the company of a criminal defense lawyer, before another judge on this Court after being held in contempt for repeatedly lying, including under oath, about the date his own grandfather had died to justify his failure to attend a court conference.  *See Berger v. Imagina Consulting, Inc.*, No. 18-CV-8956 (CS), ECF No. 62 (S.D.N.Y. Nov. 13, 2019) ("*Berger* Tr.").  The very next day, he appeared before the undersigned and — despite an explicit warning to be "very, very, very careful about the representations" he made in court — lied about his compliance with a court Order that had required an in-person mediation.  *See* ECF No. 50 ("Initial Conf. Tr."), at 7.  Making matters worse, Mr. Liebowitz then repeated that lie, over and over, and ultimately under oath during an evidentiary hearing.  On top of that, he violated at least six court Orders.  And to cap it off, defense counsel discovered only after incurring the expenses of litigating the case that the Complaint Mr. Liebowitz prepared and filed contained a false allegation — namely, that the photograph at issue in this case had previously been registered with the Copyright Office — that would have required dismissal of the lawsuit at its inception.

In the view of the undersigned, this misconduct, when viewed in light of Mr. Liebowitz's

deplorable record, confirms a conclusion that others have reached: that "steps should be taken promptly . . . to suspend his ability to file new cases," at least until "he has demonstrated" that he can comply "with court rules and rules of professional conduct." *Mondragon*, 2020 WL 2395641, at *1. But that is a question for another body — the Grievance Committee of this Court — and for another day. The question for today is what sanctions, if any, this Court should impose on Mr. Liebowitz for his misconduct in this case. For the reasons stated below, the Court concludes that sanctions are amply justified, indeed all but required, and orders a mix of substantial monetary and non-monetary sanctions against Mr. Liebowitz and his firm. The Court also refers Mr. Liebowitz to the Court's Grievance Committee to evaluate whether he should be allowed to continue practicing law in this District.

## BACKGROUND

### A. Mr. Liebowitz's Initial Violations of the Court's Orders

Mr. Liebowitz, as counsel for Arthur Usherson, filed the Complaint in this case on July 10, 2019, alleging that Bandshell Artist Management ("Bandshell") had infringed on Mr. Usherson's copyright for a photograph of musician Leon Redbone (the "Photograph"). ECF No. 1, at ¶ 1. Paragraph 9 of the Complaint alleges that, prior to suit being filed, "[t]he Photograph was registered with the United States Copyright Office and was given Copyright Registration Number VAu 1-080-046" (the "046 Registration"). *Id.* ¶ 9.

Shortly after the Complaint was filed, the Court issued two Orders: one scheduling an initial pretrial conference for October 10, 2019, and one referring the case to the Court-annexed Mediation Program for early mediation. ECF Nos. 5-6. More specifically, the mediation Order required the parties to conduct a mediation in accordance with the Mediation Program's

procedures "at least two weeks prior to the Initial Pretrial Conference" — that is, by September 26, 2019. ECF No. 6. In addition, to "facilitate prompt mediation," Plaintiff was ordered to file proof of service of the summons and Complaint "no more than three days after service has been effected," and to produce limited discovery relating to the licensing of the Photograph "by the earlier of 14 days after service of process or three business days in advance of any mediation session." *Id.*

Mr. Liebowitz failed to comply with these mandates. First, although the summons and Complaint were served on Bandshell on September 5, 2019, Mr. Liebowitz did not file proof of that service until September 21, 2019. ECF No. 7. Second, he failed to produce the required discovery by September 19, 2019, fourteen days after service was made. When defense counsel followed up about the missing discovery, Mr. Liebowitz responded on September 20, 2019: "My client is still looking but as of now doesn't look like any licensing for this photo." ECF No. 16, at 12. Finally, Mr. Liebowitz failed to participate in mediation by September 26, 2019, two weeks before the initial pretrial conference originally scheduled for October 10, 2019. Instead, more than a week *after* the deadline passed, Mr. Liebowitz filed a letter in which he suggested that the mediation had not taken place because of a failure on the part of the Mediation Office to assign a mediator. *See* ECF No. 12. In the same letter, Mr. Liebowitz requested leave to hold a telephonic mediation on October 8, 2019, or an extension of the mediation deadline and adjournment of the initial pretrial conference. *Id.*

In an Order dated October 7, 2019, the Court admonished Mr. Liebowitz for unfairly trying to place blame on the Mediation Office for his own failure to meet the mediation deadline. *See* ECF No. 13. The Court nevertheless concluded that "early mediation in the normal course

4

(i.e., in person) makes sense." *Id.*  Accordingly, the Court adjourned the initial pretrial

conference to November 14, 2019, and ordered, in no uncertain terms, that "[t]he parties shall

conduct the in-person mediation no later than October 31, 2019." *Id.*  In an email exchange later

that day, Bandshell's counsel, Brad Newberg, asked Mr. Liebowitz "if any of October 11, 16, 28

or 31 work for the [*sic*] both of you and Mr. Usherson." ECF No. 16, at 27.  Mr. Liebowitz

responded that "October 31st at 12pm works." *Id.*  The mediator (the "Mediator") — a member

of this Court's mediation panel, but recruited by Mr. Liebowitz himself to mediate this particular

case — approved the date and scheduled the mediation.  ECF No. 39, at 2.[1]

On October 31, 2019, however, neither Mr. Liebowitz nor Mr. Usherson showed up at

the mediation.  Instead, Mr. Liebowitz sent two associates — James Freeman and Rebecca

Liebowitz (Mr. Liebowitz's sister).  ECF No. 23, at 2.  Neither had entered an appearance in this

case.  In fact, Mr. Liebowitz did not even tell Mr. Freeman about "the existence of this matter"

until "about 8:00 p.m. on October 30, 2019," the night before the mediation.  *Id.* at 1.  Ms.

Liebowitz, moreover, was a "newly admitted" lawyer who was attending only "to 'shadow' Mr.

Freeman and learn from the process."  ECF No. 24, at 1.  Mr. Freeman and Ms. Liebowitz spoke

briefly with Mr. Newberg and Bandshell's principal, who did attend in person, but no settlement

was reached.  The Mediator later attributed the failure to reach an agreement in part to "the lack

of personal appearance[s]" by Mr. Liebowitz and Mr. Usherson.  ECF No. 39, at 2.

**B.  Bandshell's Motion for Sanctions**

On November 6, 2019, approximately one week before the initial pretrial conference,

---

[1]     It is unusual — and arguably improper — for counsel on one side to recruit a mediator; in
the normal course, to help ensure the mediator's neutrality, the Mediation Office assigns the
mediator.  But Bandshell consented to Mr. Liebowitz's selection of the Mediator in this case, and
the Mediation Office raised no objection to the selection.

Bandshell moved for sanctions against Mr. Liebowitz and Mr. Usherson.  ECF No. 14.

Bandshell argued that Mr. Liebowitz and Mr. Usherson had violated the Court's Orders

regarding the mediation, pre-mediation discovery, and proof of service.  ECF No. 15.  Bandshell

sought monetary sanctions "jointly against Plaintiff and its counsel," including costs and

attorney's fees, as well as dismissal of the case.  *Id.* at 13.  In response, Mr. Liebowitz asserted

— repeatedly — that he and Mr. Usherson had received approval in advance from the Mediator

not to appear at the mediation in person.  Mr. Liebowitz made this claim first in a joint letter

filed shortly before the initial pretrial conference.  *See* ECF No. 18-1.  In that letter, Mr.

Liebowitz claimed that the Mediator had "indicated that Plaintiff was permitted to appear

telephonically under Rule 9F of the mediation program."  *Id.* at 2.  Notably, in the same section

of the letter, Bandshell responded that "virtually everything in Plaintiff's statement is *false*, and

Defendant's counsel has warned Plaintiff against filing a false statement regarding the scheduled

mediation with the Court."  *Id.*

Mr. Liebowitz doubled down in his next submission: his initial "response" to the

sanctions motion, which took the form of a three-page letter (in violation of Local Rule 7.1,

which requires that, with limited exceptions inapplicable here, opposition to a motion must be in

the form of a memorandum of law).  *See* ECF No. 19.  To the extent relevant here, Mr.

Liebowitz asserted in that letter that "[n]othing in the Court order or mediation rules states that

lead counsel needs to attend the mediation."  *Id.* at 1.  Rule 9(c) of the Mediation Program's

Procedures, however, provides explicitly that "[e]ach represented party must be accompanied at

mediation by the lawyer who will be primarily responsible for handling the trial of the matter."

Rule 9(c), Procedures of the S.D.N.Y. Mediation Program (Dec. 26, 2018) ("Mediation Rules"),

*available at* https://www.nysd.uscourts.gov/sites/default/files/2019-12/Mediation%20Program%20Procedures.final_.2018.pdf.  More significantly for present purposes, Mr. Liebowitz represented that Mr. Usherson had "obtained permission from the assigned mediator . . . to appear at the scheduled mediation by telephone provided that counsel was present in person." ECF No. 19, at 2 (citing Rule 9(f) of the Mediation Rules, which allows "a party" who resides "more than 100 miles from the Courthouse" to participate in a mediation by telephone with the advance approval of the mediator).  He further claimed that he had "told [the Mediator] that an associate of Liebowitz Law Firm with knowledge of the facts of the case would appear in-person, and [the Mediator] consented." *Id.*

## C.  The Initial Pretrial Conference

On November 14, 2019, the Court held the initial pretrial conference.  Mr. Liebowitz appeared on behalf of Mr. Usherson as "the attorney who will serve as principal trial counsel." *See* ECF No. 5, at 1.  Presumably in light of the pending sanctions motion, Mr. Freeman appeared, but only on behalf of Mr. Liebowitz and the Liebowitz Law Firm, PLLC.  *See* Minute Entry (Nov. 14, 2019); *see also* ECF No. 66, Transcript of Jan. 8, 2020 Hearing ("Hearing Tr."), at 18.  Notably, the conference took place one day after Mr. Liebowitz had been dressed down by the Honorable Cathy Seibel for falsely — and repeatedly — representing to her, in some cases under oath, that he had failed to appear at a conference due to the death of his grandfather. Those lies and Mr. Liebowitz's repeated refusal to provide documentation regarding his grandfather's death in violation of court orders had led Judge Seibel to hold Mr. Liebowitz in contempt; to fine him (initially $100 per day and later $500 per day of noncompliance); and to order him to appear on pain of "arrest by the United States Marshals Service."  *Berger v.*

*Imagina Consulting, Inc.*, No. 18-CV-8956 (CS), 2019 WL 6695047, at *3 (S.D.N.Y. Nov. 1,
2019).  At the November 13th conference (to which Mr. Liebowitz was accompanied by a
criminal defense lawyer), Judge Seibel chastised Mr. Liebowitz in no uncertain terms for his
"multiple lies."  *Berger* Tr. 19-20, 25.  Even then, he sought to minimize his misconduct, calling
it an "honest mistake" — for which Judge Seibel took him to task.  *Id.* at 31-32 ("[T]his clearly
was not an honest mistake; and even if it were at first, it very quickly became . . . a concerted
campaign of deception.").  Judge Seibel advised that she "question[ed] Mr. Liebowitz's fitness to
practice," not just because of his initial "dishonesty" about the date of his grandfather's death,
but because of his subsequent "failure to own up to the dishonesty and the doubling and
quintupling and octupling down on the dishonesty."  *Id.* at 14.  She rejected Mr. Liebowitz's
counsel's request to vacate her contempt orders and referred the matter to the Court's Grievance
Committee.  *Id.* at 27.

   The very next day, appearing at the initial pretrial conference in this case, Mr. Liebowitz
claimed that he had sought permission from the Mediator for Mr. Usherson, who lives in
Georgia, to appear telephonically at the October 31, 2019 mediation and that the Mediator had
"said yes."  Initial Conf. Tr. 6-7.  Aware of the proceedings before Judge Seibel, the Court then
stopped Mr. Liebowitz and warned him: "I want to caution you that you're already in a lot of hot
water in this Court, and I think you know that.  In that regard, I would be very, very, very careful
about the representations you make to me.  If you prefer to let Mr. Freeman do the speaking, that
is one thing, although they are still representations on your behalf."  *Id.* at 7.  The Court then
asked when Mr. Liebowitz had advised the Mediator that Mr. Usherson was not going to appear
in person at the mediation, and the following colloquy occurred:

| Mr. Liebowitz: | I don't know the exact date, but it was before the mediation, and he said yes. |
| The Court: | [By] what means did you do that? |
| Mr. Liebowitz: | It was telephone. |
| The Court: | And you personally advised him? |
| Mr. Liebowitz: | I personally. |
| The Court: | And he said that was okay? |
| Mr. Liebowitz: | He said that was okay. |

*Id.* at 7. The Court also heard from Mr. Freeman, who stated that he had "learned about the existence of the case at approximately 8:00 o'clock pm on October 30th, so it was the night before the mediation." *Id.* at 9. Mr. Freeman represented that he "had no knowledge one way or the other as to what clearances were made in terms of telephonic appearances." *Id.*

Separate and apart from the issues surrounding the mediation, Mr. Newberg raised a question at the initial pretrial conference about whether the Photograph had actually been registered before the lawsuit was filed, as Paragraph 9 of the Complaint alleged. That was a matter of significance because Section 411(a) of the Copyright Act provides (with certain exceptions not relevant here) that "no civil action" for copyright infringement "shall be instituted until . . . registration of the copyright claim has been made." 17 U.S.C. § 411(a). In light of this requirement and a 2019 Supreme Court decision, this Court had held a few months before this case was filed that a suit filed pre-registration is fatally flawed and cannot be cured by "post-registration amendment" of the complaint, and thus must be dismissed. *See Malibu Media, LLC v. Doe*, No. 18-CV-10956 (JMF), 2019 WL 1454317, at *1 (S.D.N.Y. Apr. 2, 2019). Mr. Newberg advised that, the day before the initial conference, he had "discovered that after this

9

case was filed, Mr. Usherson filed a copyright registration, which . . . seems to be on these

photographs, so now it is unclear whether the registration in the complaint actually does cover

the photograph or if it is the new copyright registration."  Initial Conf. Tr. 17.  Recognizing that

the case would have to be dismissed if the Photograph had not been registered before the

Complaint was filed, Mr. Newberg requested "discovery purely on those aspects early."  *Id.*  Mr.

Liebowitz responded: "I don't know what defense counsel means about other registrations or

other photographs.  I will have to see what my office did, but this is the correct registration."  *Id.*

at 17-18.  Mr. Liebowitz argued against limited discovery or early summary judgment on the

registration issue, stating that "the appropriate thing to do at this stage is to just set discovery, set

the dates, and let the parties engage and hopefully during that process the parties could

eventually get to a settlement number."  *Id.* at 18, 22.

**D.  Mr. Liebowitz Repeats His Mediation Claim — Again and Again**

Following the initial pretrial conference, the Court ordered Mr. Liebowitz to file a formal

opposition to the motion for sanctions and directed both sides to address "whether the court

should hold an evidentiary hearing and, if so, what witnesses should be called and how it should

be conducted."  ECF No. 20, at 6.  Mr. Liebowitz filed a formal opposition, but — disregarding

the Court's Order — he failed to address the evidentiary hearing.  *See* ECF No. 21.  Instead, he

doubled down again (quadrupled down, perhaps) on his claim that Mr. Usherson had "obtained

permission from the assigned mediator . . . to appear at the scheduled mediation by telephone

provided that counsel was present in person" and that the Mediator had "consented to" Mr.

Liebowitz's associate appearing instead of Mr. Liebowitz.  *Id.* at 2-3.  In support of his

opposition, Mr. Liebowitz submitted a declaration, in which he stated "under penalty of perjury"

10

that "I sought and received approval from . . . the assigned mediator for Mr. Usherson to attend

the mediation via telephone and for my associate James Freeman to appear who had full

knowledge of the case.  I obtained [the Mediator's] consent via telephone."  ECF No. 22, at 3.

Mr. Freeman and Ms. Liebowitz also submitted declarations in connection with the

opposition.  ECF Nos. 23-24.  Mr. Freeman confirmed that he did not learn of the "existence of

this matter" until "about 8:00 p.m. on October 30, 2019."  ECF No. 23, at 1.  Mr. Freeman

further explained that Mr. Liebowitz had "notified [him] of the time/place of the mediation, sent

[him] copies of the complaint and the most recent settlement agreement draft, informed [him] of

the price agreed to and the outstanding non-monetary terms concerning right of publicity," and

"indicated that the case was likely to settle that evening but that if it didn't, [he] should be

prepared to attend the mediation in person."  *Id.* at 1-2.  Notably, Mr. Freeman did not say that

Mr. Liebowitz had ever mentioned getting approval from the Mediator for Mr. Liebowitz and

Mr. Usherson not to be present.  Nor did Ms. Liebowitz in her declaration.  *See* ECF No. 24.

In connection with Bandshell's reply, Mr. Newberg submitted another declaration.  ECF

Nos. 35-36.  Mr. Newberg took issue with Mr. Liebowitz's claims that he had secured advance

approval from the Mediator for Mr. Usherson not to appear in person at the mediation and Mr.

Freeman to attend on Mr. Liebowitz's behalf, citing emails showing that, "even as late as

October 30" — the night before the mediation — the Mediator and Mr. Newberg "were under

the impression that Mr. Liebowitz (as lead and only admitted counsel) and Mr. Usherson would

be at the mediation in person."  ECF No. 36, ¶ 9.  Mr. Newberg noted that, because he was

"concerned at what appeared to be false statements being made to the Court by Mr. Liebowitz,"

he called the Mediator on November 19, 2019.  *Id.* ¶ 21.  According to Mr. Newberg, the

Mediator said that there had been "other mediations where he allowed Mr. Liebowitz's client to appear by phone, but he stated clearly and pointedly . . . that **this was not one of them**." *Id.* ¶ 23 (emphasis in original). The Mediator allegedly also said that, on "the night of October 30," Mr. Liebowitz had "called and *informed* him (without asking for approval) that Mr. Liebowitz was out of town and that Mr. Liebowitz's associate would be at the mediation instead." *Id.* ¶ 24. In that call, "no mention was made of Mr. Usherson at all." *Id.* ¶ 25. The Mediator "only found out that Mr. Usherson would not be at the mediation" at the mediation itself. *Id.*

Prompted by these submissions, the Court issued a Memorandum Opinion and Order directing the Mediator to file a declaration "detailing any and all communications with Liebowitz regarding Liebowitz's personal attendance at the mediation and Plaintiff's participation by telephone in the mediation." *Usherson v. Bandshell Artist Mgmt.*, No. 19-CV-6368 (JMF), 2019 WL 6702069, at *3 (S.D.N.Y. Dec. 9, 2019). More specifically, the Court instructed the Mediator to "specify whether (and if so, when and how) he gave Liebowitz permission (1) not to appear personally at the mediation (and to send an associate instead); and (2) for Plaintiff not to appear at the mediation in person and to appear by telephone instead." *Id.* The next day, the Mediator submitted a declaration, which stated that, on October 30, 2019, he had "talked to Mr. Liebowitz and was informed that the mediation was on. He did not inform me that he would not personally appear but through an associate. But I have mediated a few prior mediations involving Mr. Liebowitz where on at least one occasion that office appeared by an associate without incident." ECF No. 39, at 2. The Mediator further stated: "At no time was I informed that the plaintiff would not personally appear but would be available by telephone. I should say that in a few prior mediations his client appeared by telephone without incident. On this

12

occasion no discussion was had by me as to client appearance." *Id.*

On December 16, 2019, Mr. Liebowitz filed a letter stating that he "contests certain statements proffered by the Mediator in his declaration." ECF No. 41, at 1. Once again, Mr. Liebowitz asserted that he had "notified the Mediator that Mr. Usherson would be appearing telephonically and that such request was granted." *Id.* at 3. But the December 16th letter also proffered a new line of defense: that the Mediator in this case had a "custom and practice" of granting Mr. Liebowitz's clients permission to appear telephonically at mediations. *Id.* at 1-2. Mr. Liebowitz cited five prior cases in which the Mediator had allegedly granted his clients permission to appear telephonically; in one of these five cases, he maintained, the Mediator also granted Mr. Liebowitz permission to send an associate on his behalf. *Id.* at 2. Mr. Liebowitz insisted: "This . . . corroborates Mr. Liebowitz's testimony and establishes a 'pattern or practice' of conduct showing that Mr. Liebowitz harbored a good faith belief that the requisite permissions were granted by the Mediator in this case." *Id.* at 2.

**E.  The Voluntary Dismissal and the Evidentiary Hearing**

In light of the factual disputes surrounding whether and when Mr. Liebowitz had obtained permission from the Mediator to send an associate in his place and to have Mr. Usherson participate by telephone, the Court determined that an evidentiary hearing was necessary. *See* ECF No. 42. On December 17, 2019, the Court issued an Order scheduling the hearing and directing Mr. Liebowitz, Mr. Newberg, and the Mediator to appear for testimony. *Id.* Just two days later, Mr. Liebowitz filed a stipulation of voluntary dismissal signed by both parties, providing that the case "should be dismissed with prejudice with each side to bear its own costs and attorney's fees." ECF No. 45. In a letter filed the same day, Mr. Newberg noted

13

that Bandshell had stipulated to Mr. Usherson's "withdr[awal of] the . . . case with prejudice,"

but pointedly noted that he and his client "would not have so stipulated" had his firm "not been

representing [Bandshell] pro bono."  ECF No. 46.  The Court so-ordered the voluntary dismissal

but retained jurisdiction "to adjudicate Defendant's pending motion for sanctions and any other

sanctions-related matters" and affirmed that the hearing would proceed as planned.  ECF Nos.

47-48.  The Court noted that dismissal did not moot the motion for sanctions — citing as support

for that proposition a prior opinion in which the Court had imposed sanctions on Mr. Liebowitz

despite a voluntary dismissal.  ECF No. 47 (citing *Rice*, 2019 WL 3000808, at *4).

On January 8, 2020, the Court held the evidentiary hearing, with Mr. Liebowitz, Mr.

Newberg, and the Mediator appearing as witnesses.  The Court treated the witnesses' prior

declarations as their direct testimony.  This meant that Mr. Freeman, appearing on Mr.

Liebowitz's behalf, had to make an application to expand the record to include Mr. Liebowitz's

testimony on the "custom and practice" argument raised for the first time in the December 16th

letter, as Mr. Liebowitz's declaration (submitted on November 18, 2019) made no mention of it

— underscoring the argument's belated nature.  Hearing Tr. 4-6.  Mr. Freeman argued that if the

Mediator did grant Mr. Liebowitz permission for his clients to appear telephonically on five prior

occasions, "it could well be that the mediator simply forgot that he did so in this case . . . .

Perhaps it didn't register in his consciousness."  *Id.* at 4-5.  The Court granted the application,

and Mr. Liebowitz recounted that, in five prior cases, the Mediator had orally granted him

permission to have his clients appear telephonically at the mediation; in one of those cases, he

claimed, he "obtain[ed] permission for [his] associate to appear in [his] stead" as well.  Hearing

Tr. 7-11.  On cross-examination, Mr. Liebowitz repeatedly adverted to the alleged "custom and

14

practice" of the Mediator to allow parties to appear telephonically.  *See id.* at 21, 31, 45, 46, 73,

75.  But Mr. Liebowitz was also compelled to admit that, in one of those very cases, he himself

had objected to the other party appearing telephonically on the ground that the rules of the

Mediation Office required parties to appear in person.  *Id.* at 11-16; *see Sadowski v. Seeking

Alpha Inc.*, 18-CV-9193 (VM), ECF No. 21 (S.D.N.Y. May 1, 2019) (describing an email from

Mr. Liebowitz to opposing counsel stating that the "rules of the mediation office requires [*sic*]

parties to attend in person" (internal quotation marks omitted)).

On the subject of his communications with the Mediator in this case, Mr. Liebowitz

claimed that, at about 7:30 to 8:00 p.m. on October 30, 2019, the night before the mediation, he

had called the Mediator from Los Angeles, California, and asked for permission for Mr.

Usherson to appear by telephone from Georgia and for Mr. Freeman to appear as counsel.

Hearing Tr. 21-22, 27, 45.  Mr. Liebowitz testified that the Mediator had approved both requests.

*Id.* at 21-22.  Mr. Liebowitz acknowledged that he had made no record of the call and, indeed,

that there was "[n]othing in writing" at all reflecting that the call had occurred.  *Id.* at 42.  When

asked how he suddenly remembered that the telephone call had occurred on October 30th, when

he could not remember the relevant date when asked at the November 14, 2019 initial pretrial

conference (only two weeks after the events in question), Mr. Liebowitz responded that certain

emails had jogged his memory — namely, emails that had been attached to Mr. Newberg's initial

declaration in support of the sanctions motion.  *Id.* at 47-50.  But Mr. Newberg's initial

declaration had been filed before the November 14th conference, and Mr. Liebowitz had actually

responded to it in writing.  (When pressed on that point, Mr. Liebowitz testified: "I often forget

things."  *Id.* at 50-52.)

More troubling, Mr. Liebowitz's account is not supported by the email trail.  At 6:34 p.m.

on October 30, 2019, Mr. Newberg emailed a proposed settlement agreement to the Mediator,

and stated that unless Mr. Usherson "sign[ed] the agreement" that night, "we will see Mr.

Liebowitz and Mr. Usherson tomorrow . . . at the mediation."  ECF No. 36 at 24.  At 8:15 p.m.,

the Mediator replied: "Talked to Richard and he has been tied up.  He will review tonight and get

back to us in the morning.  Hopefully we can settle this before need [*sic*] to go to in person

mediation."  ECF No. 16, at 32.  Mr. Newberg responded: "I'm headed to the train station well

before 6:00 am.  And to be candid, I would have assumed Mr[.] Usherson either flew to NY

tonight or is likewise on a very early plane."  *Id.*  The Mediator said simply, "I understand."  *Id.*

(email sent at 10:03 p.m.).  In addition, at 4:12 a.m. on October 31, 2019, Mr. Liebowitz sent Mr.

Newberg an email stating: "Attached please find revisions to the agreement which can be

discussed at the mediation."  Hearing Tr. 67; *see* ECF No. 16, at 33.  Mr. Liebowitz did not

mention that he and Mr. Usherson did not plan to attend, let alone that they had the Mediator's

permission not to attend.  Hearing Tr. 67.  At no point, in fact, did Mr. Liebowitz notify opposing

counsel that he and Mr. Usherson would not be attending.

During Mr. Liebowitz's testimony at the hearing, the Court asked him what he would

have done had the Mediator denied his alleged requests on the night of October 30th.  Hearing

Tr. 28.  Mr. Liebowitz claimed that he and Mr. Usherson would have attended the mediation the

next day in person.  *Id.* at 28-32.  But on the night of October 30th, Mr. Liebowitz was in Los

Angeles hosting a "networking event" for photographers, and Mr. Usherson was at home in

Georgia.  *Id.* at 30.  Mr. Liebowitz never booked any flights or checked when the last flight to

New York from either location was.  *Id.* at 28, 32, 46, 63.  Nevertheless, he claimed that he had

been prepared to book flights and fly overnight.  *Id.*  When pressed about whether he had

communicated this alleged plan to Mr. Usherson, Mr. Liebowitz equivocated: "Well, if he — if

he — if he didn't have to appear in person, then — then I would have just called him that day

and know that he's always around."  *Id.* at 40-41.  It is clear, therefore, that Mr. Liebowitz did

not advise Mr. Usherson that he might need to jump on a plane at a moment's notice and appear

in New York.  It follows that Mr. Liebowitz had no way of knowing whether Mr. Usherson could

have complied if asked to do so.

Notably, Mr. Liebowitz's testimony was in tension, if not direct conflict, with the

representations of his own associate, Mr. Freeman.  For example, Mr. Liebowitz claimed that he

had told Mr. Freeman on October 30th that the Mediator had approved Mr. Liebowitz's requests.

Hearing Tr. 34-35, 38.  But at the initial pretrial conference, Mr. Freeman advised the Court that

he had not known what "clearances" were given.  Initial Conf. Tr. 9.  When confronted with this

discrepancy, Mr. Liebowitz responded: "[P]eople forget things."  Hearing Tr. 38.  Mr. Liebowitz

also claimed that he had spoken with Mr. Freeman about the case on "numerous occasions"

before October 30th.  *Id.* at 32.  But, as noted, Mr. Freeman repeatedly confirmed that he did not

even know about the "existence" of the case before October 30th — a representation that he had

reiterated in his sworn declaration, ECF No. 23, at 1, which Mr. Liebowitz himself had filed and

even cited in Mr. Usherson's opposition brief.  *See* ECF No. 21, at 4, 6.  (Despite that, Mr.

Liebowitz claimed that he had not read Mr. Freeman's declaration before filing the brief.

Hearing Tr. 42-44.)

Finally, to the extent relevant here, Mr. Liebowitz also took the position that he was

never required to attend the mediation, as it was Mr. Freeman who was "the lawyer who will be

primarily responsible for handling the trial of this matter."  Hearing Tr. 19; *see* Mediation Rule

9(c) (requiring that "[e]ach represented party must be accompanied at mediation by the lawyer

who will be primarily responsible for handling the trial of the matter").  But Mr. Liebowitz

acknowledged that Mr. Freeman had not even entered an appearance in this case and that he had

never advised the Mediator or Mr. Newberg that Mr. Freeman was principal trial counsel.

Hearing Tr. 17-18, 29.  Moreover, he was forced to admit that the Court's Order scheduling the

initial pretrial conference had required "principal trial counsel" to attend "all pretrial

conferences" and that he — not Mr. Freeman — had appeared on Mr. Usherson's behalf at the

initial pretrial conference.  Hearing Tr. 17-20.  Similarly, Mr. Liebowitz claimed that Mr.

Usherson was also never required to attend the mediation because, in Mr. Liebowitz's view, the

Court's Order requiring "in-person" mediation referred only to the attorneys, "[n]ot parties."  *Id.*

at 59-60.  When asked why, then, he had bothered to confirm that he and Mr. Usherson could be

in New York on October 31st, and later asked the Mediator to excuse his and Mr. Usherson's

attendance, Mr. Liebowitz responded that he "wanted to double — double — you know, just

cover myself."  *Id.* at 35-36, 62.

      Mr. Newberg and the Mediator then testified.  Mr. Newberg recalled the Mediator saying

at the mediation that he had been "notified" that Mr. Liebowitz would not be coming and would

be sending an associate instead.  Hearing Tr. 87.  He testified that he was not "100 percent

sure[]" whether the Mediator said "I did not grant permission."  Hearing Tr. 87.  But Mr.

Newberg did recall the Mediator saying that Mr. Usherson was "expected . . . to be there."  *Id.* at

85.  Finally, the Mediator testified that he could not recall whether Mr. Liebowitz had mentioned

that Mr. Freeman would be appearing instead of Mr. Liebowitz.  *Id.* at 99-100.  The Mediator

acknowledged that, at some point prior to the mediation, he had realized that Mr. Liebowitz was in Los Angeles and likely would not be attending the mediation in person. *Id.* at 97-98. The Mediator was clear, however, that he did not give permission for Mr. Usherson to appear by phone. *Id.* at 107-08. The Mediator spoke with Mr. Liebowitz several times on October 30, 2019, the last of which was right before the Mediator emailed Mr. Newberg at 8:15 p.m. *Id.* at 96, 102. The Mediator stated that, during these conversations, Mr. Liebowitz never even mentioned the possibility of Mr. Usherson's appearing by telephone. *Id.* at 100 ("Mr. Usherson[] . . . was just not part of the conversation."), 117. The first time the Mediator learned that Mr. Usherson would not be coming was "[w]hen the mediation started." *Id.* at 103, 105.

## F. Bandshell Discovers That the Photograph Was Registered After This Case Was Filed

At the close of the hearing, the Court heard brief oral argument. Among other things, Mr. Newberg clarified that, in light of stipulation of voluntary dismissal stating that "each side" was "to bear its own costs and attorney's fees," ECF No. 45, neither he nor Bandshell was seeking to recover attorney's fees or costs. Hearing Tr. 130. Mr. Newberg explained that if fees and costs were used as a measure of the sanctions to be imposed, Mr. Liebowitz should be directed to pay the Court or "some sort of legal aid *pro bono* fund." *Id.*

Mr. Newberg then returned to the question of whether the Photograph had been registered before Mr. Liebowitz filed the Complaint as required by Section 411(a) of the Copyright Act. Mr. Newberg revealed that he had just received the Copyright Office's deposit files for the 046 Registration and confirmed that the Photograph was *not* in fact registered under that number. Hearing Tr. 127. In response, Mr. Freeman admitted that it is the regular practice of the Liebowitz Law Firm to file copyright infringement cases without verifying that the works in

19

question are properly registered, because of the "additional expense." *Id.* at 139. Mr. Freeman

stated that "[t]he client will say to us, 'This photograph is on deposit with this registration.' And

we take them for their word." *Id.* at 141. Mr. Freeman stated that, in this case, Mr. Usherson

had "represented to us that he" had registered the Photograph. *Id.* at 140. Mr. Freeman further

stated that, prior to filing the Complaint, the firm had checked on the Copyright Office's website

"that Mr. Usherson was the copyright claimant in that particular case." *Id.*

In light of these revelations, the Court ordered both sides to file letter-briefs addressing

the issue and ordered Mr. Newberg to serve a copy of the deposit files on Plaintiff. ECF No. 52.

In his letter, Mr. Liebowitz admitted that "Paragraph 9 of the Complaint" was "inaccurate"

because the Photograph was not, in fact, registered "as part of the 046 Registration." ECF No.

57, at 1. Mr. Liebowitz disclosed that his firm had registered the Photograph under registration

number VAu 1-373-272 (the "272 Registration"), but not until August 22, 2019 — more than a

month after the Complaint in this case was filed. *Id.* Mr. Liebowitz attributed the false

statement in the Complaint to "clerical error," noted that "administrative mistakes or clerical

errors do happen in the copyright registration process," and insisted that, but for dismissal of the

case, Mr. Usherson could have cured the problem by amending the Complaint. *Id.* at 1, 3. In

Bandshell's response, Mr. Newberg reminded the Court that, at the initial pretrial conference,

Mr. Liebowitz had denied any knowledge of "other registrations or other photographs." ECF

No. 58, at 3. Mr. Newberg argued that Mr. Liebowitz's new explanation thus "defie[d] belief."

*Id.* at 1. Mr. Newberg also pointed out that Mr. Liebowitz had incorrectly asserted that "the

failure to obtain a registration prior to filing suit provides grounds to amend the complaint," ECF

No. 57, at 1, citing this Court's decision in *Malibu Media* holding that premature filing

necessitates dismissal.  ECF No. 58, at 2.

Upon review of these submissions, the Court ordered Mr. Liebowitz, Mr. Freeman, and Mr. Usherson himself to submit declarations addressing the registration of the Photograph and the alleged "administrative mistake."  ECF No. 59.  In his declaration, Mr. Freeman admitted that the Photograph was registered by the Liebowitz Law Firm after the Complaint was filed but claimed that he had "no personal knowledge of this administrative mistake until after the January 8, 2020 hearing."  ECF No. 64, at 6.  Mr. Freeman explained his representations at the close of the January 8th hearing by saying (not altogether convincingly) that he had been speaking based on his "*general* knowledge of [the Liebowitz Law Firm's] custom and practices."  *Id.* at 4-5 (emphasis in original).  Mr. Usherson averred that he had "identifi[ed] the 046 Registration" when he "authorized Mr. Liebowitz to file a copyright infringement action."  ECF No. 62, at 4.  But Mr. Usherson also stated that, before the Complaint was filed, he had provided to the Liebowitz Law Firm a CD-ROM containing all of the photographs in the 046 Registration.  *Id.* at 3.  The Photograph was not among them.  Then, "[s]ometime after" the lawsuit was filed, Mr. Usherson provided the firm with a CD-ROM containing thirty additional photographs, including the Photograph, which the firm registered in the 272 Registration.  *Id.* at 4.

Finally, Mr. Liebowitz admitted that he had conducted no investigation into whether the Photograph was properly registered before filing the Complaint, even though he and his firm "had the ability as of June 2019 to double-check whether the Photograph was part of [the] images that were included on a CD-Rom that Mr. Usherson had previously sent."  ECF No. 63, at 3.  Instead, Mr. Liebowitz relied solely on an entry in the firm's internal case-tracking system, which noted that the Photograph was "associated with the 046 Registration."  *Id.* at 2-3.  This

entry was made by "a member of [the firm's] administrative staff, Zachary Cuff." *Id.* Mr.
Liebowitz also stated that he had no role in filing the 272 Registration, which was performed by
his firm's "internal staff at the request of Mr. Cuff." *Id.* at 4. Mr. Liebowitz claimed that he did
not realize the Photograph was not properly registered — which he described as a "technical
pleading deficiency" — until "subsequent to the January 8, 2020 hearing." *Id.* at 4-5.

## LEGAL STANDARDS

"Sanctions may be authorized by any of a number of rules or statutory provisions, or may
be permissible on the basis of the court's inherent powers." *Sakon v. Andreo*, 119 F.3d 109, 113
(2d Cir. 1997). Three forms of sanctions are particularly relevant here. First, Rule 16(f) of the
Federal Rules of Civil Procedure authorizes sanctions for, among other things, the "fail[ure] to
obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C); *see, e.g.*, *Rice*, 2019 WL
3000808, at *3 (imposing sanctions on Mr. Liebowitz for violations of Rule 16(f)). "In deciding
whether a sanction is merited [under Rule 16(f)], the court need not find that the party acted in
bad faith." *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 53 (2d Cir. 2018) (internal
quotation marks omitted). Instead, the Court need only find that there is clear and convincing
evidence that counsel disregarded a clear and unambiguous scheduling or other pretrial order.
*See id.* ("The fact that a pretrial order was violated is sufficient to allow some sanction." (internal
quotation marks omitted)).

Second, "district courts have the inherent power" to sanction a party "for bad faith
conduct violating the court's orders even if procedural rules exist which sanction the same
conduct." *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010)
(internal quotation marks omitted); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991)

("[N]either is a federal court forbidden to sanction bad-faith conduct by means of the inherent

power simply because that conduct could also be sanctioned under the statute or the Rules.");

*Rice*, 2019 WL 3000808, at *3-4 (imposing sanctions on Mr. Liebowitz pursuant to the Court's

inherent authority).  A court may impose sanctions under its inherent authority if "it finds, by

clear and convincing evidence, that the party or attorney knowingly submitted a materially false

or misleading pleading, or knowingly failed to correct false statements, as part of a deliberate

and unconscionable scheme to interfere with the Court's ability to adjudicate the case fairly."

*Braun ex rel. Advanced Battery Techs., Inc. v. Zhiguo Fu*, No. 11-CV-4383 (CM) (DF), 2015

WL 4389893, at *17 (S.D.N.Y. July 10, 2015); *see also Wolters Kluwer Fin. Servs., Inc. v.*

*Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009) (conditioning sanctions based on a court's inherent

authority on "clear evidence that the conduct at issue is (1) entirely without color and (2)

motivated by improper purposes").  Under this "inherent power a court may assess attorney's

fees as a sanction."  *Chambers*, 501 U.S. at 45.  To warrant an award of attorney's fees, the

Court must find that the wrongdoer acted in bad faith or that he willfully disobeyed the Court's

orders.  *See id.* at 50.

Finally, under 28 U.S.C. § 1927, a district court may award attorney's fees against an

attorney who "multiplies the proceedings in any case unreasonably and vexatiously."  The

standard for sanctions under Section 1927 is effectively the same as the inherent-authority

standard: A court must find that "(1) the challenged claim was without a colorable basis and

(2) the claim was brought in bad faith."  *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 143

(2d Cir. 2012) (internal quotation marks omitted); *see United States v. Int'l Bhd. of Teamsters*,

948 F.2d 1338, 1345 (2d Cir. 1991) ("Bad faith is the touchstone of an award under [Section

23

1927].").  Indeed, as the Second Circuit has explained, "[i]n practice, the only meaningful

difference between an award made under § 1927 and one made pursuant to the court's inherent

power is . . . that awards under § 1927 are made only against attorneys . . . while an award made

under the court's inherent power may be made against an attorney, a party, or both."  *Enmon*,

675 F.3d at 144 (internal quotation marks omitted).  To impose sanctions under Section 1927, a

court must make factual findings with a "high degree of specificity," *Dow Chem. Pac. Ltd. v.

Rascator Mar. S.A.*, 782 F.2d 329, 344 (2d Cir. 1986) (internal quotation marks omitted), but it

may infer bad faith when counsel's "actions are so completely without merit as to require the

conclusion that they must have been undertaken for some improper purpose," *Schlaifer Nance &

Co. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999) (internal quotation marks omitted).[2]

Sanctions on any of these grounds may be imposed by the Court *sua sponte*.  *See* Fed. R.

Civ. P. 16(f)(1) (noting that the Court may impose sanctions "[o]n motion or on its own");

*Chambers*, 501 U.S. at 43-44 (inherent authority); *Gallop v. Cheney*, 642 F.3d 364, 370 (2d Cir.

2011) (Section 1927).  Thus, the Court may sanction misconduct that occurred during this case

without regard for what Bandshell argued in its sanctions motion and notwithstanding the fact

---

[2]     Rule 11 of the Federal Rules of Civil Procedure is arguably another source of authority
for sanctions in this case.  *See, e.g.*, *S.E.C. v. Smith*, 710 F.3d 87, 97 (2d Cir. 2013) ("Under Rule
11(c)(3) . . . sanctions are appropriate when an individual has made a false statement to the court
and has done so in bad faith.").  Under Rule 11, however, "[t]he court must not impose a
monetary sanction . . . on its own, unless it issued the show-cause order under Rule 11(c)(3)
before voluntary dismissal or settlement of the claims made by or against the party that is, or
whose attorneys are, to be sanctioned."  Fed. R. Civ. P. 11(c)(5)(B).  That limitation arguably
does not apply here, as the voluntary dismissal was filed and so-ordered after Bandshell had filed
a motion for sanctions and the Court had scheduled an evidentiary hearing to determine if Mr.
Liebowitz's representations to the Court were truthful.  But the Court need not decide whether
Rule 11 would be a valid basis for sanctions because Rule 11(c)(5)(B)'s limitation does not
apply to the Court's authority to impose sanctions under its inherent authority, Section 1927, or
Rule 16(f), *see Rice*, 2019 WL 3000808, at *5, and those bases suffice.

that the parties entered a stipulation of dismissal in which Bandshell agreed to bear its own fees

and costs.  *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395-96 (1990); *Steeger v. JMS*

*Cleaning Servs., LLC*, No. 17-CV-8013 (DLC), 2018 WL 1363497, at *3 (S.D.N.Y. Mar. 15,

2018).  Further, the Court may impose sanctions pursuant to Rule 16, its inherent authority, and

Section 1927 on the lawyer engaging in misconduct, the lawyer's firm, or both.  *See, e.g.*, *Rice*,

2019 WL 3000808, at *2; *see also Enmon*, 675 F.3d at 148 (affirming sanctions imposed

pursuant to Section 1927 and the district court's inherent authority on both an attorney and his

firm where the attorney "was a founding, named partner of a firm that . . . had ten or fifteen

lawyers during the relevant time period" and "[t]hroughout the litigation, [the attorney's] actions

were indistinguishable from those of [the firm]").  Pursuant to its inherent authority, the Court

may also impose sanctions on a party.  *See, e.g.*, *Enmon*, 675 F.3d at 144-45.  Ultimately, the

decision whether to impose sanctions is left to the Court's discretion.  *See, e.g.*, *Macolor v.*

*Libiran*, No. 14-CV-4555 (JMF), 2015 WL 337561, at *2 (S.D.N.Y. Jan. 23, 2015).

## DISCUSSION

Applying the foregoing standards here, the Court concludes that a range of substantial

monetary and non-monetary sanctions against Mr. Liebowitz and his firm, including referral of

Mr. Liebowitz to the Grievance Committee, are amply justified.  Sanctions are appropriate for

(1) Mr. Liebowitz's repeated violations of the Court's Orders; (2) Mr. Liebowitz's repeated lies

to the Court, including under oath, about whether the Mediator granted Mr. Usherson permission

to participate in the mediation by telephone; and (3) the false allegation in the Complaint

regarding registration of the Photograph and the failure to reasonably investigate the issue, both

prior to filing suit and when put on notice about the issue during the litigation.

The Court will address each basis for sanctions in turn.

## A. Mr. Liebowitz's Repeated Violations of the Court's Orders

The Court starts with the lowest hanging fruit: Mr. Liebowitz's repeated violations of the

Court's Orders. Indeed, it is essentially undisputed, and for good reason, that Mr. Liebowitz

violated at least six of the Court's Orders:

1. On July 15, 2019, the Court ordered Mr. Usherson to "file proof of service no more than three days after service has been effected." ECF No. 6. Bandshell was served on September 5, 2019, but Mr. Liebowitz did not file proof of service until September 21, 2019, thirteen days after the Court's deadline. ECF No. 7.

2. On July 15, 2019, the Court also ordered Mr. Usherson to produce limited discovery to Bandshell "by the earlier of 14 days after service of process or three business days in advance of any mediation session." ECF No. 6. Mr. Liebowitz failed to produce these materials (or to notify Mr. Newberg that none of the required discovery existed) by the September 19, 2019 deadline. Only when Mr. Newberg prodded him on September 20, 2019, did Mr. Liebowitz respond: "My client is still looking but as of now doesn't look like any licensing for this photo." ECF No. 16, at 12.

3. On July 15, 2019, the Court scheduled an initial pretrial conference and ordered that "all pretrial conferences must be attended by the attorney who will serve as principal trial counsel." ECF No. 5, at 1. In addition, the Mediation Program's rules (which were incorporated by reference into the Court's Order at ECF No. 6), required that "the lawyer who will be primarily responsible for handling the trial of the matter" attend the mediation. Mediation Rule 9(c). Mr. Liebowitz attended the initial conference but did not attend the mediation on October 31, 2019. At the evidentiary hearing, Mr. Liebowitz was evasive about whether he or Mr. Freeman was trial counsel (even though Mr. Freeman never even entered a notice of appearance), but either way Mr. Liebowtiz violated an Order of the Court: If he was principal trial counsel, he violated the Court's Order by failing to appear at the mediation; if he was not principal trial counsel, then he violated the Court's Order by appearing at the initial conference.

4. On July 15, 2019, the Court ordered that Mr. Liebowitz and Mr. Usherson participate in mediation "**no later than two weeks *before*** the initial pretrial conference," initially scheduled for October 10, 2019. ECF No. 5, at 1 (emphasis in original). Neither did, and Mr. Liebowitz did not request an extension of the mediation deadline at least forty-eight hours in advance, as required by the Court's Individual Rules. Instead, on October 4, 2019, Mr. Liebowitz filed a letter attempting (at best, disingenuously) to pin blame onto the Mediation Office for the missed deadline and requesting permission to conduct the mediation by telephone. *See* ECF No. 12.

5. On October 7, 2019, the Court extended the deadline to mediate, and ordered that "[t]he parties shall conduct the in-person mediation no later than October 31, 2019."  ECF No. 13.  Further, as discussed below, the Mediation Office's procedures required that Mr. Usherson appear at the mediation in person.  Mr. Liebowitz agreed that he and Mr. Usherson would participate in a mediation session on October 31, 2019, ECF No. 16, at 27, but neither showed up.  As discussed below, Mr. Liebowitz gave no notice to opposing counsel, the Mediator, or the Court that Mr. Usherson would not be attending in person.

6. On November 15, 2019, the Court ordered both parties to address in their sanctions briefing "whether the Court should hold an evidentiary hearing and, if so, what witnesses should be called and how it should be conducted."  ECF No. 20, at 6.  Mr. Liebowitz failed to address those issues in his brief.  ECF No. 21.

This litany of violations, standing alone, justifies sanctions under Rule 16(f).  *See, e.g.*, *Polaris Images Corp. v. CBS Interactive, Inc.*, No. 19-CV-3670 (VEC), 2019 WL 5067167, at *2-3 (S.D.N.Y. Oct. 9, 2019) (sanctioning Mr. Liebowitz for failing to timely file proof of service and produce pre-mediation discovery, and rejecting Mr. Liebowitz's claim of "administrative oversight" because "the undersigned is unconvinced that they are indeed good faith oversights").

The Court need not make a finding of bad faith to justify sanctions under Rule 16(f), but there is no doubt that Mr. Liebowitz's violations of these court Orders were willful.  First, the Orders "were explicit and," with one possible exception, "there is no suggestion that [Mr. Liebowitz] misread or misunderstood them."  *Petrisch v. JP Morgan Chase*, 789 F. Supp. 2d 437, 455 (S.D.N.Y. 2011).  The one possible exception is the failure of Mr. Liebowitz and Mr. Usherson to attend the mediation; as to those violations, Mr. Liebowitz proffers several explanations, but as discussed below, Mr. Liebowitz's shifting explanations are patently incredible — evidence of bad faith in itself.  Second, there is no "good-faith explanation" for Mr. Liebowitz's failure to comply, particularly in light of the findings set forth below.  *See S. New England Tel. Co.*, 624 F.3d at 148.  And finally, Mr. Liebowitz's "failure to comply was 'not isolated but rather [part of] a pattern' of non-compliance in this case dating to" even before "the

very first conference." *Yu v. Diguojiaoyu, Inc.*, No. 18-CV-7303 (JMF), 2019 WL 6174204, at

*5 (S.D.N.Y. Nov. 20, 2019) (quoting *S. New England Tel.*, 624 F.3d at 148).

    In fact, Mr. Liebowitz's violations are part of an even longer pattern of violations in

scores of cases.  Despite many judicial warnings, Mr. Liebowitz has engaged in similar

misconduct for years, every time making the same excuses for his behavior.  *See, e.g.*, *Chevrestt

v. Barstool Sports, Inc.*, No. 20-CV-1949 (VEC), 2020 WL 2301210, at *2 (S.D.N.Y. May 8,

2020) (sanctioning Mr. Liebowitz under Rule 16(f) and finding that his attempt to plead

"administrative oversight" was "disingenuous, distasteful, unpersuasive, and likely perjurious");

*Polaris Images Corp.*, 2019 WL 5067167, at *3 (imposing sanctions under Rule 16(f) and noting

that "given the frequency with which Mr. Liebowitz commits 'administrative errors,' the

undersigned is unconvinced that they are indeed good faith oversights"); *Steeger*, 2018 WL

1363497, at *2-3) (imposing monetary sanctions and a requirement that Mr. Liebowitz complete

"four CLE credit hours in ethics and professionalism" in an effort to address Mr. Liebowitz's

"pattern of omissions and misrepresentations").  Indeed, he has been found to have acted in bad

faith several times this year, alone.  *See, e.g.*, *Ward*, 2020 WL 2219070, at *3 (imposing $20,000

in sanctions under the Court's inherent authority and noting that "Liebowitz's conduct in this

case has been irresponsible, unreasonable, and detrimental to the fair administration of justice");

*Wisser v. Vox Media, Inc.*, No. 19-CV-1445 (LGS), 2020 WL 1547381, at *6 (S.D.N.Y. Apr. 1,

2020) (finding bad faith and imposing sanctions for, among other things, affixing his client's

signature to interrogatory responses without authorization and without the client having even

read the responses); *Rock v. Enfants Riches Deprimes, LLC*, No. 17-CV-2618 (ALC), 2020 WL

468904, at *4, *7 (S.D.N.Y. Jan. 29, 2020) (granting attorney's fees against Mr. Liebowitz's

client totaling over $100,000, $10,000 of which Mr. Liebowitz and his firm were responsible for

as sanctions, and finding that Mr. Liebowitz's "conduct — of failing to investigate the

evidentiary basis for a Complaint, of stonewalling discovery, of misleading the Court, and of

making meritless arguments — undoubtedly demonstrates bad faith").  As one court, after

surveying the ever-growing body of cases sanctioning Mr. Liebowitz, put it: Mr. Liebowitz's and

his firm's "inability to follow specific orders . . . is part of a pattern . . . .  He and his firm are

demonstrably incapable of complying with the rules of the many courts where Mr. Liebowitz is

filing hundreds of lawsuits." *Mondragon*, 2020 WL 2395641, at *13; *see id.* at *3 (finding that

Mr. Liebowitz "has demonstrated, both in this case and in many other copyright cases in this and

other districts, a disregard for basic federal courtroom rules, procedures, and practices").

## B.  Mr. Liebowitz's Lies to the Court

That said, Mr. Liebowitz's repeated and willful violations of the Court's Orders pale in

comparison to his more serious misconduct in this case: his lies, including his lies under oath.

Mr. Liebowitz repeatedly represented to the Court that he had received permission before the

October 31, 2019 mediation for Mr. Usherson to appear by telephone at the mediation.  He made

these claims in open court (despite a warning from the Court to be "very, very, very careful"

about his representations in light of the contempt finding by Judge Seibel, *see* Initial Conf. Tr.

7); in multiple filings with the Court, including at least one declaration sworn under penalty of

perjury; and in his testimony, also under oath, at the evidentiary hearing.  In fact, to this day, Mr.

Liebowitz maintains that "such permissions were in fact granted" by the Mediator.  ECF No. 54,

at 3.  But based on a careful review of the record, including an evaluation of the witnesses'

demeanor at the January 8, 2020 hearing, the Court finds by clear and convincing evidence that

these representations were false and made in bad faith. *See S.E.C. v. Smith*, 798 F. Supp. 2d 412,

424 (N.D.N.Y. 2011) ("[T]here must exist clear and convincing evidence that an individual's

conduct was not merely negligent but was undertaken with subjective bad faith.").[3]

    First and most obviously, Mr. Liebowitz's claims are contradicted by the Mediator, who

testified unequivocally at the hearing that Mr. Liebowitz never mentioned the possibility that Mr.

Usherson would not attend the mediation in person. Hearing Tr. 100-01. The Court finds this

testimony credible, based not only its observations of the Mediator's demeanor at the hearing

and his lack of any stake in this matter, but also on the fact that it is corroborated by Mr.

Newberg's testimony and documentary evidence. Most notably, the Mediator's email exchange

with Mr. Newberg shortly after the Mediator's final phone call with Mr. Liebowitz on October

30th makes plain that the Mediator had no clue that Mr. Usherson (and Mr. Liebowitz, for that

matter) would not be attending the mediation in person the next day. ECF No. 16, at 32. For

instance, at 6:34 p.m. on October 30, 2019, Mr. Newberg stated in an email his expectation that

"we will see Mr. Liebowitz and Mr. Usherson tomorrow . . . at the mediation," ECF No. 36, at

24, and the Mediator replied, "Talked to Richard and he has been tied up. He will review tonight

and get back to us in the morning. Hopefully we can settle this before need to go to in person

---

[3]    The Court is inclined to believe — and if the applicable standard were a preponderance
of the evidence would find — that Mr. Liebowitz also lied about getting advance permission
from the Mediator for Mr. Freeman to appear in his stead. But the record is admittedly more
muddled on that front. For instance, Mr. Newberg stated in his second declaration that the
Mediator had indicated that Mr. Liebowitz had informed the Mediator "that Mr. Liebowitz was
out of town and that Mr. Liebowitz's associate would be at the mediation instead." ECF No. 36,
at 4. Further, at the hearing, the Mediator testified that he could not remember whether Mr.
Liebowitz had said "anything one way or another about whether he would be appearing at the
mediation on the 31st." Hearing Tr. 99. The Mediator indicated that he somehow "became
aware" that Mr. Liebowitz was in Los Angeles and could not recall whether Mr. Liebowitz "may
have told me." Hearing Tr. 98. As a result, the Court is not prepared to find by clear-and-
convincing evidence that Mr. Liebowitz's representations on that score were made in bad faith.

mediation," ECF No. 16, at 32.  Later that night, Mr. Newberg reiterated his expectation of an in-person mediation, stating, "I would have assumed Mr. Usherson either flew to NY tonight or is likewise on a very early plane."  *Id.*  In response, the Mediator said simply: "I understand."  *Id.* At no point in these emails did the Mediator reveal any awareness that either Mr. Usheron or Mr. Liebowitz would not be attending in person the next day —  much less that he had given them both permission not to attend *that very night*, as Mr. Liebowitz claims.

That would be enough to conclude that Mr. Liebowitz lied under oath.  Additionally, however, the Court finds, based in part on its assessment of his demeanor at the hearing and in part on the content of the testimony, that Mr. Liebowitz's testimony, on its own terms, was unworthy of belief.  To start, several portions of Mr. Liebowitz's testimony were patently incredible.  Two examples will suffice.  First, it defies credibility to claim, as Mr. Liebowitz did, that, with him in Los Angeles for a networking event and Mr. Usherson at home in Georgia, he waited until approximately 8:00 p.m. on the night before the mediation (which was already scheduled to take place on the last date permitted by the Court — after the Court had admonished Mr. Liebowitz for failing to mediate by its first deadline) to ask the Mediator for permission to send an associate on his behalf and to allow Mr. Usherson to participate by telephone.  When pressed, Mr. Liebowitz claimed that he would have flown to New York that night and arranged for Mr. Usherson to do the same had the Mediator not granted permission.  But putting aside the inherent incredibility of that claim, by Mr. Liebowitz's own admission, he had not booked or even researched flights, and there is no evidence that he ever told Mr. Usherson about the potential need to travel on short notice.  Put simply, Mr. Liebowitz's story defies belief.

A second example: On November 14, 2019, only two weeks after the relevant events had occurred, Mr. Liebowitz was unable to recall when he had allegedly obtained permission from the Mediator for Mr. Usherson to appear by telephone.  Initial Conf. Tr. 7 ("I don't know the exact date, but it was before the mediation.").  Yet almost two months later, he was suddenly able to remember that the Mediator had granted him permission by telephone between 7:30 and 8:00 p.m. on October 30th.  Hearing Tr. 22.  When confronted with the discrepancy, Mr. Liebowitz claimed that his memory had been refreshed by the documents attached to Mr. Newberg's initial declaration.  *Id.* at 50-51.  But that declaration was filed before the November 14th initial pretrial conference, and Mr. Liebowitz had even responded to it before the conference.  *See* ECF No. 19.

Next, Mr. Liebowitz's testimony was also incredible because, in contrast to the Mediator's and Mr. Newberg's testimony, there is absolutely no evidence to corroborate it.  He made no reference to the Mediator granting permission for Mr. Usherson to appear by telephone in any email; in fact, he made no record of it at all.  Hearing Tr. 39-40 ("No, no record.  I just had a phone call with the Mediator and spoke with Mr. Freeman.  And that's — that's what happened.").  Nor do his own associates — Mr. Freeman and his sister, Ms. Liebowitz — back up his account.  Their declarations say nothing about the Mediator granting consent.  *See* ECF No. 23, ¶¶ 4-5; ECF No. 24.  And orally, Mr. Freeman explicitly contradicted Mr. Liebowitz's testimony on the point.  While Mr. Liebowitz testified at the hearing that he told Mr. Freeman on October 30th that the Mediator had approved his requests, Mr. Freeman reported at the November 14th initial pretrial conference — again, only two weeks after the relevant events — that he had "no knowledge one way or the other as to what clearances were made in terms of

telephonic appearances." Initial Conf. Tr. 9. Nor was that the only inconsistency between Mr.
Liebowitz's testimony and the representations of his own employee. Mr. Liebowitz testified
under oath that he had discussed the case with Mr. Freeman on "numerous occasions" on and
before October 30th. Hearing Tr. 32. But Mr. Freeman consistently maintained — at the
November 14th initial pretrial conference, in his own sworn declaration, and at the conclusion of
the hearing — that he did not even know the case existed until the evening of October 30th.
Initial Conf. Tr. 9; ECF No. 23, ¶ 4; Hearing Tr. 138.

Third, Mr. Liebowitz's testimony is internally inconsistent, a function of his explanations
shifting to suit the moment. Again, two examples will suffice. First, Mr. Liebowitz's initial
story was unambiguous: He asked for, and received, the Mediator's consent for Mr. Usherson to
appear telephonically. At various times, Mr. Liebowitz acknowledged that the Mediation Rules
required the presence of a party, unless the mediator granted consent for a telephonic appearance.
ECF No. 19, at 1; Initial Conf. Tr. 6-7. But later, perhaps to hedge his bets, Mr. Liebowitz took a
different tack: that neither the Court's Orders nor the Mediation Rules actually required Mr.
Usherson to appear in person in the first place. ECF No. 21, at 3-4; ECF No. 22, ¶¶ 7-9, 12;
Hearing Tr. 59-60; *see also id.* at 135-36. It strains credulity to conclude that Mr. Liebowitz
actually believed that assertion, and not only because it was made so belatedly. For one thing, it
is demonstrably false, as the Mediation Rules explicitly state that "[e]ach *party* must attend
mediation," unless, if certain requirements are met, the mediator grants consent to participate by
telephone. Mediation Rules 9(a), (f); *see also* ECF No. 13 (denying Mr. Liebowitz's application
to conduct the mediation by telephone and mandating an "in-person mediation").[4] For another, it

---

[4]     Read in context, the Mediation Office procedures make plain that the term "party" does
not refer to counsel and refers here to Mr. Usherson. Further, there is no doubt that Mr.

is belied by Mr. Liebowitz's own objection in another case to the telephonic appearance of an

opposing party located in Israel, on the ground that "the rules of the mediation office requires

[*sic*]" parties to appear in person.  *Sadowski*, No. 18-CV-9193, ECF No. 21; *see* Hearing Tr. 11-

16.  And finally, it makes no sense in light of Mr. Liebowitz's first and principal story: that he

explicitly asked for, and received, the Mediator's consent for Mr. Usherson to appear

telephonically.  After all, if he believed in good faith that Mr. Usherson did not have to appear in

person at all, why ask for permission to appear telephonically the night before the mediation and

risk the possibility that, with Mr. Usherson in Georgia, the Mediator might say no?  The answer

is that, contrary to his testimony, he never asked — *and* he knew full well that Mr. Usherson was

required to appear in person.  He just thought he could get away with it, either because the

Mediator would ratify the decision or because he thought the case would settle and no one would

care.

The second example of Mr. Liebowitz's shifting and internally inconsistent explanations

is his "custom and practice" defense: that the Mediator, who had mediated five of his other cases,

had a "custom and practice" of allowing his clients to appear by telephone.  Conspicuously, Mr.

Liebowitz did not even mention this defense in his first submissions and arguments to the Court

— that is, in the two letters he filed between Bandshell's sanctions motion and the initial pretrial

conference; at the initial pretrial conference; or in his formal opposition to the sanctions motion

and his supporting declaration filed thereafter.  The "custom and practice" defense appeared for

the first time in Mr. Liebowitz's December 16th letter — a belatedness underscored by the fact

---

Liebowitz was bound by the Mediation Rules.  The Court's initial mediation order provided that
Local Rule 83.9 "shall govern," ECF No. 6, and Local Rule 83.9 provides, in relevant part, that
the mediation program "shall be governed by" the Mediation Rules.

that Mr. Freeman had to make an application at the outset of the hearing to expand the scope of

Mr. Liebowitz's direct testimony to include it.  Yet by the hearing's end, it was arguably Mr.

Liebowitz's principal defense; indeed, he and Mr. Freeman uttered the words "custom and

practice" or variations thereof at least fourteen times during the hearing.  Once again, however,

the defense is an odd fit given Mr. Liebowitz's initial and principal story: that he requested and

obtained the Mediator's explicit consent.  The defense might have been compelling if Mr.

Liebowitz's claim was that he had *assumed* the Mediator's consent.  But the Mediator's alleged

custom and practice do not shed any light on whether, as Mr. Liebowitz actually claimed, he

affirmatively consented.  Moreover, once again, if Mr. Liebowitz assumed from his past dealings

with the Mediator that he already had the Mediator's permission for Mr. Usherson to appear

telephonically, why ask for permission the night before and risk being told that he had to appear?

The answer, once again, is that Mr. Liebowitz did not do what he claimed he did.  The "custom

and practice" defense is nothing more than an after-the-fact justification, conjured up by Mr.

Liebowitz when it became apparent that the Court was not inclined to buy into his initial story.

    In short, the Court easily finds by clear and convincing evidence that Mr. Liebowitz lied

— repeatedly and under oath — by claiming that he sought and obtained the Mediator's consent

for Mr. Usherson to participate in the mediation by telephone.  Disturbingly, that misconduct is

also part of a broader pattern.  *See Steeger*, 2018 WL 1363497, at *2 (noting that Mr. Liebowitz

has been "plagued" by a "pattern of omissions and misrepresentations"); *see also Sands v. Bauer

Media Grp. USA, LLC*, No. 17-CV-9215 (LAK), 2019 WL 6324866, at *2 n.1 (S.D.N.Y. Nov.

26, 2019) ("Nor is this the only occasion on which Mr. Liebowitz has made an untrue statement

to a judge of this Court."); *Berger* Tr. 14 ("Mr. Liebowitz has woven himself a very tangled web

of lies."); *id.* ("[T]he whole issue why I question Mr. Liebowitz's fitness to practice is the

dishonesty and the failure to own up to the dishonesty and the doubling and quintupling and

octupling down on the dishonesty."); *Pereira v. 3072541 Can. Inc.*, No. 17-CV-6945 (RA), 2018

WL 5999636, at *3 (S.D.N.Y. Nov. 15, 2018) ("The Court finds particularly concerning Mr.

Liebowitz's . . . propensity to take unreasonable positions and omit crucial facts — or even to

make outright misrepresentations — in an apparent attempt to increase costs and to extort

unwarranted settlements.").[5]  In fact, Mr. Liebowitz's conduct in this case is strikingly similar to

his conduct in Judge Seibel's case, *Berger*.  In both cases, Mr. Liebowitz's travails began with a

comparatively minor infraction: there, his absence at a pretrial conference, and here, his client's

absence from mediation.  In both cases, rather than admit the truth and accept the consequences,

Mr. Liebowitz concocted a story: there, that his grandfather's death prevented him from

appearing at the conference, and here, that the Mediator had granted consent.  In both cases, he

dug his hole deeper by repeating his lies over and over, including under oath.  *See Berger* Tr. 24-

27 ("[Mr. Liebowitz] knew he was lying; and he then chose to repeat that lie six, eight, ten

times.").  In both cases, he tried — without success — to make his problems go away by

---

[5]      Regrettably, there is reason to believe that Mr. Liebowitz's pattern of lying continued
unabated even after this Court's January evidentiary hearing.  On May 7, 2020, in a hearing
before Magistrate Judge N. Reid Neureiter in the District of Colorado, Mr. Liebowitz testified
under oath that he did not know "whether Judge Seibel had referred the contempt finding against
him to a disciplinary body."  *Mondragon*, 2020 WL 2395641, at *10.  But Mr. Liebowitz was
present in court on November 13, 2019, when Judge Seibel explicitly stated that she had "made a
referral to the grievance committee" of this Court and was "not going to withdraw it."  *Berger*
Tr. 27; *see also id.* at 26 ("[T]his order of contempt, unfortunately, is going to follow Mr.
Liebowitz wherever he goes in the future where he is asked, 'Have you ever been held in
contempt?' because I am not going to vacate it.").  Moreover, as of May 11, 2020, Mr. Liebowitz
had not taken the remedial steps — a continuing legal education course in small law firm
management and mentorship by a lawyer experienced in copyright law — that he had promised
Judge Seibel he would take.  *See Mondragon*, 2020 WL 2395641, at *11.

voluntarily dismissing the case before sanctions were imposed.  And in both cases, he ultimately sought to excuse his misconduct by invoking his relative youth and inexperience, his hefty caseload, and poor case management practices.  *Berger* Tr. 13; Hearing Tr. 81-82.

Mr. Liebowitz (through Mr. Freeman) wisely concedes that lying to the Court, repeatedly and under oath, is "grounds for sanctions" against him.  Hearing Tr. 132; *see, e.g.*, *Macolor*, 2015 WL 1267337, at *4 ("Whatever the appropriate definition [of 'bad faith'], making a false statement with the intent to mislead the Court certainly meets that definition."); *Roberts v. Bennaceur*, 658 F. App'x 611, 615 (2d Cir. 2016) (summary order) (affirming discovery sanctions and noting numerous "misrepresentations" and "inadequate explanations" that demonstrated "bad faith throughout these proceedings"); *see also Enmon*, 675 F.3d at 146 (affirming sanctions based on "ample evidence" of "persistent misrepresentations" made in bad faith).  And, as discussed, there is ample evidence in this case that that is precisely what Mr. Liebowitz did.  Moreover, while Mr. Liebowitz's failures to obey court orders can arguably be explained (though not justified) by his relative inexperience, heavy caseload, and inadequate case management practices, the same cannot be said for his dishonesty.  *See Berger* Tr. 14 ("I am not really super sympathetic to the notion that . . . somebody is young and inexperienced and therefore unaware that it's wrong to lie.  We all learn that as children."); *see also Mondragon*, 2020 WL 2395641, at *8 ("While many of Mr. Liebowitz's failings seem to originate with his massive caseload and corresponding inability to follow the rules and schedules of the numerous different courts where he has cases pending, those failings *also* extend to what appears to be a problem with truth-telling." (emphasis added)).  The simple fact is that Mr. Liebowitz has a problem: He does not feel constrained by the truth and, when cornered, has no compunction

37

about lying, even under oath.  It follows that sanctions should be, and are, imposed.

## C.  Mr. Liebowitz's False Allegation that the Photograph Was Registered Prior to the Suit and His Failure to Reasonably Investigate the Issue

Finally, the evidence clearly and convincingly shows that Mr. Liebowitz brought — and maintained — this case in bad faith by willfully disregarding the fact that the case was fatally flawed from its inception.  As noted, under Section 411(a) of the Copyright Act, an infringement action may not be filed "until . . . registration of the copyright claim has been made."  17 U.S.C. § 411(a); *see Rudkowski v. MIC Network, Inc.*, No. 17-CV-3647 (DAB), 2018 WL 1801307, at *3 (S.D.N.Y. Mar. 23, 2018) (warning Mr. Liebowitz that "possession of a registration certificate is a condition precedent to filing a copyright claim").  Paragraph 9 of the Complaint in this case did allege that the Photograph was registered as part of the 046 Registration.  But in the face of irrefutable evidence to the contrary, Mr. Liebowitz now concedes — as he must — that that allegation was false and that the Photograph was not registered until August 22, 2019, almost a month and a half after the lawsuit was filed.  Mr. Liebowitz has two responses to this extraordinary revelation.  First, he seeks to trivialize it by calling it a "technical pleading deficiency" and suggesting that, but for the voluntary dismissal, he could have cured the problem by amending the Complaint.  ECF No. 63, ¶ 18; ECF No. 57, at 1-3.  Second, throwing his own client and a member of his administrative staff under the proverbial bus, he claims that he did not know about the untimely registration.  ECF No. 63, ¶¶ 4-9.  Neither response is persuasive.

First, as a matter of law, Mr. Liebowitz is wrong in suggesting that he could have cured the Section 411(a) violation through amendment.  Mr. Liebowitz cites as support for that suggestion a twenty-eight-year-old decision from this District.  *See* ECF No. 57, at 2 (citing *Atkins v. Publ'ns Int'l, Ltd.*, No. 91-CV-7427 (KMW), 1992 WL 309581 (S.D.N.Y. 1992)).  But

that case predates *Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC*, in which the
Supreme Court held that a "'registration . . . has been made' within the meaning of 17 U.S.C.
§ 411(a) not when an application for registration is filed, but when the Register has registered a
copyright after examining a properly filed application." 139 S. Ct. 881, 892 (2019). In the wake
of that decision, this Court and others held that where a plaintiff "improperly filed suit before a
copyright was registered," the suit "must be dismissed notwithstanding a plaintiff's post-
registration amendment." *Malibu Media*, 2019 WL 1454317, at *1; *accord Pickett v. Migos
Touring, Inc.*, 420 F. Supp. 3d 197, 205 (S.D.N.Y. 2019); *Xclusive-Lee, Inc. v. Hadid*, No. 19-
CV-520 (PKC) (CLP), 2019 WL 3281013, at *4 (E.D.N.Y. July 18, 2019). Thus, Mr. Liebowitz
is just plain wrong in suggesting that the error was no big deal. Had the error been disclosed
while the lawsuit was pending, Bandshell would have been entitled to dismissal.

Notably, there is a strong argument that Mr. Liebowitz's suggestion that he could have
cured the defect through amendment is itself made in bad faith. First, it is hard to believe that he
would be unaware of the recent law on that issue. His practice is devoted to copyright
infringement cases; in little more than four years, he has filed approximately 2,500 such cases
and, at the time of the mediation in this case, his firm had more than 400 such cases pending in
federal court. *See* Hearing Tr. 80-81; *Sadowski v. Ziff Davis, LLC*, No. 20-CV-2244 (DLC),
2020 WL 3397714, at *4 (S.D.N.Y. June 19, 2020). But assuming for the sake of argument that
Mr. Liebowitz does not keep up on developments in copyright law (which would be inexcusable,
but is nevertheless all too plausible), he was explicitly put on notice of the fact that an untimely
registration is not curable at the initial pretrial conference in this case, when Mr. Newberg first
raised the issue and noted that dismissal would be required if the Photograph was registered after

39

the Complaint was filed, citing *Fourth Estate* and this Court's holding in *Malibu Media* that a
premature filing "is a non-curable error."  Initial Conf. Tr. 17.  Making matters even worse, Mr.
Liebowitz persisted in pressing the point even after Mr. Newberg, in his post-hearing letter,
explicitly noted that the suggestion was "incorrect," citing *Malibu Media* and other precedent.
*Compare* ECF No. 58, at 2, *with* ECF No. 63, ¶¶ 18-19.  These facts support an inference of bad
faith.  *See Gollomp v. Spitzer*, 568 F.3d 355, 369 (2d Cir. 2009) (affirming a finding of bad faith
where plaintiff's counsel had filed claims "that were clearly barred by the Eleventh
Amendment," which "several courts had already instructed plaintiff's counsel"); *In re Gushlak*,
No. 11-MC-218 (NGG), 2012 WL 2564523, at *3, *7-8, *10 (E.D.N.Y. July 2, 2012)
(concluding that an attorney acted unreasonably and in bad faith where he made "utterly
frivolous" legal arguments whose futility would have been revealed by "basic legal research or a
moment's thought," and then persisted in making the arguments even after they were refuted).

Mr. Liebowitz's efforts to distance himself from responsibility for the untimely
registration and the false allegation in the Complaint, and his attempt to pin blame on either his
client or an administrative assistant at his firm, are similarly unavailing.  For one thing, the
evidence clearly and convincingly shows that Mr. Liebowitz *did* know about the untimely
registration, at least as of August 22, 2019, when his firm registered the Photograph under the
272 Registration, if not earlier.  Indeed, as Mr. Freeman explained at the January 8th hearing, the
firm increasingly files copyright registration applications itself "[s]o we know for sure it's on
deposit."  Hearing Tr. 139-140.  And that is what happened here: Sometime after July 10, 2019,
when the Complaint in this case was filed, Mr. Usherson sent the firm a CD-ROM containing all
of the photographs that he had not yet registered — including the Photograph — and Mr.

40

Liebowitz's firm proceeded to register them.  ECF No. 62, at 4.  The firm thus had knowledge

that the Photograph had not been registered prior to the filing of the Complaint.  And it is hard to

believe that Mr. Liebowitz, as "lead counsel for Plaintiff" and the "founding member of

Liebowitz Law Firm," ECF No. 63, at 1, was unaware of the fact himself.  It is far more

plausible — indeed likely — that, upon receiving the Photograph from Mr. Usherson, Mr.

Liebowitz realized that it had not yet been registered and sought to quietly take care of the

problem, hoping that Bandshell and the Court would be none the wiser and he would escape

dismissal.

　　　In any event, even if Mr. Liebowitz did not personally know that the Photograph had not

been registered when this case was filed, he certainly should have known — and his lack of

knowledge is attributable to an inexcusable failure to conduct a reasonable investigation before

and during the case.  "An attorney 'is entitled to rely on his or her client's statements as to

factual claims when those statements are objectively reasonable.'  However, the attorney must

still engage in 'an inquiry reasonable under the circumstances.'"  *Chien v. Skystar Bio Pharm.

Co.*, 256 F.R.D. 67, 75 (D. Conn. 2009) (Kravitz, J.), *aff'd*, 378 F. App'x 109 (2d Cir. 2010)

(quoting *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1329 (2d Cir.1995), and Fed. R. Civ. P.

11(b)); *see also Rabin v. Dow Jones & Co., Inc.*, 665 F. App'x 21, 23-24 (2d Cir. 2016)

(summary order) (affirming a finding of bad faith where counsel admitted that two allegations in

his complaint were "overstatement[s]" and that he "failed to conduct a good-faith investigation

into that evidence or to adjust the pleadings" and "sought to suppress the truth by withholding

relevant evidence," until he was finally "confronted with evidence of dishonesty in his

deposition," at which point he "dubiously claimed a bad memory").  Mr. Liebowitz engaged in

41

no investigation at all despite the fact that he "had the ability . . . to double-check whether the

Photograph was part of the images that were included" in the 046 Registration using the CD-

ROM that Mr. Usherson had sent the firm.  ECF No. 63, at 3.  It is no answer to say, as Mr.

Liebowitz does, that he relied on his administrative assistant; Mr. Liebowitz is the lawyer who

signed the Complaint containing the affirmatively false allegation.  Making matters worse, Mr.

Liebowitz and his firm received a second CD-ROM, which would have revealed that the

Photograph was not among those registered as part of the 046 Registration, and the firm then

registered the Photograph itself.  And to top it off, at the initial pretrial conference in November

2019, Mr. Newberg specifically addressed the 272 Registration and raised doubts about whether

the Photograph had been timely registered — putting Mr. Liebowitz on notice of what turns out

to have been a fatal defect in the Complaint.  Initial Conf. Tr. 17.  Under these circumstances, it

was Mr. Liebowitz's obligation to investigate whether the Photograph was properly registered.[6]

Nevertheless, Mr. Liebowitz and his firm conducted no investigation until after the

January 8, 2020 hearing and, even then, did so only because the Court ordered them to file a

letter addressing the issue and, when that did not clear things up, declarations.  *See* ECF No. 64,

at 3, 5-6; ECF No. 63, at 4.  In fact, Mr. Liebowitz actively stonewalled Mr. Newberg's request

---

[6]     Mr. Liebowitz also argues that it was not his responsibility to confirm that the
Photograph was properly registered because "the burden to retrieve a certified deposit copy from
the U.S. Copyright Office rests upon the alleged infringer."  ECF No. 57, at 3.  The cases he cites
in support of that proposition, however, are inapposite because they involved challenges by
defendants to the validity of an alleged registration.  *See, e.g.*, *Goodman v. Univ. Beauty Prods.,
Inc.*, No. 17-CV-1716 (KBF), 2018 WL 1274855, at *5 (S.D.N.Y. Mar. 9, 2018) (concluding
that the defendants "failed to proffer any evidence" in support of their argument at summary
judgment "that the registration is deficient").  The argument also misses the point: Mr. Liebowitz
personally signed and filed the Complaint, which contained what he now admits was a false
allegation.  It was his obligation to conduct a reasonable investigation to confirm the accuracy of
the affirmative allegations to which he chose to sign his name, particularly after Mr. Newberg
alerted him to the allegation's falsity at the initial pretrial conference.

for discovery on the issue at the initial pretrial conference, stating: "I don't know what defense counsel means about other registrations or other photographs.  I will have to see what my office did, but this is the correct registration."  Initial Conf. Tr. 17-18.  It is hard to avoid the conclusion that Mr. Liebowitz hoped to settle the case before the truth came to light.  In fact, Mr. Freeman himself conceded that the firm's "custom and practice" had been to file suits without checking if the works in question are actually registered to avoid "an additional expense," at least until they "believe that [they]'re going to proceed with the case to summary judgment."  Hearing Tr. 139.  Clearly hoping to settle the case before reaching that stage, Mr. Liebowitz argued to the Court at the initial pretrial conference that "the appropriate thing to do at this stage is to just set discovery, set the dates, and let the parties engage and hopefully during that process the parties could eventually get to a settlement number."  Initial Conf. Tr. 18.

Once again, this misconduct is not unique to this case, but fits a broader pattern.  In another recent case, for example, Mr. Liebowitz filed suit alleging copyright infringement of a photograph of musician Lou Reed, even though the alleged registration explicitly excluded "previously published works" like the photograph.  *Rock*, 2020 WL 468904, at *1.  Mr. Liebowitz nevertheless pressed the suit.  When confronted about the registration issue, he "produced no evidence that the Photograph was registered" and "actively stonewalled discovery requests" for information about the alleged registration.  *Id.* at *1, *3.  Mr. Liebowitz also defied Judge Carter's order to obtain and produce any relevant deposit files from the Copyright Office.  *Id.* at *3.  "After it became apparent that the Photograph was not registered," Mr. Liebowitz attempted to argue that the registration had "mistakenly" excluded the Photograph, without any evidentiary support.  *Id.* at *4.  Judge Carter rejected the argument and concluded that "[t]his

43

conduct — of failing to investigate the evidentiary basis for a Complaint, of stonewalling discovery, of misleading the Court, and of making meritless arguments — undoubtedly demonstrates bad faith." *Id*. He therefore sanctioned Mr. Liebowitz and his firm $10,000. *See id.* at *7.

As in *Rock*, the conduct of Mr. Liebowitz and his firm in this case "undoubtedly demonstrates bad faith." *Rock*, 2020 WL 468904, at *4. As a result of that bad faith, Mr. Newberg and Bandshell had to bear the expense of defending a case that was fatally flawed from its inception. And, as in *Rock*, when the truth came to light, Mr. Liebowitz feebly blamed the false allegation in the Complaint on "clerical" or "administrative error." ECF No. 57, at 3; ECF No. 63, at 4. Mr. Liebowitz and his firm cannot escape responsibility so easily. Their willful disregard of the registration requirement is part of their broader strategy to use the burdens of litigation to extract settlements, even in frivolous or unmeritorious suits. *See Otto v. Hearst Comm'ns, Inc.*, No. 17-CV-4712 (GHW), 2020 WL 377479, at *3 & n.1 (S.D.N.Y. Jan. 23, 2020) (noting that "Otto and [Mr. Liebowitz, his counsel,] consistently and undeniably asserted inflated values for Otto's copyright" using "figures [that] were wholly unsupported by the evidentiary record"). And by filing the lawsuit without conducting any investigation into the truth or falsity of Paragraph 9 of the Complaint, and by maintaining the lawsuit and failing to conduct any investigation even after being put on notice about a potential registration problem, Mr. Liebowitz and his firm "multiplie[d] the proceedings . . . unreasonably and vexatiously." 28 U.S.C. § 1927. It follows that sanctions are warranted on this basis, as well.

**D.  The Nature and Amount of the Appropriate Sanctions**

So what sanctions should the Court impose? In deciding what sanctions to impose, the

44

Court may consider the following factors, among others: "(i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the injured party; (iii) whether there is a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future." *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) (discussing the Court's inherent authority to investigate and sanction frauds on the Court). Sanctions should be "no more severe than reasonably necessary to deter repetition" of the misconduct "or comparable conduct by similarly situated persons." *Macolor*, 2015 WL 1267337, at *5 (internal quotation marks omitted).

If specific deterrence — that is, deterring Mr. Liebowitz from repeating his misconduct — were the sole consideration, it is not clear that any sanction (short of, perhaps, disbarment) would suffice. After all, his first lie in this case occurred only one day after he was dressed down by Judge Seibel for repeatedly lying about his grandfather's death, and despite a warning from the Court to be "very, very, very careful" about what he said. Initial Conf. Tr. 7. And thereafter, as in the case before Judge Seibel, he dug his hole even deeper, repeating his lies over and over, including under oath. (In fact, he arguably expanded upon his lies, concocting, after the fact, his "custom and practice" excuse.) Even more troubling, as the discussion above makes clear, Mr. Liebowitz's misconduct in this case is part of a larger pattern that has led judges on this court — and, as his practice has expanded to other districts, judges on other courts — to chastise him, impose sanctions on him, and require his clients to post bonds to cover future adverse awards of attorney's fees and costs resulting from his misbehavior. The list of such cases is too long to cite here and, thus, is attached as an Appendix to this Opinion and Order.

And even that list is likely not exhaustive.  For one thing, there may well be orders imposing

sanctions or requiring a bond that are not easily searchable on Westlaw or Lexis.  For another, as

this case, the case before Judge Seibel, and this Court's prior decision imposing sanctions in *Rice*

make clear, Mr. Liebowitz frequently drops his cases when the going gets tough and sanctions

are on the horizon.  *See Berger* Tr. 25 ("[W]hen [Mr. Liebowitz] gets into hot water, he just

decides to kick the can down the road as long as he can: Try to drop the case, hope the judge will

go away."); *see, e.g.*, *Ramales v. Alexander Wang Inc.*, No. 20-CV-0926 (DLC), ECF No. 32,

¶¶ 9-11 (S.D.N.Y. June 2, 2020) (opposing counsel's declaration in support of a sanctions

motion stating that counsel had repeatedly requested licensing history from Mr. Liebowitz, who

first claimed he could not retrieve it "without a subpoena," and then admitted that there was "no

licensing history and that his client was wrong," at which point he settled the case and avoided

adjudication of the sanctions motion).  Undoubtedly there are cases in which that tactic

succeeded and Mr. Liebowitz was never held to account.  Thus, there may be no sanction short

of disbarment that would stop Mr. Liebowitz from further misconduct.

But because disbarment is an issue for the Grievance Committee, this Court is left with

the task of crafting a sanction that could conceivably deter Mr. Liebowitz from repeating his

misconduct again.  Moreover, another purpose of sanctions is general deterrence — that is,

deterrence of "comparable conduct by similarly situated persons."  *Macolor*, 2015 WL 1267337,

at *5 (internal quotation marks omitted).  In view of both considerations, it is plain that

substantial sanctions — a mix of monetary and non-monetary sanctions — are well justified.  As

discussed above, much of Mr. Liebowitz's misconduct was the product of intentional bad faith.

In addition, Bandshell and Mr. Newberg (who handled the case pro bono) incurred considerable

expenses as a result of Mr. Liebowitz's misconduct, having to defend against a lawsuit that was flawed from its inception, having to appear at a mediation that was doomed from the start, and having to litigate the issue of sanctions. Moreover, there is, to put it mildly, a long and ignominious history of misbehavior by Mr. Liebowitz, and an enormous risk that he will continue his pattern of misbehavior. And finally, Mr. Liebowitz never corrected his misconduct, but rather repeated his lies under oath and, in the case of the false allegation regarding the copyright registration, proffered unconvincing excuses. *See Passlogix*, 708 F. Supp. 2d at 394. In light of that record, and the fact that prior efforts to deter him — including hefty fines, *see, e.g.*, *Ward*, 2020 WL 2219070, at *4 ($20,000), and sizeable awards of attorney's fees and costs, *see, e.g.*, *Craig*, 2019 WL 2992043, at *4, *7 ($98,532.62) — were insufficient, substantial sanctions are plainly warranted.

Additionally, the Court concludes that the same sanctions should be imposed on Mr. Liebowitz and on his firm.[7] Without question, an attorney's actions may be attributed to his firm for purposes of sanctions where the firm is small; the attorney is its founding partner and leader; and, throughout the litigation, the attorney's actions were indistinguishable from those of the firm. *See Enmon*, 675 F.3d at 148; *see also, e.g.*, *Rock*, 2020 WL 468904, at *4 (imposing

---

[7]     The Court declines to sanction Mr. Usherson himself, as "the sins of the lawyer" are not automatically "visited on the client," and the evidence in the record does not clearly and convincingly demonstrate any bad-faith misconduct by Mr. Usherson. *See, e.g.*, *Ransmeier v. Mariani*, 718 F.3d 64, 71 (2d Cir. 2013). If anything, Mr. Usherson was ill served by Mr. Liebowitz — who likely agreed to voluntary dismissal of Mr. Usherson's claims in an effort to protect his own hide. If so, Mr. Usherson may in fact have a legal malpractice claim against Mr. Liebowitz. *See Mondragon*, 2020 WL 2395641, at *10 (characterizing Mr. Liebowitz's testimony at the evidentiary hearing in *this* case, based on a review of the transcript, as "a damning self-indictment by a lawyer who has perfected a recipe for the regular commission of legal malpractice"); *see also id.* at *12 (finding that "Mr. Liebowitz regularly is committing legal malpractice"); *id.* at 13 ("Mr. Liebowitz . . . represents a clear and present danger . . . to the interests of his own clients.").

sanctions on Mr. Liebowitz and his firm jointly and severally); *Craig v. UMG Recordings, Inc.*,

No. 16-CV-5439 (JPO), 2019 WL 2992043, at *10 (S.D.N.Y. July 9, 2019) (same).  That is

plainly the case here.  Mr. Liebowitz admits that he is the "founding member of Liebowitz Law

Firm, PLLC," ECF No. 63, ¶ 2; the firm is small, consisting of mostly staff and only a handful of

lawyers other than Mr. Liebowitz, including Mr. Freeman and Mr. Liebowitz's sister; and

throughout this litigation, Mr. Liebowitz's actions have been indistinguishable from those of his

firm, as evidenced by the fact that Mr. Freeman appeared at the November 14, 2019 initial

conference on behalf of both Mr. Liebowitz and the firm in connection with the sanctions

motion.  What is more, in an effort to minimize his personal responsibility, Mr. Liebowitz

himself has repeatedly tried to place blame for some of his misconduct on his firm, as he did

most clearly with the false allegation in Paragraph 9 of the Complaint.  *See* ECF No. 63, ¶¶ 4-

9.  Accordingly, his actions may be attributed to the firm, and the sanctions that follow are

imposed jointly and severally on them both.

The Court begins with monetary sanctions.  A "well-accepted" measure of sanctions for

"bad faith conduct that unnecessarily prolongs a proceeding and multiplies the expense incurred

by an adversary" is the opposing counsel's attorney's fees and costs.  *Homkow v. Musika*

*Records, Inc.*, No. 04-CV-3587 (KMW) (THK), 2009 WL 721732, at *25 (S.D.N.Y. Mar. 18,

2009); *see also* 28 U.S.C. § 1927 (expressly requiring that the offending party "satisfy personally

the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct").

Significantly, that is true even though the principal goal of sanctions is not to remedy harm to the

opposing side, but to deter repetition of the misconduct or comparable conduct by others.  Thus,

courts have pegged sanctions to attorney's fees and costs even where the opposing counsel did

not actually receive fees.  *See, e.g.*, *Dallas v. Goldberg*, No. 95-CV-9076 (LTS) (RLE), 2003

WL 22872325, at *1 (S.D.N.Y. Dec. 5, 2003) (requiring the defendants to pay, as sanctions

under Rule 16 and the court's inherent authority, "reasonable attorneys' fees and expenses

incurred" even though the plaintiff's lawyer had handled the case "on a pro bono basis at the

request of the Court"); *see also Nat'l Lawyers Guild v. Att'y Gen.*, 94 F.R.D. 616, 618 (S.D.N.Y.

1982) ("[C]ourts have rejected the contention, in situations analogous to Rule 37 sanctions, that

plaintiffs represented on a pro bono basis are not entitled to attorneys' fees, or should receive a

reduced amount." (citations omitted)); *cf. Centennial Archaeology, Inc. v. AECOM, Inc.*, 688

F.3d 673, 680 (10th Cir. 2012) ("The purpose of Rule 37 attorney-fee sanctions would be

thwarted if a party could escape the sanction whenever opposing counsel's compensation is

unaffected by the abuse.").  *But see Goldman v. Barrett*, No. 15-CV-9223 (PGG), 2019 WL

4572725, at *7 n.9 (S.D.N.Y. Sept. 20, 2019) (expressing skepticism that "pro bono counsel is

entitled to be compensated at market rates in connection with a sanctions award" (internal

quotation marks and alterations omitted)).

Thus, the Court concludes that the reasonable attorney's fees and costs Bandshell would

have incurred in connection with the mediation and the sanctions motion are an appropriate

measure of sanctions here.  That is true even though Bandshell's counsel handled the case pro

bono.  And it is true even though Bandshell and Mr. Newberg disclaimed fees and costs when

agreeing to dismissal of the case and, thus, do not seek to recover the fees and costs for

themselves.  Here, as set forth in an accounting submitted by Bandshell at the Court's request,

fees would have come to $84,435 and costs did come to $1,423.99, for a total of $85,858.99.

ECF 56, at 2.  The fees are based on Mr. Newberg's hourly rate of $855 and his associate's

hourly rate of $420.  *See id.*

When evaluating attorney's fees, a court must determine whether the proposed fees are

"reasonable," based on "a reasonable hourly rate and the reasonable number of hours required by

the case."  *Millea v. Metro-North R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011).  Given Mr.

Newberg's experience, credentials, and position as a partner at McGuireWoods, and taking into

account "all of the case-specific variables . . . relevant to the reasonableness of attorney's fees,"

*Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 172 (2d Cir. 2009) (emphasis omitted), including

the fact that Mr. Newberg handled the case pro bono, the Court finds that his hourly rate is

reasonable.  *See, e.g.*, *Rock*, 2020 WL 468904, at *5.  His associate's rate, however, exceeds the

reasonable rate for an attorney with less than one year's experience.  *See Tiffany & Co. v. Costco*

*Wholesale Corp.*, No. 13-CV-1041 (LTS) (DCF), 2019 WL 120765, at *10 (S.D.N.Y. Jan. 7,

2019) (finding that rates of "$315-$585 per hour for an associate (depending on experience)" are

reasonable).  Thus, the Court reduces the associate's hourly rate to $315 — a reduction of $105

per hour for 22.3 hours of work, for a total reduction of $2,341.50.  The Court concludes that the

hours both attorneys worked and their costs were reasonable.  That yields a total of $83,517.49 in

fees and costs attributable to the mediation and the sanctions motion.  Thus, the Court orders Mr.

Liebowitz and his firm, jointly and severally, to pay to the Court $83,517.49 for misrepresenting

that the Mediator gave permission for Mr. Usherson not to attend the mediation in person and for

his multiple other violations of the Court's Orders.

In addition, the Court orders Mr. Liebowitz and his firm, jointly and severally, to pay to

the Court $20,000 for falsely alleging that the Photograph was registered, not conducting a

reasonable investigation prior to filing the lawsuit and after being put on notice of the

registration issue, and maintaining the suit thereafter.  This type of misconduct is a self-avowed

"custom and practice" of the Liebowitz Law Firm, Hearing Tr. 139, and has undoubtedly

affected other cases, *see, e.g.*, *Rock*, 2020 WL 468904, at *2 ("Plaintiff and his counsel knew, or

should have known, that the Photograph was not registered.").  Taking into consideration all of

the relevant factors, including Mr. Liebowitz's stonewalling of any investigation into the

registration issue once it was raised by opposing counsel, the Court concludes that sanctions of

$20,000 are no greater than necessary to provide adequate deterrence, to Mr. Liebowitz, to his

firm. and to others similarly situated.  *See, e.g.*, *Ward*, 2020 WL 2219070, at *3-4 (imposing

$20,000 in sanctions for filing a lawsuit in bad faith and proceeding even after being notified that

venue was improper).

The Court imposes these sanctions, as well as the non-monetary sanctions discussed

below, pursuant to Rule 16, Section 1927, and the Court's inherent authority.  The Court finds

that, in total, these sanctions are "no more severe than reasonably necessary to deter repetition"

of the misconduct "or comparable conduct by similarly situated persons."  *Macolor*, 2015 WL

1267337, at *5 (internal quotation marks omitted); *cf. Craig*, No. 16-CV-5439, ECF No. 110

(sanctioning Mr. Liebowitz and his firm in the amount of $98,532.62 in attorney's fees and

costs); *Rock*, 2020 WL 468904, at *4, *7 (granting attorney's fees against Mr. Liebowitz's client

totaling over $100,000, of which Mr. Liebowitz and his firm were responsible for $10,000).  In

fact, if anything, the scope of Mr. Liebowitz's misconduct, his overall record, and the fact that

the case was fatally flawed from its inception would have supported a larger monetary sanction.

In addition, the Court concludes that two types of non-monetary sanctions are warranted

to deter future misconduct.  First, Mr. Liebowitz shall be required to serve a copy of this Opinion

and Order on Mr. Usherson and every other current client of the Liebowitz Law Firm and to file

it on the docket of any pending case brought by Mr. Liebowitz or any attorney working for his

firm, as well as on the docket of any new case brought within one year from the date of the

Opinion and Order by Mr. Liebowitz or any attorney working for his firm.  *See In re Richard P.*

*Liebowitz*, No. 19-MC-80228 (JD), ECF No. 17, at 2-3 (N.D. Cal. June 12, 2020) (finding that

Mr. Liebowitz "has falsely held himself out as a member of this Court's bar on multiple

occasions," creating "good grounds for doubting that Liebowitz should be permitted to practice

in this District even on a pro hac vice basis," and thus requiring Mr. Liebowitz to "submit a copy

of this Order in every open case in this District in which he has been admitted pro hac vice," as

well as "with every future pro hac vice application he may file in this District between June 13,

2020, and June 13, 2021");  *Gallop*, 667 F.3d at 230 (requiring sanctioned counsel "for a period

of one year from the date of entry of this order, to provide notice of the sanctions imposed upon

him in this case . . . to any federal court in this Circuit before which he appears or seeks to

appear").  In addition, in any action that is filed within one year of the date of this Opinion and

Order by Mr. Liebowitz or any attorney working for the Liebowitz Law Firm that involves

allegations of copyright infringement, the complaint must include as an attached exhibit a copy

of the deposit files maintained by the U.S. Copyright Office reflecting the registration of the

relevant copyrighted work or works at issue.  *Cf. Gertskis v. N.Y. Dep't of Health & Mental*

*Hygiene*, No. 13-CV-2024 (JMF), 2014 WL 2933149, at *7 (S.D.N.Y. June 27, 2014) (requiring

that any future action be filed as an application for leave to file with a copy of the order imposing

sanctions for frivolous litigation); *In re Martin-Trigona*, 592 F. Supp. 1566, 1573 (D. Conn.

1984) (Cabranes, J.) (entering a permanent injunction placing limits on new lawsuits in response to a history of vexatious and harassing litigation).

Finally, the Court will send a copy of this Opinion and Order to the Chair of the Court's Grievance Committee to take whatever action the Committee deems appropriate. *See Berger* Tr. 27 (finding "this series of events serious enough to warrant . . . consideration" by the Grievance Committee); *Mondragon*, 2020 WL 2395641, at *1, *14 (concluding that "steps should be taken promptly by appropriate disciplinary authorities to suspend [Mr. Liebowitz's] ability to file new cases unless and until he has demonstrated he has appropriate systems in place to assure regular compliance with court rules and rules of professional conduct"); *cf. Konangataa v. Am. Broad. Cos.*, No. 16-CV-7382 (LAK), No. 16-CV-7383 (LAK), No. 16-CV-7472 (LAK), 2017 WL 2684067, at *3 (S.D.N.Y. June 21, 2017) (noting that "defendants may pursue any claims of professional misconduct on the part of plaintiff's attorney [Mr. Liebowitz] before appropriate disciplinary bodies").

## CONCLUSION

The Supreme Court has observed that "[m]embership in the bar is a privilege burdened with conditions. An attorney is received into that ancient fellowship for something more than private gain. He becomes an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice." *In re Snyder*, 472 U.S. 634, 644 (1985) (internal quotation marks and alterations omitted). Further, "[a]s an officer of the court, a member of the bar enjoys singular powers that others do not possess." *Id.* at 644. In exchange for "[t]he license granted by the court," members of the bar must "conduct themselves in a manner compatible with the role of courts in the administration of justice." *Id.* at 645.

53

In this case and others, Mr. Liebowitz and his firm have fallen far short of that standard and failed to "conduct themselves in a manner compatible with the role of courts in the administration of justice." *Id.* at 645. Accordingly, and for the reasons stated above, the Court concludes that sanctions must be imposed on Mr. Liebowitz and his firm, as follows:

(1) **Within seven days of the date of this Opinion and Order**, Mr. Liebowitz and his firm shall pay to the Clerk of Court sanctions totaling $103,517.49;

(2) **By the same date**, Mr. Liebowitz shall serve a copy of this Opinion and Order by overnight courier on Mr. Usherson and file proof of such service on ECF;

(3) **Within thirty days of the date of this Opinion and Order**, Mr. Liebowitz and his firm shall serve a copy of this Opinion and Order, either by email or by overnight courier, on every one of the firm's current clients and Mr. Liebowitz shall file a declaration attesting to such service on ECF;

(4) **By the same date**, Mr. Liebowitz and his firm shall file a copy of this Opinion and Order on the docket of any currently pending case that was brought by Mr. Liebowitz or his firm and Mr. Liebowitz shall file a declaration attesting to the same on ECF;

(5) In any action that is filed **within one year of the date of this Opinion and Order** by Mr. Liebowitz or his firm, Mr. Liebowitz and his firm shall file a copy of this Opinion and Order on the docket of the case **within two days of filing the complaint or otherwise initiating the case**; and

(6) In any action that is filed **within one year of the date of this Opinion and Order** by Mr. Liebowitz or his firm that involves allegations or claims of copyright infringement, the complaint shall include as an attached exhibit a copy of the deposit files maintained by the U.S. Copyright Office reflecting prior registration of the relevant copyrighted work or works at issue.

In addition, as noted above, the Court will send a copy of this Opinion and Order to the Chair of the Court's Grievance Committee to take whatever action the Committee deems appropriate.

The Clerk of Court is directed to terminate ECF No. 14.

SO ORDERED.

Dated: June 26, 2020
New York, New York

_____
JESSE M. FURMAN
United States District Judge

54

# APPENDIX

1. *Sadowski v. Ziff Davis, LLC*, No. 20-CV-2244 (DLC), 2020 WL 3397714, at *4 (S.D.N.Y. June 19, 2020) (citing the fact that "Liebowitz regularly fails to comply with court orders . . . [and] has been repeatedly sanctioned" as a factor weighing in favor of requiring a bond to cover fees and costs, and noting that "[w]hile one can always hope that Liebowitz will comply with court orders in this case and conform his behavior to the standards of his chosen profession, it is difficult to be sanguine on this score given his track record").

2. *In re Richard P. Liebowitz*, No. 19-MC-80228 (JD), ECF No. 17, at 1-2 (N.D. Cal. June 12, 2020) (finding that Mr. Liebowitz "has falsely held himself out as a member of this Court's bar on multiple occasions," even though he "never has been a member"; noting that his "unprofessional and blameworthy conduct" is "consistent with the extensive public record of discipline he has amassed in courts across the United States"; and concluding that there are "good grounds for doubting that Liebowitz should be permitted to practice in this District even on a pro hac vice basis").

3. *Ramales v. Alexander Wang Inc.*, No. 20-CV-0926 (DLC), ECF No. 32, ¶¶ 9-11 (S.D.N.Y. June 12, 2020) (declaration in support of a sanctions motion stating that opposing counsel repeatedly requested licensing history from Mr. Liebowitz, who first claimed he could not retrieve it "without a subpoena," and then admitted that there was "no licensing history and that his client was wrong," at which point he filed a notice of settlement at ECF No. 39 and avoided adjudication of the sanctions motion).

4. *Geerds v. San Francisco Bay View Inc.*, No. 19-CV-6465 (JST), ECF No. 29 (N.D. Cal. June 10, 2020) (denying Mr. Liebowitz's motion for admission *pro hac vice* in a case he filed in the Northern District on October 8, 2019, *one day after* he was disbarred in *In re Richard P. Liebowitz*, No. 19-MC-80228 (JD), ECF No. 3 (N.D. Cal. Oct. 7, 2019)).

5. *Polaris Images Corp. v. ENTtech Media Grp., LLC*, No. 19-CV-8208 (KPF), 2020 U.S. Dist. LEXIS 97851, at *3 (S.D.N.Y. June 3, 2020) (finding that the Court could not award attorney's fees under 17 U.S.C. § 505 against Mr. Liebowitz's client because Mr. Liebowitz had filed a notice of voluntary dismissal before the Court ruled on the defendant's motion to dismiss, and noting that "[t]he Court sympathizes with ENTtech's frustration with Plaintiffs' conduct, and is only too aware of the notoriety that Plaintiffs' counsel, Richard Liebowitz, has obtained in this District").

6. *Alvarado v. Mother Jones, LLC*, No. 19-CV-6417 (JST), ECF No. 25, at 2-4 (N.D. Cal. May 14, 2020) (denying Mr. Liebowitz's motion to appear pro hac vice after finding that Mr. Liebowitz continues to "regularly" file and litigate cases in the Northern District of California following his order of disbarment in *In re Richard P. Liebowitz*).

7. *Mondragon v. Nosrak LLC*, No. 19-CV-1437 (CMA) (NRN), 2020 WL 2395641, at *1,

i

*14 (D. Colo. May 11, 2020) (concluding that "Mr. Liebowitz's continued practice of law represents a clear and present danger to the fair and efficient administration of justice, and steps should be taken promptly by appropriate disciplinary authorities to suspend his ability to file new cases unless and until he has demonstrated he has appropriate systems in place to assure regular compliance with court rules and rules of professional conduct," and requiring that Mr. Liebowitz associate with a Colorado-based attorney with at least five years of experience, who must co-sign any filings in the case, and that Mr. Liebowitz file a copy of the sanctions order in all other cases he has filed in the District of Colorado or files in the following sixth months).

8.  *Chevrestt v. Barstool Sports, Inc.*, No. 20-CV-1949 (VEC), 2020 WL 2301210, at *2 & n.4 (S.D.N.Y. May 8, 2020) (sanctioning Mr. Liebowitz under Rule 16, and finding that his attempt to plead "administrative oversight" was "disingenuous, distasteful, unpersuasive, and likely perjurious," noting that he filed twenty-five new cases during the time he allegedly was prevented from complying with the Court's order to timely file proof of service).

9.  *Ward v. Consequence Holdings, Inc.*, No. 18-CV-1734 (NJR), 2020 WL 2219070, at *3 (S.D. Ill. May 7, 2020) (concluding that Mr. Liebowitz "likely filed this action as a bad faith, frivolous effort to harass [the defendant]"; imposing $20,000 in sanctions under the Court's inherent authority; and noting that "Liebowitz's conduct in this case has been irresponsible, unreasonable, and detrimental to the fair administration of justice, harming both [the defendant], the Court, and even his own client, who has lost his opportunity to advance what appears to have been a meritorious claim").

10. *Wisser v. Vox Media, Inc.*, No. 19-CV-1445 (LGS), 2020 WL 1547381, at *3, *6 (S.D.N.Y. Apr. 1, 2020) (imposing sanctions for various discovery violations, including affixing his client's signature to interrogatory responses without authorization and without the client having even read the responses; and finding that "[c]lear evidence shows that Mr. Liebowitz's and his firm's actions . . . were so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose" (internal quotation marks omitted)).

11. *Masi v. Mythical Entm't*, No. 19-CV-438 (FL), 2020 WL 1490704, at *1-2 (E.D.N.C. Mar. 24, 2020) (dismissing the case without prejudice for failure to comply with court orders because of Mr. Liebowitz's refusal to cure a "litany" of filing deficiencies, which "mirrored numerous deficiencies in other cases before this court involving attorney Liebowitz," in violation of the Court's repeated warnings and orders).

12. *Dermansky v. Tel. Media, LLC*, No. 19-CV-1149 (PKC) (PK), 2020 U.S. Dist. LEXIS 44475, at *22 n.7, 24 (E.D.N.Y. Mar. 13, 2020) (citing Mr. Liebowitz's "misleading conduct," such as "cherry picking the few cases that support his maximum statutory damages request while ignoring the more numerous cases litigated by the same attorney awarding far less," in past cases and the current case, and warning him that he may be subject to Rule 11 sanctions if he continues to engage in such conduct (internal quotation

marks omitted)).

13. *Rock v. Enfants Riches Deprimes, LLC*, No. 17-CV-2618 (ALC), 2020 WL 468904, at
*4, *7 (S.D.N.Y. Jan. 29, 2020) (granting attorney's fees against Mr. Liebowitz's client
totaling over $100,000, $10,000 of which Mr. Liebowitz and his firm were responsible
for as sanctions, and finding that Mr. Liebowitz's "conduct — of failing to investigate the
evidentiary basis for a Complaint, of stonewalling discovery, of misleading the Court,
and of making meritless arguments — undoubtedly demonstrates bad faith").

14. *Otto v. Hearst Comm'ns, Inc.*, No. 17-CV-4712, 2020 WL 377479, at *3-4 (S.D.N.Y.
Jan. 23, 2020) (denying Mr. Liebowitz's motion for attorney's fees because he and his
client Otto "consistently and undeniably asserted inflated values for Otto's copyright"
that were "wholly unsupported by the evidentiary record"; and noting that "[t]he
protection of copyright is an important value, but there is little benefit to the copyright
law in rewarding Otto for prolonging litigation in pursuit of an unjustifiably inflated
claim").

15. *Karavani v. Nooklyn, Inc.*, No. 19-CV-1588 (ENV) (RER), 2019 U.S. Dist. LEXIS
224199, at n.2 (E.D.N.Y. Dec. 13, 2019) (affirming the magistrate judge's decision to
require Mr. Liebowitz's client to post a bond because "[t]he bond order was well founded
. . . and was heavily buttressed [by] multiple recent cases where plaintiff's attorney has
been ordered to post a bond and been previously sanctioned for misconduct in similar
circumstances").

16. *Sands v. Bauer Media Grp. USA, LLC*, No. 17-CV-9215 (LAK), 2019 WL 6324866, at
*1-3 (S.D.N.Y. Nov. 26, 2019) (dismissing an action with prejudice because of Mr.
Liebowitz's client's failure to post a bond to cover costs and attorney's fees awarded to
the opposing party because of Mr. Liebowitz's "discovery abuse" and "failure . . . to
comply with discovery obligations," and noting that "[i]n his zeal to deny that he files
suits to extort settlements," Mr. Liebowitz stated falsely under penalty of perjury that his
client did not make a settlement demand in this case, even though he plainly did at both
the initial conference and in an email "from Mr. Liebowitz . . . in which Mr. Liebowitz
himself proposed settling for $25,000").

17. *Berger v. Imagina Consulting, Inc.*, No. 18-CV-8956 (CS), 2019 WL 6695047, at *4
(S.D.N.Y. Nov. 1, 2019) (holding Mr. Liebowitz in contempt of Court, imposing
sanctions of $500 per day he failed to comply with the Court's orders, and ordering Mr.
Liebowitz to appear and show cause on pain of "arrest by the United States Marshals
Service" in connection with Mr. Liebowitz's misrepresentation about the date on which
his grandfather passed away, which he made in order to justify missing a discovery
conference, and his refusal to provide documentation reflecting the actual date of passing
— misconduct which would later be referred to the Southern District's Grievance
Committee).

18. *Polaris Images Corp. v. CBS Interactive, Inc.*, No. 19-CV-3670 (VEC), 2019 WL

iii

5067167, at *3 (S.D.N.Y. Oct. 9, 2019) (imposing sanctions under Rule 16; concluding that "given the frequency with which Mr. Liebowitz commits 'administrative errors,' the undersigned is unconvinced that they are indeed good faith oversights"; and noting "Mr. Liebowitz's continual disregard for this Court's orders in multiple other cases").

19. *In re Richard P. Liebowitz*, No. 19-MC-80228 (JD), ECF No. 3 (N.D. Cal. Oct. 7, 2019) (ordering Mr. Liebowitz removed from the membership roll of the bar of the Court after he filed a case without being an active member of the state bar and submitted an explanation that was "not responsive and does not say anything at all about his membership in the State Bar of California"; and directing him to "disclose these [order to show cause] proceedings to any judge in this district before whom Liebowitz has a pending pro hac vice application").

20. *Craine v. Stylish Curves LLC*, No. 19-CV-3995 (BMC), Text-Only Order (E.D.N.Y. Sept. 3, 2019) (sanctioning Mr. Liebowitz for failing to appear at an initial status conference or request an entry of default, as ordered by the Court; noting that Mr. Liebowitz "made no effort to even contact this Court" until more than a week after the deadline passed; and, after rescheduling the status conference, directing Mr. Liebowitz to "attend this conference personally, not send some other lawyer").

21. *Mango v. Democracy Now! Prods.*, No. 18-CV-10588 (DLC), 2019 U.S. Dist. LEXIS 123550, at *15 (S.D.N.Y. July 24, 2019) (concluding that "[t]he history of Liebowitz's failure to comply with court orders counsels in favor of the imposition of an additional bond" on his client).

22. *Rice v. NBCUniversal Media, LLC*, No. 19-CV-447 (JMF), 2019 WL 3000808, at *4-5 (S.D.N.Y. July 10, 2019) (imposing $8,745.50 in sanctions under Rule 16 and the Court's inherent authority, and finding that Mr. Liebowitz's "disobedience of the Court's Orders — both the Orders requiring mediation and Liebowitz's appearance on May 2 — was willful").

23. *Craig v. UMG Recordings, Inc.*, No. 16-CV-5439 (JPO), 2019 WL 2992043, at *4, *7 (S.D.N.Y. July 9, 2019) (holding Mr. Liebowitz and his firm jointly and severally liable for an attorney's fees and costs award of $98,532.62, and "reaffirm[ing] [the Court's] inference that Liebowitz acted in bad faith" in filing a frivolous motion).

24. *Stelzer v. Lead Stories LLC*, No. 19-CV-0473 (PAB) (KMT), 2019 WL 5095689, at *4 (D. Colo. July 3, 2019) (granting dismissal with prejudice as a sanction for repeated failures to comply with deadlines and court orders, including a failure to attend a scheduled conference, and noting that "Plaintiff's counsel has previously been sanctioned in another district for similar behavior, which clearly has had no deterrent effect").

25. *Rice v. Musee Lingerie, LLC*, No. 18-CV-9130 (AJN), 2019 U.S. Dist. LEXIS 111487, at *6 (S.D.N.Y. July 3, 2019) (noting that "Plaintiff's attorney, Mr. Liebowitz, has previously been sanctioned by courts in this District for failure to comply with court orders and for filing misleading documents with the courts," and ordering the imposition

iv

of a bond on his client because "Defendant here has a justified concern that Plaintiff, through his counsel, will evade court orders, or not proceed with this litigation prudently").

26. *Stridiron v. Cmty. Broads., LLC*, No. 19-CV-108 (MAD) (ATB), 2019 U.S. Dist. LEXIS 103805, at *10-11 (N.D.N.Y. June 21, 2019) (noting that "like in the present matter, Mr. Liebowitz has regularly been found to have failed to comply with court orders," and "courts in the Southern and Eastern Districts of New York have now begun to regularly require plaintiffs represented by Mr. Liebowitz to file bonds before proceeding further with his lawsuits, after a number of them were dismissed as frivolous from the bench or voluntarily dismissed by the plaintiff when it was made clear that the suits were subject to dismissal").

27. *Lee v. W Architecture & Landscape Architecture, LLC*, No. 18-CV-5820 (PKC) (CLP), 2019 U.S. Dist. LEXIS 89335, at *12-13 (E.D.N.Y. May 28, 2019) (relying on "*counsel*'s history of violating court orders," both "in this case" and in "other cases," to impose a bond on Mr. Liebowitz's client, and noting that "plaintiff has failed to timely file motion papers and failed to move this case forward").

28. *Dvir v. Dancing Astronaut, Inc.*, No. 18-CV-9416 (VEC), ECF No. 31, at 1, 6 (S.D.N.Y. May 22, 2019) (imposing sanctions under Rule 16 because "Mr. Liebowitz failed to comply with this Court's order — communicated to him in-person, face-to-face, by the undersigned," to be suspended for eighteen months in the "hopes" of deterring "Mr. Liebowitz's future noncompliance with [the Court's] orders").

29. *Otto v. Hearst Comm'ns, Inc.*, No. 17-CV-4712 (GHW) (JLC), 2019 WL 1034116, at *12 (S.D.N.Y. Feb. 21, 2019) (concluding that sanctions were not warranted "on the current record" for Mr. Liebowitz's alleged misrepresentations during settlement negotiations, although it was "a close call," and noting that "[t]his is hardly the first time that Liebowitz and his firm have had their reputation called into question, and the Court can only hope it will be the last").

30. *Pereira v. 3072541 Canada Inc.*, No. 17-CV-6945 (RA), 2018 WL 5999636, at *3 (S.D.N.Y. Nov. 15, 2018) (finding that "Mr. Liebowitz failed to follow this Court's orders and rules in at least three ways," although ultimately declining to impose monetary sanctions, and expressing concern over "Mr. Liebowitz's repeated failures to follow the orders and rules of this Court and others within the district, as well as his propensity to take unreasonable positions and to omit crucial facts — or even to make outright misrepresentations — in an apparent attempt to increase costs and to extort unwarranted settlements").

31. *McDermott v. Monday Monday, LLC*, No. 17-CV-9230 (DLC), 2018 U.S. Dist. LEXIS 184049, at *9-10 (S.D.N.Y. Oct. 26, 2018) (denying Mr. Liebowitz's request for the Court to redact the term "copyright troll" from an opinion that described him as such because "[a]s evidenced by the astonishing volume of filings coupled with an astonishing rate of voluntary dismissals and quick settlements, it is undisputable that Mr. Liebowitz is

a copyright troll").

32. *Ferdman v. CBS Interactive Inc.*, 342 F. Supp. 3d 515, 529-30 (S.D.N.Y. 2018) (imposing discovery sanctions because "Plaintiff [represented by Mr. Liebowitz] has offered no explanation for his failure to produce copyright application-related materials during discovery," and therefore denying Plaintiff's motion for summary judgment because "there is a genuine issue of material fact as to whether the photographs that are the subject of Plaintiff's infringement claim are included in the copyright registration").

33. *Seidman v. GAX Prods., LLC*, No. 18-CV-2048 (RA) (BCM), ECF No. 23, at 3 (S.D.N.Y. Sept. 6, 2018) (sanctioning Mr. Liebowitz for serving unsigned interrogatory responses, "even after this Court expressly reminded [his client] of that obligation" in an order, and making arguments defending his actions that were "meritless as a matter of law").

34. *Leibowitz v. Galore Media Inc.*, No. 18-CV-2626 (RA) (HBP), ECF No. 18, at 6 (S.D.N.Y. July 11, 2018) (ordering Mr. Liebowitz's client to post a bond in part because "defendant has a justified concern that plaintiff's counsel, Richard P. Liebowitz, will evade court orders or voluntarily dismiss the action in an attempt to make plaintiff's assets unreachable in the event costs are awarded to defendant").

35. *Romanowicz v. Alister & Paine, Inc.*, No. 17-CV-8937 (PAE) (KHP), ECF No. 24 (S.D.N.Y. June 22, 2018) (imposing monetary sanctions on Mr. Liebowitz after he "failed to attend the [inquest] hearing as ordered and failed to request an adjournment," in addition to other violations of the Court's orders).

36. *Terry v. Masterpiece Adver. Design*, No. 17-CV-8240 (NRB), 2018 U.S. Dist. LEXIS 104467, at *4-5 (S.D.N.Y. June 21, 2018) (rejecting Mr. Liebowitz's argument that the Court should award $20,000 in damages without conducting any inquest as having "no basis in law" and being "constructed from whole cloth," as previously ruled in the same case before Mr. Liebowitz "repeat[ed] [it] as part of this second motion").

37. *Steeger v. JMS Cleaning Servs., LLC*, No. 17-CV-8013 (DLC), 2018 WL 1363497, at *2-3 (S.D.N.Y. Mar. 15, 2018) (imposing monetary sanctions and a requirement that Mr. Liebowitz complete "four CLE credit hours in ethics and professionalism" in an effort to address Mr. Liebowitz's "pattern of omissions and misrepresentations," and noting that even Mr. Liebowitz's motion for reconsideration of the sanctions order "continues the pattern").

38. *Reynolds v. Hearst Comm'ns, Inc.*, No. 17-CV-6720 (DLC), 2018 U.S. Dist. LEXIS 35453, at *12 (S.D.N.Y. Mar. 5, 2018) ("Mr. Liebowitz also argues that plaintiff has not willfully disobeyed court orders, obstructed discovery, or increased the cost of litigation. This is demonstrably false. Mr. Liebowitz failed to comply with orders in this litigation, as he has in other lawsuits. Further, the failure to include the Campaign [to which the plaintiff had voluntarily given the photograph at issue, and which then passed the

photograph along to the defendant], as part of this suit, or to even mention the plaintiff's relationship with the Campaign in the complaint, will inevitably increase the cost of litigation.").

39. *Janik v. SMG Media, Inc.*, No. 16-CV-7308 (JGK) (AJP), 2018 WL 345111, at *16 (S.D.N.Y. Jan. 10, 2018) (concluding that "the Liebowitz Law Firm made a total hash of discovery, requiring multiple court conferences," and "there was a failure of counsel to adequately communicate and coordinate with the plaintiffs, let alone with opposing counsel and the Court," and warning that "the Liebowitz Law Firm needs to consider its reputation with the Court and, frankly, clean up its act").

40. *Konangataa v. American Broad. Cos., Inc.*, No. 16-CV-7382 (LAK), No. 16-CV-7383 (LAK), No. 16-CV-7472 (LAK), 2017 WL 2684067, at *2-3 (S.D.N.Y. June 21, 2017) (granting attorney's fees to Mr. Liebowitz's adversary because "no reasonable lawyer with any familiarity with the law of copyright could have thought that [the use of work at issue] . . . was anything but fair," and noting that "defendants may pursue any claims of professional misconduct on the part of plaintiff's attorney before appropriate disciplinary bodies").

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Arthur Usherson (plaintiff);

Richard Liebowitz (appellant); Liebowitz Law Firm, PLLC (appellant)

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

Bandshell Artist Management (defendant)

(List the full name(s) of the defendant(s)/respondent(s).)

19 CV 6368 (JMF)(    )

**NOTICE OF APPEAL**

Notice is hereby given that the following parties: (1) Richard Liebowitz (attorney for plaintiff and party to this appeal);

(2) Liebowitz Law Firm, PLLC (attorney for plaintiff and party to this appeal)

(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the    ☐ judgment    ☒ order    entered on: June 26, 2020 [Dkt. No. 68]

(date that judgment or order was entered on docket)

that:

Imposed monetary and non-monetary sanctions on Richard Liebowitz and Liebowitz Law Firm, PLLC

(If the appeal is from an order, provide a brief description above of the decision in the order.)

July 20, 2020

Dated

/s/ Robert J. Anello

Signature*

Robert J. Anello

Name (Last, First, MI)

565 Fifth Avenue    New York    NY    10017

Address    City    State    Zip Code

(212) 880-9520

Telephone Number

ranello@maglaw.com

E-mail Address (if available)

---

* Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case. Fed. R. App. P. 3(c)(2). Attach additional sheets of paper as necessary.

Rev. 12/23/13

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ARTHUR USHERSON, | |
| Plaintiff, | |
| v. | No. 19-CV-6368 (JMF) |
| BANDSHELL ARTIST MANAGEMENT, | |
| Defendant. | |

|  |
|---|
| RICHARD LIEBOWITZ; LIEBOWITZ LAW FIRM, PLLC, |
| Miscellaneous. |

## [PROPOSED] ORDER TO SHOW CAUSE TO STAY
## ORDER PENDING APPEAL

Upon the Declaration of Brian A. Jacobs, dated July 20, 2020, the Declaration of Richard Liebowitz, dated July 20, 2020, the Declaration of Bruce Cotler, dated July 19, 2020, and Mr. Liebowitz and Liebowitz Law Firm ("LLF")'s memorandum of law in support of their motion by order to show cause for a stay pending appeal:

**IT IS HEREBY ORDERED** that Defendant Bandshell Artist Management show cause before this Court on _____, 2020 at _____ ___.m. before the Honorable Jesse M. Furman, United States District Court Judge, why an order should not be entered (a) granting a stay of the non-monetary sanctions numbered three, four, five, and six in this Court's Opinion and Order dated June 26, 2020 (Dkt. No. 68) (the "Order") pending appeal of the Order to the United States Court of Appeals for the Second Circuit, and (b) in the alternative, in the event that

this Court denies the motion for a stay pending appeal, staying the sanctions for sufficient time to allow Mr. Liebowitz and LLF to promptly move in the Second Circuit for a stay pursuant to Federal Rule of Appellate Procedure 8(a)(2) and, assuming such motion is promptly made, until the Second Circuit determines the stay motion.

**IT IS FURTHER ORDERED** that service via email and ECF of a copy of this order and annexed papers upon the Defendant on or before _____ ___.m on _____, 2020, shall be deemed good and sufficient service thereof.

**IT IS FURTHER ORDERED** that Defendant's opposing papers, if any, in response to this order to show cause, shall be served upon counsel for Mr. Liebowitz and LLF on an expedited basis no later than _____, 2020 at _____ ___.m.

**IT IS FURTHER ORDERED** that Mr. Liebowitz and LLF's reply papers, if any, shall be served upon counsel for Defendant on an expedited basis no later than _____, 2020 at _____ ___.m.

**IT IS FURTHER ORDERED** that all aspects of the non-monetary sanctions numbered three, four, five, and six in the Order are stayed pending this Court's resolution of Mr. Liebowitz and LLF's present motion by order to show cause for a stay pending appeal.

**SO ORDERED**:

Dated: _____, 2020
_____, New York

_____
Hon. Jesse M. Furman
United States District Judge

# Exhibit E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                   :

ARTHUR USHERSON,                 :

                                   :

                    Plaintiff,         :          19-CV-6368 (JMF)

                                   :

         -v-                  :        <u>OPINION AND ORDER</u>

                                   :

BANDSHELL ARTIST MANAGEMENT,    :

                                   :

                  Defendant.      :

                                   :

------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

On June 26, 2020, the Court issued a fifty-four page Opinion and Order — familiarity with which is assumed — imposing a range of monetary and non-monetary sanctions on the oft-sanctioned Plaintiff's counsel Richard Liebowitz and his firm, the Liebowitz Law Firm, PLLC. *See Usherson v. Bandshell Artist Mgmt.*, No. 19-CV-6368 (JMF), 2020 WL 3483661 (S.D.N.Y. June 26, 2020) (ECF No. 68). The sanctions were based on three sets of detailed findings: first, that Mr. Liebowitz had violated "at least six of the Court's Orders"; second, that he repeatedly lied to the Court, including under oath at a hearing, about whether he had been granted permission by a mediator (the "Mediator") for his client to participate in a mediation session by telephone; and third, that he had failed to reasonably investigate whether the photograph at issue (the "Photograph") had been registered with the Copyright Office (it hadn't), both prior to filing suit and when put on notice about the issue during the litigation. *See id.* at *1, *11-18. The Court found that the sanctions, several of which involve notifying other clients and courts about the Court's Opinion and Order, were reasonably necessary to deter repetition of the misconduct

given Mr. Liebowitz's "long and ignominious history." *Id.* at *19-21.  Mr. Liebowitz and his

firm had thirty days to comply with several of the sanctions.  *See id.* at *22.  Two evenings ago

— that is, twenty-four days after the Court's decision and only four business days before the

deadline — they filed a motion (styled as an order to show cause) asking the Court to stay those

sanctions pending appeal.  *See* ECF No. 76.

> In deciding whether to issue a stay pending appeal, a court must consider four factors:
>
> (1) whether the stay applicant has made a strong showing that he is likely to
> succeed on the merits; (2) whether the applicant will be irreparably injured absent
> a stay; (3) whether issuance of the stay will substantially injure the other parties
> interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 434 (2009).  The first two factors — the likelihood of success and

irreparable harm — "are the most critical," *id.*, and "have typically been evaluated on a sliding

scale, so that a strong showing that the applicant is likely to succeed excuses a weaker showing

of irreparable injury," *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 884 F. Supp. 2d

108, 122 (S.D.N.Y. 2012).  Nevertheless, as the Supreme Court has emphasized, "the applicant

must demonstrate that both factors are satisfied, so that even if a party makes a robust showing

that it is likely to succeed on appeal, it must also show that 'irreparable injury is likely.'"  *Id*.

(quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  "A stay," moreover, "is

not a matter of right, even if irreparable injury might otherwise result.  It is instead an exercise of

judicial discretion, and the propriety of its issue is dependent upon the circumstances of the

particular case."  *Nken,* 556 U.S. at 433 (internal quotation marks and citations omitted).

Ultimately, the party or parties seeking the stay — here, Mr. Liebowitz and his firm (together,

the "Movants") — bear "the heavy burden of demonstrating that a stay is warranted."  *U.S.*

*Commodity Futures Trading Comm'n v. eFloorTrade, LLC*, No. 16-CV-7544 (PGG), 2020 WL

2216660, at *2 (S.D.N.Y. May 7, 2020) (internal quotation marks omitted).

Applying these standards, the Court finds that the Movants do not come close to carrying their heavy burden.  The Court is tempted to leave things there and let its Opinion and Order, with its exhaustive findings and analysis, speak for itself.  (Mr. Liebowitz's shenanigans have surely consumed enough of this Court's time and resources as it is.)  But a few observations are in order, if only to aid the Circuit in the event that the Movants decide to now burden that court with having to decide on short notice whether a stay pending appeal is warranted.

## IRREPARABLE HARM

For starters, the Movants' claims of irreparable harm ring hollow for several reasons.  First, the Movants' principal claim is that the sanctions — which require service of the Court's Opinion and Order on current and future clients and in current and future actions — will result in "severe and irreparable reputational and economic harm to their law practice."  ECF No. 78 ("Mem."), at 11.  But any harm to Movants' reputations resulting from the mere act of sharing the Court's Opinion and Order is caused not by the *sanctions* themselves, but by growing awareness of *Mr. Liebowitz's own conduct and record*, which are accurately recounted in the Court's Opinion and Order.  Notably, the Movants attack none of the history recounted in the Court's Opinion and Order and few of the Court's factual findings, and, as discussed below, their attacks on those findings are entirely unpersuasive.

Significantly, the Court did not bar or even inhibit the Movants from filing any new action — though such sanctions have long been approved with respect to vexatious litigants.  *See, e.g.*, *Grezak v. Grezak*, 670 F. App'x 15, 16 (2d Cir. 2016) (summary order) (affirming imposition of a leave-to-file sanction); *In re Sassower*, 20 F.3d 42, 44 (2d Cir. 1994) ("[C]ourts

have recognized that the normal opportunity to initiate lawsuits may be limited once a litigant

has demonstrated a clear pattern of abusing the litigation process . . . .").  Instead, its order

merely requires the Movants to share information — that is, the Opinion and Order — with their

clients and any courts in which they appear for a time, on the theory that they may be deterred

from further misconduct by the knowledge that their clients and courts are likely to be more

vigilant.[1]  Requiring a party to share truthful information — here, that this Court made certain

findings and, on the basis of those findings, imposed sanctions on the Movants — does not

constitute irreparable harm.  *Cf. Smith v. Doe*, 538 U.S. 84, 98 (2003) ("Our system does not

treat dissemination of truthful information in furtherance of a legitimate governmental objective

as punishment."); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975) ("Public records by their

very nature are of interest to those concerned with the administration of government . . . .").

      Second, to the extent that awareness of the Court's Opinion and Order will cause the

Movants' reputational and economic harm, much of that harm has already occurred.  As the old

saying goes, the cat is out of the bag.  The Court's Opinion and Order is a public document and,

due in no small part to Mr. Liebowitz's well-deserved notoriety, it has already received fairly

extensive publicity in the press and social media, particularly in the copyright world.  *See, e.g.*,

Stephen Rex Brown, *Manhattan Federal Court's 'Most Sanctioned Lawyer' Fined $104K by

Judge*, N.Y. Daily News (June 29, 2020).[2]  Granting a stay would not undo any of that damage

---

[1]    Notably, the Court's Opinion and Order does not preclude Mr. Liebowitz from doing so in a manner that notes his disagreement with the Court's findings and sanctions or the fact that he plans to challenge them on appeal.

[2]    *See also, e.g.*, DL Cade, *Notorious Lawyer and 'Copyright Troll' Fined $103K, Photographers Beware*, PetaPixel (July 14, 2020), https://petapixel.com/2020/07/14/notorious-lawyer-and-copyright-troll-fined-103k-photographers-beware/; Ernesto Van der Sar, *Court Excoriates 'Copyright Troll' Lawyer and Adds $100,000 in Sanctions*, TorrentFreak (June 30,

(which, needless to say, is ultimately attributable to Mr. Liebowitz's own deplorable conduct rather than to the Court's Opinion and Order itself). Put another way, the potential harm here is not irreparable; it is only marginal. *See, e.g.*, *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63-64 (2d Cir. 2011) (finding no irreparable harm based on the reputational damage from a legislative declaration where the legislation was already enacted); *Star Boxing, Inc. v. Tarver*, No. 02-CV-8446 (GEL), 2002 WL 31867729, at *3 (S.D.N.Y. Dec. 20, 2002) (Lynch, J.) (rejecting irreparable harm to reputation where the embarrassing fact was "already known in boxing circles" so "whatever embarrassment could arise . . . ha[d] already occurred"); *Alvarez v. City of New York*, 2 F. Supp. 2d 509, 514 n.5, 514-15 (S.D.N.Y. 1998) (rejecting irreparable harm to reputation where the fact of investigation was already publicized, so "any 'damage' [wa]s already done").

Finally, a court "must consider a plaintiff's delay in seeking relief when analyzing whether the plaintiff will suffer irreparable harm in the absence of relief." *New York v. U.S. Dep't of Commerce*, 339 F. Supp. 3d 144, 148 (S.D.N.Y. 2018) (internal quotation marks omitted). That is because "inexcusable delay in filing" a motion to stay "severely undermines

---

2020), https://torrentfreak.com/court-excoriates-copyright-troll-lawyer-and-adds-100000-in-sanctions-200630/; Mike Masnick, *Copyright Troll Richard Liebowitz Benchslapped and Sanctioned AGAIN in a Massive Filing Detailing Pages Upon Pages of Him Lying Under Oath*, TechDirt (June 30, 2020), https://www.techdirt.com/articles/20200626/18131744799/copyright-troll-richard-liebowitz-benchslapped-sanctioned-again-massive-filing-detailing-pages-upon-pages-him-lying-under-oath.shtml; Bill Donahue, *Judge Says Liebowitz Might Need to Be Banned from SDNY*, Law360 (June 26, 2020), https://www.law360.com/articles/1287090/judge-says-liebowitz-might-need-to-be-banned-from-sdny; Eugene Volokh, *More Massive Sanctions on Richard Liebowitz, 'Copyright Troll' and 'Legal Lamprey'*, Reason: Volokh Conspiracy (June 26, 2020), https://reason.com/2020/06/26/more-massive-sanctions-on-richard-liebowitz-copyright-troll-and-legal-lamprey/; Porter Wells, *'Copyright Troll' Faces Disbarment at SDNY for Bad Behavior*, Bloomberg Law (June 26, 2020), https://news.bloomberglaw.com/ip-law/copyright-troll-faces-disbarment-at-sdny-for-bad-behavior.

the . . . argument that absent a stay irreparable harm would result." *Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 39 (2d Cir. 1993) (rebuking the Board of Elections for seeking a stay twenty-eight days after judgment was entered and only six days before election day). As noted, the Court gave the Movants thirty days in which to comply with the relevant sanctions or seek appropriate relief. Nevertheless, they waited until day twenty-four to seek a stay (at which point, no less, they proposed giving their adversary only three days in which to respond). Put simply, the Movants' "delay, in itself, belies [their] conclusory assertions of irreparable harm" and "is enough to defeat [their] claim." *U.S. Dep't of Commerce*, 339 F. Supp. 3d at 149.

## LIKELIHOOD OF SUCCESS ON THE MERITS

At best, the Movants make only a weak showing that they would suffer harm in the absence of a stay. It follows that they need to make a correspondingly "strong showing" of likelihood on the merits. *See U.S. Food & Drug Admin.*, 884 F. Supp. 2d at 122 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *cf. Winter*, 555 U.S. at 22. In particular, that requires them to do more than raise "serious questions" about the Court's Opinion and Order. Mem. 13; *see Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). Yet conspicuously they do not even attempt to do so; indeed, their boilerplate recitation of the standard aside, *see* Mem. 10, the Movants' brief does not even include the words "likelihood" or "success." In any event, they do not even meet the "more flexible" "serious questions" standard. *Citigroup Glob. Mkts., Inc.*, 598 F.3d at 38; *see LaRouche v. Kezer*, 20 F.3d 68, 72-73 (2d Cir. 1994) (providing that a stay may issue if "a serious legal question is involved" *and* the movant "present[s] a substantial case on the merits . . . and show[s] that the balance of the equities weighs heavily in favor of granting the stay").

6

Their first attack is on the Court's factual findings about Mr. Liebowitz's lies with respect to the Mediator and his knowledge that the Photograph in question was not registered prior to filing the Complaint.  But reading their motion papers, one wonders if they even read the Court's Opinion and Order.  With respect to Mr. Liebowitz's lies regarding the Mediator, the Movants do little more than cherry pick a single email that they argue (unpersuasively) is more "equivocal" than the Court acknowledged.  Mem. 15.  In doing so, however, they all but ignore the fact that the Court's findings were based in large part on its credibility assessments, following a full-blown evidentiary hearing, of the Mediator's and Mr. Liebowitz's testimony. *See Usherson*, 2020 WL 3483661, at *13 (explicitly crediting the Mediator's testimony, based on both "observations of the Mediator's demeanor" and corroborating evidence); *id.* (finding Mr. Liebowitz's testimony "unworthy of belief" and "patently incredible" based on "his demeanor at the hearing" and "the content of his testimony").[3]  In light of the "particularly strong deference" owed to the Court's findings in such circumstances, the Movants' arguments do not come close to raising questions, let alone serious questions, about the Court's decision.  *Ortega v. Duncan,* 333 F.3d 102, 107 (2d Cir. 2003); *see, e.g.*, *Ceraso v. Motiva Enters., LLC,* 326 F.3d 303, 316-17

---

[3]    The Movants assert that the Court "discounted" some portions of the Mediator's testimony, Mem. 15 n.8, and note the Court's ultimate conclusion that one subject of the hearing (whether the Mediator gave Mr. Liebowitz advance permission to send an associate in his place to the mediation) was "too 'muddled' to make factual findings as to Mr. Liebowitz's bad faith by clear and convincing evidence," *id.* at 6 n.5 (quoting *Usherson*, 2020 WL 3483661, at *13 n.3).  If anything, however, those features of the Court's Opinion and Order show the care that the Court took in making its findings and ensuring that it imposed sanctions only to the extent that the evidence clearly and convincingly supported those findings.  In any event, it is well established that a factfinder "is not required . . . to treat credibility as an all-or-nothing matter," but may "credit portions of a witness's testimony and discredit others."  *Hoyte v. Nat'l R.R. Passenger Corp.*, No. 04-CV-5297 (GEL), 2006 WL 2053383, at *3 n.2 (S.D.N.Y. July 24, 2006) (Lynch, J.).

(2d Cir. 2003) ("The decisions as to whose testimony to credit and which of permissible inferences to draw are solely within the province of the trier of fact . . . ."); *Mackler Prods., Inc. v. Cohen*, 225 F.3d 136, 145 (2d Cir. 2000) ("[T]he assessment of the credibility of witnesses is peculiarly within the province of the trier of fact . . . ." (internal quotation marks and brackets omitted)).

Meanwhile, the Movants attack a straw man when they contend that the Court erred by finding that Mr. Liebowitz "initiated this action knowing the Photograph was unregistered." Mem. 17. Put simply, that portion of the Court's sanctions decision was not based on a finding that Mr. Liebowitz knew when the complaint was filed that the Photograph had not yet been registered; indeed, the Court *acknowledged* that Mr. Liebowitz may not have personally known about the lack of registration at the time of filing. *Usherson*, 2020 WL 3483661, at *17. Instead, the Court faulted Mr. Liebowitz and his firm for their "inexcusable failure to conduct a reasonable investigation before and during the case." *Id.* Moreover, the Movants conspicuously focus solely on Mr. Liebowitz's knowledge when the Complaint was filed and say next to nothing about the Court's findings and analysis with respect to his or the firm's knowledge and conduct "during" the case. As the Court emphasized, however, whatever knowledge the Movants may have had before filing suit, they certainly knew or should have known about the untimely registration by November 2019, when defense counsel explicitly put them "on notice of what turns out to have been a fatal defect in the Complaint." *Id.* At that point, if not before, the Movants had an "obligation to investigate," yet they conducted "no investigation" whatsoever until ordered to do so months later by the Court. *Id.* at *17-18. To the contrary, Mr. Liebowitz affirmatively represented to the Court that the registration alleged in the Complaint was "the

correct" one and resisted discovery on the issue.  ECF No. 50 ("Initial Conf. Tr."), at 17-18.  Mr.

Liebowitz did not admit, as the Movants do now, that he lacked independent knowledge of the

registration, let alone acknowledge, as the Movants do now, that the allegation in the Complaint

was false; had he done so, the Court and Defendant would have learned sooner that the case was

fatally flawed from its inception.

Next, the Movants contend that the scope and severity of the sanctions are

disproportionate to the misconduct.  Mem. 18-22.  The Court is confident, however, that the

record set forth in the Opinion and Order, taken as a whole, justifies the scope and severity of the

chosen sanctions.[4]  Ironically, the cases that the Movants themselves cite make plain that the

Court acted well within its authority in imposing the sanctions on a nationwide basis.  *See, e.g.*,

*Gallop v. Cheney*, 667 F.3d 226, 230 (2d Cir. 2012) (requiring counsel to "provide notice of

sanctions imposed upon him in this case . . . to any federal court" in the Circuit "before which he

appears or seeks to appear" for "a period of one year from the entry of [the] order"); *Enmon v.*

*Prospect Capital Corp.*, 675 F.3d 138, 148 (2d Cir. 2012) (affirming the district court's sanctions

order requiring a firm's lawyers to submit the order "with any *pro hac vice* applications in the

Southern District of New York").

---

[4]     In a footnote, the Movants suggest that the Court may have separately erred "in
sanctioning Mr. Liebowitz and [his firm] for their conduct before *other* courts."  Mem. 18 n.10
(emphasis in original).  Putting aside the fact that a party may not raise an argument in a
footnote, that argument is frivolous.  The Court did not rely on the Movants' "[v]iolations of
orders in other litigation" as "*the basis*" of its decision to impose sanctions.  *Dow Chem. Pac.
Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329, 345 (2d Cir. 1986) (emphasis added).  Instead, it took
stock of Mr. Liebowitz's "long and ignominious history" in evaluating what sanctions were
necessary to deter further misconduct.  *Usherson*, 2020 WL 3483661, at *19.  The Court is not
aware of, and the Movants do not cite, any authority for the extreme proposition that a court
should blind itself to an attorney's history of misconduct in crafting appropriate sanctions.

Indeed, if anything, the Movants' own cases suggest that the Court did not go as far as it could have, given that the sanctions are limited in time and do not limit their ability to file new cases, but merely require disclosure.  *See Gallop,* 667 F.3d at 230; *see also Enmon*, 675 F.3d at 148 (noting that the Court had previously upheld a similar order against individual counsel "without any temporal limits"); *In re Hartford Textile Corp*., 681 F.2d 895, 897-98 (2d Cir. 1982) (per curiam) (imposing a "permanent[]" injunction on the litigation or relitigation of certain claims and legal issues).  The Movants are undoubtedly correct in asserting that "nationwide sanctions" are rare, *see* Mem. 20, but that is only because they are rarely warranted.  Here, they were, as the record makes clear that the Movants' practice — and misconduct — has begun to spread to other districts.[5]  Given that record, limiting sanctions to this District (or this Circuit) would not have been adequate to deter repetition of the misconduct; the Movants could simply file suits elsewhere.  That is, the Court's sanctions ensure that, for at least a year, any courts in which the Movants are litigating are "alert" to Mr. Liebowitz's "past activities so that they may take judicial notice of matters relevant to new litigation brought by him."  *In re Martin-Trigona*, 737 F.2d 1254, 1263 (2d Cir. 1984) (approving of an injunction requiring the

---

[5]      The Movants may have expanded the geographic scope of their practice in order to file more cases and make more money.  Or they may have done so in an effort to escape Mr. Liebowitz's well-earned reputation as a problem in this District.  (Not surprisingly, Mr. Liebowitz's reputation seems to have either preceded him or to be catching up with him.  *See, e.g.*, *In re Richard P. Liebowitz*, No. 19-MC-80228 (JD), ECF No. 17, at 1-2 (N.D. Cal. June 12, 2020) (noting that Mr. Liebowitz's "unprofessional and blameworthy conduct" is "consistent with the extensive public record of discipline he has amassed in courts across the United States"); *Mondragon v. Nosrak LLC*, No. 19-CV-1437 (CMA) (NRN), 2020 WL 2395641, at *1, *14 (D. Colo. May 11, 2020) ("Mr. Liebowitz's continued practice of law represents a clear and present danger to the fair and efficient administration of justice . . . .").)  Either way, the decision to expand the firm's practice is a strange one given Mr. Liebowitz's own acknowledgment that his business management practices are "not [the] best" and that "things need to change."  Initial Conf. Tr. 81-82; Mem. 18 n.9; ECF No. 79 ("Liebowitz Decl."), ¶ 12.

attachment of "pertinent informational materials to pleadings in state courts").  Anything less would be insufficient to deter repetition of Mr. Liebowitz's misconduct.

Finally, the Movants assert in passing that, by requiring the Movants to file a deposit copy of a copyright registration upon the initiation of an action, the Court impermissibly "alter[ed] the statutory presumption of validity in copyright cases."  Mem. 23.  Not so.  The statute at issue provides only that "[p]ossession of a registration certificate creates a rebuttable presumption that the work in question" — that is, the work covered by the certificate — "is copyrightable," *Whimsicality, Inc. v. Rubie's Costume Co.*, 891 F.2d 452, 455 (2d Cir. 1989), and that the copyright is otherwise "valid[]," 17 U.S.C. § 410(c).  That presumption, however, is not even remotely implicated by the Court's sanction requiring the Movants to verify and confirm that any work at issue in a new lawsuit is actually registered — which, after all, is a statutory condition precedent to even filing a copyright claim.  *Usherson*, 2020 WL 3483661, at *4 (citing 17 U.S.C. § 411(a)).[6]  Moreover, the Movants' argument falls flat for another reason: The sanction was imposed on *them*, based on *their* history of failing to investigate the evidentiary basis of their own pleadings, not on their current or future clients.  That is, although violation of the sanction would subject the Movants to contempt in this Court, it would not in any way (at least absent independent action by the court presiding over the new action) affect the substantive rights of the Movants' clients themselves.[7]

_____

[6]      The statutory presumption recognizes that "[t]he Copyright Office has expertise to determine in the first instance whether a filer has complied with the technical requirements for a registration certificate."  *Fonar Corp. v. Domenick*, 105 F.3d 99, 105 (2d Cir. 1997).  Needless to say, the Court does not undermine the Copyright Office's expertise by requiring the Movants to confirm that the Copyright Office did, in fact, review a work and issue a certificate.

[7]      On a related note, the Movants complain that the costs and delays involved in obtaining deposit copies of copyrighted works from the Copyright Office will reduce their clients'

## PUBLIC INTEREST

The final relevant factor is whether the public interest favors or disfavors a stay.[8]  In the

Court's view, there is a strong public interest in shining a bright light on Mr. Liebowitz's

extraordinary record of misconduct and in ensuring that both courts and his clients, current and

future, are aware of that history so that they can be vigilant in scrutinizing Mr. Liebowitz's

conduct.  *See, e.g.*, LOUIS D. BRANDEIS, OTHER PEOPLE'S MONEY AND HOW THE BANKERS USE IT

92 (1914) ("Sunlight is said to be the best of disinfectants; electric light the most efficient

policeman."); *cf. In re Oliver*, 333 U.S. 257, 270 & n.25 (1948) (noting, in reference to the

---

recoveries and may result in statute-of-limitations problems.  *See* Mem. 12-13.  The Court's
sanction may reduce some recoveries (although one would think that Mr. Liebowitz would
absorb the difference rather than passing the costs on to his clients), but there are reasons to think
the Movants overstate the potential impact.  By Mr. Liebowitz's own admission, he settles cases
"in the low thousands or tens of thousands of dollars," Liebowitz Decl. ¶ 6 — a far cry from the
$200 to $1,200 cost of obtaining a deposit copy, *see id.* ¶ 10.  Moreover, the sanction could serve
to reduce the Movants' overall expenses, given the substantial monetary sanctions that Mr.
Liebowitz routinely incurs.  Indeed, this is at least the third time that he and his clients have been
made to pay approximately $100,000 due to his misconduct.  *See Usherson*, 2020 WL 3483661,
at *22; *Rock v. Enfants Riches Deprimes, LLC*, No. 17-CV-2618 (ALC) 2020 WL 468902, at *4,
*7 (S.D.N.Y. Jan. 29, 2020); *Craig v. UMG Recordings, Inc.*, No. 16-CV-5439 (JPO), 2019 WL
2992043, at *4, *7 (S.D.N.Y. July 9, 2019).  In any event, the costs are the price of the Movants'
misconduct and, for reasons already stated, they are necessary to deter and prevent future
misconduct.  The Court is also skeptical of the Movants' concerns regarding delay, given that the
statute of limitations for copyright claims is three years.  17 U.S.C. § 507(b).  That said, to
ensure that the Court's sanction does not unintentionally harm a client through no fault of his or
her own, the Court modifies the sanction (Sanction 6) to include the following proviso:  In any
case in which the Movants have a good-faith belief that waiting for deposit copies might cause
their client's claim to be barred by the statute of limitations, they may file, in lieu of the deposit
copies, an affidavit (1) informing the court of such good-faith belief; (2) confirming that they
have applied for, and are awaiting, deposit copies of the work(s) at issue; and (3) representing
that they will promptly file such copies promptly upon their receipt.

[8]     The Court agrees with the Movants that a stay would not cause substantial injury to the
other parties interested in this proceeding, as the sanctions do not directly benefit Defendant.  *See*
Mem. 23.  The harm to other litigants and the interests of justice that might result from delaying
the sanctions is a factor in the public interest analysis.

importance of public trials, that "knowledge" that the proceeding "is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of . . . power" and that "the presence of interested spectators may keep" participants "keenly alive to a sense of their responsibility and to the importance of their functions").

Against that strong public interest, the Movants cite the "interest in the continuation of [their] law practice" because they have carved out "a successful law practice that provides a realistic prospect of recovery to copyright plaintiffs in relatively low-dollar infringement cases that otherwise could go unfiled." Mem. 24. But the sanctions do not bar the Movants from "continu[ing their] law practice," and Movants' conclusory assertion that such cases would not be filed without them is unsubstantiated. (Moreover, to the extent that the Movants' success is built on unsavory business practices or conduct unbecoming an officer of the court, it is, of course, not at all in the public interest for it to be perpetuated.) Nor do the Court's sanctions deprive photographers of the opportunity to hire Mr. Leibowitz or his firm to bring suit. The sanctions merely ensure that such photographers do so with their eyes wide open, cognizant of the fact that they could be left holding the bag on a hefty attorney's fee or sanctions award, *see, e.g.*, *Rock*, 2020 WL 468904, at *2 (ordering Mr. Liebowitz's client to pay the defendant's attorney's fees over $100,000), and of Mr. Liebowitz's tendency to cut and run, perhaps sacrificing their interests in the process, when he feels that the heat is on him personally, *see Usherson*, 2020 WL 3483661, at *1. In short, insofar as the sanctions provide Mr. Liebowitz's clients and courts with more information about his past, it is in the public interest for them to go into effect now, while the Grievance Committee ponders Mr. Liebowitz's fate longer term.

*       *       *       *

In sum, the Movants' eleventh-hour request for a stay of the Court's sanctions pending appeal is denied and the Court's sanctions remain in full force and effect, with the following modification: In any case in which the Movants have a good-faith belief that waiting for deposit copies might cause their client's claim to be barred by the statute of limitations, they may file, in lieu of the deposit copies, an affidavit (1) informing the court of such good-faith belief; (2) confirming that they have applied for, and are awaiting, deposit copies of the work(s) at issue; and (3) representing that they will promptly file such copies promptly upon their receipt.

Nor will the Court grant the Movants' alternative request for an "administrative" stay pending the Circuit's decision on whether to grant a stay pending appeal.  Mem. 24-25.  Granting an administrative stay would obviously ease the burden on the Circuit in the event that it is called upon to decide if a longer stay is warranted.  In the Court's view, however, that virtue is outweighed by the vice of rewarding an appellant for dilatory conduct.  Deadlines matter.  And having given Mr. Liebowitz and his firm sufficient time to either comply or seek a stay, the Court should not be forced to alter its deadline merely because *they* waited until the last minute to do the latter.  Instead, in the event of an appeal from this Order, the Court will leave it to Mr. Liebowitz and his firm to explain to the Circuit why they put that court in the position of deciding whether to grant a stay with only a few days remaining on the clock.

SO ORDERED.

Dated: July 22, 2020
New York, New York

_____
JESSE M. FURMAN
United States District Judge

14

# Exhibit F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARTHUR USHERSON,

                                        Plaintiff,

        - against -

BANDSHELL ARTIST MANAGEMENT

                                        Defendant.

---

Docket No. 1:19-cv-6368

JURY TRIAL DEMANDED

## **COMPLAINT**

Plaintiff Arthur Usherson ("Usherson" or "Plaintiff") by and through his undersigned

counsel, as and for his Complaint against Defendant Bandshell Artist Management ("Bandshell

or "Defendant") hereby alleges as follows:

## **NATURE OF THE ACTION**

1.       This is an action for copyright infringement under Section 501 of the Copyright

Act. This action arises out of Defendant's unauthorized reproduction and public display of a

copyrighted photograph of singer-songwriter Leon Redbone, owned and registered by Usherson,

a professional photographer. Accordingly, Usherson seeks monetary relief under the Copyright

Act of the United States, as amended, 17 U.S.C. § 101 *et seq.*

## **JURISDICTION AND VENUE**

2.       This claim arises under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and this Court

has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

3.       Upon information and belief, this Court has personal jurisdiction over Defendant

because Defendant resides and/or transacts business in New York.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

**PARTIES**

5.      Usherson is a professional photographer in the business of licensing his

photographs for a fee having a usual place of business at 10006 Old Holcomb Bridge Road,

Roswell, Georgia 30076.

6.      Upon information and belief, Bandshell is a company with a place of business at

500 West 140th Street, #3B, New York, New York 10031. At all times material hereto, Bandshell

has operated David Bromberg Quintet & Band Facebook Page at the following URL:

http://www.facebook.com/DavidBrombergBand (the "Website").

**STATEMENT OF FACTS**

**A.      Background and Plaintiff's Ownership of the Photograph**

7.      Usherson photographed singer-songwriter Leon Redbone (the "Photograph"). A

true and correct copy of the Photograph is attached hereto as Exhibit A.

8.      Usherson is the author of the Photograph and has at all times been the sole owner

of all right, title and interest in and to the Photograph, including the copyright thereto.

9.      The Photograph was registered with United States Copyright Office and was

given Copyright Registration Number VAu 1-080-046.

**B.      Defendant's Infringing Activities**

10.      On May 30, 2019, Bandshell ran the Photograph on the Website. See:

https://www.facebook.com/DavidBrombergBand/photos/pb.294271320017.-

2207520000.1559767400./10161528007940018/?type=3&theater. A screenshot of the

Photograph on the Website is attached hereto as Exhibit B.

11.     Bandshell did not license the Photograph from Plaintiff for its Website, nor did

Bandshell have Plaintiff's permission or consent to publish the Photograph on its Website.

**CLAIM FOR RELIEF**
**(COPYRIGHT INFRINGEMENT AGAINST DEFENDANT)**
**(17 U.S.C. §§ 106, 501)**

12.     Plaintiff incorporates by reference each and every allegation contained in

Paragraphs 1-11 above.

13.     Bandshell infringed Plaintiff's copyright in the Photograph by reproducing and

publicly displaying the Photograph on the Website. Bandshell is not, and has never been,

licensed or otherwise authorized to reproduce, publically display, distribute and/or use the

Photograph.

14.     The acts of Defendant complained of herein constitute infringement of Plaintiff's

copyright and exclusive rights under copyright in violation of Sections 106 and 501 of the

Copyright Act, 17 U.S.C. §§ 106 and 501.

15.     Upon information and belief, the foregoing acts of infringement by Bandshell

have been willful, intentional, and purposeful, in disregard of and indifference to Plaintiff's

rights.

16.     As a direct and proximate cause of the infringement by the Defendant of

Plaintiff's copyright and exclusive rights under copyright, Plaintiff is entitled to damages and

Defendant's profits pursuant to 17 U.S.C. § 504(b) for the infringement.

17.     Alternatively, Plaintiff is entitled to statutory damages up to $150,000 per work

infringed for Defendant's willful infringement of the Photograph, pursuant to 17 U.S.C. § 504(c).

18.     Plaintiff further is entitled to his attorney's fees and full costs pursuant to

17 U.S.C. § 505.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

1.      That Defendant Bandshell be adjudged to have infringed upon Plaintiff's

copyrights in the Photograph in violation of 17 U.S.C §§ 106 and 501;

2.      That Plaintiff be awarded either: a) Plaintiff's actual damages and Defendant's

profits, gains or advantages of any kind attributable to Defendant's infringement

of Plaintiff's Photograph; or b) alternatively, statutory damages of up to $150,000

per copyrighted work infringed pursuant to 17 U.S.C. § 504;

3.      That Defendant be required to account for all profits, income, receipts, or other

benefits derived by Defendant as a result of its unlawful conduct;

4.      That Plaintiff be awarded his costs, expenses and attorneys' fees pursuant to 17

U.S.C. § 505;

5.      That Plaintiff be awarded pre-judgment interest; and

6.      Such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable in accordance with Federal

Rule of Civil Procedure 38(b).

Dated: Valley Stream, New York
            July 10, 2019

LIEBOWITZ LAW FIRM, PLLC

By: /s/Richard Liebowitz
       Richard P. Liebowitz
11 Sunrise Plaza, Suite 305
Valley Stream, NY 11580
Tel: (516) 233-1660
RL@LiebowitzLawFirm.com
*Attorneys for Plaintiff Arthur Usherson*

# EXHIBIT A



# EXHIBIT B





# Exhibit G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                  :

ARTHUR USHERSON,                            :
                                                  :

                      Plaintiff,        :                   19-CV-6368 (JMF)
                                                    :

                    -v-              :           MEDIATION REFERRAL
                                                   :               ORDER

BANDSHELL ARTIST MANAGEMENT,    :
                                                    :

                    Defendant.      :
                                                    :
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

    It is hereby ORDERED that this case, involving claims under the Copyright Act, 17 U.S.C. § 101 *et seq.*, is referred for mediation to the Court-annexed Mediation Program. The parties are hereby notified that Local Rule 83.9 shall govern the mediation and are directed to participate in the mediation in good faith. **The mediation should take place at least two weeks prior to the Initial Pretrial Conference, which is currently scheduled (by separate Order to be entered today) for October 10, 2019.** The mediation will have no effect upon any scheduling Order issued by this Court without leave of this Court. The Court specifically requests a mediator with expertise in copyright matters be assigned.

    To facilitate prompt mediation, Plaintiff is hereby ORDERED to file proof of service no more than three days after service has been effected. Plaintiff is further ORDERED to produce to Defendant, **by the earlier of 14 days after service of process or three business days in advance of any mediation session**, (1) copies of records sufficient to show the royalty paid the last three times the work (e.g., the photograph or video) at issue in this case was licensed and (2) the number of times the work was licensed in the last five years.

    SO ORDERED.

Dated: July 15, 2019
      New York, New York                                           
                                               JESSE M. FURMAN
                                       United States District Judge

# Exhibit H

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ARTHUR USHERSON,** | |
| **Plaintiff,** | |
| **v.** | **Docket No. 1:19-cv-6368 (JMF)** |
| **BANDSHELL ARTIST MANAGEMENT** | |
| **Defendant.** | |

## NOTICE OF MOTION FOR SANCTIONS

PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law,

Declaration of Brad R. Newberg dated November 6, 2019, and all exhibits annexed thereto, and

upon all prior proceedings, pleadings, and filings in this action, Defendant Bandshell Artist

Management, by and through their undersigned counsel, hereby moves this Court before the

Honorable Jesse M. Furman, at the Thurgood Marshall United States Courthouse, Courtroom

1105, 40  Foley Square, New York, New York, 10007, for an Order granting sanctions against

Plaintiff Arthur Usherson and Plaintiff's counsel, Richard Liebowitz, pursuant to this Court's

inherent authority, Federal Rules of Civil Procedure 16(f) and 41, and 28 U.S.C. § 1927.


Dated: November 6, 2019                                    Respectfully submitted,


                                                          */s/ Brad R. Newberg*
                                                          Brad R. Newberg (#BN1203)
                                                          McGuireWoods LLP
                                                          1750 Tysons Blvd.
                                                          Tysons Corner, VA 22102
                                                          T: 703-712-5061
                                                          F: 703-712-5050
                                                          bnewberg@mcguirewoods.com

                                                          *Attorney for Defendant Bandshell
                                                          Artist Management*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Notice of Motion for Sanctions

with the Clerk of the Court using the CM/ECF system on this 6th day of November, 2019, which

constitutes service on Plaintiff, a registered user of the CM/ECF system pursuant to Fed. R. Civ.

P. 5(b)(2)(E).

Dated: November 6, 2019

/s/ Brad R. Newberg
Brad R. Newberg (#BN1203)
McGuireWoods LLP
1750 Tysons Blvd.
Tysons Corner, VA 22102
T: 703-712-5061
F: 703-712-5050
bnewberg@mcguirewoods.com

Attorney for Defendant Bandshell Artist
Management

# Exhibit I

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARTHUR USHERSON, | |
| Plaintiff, | |
| v. | **Docket No. 1:19-cv-6368 (JMF)** |
| BANDSHELL ARTIST MANAGEMENT | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANT'S MOTION FOR SANCTIONS</u>

*/s/ Brad R. Newberg*
Brad R. Newberg (#BN1203)
McGuireWoods LLP
1750 Tysons Blvd.
Tysons Corner, VA 22102
T: 703-712-5061
F: 703-712-5050
bnewberg@mcguirewoods.com

*Attorney for Defendant Bandshell Artist Management*

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ........................................................................ 1

II.   FACTUAL BACKGROUND ......................................................................... 3

III.   ARGUMENT .............................................................................................. 13

   A.   **Pursuant to This Court's Inherent Authority, Plaintiff and Plaintiff's Counsel Should Be Sanctioned for Violations of Court Orders** ...................................... 14

   B.   **This Court Should Also Sanction Plaintiff's and Plaintiff's Counsel's Willful Defiance of the Court's Order under the Federal Rules of Civil Procedure**.................... 16

   C.   **Plaintiff and Plaintiff's Counsel Should Be Sanctioned for their Failure to Timely File Proof of Service and Provide Licensing and Royalty Information as Ordered.**........ 19

IV.   CONCLUSION .......................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
   421 U.S. 240 (1975)........................................................................................14

*Centennial Archaeology, Inc. v. Aecom, Inc.*,
   688 F.3d 673 ................................................................................................15

*Craig v. UMG Recordings, Inc.*,
   2019 WL 2992043 (S.D.N.Y. 2019)...............................................................13

*Craig v. UMG Recordings, Inc.*,
   380 F.Supp. 3d 324 (S.D.N.Y. 2019)..............................................................14

*Dallas v. Goldberg*, 2003 WL 22872325
   2003 WL 22872325 ......................................................................................15

*Early v. Superintendent of Groveland Correctional Facility*,
   680 F.Supp.2d 445 (W.D.N.Y.) .....................................................................17

*Ferdman v. CBS Interactive, Inc.*,
   342 F.Supp.3d 515 (S.D.N.Y. 2018)...............................................................13

*Galt G/S v. Sealand Services, Inc.*,
   No. 87-CV-1038, 1989 WL 69908 (N.D.N.Y. June 13, 1989)...........................15

*Hall v. Flynn*,
   829 F.Supp. 1401 (N.D.N.Y. 1993) ................................................................15

*Lediju v. New York City Department of Sanitation*,
   173 F.R.D. 105 (S.D.N.Y. 1997) ....................................................................15

*LeSane v. Hall's Sec. Analyst, Inc.*,
   239 F.3d 206 (2nd Cir. 2001).........................................................................17

*MA Salazar, Inc. v. Incorporated Village of Atlantic Beach*,
   499 B.R. 268 (E.D.N.Y. 2013) .......................................................................14

*Meyer v. Kalanick*,
   212 F.Supp.3d 437 (S.D.N.Y. 2016)...............................................................14

*New York Ass'n for Retarded Children, Inc. v. Carey*
   711 F.2d 1136 (2d Cir. 1983)..........................................................................15

*Pereira v. 3072541 Canada Inc.*,
2018 WL 5999636 (S.D.N.Y. 2018)................................................................13

*Polaris Images Corp. v. CBS Interactive, Inc.*,
2019 WL 5067167 (S.D.N.Y. 2019)................................................................20

*Rice v. NBCUniversal Media, LLC*,
2019 WL 3000808 (S.D.N.Y 2019)................................................................13

*Romag Fasteners, Inc. v. Fossil, Inc.*,
29 F.Supp.3d 85 (D. Conn. 2014)................................................................17

*Sands v. Bauer Media Grp. USA, LLC*,
2019 WL 4464672 (S.D.N.Y. 2019)................................................................13, 18

*Saxon v. Zirkle*
97 A.3d 568 (D.C. 2014) ................................................................15

*Steeger v. JMS Cleaning Servs. LLC*,
2018 WL 1363497 (S.D.N.Y 2018)................................................................13

*Walpert v. Jaffrey*,
127 F.Supp.3d 105 (S.D.N.Y. 2015)................................................................14

**Federal Statutes**

28 U.S.C. § 1927................................................................2, 14, 16, 17

**Rules**

Federal Rules of Civil Procedure:

Rule 16(f) ................................................................2, 14, 19

Rule 16(f)(1)(c)................................................................16

Rule 16(f)(2)................................................................16

Rule 41 ................................................................2, 14, 18

Rule 41(b)................................................................17

Federal Rules of Evidence:

Rule 408 ................................................................9

Local Rules of the United States District Courts for the Southern and Eastern
Districts of New York:

**Rules – continued**

Rule 83.9 (including/adopting the Southern District Mediation Procedures) ............... 5-8, 12, 18

Bandshell Artist Management ("Bandshell") respectfully submits this memorandum in support of its motion for sanctions against Plaintiff Arthur Usherson ("Usherson" or "Plaintiff") and his counsel, Mr. Liebowitz, for repeatedly violating court orders, especially the Order in this case requiring an in-person mediation by October 31, 2019.

## I.     PRELIMINARY STATEMENT

As the Court might remember, it was "to put it mildly, somewhat perturbed" by the failure of Plaintiff and Mr. Liebowitz to follow its July 15, 2019 Orders (Dkt. 5 and 6) and schedule and complete an in-person mediation in this case prior to the originally scheduled initial court conference. *See* Dkt. 13. Due to that failure, on October 7, the Court pushed off the initial conference to November 14, 2019, and issued another Order, this time ordering the parties to "conduct the in-person mediation no later than October 31, 2019." *Id.*

Defendant's counsel gave Mr. Liebowitz a list of various dates that his client could be available and that Defendant's counsel could travel from Virginia to New York. Mr. Liebowitz immediately responded by choosing the very last date possible, October 31.

Despite the Court's Orders (and even before (and after) the October 7 Order, Defendant's counsel's reminders to Mr. Liebowitz that the mediation needed to be in-person and with the parties), the instructions from the Mediation Office, this Court's Local Rule adopting the Procedures of the Mediation Office, and that Mr. Liebowitz specifically chose a date that he and his client could supposedly be available in New York, and that Mr. Liebowitz and Defendant's counsel were in contact the day before and very early the morning of mediation, with numerous references to the mediation (and no mention that he and his client would not be attending), ***neither Plaintiff Mr. Usherson nor Mr. Liebowitz showed up to the mediation***. It appears

1

Plaintiff never left Georgia where he lives, and Defendant's counsel has discovered that Mr. Liebowitz was in Los Angeles, having hosting a party there the night before.[1]

Given the blatant disregard of this Court's Orders, Defendant respectfully requests, under its inherent powers, under Federal Rules of Civil Procedure 16 and 41, and under 28 U.S.C. § 1927, that this Court Order that:

- Plaintiff and its counsel (who shall be jointly responsible) shall pay/reimburse Defendant for its costs of travel and ten hours of Defendant's attorney's legal fees (representing a discounted amount of time spent on preparing the mediation statement, preparing for mediation, attendance at the courthouse, and travel);

- This matter shall be dismissed with prejudice; and,

- To the extent any Orders are issued related to this Motion, Plaintiff's counsel shall be required to provide a copy to Plaintiff and verify the same to this Court, and to the extent there are any hearings related to this Motion, Plaintiff shall be required to attend in person.

Finally, Plaintiff was also in violation of both portions of this Court's July 15 Mediation Referral Order.  Dkt. 6.  The July 15 Order required Plaintiff to "file proof of service no more than three days after service has been effected" and within 14 days of service to produce to Defendant "(1) copies of records sufficient to show the royalty paid the last three times the work (e.g., the photograph or video) at issue in this case was licensed and (2) the number of times the work was licensed in the last five years."  Plaintiff failed to comply with any of the Order.

---

[1] Mr. Liebowitz did send an associate (not of record in this case and seemingly with no knowledge of this case), and Mr. Liebowitz's sister—we do not know if she is even an attorney—to inform us that Mr. Usherson and Mr. Liebowitz would not be attending.

We bring the violation of that particular Order to the Court's attention (in addition to the more serious violation of the mediation Orders) because this is not the first time Mr. Liebowitz has violated or been sanctioned over failure to comply with this exact Order. This Court should therefore again impose sanctions for this conduct. However, Defendant does not request that sanction be paid to Defendant. Instead, any sanctions the Court deems necessary for violation of the Order related to service and licensing information should be paid to the Clerk of Court or any other fund deemed appropriate by the Court.

## II.     FACTUAL BACKGROUND

### A.  Brief Background Regarding This Case

Defendant Bandshell is a small music management company. Bandshell represents a few musical artists, such as The David Bromberg Quintet. David Bromberg is an older gentleman, who has had a long career, originally becoming well known for playing with some of American music's legends, such as Bob Dylan. Bandshell administers The David Bromberg Quintet's Facebook page, providing information about David Bromberg and his band. On May 30, 2019, Leon Redbone, another American music legend, passed away. The profile picture on Mr. Redbone's Facebook page was a cropped portion of the photograph in question in this lawsuit. The cropped portion shows Leon Redbone, David Bromberg, and Bob Dylan together at the Mariposa Folk Festival in 1972. The photograph contained no copyright notice or copyright information whatsoever.[2] In tribute to Mr. Redbone, Bandshell posted a Rest in Peace message

---

[2] The photograph appears to have been published for years without any copyright notice. Among other issues, including Defendant's fair use of the photograph, Defendant's eventual summary judgment motion will address the fact that a plaintiff cannot hold a copyright in a work that was published prior to 1989 without a copyright notice.

on The David Bromberg Quintet's Facebook page, noting their friendship, and showing Mr. Redbone's Facebook profile picture.

For this, Plaintiff Arthur Usherson, through his attorney, Richard Liebowitz, is suing Bandshell.  On July 10, 2019, Plaintiff filed this suit alleging The David Bromberg Quintet's tribute to Leon Redbone showing Redbone's Facebook profile infringed on Usherson's copyright in the original photograph.  Bandshell was not served until September 5, 2019, and Bandshell immediately retained counsel, which took this case on *pro bono*.

### B.  Plaintiff's and His Counsel's Violation of Every Court Order to Date

The very first orders in this case were the Court's July 15 Orders.  (Dkt. 5 & 6).  Dkt. 6, the Mediation Referral Order required Plaintiff to "file proof of service no more than three days after service has been effected" and within 14 days of service to produce to Defendant "(1) copies of records sufficient to show the royalty paid the last three times the work (e.g., the photograph or video) at issue in this case was licensed and (2) the number of times the work was license in the last five years."

The July 15 Order, Dkt. 6, required Plaintiff to "file proof of service no more than three days after service has been effected."  Plaintiff served Defendant on September 5, yet, in violation of the Order, did not file his proof of service for 16 days (September 21) instead of three.  Dkt. 7; *see also* Declaration of Brad R. Newberg, ¶¶ 4–5.

Regarding the licensing information requirement, Plaintiff failed to comply with this portion of the Order as well.  Plaintiff's counsel only revealed to Defendant's counsel that the photograph in question had never been licensed after Defendant's counsel questioned compliance with the July 15 Order, received no answer, and followed up the next day.  *See Id.*, ¶¶ 6–7, Ex. 1.

Plaintiff then went into radio silence, forcing Defendant's counsel to contact Plaintiff's counsel on October 3 to remind him of a case management plan due that day.  *Id.,* ¶ 8, Ex. 2.  At that point, Plaintiff's counsel first mentioned that he needed to schedule the parties' mediation, and asked for it to be two business days later.  Despite the late notice, Defendant's counsel responded that he could get to New York then, and tried to verify that Plaintiff could be there in person for mediation as well. *Id.,* ¶ 10, Ex. 2.  However, Plaintiff's counsel requested that it be: a) telephonic and b) lawyers-only.  *Id.,* ¶ 7, Ex. 2.    Mr. Liebowitz also requested that the lawyers use a mediator he knew of and not go through the Mediation Office (although the mediator he chose is a mediator affiliated with the Mediation Office).  *Id.,* ¶ 11, Ex. 2.

Defendant's counsel expressed discomfort with Mr. Liebowitz's requests on a number of levels, informing Mr. Liebowitz that he did not believe the court would want a telephonic conference—which was not in accordance with standard procedures for this Court—and there could not possibly be a mediation without the parties present. *Id.,* ¶ 12, Ex. 2. This was especially true given that the Mediation Referral Order (Dkt. 6) directed the "parties" to participate in the mediation in good faith, and in compliance with Local Rule 83.9, which is governed by the "Procedures of the Mediation Program for the Southern District of New York."

Defendant's counsel also expressed concern as to whether the mediator had the expertise required by the court Order, which (Dkt. 6) required a mediator "with expertise in copyright matters."  *Id.,* ¶ 12, Ex. 2.  Mr. Liebowitz assured Defendant's counsel that the mediator he chose was a "copyright lawyer who is part of the mediation program." *Id.,* ¶ 13, Ex. 2. However, a search of the mediator's background showed only experience in bankruptcy law.  *Id.,* ¶ 14, Ex. 2. Defendant's counsel raised concerns about the mediator's expertise and again reiterated that the mediation would require the attendance of both parties. *Id.*

5

Eventually (and after hearing from the mediator Mr. Liebowitz had chosen the mediator's representation that he could handle copyright cases), in the spirit of cooperation, Defendant's counsel told Mr. Liebowitz that, *if and only if the arrangement was acceptable to the Court and the Mediation Office/mediator*, Defendant's counsel could agree to the telephonic mediation he was requesting as long as the parties would fully participate. *Id.,* ¶¶ 15–16, Ex. 2.

On October 4, Mr. Liebowitz reached out to the Mediation Office to have his request docketed. *Id.,* ¶ 17, Ex. 3–4. That same day, the Mediation Office wrote the parties, expressing its discomfort with a telephonic mediation and Mr. Liebowitz's outreach to a mediator directly and not through the Mediation Office, and stating that **neither could be considered "in accordance with the procedures that govern this program."** *Id.,* ¶ 18, Ex. 3–4 (emphasis added). The Mediation Office stated clearly that a telephonic mediation *should not go forward*, the Mediation Office would await the Court's guidance, and that the parties could choose the same mediator in the future, but it must be done through the Mediation Office's "normal process." *Id.* The Mediation Office instructed the parties that the Court's mediation Order stood, and directed them to "seek appropriate relief directly from the Judge." *Id.,* ¶ 19, Ex. 3.

Mr. Liebowitz then attempted to write the Court and get approval for his arrangement or move the October 10 initial court conference date. He sent Defendant's counsel a draft of what Mr. Liebowitz was going to send the Court, saying that he was going to file it that same day. *Id.,* ¶ 20, Ex. 5. Defendant's counsel was very disheartened to see that the letter had various factual assertions about the history of the case that simply were not true, and apparently created in an effort to make the request more likely to be approved, such as stating Defendant's counsel was retained later than he was, that the parties had been attempting to find a mediator, and that the parties desired a telephonic mediation to avoid the costs of Defendant's Counsel coming to New

York—something never requested by Defendant's counsel.  *Id.,* ¶ 21, Ex. 5.  Defendant's counsel informed Mr. Liebowitz that he could not file a letter with those inaccuracies and he needed to modify the letter, which he did (at Dkt. 12, filed October 4).  *Id.,* ¶ 22, Ex. 5.

On October 7, the Court issued an Order on Mr. Liebowitz's letter.  Dkt. 13.  The Court stated that it was "to put it mildly, somewhat perturbed" by Mr. Liebowitz's actions and statements, expressing particular displeasure with Mr. Liebowitz's delays.  *Id.*  The Court adjourned the initial pretrial conference to November 14, 2019 at 4:00 pm and Ordered that the "parties shall conduct the **in-person** mediation no later than October 31, 2019."  *Id.* (emphasis added).

***In sum, this Court specifically gave the parties significant time to make sure they could conduct an in-person mediation with the parties and lead lawyers present, and conducted properly through the Mediation Office and in accordance with the mediation procedures of this Court as per the Local Rules.***  Newberg Decl.¶ 25.

The Mediation Office also followed up on October 7, contacting the parties to make them aware that the mediation needed to occur **in-person** in accordance with the Judge's direction. *Id.,* ¶ 24, Ex. 4.  This was yet another signal to Mr. Liebowitz that he needed to make sure that he and his client would be available in person at the Mediation Office for whatever mediation was scheduled. At this point, the Court, the Mediation Office, and the rules and Mediation procedures of this Court had made it clear that mediation was to be conducted in person, attended by both the parties and their lead counsel. *Id.,* ¶ 26.

Furthermore, as per the Court's Local Rule, which adopts the standing Procedures of the Mediation Program, including Section 9, "Attendance at Mediation Sessions" (emphasis added):

a. Each party **must attend mediation. This requirement is critical** to the effectiveness of the mediation process as it enables parties to articulate their

7

positions and interests, to hear firsthand the positions and interests of the other parties, and to participate in discussions with the mediator both in joint session and individually. **If a represented party is unable to attend** a previously scheduled mediation because of a change in that party's availability, **the party's attorney must notify the mediator immediately so that a decision can be made whether to go forward with the mediation session as scheduled or to reschedule it.** Mediators are required to report to the Court if a party failed or refused to attend, or refused to participate in the mediation.

b. Each represented party **must be accompanied at mediation by the lawyer who will be primarily responsible for handling the trial of the matter**.

Defendant's counsel gave Mr. Liebowitz various dates that Defendant's counsel could travel to New York from Virginia and on which his client would also be available and asked Mr. Liebowitz to pick whatever date he wanted *where his client could come to New York from Georgia and Mr. Liebowitz would be available*, to make it easiest for them to both attend in person. Newberg Decl., ¶ 28, Ex. 6. Mr. Liebowitz did not raise any issues of availability but rather immediately responded (within five minutes) with the last possible date, October 31. *Id.,* ¶ 29, Ex. 6. The in-person mediation was therefore scheduled for October 31 at noon, at the Mediation Offices at 40 Foley Square. *Id.,* ¶ 30. ████████ the mediator, informed the parties their required mediation statements were due by October 29. *Id.*

Defendant's counsel received an email from the mediator in the evening of October 23 seeking a call on October 24 ████████████████████████████████████. *Id.,* ¶ 31, Ex. 7. Defendant's counsel had a call with the mediator on October 24 and it was agreed that ████ ████████████████████████ the in-person mediation would move forward. *Id.,* ¶ 32.

Defendant sent a detailed Confidential Mediation Statement to the mediator before October 29. *Id.,* ¶ 32. It is unknown if Plaintiff sent such a statement.

On October 30, the day before the mediation, Defendant's counsel received an email from the mediator with a potential offer from Plaintiff. *Id.*, ¶ 34.[3] That offer was unacceptable to Defendant. *Id.* However, in a good-faith effort to end the case, Defendant's counsel drafted a full proposed agreement, stating in the email (which we believe was forwarded on to Mr. Liebowitz with the draft agreement) that Plaintiff could sign the agreement or "we will see Mr. Liebowitz and Mr. Usherson tomorrow and we can continue discussing the possibility of settlement at the mediation. . . ." *Id.*, ¶ 35. Later that evening, the mediator sent an email stating that he had talked to Mr. Liebowitz, who relayed that he "has been tied up. He will review [the draft Defendant's counsel sent] tonight and get back to us in morning. Hopefully we can settle this before need to go to **in person mediation**." *Id.*, ¶ 36, Ex. 8 (redacted) (emphasis added). Defendant's counsel reiterated to the mediator that he would be headed to the train station "well before 6:00 am" and further noted his assumption that "Mr. Usherson either flew to NY tonight or is likewise on a very early plane." *Id.* The mediator responded "I understand." *Id.*

At 4:14 am on October 31, Defendant's counsel received an email from Mr. Liebowitz stating "Attached please find revisions to the agreement which can be discussed at mediation." *Id.*, ¶ 37, Ex. 9 (without attachment). Even at this point, hours before mediation, there was no mention that Mr. Liebowitz or his client might not show despite Defendant's counsel repeatedly mentioning to the mediator and Mr. Liebowitz their imminent in-person conference. *Id.*, ¶ 38. The email sent by Mr. Liebowitz cc'd a "James H. Freeman" but did not mention anything about Mr. Freeman attending the mediation. *Id.*, ¶ 39, Ex. 9. Mr. Freeman has not made an appearance

---

[3] Although it is unlikely that Rule 408 applies here, the October 30 and 31 emails are not being submitted out of an abundance of caution.

9

in this case, and to the best of Defendant's counsel's knowledge has not been on any prior emails or calls in this case. *Id.*, ¶ 40.

The revisions were unacceptable, and strange in that at least one did not seem to have any application to this matter. *Id.*, ¶ 41. Defendant's counsel was admittedly surprised to see the email had come in at 4:14 am—but (as noted below) Defendant's counsel later discovered that Mr. Liebowitz was in Los Angeles (so it was only 1:14 his time), over 2000 miles away, hosting a party, and had no intention (and likely never had any intention) of coming to the mediation. *Id.*, ¶ 58, Ex. 10.

Never once did Mr. Liebowitz state that he would not be at or even might not be at the mediation. *Id.*, ¶ 42. Never once did Mr. Liebowitz state that his client would not be at or might not be at the mediation. *Id.*, ¶ 43. This is despite numerous occasions of Defendant's counsel making references to Mr. Usherson and Mr. Liebowitz being at the Court Ordered in-person mediation. *Id.*, ¶¶ 10, 12, 14–16, 28, 35, 38.

Defendant's counsel set his alarm for 5:00 am after having apologized the night before to one daughter for having to miss her playoff volleyball match and the other for having to arrange alternative Halloween plans for her,[4] went to New York, met with his client to prepare for the mediation, and entered the mediation room with his client at 11:45 am for the noon mediation. *Id.*, ¶¶ 44–46.

At that point, and for the first time, Defendant's counsel was told by the mediator that he had gotten word that Mr. Liebowitz would not be attending the mediation, and he did not know, but doubted Mr. Usherson would be attending. *Id.*, ¶ 47. Soon thereafter, Mr. Liebowitz's associate, James Freeman, arrived with Mr. Liebowitz's sister, to let us know that Mr. Usherson

---

[4] Defendant's counsel asks the Court's forgiveness for expressing his frustration.

would not be attending either. *Id.,* ¶ 48.  Despite the Rule that lead trial counsel attend the

mediation, Mr. Liebowitz's associate, Mr. Freeman, has not even made an appearance in this

case, and seemed to have little (if any) knowledge of the details of the case. *Id.,* ¶ 49.  It is

unclear if Mr. Liebowitz's sister is an attorney or what role, if any, she has in this case. *Id.*  Mr.

Freeman seemed surprised that Defendant's counsel was upset that neither Mr. Liebowitz nor

Mr. Usherson were there. *Id.,* ¶ 50.  Clearly, sending an associate not admitted to this case and

without a client present was not remotely in compliance with the Court's direct Orders, nor with

the standing rules or procedures regarding mediations in this Court. *Id.,* ¶ 51.  Furthermore, Mr.

Liebowitz can hardly be considered unfamiliar with this Court.

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

54.  ███████████████████████████████████████ the meeting (it is

doubtful one could call it a mediation) ended, a few minutes after it started. *Id.,* ¶ 55.

Defendant's counsel got on a train and headed back to Virginia. *Id.,* ¶ 56.

While on the train, Defendant's counsel went on the Internet to look up Mr. Liebowitz's

website. *Id.,* ¶ 57.  Defendant's counsel was shocked and appalled when the first thing that came

up in the search was Mr. Liebowitz's firm's Twitter feed, which revealed that he was in Los

Angeles, having hosted an event there the prior night. *Id.,* ¶ 58, Ex. 10.   As such, Mr. Liebowitz

almost certainly knew he could not attend the mediation when he scheduled it and up until the

moment he did not attend. *Id.,* ¶ 58, Ex. 10. This, in spite of him supposedly choosing October

31 so that he could attend and his client could travel to New York from Georgia. *Id.,* ¶ 28.

11

On November 1. 2019, Defendant's counsel sent Mr. Liebowitz an email, requesting reimbursement of Defendant's costs and ten hours of Defendant's counsel's legal fees, as well as dismissal of this case with prejudice due to Plaintiff's and Mr. Liebowitz's violation of Court Orders. *Id.,* ¶ 60, Ex. 11.  Despite the lack of need under this Court's rules to have a meet and confer on this motion, Defendant's counsel offered one anyway, and that call was held on November 4.  *Id.,* ¶ 61, Ex. 11.  The call did not result in resolution of this motion.

Although Defendant's lead counsel spent more than ten hours on the Mediation Statement, preparation for mediation, travel to New York, and attendance at the courthouse, and although an associate who works with Defendant's lead counsel worked on the Mediation Statement as well, Defendant is limiting its request to ten hours of its lead counsel's time.  *Id.,* ¶ 62.  Defendant's counsel's standard 2018 rate is $855 per hour, making the fees request $8,550. *Id.,* ¶ 63.[5]  The receipts for all of Defendant's costs for the New York trip are attached to the Newberg Declaration and come to $428.75, making Defendant's total request $8,978.75, plus, to the extent awarded by the Court, Defendant's fees for this Motion.  *Id.,* ¶ 64, Ex. 12.   Defendant asks that Mr. Usherson and Mr. Liebowitz be jointly liable for this reimbursement.  Defendant also asks for dismissal of this matter with prejudice.  In a very short time, Mr. Liebowitz has blatantly defied the only two Orders issued by this Court in this case as well as the Court's Local Rules and Mediation Procedures, after at least two years in which he has defied this Court's orders over and over.

Defendant also asks the Court to sanction Mr. Usherson and Mr. Liebowitz for the failure to comply with the July 15 Mediation Referral Order regarding filing proof of service and

---

[5] Defendant's counsel has taken this case on *pro bono*.  However, as discussed further in this Motion, legal fees are recoverable even in a pro bono matter.

providing licensing information.  However, Defendant believes that particular sanction should go to the Clerk of Court or other fund designated by the Court and not Defendant.

Finally, Defendant requests that the Court use its inherent powers to require Mr. Liebowitz to provide Mr. Usherson with a copy of any sanctions Orders issued in this case since it is unclear whether Mr. Usherson is aware of the Court's Orders, and verify the same to this Court.  To the extent there is any hearing on this Motion, Defendant respectfully requests that the Court Order Mr. Usherson to attend.

## III.    ARGUMENT

Plaintiff's counsel has added another instance of misconduct to his ever-lengthening list. As the Court is undoubtedly aware, Plaintiff's counsel has been repeatedly been sanctioned by this Court.[6]  Here, he has once more failed to comply with multiple Court Orders, and, in fact, has failed to comply with *any* of the Court Orders issued so far in this matter.  He failed to file his proof of service in the time required by the Court.  He failed to provide Defendant with licensing information in the time required by the Court.  He failed to schedule mediation in the time and in the manner required by the Court.  And then, after scheduling a mediation on a date that was supposedly the date that he and his client could both attend the mediation in person, neither he nor his client appeared.  Given that Mr. Liebowitz was hosting a party in Los Angeles,

---

[6] *See, e.g.*, *Sands v. Bauer Media Grp. USA, LLC*, 2019 WL 4464672, at *7 (S.D.N.Y. 2019) (ordering monetary sanctions against Mr. Liebowitz for discovery misconduct); *Craig v. UMG Recordings, Inc.*, 2019 WL 2992043, at *7 (S.D.N.Y. 2019) (ordering sanctions against Mr. Liebowitz in the amount of $98,532.65 for discovery misconduct), *Rice v. NBCUniversal Media, LLC*, 2019 WL 3000808 (S.D.N.Y 2019), *report & recommendation adopted by* 2019 WL 3752491 (S.D.N.Y. 2019) (sanctioning Mr. Liebowitz for discovery misconduct); *Steeger v. JMS Cleaning Servs. LLC*, 2018 WL 1363497, at *3 (S.D.N.Y 2018) (requiring Mr. Liebowitz to complete four hours of ethics and professionalism CLE courses and ordering monetary sanctions against him); *Ferdman v. CBS Interactive, Inc.*, 342 F.Supp.3d 515, 529 (S.D.N.Y. 2018) (sanctioning Mr. Liebowitz by precluding evidence); *see also Pereira v. 3072541 Canada Inc.*, 2018 WL 5999636, at *3 (S.D.N.Y. 2018) ("[t]o the extent that Mr. Liebowitz and/or his law firm engage in misconduct in the future, the Court will not hesitate to impose sanctions"). There is also a pending motion against Mr. Liebowitz in *Wisser v. Vox Media*, Mem. Of Law in Support of Defendant's Mot. For Sanctions, *Wisser v. Vox Media*, No. 36 1:19-cv-1445-LGS (S.D.N.Y. Oct. 3, 2019), for allegedly forging his client's signature onto Interrogatory responses.

it appears he never had any intention of him or his client appearing. Due to this continued and flagrant pattern of willful disregard for the Court's Orders, as well as Mr. Liebowitz's responsibilities as an officer of the court, Bandshell requests sanctions jointly against Plaintiff and its counsel under this Court's inherent authority, 28 U.S.C. §1927, and Federal Rules 16(f) and 41, including, but not limited to, costs, fees, and involuntary dismissal of this case.

### A. Pursuant to This Court's Inherent Authority, Plaintiff and Plaintiff's Counsel Should Be Sanctioned for Violations of Court Orders

Under this Court's inherent authority, Plaintiff's counsel should be sanctioned for failing to comply with the Court's July 15 Early Mediation Order, and the October 17 Order that mediation be conducted in person (as well as the Court's Local Rule and the Court's Mediation Rules) despite numerous warnings that he and his client must appear in person. *See* Dkt. 5, 6, 13. The Court has inherent power "to sanction parties and attorneys who have 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Craig v. UMG Recordings, Inc.*, 380 F.Supp. 3d 324, 339 (S.D.N.Y. 2019) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59 (1975)) (sanctioning Mr. Liebowitz). "A court may infer bad faith where the action was 'so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose." *MA Salazar, Inc. v. Incorporated Village of Atlantic Beach*, 499 B.R. 268, 274 (E.D.N.Y. 2013). "Courts' inherent powers include the power to [impose sanctions] for failure to obey court orders." *Walpert v. Jaffrey*, 127 F.Supp.3d 105, 122– 23 (S.D.N.Y. 2015). These powers include the ability to "assess[] attorneys' fees and costs against a party." *Meyer v. Kalanick*, 212 F.Supp.3d 437, 450 (S.D.N.Y. 2016). Plaintiff's counsel has willfully ignored this Court's orders and significantly impaired the resolution of this case and should be sanctioned.

14

Defendant is being represented *pro bono,* but the general rule is that attorney's fees are recoverable even where an attorney is represented their client on a pro bono basis. *See Dallas v. Goldberg*, 2003 WL 22872325, *1 (S.D.N.Y. Dec. 5, 2003) (awarding attorney's fees under Rule 16 and the court's inherent power where the party was represented pro bono); *see also New York Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136 (2d Cir. 1983) (awarding attorney's fees where a civil rights claimant was represented pro bono); *see also Centennial Archaeology, Inc. v. Aecom, Inc.*, 688 F.3d 673, 680 (10th Cir. 2012) ("The purpose of Rule 37 attorney-fee sanctions would be thwarted if the party could escape the sanction whenever the opposing counsel's compensation is unaffected by the abuse"); *see also Saxon v. Zirkle*, 97 A.3d 568, 576–77 (D.C. 2014) (awarding attorney's fees sanctions in spite of pro bono representation by guardians ad litem). As such, Defendant's counsel's representation of Bandshell on a pro bono basis is immaterial.

Plaintiff's and Mr. Liebowitz's conduct is further so egregious as to warrant dismissal as well as costs. "[D]ismissal or default may be an appropriate remedy where 'there is a showing of willfulness, bad faith, or fault." *Walpert*, 127 F.Supp.3d 105 at 122. This Court and its sister districts have repeatedly held that ignoring court orders and failing to appear at conferences is precisely the kind of willful conduct that supports dismissal. *See, e.g., Lediju v. New York City Department of Sanitation*, 173 F.R.D. 105 (S.D.N.Y. 1997) (dismissing a case for willful failure to obey pretrial scheduling orders); *see also Hall v. Flynn*, 829 F.Supp. 1401, 1403 (N.D.N.Y. 1993) (dismissing complaint for plaintiff's failure to appear at discovery conference); *see also Galt G/S v. Sealand Services, Inc.*, No. 87-CV-1038, 1989 WL 69908, at *1 (N.D.N.Y. June 13, 1989) (entering default judgment against defendant for failure to comply with a court order).

Plaintiff and its counsel's misconduct should be sanctioned with dismissal: the Court's inherent powers to dismiss are squarely aimed at this kind of conduct.

Here, Plaintiff and Mr. Liebowitz have been in direct violation of each of the Orders issued so far in this case, the last violation being the most serious: failing to show up for mediation despite a Court Order and various warnings and reminders from the Mediation Office and Defendant's counsel. Not once did Mr. Liebowitz even raise the possibility that he and his client might not attend. But when the day came and Defendant was present with its counsel, who traveled from Virginia early that morning, Mr. Liebowitz was in California presumably hosting an event to grow his portfolio of clients, and Mr. Usherson was still in Georgia. The mediation stymied by Plaintiff's counsel's misconduct required significant preparation. As such, this case should be dismissed and Plaintiff and his counsel jointly ordered to pay the costs and fees of preparing for mediation.

### B. This Court Should Also Sanction Plaintiff's and Plaintiff's Counsel's Willful Defiance of the Court's Order under the Federal Rules of Civil Procedure

Rule 16(f)(1)(c) states, "the court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney . . . fails to obey a scheduling or other pretrial order." "Instead of or in addition to any other sanction, the court **must** order the party, its attorney, or both to pay the reasonable expenses—including attorney's fees—incurred because of noncompliance with this rule, unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust." Rule 16(f)(2) (emphasis added). Plaintiff and its counsel cannot either justify or explain their failures, and thus sanctions are warranted.

Additionally, sanctions should be imposed under 28 U.S.C. § 1927. § 1927 provides "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously

16

may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. "In practice, the only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." *Romag Fasteners, Inc. v. Fossil, Inc.*, 29 F.Supp.3d 85, 105 (D. Conn. 2014) (*judgment vacated in part on other grounds by Romag Fasteners, Inc. v. Fossil, Inc.,* 686 Fed.Appx. 889 (Fed. Cir. 2017)). As such, sanctions should be imposed against Mr. Liebowitz under § 1927 in addition to the court's inherent authority.

Further, under the Federal Rules of Civil Procedure, a case should be dismissed where "the plaintiff fails . . . to comply with . . . a court order." F. R. Civ. P. 41(b). The Second Circuit has "instructed a district court contemplating dismissing a plaintiff's case under Rule 41(b) . . . to consider: '[1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal; [3] whether the defendant is likely to be prejudiced by further delay, [4] whether the district judge has take[n] care to strik[e] the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard . . . and [5] whether the judge has adequately assessed the efficacy of lesser sanctions.'" *Early v. Superintendent of Groveland Correctional Facility*, 680 F.Supp.2d 445, 448 (W.D.N.Y.) (quoting *LeSane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2nd Cir. 2001)). After a balancing of these factors, and considering the many warnings Mr. Liebowitz has received from this Court regarding his conduct over the past couple of years, the situation here calls for dismissal of this matter with prejudice.

As discussed throughout this memorandum, Plaintiff's counsel ignored both the Court's July 15 Order and its October 17 Order as well as the Local Rule and this Court's standing Mediation Procedures. *See* Dkt. 5, 6, 13; Local Rule 83.9; Procedures of the Mediation Program of the Southern District of New York, Section 9. This conduct goes beyond a simple mistake and passes into willful misconduct. "A 'mere oversight' that happens once or twice is one thing, [a] pattern of discovery and related abuse is quite another and rings of deliberate indifference to an attorney's obligation to behave in a professional, responsible, and competent manner in each and every case he handles." *Sands v. Bauer Media Grp. USA, LLC*, 2019 WL 4464672 at *7 (S.D.N.Y 2019) (sanctioning Mr. Liebowitz). The Court has already recognized Mr. Liebowitz's knowing violation of the Court's orders in this case, stating "he knew or should have known that . . . docket entry did not mean mediation would not be scheduled (let alone relieve counsel of the obligation to comply with the Court's order requiring mediation no later than two weeks before the initial pretrial conference). Dkt. 13. However, Mr. Liebowitz was not dissuaded from his course of misconduct and failed to attend or have his client attend an in person mediation under the October 17 Order. He cannot excuse his conduct as his failure to conduct mediation stemmed from hosting a client event in California. Instead of responsibly conducting a case he already handles, Mr. Liebowitz was attempting to drum up more business.

In addition to monetary sanctions, Plaintiff's and Plaintiff's counsel's conduct warrants dismissal under Rule 41. Plaintiff appears to have no excuse (and chose his counsel), and as previously discussed, the disregard for this Court's orders is part of a sustained pattern. Monetary sanctions have had little effect on Mr. Liebowitz. Further, he is clearly on constructive notice that his defiance of court orders could result in dismissal under the authority this memorandum describes given his history. Bandshell has been prejudiced and is likely to be prejudiced by Mr.

Liebowitz continuing this pattern as it has already sustained significant costs, multiplied proceedings, and delayed litigation. Allowing this case to continue would undoubtedly result in further misdeeds on Plaintiff's counsel's part, and further prejudice to Bandshell.

### C. Plaintiff and Plaintiff's Counsel Should Be Sanctioned for their Failure to Timely File Proof of Service and Provide Licensing and Royalty Information as Ordered.

This Court should bring whatever sanctions it deems appropriate to be paid to the Clerk of the Court for Plaintiff's counsel's failure to comply with this Court's July 15 Mediation Referral Order regarding service and licensing information. Dkt. 5, 6. As discussed above, Rule 16(f) provides "the court may issue any just orders . . . if a party or its attorney . . . fails to obey a scheduling or other pretrial order." Plaintiff's counsel's misconduct warrants further sanctions under this Rule.

Plaintiff and its counsel entirely disregarded this Court's order, something for which this Court has already sanctioned Mr. Liebowitz in prior cases. The July 15 Order required Plaintiff to "file proof of service no more than three days after service has been effected." Dkt. 6. Plaintiff served Defendant on September 5, yet, in violation of the Order, did not file his proof of service for 16 days (September 21) instead of three. The July 15 Order also required Plaintiff to produce to Defendant within 14 days after service (i.e., September 19) to provide "(1) copies of records sufficient to show the royalty paid the last three times the work (e.g., the photograph or video) at issue in this case was licensed and (2) the number of times the work was license in the last five years." Dkt. 6. Plaintiff failed to do this. Plaintiff's counsel only revealed to Defendant's counsel that the photograph in question had never been licensed after Defendant's counsel questioned compliance with the July 15 Order.

While Defendant cannot claim severe prejudice from the willful failure of those parts of the July 15 Orders, we bring this to the Court's attention because this is not the first time Mr. Liebowitz has committed this exact form of misconduct, and he has been warned and sanctioned by this Court over this exact Order in the past. *See Polaris Images Corp. v. CBS Interactive, Inc.*, 2019 WL 5067167 at *2 (S.D.N.Y. 2019) (noting Mr. Liebowitz had twice disregarded orders to provide information in advance of mediation and sanctioning him). This Court should again impose sanctions for this conduct. However, Defendant does not request any sanction paid to Defendant. Instead, any sanctions the Court deems necessary should be paid to the Clerk of Court or any other fund deemed appropriate by the Court.

## IV.    CONCLUSION

Plaintiff's misconduct has no excuse. Plaintiff's counsel's misconduct in this case, as well as the growing list of cases sanctioning him, demonstrates his utter lack of regard for court orders and his obligations as an officer of this Court. He has shown again and again that he will not be deterred from misconduct by monetary sanctions. There is little hope he will correct his practices unless severe sanctions are issued. Bandshell is just the latest litigant to suffer the costs of Mr. Liebowitz's actions in the form of costs, multiplied proceedings, and delayed litigation. Defendant now asks this Court to grant sanctions against Plaintiff and Mr. Liebowitz in the form of 1) Bandshell's costs, and ten hours of legal fees, in preparing for and traveling to mediation, 2) involuntary dismissal of this case under the Federal Rules and the Court's inherent authority, 3) Bandshell's fees in preparing this Motion; 4) whatever sanctions the Court deems appropriate to address Plaintiff's and Mr. Liebowitz's failure to comply with the July 15 Orders, and 5) any other sanctions that the Court may deem appropriate to deter future misconduct.

Defendant also respectfully asks that Plaintiff's counsel be required to provide Plaintiff a copy with any Orders related to this Motion, and verify the same to this Court, and if there is to be a show cause or other hearing on this Motion, that Mr. Usherson be required to attend.

Dated: November 6, 2019

Respectfully Submitted,

Brad R. Newberg

*/s/ Brad R. Newberg*
Brad R. Newberg (#BN1203)
McGuireWoods LLP
1750 Tysons Blvd.
Tysons Corner, VA 22102
T: 703-712-5061
F: 703-712-5050
bnewberg@mcguirewoods.com

*Attorney for Defendant Bandshell Artist Management*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing Memorandum of Law in Support of Motion for Sanctions with the Clerk of the Court using the CM/ECF system on this 6th day of November, 2019, which constitutes service on Plaintiff, a registered user of the CM/ECF system pursuant to Fed. R. Civ. P. 5(b)(2)(E).

Dated: November 6, 2019

*/s/ Brad R. Newberg*
Brad R. Newberg (#BN1203)
McGuireWoods LLP
1750 Tysons Blvd.
Tysons Corner, VA 22102
T: 703-712-5061
F: 703-712-5050
bnewberg@mcguirewoods.com

*Attorney for Defendant Bandshell Artist Management*

# Exhibit J

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARTHUR USHERSON,<br><br>Plaintiff,<br><br>v.<br><br>BANDSHELL ARTIST MANAGEMENT<br><br>Defendant. | Docket No. 1:19-cv-6368 (JMF) |

## DECLARATION OF BRAD R. NEWBERG IN SUPPORT OF DEFENDANT'S MOTION FOR SANCTIONS

I, Brad R. Newberg, declare:

1. I am an attorney licensed to practice in the United States District Court for the Southern District of New York.

2. I am a partner in the Intellectual Property department of McGuireWoods LLP, which represents Defendant Bandshell Artist Management ("Defendant" or "Bandshell"). I head the McGuireWoods copyright and trademark litigation practice and have 20 years of experience in those fields. I am handling this case pro bono.

3. I make this declaration in support of Defendant's Motion for Sanctions.

4. Bandshell was served on September 5, 2019.

5. The proof of service was filed by Plaintiff on September 21, 2019.

6. On September 19, 2019, I emailed Mr. Liebowitz given that the Court Ordered that the Plaintiff provide Defendant with copies of records sufficient to show royalties paid the last three times the photograph at issue was licensed and the number of times the work had been licensed in the past three years.

7.  Having received no response, I followed up with Mr. Liebowitz on September 20. He responded to inform me that he had not found any prior licensing for this photograph. A true and correct copy of this email exchange is attached as Exhibit 1.

8.  Plaintiff did not contact Defendant regarding the case management plan or mediation required by the Court until I sent an email on October 3, 2019 to remind him of the case management plan due that day. A true and correct copy of this email chain is attached as Exhibit 2.

9.  As shown in Exhibit 2, Mr. Liebowitz did not respond at all to the case management plan request at first, but noted the mediation requirement and asked if we could schedule the mediation to occur two business days later.

10. As shown in Exhibit 2, I stated that I could get to New York that day for the in-person mediation, and wanted to make sure that Mr. Usherson could make it there (from Georgia) at that time. I also noted that the Court ordered that the mediator be someone with expertise in copyright law and the mediation office might not be able to accomplish all of this in a day or two.

11. As shown in Exhibit 2, Mr. Liebowitz stated that he was "going to reach out to a mediator I know to see if he is available early next week."

12. At this point, I started becoming uncomfortable. As shown in Exhibit 2, I responded that despite his desire "to have this done by Monday, I do want to make sure we handle this in the ways required by the Court and the Court's mediation rules." I again noted the need for a mediator with copyright expertise, the need to handle the mediation through the Court's mediation program, and the need for the parties' attendance.

13. As shown in Exhibit 2, Mr. Liebowitz responded that the mediator he suggested, ▮▮▮▮▮▮▮▮ "is a copyright lawyer who is part of the mediation program." Mr. Liebowitz also suggested that the mediation be done over the phone with just the lawyers.

14. As shown in Exhibit 2, I responded: "I'm very uncomfortable with some of your suggestions regarding the mediation." I raised concerns that an Internet search showed the person he suggested to mediate was a bankruptcy lawyer, not a copyright lawyer. I also stated: "the Court's rules are clear that all parties must attend mediations without exception, and even suggests that the mediation is pointless without the parties. Our clients cannot simply give us authority."

15. As shown in Exhibit 2, in an effort to move forward, I noted that if ▮▮▮▮▮▮▮ was indeed a copyright lawyer and part of the mediation program and if the mediation program's mediator believed that a telephonic mediation "would comply with the Court's mediation rules," then my client and I could be available for such a mediation. I made clear: "I am not willing to have a mediation, however, without the full participation of the parties."

16. After hearing from ▮▮▮▮▮▮▮ that he had some experience mediating copyright cases, as shown in Exhibit 2, I reiterated that a phone mediation could only be done if in compliance with the rules, and the attorneys and clients fully participated. I again stated: "I do not believe there is any reading of the rules that would say our clients do not have to participate." I finished my email by again reminding Mr. Liebowitz of the case management plan that was due.

3

17. Mr. Liebowitz then (on October 4) contacted the Mediation Office to request that a telephonic mediation be added to the docket. A true and correct copy of this email chain is attached within Exhibits 3 & 4.

18. As shown in Exhibits 3 & 4, the Mediation Office immediately responded by rejecting his request, stating: "The outreach to               directly, and the request to convene telephonically, are not in accordance with the procedures that govern this program." The Mediation Office stated that it was reaching out to chambers, that the telephonic mediation *should not* go forward, and that any future mediation should be done "through our normal process."

19. As shown in Exhibit 3, the Mediation Office told the parties that the original Order regarding mediation stood and if it could not be complied with, a party could "seek appropriate relief directly from the Judge."

20. In an effort to seek relief from this Court, Mr. Liebowitz drafted a letter, and sent it to me, saying that he was going to file it that same day (October 4). A true and correct copy of the relevant portion of this email chain and his *draft* letter is attached as Exhibit 5.

21. I was upset to see that the letter he drafted was factually false in many respects and I made him aware of it. For instance, as shown in Exhibit 5, the draft stated that "Defendant has just recently engaged counsel of September 25, 2019." That was false. The draft stated that the "parties have been trying to find a mediator." That was false. The draft stated that he wanted to do the mediation "via telephone to avoid the cost of Defendant's counsel to come up from Virginia." That was false as I never made such a request and, in fact, stated that the mediation should be done in person.

4

22. As Exhibit 5 shows, I made Mr. Liebowitz aware of my displeasure and told him of the misstatements of fact that needed to be changed. He responded that he would "fix and file," which he did.

23. On October 7, the Court issued an Order, stating it was "to put it mildly, somewhat perturbed" by Plaintiff's request. The Court criticized Mr. Liebowitz for not following the Court's prior Order. The Court adjourned the initial pretrial conference to November 14 and Ordered that the parties conduct an **in-person** mediation by October 31.

24. As shown in Exhibit 4, the Mediation Office wrote the parties that same day, noting the Court's Order and stating that the parties must conduct "an in person session in accordance with the Judge's direction."

25. This Court gave the parties significant time to make sure they could conduct an in-person mediation with the parties and lead lawyers present, and conducted through the Mediation Office in accordance with the mediation procedures of this Court adopted by the Local Rules.

26. Both the Court and the Mediation Office stated in no uncertain terms that the mediation needed to be in person.

27. Furthermore, the Court's Local Rules adopt the Mediation Procedures of the Southern District of New York, which not only discuss the importance of in person mediations, but state that **the actual parties and their lead attorneys** must be present at the in person mediation.

28. I provided Mr. Liebowitz with several dates on which I and my client could be available in person in New York for mediation and asked him to pick a date where both he and

5

his client would also be available. A true and correct copy of this email chain is attached as Exhibit 6.

29. As shown in Exhibit 6, Mr. Liebowitz did not raise any issues of availability, and responded within five minutes, picking the last possible date, October 31.

30. The parties scheduled the mediation for October 31 at noon at the Mediation Offices at 40 Foley Square. ▇▇▇▇ informed the parties that they should send him the required mediation statements by October 29.

31. I received an email from ▇▇▇▇ on October 23, 2019 seeking a call on October 24, 2019 ▇▇▇▇▇▇▇▇▇▇. A true and correct copy of this email chain is attached as Exhibit 7.

32. I had a call with ▇▇▇▇ on October 24, and it was agreed that ▇▇▇▇ ▇▇▇▇ in-person mediation would move forward.

33. Defendant then sent its detailed Confidential Mediation Statement to the mediator.

34. On October 30, 2019, I received an email from ▇▇▇▇ with a potential offer from Plaintiff. The offer was unacceptable to my client.

35. However, in a good-faith effort to reach a resolution in the case, I drafted a full proposed agreement, and sent it to ▇▇▇▇ stating that Plaintiff could accept and sign the agreement or "we will see Mr. Liebowitz and Mr. Usherson tomorrow and we can continue discussing the possibility of settlement at the mediation. . . . " I believe this email was forwarded to Mr. Liebowitz as ▇▇▇▇ had sent on other emails and Mr. Liebowitz eventually responded to the draft proposal.

36. Later that evening on October 30, ▇▇▇▇ sent me an email stating he had talked to Mr. Liebowitz, who relayed that he "has been tied up. He will review [the draft I

6

sent] tonight and get back to us in the morning. Hopefully we can settle this before need to go to **in person** mediation" (emphasis added). I reiterated that I would be headed to the train station well before 6:00 AM the next day and noted my assumption that "Mr. Usherson either flew to NY tonight or is likewise on a very early plane."   responded "I understand." A true and correct copy of this email chain is attached as Exhibit 8, redacted to eliminate settlement discussions.

37. On October 31 at *4:14 am*, I received an email from Mr. Liebowitz stating "Attached please find revisions to the agreement which can be discussed at mediation." A true and correct copy of this email (without attachment) is attached as Exhibit 9.

38. At this point, neither I nor my client had received any word that Mr. Liebowitz or his client would not attend the in-person mediation—or that their lack of attendance was even contemplated. I had made numerous references at this point to Mr. Liebowitz and to the mediator about the parties and Mr. Liebowitz and I meeting in person in New York.

39. As shown in Exhibit 9, Mr. Liebowitz's 4:14 am email courtesy copied a "James H. Freeman" but did not mention anything about Mr. Freeman attending the mediation, and I did not think twice about it.

40. Mr. Freeman had not made an appearance in this case and, to the best of my knowledge, Mr. Freeman had not been on any prior emails or calls in this case.

41. The revisions to the draft settlement agreement were unacceptable, and odd in that at least one did not seem to have any application to this matter.

42. Mr. Liebowitz never communicated that he would not or might not be at the mediation.

7

43. Mr. Liebowitz never communicated that his client would not or might not be at the mediation.

44. I woke up at 5:00 am on the morning of October 31 (at which point I saw Mr. Liebowitz's 4:14 am email), and then I headed to the train station.

45. I made sure to attend this mediation in person. I did not let the fact that I was, for instance, missing one daughter's playoff volleyball match, or had to arrange alternative Halloween plans for another, affect my ability to be at the mediation.

46. On October 31, I arrived in New York, met with my client to prepare for the mediation, and entered the mediation room with my client at 11:45 am for the noon mediation.

47. At this point, I was told for the first time by ⬛⬛⬛⬛ that he had gotten word that Mr. Liebowitz would not be attending the mediation, and that Mr. Liebowitz's associate would be attending instead, and he did not know whether, but doubted Mr. Usherson would be attending.

48. Mr. Freeman, an associate of Mr. Liebowitz, arrived with Mr. Liebowitz's sister to let us know that Mr. Usherson would not be attending either.

49. Mr. Freeman seemed to have little to no knowledge of the details of this case and has not made an appearance in the case. I do not know if Mr. Liebowitz's sister is an attorney or what her role is in this case, if any.

50. Mr. Freeman seemed surprised that I was upset that Mr. Usherson and Mr. Liebowitz were not attending the mediation.

51. Given that neither Mr. Usherson nor Mr. Liebowitz were there, the mediation could not move forward.

8



56. My client and I left the mediation room, and I traveled home to Virginia by train.

57. While on the train, I attempted to look up Mr. Liebowitz's website.

58. One of the first search results was the Twitter page for Liebowitz Law Firm, PLLC. I was shocked to discover a post from Mr. Liebowitz that morning, thanking those who attended an event he hosted in Los Angeles the prior night. A true and correct copy of a screenshot of the posting from the Liebowitz Law Firm, PLLC's Twitter feed is attached as Exhibit 10.

59. Based on the posting, it seems highly unlikely that the Los Angeles event was an impromptu event, but rather something that had been planned even before Mr. Liebowitz scheduled the October 31 in-person mediation for him and his client.

60. On November 1, 2019, I sent Mr. Liebowitz an email requesting reimbursement of Defendant's costs and ten hours of my legal fees, as well as dismissal of this case due to his violation of Court Orders. A true and correct copy of this email chain is attached as Exhibit 11.

9

61. As shown in Exhibit 11, I offered to have a meet and confer on this motion via telephone although it did not appear required by this Court's rules. We had such a call on November 4, 2019. The call did not result in resolution of this motion.

62. I spent more than ten hours on the Mediation Statement, preparation for mediation, travel to New York, and attendance at the planned in-person mediation. My associate, Michael Shafer, worked on the Mediation Statement as well. However, I limited my request to ten hours of my time and none of Mr. Shafer's.

63. Although this case is being handled pro bono, my standard 2018 rate as charged by McGuireWoods LLP is $855 per hour. This rate is consistent with the rates McGuireWoods charges for attorneys of my experience.

64. The receipts for Defendant's costs for the New York trip came to $428.75. True and correct copies of these receipts are attached as Exhibit 12.

65. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: November 6, 2019

Brad R. Newberg (#BN1203)

10

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Declaration of Brad R. Newberg with the Clerk of the Court using the CM/ECF system on this 6th day of November, 2019, which constitutes service on Plaintiff, a registered user of the CM/ECF system pursuant to Fed. R. Civ. P. 5(b)(2)(E).

Dated: November 6, 2019

/s/ Brad R. Newberg
Brad R. Newberg (#BN1203)
McGuireWoods LLP
1750 Tysons Blvd.
Tysons Corner, VA 22102
T: 703-712-5061
F: 703-712-5050
bnewberg@mcguirewoods.com

*Attorney for Defendant Bandshell Artist Management*

## Newberg, Brad R.

| | |
|---|---|
| **From:** | Richard Liebowitz <RL@liebowitzlawfirm.com> |
| **Sent:** | Friday, September 20, 2019 4:55 PM |
| **To:** | Newberg, Brad R. |
| **Subject:** | Re: Usherson v. Bandshell Artist Management 19-cv-6368-JMF |

Hi Brad,

Checking with process server. I am not sure if they were official severed. If not, can you do a waiver of service? My client is still looking but as of now doesn't look like any licensing for this photo. Are you around for a phone call on Monday at 3pm to see if we can get resolved? Thanks.

On Fri, Sep 20, 2019 at 4:49 PM Newberg, Brad R. <BNewberg@mcguirewoods.com> wrote:

Following up on this. Thank you.


**Brad R. Newberg**
McGuireWoods LLP
T: +1 703 712 5061 | M: +1 703 772 6787


**From:** Newberg, Brad R.
**Sent:** Thursday, September 19, 2019 12:04 PM
**To:** 'RL@Liebowitzlawfirm.com' <RL@Liebowitzlawfirm.com>
**Subject:** Usherson v. Bandshell Artist Management 19-cv-6368-JMF


Richard,


I'm going to be representing Bandshell in this case. I just left you a voicemail, but can you let me know when you might be available today or tomorrow to discuss the case?


Also, a couple of quick things:

1) Can you let me know the exact date that Bandshell was served? My client is not positive whether it was September 4, 5, or 6.

2) I don't think these have been sent to my client yet, but can you please send to me the records sufficient to show the royalty paid the last three times the photograph at issue was licensed, and sufficient to show the number of times the work was licensed in the last five years?

Thank you.

**Brad R. Newberg**
Partner
McGuireWoods LLP
<u>1750 Tysons Boulevard</u>
<u>Suite 1800</u>
<u>Tysons, VA 22102</u>-4215
T:  +1 703 712 5061
M: +1 703 772 6787
F:  +1 703 712 5187
<u>bnewberg@mcguirewoods.com</u>
<u>Bio</u> | <u>VCard</u> | <u>www.mcguirewoods.com</u>

# McGuireWoods

---

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

--
Best,

Richard Liebowitz, Esq.
Liebowitz Law Firm, PLLC
t.516-233-1660
RL@LiebowitzLawFirm.com
<u>www.LiebowitzLawFirm.com</u>

*****************************************************************
This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.
*****************************************************************

## Newberg, Brad R.

| | |
|---|---|
| **From:** | Richard Liebowitz <RL@liebowitzlawfirm.com> |
| **Sent:** | Thursday, October 03, 2019 12:02 PM |
| **To:** | Newberg, Brad R. |
| **Cc:** | Shafer, Michael A. |
| **Subject:** | Re: Case Management Plan in Usherson v. Bandshell Artist Management |

Thank you. Will find out ▮▮▮▮ availability on Tuesday morning. Will have any revisions to the plan and joint letter by 6pm today.

On Thu, Oct 3, 2019 at 11:55 AM Newberg, Brad R. <BNewberg@mcguirewoods.com> wrote:

Based on ▮▮▮▮▮ representation that he is familiar with copyright law (and as stated below, your statement that he will be doing this as part of the SDNY mediation program (so without compensation)), we can go ahead with him as the mediator. If he believes your suggestion of a telephone mediation is appropriate under the rules, and you and your client and he are available, my client and I can be available by phone Tuesday morning, October 8. As previously stated, I do not believe there is any reading of the rules that would say our clients do not have to participate.

Please do let me know as well regarding my inquiries related to the joint letter and case management plan. Thanks.

**Brad R. Newberg**
McGuireWoods LLP
T: +1 703 712 5061 | M: +1 703 772 6787

**From:** Newberg, Brad R.

**Sent:** Thursday, October 03, 2019 11:10 AM
**To:** 'Richard Liebowitz' <RL@liebowitzlawfirm.com>
**Cc:** Shafer, Michael A. <MShafer@mcguirewoods.com>
**Subject:** RE: Case Management Plan in Usherson v. Bandshell Artist Management

Richard,

I'm very uncomfortable with some of your suggestions regarding the mediation. I will take you at your word that the attorney you just recommended, ▮▮▮▮▮▮ , is part of the SDNY mediation program—and therefore would also be conducting the mediation without compensation. However, a quick search on ▮▮▮▮ suggests that his career has been as a bankruptcy and antitrust litigator, not that he is a "copyright lawyer" as your email states, and the Court's Order is clear that it wants a mediator with copyright expertise. If there is information on ▮▮▮▮ of which I am not aware, please let me know.

1

Also, the Court's rules are clear that all parties must attend mediations without exception, and even suggests that the mediation is pointless without the parties. Our clients cannot simply give us authority. The rules also say that everyone must be there in person, although if a party has a particular hardship, they may apply to attend telephonically. I would be willing to consider an agreement to conduct the mediation over the phone, but it is unclear how that would work given the need for joint and solo sessions with the mediator.

My concern is simply making sure this is done correctly.

If ▉▉▉▉▉ is indeed a "copyright lawyer," (and part of the SDNY program doing this without compensation), and he believes that the mediation should occur over the phone and that doing such would comply with the Court's mediation rules, then we could be available by phone and I would suggest Tuesday morning (if by phone). I am not willing to have a mediation, however, without the full participation of the actual parties.

--

Meanwhile, we do need to get the joint letter and case management plan on file today. Please send me a draft that I can review/request changes to, and add Defendant's portions.

**Brad R. Newberg**
McGuireWoods LLP
T: +1 703 712 5061 | M: +1 703 772 6787

**From:** Richard Liebowitz <RL@liebowitzlawfirm.com>
**Sent:** Thursday, October 03, 2019 10:28 AM
**To:** Newberg, Brad R. <BNewberg@mcguirewoods.com>
**Cc:** Shafer, Michael A. <MShafer@mcguirewoods.com>
**Subject:** Re: Case Management Plan in Usherson v. Bandshell Artist Management

Hi Brad,

Yes, ▉▉▉▉ is a copyright lawyer who is part of the meditation program. We can do via phone if all the parties agree. I think because of the time sensitiveness we do over the phone. If you have authority from your client just the lawyers can be on the phone.

On Thu, Oct 3, 2019 at 10:22 AM Newberg, Brad R. <BNewberg@mcguirewoods.com> wrote:

Please do keep me posted. A few things though:

1)   Despite the desire to have this done Monday, I do want to make sure we handle this in the ways required by the Court and the Court's mediation rules.

2)   Obviously we will want any mediator to be part of the Court program as well as have the copyright expertise ordered by the Court. As we are handling this case pro bono, we are not willing to pay for an outside mediator.

3)   I still have to check with my client obviously as this is very late notice and I have no idea if he is available Monday afternoon.

4)   3:30 pm is the earliest I can do Monday due to another Court ordered settlement conference.

5)   As Tuesday-Wednesday is Yom Kippur, those days would be out.


Can you also let me know your availability on the case management conference/joint letter?


**Brad R. Newberg**
McGuireWoods LLP
T: +1 703 712 5061 | M: +1 703 772 6787

**From:** Richard Liebowitz <RL@liebowitzlawfirm.com>
**Sent:** Thursday, October 03, 2019 10:07 AM
**To:** Newberg, Brad R. <BNewberg@mcguirewoods.com>
**Cc:** Shafer, Michael A. <MShafer@mcguirewoods.com>
**Subject:** Re: Case Management Plan in Usherson v. Bandshell Artist Management

Thanks. I am going to reach out to a mediator I know to see if he is available early next week. Will keep you posted. Thank you.


On Thu, Oct 3, 2019 at 10:04 AM Newberg, Brad R. <BNewberg@mcguirewoods.com> wrote:

Thanks. My email was directed to the joint letter and case management plan due today. But as to the mediation, my understanding was that the mediation was to occur by a week ago (although there is also an entry in PACER that the mediation deadlines were terminated).


I actually will be in New York on Monday for a settlement meeting that will end around 3:00 pm. I could be at the courthouse (or could host at McGuireWoods' NY office) at 3:30 pm, but a) I would have to check with my client that he is available on such short notice (is Mr. Usherson also available then?), and b) the Court has ordered that the mediator be someone with expertise in copyright. I'm not sure the mediation office will be able to get someone like that with one business day's notice. Let me know if they can and I will check with my client.

**Brad R. Newberg**
McGuireWoods LLP
T: +1 703 712 5061 | M: +1 703 772 6787

**From:** Richard Liebowitz <RL@liebowitzlawfirm.com>
**Sent:** Thursday, October 03, 2019 9:46 AM
**To:** Newberg, Brad R. <BNewberg@mcguirewoods.com>
**Cc:** Shafer, Michael A. <MShafer@mcguirewoods.com>
**Subject:** Re: Case Management Plan in Usherson v. Bandshell Artist Management

Hi Brad,

I will contact the mediation office. We need to have a mediation before next week. Are you available on Monday to have the mediation? Thank you.

On Thu, Oct 3, 2019 at 8:59 AM Newberg, Brad R. <BNewberg@mcguirewoods.com> wrote:

Hi Richard. This is due today. I am available to discuss just about any time today. And if you have a draft that you'd like us to consider and add our defenses and other information to in advance of the call, we would be happy to do that.

**Brad R. Newberg**
Partner
McGuireWoods LLP
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102-4215
T:  +1 703 712 5061
M: +1 703 772 6787
F:  +1 703 712 5187
bnewberg@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

--

Best,

Richard Liebowitz, Esq.

Liebowitz Law Firm, PLLC

t.516-233-1660

RL@LiebowitzLawFirm.com

www.LiebowitzLawFirm.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

--

Best,

Richard Liebowitz, Esq.

Liebowitz Law Firm, PLLC

t.516-233-1660

RL@LiebowitzLawFirm.com

www.LiebowitzLawFirm.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

********************************************************************

--

Best,


Richard Liebowitz, Esq.

Liebowitz Law Firm, PLLC

t.516-233-1660

RL@LiebowitzLawFirm.com

www.LiebowitzLawFirm.com



********************************************************************

This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

********************************************************************

--
Best,

Richard Liebowitz, Esq.
Liebowitz Law Firm, PLLC
t.516-233-1660
RL@LiebowitzLawFirm.com
www.LiebowitzLawFirm.com

********************************************************************

This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.
********************************************************************

## Newberg, Brad R.

| | |
|---|---|
| **From:** | on behalf of MediationOffice@nysd.uscourts.gov |
| **Sent:** | Friday, October 04, 2019 3:28 PM |
| **To:** | RL@LiebowitzLawFirm.com |
| **Cc:** | Newberg, Brad R. |
| **Subject:** | Re: Usherson v. Bandshell Artist Management 19-cv-6368 |

Counsel, We have heard back from chambers with direction that you should either comply with the exiting order (to hold mediation at least two weeks prior to the Oct 10 IPTC) or seek appropriate relief directly from the judge.

Mediation Office
United States District Court
Southern District of New York
40 Foley Square, Suite 120
New York, New York 10007
(212) 805-0643
Email: mediationoffice@nysd.uscourts.gov www.nysd.uscourts.gov/mediation

From:   Mediation Office NYSD/NYSD/02/USCOURTS
To:     RL@LiebowitzLawFirm.com, bnewberg@mcguirewoods.com
Cc:     
Date:   10/04/2019 01:43 PM
Subject:Re: Usherson v. Bandshell Artist Management 19-cv-6368
Sent by:    

Dear Mr. Liebowitz, We are waiting to hear back from chambers.      confirmed his willingness to work with counsel in this matter. We learned through our conversation with him, however, that he had been asked to conduct a telephonic session. The outreach to      directly, and the request to convene telephonically, are not in accordance with the procedures that govern this program so we reached out to chambers for guidance and are awaiting direction from the judge. I am copying all counsel and      to confirm that there will not be a session next Tuesday. If the judge decides that mediation should go forward in the future,      has indicated his willingness to work on this matter through our normal process.

Mediation Office
United States District Court
Southern District of New York
40 Foley Square, Suite 120
New York, New York 10007
(212) 805-0643
Email: mediationoffice@nysd.uscourts.gov www.nysd.uscourts.gov/mediation

From:   Richard Liebowitz <RL@liebowitzlawfirm.com>
To:     mediation_intern@nysd.uscourts.gov
Cc:     SDNY Mediation Office <MediationOffice@nysd.uscourts.gov>

Date: 10/04/2019 12:57 PM
Subject: Usherson v. Bandshell Artist Management 19-cv-6368

Hi ▮▮▮,

Just confirming you reached out to ▮▮▮▮▮ regarding our scheduled mediation for this Tuesday, October 8, 2019 at 11:30am? Can you please add this to the docket today so the Judge knows we are having the mediation then?

Thank you.

Best,

Richard Liebowitz, Esq.
Liebowitz Law Firm, PLLC
t.516-233-1660
RL@LiebowitzLawFirm.com
https://protect2.fireeye.com/url?k=d1659f25-8def25f1-d165ad71-8687eb7ec816-94b82f4bd75f22cf&q=1&u=http%3A%2F%2Fwww.liebowitzlawfirm.com%2F

******************************************************************

This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

******************************************************************

## Newberg, Brad R.

| | |
|---|---|
| **From:** | on behalf of MediationOffice@nysd.uscourts.gov |
| **Sent:** | Monday, October 07, 2019 3:24 PM |
| **To:** | RL@LiebowitzLawFirm.com; Newberg, Brad R.; |
| **Subject:** | Re: Usherson v. Bandshell Artist Management 19-cv-6368 |

Counsel, Judge Furman has extended the time to mediate to October 31. We will assign ▆ as the mediator and will send out that notice shortly. Please promptly contact ▆ to arrange for an in person session in accordance with the Judge's direction.

Mediation Office
United States District Court
Southern District of New York
40 Foley Square, Suite 120
New York, New York 10007
(212) 805-0643
Email: mediationoffice@nysd.uscourts.gov www.nysd.uscourts.gov/mediation

From: Mediation Office NYSD/NYSD/02/USCOURTS
To: RL@LiebowitzLawFirm.com, bnewberg@mcguirewoods.com
Cc: ▆
Date: 10/04/2019 01:43 PM
Subject: Re: Usherson v. Bandshell Artist Management 19-cv-6368
Sent by: ▆

Dear Mr. Liebowirz, We are waiting to hear back from chambers. ▆ confirmed his willingness to work with counsel in this matter. We learned through our conversation with him, however, that he had been asked to conduct a telephonic session. The outreach to ▆ directly, and the request to convene telephonically, are not in accordance with the procedures that govern this program so we reached out to chambers for guidance and are awaiting direction from the judge. I am copying all counsel and ▆ to confirm that there will not be a session next Tuesday. If the judge decides that mediation should go forward in the future, ▆ has indicated his willingness to work on this matter through our normal process.

Mediation Office
United States District Court
Southern District of New York
40 Foley Square, Suite 120
New York, New York 10007
(212) 805-0643
Email: mediationoffice@nysd.uscourts.gov www.nysd.uscourts.gov/mediation

From: Richard Liebowitz <RL@liebowitzlawfirm.com>
To: mediation_intern@nysd.uscourts.gov
Cc: SDNY Mediation Office <MediationOffice@nysd.uscourts.gov>

1

Date:    10/04/2019 12:57 PM
Subject:Usherson v. Bandshell Artist Management 19-cv-6368


Hi ▮▮▮▮ ,

Just confirming you reached out to ▮▮▮▮▮▮▮ regarding our scheduled mediation for this Tuesday, October 8, 2019
at 11:30am? Can you please add this to the docket today so the Judge knows we are having the mediation then?

Thank you.

Best,

Richard Liebowitz, Esq.
Liebowitz Law Firm, PLLC
t.516-233-1660
RL@LiebowitzLawFirm.com
https://protect2.fireeye.com/url?k=9bf9330b-c768cf3f-9bf9015f-0cc47aab5846-
970f8aac7a9ec516&q=1&u=http%3A%2F%2Fwww.liebowitzlawfirm.com%2F


*******************************************************************

This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and
may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient,
you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail
and delete this message. Thank you.


*******************************************************************

2

## Newberg, Brad R.

| | |
|---|---|
| **From:** | Richard Liebowitz <RL@liebowitzlawfirm.com> |
| **Sent:** | Friday, October 04, 2019 5:35 PM |
| **To:** | Newberg, Brad R. |
| **Cc:** | Shafer, Michael A. |
| **Subject:** | Re: Case Management Plan in Usherson v. Bandshell Artist Management |

Thank you. I will fix and file.

Best,

Richard Liebowitz, Esq.
Liebowitz Law Firm, PLLC
t.516-233-1660
RL@LiebowitzLawFirm.com
www.LiebowitzLawFirm.com

*******************************************************************

This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.
*******************************************************************

On Fri, Oct 4, 2019 at 4:16 PM Newberg, Brad R. <BNewberg@mcguirewoods.com> wrote:

While the tone of the letter and the request is ok, I do not believe that all of the history is factually correct. It currently reads:

We represent Plaintiff, Arthur Usherson, in the above in-captioned case. Defendant has just recently engaged counsel on September 25, 2019. The mediation office did not assign a mediator because for some reason the mediation case track was terminated on July 29, 2019. The parties have been trying to find a mediator. On October 3, 2019 we found a mediator that can do the mediation on October 8, 2019 via telephone to avoid the cost of Defendant's counsel to come up from Virginia. We respectfully request to either have the mediation schedule for October 8, 2019 via telephone or to schedule the mediation for another time in October. In addition, we respectfully request that the initial conference be adjourned until after the mediation.

However, my email to you stating that I represented Bandshell was on September 19. And it is not correct to say that we have been trying to find a mediator or that the telephonic aspect was to avoid the cost of me coming up from Virginia. I actually don't have a problem coming to NY depending on the date. I would be ok with you **stating the following in your letter**:

1

We represent Plaintiff, Arthur Usherson, in the above in-captioned case. Defendant engaged counsel on September 19, 2019. The mediation office did not assign a mediator because for some reason the mediation case track was terminated on July 29, 2019. On October 3, 2019 I found a mediator that can do the mediation on October 8, 2019 via telephone to accomplish it before the October 10 Court conference. We respectfully request to either have the mediation scheduled for October 8, 2019 via telephone or to schedule the mediation for another time in October. In addition, we respectfully request that the initial conference be adjourned until after the mediation.

**Brad R. Newberg**
McGuireWoods LLP
T: +1 703 712 5061 | M: +1 703 772 6787

**From:** Richard Liebowitz <RL@liebowitzlawfirm.com>
**Sent:** Friday, October 04, 2019 4:07 PM
**To:** Newberg, Brad R. <BNewberg@mcguirewoods.com>
**Cc:** Shafer, Michael A. <MShafer@mcguirewoods.com>
**Subject:** Re: Case Management Plan in Usherson v. Bandshell Artist Management

Hi Brad,

I think we should file this letter with the Court today. Please let me know. Kindly call me at 646-740-3808.

Best,

Richard Liebowitz, Esq.

Liebowitz Law Firm, PLLC

t.516-233-1660

RL@LiebowitzLawFirm.com

www.LiebowitzLawFirm.com



# Liebowitz ⊙ Law Firm, PLLC

ATTORNEYS FOR THE PHOTOGRAPHIC ARTS

11 SUNRISE PLAZA, STE. 305
VALLEY STREAM, NY 11580
(516) 233-1660
WWW.LIEBOWITZLAWFIRM.COM

October 4, 2019

Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re:     *Usherson v. Bandshell Artist Management (1:19-cv-6368-JMF)*

Dear Judge Furman,

We represent Plaintiff, Arthur Usherson, in the above in-captioned case. Defendant has just recently engaged counsel on September 25, 2019. The mediation office did not assign a mediator because for some reason the mediation case track was terminated on July 29, 2019. The parties have been trying to find a mediator. On October 3, 2019 we found a mediator that can do the mediation on October 8, 2019 via telephone to avoid the cost of Defendant's counsel to come up from Virginia. We respectfully request to either have the mediation schedule for October 8, 2019 via telephone or to schedule the mediation for another time in October. In addition, we respectfully request that the initial conference be adjourned until after the mediation.

The Court's consideration is much appreciated.

Respectfully submitted,

/s/Richard Liebowitz
Richard P. Liebowitz

*Counsel for Plaintiff Arthur Usherson*

Liebowitz ⊙ Law Firm, PLLC

## Newberg, Brad R.

| | |
|---|---|
| **From:** | Richard Liebowitz <RL@liebowitzlawfirm.com> |
| **Sent:** | Monday, October 07, 2019 4:22 PM |
| **To:** | Newberg, Brad R. |
| **Cc:** | |
| **Subject:** | Re: Usherson v. Bandshell Artist Management 19-cv-6368 |

Oct 31st at 12pm works.     does this work? Thanks.

On Mon, Oct 7, 2019 at 4:17 PM Newberg, Brad R. <BNewberg@mcguirewoods.com> wrote:
Please let me know if any of October 11, 16, 28 or 31 work for the both of you and Mr. Usherson. Thank you very much.

Brad R. Newberg
McGuireWoods LLP

On Oct 7, 2019, at 3:34 PM, Richard Liebowitz <RL@liebowitzlawfirm.com> wrote:

Thanks.

On Mon, Oct 7, 2019 at 3:29 PM Newberg, Brad R. <BNewberg@mcguirewoods.com> wrote:
I will check with my client and get back to you by tomorrow with available dates. Thank you.

Brad R. Newberg
McGuireWoods LLP

On Oct 7, 2019, at 3:25 PM, Richard Liebowitz <RL@liebowitzlawfirm.com> wrote:

Thank you. Brad and     when are you available?

On Mon, Oct 7, 2019 at 3:24 PM <MediationOffice@nysd.uscourts.gov> wrote:
Counsel, Judge Furman has extended the time to mediate to October 31. We will assign     as the mediator and will send out that notice shortly. Please promptly contact     to arrange for an in person session in accordance with the Judge's direction.

Mediation Office
United States District Court
Southern District of New York
40 Foley Square, Suite 120
New York, New York 10007
(212) 805-0643
Email: mediationoffice@nysd.uscourts.gov
www.nysd.uscourts.gov/mediation

From: Mediation Office NYSD/NYSD/02/USCOURTS
To: RL@LiebowitzLawFirm.com, bnewberg@mcguirewoods.com
Cc: ▐▐▐▐▐▐▐▐▐▐
Date: 10/04/2019 01:43 PM
Subject: Re: Usherson v. Bandshell Artist Management 19-cv-6368
Sent by: ▐▐▐▐▐▐▐▐▐

Dear Mr. Liebowirz, We are waiting to hear back from chambers. ▐▐▐▐▐▐▐
confirmed his willingness to work with counsel in this matter. We learned
through our conversation with him, however, that he had been asked to
conduct a telephonic session. The outreach to ▐▐▐▐▐▐▐▐ directly, and the
request to convene telephonically, are not in accordance with the
procedures that govern this program so we reached out to chambers for
guidance and are awaiting direction from the judge. I am copying all
counsel and ▐▐▐▐▐▐▐ to confirm that there will not be a session next
Tuesday. If the judge decides that mediation should go forward in the
future, ▐▐▐▐▐▐▐ has indicated his willingness to work on this matter
through our normal process.

Mediation Office
United States District Court
Southern District of New York
40 Foley Square, Suite 120
New York, New York 10007
(212) 805-0643
Email: mediationoffice@nysd.uscourts.gov
www.nysd.uscourts.gov/mediation

From: Richard Liebowitz <RL@liebowitzlawfirm.com>
To: mediation_intern@nysd.uscourts.gov
Cc: SDNY Mediation Office <MediationOffice@nysd.uscourts.gov>
Date: 10/04/2019 12:57 PM
Subject: Usherson v. Bandshell Artist Management 19-cv-6368

Hi ▐▐▐▐▐ ,

Just confirming you reached out to ▐▐▐▐▐▐▐▐ regarding our scheduled
mediation for this Tuesday, October 8, 2019 at 11:30am? Can you please add
this to the docket today so the Judge knows we are having the mediation
then?

Thank you.

Best,

Richard Liebowitz, Esq.
Liebowitz Law Firm, PLLC
t.516-233-1660
RL@LiebowitzLawFirm.com
www.LiebowitzLawFirm.com

************************************************************
****

This message is intended only for the designated recipient(s). It may
contain confidential or proprietary information and may be subject to the
attorney-client privilege or other confidentiality protections. If you are
not a designated recipient, you may not review, copy or distribute this
message. If you receive this in error, please notify the sender by reply
e-mail and delete this message. Thank you.

************************************************************
****

--
Best,

Richard Liebowitz, Esq.
Liebowitz Law Firm, PLLC
t.516-233-1660
RL@LiebowitzLawFirm.com
www.LiebowitzLawFirm.com

************************************************************
***
This message is intended only for the designated recipient(s). It may contain
confidential or proprietary information and may be subject to the attorney-client
privilege or other confidentiality protections. If you are not a designated
recipient, you may not review, copy or distribute this message. If you receive
this in error, please notify the sender by reply e-mail and delete this message.
Thank you.
************************************************************
***

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

--
Best,

Richard Liebowitz, Esq.
Liebowitz Law Firm, PLLC
t.516-233-1660
RL@LiebowitzLawFirm.com
www.LiebowitzLawFirm.com

*****************************************************************
This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message.,Thank you.
*****************************************************************

--
Best,

Richard Liebowitz, Esq.
Liebowitz Law Firm, PLLC
t.516-233-1660
RL@LiebowitzLawFirm.com
www.LiebowitzLawFirm.com

*****************************************************************
This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.
*****************************************************************

## Newberg, Brad R.

**From:**
**Sent:** Wednesday, October 23, 2019 7:35 PM
**To:** Newberg, Brad R.
**Subject:** Re: Usherson

Fine will call you at 10

Sent from Yahoo Mail for iPhone

On Wednesday, October 23, 2019, 7:34 PM, Newberg, Brad R. <BNewberg@mcguirewoods.com> wrote:

I'm happy to discuss tomorrow. I'm around in the morning. 703-712-5061

Brad R. Newberg
McGuireWoods LLP

On Oct 23, 2019, at 7:04 PM, wrote:

I am the mediator in the above case. Can I call you tomorrow morning to see if
we can settle this matter without you having to come to New York?

Sent from Yahoo Mail for iPhone

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are
not the intended recipient, please advise by return e-mail and delete immediately without reading
or forwarding to others.*

## Newberg, Brad R.

**From:**
**Sent:** Wednesday, October 30, 2019 10:03 PM
**To:** Newberg, Brad R.
**Subject:** Re: Mediation

I understand

Sent from Yahoo Mail for iPhone

On Wednesday, October 30, 2019, 9:36 PM, Newberg, Brad R. <BNewberg@mcguirewoods.com> wrote:

I'm headed to the train station well before 6:00 am. And to be candid, I would have assumed Mr Usherson either flew to NY tonight or is likewise on a very early plane.

Thanks.

Brad R. Newberg
McGuireWoods LLP

On Oct 30, 2019, at 8:15 PM, wrote:

Talked to Richard and he has been tied up. He will review tonight and get back to us in morning. Hopefully we can settle this before need to go to in person mediation.

Sent from Yahoo Mail for iPhone

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

## Newberg, Brad R.

| | |
|---|---|
| **From:** | Richard Liebowitz <RL@liebowitzlawfirm.com> |
| **Sent:** | Thursday, October 31, 2019 4:12 AM |
| **To:** | Newberg, Brad R.; ; James H. Freeman |
| **Subject:** | Usherson v. Bandshell |
| **Attachments:** | Usherson v. Bandshell- Settlement Agreement.doc |

Hi All,

Attached please find revisions to the agreement which can be discussed at the mediation. Thank you.

Best,

Richard Liebowitz, Esq.
Liebowitz Law Firm, PLLC
t.516-233-1660
RL@LiebowitzLawFirm.com
www.LiebowitzLawFirm.com

*******************************************************************
This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.
*******************************************************************



**Liebowitz Law Firm, PLLC**
@liebowitzlaw

We enjoyed seeing all of you at our 2019 #LA #Photographers Networking Event, at @RockandReilly, last night! Thank you for attending! 🍻🍽️📷

5:46 AM · 31 Oct 2019 from West Hollywood, CA

1 Like

twitter.com/liebowitzlaw/status/1189886409181663233

LLC on Twi...   x   +

I   USPTO   Trademark Electroni...   Lexis Advance® Ho...   Westlaw   Password Protected...

Home   Moments   Search Twitter   Have an account? Log in ▾

Follow

**Liebowitz Law Firm, PLLC**
@liebowitzlaw

Liebowitz Law Firm, PLLC is your partner in protecting your creative work! From photos to videos to other artistic pursuits, our law firm is on your side!

📍 Valley Stream, NY
🔗 liebowitzlawfirm.com
📅 Joined September 2015

📷 11 Photos and videos

Want to take advantage of all the new Twitter features?

It's simple – just log in.

Log in

Sign up

You may also like · Refresh

**Stevens Caruso**
@StevensCaruso

**Cadwalader** ✓
@Cadwalader

**Adobe Stock** ✓
@adobestock

**Centil Law Firm**
@CentilLaw

**Nancy Leong** ✓
@nancyjleong

Worldwide trends

**Happy Halloween**

## Newberg, Brad R.

| From: | Newberg, Brad R. |
|---|---|
| Sent: | Friday, November 01, 2019 9:23 AM |
| To: | 'Richard Liebowitz' |
| Cc: | Shafer, Michael A. |
| Subject: | Motion related to Mediation in Usherson v. Bandshell Artist Management |

Richard,

As you are aware, the failure of Mr. Usherson or you to attend yesterday's mediation was a direct violation of the Court's Orders (as well as the instructions of the Mediation Office). This is especially disconcerting because we specifically arranged a time that you and your client could be there—and sending an associate in your stead (who did not seem to know the specifics of this case) is not acceptable. Because of these actions, we were unable to conduct any meaningful mediation.

As such, we will be moving for our costs of the day, and legal fees for preparation for the mediation, travel, and attendance, which I will limit to ten hours. I have itemized those numbers below. We will also be moving for dismissal of the case. We plan on filing papers related to this motion early next week. While I do not believe a meet and confer is required for this motion under the Local Rules or Judge Furman's Individual Rules, I am available today before 3:00 pm, or Monday before 2:00 pm to confer on this issue.

Costs:
$374 for train
$5.50 for subway
$24 for parking at train station
$25.25 for breakfast and lunch in train stations
Total in costs: $428.75

Legal fees:
At this point (in addition to time spent on the motion), the motion will request ten hours of my time at my standard 2018 rate to cover the creation of the mediation statement, preparation for mediation, travel, and attendance. For your information, the actual amount of hours actually expended was higher and my associate, Michael Shafer also spent time related to mediation. My standard 2018 rate is $855. As such, ten hours is $8,550.

Total in costs and fees: $8,978.75.

Finally, if you are in agreement that you will pay the $8,978.75 in costs and fees and dismiss your case with prejudice, let me know and we can avoid the motion. Thank you.

## Brad R. Newberg

Partner
McGuireWoods LLP
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102-4215
T:  +1 703 712 5061
M: +1 703 772 6787
F:  +1 703 712 5187
bnewberg@mcguirewoods.com

1

UNION STATION PARKIN#5
30 MASSACHUSETTS AVE NE
WASHINGTON, DC 20002
10/31/2019                    17:33:47
CREDIT CARD

VISA SALE

Card #                XXXXXXXXXXXX5861
Network:                          VISA
Chip Card:           CAPITAL ONE VISA
AID:                  A0000000031010
SEQ #:                              49
Batch #:                           202
INVOICE                             49
Approval Code:                  00421D
Entry Method:                Chip Read
Mode:                           Issuer

SALE AMOUNT              $24.00

CUSTOMER COPY

MVM RECEIPT

MTA NYC TRANSIT
N067-34 ST-PENN STA
NEW YORK CITY NY

MVM #: 1430(N067  0401)

Thurs 31 Oct 19 09:55

Trans: Sale OK
Payment Mode: Credit
Amount:          $ 29.00
Card Value:      $ 29.00
New Card Fee:    $  1.00
Total Paid:      $ 30.00

VISA
Card #:
  ************5861
Auth#: 06066D
Ref #: 048801378133

Serial #:3028880752
Type: 000
FULL FARE

        Questions?
Call (212) METROCARD

---

STARBUCKS Store #7759
50 Massachusetts Avenue, Space T-16
Washington, DC  (202) 682-5895
------------------------------------------
CHK 694282
10/31/2019 06:27 AM
2765811  Drawer: 1  Reg: 4
------------------------------------------
Quad Espresso           2.95
Quad
With Coconut Milk
In A Grande Cup
Bacon Gouda Sndwch      3.95

Sbux Card               7.59
XXXXXXXXXXXXX0767

Subtotal               $6.90
Tax 10%                $0.69
Total                  $7.59
Change Due            $0.00

----------- Check Closed ---------------
10/31/2019 06:27 AM

SBUX Card x0767 New Balance:   9.30
Card is registered.

Zaro's Bakery
1 Penn Plaza
Amtrak Rotunda
Host: Ty-Asia              10/31/2019
ORDER #3307                  1:02 PM
                              30308

Tomato & Mozz Baguette         10.25
XL Chocolate Ruggelach          3.50
Bottle Soda                     2.76

Subtotal                       16.51
Tax                             1.15

For Here Total     17.66

Visa                           17.66
  Auth:03316D

Need Breakfast or Lunch For Your Office?
Zaro's Can Help.
Email Catering@zaro.com

--- Check Closed ---

**Newberg, Brad R.**

| | |
|---|---|
| **From:** | etickets@amtrak.com |
| **Sent:** | Monday, October 28, 2019 9:44 AM |
| **To:** | Newberg, Brad R. |
| **Subject:** | Amtrak: eTicket and Receipt for Your 10/31/2019 Trip - BRAD NEWBERG |
| **Attachments:** | Newberg Brad 201910280944150888.pdf |

## SALES RECEIPT



Purchased: 10/28/2019 6:44 AM PTThank you for your purchase.

1. Retain this receipt for your records.
2. Print the attached eTicket and carry during your trip.

Merchant ID 006241 Massachusetts Ave NWWashington, DC 20001800-USA-RAILAmtrak.com

# Reservation Number - 3C3DCEWASHINGTON, DC -
**NEW YORK PENN, NY (Round-Trip)**OCTOBER 28, 2019
Billing Information

BRAD NEWBERG12005 CREEKBEND DRRESTON, VA 20194-

**Visa** ending in 6349 (Purchase)Authorization Code 02450D

**Total $313**

Purchase Summary - Ticket Number 3010624515041

**TRAIN 2154: WASHINGTON, DC - NEW YORK (PENN STATION), NY**Depart
7:00 AM, Thursday, October 31, 2019
1 ACELA BUSINESS CLASS SEAT

**$215.00**

**Ticket Terms & Conditions**ACELA SERVICE, NO PARTIAL REFUND IF USED ON OTHER SERVICE
**Subtotal**

**$215.00**

**TRAIN 85: NEW YORK (PENN STATION), NY - WASHINGTON, DC**Depart 3:05
PM, Thursday, October 31, 2019
1 RESERVED COACH SEAT

**$98.00**

1

| | Subtotal |
|---|---|
| | **$98.00** |
| | **Total Charged by Amtrak** |
| | **$313.00** |

## Passengers

Brad Newberg

## Important Information

- Try the FindYourWay app for personalized train and station information at New York Penn Station. Download it on Google Play or the Apple App Store today.
- Tickets are non-transferable.
- Changes to your itinerary may affect your fare. Refund and exchange restrictions and penalties for failure to cancel unwanted travel may apply. If your travel plans change, contact us before departure to change your reservation. If you do not board your train, your entire reservation from that point will be canceled. If you board a different train without notifying us, you will have to pay for it separately; the conductor cannot apply the money paid for your prior reservation. For more information please visit Amtrak.com/changes.
- Summary of Terms and Conditions: Ticket valid for carriage or refund (subject to the refund rules of the fare purchased) for twelve months after day of issue unless otherwise specified. Amtrak tickets may only be sold or issued by Amtrak or an authorized travel agent/tour operator. Tickets sold or issued by an unauthorized third party will be voided by Amtrak. This ticket is a contract of carriage which includes specific terms and conditions and a binding arbitration agreement between Amtrak and the ticket holder. The terms and conditions and arbitration agreement are available at Amtrak.com/terms-and-conditions.html. Tickets sold for non-Amtrak service are subject to the tariffs of the providing carrier.
- Questions? Contact us online at Amtrak.com/contact or call 1-800-USA-RAIL (1-800-872-7245) or for text telephone (TTY) 1-800-523-6590.

**Newberg, Brad R.**

| | |
|---|---|
| **From:** | etickets@amtrak.com |
| **Sent:** | Thursday, October 31, 2019 12:38 PM |
| **To:** | Newberg, Brad R. |
| **Subject:** | Amtrak: eTicket and Receipt for Your 10/31/2019 Trip - BRAD NEWBERG - UPDATED |
| **Attachments:** | Newberg Brad 201910311238220930.pdf |

### SALES RECEIPT



Purchased: 10/28/2019 6:44 AM PTModified: 10/31/2019 9:38 AM PTThank you for your purchase.

1. Retain this receipt for your records.
2. Print the attached eTicket and carry during your trip.

Merchant ID 006351 Massachusetts Ave NWWashington, DC 20001800-USA-RAILAmtrak.com

# Reservation Number - 3C3DCENEW YORK PENN, NY
## - WASHINGTON, DC (One-Way)OCTOBER 28, 2019
Billing Information

BRAD NEWBERG12005 CREEKBEND DRRESTON, VA 20194-

**Visa** ending in 6349 (Purchase)Authorization Code 04658D

Total $61

## Change Summary - Ticket Number 3040635531828

| **Original Amount Paid** | |
|---|---|
| | **$313.00** |
| **Travel Amount Used** | |
| | **($215.00)** |
| | **Subtotal** |
| | **$98.00** |

1

Revised Trip Details **TRAIN 93: NEW YORK (PENN STATION), NY - WASHINGTON, DC** Depart 2:02 PM, Thursday, October 31, 2019
1 RESERVED COACH SEAT

| | |
|---|---|
| | **$159.00** |
| | **Subtotal** |
| | **$159.00** |
| | **Revised Fare** |
| | **$159.00** |
| | **Total** |
| | **$61.00** |

## Passengers

Brad Newberg

## Important Information

- Try the FindYourWay app for personalized train and station information at New York Penn Station.  Download it on Google Play or the Apple App Store today.
- Tickets are non-transferable.
- Changes to your itinerary may affect your fare.  Refund and exchange restrictions and penalties for failure to cancel unwanted travel may apply.  If your travel plans change, contact us before departure to change your reservation.  If you do not board your train, your entire reservation from that point will be canceled.  If you board a different train without notifying us, you will have to pay for it separately; the conductor cannot apply the money paid for your prior reservation.  For more information please visit Amtrak.com/changes.
- Summary of Terms and Conditions:  Ticket valid for carriage or refund (subject to the refund rules of the fare purchased) for twelve months after day of issue unless otherwise specified.  Amtrak tickets may only be sold or issued by Amtrak or an authorized travel agent/tour operator.  Tickets sold or issued by an unauthorized third party will be voided by Amtrak.  This ticket is a contract of carriage which includes specific terms and conditions and a binding arbitration agreement between Amtrak and the ticket holder.  The terms and conditions and arbitration agreement are available at Amtrak.com/terms-and-conditions.html.  Tickets sold for non-Amtrak service are subject to the tariffs of the providing carrier.
- Questions?  Contact us online at Amtrak.com/contact or call 1-800-USA-RAIL (1-800-872-7245) or for text telephone (TTY) 1-800-523-6590.

# Exhibit K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

Arthur Usherson

                  Plaintiff,  ▢▾

         -v-

Bandhsell Artist Management

               Defendant( ▾

----------------------------------------------------------------X

19 ___ -CV- 6368 (JMF)

CIVIL CASE
MANAGEMENT PLAN
AND SCHEDULING
ORDER

      This Civil Case Management Plan and Scheduling Order is submitted by the parties in accordance with Fed. R. Civ. P. 26(f)(3).

1.   All parties [consent ____ / do not consent ✔ ] to conducting all further proceedings before a United States Magistrate Judge, including motions and trial. 28 U.S.C. § 636(c). The parties are free to withhold consent without adverse substantive consequences. [*If all parties consent, the remaining Paragraphs should not be completed. Instead, within three (3) days of submitting this Proposed Case Management Plan and Scheduling Order, the parties shall submit to the Court a fully executed Notice, Consent, and Reference of a Civil Action to a Magistrate Judge, available at* http://nysd.uscourts.gov/file/forms/consent-to-proceed-before-us-magistrate-judge.]

2.   The parties [have ✔ / have not ____ ] conferred pursuant to Fed. R. Civ. P. 26(f).

3.   Settlement discussions [have ✔ / have not ____ ] taken place.

4.   [*If applicable*] Counsel have discussed an informal exchange of information in aid of early settlement and have agreed upon disclosure of the following information within _____ days/weeks:

    _____

    _____

    _____

    _____

    _____

5. Amended pleadings may not be filed and additional parties may not be joined except with leave of the Court. Any motion to amend or to join additional parties shall be filed no later than ___December 13, 2019___ . [*Absent exceptional circumstances, a date not more than thirty (30) days following the initial pretrial conference. Any motion to amend or to join additional parties filed after the deadline in this paragraph will be subject to the "good cause" standard in Fed. R. Civ. P. 16(b)(4) rather than the more lenient standards of Fed. R. Civ. P. 15 and 21.*]

6. Initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1) shall be completed no later than than ___November 29, 2019___. [*Absent exceptional circumstances, a date not more than fourteen (14) days following the initial pretrial conference.*]

7. [*If applicable*] The plaintiff(s) shall provide HIPAA-compliant medical records release authorizations to the defendant(s) no later than _____.

8. Discovery

   a. The parties are to conduct discovery in accordance with the Federal Rules of Civil Procedure and the Local Rules of the Southern District of New York.

   b. All fact discovery shall be completed no later than ___~~March 13, 2020~~ Jan. 31, 2020___. [*A date not more than 120 days following the initial pretrial conference, unless the Court finds that the case presents unique complexities or other exceptional circumstances.*]

   c. The parties agree that there [is ☐ / is no ☑ ] need for expert discovery. If the parties agree that there is no need for expert discovery, all discovery shall be completed by the deadline for fact discovery, unless — prior to that date — a party files, and the Court grants, a letter-motion seeking an extension for purposes of taking expert discovery; any such motion should explain why expert discovery has become necessary and propose a schedule for such discovery. [*If any party believes that there is a need for expert discovery, the parties should complete Paragraph 8(d).*]

   d. [*If applicable*] All expert discovery, including reports, production of underlying documents, and depositions, shall be completed no later than _____. [*Absent exceptional circumstances, a date not more than 45 days from the date in Paragraph 8(b) (i.e., the completion of all fact discovery).*]

   e. The parties should not anticipate extensions of the deadlines for fact discovery and expert discovery set forth in the foregoing Paragraphs. Relatedly, the parties should not make a unilateral decision to stay or halt discovery (on the basis of settlement negotiations or otherwise) in anticipation of an extension. If something unforeseen arises, a party may seek a limited extension of the foregoing deadlines by letter-motion filed on ECF. Any such motion must be filed before the relevant deadline and must explain why, despite the parties' due diligence, discovery could not be completed by the relevant deadline.

9.    Interim Discovery Deadlines

   a.  Initial requests for production of documents shall be served by _____December 6, 2019_____.
      *[Absent exceptional circumstances, a date not more than thirty (30) days following the initial pretrial conference.]*

   b.  Interrogatories pursuant to Rule 33.3(a) of the Local Civil Rules of the Southern District of New York shall be served by _December 6, 2019_. *[Absent exceptional circumstances, a date not more than thirty (30) days following the initial pretrial conference.]* No Rule 33.3(a) interrogatories need to be served with respect to disclosures automatically required by Fed. R. Civ, P. 26(a).

   c.  Unless otherwise ordered by the Court, contention interrogatories pursuant to Rule 33.3(c) of the Local Civil Rules of the Southern District of New York must be served no later than thirty (30) days before the close of discovery. No other interrogatories are permitted except upon prior express permission of the Court.

   d.  Unless otherwise ordered by the Court, depositions of fact witnesses shall be completed by the date set forth in Paragraph 8(b). *Each side is limited to one (1) deposition (assuming that the person who posted the photograph on defendant's behalf and its corporate designee are one and the same), absent leave of court.*

       i.  Absent an agreement between the parties or an order from the Court, depositions are not to be held until all parties have responded to initial requests for document production.

       ii.  There is no priority in deposition by reason of a party's status as a plaintiff or a defendant.

       iii.  Absent an agreement between the parties or an order from the Court, non-party depositions shall follow initial party depositions.

   e.  Unless otherwise ordered by the Court, requests to admit shall be served by no later than thirty (30) days before the close of discovery.

   f.  Any of the deadlines in Paragraphs 9(a) through 9(e) may be extended by the written consent of all parties without application to the Court, provided that all fact discovery is completed by the date set forth in Paragraph 8(b).

   g.  In the event that there is expert discovery, no later than thirty (30) days prior to the date in Paragraph 8(b) (i.e., the completion of all fact discovery), the parties shall meet and confer on a schedule for expert disclosures, including reports, production of underlying documents, and depositions, provided that (1) expert report(s) of the party with the burden of proof shall be due before those of the opposing party's expert(s); and (2) all expert discovery shall be completed by the date set forth in Paragraph 8(c).

10.    All motions and applications shall be governed by the Federal Rules of Civil Procedure, the Local Rules of the Southern District of New York, and the Court's Individual Rules and Practices (available at http://nysd.uscourts.gov/judge/Furman).

11.     In the case of discovery disputes, parties should follow Local Civil Rule 37.2 with the following modifications.  Any party wishing to raise a discovery dispute with the Court must first confer in good faith with the opposing party, in person or by telephone, in an effort to resolve the dispute.  If this meet-and-confer process does not resolve the dispute, the party shall, in accordance with the Court's Individual Rules and Practices in Civil Cases, promptly file a letter-motion, no longer than three pages, explaining the nature of the dispute and requesting an informal conference.  Any letter-motion seeking relief *must* include a representation that the meet-and-confer process occurred and was unsuccessful.  Any opposition to a letter-motion seeking relief shall be filed as a letter, not to exceed three pages, within three business days.  Counsel should be prepared to discuss with the Court the matters raised by such letters, as the Court will seek to resolve discovery disputes quickly, by order, by conference, or by telephone.  **Counsel should seek relief in accordance with these procedures in a timely fashion; if a party waits until near the close of discovery to raise an issue that could have been raised earlier, the party is unlikely to be granted the relief that it seeks, let alone more time for discovery.**

12.     All counsel must meet in person for at least one hour to discuss settlement within fourteen (14) days following the close of fact discovery.

13.     Absent good cause, the Court will not have summary judgment practice in a non-jury case.  Summary judgment motions, if applicable, and any motion to exclude the testimony of experts pursuant to Rules 702-705 of the Federal Rules of Evidence and the *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), line of cases, are to be filed within thirty (30) days of the close of fact or expert discovery (whichever is later).  Unless otherwise ordered by the Court, opposition to any such motion is to be filed two (2) weeks after the motion is served on the opposing party, and a reply, if any, is to be filed one (1) week after service of any opposition.

14.     Unless otherwise ordered by the Court, within thirty (30) days of the close of all discovery, or, if a dispositive motion has been filed, within thirty (30) days of a decision on such motion, the parties shall submit to the Court for its approval a Joint Pretrial Order prepared in accordance with the Court's Individual Rules and Practices and Fed. R. Civ. P. 26(a)(3).  The parties shall also follow Paragraph 5 of the Court's Individual Rules and Practices for Civil Cases, which identifies submissions that must be made at or before the time of the Joint Pretrial Order, including any motions *in limine*.

15.     If this action is to be tried before a jury, joint requests to charge, joint proposed verdict forms, and joint proposed *voir dire* questions shall be filed on or before the Joint Pretrial Order due date in accordance with the Court's Individual Rules and Practices.  Jury instructions may not be submitted after the Joint Pretrial Order due date, unless they meet the standard of Fed. R. Civ. P. 51(a)(2)(A).  If this action is to be tried to the Court, proposed findings of fact and conclusions of law shall be filed on or before the Joint Pretrial Order due date in accordance with the Court's Individual Rules and Practices.

16.     Unless the Court orders otherwise for good cause shown, the parties shall be ready for trial two weeks after the Joint Pretrial Order is filed.

17. This case [is ☑ / is not ☐ ] to be tried to a jury.

18. Counsel for the parties have conferred, and the present best estimate of the length of trial is
    2-3 days _____.

19. Other issues to be addressed at the Initial Pretrial Conference, including those set forth in
    Fed. R. Civ. P. 26(f)(3), are set forth below.

    None. _____

    _____

    _____

    _____

## TO BE FILLED IN BY THE COURT IF APPLICABLE:

_Defendant_ shall file a motion for/to _bond_ _____ no
later than _November 27, 2019_. Any opposition shall be filed by _December 11, 2019_
Any reply shall be filed by _Dec. 18, 2019_. At the time any reply is due, the moving party
shall supply one courtesy hard copy of all motion papers by mail or hand delivery to the Court in
accordance with the Court's Individual Rules and Practices.

The parties shall contact the Chambers of the Magistrate Judge assigned to this case on or
before _____ in order to schedule settlement discussions under his/her supervision in
or about _____.

The parties shall file a joint letter by _____ indicating whether they
would like the Court to refer the case to the assigned Magistrate Judge and/or the Court mediation
program for settlement purposes and, if so, approximately when they believe a settlement
conference should be held.

The next pretrial conference is scheduled for _February 6, 2020_ at
_3:30 pm_ in Courtroom 1105 of the Thurgood Marshall Courthouse, 40 Centre Street, New
York, New York 10007.

Absent leave of Court, by **Thursday of the week prior to any future conference**, the
parties shall file on ECF a joint letter, not to exceed three (3) pages, regarding the status of the case.
The letter should include the following information in separate paragraphs:

(1) A statement of all existing deadlines, due dates, and/or cut-off dates;

(2) A brief description of any outstanding motions;

(3) A brief description of the status of discovery and of any additional discovery that needs to
be completed;

(4) A list of all prior settlement discussions, including the date, the parties involved, whether any third-party (e.g., Magistrate Judge, mediator, etc.) was involved, and the approximate duration of such discussions, if any;

(5) A statement of whether or how the Court could facilitate settlement of the case (for example, through a(nother) settlement conference before the assigned Magistrate Judge or as part of the Court's Mediation Program);

(6) A statement of the anticipated length of trial and whether the case is to be tried to a jury;

(7) A statement of whether the parties anticipate filing motions for summary judgment; and

(8) Any other issue that the parties would like to address at the pretrial conference or any information that the parties believe may assist the Court in advancing the case to settlement or trial.

This Order may not be modified or the dates herein extended, except by further Order of this Court for good cause shown. Further, the use of any alternative dispute resolution mechanism does not stay or modify any date in this Order. Indeed, unless the Court orders otherwise, parties engaged in settlement negotiations must proceed on parallel tracks, pursuing settlement and conducting discovery simultaneously. Parties should not assume that they will receive an extension of an existing deadline if settlement negotiations fail.

Any application to modify or extend the dates herein (except as provided in Paragraph 9(f)) shall be made in a written application in accordance with Court's Individual Rules and Practices for Civil Cases and shall be made no fewer than two (2) business days prior to the expiration of the date sought to be extended. Absent exceptional circumstances, extensions will not be granted after deadlines have already passed.

SO ORDERED.

Dated: November 14, 2019
New York, New York

JESSE M. FURMAN
United States District Judge

Defendant is granted leave to file an amended answer no later than November 22, 2019.
Plaintiff shall file a formal opposition to the motion for sanctions by November 18, 2019; Defendant shall file any reply by November 25, 2019. The parties should address in those submissions whether the court should hold an evidentiary hearing and, if so, what witnesses should be called and how it should be conducted.

# Exhibit L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARTHUR USHERSON,

                          Plaintiff,

     - against -

BANDSHELL ARTIST MANAGEMENT

                          Defendant.

Docket No. 1:19-cv-06368-JMF

---

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO SANCTIONS

Plaintiff Arthur Usherson, via counsel, respectfully submits this memorandum of law in opposition to Defendant Bandshell Artist Management ("Defendant")'s motion for sanctions.

## RELEVANT BACKGROUND

The Court's Mediation Referral Order, dated July 15, 2019, states that "Local Rule 83.9 shall govern the mediation and are directed to participate in the mediation in good faith." [Dkt. # 6]. By Order dated October 7, 2019, the Court stated that it "continues to believe that early mediation in the normal course (i.e., in person) makes sense. Accordingly, . . . .[t]he parties shall conduct the in-person mediation no later than October 31, 2019." [Dkt. #13]

On October 31, 2019, the parties conducted a mediation on at 40 Foley Square. Two attorneys employed by Liebowitz Law Firm, PLLC, both of whom are admitted to practice in this District attended the mediation in person. Mr. Freeman, an experienced copyright practitioner, had knowledge of all the facts in the case.

Plaintiff, who resides over 860 miles from the courthouse, appeared via telephone pursuant to Rule 9(f) of S.D.N.Y. Mediation Rules and consistent with ordinary custom of practice. Plaintiff acted in in good faith and was ready to negotiate a settlement. He was on the phone for the duration of the substantive portion of the mediation. Nothing in the Court order or mediation rules stated that lead counsel needed to attend the mediation.

At the top of the mediation session, defense counsel indicated that he was upset that neither Mr. Liebowitz nor Mr. Usherson appeared in person. ██████████████████
████████████████████████████████████████
██████████████████████████
████████████████████████████

████████████ The meditation was adjourned after about 45 minutes. Defendant subsequently moved for sanctions against Plaintiff and Mr. Liebowitz on grounds that they did not attend mediation in person.

## ARGUMENT

**POINT I:** **PLAINTIFF PARTICIPATED IN THE MEDIATION IN GOOD FAITH AND IN COMPLIANCE WITH THE COURT'S ORDER AND S.D.N.Y. MEDIATION RULES**

The Court's subsequent Order, dated October 7, 2019, states that the mediation should be conducted in person, but does not explicitly state that both attorneys and parties must be present in person. Rather, it says that "[t]he parties shall conduct the in-person mediation no later than October 31, 2019." [Dkt. #13] As attorneys represent parties, there is a reasonable interpretation of this Order that only attorneys are required to be present in-person. Mr. Liebowitz understood the Court's 10/7/19 Order to mean that counsel for the parties was required to participate in person. [Richard Liebowitz Declr. ¶ 7].

However, the Court's 10/7/19 order is silent with respect to the mode of client participation and does not specifically state that clients were required to attend in-person. [*Id.*] *Compare* Local Rule 33.1(d)(2) of the Second Circuit's rules, which states that "A mediator may require *a client* to participate in a conference in person or by telephone." [www.ca2.uscourts.gov/clerk/case_filing/rules/title7/local_rule_33_1.html] (italics added).

S.D.N.Y. Local Rule 83.9(c)(3) provides that "the mediation program shall be governed by 'The Procedures of the Mediation Program for the Southern District of New York'. L.R. 83.9(c)(3). Moreover, Rule 9(f) of the S.D.N.Y. Procedures of the Mediation Program, dated June 2, 2017, provides as follows:

"Under some circumstances, if a party resides more than 100 miles from the Courthouse, and it would be a great hardship for the party to attend in person, he or she may request that the mediator allow for telephonic participation at the mediation; however, if such request is granted, that party must participate by telephone with full attention and for the duration of the mediation."

Here, Plaintiff lives in Roswell, Georgia, which is approximately 865 miles from the Courthouse. [Richard Liebowitz Declr. ¶ 11]  Accordingly, Plaintiff obtained permission from the assigned mediator, ███████████, to appear at the scheduled mediation by telephone provided that counsel was present in person. [Richard Liebowitz Declr. ¶ 13]. Mr. Liebowitz also informed ██████████ that an associate of Liebowitz Law Firm with knowledge of the facts of the case would appear in-person, and ██████████ consented to this. [Richard Liebowitz Declr. ¶ 13].

Whether conducted by an outside mediator or by a Magistrate Judge, it is routine practice in S.D.N.Y. mediation sessions for parties located out-of-state to participate telephonically.  [Richard Liebowitz Declr. ¶ 13; Freeman Declr. ¶ 7]. This is warranted given that in cases involving modest recovery, the travel expenses alone could greatly reduce the benefit of any settlement amount. [Richard Liebowitz Declr. ¶ 12].

During the course of the mediation, which lasted about forty-five minutes, Plaintiff actively participated by speakerphone and spoke directly to Defendant and his counsel while the mediator was present.  [Freeman Declr. ¶¶ 11-16, Rebecca Liebowitz Declr. ¶¶ 6-13].

███████████████████████████████████████████████████
█████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████
████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

## POINT II:    DEFENDANT'S CLAIM FOR MONETARY AWARD IS BARRED BY THE DOCTRINE OF UNCLEAN HANDS AND BY THE ABSENCE OF ANY PREJUDICE

The Court's Mediation Referral Order, dated July 15, 2019, states that "Local Rule 83.9 shall govern the mediation and are directed to participate in the mediation in good faith."  [Dkt. # 6].

"Courts have refused to invoke their inherent authority to impose sanctions where the party requesting sanctions has unclean hands." *Thomas v. Schwab*, No. 09-CV-13632, 2012 WL 6553773, at *1 (E.D. Mich. Dec. 14, 2012); *see also S. Shore Ranches, LLC v. Lakelands* Co., LLC, No. 09–CV–105, 2010 WL 2546112, at *5 (E.D.Cal. Jun. 18, 2010) ("Both parties have a form of 'unclean hands,' and the Court will not use its inherent authority to reward one party over the other."); *Fayemi v. Hambrecht & Quist, Inc.,* 174 F.R.D. 319, 326–27 (S.D.N.Y. 1997) (applying unclean hands maxim and refusing to impose evidentiary sanction).

**A.**    ████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

Case 20-2304, Document 16-3, 07/23/2020, 2891376, Page200 of 445

Convenience to defense counsel should not have been a factor as Liebowitz Law Firm employees also had to incur time attending the mediation, but did not complain. ███████████████

████████████████████████████████████████████████████████████

███████████████████████████████ The Court should decide sanctions

motions on a case-by-case basis.  Here, there is no evidence that Mr. Liebowitz violated the

Court's order by, for example, not participating in mediation as was the case in *Rice v*

*NBCUniversal.*

**B.  Defendant Was Not Prejudiced by the Lack of In-Person Attendance by Mr. Liebowitz or Mr. Usherson**

The crux of Defendant's motion for sanctions is that it wasted its time and money on

attending the October 31 mediation because neither Mr. Liebowitz nor Mr. Usherson attended in

person.  However, Defendant has abjectly failed to demonstrate how Liebowitz and Usherson's

in-person participation would have made any difference.

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████

██████████████████████████████

█████████████████████████████████

█████████████████████████████████

██████████████████████████████

████████████████████████████████

████████

Given that Defendant cannot show that it suffered any prejudice as a result of Usherson's telephonic appearance, nor suffered any prejudice as a result of Mr. Freeman's in-person attendance in lieu of Mr. Liebowitz, any claim to monetary relief should be denied.

**POINT III:   WITH RESPECT TO LICENSING FEES, PLAINTIFF IS IN COMPLIANCE WITH THE COURT'S ORDER**

By Defense counsel's own admission, Mr. Liebowitz notified Defendant on September 20, 2019 that there was no prior licensing fee information for the Photograph. [Dkt. # 16, ¶ 7] As a matter of law, Plaintiff cannot be held accountable for not producing documents that he does not have. *Williams v. Bank Leumi Tr. Co. of New York*, No. 96 CIV. 6695(LMMAJP), 1999 WL 375559, at *1 (S.D.N.Y. June 7, 1999) ("It is too obvious to need citation that the Court cannot compel a party to produce documents that he does not possess."); see also *Rudawsky v. Borror*, No. 2:06-CV-144, 2007 WL 2127879, at *1 (S.D. Ohio Apr. 5, 2007) ("The Court cannot compel defendant to produce what it does not have").

As such, Defendant's argument that Plaintiff violated the Court's order by not producing licensing fee information is meritless.

**POINT IV:   WITH RESPECT TO SERVICE OF PROCESS, PLAINTIFF PROMPTLY FILED THE AFFIDAVIT OF SERVICE WITHIN ONE DAY AFTER HAVING RECEIVED IT FROM THE PROCESS SERVER**

Plaintiff filed the affidavit of service of the summons and complaint on September 21, 2019, just one day after receiving it from the process server. [Richard Liebowitz Declr. ¶ 4] Such conduct is not sanctionable.

**POINT V:**   **DEFENDANT'S REQUEST FOR FEES IS GROSSLY EXCESSIVE AND DISPROPORTIONATE TO ANY ALLEGED HARM CAUSED**

For all the reasons stated in Points I-IV, *supra*, sanctions are not warranted as Plaintiff is in substantial compliance with the Court's orders and S.D.N.Y. mediation rules. Moreover, Defendant is to blame for not participating in mediation in good faith.

If the Court does find that sanctions are warranted, then Defendant's recovery should not exceed $400/hr. x. 2.0 hours of billable time, or $800. One hour to attend mediation plus one hour to prepare is reasonable. Moreover, defense counsel cannot possibly bill more than $400/hr. in this District, which is a substantial hourly rate for an attorney of defense counsel's experience. *Pyatt v. Raymond*, No. 10 Civ. 8764 (CM), 2012 WL 1668248, at *6 (S.D.N.Y. May 10, 2012) (collecting cases approving hourly rates of $400 for partners in copyright and trademark cases).

**POINT VI:**   **THE COURT SHOULD AWARD PLAINTIFF HIS FEES FOR HAVING TO OPPOSE THIS FRIVOLOUS MOTION**

Given that Defendant and his counsel acted in bad faith at mediation, there was no justification for Defendant's filing of this motion. Further, the motion is improperly motivated because Defendant is simply trying to exploit the Liebowitz Law Firm's past history of sanctions orders. Accordingly, the Court should award Plaintiff his fees in connection with the instant motion pursuant to the Court's inherent powers.

**CONCLUSION**

Based on the foregoing, Plaintiff and his counsel respectfully request that Defendant's motion for sanctions should be DENIED and this case should be allowed to proceed on the

merits.  If sanctions are imposed, they should not exceed the amount of $800.00

Dated: November 18, 2019
      Valley Stream, NY

                                    Richard Liebowitz
                                    LIEBOWITZ LAW FIRM, PLLC
                                    11 Sunrise Plaza, Suite 305
                                    Valley Stream, NY 11580
                                    516-233-1660
                                    RL@LiebowitzLawFirm.com

                                    *Attorneys for Plaintiff*

# Exhibit M

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARTHUR USHERSON,

                          Plaintiff,

        - against -

BANDSHELL ARTIST MANAGEMENT

                          Defendant.

---

Docket No. 1:19-cv-06368-JMF

## DECLARATION OF RICHARD LIEBOWITZ

I, RICHARD LIEBOWITZ, declare under the penalty of perjury that the following is true and correct to the best of my personal knowledge.

1.      I am lead counsel for Plaintiff Arthur Usherson ("Plaintiff") in this action.

2.      I submit this Declaration in opposition to Defendant Bandshell Artist Management ("Defendant")'s motion for sanctions.

**Proof of Service**

3.      Defendant was served with a copy of the summons and complaint on September 5, 2019.

4.      The certificate of service was filed on September 21, 2019 because I did not receive the certificate from the process server until September 20, 2019. Attached as Exhibit A is a true and correct copy of the e-mail from the process server, dated September 20, 2019.

**Licensing Fee Information**

5.      On or about September 20, 2019, I advised defense counsel that Defendant was still looking for licensing but as of that date Plaintiff did not have licensing fee information for the Photograph at issue in this case.

**Mediation**

6.      At all relevant times, I was aware of the Court's Order, dated October 7, 2019, in which the Court stated that it "continues to believe that early mediation in the normal course (i.e., in person) makes sense. Accordingly, . . . .[t]he parties shall conduct the in-person mediation no later than October 31, 2019." [Dkt. #13]

7.      I understood the Court's 10/7/19 Order to mean that counsel for the parties was required to participate in person.  However, the Court's order is silent with respect to the mode of client participation and does not specifically state that clients were required to attend in-person.  *Compare* Local Rule 33.1(d)(2) of the Second Circuit's rules, which states that "A mediator may require a client to participate in a conference in person or by telephone." [*see* www.ca2.uscourts.gov/clerk/case_filing/rules/title7/local_rule_33_1.html]

8.      S.D.N.Y. Local Rule 83.9(c)(3) provides that "the mediation program shall be governed by "The Procedures of the Mediation Program for the Southern District of New York". Rule 9(f) of The Procedures of the Mediation Program for the Southern District of New York provides that clients who are located more than 100 miles from the courthouse may participate in mediation via telephone with the mediator's approval.  Attached as Exhibit B is a true and correct copy of the S.D.N.Y. Procedures of the Mediation Program (6/2/2017) (the "S.D.N.Y. Mediation Rules")

9.      I have diligently reviewed the S.D.N.Y. Mediation Rules and am not aware of any rule which requires that lead counsel personally attend scheduled mediations.

10.     I employ an associate, James Freeman, who has eighteen years of experience admitted to this Court.  Mr. Freeman is well-versed in copyright law.  I routinely ask Mr. Freeman to attend Court-ordered mediations on my behalf (regardless of whether he has filed a notice of appearance).  Before the instant motion, I am not aware of any instance where Mr. Freeman's participation at mediation has been contested by an opposing party.

11.     Plaintiff resides in Roswell, Georgia, more than 100 miles from the S.D.N.Y. courthouse.

12.     I have personally participated in dozens of mediations in this Circuit.  It is routine practice in this District for clients who reside more than 100 miles from the courthouse to participate in mediation by telephone.  This is because it is prejudicial for an out-of-state plaintiff to have to incur the time and out-of-pocket travel expense to appear in-person, particularly given that the defendant (who resides in the venue) does not have to incur such time and expense.  The prejudice to Plaintiff is exacerbated by the monetary value of the case, which is relatively modest.

13.     Prior to October 31, 2019, the mediation date scheduled in this case, I sought and received approval from ███████████ the assigned mediator, for Mr. Usherson to attend the mediation via telephone and for my associate James Freeman to appear who had full knowledge of the case.  I obtained ███████████ consent via telephone.

14.     ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
███████████████

15.     I did not personally attend the mediation session on October 31, 2019.  However,

Mr. Freeman, who was accompanied by Rebecca Liebowitz, an attorney who was recently

admitted to practice in this Court, was prepared to settle the case.


Dated: November 18, 2019
        Valley Stream, NY

                                        **/s/richardliebowitz/**
                                        Richard Liebowitz
                                        Liebowitz Law Firm, PLLC
                                        11 Sunrise Plaza, Suite 305
                                        Valleystream, NY 11580
                                        516-233-1660
                                        RL@LiebowitzLawFirm.com

                                        *Attorneys for Plaintiff*

# EXHIBIT A



**Richard Liebowitz <richardpliebowitz@gmail.com>**

---

## Usherson v. Bandshell Artist Management

**GOTHAM** <gothamprocess@hotmail.com>                    Fri, Sep 20, 2019 at 5:13 PM
To: Richard Liebowitz <RL@liebowitzlawfirm.com>

Sent from Outlook

---

**From:** Richard Liebowitz <RL@liebowitzlawfirm.com>
**Sent:** Friday, September 20, 2019 4:52 PM
**To:** GOTHAM <gothamprocess@hotmail.com>
**Subject:** Re: Usherson v. Bandshell Artist Management

[Quoted text hidden]

---

 **img275.pdf**
40K

# EXHIBIT B



# PROCEDURES OF
# THE MEDIATION PROGRAM
## (6/2/2017)

Mediation Program
United States District Court
Southern District of New York
40 Foley Square, Suite 120
New York, New York 10007
(212) 805-0643
Email:  mediationoffice@nysd.uscourts.gov
www.nysd.uscourts.gov/mediation

# Table of Contents

1.  Introduction and Scope ......................................................................................................................... 2

2.  Confidentiality ....................................................................................................................................... 2

3.  Entering and Removing Cases from Mediation ..................................................................................... 3

4.  Assignment of the Mediator .................................................................................................................. 3

5.  Disqualification ...................................................................................................................................... 4

6.  Mediation Scheduling............................................................................................................................ 4

7.  Electronic Devices in the Courthouses .................................................................................................. 6

8.  Mediation Statements ........................................................................................................................... 6

9.  Attendance at Mediation Sessions ........................................................................................................ 7

10. Mediation Location ................................................................................................................................ 8

11. Mediation Forms .................................................................................................................................... 8

12. Reporting ............................................................................................................................................... 8

13. Post-mediation Survey .......................................................................................................................... 9

14. Mediation Panel Application Criteria .................................................................................................... 9

15. Mediation Panel Application Process ................................................................................................... 10

16. Service as a Mediator .......................................................................................................................... 11

17. Code of Conduct .................................................................................................................................. 11

18. Complaints about Mediators: Investigation/Remediation ................................................................. 12

19. Complaints About the Mediation Program or Director ....................................................................... 13

20. Resignation or Removal from the Mediation Panel ............................................................................ 13

21. Immunity .............................................................................................................................................. 14

## 1. Introduction and Scope

These procedures are promulgated for the management of the Mediation Program of the Southern District of New York. They shall not be deemed to vest any rights in litigants or their attorneys and shall be subject to such amendments from time to time as shall be approved by the Court. These procedures contemplate flexibility in the Mediation Program and in the mediation of each individual case. The Mediation Office may, if requested, offer guidance and assistance in any given matter.

## 2. Confidentiality[1]

a.  Any communications made exclusively during or for the mediation process shall be confidential except as to the provisions indicated in this section. The mediator shall not disclose any information about the mediation process, communications, or participants to anyone except for Mediation Office staff. Mediation Office staff must also maintain confidentiality except as to the provisions indicated in this section. Administrative aspects of the mediation process, including the assignment of a mediator, scheduling and holding of sessions, and a final report that the case has concluded or not concluded through mediation, or that parties failed to participate, are not confidential and will appear on the docket of the case.

b.  The parties may not disclose discussions or other communications with the mediator unless all parties agree, because it is required by law, or because otherwise confidential communications are relevant to a complaint against a mediator or the Mediation Program arising out of the mediation. The parties may agree to disclose information provided or obtained during mediation to the Court while engaged in further settlement negotiations with a District or Magistrate Judge. The parties may disclose the terms of settlement if either party seeks to enforce those terms.

---

[1] These confidentiality rules are intended to include the protections afforded by Rule 408 of the Federal Rules of Evidence, the New York State rules of evidence, and the Model Standards of Conduct for Mediators, promulgated by the American Bar Association, American Arbitration Association, and the Association for Conflict Resolution (September 2005), available as of 11/2/16 at: http://www.americanbar.org/content/dam/aba/migrated/2011_build/dispute_resolution/model_standards_conduct_april2007.authcheckdam.pdf.

c. Documents and information otherwise discoverable under the Federal Rules of Civil Procedure shall not be shielded from discovery merely because they are submitted or referred to in the mediation.

d. The mediator shall not be inquired of or called as a witness or deponent in any proceeding related to the dispute in which the mediator served, or be compelled to produce documents that the mediator received or prepared for mediation.

3. **Entering and Removing Cases from Mediation**

a. Cases enter the Mediation Program either through a process of automatic referral or by referral of a specific case from the presiding judge with or without the request of the parties.

b. Any party may request removal from mediation by submitting such a request in writing to the presiding judge. The Mediation Office should be copied on any requests for removal. Mediation deadlines will be stayed pending a determination from the presiding judge.

4. **Assignment of the Mediator**

a. The mediators on the panel for the Southern District of New York are divided into sub-groups based on areas of subject matter expertise. For most substantive areas of law, mediators identify to the program the areas in which they have the requisite experience or background. In consultation with members of the employment bar, the following criteria were developed for all mediators assigned to employment cases. Any mediator who wishes to mediate employment cases through the SDNY must: i) Have five years of experience practicing employment law in the past eight years; or ii) In the last three years have: taken an EEO/employment law CLE for at least 5 CLE credits, or been an instructor at an employment law CLE, or taught a course in employment law; or iii) Have greater than five years of demonstrated expertise as an employment law neutral.

b. Once the Mediation Office receives a referral (either through a Mediation Referral Order or an automatic process), a mediator is selected for proposed assignment at random from the sub-group of mediators who have the subject matter expertise that is relevant to the case. If no such mediator is available, the Mediation Office will select a proposed mediator at random from a sub-group of mediators with expertise in a related subject matter. The mediator selected must respond to the Mediation Office as quickly as possible, but no later than three (3) business days, to accept the assignment, to request an extension of time to clear conflicts, or to decline. Upon

notice that the selected mediator has declined, or after three (3) business days without notice of acceptance or a request for an extension of time, another mediator will be selected. Once a mediator has accepted the case, the Mediation Office shall notify the mediator and the parties of the assignment. The assignment of a case to a mediator should take place within ten (10) business days of the receipt by the Mediation Office of the mediation referral.

c.  Mediators are provided with a free PACER account to access pleadings and other relevant information that may be needed when considering whether to accept a case, or for relevant research while mediating. At the mediator's request, the Mediation Office will forward documents and information to the mediator directly. The free PACER account is only to be used for the purposes of service as a mediator on SDNY matters and mediators may not allow others to use the account.

## 5.  Disqualification

a.  Before accepting an appointment as a mediator, and at all times after accepting such an appointment, a mediator shall disclose to the Mediation Office, in the first instance, any circumstance that could give rise to a reasonable apprehension of a lack of impartiality such as those circumstances enumerated under 28 U.S.C. § 455.

b.  Any mediator who makes a disclosure under (5)(a) and who is deemed qualified to serve by the Mediation Office shall continue as the assigned mediator if all parties to the dispute waive, in writing, all objections to any reasonable apprehension of a lack of impartiality or conflict of interest that arises as a consequence of the disclosure.

c.  Any party may submit a written request to the Director of the ADR Program for the mediator's disqualification based on the circumstances enumerated in 28 U.S.C. § 455 or  28 U.S.C. § 144. This request should be submitted within three (3) days from the date of the notification of the mediator's name, or from the date of the discovery of a new ground for disqualification. A denial of such a request by the Director of the ADR Program is subject to review by the presiding judge upon motion filed within ten (10) days of the date of the Director of the ADR Program's denial.

## 6.  Mediation Scheduling

a.  The mediator shall confer with counsel for the parties, or parties themselves if proceeding *pro se*, immediately after assignment of a case to determine an appropriate date, time, and location for the first mediation session. Unless cases enter the Mediation Program through an order that imposes specific timelines or guidelines for the mediation process, the date, time, and location of the first session

should be finalized within thirty (30) days of the assignment of the mediator unless there is a specific reason why a date certain cannot be established within thirty (30) days. If the parties require no discovery or information before mediation can take place, the mediator should hold the first session within thirty (30) days of the assignment of the mediator. If the parties require discovery or information for the purpose of mediation, the parties must confer to establish a short reasonable timeline for the completion of limited discovery and should hold the first session within thirty (30) days of the completion of limited discovery. The assigned mediator shall promptly notify the Mediation Office of the date, time, and location of the first mediation session or the reason for failing to schedule within the 30-day period. The Mediation Office will docket the date, time, and location of the mediation session.

b. In certain instances, mediation participants may wish to indefinitely adjourn mediation pending some specific action in the case (e.g. a decision on a pending motion), or remove a case from mediation entirely. Such requests should be made directly to the presiding judge with copies to the assigned mediator and the Mediation Office.

c. On or before receipt of each party's mediation statements (see section 8), the assigned mediator may contact counsel, or parties themselves if proceeding *pro se*, to schedule either a joint or individual preliminary case conference telephone call.

d. Any subsequent sessions shall be scheduled within thirty (30) days of the prior session, unless there is a specific reason why a date certain cannot be established. The assigned mediator shall promptly notify the Mediation Office of the date, time, and location of the next mediation session or the reason for failing to schedule within the 30-day period. The Mediation Office will docket the date, time, and location of the mediation session.

e. The mediation will conclude when the parties reach a resolution of some or all issues in the case or when the mediator or parties conclude that resolution (or further resolution) is not possible.

f. With the permission of the presiding judge, parties who have not settled through mediation may return to mediation at any point and may request the original mediator (if he or she is available) or that a new mediator be assigned.

7. **Electronic Devices in the Courthouses**

   a. Attorneys with SDNY service passes may bring cell phones into the Courthouse. (Information on how to obtain a SDNY secure pass can be found at http://www.nysd.uscourts.gov/file/forms/attorney-service-pass-application.) To request permission to bring an additional or different electronic device into the Courthouse for a specific proceeding, an Electronic Device Order must be submitted to the mediation office at least two weeks before the scheduled mediation date.

   b. Attorneys coming to the Courthouse for the purpose of mediation without a secure pass, who wish to bring a cell phone or other approved electronic device, must submit an Electronic Device Order at least two weeks before the scheduled mediation date.

   c. The Electronic Device Order can be found on the Court's website: http://www.nysd.uscourts.gov/mediation under "Mediation Forms."

8. **Mediation Statements**

   a. Unless otherwise directed by the mediator, at least seven (7) days before the first scheduled mediation session, each party shall prepare and deliver to the mediator, either *ex parte* or as the mediator directs or the parties agree, a mediation statement not exceeding ten double-spaced pages including:

      i. the party's contentions as to both liability and damages;

      ii. the status of any settlement negotiations;

      iii. the names of the persons, in addition to counsel, with full authority to resolve the matter who will attend the mediation; and

      iv. the parties' reasonable settlement range, including any non-monetary proposals for settlement of the action.

   b. The mediator may request the parties to provide different or additional information in the mediation statement including, for example, information about the parties or the dispute which might be useful in resolving the case.

   c. These mediation statements shall be subject to the confidentiality of the mediation process and treated as documents prepared "for settlement purposes only."

Case 20-2304, Document 16-3, 07/23/2020, 2891076, Page220 of 445

### 9. Attendance at Mediation Sessions

a. Each party must attend mediation. This requirement is critical to the effectiveness of the mediation process as it enables parties to articulate their positions and interests, to hear firsthand the positions and interests of the other parties, and to participate in discussions with the mediator both in joint session and individually. If a represented party is unable to attend a previously scheduled mediation because of a change in that party's availability, the party's attorney must notify the mediator immediately so that a decision can be made whether to go forward with the mediation session as scheduled or to reschedule it. Mediators are required to report to the Court if a party failed or refused to attend, or refused to participate in the mediation.

b. A party other than a natural person (e.g., a corporation or an association) satisfies this attendance requirement if represented by a decision-maker who has full settlement authority and who is knowledgeable about the facts of the case. "Full settlement authority" means the authority to agree to the opposing side's settlement offer, if convinced to do so at the mediation.

c. Each represented party must be accompanied at mediation by the lawyer who will be primarily responsible for handling the trial of the matter.

d. A fully authorized representative of the client's insurance company must attend where the decision to settle and/or the amount of settlement must be approved by the insurance company.

e. A government unit or agency satisfies this attendance requirement if represented by a person who has, to the greatest extent feasible, full settlement authority, and who is knowledgeable about the facts of the case, the governmental unit's position, and the procedures and policies under which the governmental unit decides whether to accept proposed settlements. In addition, in cases where the Comptroller of the City of New York has authority over settlement, the Assistant Corporation Counsel must make arrangements in advance of the session for a representative of the Comptroller either to attend the session or to be available by telephone to approve any proposed settlement. If the action is brought by the government on behalf of one or more individuals, at least one such individual also must attend.

f. Under some circumstances, if a party resides more than 100 miles from the Courthouse, and it would be a great hardship for the party to attend in person, he or she may request that the mediator allow for telephonic participation at the

mediation; however, if such request is granted, that party must participate by telephone with full attention and for the duration of the mediation.

g. Counsel for parties, parties if *pro se*, or the mediator may occasionally wish to invite individuals who are not part of the mediation process to observe the mediation. Observers may only attend if all parties, counsel for parties, and the mediator consent. As a condition of an observer attending, each observer is required to sign the Mediation Confidentiality Agreement (attached) and will be bound by any confidentiality provisions that are relevant to the mediation as if they were a party to the mediation.

h. Requests for observers to attend should be made in advance to the Mediation Office, in writing, and should include the following:

 i. A statement of the requester's relationship to the individual who wishes to observe, and

 ii. A statement that all parties, counsel for parties, and the mediator have been consulted and that all consent to the individual(s) observing.

## 10. Mediation Location

Mediation sessions may take place at the mediator's office, at the Courthouse, or at any other location agreed to by the mediator and the parties.

## 11. Mediation Forms

a. All participants in the mediation must read and sign the Mediation Confidentiality Agreement (attached) before or at the start of the mediation. Copies of this signed form should be retained by the Mediation Office.

b. Any term sheet or stipulation developed through mediation must be read and signed by all parties and/or counsel for parties.

## 12. Reporting

a. After referral of a case to the Mediation Program, such referral will be closed with the docketing of a Final Report of Mediator indicating that the mediation was:

 i. Held and agreement was reached on all issues. The judge may wish to issue a "30 day order" under which the case is automatically closed in 30 days unless a party seeks to re-open the matter.

     ii.  Held and agreement was reached on some, but not all, issues.

    iii.  Held and agreement was reached as to some, but not all, parties.

    iv.  Held but was unsuccessful in resolving any issue in the case. The Mediation Unit will consider the referral to be completed and close its files at this time but the judge may re-refer parties to mediation at any point.

    v.  Not held as parties represent that they have reached settlement on all issues. The judge may wish to issue a "30 day order" under which the case is automatically closed in 30 days unless a party seeks to re-open the matter.

    vi.  Not held as a stipulation settling all of the issues of the case was entered into prior to mediation.

    vii.  Not held as one or both parties failed, refused to attend, or refused to participate in the mediation.

    viii.  Not held as the case was removed from mediation by the judge.

b. The Final Report of Mediator shall be submitted by the mediator to the Mediation Office within seven (7) days of the final mediation session or the results set forth in (a)(v), (vi), (vii) or (viii).

c. If the Final Report of Mediator indicates the result set forth in (a)(i), (ii), (iii), or (v), the parties should promptly submit a stipulation of discontinuance or other appropriate document to the Clerk of Court.

## 13. Post-mediation Survey

To assist in the continued development of the Mediation Program, the Court requests that all counsel for parties, or parties if *pro se*, respond to a short survey after the close of the mediation process. When the Final Report of Mediator is docketed on CM/ECF attorneys of record will receive a Notice of Electronic Filing in which a hyperlink to the survey is embedded. The survey may also be sent from the Mediation Office as a fillable document and is accessible on the Court's mediation web site (http://www.nysd.uscourts.gov/mediaton).

## 14. Mediation Panel Application Criteria

An individual may apply to serve as a mediator if he or she satisfies the following criteria:

a. Is a member in good standing of the bar of any United States District Court;

b. Has substantial exposure to mediation in federal court or has mediated cases in other settings;

c. Has successfully completed an initial mediation training of at least 30 hours within the last three years or, if the initial mediation training was completed more than three years ago the applicant has:

    i. served as a mediator in more than 5 disputes during the last three years, or

    ii. successfully completed during the last three years at least one other mediation skills training, apprenticeship program, or practicum;

d. Provides a letter of reference from a party, mediation training provider, colleague, judge, court administrator, or appropriate staff person with a public or private dispute resolution organization, that specifically addresses the applicant's mediation process skills including the ability to listen well, facilitate communication, and assist with settlement discussions; and

e. Is willing to participate in training, mentoring programs, and ongoing assessment as detailed in section (17)(d).

## 15. Mediation Panel Application Process

a. Approximately once a year the Mediation Program will review all pending applications. Applicants will be notified whether or not they have been selected for an interview. Consistent with Standard IV of the Model Standards of Conduct for Mediators, all mediators asked to continue on past the interview are required to observe at least three cases and participate in a mentor mediation before undertaking to mediate cases on his or her own.

b. The purpose of the mentor mediation is for the incoming mediator to take the lead with a mentor mediator there to provide support and step in (as needed) to maintain the quality of the process. The mentor mediator will also provide a recommendation as to the incoming mediator's readiness to join the panel.

c. The process of observation and acceptance of a matter for mentor mediation should take no longer than six months.

Case 2:23-cv-06968-JMF   Document 16-3   07/23/2029   2891076   Page 224 of 445

### 16. Service as a Mediator

a. An individual may serve as a mediator once he or she has been certified by the Chief Judge or his/her designee to be competent to perform the duties of a mediator for this Court.

b. Each individual certified as a mediator shall take the oath or affirmation prescribed by 28 U.S.C. § 453.

c. All mediators shall serve without compensation.

d. Unless the Director of the ADR Program approves otherwise, mediators who are invited to join the Court's panel will be expected to meet the following requirements to remain on the panel:

   i. Membership in good standing of the bar of any United States District Court;

   ii. Attending at least one continuing education program in mediation each year;

   iii. Participating in ongoing assessment as determined by the Director of the ADR Program; and

   iv. Mediating at least two cases per year.

e. All mediators are assumed available to accept cases unless the Mediation Office is notified otherwise. Mediators should notify the Mediation Office if they cannot accept cases for a discrete period of time by sending an e-mail to the Mediation Office with the start and end dates. The Mediation Office will automatically resume sending cases to the mediator on the date indicated by the mediator. Mediators who request not to receive cases indefinitely, and who are inactive for a period exceeding one year, will be presumed retired from the panel. Mediators who wish to return to active status after being inactive for more than one year shall write a letter of request to the Director of the ADR Program. Reinstatement to the panel is at the discretion of the Director of the ADR Program and will be based on the needs of the program at the time the request is received.

### 17. Code of Conduct

The code of conduct set forth herein applies in its entirety to every mediator who is on the panel of the Southern District of New York. While mediators come from various professional

backgrounds and may have been exposed to differing mediation theories, every mediator for the Southern District of New York must adhere to this code of conduct at a minimum.

    a. As representatives of the Southern District of New York, mediators should at all times be professional, respectful, and measured in their communication with attorneys for parties, *pro se* parties, and the Mediation Office.

    b. Mediators should understand and clearly convey that they are not decision-makers but facilitators of the decision-making of the parties. They may choose to meet with parties separate from their attorneys, or with attorneys separate from the parties. Mediators should ensure that participants in mediation understand that the role of the mediator is that of a neutral intermediary, not that of an advocate or representative for any party. A mediator should not offer legal advice to a party. If a mediator offers an evaluation of a party's position or of the likely outcome in court, or offers a recommendation with regard to settlement, the mediator should ensure that the parties understand that the mediator is not acting as an attorney for any party; is not providing legal advice; and is not speaking for the Court or any judge.

    c. Mediators should provide the same quality of service as they would for paying clients, or should request that the case be reassigned if they cannot do so.

    d. Mediators shall not work as consultants or attorneys in any pending or future action relating to any dispute in which they served as mediators, including actions between persons not parties to the mediation process.

    e. Mediators shall not solicit or accept payment for any aspect of any case undertaken as a panel mediator.

    f. Mediators should be familiar with, and at all times uphold, the values of the Model Standards of Conduct for Mediators, particularly Standard VI.

    g. This code of conduct also applies to prospective panel mediators undertaking observation or co-mediation, to observers, and to anyone else who has access to a mediation under the auspices of the Program.

## 18. Complaints about Mediators: Investigation/Remediation

The following protocol is observed whenever the Mediation Office receives a complaint about a mediator.

    a. The Director of the ADR Program will begin by gathering information from relevant parties, attorneys for parties, and other relevant Court personnel or observers. The

Director of the ADR Program will then contact the mediator in question to discuss the complaint or concern directly. This may be a phone call or an in-person meeting, depending on convenience and the nature of the complaint. In most cases, the issue will be considered sufficiently addressed after a discussion with the mediator.

b.  If the complaint is serious, or if the particular complaint is part of a pattern, the Director of the ADR Program and the mediator may explore options for correction. A plan will be determined on a case-by-case basis, and might include being observed or observing cases, attending relevant training, co-mediating, or participating in simulated mediations. It is possible that a mediator will be suspended from mediating during the remedial period. The situation will be reassessed after the determined course of action is completed.

c.  If a mediator chooses not to participate in the remedial process, he or she will be choosing to discontinue serving as a panel mediator.

d.  If similar or other complaints persist after the remedial period, the mediator and the Director of the ADR Program may discuss options for additional remedial work or the mediator may be removed from the panel (section 20(d)).

## 19. Complaints About the Mediation Program or Director

a.  Complaints by a mediator or mediation participant about Mediation Program staff or protocols should be made to the Director of the ADR Program. If the complaint is not satisfactorily resolved, the mediator or participants may contact the Chair of the Mediation Services Committee.

b.  Complaints about the Director of the ADR Program should be made to the Chair of the Mediation Services Committee.

## 20. Resignation or Removal from the Mediation Panel

Mediators may resign from the mediation panel at any time by notifying the Mediation Office. The Director of the ADR Program may remove mediators from the mediation panel for:

a.  Failing to meet the requirements of section (17)(d); or

b.  Violating the Code of Conduct set forth in section (18); or

c.  Violating any other Procedures promulgated by the Mediation Program; or

    d.  Based on complaints, observations, or communications with counsel, parties, or the Mediation Program, that indicate that a mediator is no longer mediating in a way that is appropriate for the Mediation Program or that resources are not available to provide sufficient training or support to enhance the quality of a mediator's practice.

## 21. Immunity

Any person designated to serve as a mediator pursuant to these Procedures shall be immune from suit based upon actions engaged in or omission made while performing the duties of a mediator.

Case 20-2304, Document 16-3, 07/23/2020, 2891076, Page228 of 445



**Mediation Confidentiality Agreement**

Parties, counsel for the Parties, any observers, and the mediator agree as follows:

a.   Any communications made exclusively during or for the mediation process shall be confidential except as to the provisions indicated in this agreement. The mediator shall not disclose any information about the mediation process, communications, or participants to anyone except for Mediation Office staff. Mediation Office staff must also maintain confidentiality except as to the provisions indicated in this section. Administrative aspects of the mediation process, including the assignment of a mediator, scheduling and holding of sessions, and a final report that the case has concluded or not concluded through mediation, or that parties failed to participate, are not confidential and will appear on the docket of the case.

b.   The parties may not disclose discussions or other communications with the mediator unless all parties agree, because it is required by law, or because otherwise confidential communications are relevant to a complaint against a mediator or the Mediation Program arising out of the mediation. The parties may agree to disclose information provided or obtained during mediation to the Court while engaged in further settlement negotiations with a District or Magistrate Judge. The parties may disclose the terms of settlement if either party seeks to enforce those terms.

c.   Documents and information otherwise discoverable under the Federal Rules of Civil Procedure shall not be shielded from discovery merely because they are submitted or referred to in the mediation.

d.   The mediator shall not be inquired of or called as a witness or deponent in any proceeding related to the dispute in which the mediator served, or be compelled to produce documents that the mediator received or prepared for mediation.

The undersigned have read and agree to comply with this agreement.

Dated:

Plaintiff(s): _____          Defendant(s): _____

Attorney(s) for Plaintiff(s):_____          Attorney(s) for Defendant(s):_____

Mediator:_____          Observer(s):_____

# Exhibit N

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
ARTHUR USHERSON,                                                  :
                                                                  :
                                    Plaintiff,                    :          19-CV-6368 (JMF)
                                                                  :
                    -v-                                           :          ORDER
                                                                  :
BANDSHELL ARTIST MANAGEMENT,                                      :
                                                                  :
                                    Defendant.                    :
                                                                  :
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        In accordance with the Court's Memorandum Opinion and Order dated December 9,

2019, the Mediator submitted to the Court the attached Declaration, which the Court has redacted

to remove references to the Mediator's name.  No later than **noon** on **December 16, 2019**, Mr.

Liebowitz shall file a letter on ECF indicating if he believes that an evidentiary hearing is

necessary to resolve Defendant's motion.  In the absence of such a request, the Court will treat

the facts set forth in the Mediator's declaration as uncontested.


        SO ORDERED.

Dated: December 11, 2019                        _____
       New York, New York                              JESSE M. FURMAN
                                                     United States District Judge

IN THE MATTER OF

19 civ 06368 (JMF)

Usherson V. Brandshell

1. ▮▮▮▮▮▮▮▮▮ under penalty of perjury, states as follows, I was the appointed mediator in the above referenced case and I requested the parties to give me a couple of mutually agreeable dates.

2. Some time thereafter I received a communication from Mr. Liebowitz asking whether I would agree to conduct the mediation telephonically since the attorney for the defendant was located in Virginia. I agreed if it was mutually agreeable and informed the office of mediation.

3. After this agreement was communicated to mediation I received a call informing me that it was office policy for mediations to be in person.

4. I so informed the parties and requested that they confer and give me a date for an in person mediation. I was informed by Mr. Liebowitz that the parties agreed to October 31, 2019 at the offices of the mediation office at the courthouse.

5. On the date prior to the mediation I conferred with attorneys for both parties as to the status of negotiations. While the parties were somewhat close to resolving the matter no ultimate agreement was reached.

6. That evening I talked to Mr. Liebowitz and was informed that the mediation was on. He did not inform me that he would not personally appear but through an associate. But I have mediated a few prior mediations involving Mr. Liebowitz where on at least one occasion that office appeared by an associate without incident.

7. At no time was I informed that the plaintiff would not personally appear but would be available by telephone. I should say that in a few prior mediations his client appeared by telephone without incident. On this occasion no discussion was had by me as to client appearance.

8. It was only on the day of the mediation that I was informed by defendant's counsel that the October 31, date was agreed to specially because both attorneys and more importantly their respective client would personally appear. Frankly this was news to me.

9. Mr. Liebowitz's associate appeared and at the conclusion of the mediation his client by telephone, but no agreement was reached partly I believe because of the lack of personal appearance which were allegedly agreed to by counsel.

4817-8716-8686.1

Dated;

December 10, 2019



Exhibit O

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                                   :

ARTHUR USHERSON,
                                                   :

                        Plaintiff,          :                  19-CV-6368 (JMF)

                                                   :

                -v-                        :                       ORDER

                                                 :

BANDSHELL ARTIST MANAGEMENT,
                                                 :

                       Defendant.         :

                                                   :

---------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      After reviewing Plaintiff's response to the Court's December 11, 2019 Order, the Court concludes that an evidentiary hearing is warranted, if not necessary, to resolve certain factual disputes relevant to Defendant's motion for sanctions.

      The Court plans to conduct the evidentiary hearing as follows.  Consistent with the Court's prior Memorandum Opinion and Order, the evidentiary hearing will be narrowly limited to whether (and if so, when and how) the Mediator gave Liebowitz permission (1) not to appear personally at the October 31, 2019 mediation (and to send an associate instead); and (2) for Plaintiff himself not to appear at the mediation in person and to participate by telephone instead. The Court will hear in-person testimony from three witnesses: Liebowitz, Newberg, and the Mediator.  The Court will treat the declarations already submitted by these witnesses as their direct testimony and may conduct additional questioning of each witness.  After any questioning by the Court, counsel will be given an opportunity to question each witness — in the case of the Mediator, both sides will be permitted to ask additional questions; in the case of each lawyer, only opposing counsel will be allowed to ask additional questions.

      Unless the Court orders otherwise, the evidentiary hearing shall be held on **January 8, 2020**, at **9:30 a.m.** in Courtroom 1105 of the Thurgood Marshall Courthouse, 40 Centre Street, New York, New York.  Richard Liebowitz, Brad Newberg, and the Mediator must attend in person.  The parties may, but do not have to, attend in person.

      Any party objecting to the foregoing — or believing that a conference should be held to discuss these (or any other) matters — shall submit a letter by **noon** on **December 19, 2019**.

      SO ORDERED.

Dated: December 17, 2019
      New York, New York                            JESSE M. FURMAN
                                           United States District Judge

# Exhibit P

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                   :

ARTHUR USHERSON,                       :
                                     :
                      Plaintiff,     :          19-CV-6368 (JMF)
                                     :
            -v-                   :              ORDER
                                     :
BANDSHELL ARTIST MANAGEMENT,   :
                                     :
                    Defendant.   :
                                     :
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      On December 19, 2019, the parties submitted a stipulation of voluntary dismissal.  ECF
No. 45.  Dismissal of the case moots Defendant's motion for a bond, but it does not moot
Defendant's motion for sanctions.  *See, e.g.*, *Rice v. NBCUniversal Media, LLC*, No. 19-CV-447
(JMF), 2019 WL 3000808, at *4 (S.D.N.Y. July 10, 2019) (noting, in imposing sanctions on Mr.
Liebowitz, that "voluntary dismissal 'does not preclude the district court from considering
collateral issues such as sanctions.'" (quoting *U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*,
775 F.3d 128, 134 (2d Cir. 2014)).  Accordingly, the January 8, 2020 hearing will proceed as
planned.  At that hearing, the Court will hear sworn testimony from three witnesses in the
following order: Mr. Liebowitz, Mr. Newberg, and the Mediator.  As noted, the Court will treat
their previously submitted declarations as their direct testimony and proceed directly to cross-
examination — limited to the issues of whether Mr. Liebowitz obtained advance permission
from the Mediator for an associate to appear at the mediation instead of Mr. Liebowitz and for
Plaintiff to participate in the mediation by telephone.  *See* ECF No. 42.  In the case of Mr.
Liebowitz and Mr. Newberg, the Court will begin with cross-examination by opposing counsel
and then proceed to its own questioning.  In the case of the Mediator, the Court will engage in its
own questioning first and then give counsel for both sides an opportunity to ask follow-up
questions.  Counsel should be prepared for brief oral argument at the close of the hearing.

      The Clerk of Court is directed to terminate ECF No. 29.

      SO ORDERED.

Dated: December 20, 2019
      New York, New York                          JESSE M. FURMAN
                                       United States District Judge

# Exhibit Q

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARTHUR USHERSON

                    Plaintiff,

        v.

BANDSHELL ARTIST MANAGEMENT

                    Defendant.

---

**STIPULATION OF DISMISSAL OF
CIVIL ACTION WITH PREJUDICE
(FRCP 41(a)(1)(A)(ii)**

**Case No.: 1:19-cv-6368**

IT IS HEREBY STIPULATED by Plaintiff Arthur Usherson and Defendant Bandshell

Artist Management that the case has been settled and that the above case should be

dismissed with prejudice with each side to bear its own costs and attorney's fees.

Richard P. Liebowitz
Liebowitz Law Firm, PLLC
11 Sunrise Plaza, Suite 305
Valley Stream, NY 11580
Tel: (516) 233-1660
RL@LiebowitzLawFirm.com

Dated: December 18, 2019

*Attorneys for Plaintiff Arthur Usherson*

Brad Newberg
McGuireWoods LLP
1750 Tysons Blvd., Suite 1800
Tysons, VA 22102-4215
703-712-5061
BNewberg@McGuireWoods.co
m
December 18, 2019

*Attorneys for Defendant
Bandshell Artist Management*

SO ORDERED.  To be clear, the Court retains jurisdiction to adjudicate Defendant's pending
motion for sanctions and any other sanctions-related matters.  *See, e.g., Rice v. NBCUniversal
Media, LLC,* No. 19-CV-447 (JMF), 2019 WL 3000808, at *4 (S.D.N.Y. July 10, 2019)
(noting, in imposing sanctions on Mr. Liebowitz, that "voluntary dismissal 'does not
preclude the district court from considering collateral issues such as sanctions.'" (quoting
*U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.,* 775 F.3d 128, 134 (2d Cir. 2014)).

The Clerk of Court is directed to close this case but should NOT terminate ECF No. 14.

December 20, 2019

# Exhibit R

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
                                                                    :
ARTHUR USHERSON,                                                    :
                                                                    :
                                        Plaintiff,                  :            19-CV-6368 (JMF)
                                                                    :
                        -v-                                         :                ORDER
                                                                    :
BANDSHELL ARTIST MANAGEMENT,                                        :
                                                                    :
                                        Defendant.                  :
                                                                    :
--------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        As stated on the record at the close of the evidentiary hearing held on January 8, 2020,
Defendant shall serve via overnight courier a copy of the files obtained from the U.S. Copyright
Office for the copyright registration by **January 9, 2020**, and file proof of service **within one
business day of service**.  No later than **January 17, 2020**, Plaintiff shall file a letter on ECF
addressing (1) whether Paragraph 9 of the Complaint is accurate; and (2) if not, whether
sanctions are warranted on this basis against either Plaintiff's counsel or Plaintiff himself.

        In addition, by **January 13, 2020**, Plaintiff shall submit a letter brief not to exceed three
pages addressing the effect, if any, of the parties' stipulation of dismissal on Defendant's motion
for sanctions and addressing the appropriate sanctions in the event that the Court deems
sanctions to be appropriate.  Defendant shall submit any reply to Plaintiff's submission, not to
exceed three pages, by **January 15, 2020**.  Finally, Defendant shall submit a detailed accounting
of the costs and attorney's fees incurred (had counsel not been pro bono) in connection with the
October 31, 2019 mediation and the pending motion for sanctions by **January 17, 2020**.

        SO ORDERED.

Dated: January 8, 2020                          _____
        New York, New York                              JESSE M. FURMAN
                                                        United States District Judge

# Exhibit S



Attorneys for the Photographic Arts

11 Sunrise Plaza, Ste. 305
Valley Stream, NY 11580
(516) 233-1660
www.LiebowitzLawFirm.com

January 17, 2020

**VIA ECF**

Honorable Jesse M. Furman
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

Re:     *Usherson v. Bandshell Artist Management,* 1:19-cv-06368 (JMF)

Dear Judge Furman:

    We represent Plaintiff Arthur Usherson in the above-captioned case. We write in response to the Court's Order, dated January 8, 2020 [Dkt. #52].

**Point I:     Paragraph 9 of the Complaint Does Not Identify the Correct Copyright
                Registration Number; However, the Photograph At Issue Is Registered in
                Plaintiff's Name Under a Separate Registration**

    Paragraph 9 of the Complaint, which identifies the Copyright Registration Number as VAu 1-080-046, is inaccurate. [Dkt. #1] The photograph at issue in this case (the "Photograph") was not registered as part of the 046 Registration, which was effectuated by Plaintiff on August 2, 2011. Other similar photographs of the same event and scene (i.e., Bob Dylan at Mariposa Folk Festival on July 16, 1972) were registered as part of the 046 Registration.

    Instead, the Photograph was registered in Plaintiff's name under registration number VAu 1-373-272, with effective date of August 22, 2019 (the "272 Registration"). The Photograph is on deposit with the 272 Registration bearing content title "Bob Dylan at Mariposa Folk Festival July 16, 1972 (13).jpg." Notably, the 272 Registration was not effectuated until after this lawsuit was filed, but as demonstrated in Point II below, that fact should not be of critical import in light of the liberal policy accorded to amended pleadings under Rule 15(a)(2).

**Point II:     If the Action Remained Pending, Then an Amended Complaint Under Rule
                15 – Rather Than Sanctions Under Rule 11 – Would be the Appropriate
                Procedural Disposition**

    Plaintiff and his counsel respectfully submit that administrative mistakes or clerical errors do happen in the copyright registration process. However, such mistakes are never considered fraudulent or bad faith (absent clear evidence of an intent to deceive). *See, e.g., Urantia Found. v. Maaherra*, 114 F.3d 955, 963 (9th Cir. 1997) ("inadvertent mistakes on registration certificates



do not invalidate a copyright and thus do not bar infringement actions, unless the alleged infringer has relied to its detriment on the mistake, or the claimant intended to defraud the Copyright Office by making the misstatement."); *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 991 (9th Cir. 2017) ("Good faith mistakes in copyright applications do not preclude an infringement action.").

Moreover, Plaintiff is not aware of any decision where a federal court sanctioned a party or his attorney for identifying the wrong registration number in an initial complaint. Quite to the contrary, the failure to obtain a registration prior to filing suit provides grounds to amend the complaint under Rule 15. *Atkins v. Publications Int'l, Ltd.,* No. 91 CIV. 7427 (KMW), 1992 WL 309581, at *4 (S.D.N.Y. Oct. 15, 1992) (declining to impose sanctions under Rule 11 where plaintiff failed to obtain a copyright registration prior to initiating her copyright infringement claim and noting that leave to amend should be "freely given when justice so requires" under Rule 15).

**Point III.        Sanctions are Not Warranted Against Plaintiff's Counsel Because a Finding of Subjective Bad Faith is Foreclosed in Matters of Clerical Error**

In order to impose sanctions *sua sponte* upon an attorney, a district court must make a "finding of bad faith on the part of the attorney." *In re Pennie & Edmonds, LLP,* 323 F.3d 86, 90 (2d Cir.2003). The Second Circuit reasoned that, as opposed to a sanctions proceeding initiated by a party's motion, "when a lawyer's submission . . . is subject to sanction by a *court,* the absence of a 'safe harbor' opportunity" for counsel to reconsider the challenged submission weighs in favor of "avoiding the inhibiting effect of an 'objectively unreasonable' standard." *Pennie & Edmonds,* 323 F.3d at 91 (emphasis supplied). Thus, the Second Circuit concluded that the "bad faith standard applies to a court-initiated show cause order issued where an opportunity for withdrawal or correction is unavailable." *Id.* at 91 n. 4. Accordingly, in order to sanction Plaintiff's counsel for designating an incorrect copyright registration number in the initial complaint, the Court would need to make a specific showing of bad faith conduct on part of Mr. Liebowitz, the attorney who signed the complaint, respecting the registration itself.

Here, Defendant did not ask the Court to sanction counsel in connection with the copyright registration issue, and certainly did not file any written motion.[1] Instead, the sanctions proceeding concerning paragraph 9 of the complaint was initiated by the Court. [Dkt. #52]  In any event, defendant cannot move for sanctions under Rule 11 without serving Plaintiff's counsel with a formal Rule 11 motion and a 21-day "safe harbor" to correct any pleading deficiency. Fed.R.Civ.P. 11(c)(1)(A).  Defendant failed to serve such motion during the pendency of the action and thus the time to file and serve a Rule 11 motion has passed. *See* Fed. R. Civ. P. 11 advisory committee notes to 1993 amendment ("Ordinarily the [Rule 11] motion should be served promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as untimely.").

---

[1] Indeed, Defense counsel plainly violated the Court's Order [Dkt. #47] by raising the registration issue at the January 8 hearing, which was narrowly limited to the question of whether Mr. Liebowitz obtained certain permissions from the Mediator.  There is no just cause to impose sanctions against Liebowitz while Mr. Newberg, who certainly understood the parameters of the hearing, willfully violated the Court's Order in premeditated fashion during closing argument.

**Liebowitz** ⬤ **Law Firm, PLLC**

The allegation set forth in paragraph 9 of the complaint is attributable to clerical error, rather than any bad faith intent to deceive. *Class v. E. Airlines Inc.*, 117 F.R.D. 511, 512 (S.D.N.Y. 1987) (declining to impose sanctions where discrepancy was merely a clerical error in the doctor's records). Indeed, there would no logical reason why any attorney would purposely seek to identify the incorrect registration number in a complaint.

**Point IV:** **Sanctions Are Not Appropriate Against Plaintiff (nor Counsel) Because They Are Entitled to Rely On Judicial Precedent Which Holds That the Burden to Retrieve a Certified Deposit Copy Rests on the Alleged Infringer**

As stated at the January 8 hearing, there is no statutory or regulatory requirement which imposes a duty upon the copyright holder (or his counsel) to incur the expense of ordering a certified deposit copy from the Copyright Office. Moreover, there is no caselaw authority of which Plaintiff is aware which imposes such a duty. Under these circumstances, sanctions cannot be warranted for an alleged failure on counsel or the party's part to secure a certified deposit copy prior to filing suit. *See, e.g.*, *Clancey v. Mobil Oil Corp.*, 906 F.Supp. 42, 50 (D.Mass.1995) (holding that Rule 11 sanctions were not warranted where legal precedents were not clearly defined); *Smith & Green Corp. v. Trustees of the Construction Industry & Laborers Health & Welfare Trust*, 244 F.Supp.2d at 1104 (holding that Rule 11 should not be used to raise issues of legal sufficiency that are more properly decided in a dispositive motion).

Moreover, prevailing law in this Circuit holds that the burden to retrieve a certified deposit copy from the U.S. Copyright Office rests upon the alleged infringer.. *See, e.g., Goodman v. Universal Beauty Prod. Inc.*, No. 17-CV-1716 (KBF), 2018 WL 1274855, at *5 (S.D.N.Y. Mar. 9, 2018) ("A full period of discovery has occurred in this case; defendants had the opportunity to request a certified deposit copy from the U.S. Copyright Office and submit it with their opposition to plaintiff's motion for summary judgment. Their failure to submit any evidence, however, prevents them from raising a triable issue on the validity of the registration"); *Masi v. Moguldom Media Grp. LLC*, No. 18 CIV. 2402 (PAC), 2019 WL 3287819, at *4 (S.D.N.Y. July 22, 2019) ("Defendant could have . . . requested a certified deposit copy from the U.S. Copyright Office to support its position on summary judgment."); *Chicoineau v. Bonnier Corp.*, No. 18-cv-3264 (JSR), 2018 WL 6039387, at *2 (S.D.N.Y. Oct. 16, 2018) (implying that Defendant must produce evidence to invalidate registration). We are not aware, and Defendant has failed to cite, any caselaw which holds that a copyright holder must obtain a certified deposit prior to filing suit.

Based on the foregoing, Plaintiff and his counsel respectfully submit that sanctions are not warranted concerning the registration issue. Had the case proceeded on the merits, Plaintiff would have sought Court's leave to amend the complaint to correct the pleading deficiency by identifying the 272 Registration.

Respectfully submitted,

**/s/richardliebowitz/**
Richard Liebowitz

*Counsel for Plaintiff Arthur Usherson*

1/17/2020



| Help | Search | History | Titles | Start Over |

---

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Copyright Number = VAu001373272
Search Results: Displaying 1 of 1 entries



---

Labeled View

---

### *Arthur Usherson - Bob Dylan at Mariposa Folk Festival July 16, 1972.*

**Type of Work:** Visual Material

**Registration Number / Date:** VAu001373272 / 2019-08-22

**Application Title:** Arthur Usherson - Bob Dylan at Mariposa Folk Festival July 16, 1972

**Title:** Arthur Usherson - Bob Dylan at Mariposa Folk Festival July 16, 1972. [Group registration of unpublished photographs. 30 photographs]

**Description:** 30 photographs : Electronic file (eService)

**Copyright Claimant:** Arthur Usherson. Address: 1006 Old Holcomb Bridge Road, Roswell, GA, 30076, United States.

**Date of Creation:** 1972

**Authorship on Application:** Arthur Usherson; Domicile: United States. Authorship: photographs.

**Copyright Note:** C.O. correspondence.

Regarding title information: Deposit contains complete list of titles that correspond to the individual photographs included in this group.

Regarding group registration: A group of unpublished photographs may be registered on one application with one filing fee only under limited circumstances. ALL of the following are required: 1. All photographs (a) are unpublished AND (b) were created by the same author AND (c) are owned by the same copyright claimant AND 2. The group contains 750 photographs or less AND 3. A

sequentially numbered list of photographs containing the title and file name for each photograph included in the group must be uploaded along with other required application materials. The list must be submitted in an approved document format such as .XLS or .PDF. The file name for the numbered list must contain the title of the group and the Case Number assigned to the application.

**Photographs:** (20 photographs): Bob Dylan at Mariposa Folk Festival July 16, 1972 (1).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (10).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (11).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (12).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (13).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (14).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (15).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (16).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (17).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (18).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (19).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (2).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (20).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (21).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (22).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (23).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (24).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (25).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (26).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (27).jpg,

(10 photographs): Bob Dylan at Mariposa Folk Festival July 16, 1972 (28).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (29).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (3).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (30).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (4).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (5).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (6).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (7).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (8).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (9).jpg,

**Names:** Usherson, Arthur



### Save, Print and Email (**Help Page**)

| Select Download Format | Full Record ⏷ | Format for Print/Save |
|---|---|---|
| Enter your email address: | | Email |

---

[Help](#)   [Search](#)   [History](#)   [Titles](#)   [Start Over](#)

---

[Contact Us](#)  |  [Request Copies](#)  |  [Get a Search Estimate](#)  |  [Frequently Asked Questions (FAQs) about Copyright](#)  |  [Copyright Office Home Page](#)  |  [Library of Congress Home Page](#)

# Exhibit T

**McGuireWoods LLP**
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102-4215
Phone: 703.712.5000
Fax: 703.712.5050
www.mcguirewoods.com

**Brad R. Newberg**
Direct: 703.712.5061

# McGuireWoods

bnewberg@mcguirewoods.com
Fax: 703.712.5187

January 18, 2020

**VIA ECF**
The Honorable Jesse M. Furman
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007
Furman_NYSDChambers@nysd.uscourts.gov

Re:     *Usherson v. Bandshell Artist Management*, 1:19-cv-6368 (JMF)

Dear Judge Furman,

We write in response to Mr. Liebowitz's January 17 letter (the "January 17 letter") regarding the issue of copyright registrations in the above-captioned case. We write again as an officer of the Court, despite this case having been settled.

The January 17 letter admits that the photograph upon which Plaintiff sued was not registered with the Copyright registration named in the Complaint as the basis for the lawsuit. The January 17 letter goes on to state that the photograph is actually part of a registration filed instead on August 22, 2019, more than a month after this case was filed.

However, Mr, Liebowitz states that he (and his client) should avoid sanctions on this issue because this was a mere "clerical error." Such an explanation defies belief.

As an initial matter, the January 17 letter does not state how Mr. Liebowitz knows for sure that the photograph is part of the August 22 registration. The only way would be that he is making a statement on personal knowledge, that is that he filed the August 22 registration or it was filed under his direction. That may be true given that Mr. Freeman stated to the Court during the January 8 hearing that the Liebowitz Law Firm handles the copyright filings for its clients unless the photographs had been registered already. More on that below.

As to the clerical error defense, a clerical error would be filing a complaint with, say, a typo in the registration number. Here, there can be no "clerical error." In this case, there was **no** copyright registration at the time of the Complaint being filed. Here, the obvious conclusion is that Mr. Liebowitz realized that the Complaint was not valid and filed a later registration. This further appears to have been done intentionally with the hope of Defendant and the Court not finding out. That would also explain why Mr. Liebowitz blames the undersigned for bringing this issue to the Court's attention (because, he says, the hearing was only to determine if he

January 18, 2020
Page 2

should be sanctioned for one wrongdoing, not another), and goes so far as to claim that it should be up to a defendant to see through his ruse.[1]

The question is why Mr. Liebowitz would have taken such actions?  And, if he could have just moved to amend, why did he not move to amend the Complaint earlier (especially given the tight discovery window of this case)?.  The answer is that despite the January 17 letter's statement that Plaintiff could have just amended the complaint under the liberal pleading rules, that is incorrect.  Mr. Liebowitz almost certainly knows this, likely when he filed the second registration, but certainly when I brought this exact issue up to the Court at length in the initial pre-trial conference, two months ago.

As this Court is well aware, in *Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC*, __ U.S. __, __ 139 S. Ct. 881, 892 (2019), the Supreme Court held that an actual copyright registration, and not even a pending application, must exist before a plaintiff can bring a claim on its work.  Since *Fourth Estate*, this Court (including J. Furman) has found that allowing a plaintiff to amend its copyright claims once it obtained a registration would "undermine Congress's choice to maintain registration as a prerequisite to suit."  *Malibu Media, LLC v. Doe*, No. 18-CV-10956 (JMF), 2019 WL 1454317, at *2-3 (S.D.N.Y. Apr. 2, 2019) (J. Furman).  Therefore, Mr. Liebowitz could not possibly have amended Plaintiff's Complaint based on the second registration.  *See also Pickett v. Migos Touring, Inc.*, 18-cv-9775 (AT), 2019 WL 5887742, at * 5 (S.D.N.Y. Nov. 12, 2019); *Xclusive-Lee, Inc. v. Hadid*, 19-cv-520 (PKC) (CLP), 2019 WL 3281013, at *4 (E.D.N.Y. July 18, 2019) (quoting *Malibu Media*, and "declin[ing] to grant Plaintiff leave to amend the complaint to allege registration should its copyright application be approved in the future"); *Izmo, Inc. v. Roadster, Inc.*, No. 18-cv-06092 (NC), 2019 WL 2359228, at *2 (N.D. Cal. June 4, 2019); *Mai Larsen Designs v. Want2Scrap, LLC*, No. 17-CV-1084 (ESC), 2019 WL 2343019, at *6 (W.D. Tex. June 3, 2019).

More importantly—and the reason the January 17 letter requires a response—is that the very claims Mr. Liebowitz is making now are the claims he (and Mr. Freeman) denied in open Court.

During the January 8 hearing, Mr. Freeman stated to the Court that he had no knowledge regarding the registration of the photograph in issue.  As the Court knows, he also filed a sworn declaration with Mr. Liebowitz's sanctions response, claiming no knowledge of even "the existence of this matter" until the night of October 30.  Freeman Decl. ¶ 4.

That leaves Mr. Liebowitz, the only attorney to make an appearance in this case. Attached as an Exhibit are relevant pages from the November 14 Court conference in this case. At page 17, the Court can see that I brought this issue front and center, including my suspicion that Mr. Liebowitz knew the copyright registration sued on was invalid or did not contain the

---

[1] In discussing the "burden to retrieve" deposit copies, Mr. Liebowitz merely cites cases wherein a defendant tried to make a claim that a registration was not valid without ever seeking the evidence to make such a claim.  That is completely immaterial to the issue at hand and certainly does not relieve a plaintiff from making truthful filings. Those cases also do not contest this Court's power to, as part of any sanctions award, require Mr. Liebowitz to serve a defendant certified deposit copies with or soon after the service of any future complaints.

January 18, 2020
Page 3

photograph at issue, leading to the second registration, and that, if my suspicions were correct, how the second registration could not cure the Complaint.  Tr. at 17, 19-20.

Mr. Liebowitz did not argue the point or suggest he would be amending Plaintiff's complaint.  Instead, he outright denied that there was an issue:  "I don't know what defense counsel means about other registrations or other photographs.  I will have to see what my office did, *but this is the correct registration*."  Tr. 17-18 (emphasis added).  At no point thereafter, until the January 17 letter, did Mr. Liebowitz go and "check with [his] office" and inform the Court or defense counsel that his statement in open Court was incorrect.

Even at the January 8 hearing, there was still feigned ignorance by Plaintiff's counsel of the invalidity of the first registration and the existence of the second registration.  Now, in what appears to be yet another attempt to move the ball, Mr. Liebowitz suggests that he knew of the existence of the second registration, but claims this whole issue was just "clerical error."

This Court is aware of Mr. Liebowitz's tactics in other cases in an attempt to avoid sanctions.  Blame the other side and claim his errors were no big deal. His January 17 letter can be added to that pile.

Respectfully submitted,

*s/Brad R. Newberg/*
Brad. R. Newberg
*Attorney for Defendant Bandshell Artist Management.*

Case 20-2304, Document 16-3, 07/23/2020, 2891376, Page252 of 445

JBEJUSHC                    Conference

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ARTHUR USHERSON,

4                 Plaintiff,

5            v.                          19 Civ. 6368 JMF

6   BANDSHELL ARTIST MANAGEMENT,

7                 Defendant.

8   ------------------------------x

9

10                                       November 14, 2019
                                         4:00 p.m.
11

12

13  Before:

14                   HON. JESSE M. FURMAN,

15                                       District Judge

16

17                    APPEARANCES

18

    LIEBOWITZ LAW FIRM, PLLC
19       Attorneys for plaintiff
    BY:  RICHARD LIEBOWITZ, Esq.
20       JAMES FREEMAN, Esq.
                    Of counsel
21

22  McGUIRE WOODS, LLP
         Attorneys for defendant
23  BY:  BRAD RICHARD NEWBERG, Esq.
                    Of counsel
24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

Case 20-2304, Document 16-3, 07/23/2020, 2891376, Page253 of 445

JBEJUSHC                        Conference

1    needs to testify, how you think it should be handled.  I will

2    issue an order that gives you further guidance on that front.

3            More broadly, I guess we are here for the initial

4    conference.  One option would be to put everything on hold

5    pending adjudication of the sanctions motion and see where that

6    lands us.  I will say I am skeptical of the request to dismiss

7    the complaint on that basis.  I think if sanctions are

8    appropriate, monetary sanctions are presumably the way to go

9    and not dismissal, but so in part for that reason I guess my

10   inclination would not be to hit the pause button.

11           Another option would be to proceed with discovery in

12   the normal course.  I guess the third option is somewhere

13   in-between.  I wanted to raise this.  Mr. Newberg has a

14   footnote in his memorandum of law, suggesting that there may be

15   a threshold issue with respect to the copyright in this case

16   that because it may predate 1989, that it is not a valid

17   copyright in the absence of a registration.  I don't know if

18   you're right about that, and maybe you can elaborate on it.

19           Would that be dispositive of the claims in this case

20   and, if so, is that something we should have early summary

21   judgment motion practice on?  What is your thought?

22           MR. NEWBERG:  Thank you.  Yes, that would be

23   dispositive.  They lose all rights in copyright for publishing,

24   print out, listening, anything regarding your photograph

25   without notice if it was done before 1989.

Case 20-2304, Document 16-3, 07/23/2020, 2891376, Page254 of 445

JBEJUSHC                    Conference

1          Additionally, actually just yesterday we also

2     discovered that after this case was filed, Mr. Usherson filed a

3     copyright registration, which it seems to be on these

4     photographs, so now it is unclear whether the registration in

5     the complaint actually does cover the photograph or if it is

6     the new copyright registration.

7          If it is the new copyright registration, it is

8     unequivocal this case must be dismissed with prejudice based on

9     the Supreme Court's recent holding in terms of having to have a

10    registration before you file and the Second Circuit and this

11    Court's holdings that that is a non-curable error.

12         So now we discovered that yesterday.  One of the

13    things I was going to ask your Honor, I think we we need to

14    amend our answer.  I do think that having discovery purely on

15    those aspects early would probably be a very good idea.

16         THE COURT:  Mr. Liebowitz.

17         MR. LIEBOWITZ:  Your Honor, so what defendant doesn't

18    realize is this is an unpublished work.  The VA number is VAU.

19    When it is VAU, it is unpublished.  So defendants say it was

20    published before 1989 is not accurate.  So it was VAU, it is

21    unpublished, and that does not affect any public domain or

22    anything like that.

23         It was unpublished, so there is no issue with

24    registration.  I don't know what defense counsel means about

25    other registrations or other photographs.  I will have to see

Case 20-2304, Document 16-3, 07/23/2020, 2891376, Page255 of 445

JBEJUSHC                      Conference

1    what my office did, but this is the correct registration.   It

2    is registered as unpublished, and there are statutory damages

3    and attorney's fees in this case.

4            We believe that if defendant wants to take up these

5    issues during discovery, we want to have discovery as well.   We

6    want to determine why wasn't there a license, why wasn't the

7    photograph taken down.   There are a lot of factors that go into

8    statutory damages, and we believe that the appropriate thing to

9    do at this stage is to just set discovery, set the dates, and

10   let the parties engage and hopefully during that process the

11   parties could eventually get to a settlement number we are

12   willing to live with and we can finally put this matter to

13   rest.

14           MR. NEWBERG:  May I respond briefly, your Honor?

15           THE COURT:  Sure.

16           MR. NEWBERG:  Responding backwards on the point of the

17   facts on the discovery Mr. Liebowitz is talking about, that is

18   normal discovery.  What we are talking about --

19           THE COURT:  Slow down.

20           MR. NEWBERG:  -- is preemptive discovery on the notice

21   on registration.  I can tell Mr. Liebowitz right here on

22   August -- this is a photo, sort of well known folk community

23   photo of Bob Dylan, Leon Redbone and David Bromberg at the

24   Mariposa Folk Festival on July 16, 1972.

25           Taking this backwards, while there is a registration

Case 20-2304, Document 16-3, 07/23/2020, 2891376, Page256 of 445

JBEJUSHC                    Conference

1    that was mentioned in the complaint that simply just says

2    unpublished photographs, Nos. 122-208, that is what was for the

3    complaint.  On August 22nd, a very specific registration was

4    issued that says Arthur Usherson, Bob Dylan at Mariposa Folk

5    Festival, July 16, 1972, 30 photographs.  Clearly it is very

6    likely one of these 30 photographs is the photograph in

7    question, which is a photograph of Bob Dylan at the Mariposa

8    Folk Festival, July 16, 1972.

9         As far as the publication, I am well aware the

10   registration says that they're unpublished photographs.  I

11   think that is almost certainly inaccurate.  This is a

12   photograph that has been widely circulated.  I found examples

13   of it ranging back 10 to 20 years, and so if it were

14   unpublished, it would, it would be widely circulated, which may

15   be another reason to take discovery.  Thank you.

16        THE COURT:  If there is a generic registration on day

17   one, and then a more specific registration on day two, I don't

18   know why that would, be but in theory cover the same work?.

19        MR. NEWBERG:  It is possible then it could cover the

20   same work.  We are willing to find out whether these

21   unpublished photographs are composite copies to determine

22   whether or not this is part of it and why there was this new

23   registration.

24        In addition, if you published hundreds or a group of

25   unpublished photographs, a collection, if any of those

JBEJUSHC                    Conference

1    photographs, and -- this may be the reason for the new

2    registration -- if any of those photographs actually were

3    published, that takes away the entire copyright registration.

4    So I have 50 unpublished photographs and 10 published, and to

5    put them in as unpublished photographs and try to get them in

6    that way and determine some of them were published, then that

7    copyright is no longer valid.

8         THE COURT:  What do you need to get to the bottom of

9    that and figure out what is going on here?

10        MR. NEWBERG:  In terms of discovery, we need discovery

11   on deposit copies of the photographs were put in for this 2011

12   registration.  We need discovery on Mr. Usherson of when these

13   photographs were published, if they were published, and if they

14   have, how they have been used, and discovery of why this new

15   registration was put in on August 22nd, because if the new

16   registration was essentially the first valid registration for

17   this photograph, then this case is -- and that is a separate

18   issue obviously from the notice, which is another reason for

19   dismissing.

20        If it were found, that is the other part of discovery,

21   if this is a published photograph and it was published without

22   notice prior to 1989, then there is no copyright possibility

23   whatsoever.

24        THE COURT:  What discovery would you need on that

25   aside from the deposition of Mr. Usherson?

Case 20-2304, Document 16-3, 07/23/2020, 2891376, Page257 of 445

Exhibit U

Case 20-2304, Document 16-3, 07/23/2020, 2891376, Page259 of 445

```
JBEJUSHC                    Conference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ARTHUR USHERSON,

                Plaintiff,

            v.                      19 Civ. 6368 JMF

BANDSHELL ARTIST MANAGEMENT,

                Defendant.

------------------------------x


                                    November 14, 2019
                                    4:00 p.m.



Before:

                    HON. JESSE M. FURMAN,

                                    District Judge


                    APPEARANCES


LIEBOWITZ LAW FIRM, PLLC
        Attorneys for plaintiff
BY:  RICHARD LIEBOWITZ, Esq.
        JAMES FREEMAN, Esq.
                    Of counsel


McGUIRE WOODS, LLP
        Attorneys for defendant
BY:  BRAD RICHARD NEWBERG, Esq.
                    Of counsel
```

Case 20-2304, Document 16-3, 07/23/2020, 2891376, Page260 of 445

JBEJUSHC                    Conference

1   needs to testify, how you think it should be handled.  I will

2   issue an order that gives you further guidance on that front.

3         More broadly, I guess we are here for the initial

4   conference.  One option would be to put everything on hold

5   pending adjudication of the sanctions motion and see where that

6   lands us.  I will say I am skeptical of the request to dismiss

7   the complaint on that basis.  I think if sanctions are

8   appropriate, monetary sanctions are presumably the way to go

9   and not dismissal, but so in part for that reason I guess my

10  inclination would not be to hit the pause button.

11        Another option would be to proceed with discovery in

12  the normal course.  I guess the third option is somewhere

13  in-between.  I wanted to raise this.  Mr. Newberg has a

14  footnote in his memorandum of law, suggesting that there may be

15  a threshold issue with respect to the copyright in this case

16  that because it may predate 1989, that it is not a valid

17  copyright in the absence of a registration.  I don't know if

18  you're right about that, and maybe you can elaborate on it.

19        Would that be dispositive of the claims in this case

20  and, if so, is that something we should have early summary

21  judgment motion practice on?  What is your thought?

22        MR. NEWBERG:  Thank you.  Yes, that would be

23  dispositive.  They lose all rights in copyright for publishing,

24  print out, listening, anything regarding your photograph

25  without notice if it was done before 1989.

Case 20-2304, Document 16-3, 07/23/2020, 2891376, Page261 of 445

JBEJUSHC                    Conference

1           Additionally, actually just yesterday we also

2    discovered that after this case was filed, Mr. Usherson filed a

3    copyright registration, which it seems to be on these

4    photographs, so now it is unclear whether the registration in

5    the complaint actually does cover the photograph or if it is

6    the new copyright registration.

7           If it is the new copyright registration, it is

8    unequivocal this case must be dismissed with prejudice based on

9    the Supreme Court's recent holding in terms of having to have a

10   registration before you file and the Second Circuit and this

11   Court's holdings that that is a non-curable error.

12          So now we discovered that yesterday.  One of the

13   things I was going to ask your Honor, I think we we need to

14   amend our answer.  I do think that having discovery purely on

15   those aspects early would probably be a very good idea.

16          THE COURT:  Mr. Liebowitz.

17          MR. LIEBOWITZ:  Your Honor, so what defendant doesn't

18   realize is this is an unpublished work.  The VA number is VAU.

19   When it is VAU, it is unpublished.  So defendants say it was

20   published before 1989 is not accurate.  So it was VAU, it is

21   unpublished, and that does not affect any public domain or

22   anything like that.

23          It was unpublished, so there is no issue with

24   registration.  I don't know what defense counsel means about

25   other registrations or other photographs.  I will have to see

Case 20-2304, Document 16-3, 07/23/2020, 2891376, Page262 of 445

JBEJUSHC                    Conference

1    what my office did, but this is the correct registration.  It

2    is registered as unpublished, and there are statutory damages

3    and attorney's fees in this case.

4           We believe that if defendant wants to take up these

5    issues during discovery, we want to have discovery as well.  We

6    want to determine why wasn't there a license, why wasn't the

7    photograph taken down.  There are a lot of factors that go into

8    statutory damages, and we believe that the appropriate thing to

9    do at this stage is to just set discovery, set the dates, and

10   let the parties engage and hopefully during that process the

11   parties could eventually get to a settlement number we are

12   willing to live with and we can finally put this matter to

13   rest.

14           MR. NEWBERG:  May I respond briefly, your Honor?

15           THE COURT:  Sure.

16           MR. NEWBERG:  Responding backwards on the point of the

17   facts on the discovery Mr. Liebowitz is talking about, that is

18   normal discovery.  What we are talking about --

19           THE COURT:  Slow down.

20           MR. NEWBERG:  -- is preemptive discovery on the notice

21   on registration.  I can tell Mr. Liebowitz right here on

22   August -- this is a photo, sort of well known folk community

23   photo of Bob Dylan, Leon Redbone and David Bromberg at the

24   Mariposa Folk Festival on July 16, 1972.

25           Taking this backwards, while there is a registration

Case 20-2304, Document 16-3, 07/23/2020, 2891376, Page263 of 445

JBEJUSHC                    Conference

1   that was mentioned in the complaint that simply just says

2   unpublished photographs, Nos. 122-208, that is what was for the

3   complaint.  On August 22nd, a very specific registration was

4   issued that says Arthur Usherson, Bob Dylan at Mariposa Folk

5   Festival, July 16, 1972, 30 photographs.  Clearly it is very

6   likely one of these 30 photographs is the photograph in

7   question, which is a photograph of Bob Dylan at the Mariposa

8   Folk Festival, July 16, 1972.

9          As far as the publication, I am well aware the

10  registration says that they're unpublished photographs.  I

11  think that is almost certainly inaccurate.  This is a

12  photograph that has been widely circulated.  I found examples

13  of it ranging back 10 to 20 years, and so if it were

14  unpublished, it would, it would be widely circulated, which may

15  be another reason to take discovery.  Thank you.

16         THE COURT:  If there is a generic registration on day

17  one, and then a more specific registration on day two, I don't

18  know why that would, be but in theory cover the same work?.

19         MR. NEWBERG:  It is possible then it could cover the

20  same work.  We are willing to find out whether these

21  unpublished photographs are composite copies to determine

22  whether or not this is part of it and why there was this new

23  registration.

24         In addition, if you published hundreds or a group of

25  unpublished photographs, a collection, if any of those

Case 20-2304, Document 16-3, 07/23/2020, 2891376, Page264 of 445

JBEJUSHC                    Conference

1   photographs, and -- this may be the reason for the new

2   registration -- if any of those photographs actually were

3   published, that takes away the entire copyright registration.

4   So I have 50 unpublished photographs and 10 published, and to

5   put them in as unpublished photographs and try to get them in

6   that way and determine some of them were published, then that

7   copyright is no longer valid.

8           THE COURT:  What do you need to get to the bottom of

9   that and figure out what is going on here?

10          MR. NEWBERG:  In terms of discovery, we need discovery

11  on deposit copies of the photographs were put in for this 2011

12  registration.  We need discovery on Mr. Usherson of when these

13  photographs were published, if they were published, and if they

14  have, how they have been used, and discovery of why this new

15  registration was put in on August 22nd, because if the new

16  registration was essentially the first valid registration for

17  this photograph, then this case is -- and that is a separate

18  issue obviously from the notice, which is another reason for

19  dismissing.

20          If it were found, that is the other part of discovery,

21  if this is a published photograph and it was published without

22  notice prior to 1989, then there is no copyright possibility

23  whatsoever.

24          THE COURT:  What discovery would you need on that

25  aside from the deposition of Mr. Usherson?

# Exhibit V

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                        :
ARTHUR USHERSON,                                        :
                                                        :
                              Plaintiff,                :        19-CV-6368 (JMF)
                                                        :
              -v-                                       :        ORDER
                                                        :
BANDSHELL ARTIST MANAGEMENT,                            :
                                                        :
                              Defendant.                :
                                                        :
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        In the colloquy that followed the evidentiary hearing in this case on January 8, 2020,

defense counsel advised the Court that he had reason to believe that Paragraph 9 of the

Complaint, ECF No. 1 — which alleges that the photograph at issue in this case (the

"Photograph") "was registered with United States Copyright Office and was given Copyright

Registration Number VAu 1-080-046" ("Registration 046") — was inaccurate.  *See* Tr. of

January 8, 2020 Hearing ("Tr."), at 127.  In response, counsel to Richard Liebowitz and the

Liebowitz Law Firm, James Freeman, represented that Paragraph 9 of the Complaint "was based

on Mr. Usherson's representation that the photograph in this case was under that copyright

registration number"; that counsel had no "reason to doubt the veracity of [Mr. Usherson's]

representations"; and that, before filing suit, counsel verified that Mr. Usherson was the claimant

for Registration 046, but did not take additional steps to confirm that the Photograph was

actually registered.  *Id.* at 140-41.  The Court then ordered Plaintiff's counsel to submit a letter-

brief "indicating, one, whether the photograph at issue in this case was, in fact, registered with

the Copyright Office; and, two, if it was not, why sanctions would not be appropriate based on the allegation in paragraph 9 of the complaint." *Id.* at 142; *see* ECF No. 52.

Pursuant to the Court's Order, Mr. Liebowitz filed a letter-brief on January 17, 2020. ECF No. 57. In his letter, Mr. Liebowitz concedes that Paragraph 9 of the Complaint "is inaccurate" because the Photograph "was not registered as part of the 046 Registration." *Id.* at 1. Mr. Liebowitz reports further that "the Photograph was registered in Plaintiff's name under registration number VAu 1-373-272" ("Registration 272"), with an "effective date of August 22, 2019" — more than one month after this lawsuit was filed. *Id.* at 1; *see also* ECF No. 1 (Complaint filed on July 10, 2019). Mr. Liebowitz attributes the problem (although it is not clear if the problem to which he refers is the inaccuracy of Paragraph 9 or the failure to register the Photograph in the first instance) to "administrative mistake[] or "clerical error[]" — but he does not elaborate on the nature or source of the purported mistake or error. ECF No. 57, at 1-2. Ultimately, Mr. Liebowitz contends that the Court cannot impose sanctions "for designating an incorrect copyright registration number in the initial complaint" without "a specific showing of bad faith conduct on [the] part of Mr. Liebowitz, the attorney who signed the complaint, respecting the registration itself." *Id.* at 2.[1]

Mr. Liebowitz's unsworn letter raises more questions than it answers. Accordingly, no later than **January 31, 2020**, Mr. Liebowitz shall file a declaration, sworn under penalty of perjury, specifying: (1) the nature and cause of the "administrative mistake" or "clerical error" to

---

[1]     Mr. Liebowitz also accuses defense counsel of "violat[ing]" the Court's Order by raising the registration issue at the January 8, 2020 hearing, "which was narrowly limited to the question of whether Mr. Liebowitz obtained certain permissions from the Mediator." ECF No. 57, at 2 n.1. Not so. Defense counsel did not seek to introduce evidence with respect to the issue during the evidentiary hearing itself, which was — per the Court's earlier Order — "narrowly limited." ECF No. 42. Instead, as an officer of the Court, he brought it to the Court's attention in the colloquy that followed the evidentiary hearing. Tr. at 127. That was entirely appropriate.

which he refers in his January 17, 2020 letter, including who was responsible for the mistake or

error; (2) the factual basis for his inclusion of the allegation set forth in Paragraph 9 of the

Complaint and the source of that factual basis, including a detailed description of any

investigation into the matter that he conducted prior to the filing of the Complaint; (3) what role,

if any, he played in the filing of the application for Registration 272, when and by whom that

application was filed, and why the decision to obtain that registration was made (including but

not limited to whether it was made due to a realization that the Photograph had not been

registered); (4) when Mr. Liebowitz became aware that the Photograph was not registered under

Registration 046, how he learned of that fact, and whether Mr. Liebowitz knew on November 14,

2019 (the date of the initial pretrial conference in this matter) that the Photograph had been

registered after this lawsuit was commenced; and (5) why Mr. Liebowitz failed to advise the

Court and defense counsel that Paragraph 9 of the Complaint was inaccurate until his January 17,

2020 letter.

No later than the **same date**, Mr. Freeman shall file a declaration, sworn under penalty of

perjury, specifying (1) the factual basis for the representations he made at the January 8, 2020

hearing about the registration of the Photograph, including that the allegation in Paragraph 9 of

the Complaint was based on information provided to counsel by Mr. Usherson and that counsel

had confirmed, prior to filing the Complaint, that Mr. Usherson was the claimant for Registration

046; and (2) any personal knowledge he has of any "administrative mistake" or "clerical error"

related to the allegation in Paragraph 9 of the Complaint, and the basis for such knowledge.  In

addition, no later than the **same date**, Mr. Usherson shall also file a declaration, both ***notarized***

and sworn under penalty of perjury, specifying (1) whether, as of the date this lawsuit was filed,

he was aware that the Photograph had not been registered; (2) what, if any, information he

provided to Mr. Liebowitz, Mr. Freeman, or any other attorney from the Liebowitz Law Firm about the registration of the Photograph and the date(s) on which he provided such information; and (3) what role, if any, he played in connection with Registration 272, including but not limited to the decision to seek registration and the actual filing of the registration.

Finally, by the **same date**, Mr. Liebowitz is granted leave (but not required) to file a supplemental letter, not to exceed three pages, addressing the question of whether sanctions should be imposed in light of any new information in the aforementioned declarations.  Defense counsel is granted leave (but not required) to file a letter, not to exceed three pages, responding to the declarations and any supplemental letter no later than **February 5, 2020**.

       SO ORDERED.

Dated: January 24, 2020
     New York, New York

                                   JESSE M. FURMAN
                              United States District Judge

# Exhibit W

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARTHUR USHERSON,

                              Plaintiff,                    Docket No. 1:19-cv-06368-JMF

       - against -

BANDSHELL ARTIST MANAGEMENT

                              Defendant.

## AFFIDAVIT OF ARTHUR USHERSON

       I, ARTHUR USHERSON, declare under the penalty of perjury that the following is true

and correct to the best of my personal knowledge.

       1.      I am the plaintiff in this action.

       2.      I submit this Declaration in response to the Court's Order, dated January 24, 2020

[Dkt. #59], the pertinent portion which reads:

> Mr. Usherson shall also file a declaration . . . specifying (1) whether, as of the date
> this lawsuit was filed, he was aware that the Photograph had not been registered; (2)
> what, if any, information he provided to Mr. Liebowitz, Mr. Freeman, or any other
> attorney from the Liebowitz Law Firm about the registration of the Photograph and
> the date(s) on which he provided such information; and (3) what role, if any, he
> played in connection with Registration 272, including but not limited to the decision
> to seek registration and the actual filing of the registration.

**The 046 Registration**

       3.      On August 2, 2011, I personally applied to the U.S. Copyright Office ("USCO")

for protection of my photographs which included several photographs I took of musicians Bob

Dylan and Leon Redbone at the Mariposa Folk Festival on July 16, 1972 (the "Mariposa Festival"). The Copyright Office assigned the registration number VAu001080046 (the "046 Registration"). Attached as <u>Exhibit A</u> is a true and correct of the 046 Registration, as maintained by the USCO's website.

4.      Specifically, twelve photographs on deposit with the 046 Registration depicted Bob Dylan at the Mariposa Festival. [*bearing JPG content titles*: #0082, #0083, #0215, #0216, #0217, #0218, #0416, #0436, #0437, #0438, #0439; #0440] Of those twelve photographs, five of them depicted Bob Dylan walking or standing with Leon Redbone. [*bearing JPG content titles*: #0082, #0083, #0438, #0439; #0440] (the "Dylan / Redbone Photos"). Attached as <u>Exhibit B</u> are true and correct copies of the Dylan / Redbone Photos that are on deposit with the 046 Registration.

**<u>Transmission of 046 Registration Materials to Liebowitz Law Firm</u>**

5.      On January 24, 2019, I engaged Richard Liebowitz of Liebowitz Law Firm, PLLC ("LLF") to be my copyright enforcement attorney. Shortly thereafter, I was informed that Zachary Cuff of LLF would serve as my "research analyst" to help me with issues pertaining to copyright registrations and searches for on-line infringements.

6.      On February 1, 2019, I e-mailed Donna Halperin, LLF's Director of Client Relations, and Mr. Cuff several screenshots of infringements that I had found on-line by googling "1972 Mariposa Folk Festival Toronto". Attached as <u>Exhibit C</u> is a true and correct copy of the 2/1/19 e-mail I transmitted to LLF.

7.      On February 6, 2019, I e-mailed Ms. Halperin and Mr. Cuff another screenshot from Facebook of a third-party infringement that I had found involving the identical photograph

at issue in this case.  Attached as <u>Exhibit D</u> is a true and correct copy of the 2/6/19 e-mail I transmitted to LLF.

8.      On February 7, 2019, Mr. Cuff responded to my 2/6/19 e-mail, asking me whether the screenshot I sent him on 2/6/19 included a photograph that was registered and whether I could send him the registration number.  I responded back to Mr. Cuff the same day, indicating that the photograph was registered and that I would send him a disk containing all the photographs that I had already registered. Attached as <u>Exhibit E</u> is a true and correct copy of the 2/7/19 e-mail chain between myself and Mr. Cuff.

9.      On or about February 11, 2019, I mailed Mr. Cuff a CD-Rom labeled *Copyright Registered Images #0001-#2,093* ("CD1").  CD1 contained all of the JPEG images that were registered with the Copyright Office in connection with the 046 Registration. I transmitted CD1 to LLF so that Mr. Cuff could search for more infringements on my behalf. Attached as <u>Exhibit F</u> is a true and correct copy of the label for CD1 which I transmitted to LLF.

<u>**My Discovery of Defendant's Infringement and Authorization to File a Lawsuit**</u>

10.      On or about June 5, 2019, I discovered the on-line infringement by Defendant Bandshell Artist Management ("Defendant") of a photograph which depicted Bob Dylan standing with Leon Redbone at the Mariposa Festival (the "Photograph").  I immediately sent a screenshot of the Defendant's infringing website (the "Infringing Screenshot"), which is attached as Exhibit B to the Complaint [Dkt. #1-2] to Richard Liebowitz and Zachary Cuff.  Attached as <u>Exhibit G</u> is a true and correct copy of the 6/5/2019 e-mail I transmitted to LLF which attached a copy of the Infringing Screenshot.

11.     At the time I transmitted the Infringing Screenshot to LLF, I believed that the
Infringing Screenshot included a cropped version of one of the Dylan / Redbone Photos on file
with the 046 Registration.

12.     On or about July 8, 2019, I authorized Mr. Liebowitz to file a copyright
infringement action against Defendant for unauthorized use of the Photograph, identifying the
046 Registration.

13.     At the time the lawsuit was filed on July 10, 2019, I believed that the Photograph
identified in Exhibit A of the Complaint was on deposit with the 046 Registration.  I assumed
that the Photograph which Defendant posted without my authorization was a part of the 046
Registration because it was one of a series of a photographs I took of Dylan and Redbone at the
Mariposa Folk Festival on July 16, 1972.  Defendant's use of the Photograph was also cropped,
which I believe led to some confusion between similar photographs.

**The 272 Registration**

14.     After learning of Defendant's infringement, and realizing that the Dylan /
Redbone Photos were being targeted for infringement, I searched my personal archives and
compiled some additional images from the Mariposa Festival and placed them on a CD-Rom in
JPEG format.  My intent in compiling these additional images was for LLF to register them with
the USCO.

15.     Sometime after July 10, 2019, I mailed Mr. Cuff a second CD-Rom, entitled *Bob
Dylan at Mariposa Folk Festival, July 16, 1972,* which contained thirty additional photographs
taken by me at the Mariposa Festival.  ("CD2"). Attached as Exhibit H is a true and correct copy
of the label for CD2 which I transmitted to Mr. Cuff at LLF.

16.     Before or during the pendency of this action, I did not provide any information pertaining to copyright registrations directly to Mr. Liebowitz, Mr. Freeman[1] or any other attorney at LLF. Instead, all my communications and transmissions concerning registration issues were sent to Zachary Cuff, who was the assigned research analyst at LLF, and in some cases to Ms. Halperin.

17.     On August 22, 2019, LLF applied for a copyright registration on my behalf for the thirty photographs contained on CD2.  The USCO assigned registration number VAu 1-373-272 to these photographs, with effective date of August 22, 2019 (the "272 Registration").  Attached as Exhibit I is a true and correct copy of the 272 Registration, as maintained by the USCO website.

18.     Although I did not play a direct role in the application process for the 272 Registration, which was handled by LLF, I provided CD2 to Mr. Cuff with the intent that the images contained on CD2 would be registered by LLF with the USCO.

19.     I did not realize that the Photograph at issue in this action was not on deposit with the 046 Registration - but was instead on deposit with the 272 Registration - until preparing this declaration in response to the Court's most recent Order.

20.     In retrospect, it is fundamental to see how there was administrative confusion regarding the Photograph, with respect to being on deposit with the 046 Registration, because it was very similar to other photos of the identical subject matter that were in fact on deposit with

---

[1]  I did not have any contact with Mr. Freeman until the evening of October 30, 2019, when he was copied on an e-mail sent to me by Mr. Liebowitz regarding the next day's mediation.

046 Registration.  *See* Exhibit B attached hereto.  The confusion was compounded by the fact

that Defendant used a cropped version of the Photograph.

21.     Ultimately, I am the true and rightful author and owner of the Photograph, which

is currently on deposit with the USCO.

Dated:          February __, 2020
                Roswell, GA


                                                    _____

                                                    ARTHUR USHERSON




_____
Notary

046 Registration. *See* Exhibit B attached hereto. The confusion was compounded by the fact

that Defendant used a cropped version of the Photograph.

21.    Ultimately, I am the true and rightful author and owner of the Photograph, which

is currently on deposit with the USCO.

Dated:        February 17, 2020
              Roswell, GA

ARTHUR USHERSON

Notary

LILIANA C GARCIA
NOTARY PUBLIC
Fulton County
State of Georgia
My Comm. Expires Sept. 18, 2022

--------- Forwarded message ---------

From: **Arthur Usherson** <artphotovideo@mindspring.com>

Date: Thu, Feb 6, 2020 at 12:51 PM

Subject: Notary -Signatures

To: Richard Liebowitz <RL@liebowitzlawfirm.com>, Donna Halperin

<dh@liebowitzlawfirm.com>, Christopher Melbourne

<cm@liebowitzlawfirm.com>

OK?



# Exhibit X

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARTHUR USHERSON,

Plaintiff,

- against -

BANDSHELL ARTIST MANAGEMENT

Defendant.

---

Docket No. 1:19-cv-06368-JMF

## DECLARATION OF RICHARD LIEBOWITZ

I, RICHARD LIEBOWITZ, declare under the penalty of perjury that the following is true

and correct to the best of my personal knowledge.

1.       I am lead counsel for Plaintiff Arthur Usherson ("Plaintiff") in this action.

2.       I am the founding member of Liebowitz Law Firm, PLLC ("LLF").

3.       I submit this Declaration in response to the Court's Order, dated January 24, 2020

[Dkt. #59], the pertinent portion which reads:

> Mr. Liebowitz shall file a declaration, sworn under penalty of perjury, specifying: (1) the
> nature and cause of the "administrative mistake" or "clerical error" to which he refers in
> his January 17, 2020 letter, including who was responsible for the mistake or error; (2)
> the factual basis for his inclusion of the allegation set forth in Paragraph 9 of the
> Complaint and the source of that factual basis, including a detailed description of any
> investigation into the matter that he conducted prior to the filing of the Complaint; (3)
> what role, if any, he played in the filing of the application for Registration 272, when and
> by whom that application was filed, and why the decision to obtain that registration was
> made (including but not limited to whether it was made due to a realization that the
> Photograph had not been registered); (4) when Mr. Liebowitz became aware that the
> Photograph was not registered under Registration 046, how he learned of that fact, and
> whether Mr. Liebowitz knew on November 14, 2019 (the date of the initial pretrial

conference in this matter) that the Photograph had been registered after this lawsuit was commenced; and (5) why Mr. Liebowitz failed to advise the Court and defense counsel that Paragraph 9 of the Complaint was inaccurate until his January 17, 2020 letter.

**Nature of Administrative Mistake**

4.      In February 2019, Plaintiff informed a member of my administrative staff, Zachary Cuff, who was responsible for tracking information about Mr. Usherson's photographs, that the photograph at issue in this action (the "Photograph") was on deposit with the 046 Registration [Declaration of Arthur Usherson, ¶ 8, Ex. E]

5.      In reliance on Mr. Usherson's representation, Mr. Cuff recorded the Photograph in LLF's internal case-tracking system as being associated with the 046 Registration.

6.      I conclude that the mix-up was caused by confusing similarities between the visual elements of photographs taken on the same day, by the same photographer, with the same camera equipment, using similar tone and lighting, and depicting identical subject matter (i.e., Dylan and Redbone).  Attached as Exhibit A is a demonstrative exhibit showing that Mr. Usherson's photographs which are on deposit with the 046 Registration, when viewed in cropped format, are remarkably similar to the Photograph on deposit with the 272 Registration.

7.      It appears that the initial mistake was made by Mr. Usherson, who represented to Mr. Cuff on February 7, 2019 that the Photograph was on deposit with the 046 Registration. [Declaration of Arthur Usherson, ¶ 8, Ex. E]

8.      After Mr. Usherson sent Mr. Cuff and me evidence of the Defendant's infringement, on June 5, 2019  [Declaration of Arthur Usherson, ¶ 10, Ex. G], Mr. Cuff recorded the infringement into LLF's internal case-tracking database.  It appears that Mr. Cuff relied on Mr. Usherson's representation concerning the Photograph because Mr. Cuff recorded the

Photograph into LLF's internal database as being associated with the 046 Registration. Thus, I
believe that Mr. Cuff made the same mistake as Mr. Usherson, visually associating the
Photograph with similar images that were on deposit with the 046 Registration.

9.      Mr. Cuff had the ability as of June 2019 to double-check whether the Photograph
was part of images that were included on a CD-Rom that Mr. Usherson had previously sent to
Mr. Cuff in February 2019. [Declaration of Arthur Usherson, ¶ 9, Ex. F]. I don't know whether
Mr. Cuff made an attempt to verify or not, but the mistake was not corrected at the time Mr. Cuff
entered the case into LLF's system on June 5, 2019.

**Factual Basis for Paragraph 9 of the Complaint**

10.     By the time I went to draft and file the complaint on July 10, 2019, the
Photograph remained associated with the 046 Registration in LLF's internal case-tracking
system, as recorded by Mr. Cuff on June 5, 2019.

11.     Other than viewing LLF's internal case-tracking system, which indicated that the
Photograph was on deposit with the 046 Registration, I did not conduct any further investigation
before filing the Complaint. Mr. Cuff was a long-term employee of LLF whose work I trusted
and I reasonably relied on the information that was available in LLF's case-tracking system.

12.     Further, it appears that Mr. Cuff relied on the February 2019 representation
provided by Mr. Usherson. Thus, the factual basis for paragraph 9 was provided by Mr.
Usherson, in the first instance, and then by Mr. Cuff, upon whom I relied as a trusted employee
of LLF.

**272 Registration**

13.     I did not play any role in the filing of the application for 272 Registration.  The application was filed by LLF's internal staff at the request of Mr. Cuff, who had received a CD-Rom of additional images from Mr. Usherson.

14.     At some point after the Complaint was filed in July 2019, Mr. Usherson requested that those additional images be filed with the Copyright Office and we honored that request as it is LLF's ordinary practice to register photographs on behalf of its clients.  The decision to deposit the Photograph in August 2019 as part of the 272 Registration was not made due to any realization that the Photograph had not been previously registered.

**Discovery of Administrative Mistake**

15.     I did not realize that an administrative error had been made concerning the 046 Registration until subsequent to the January 8, 2020 hearing when, in response to the Court's order, I was required to file a letter to address the registration issue raised by Mr. Newberg at the 1/8/20 Hearing.

16.     I learned of the administrative error by reviewing LLF's case-tracking system, reviewing the deposit copy provided by opposing counsel, and reviewing LLF's transmissions with Mr. Usherson concerning the Photograph at issue.

17.     As of November 14, 2019, the date of the initial pretrial conference in this matter, I was not aware of the administrative error concerning the 046 registration and believed in good faith that the Photograph had been registered as part of the 046 Registration.  I did not know that the Photograph was registered in August 2019 as part of the 272 Registration.

**Paragraph 9 of the Complaint**

18.     I did not notify the Court or defense counsel about the technical pleading

deficiency in Paragraph 9 of the Complaint until my January 17, 2020 letter because I did not

know a pleading deficiency existed until after the January 8, 2020 hearing.

19.     Furthermore, this case was dismissed with prejudice on December 20, 2019 [Dkt.

# 48] so there would have been no reason to seek leave of Court to amend a pleading in a case

that was already dismissed.

Dated:          February 6, 2020
                Valley Stream, New York


                                        **/s/richardliebowitz/**
                                        Richard Liebowitz
                                        Liebowitz Law Firm, PLLC
                                        11 Sunrise Plaza, Suite 305
                                        Valleystream, NY 11580
                                        516-233-1660
                                        RL@LiebowitzLawFirm.com

                                        *Attorneys for Plaintiff*

# Exhibit Y

# EXHIBIT A

## 272 Registration

[Cropped Version of Infringed Photograph on Deposit]




**#13**

## 046 Registration

[Cropped Versions of similar photographs on Deposit]



**#0439**



**#0082**



**#0483**

**#0440**

**#0083**

# Exhibit Z

1

K18VUSHH

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  ARTHUR USHERSON,

4              Plaintiff,

5         v.                          19 CV 6368 (JMF)

6  BANDSHELL ARTIST MANAGEMENT,

7              Defendant.             HEARING

8  ------------------------------x
                                     New York, N.Y.
9                                    January 8, 2020
                                     9:30 a.m.
10
   Before:
11
                    HON. JESSE M. FURMAN,
12
                                     District Judge
13
                         APPEARANCES
14
   LIEBOWITZ LAW FIRM
15      Attorneys for Plaintiff
   BY:  RICHARD LIEBOWITZ
16
   LIEBOWITZ LAW FIRM
17      Attorney for Richard Liebowitz
   BY:  JAMES FREEMAN
18
   McGUIRE WOODS
19      Attorneys for Defendant
   BY:  BRAD R. NEWBERG
20      STEPHEN FORESTA

21

22

23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

K18VUSHH

1           (Case called)

2           THE DEPUTY CLERK:  Counsel, please state your name for

3    the record.

4           MR. FREEMAN:  Yes.  James Freeman, on behalf of

5    Richard Liebowitz and the Liebowitz Law Firm.

6           MR. LIEBOWITZ:  Good morning, your Honor.

7           Richard Liebowitz, Liebowitz Law Firm.  Good morning.

8           THE COURT:  Good morning.

9           MR. NEWBERG:  Brad Newberg of McGuire Woods.

10          MR. FORESTA:  Good morning, your Honor.

11          Stephen Foresta, also from McGuire Woods, on behalf of

12    defendant.

13          THE COURT:  Good morning as well.

14          And I assume the mediator, whose name I'm not going to

15    use on the record, is here?

16          THE MEDIATOR:  ███████████.

17          THE COURT:  Okay.  Well, you used your own name.

18          All right.  As I said in my order, my plan is to hear

19    from Mr. Liebowitz first, then from Mr. Newberg, and then from

20    the mediator.

21          A couple things to note at the outset:

22          One, as I've made clear, as far as I'm concerned, the

23    hearing is limited to the two issues that I've flagged, namely,

24    whether Mr. Liebowitz obtained advanced permission to send

25    associates from his firm instead of himself to the mediation;

K18VUSHH

1    and whether he obtained advanced permission to have his client

2    participate by telephone, and the veracity of his

3    representations with respect to those issues.

4         I don't intend to allow any inquiry with respect to

5    the substance of the mediation itself.  As far as I'm

6    concerned, that remains within the scope of the confidentiality

7    of mediations generally.

8         Number two.  As I've just indicated, I don't see any

9    reason that the mediator's name needs to be part of the public

10   record.  To the extent that he identified himself a moment ago,

11   I'll have that redacted from the transcript of today's

12   proceeding.  But I would ask you refrain from using his name

13   and just refer to him as "the mediator" so that it's not part

14   of the public record.

15        With that, as I said, my plan is to have Mr. Liebowitz

16   testify first, Mr. Newberg, and then the mediator.  I would

17   think that the mediator should not be in the courtroom for the

18   testimony of those first two witnesses.  I'm open to your views

19   on whether Mr. Newberg should be here for the testimony of

20   Mr. Liebowitz.  But I would think he should or can, as

21   essentially a party or representative of the party in these

22   proceedings, but certainly open to hearing your thoughts on

23   that and anything else that you want to raise.

24        So, first, does anyone disagree that the mediator

25   should not be present?  I'd be inclined to let him go sit in

K18VUSHH

1    the jury room until his presence is needed.

2              MR. FREEMAN:  Yes, your Honor.

3              For the Liebowitz Law Firm, James Freeman.

4              We would respectfully request that the mediator excuse

5    himself during the cross-examination of counsel.

6              THE COURT:  All right.  Hold on one second.

7              I'll have my deputy just let him sit in the jury room

8    so that he's comfortable until we need to call him.

9              (Pause)

10             THE COURT:  All right.  Go ahead.

11             MR. FREEMAN:  We also have a brief application that

12   we'd like to make to the Court regarding the scope of evidence

13   to be presented at the hearing.  It shouldn't take more than 30

14   seconds.

15             So in our letter of December 16th to the Court, we

16   noted that there was an existing custom and practice of the

17   mediator granting Mr. Liebowitz permission for his clients to

18   appear telephonically in five separate cases that took place

19   between June of 2019 to September 2019.

20             We believe this evidence establishes a custom and

21   practice that's relevant on two independent grounds, the first

22   being that it would establish or help, at least, explain or

23   inform why there's a discrepancy between the mediator's sworn

24   declaration and Mr. Liebowitz's sworn decoration.  If the

25   mediator did grant Mr. Liebowitz, on five separate occasions

K18VUSHH

1    recently, permission for his clients to appear telephonically,

2    then it could well be that the mediator simply forgot that he

3    did so in this case, because he had routinely granted such

4    permission.  Perhaps it didn't register in his consciousness.

5              THE COURT:  Is the application to permit inquiry

6    into --

7              MR. FREEMAN:  The application is to present evidence

8    of and to ask the mediator, as well, about these five

9    proceedings.

10             THE COURT:  That's totally fine with me.  I think

11   that's within the scope of the two issues that --

12             MR. FREEMAN:  Okay.  Great.

13             THE COURT:  -- the hearing pertains to.

14             MR. FREEMAN:  Thank you, your Honor.

15             THE COURT:  Obviously we're not going to get into the

16   substance of any --

17             MR. FREEMAN:  No, just whether or not permission was

18   granted.

19             THE COURT:  All right.

20             Mr. Newberg, anything from your end?

21             MR. NEWBERG:  No, your Honor.  Thank you.

22             THE COURT:  All right.

23             And with respect to Mr. Newberg's presence, any issues

24   there?

25             MR. FREEMAN:  No issue, your Honor.

K18VUSHH

1          THE COURT:  Okay.

2          MR. NEWBERG:  Well, obviously I'd like to be heard.

3     But my understanding from the order is that, in part, I appear

4     to cross-examine Mr. Liebowitz; so it would be a good call for

5     me to do that.

6          THE COURT:  That's a good point.

7          Well, in any event, since there is no objection, you

8     will remain regardless.

9          All right.  Mr. Liebowitz, if you could please

10    approach the stand, and my deputy will administer the oath to

11    you in a moment.

12    RICHARD LIEBOWITZ,

13         called as a witness on his own behalf,

14         having been duly sworn, testified as follows:

15         THE COURT:  All right.  You may be seated.

16         MR. FREEMAN:  Just for clarification, Mr. Liebowitz's

17    direct testimony is already in the record.  So we would like to

18    examine at this point the custom and practice evidence.

19         So we'd like to -- with the Court's permission, to

20    approach the witness with Exhibit A, which is the docket sheet

21    and complaint in the matter of *Emerson v. Telepicture*

22    *Productions.*

23         THE COURT:  I was intending to proceed directly to

24    cross, but I suppose, to the extent that we have expanded the

25    scope to include those others, that's fine.  I'll allow it.

K18VUSHH                    Liebowitz – direct

1          MR. FREEMAN:  Thank you, your Honor.

2          May I proceed, your Honor?

3          THE COURT:  You may.  But why don't you use the podium

4     over there.

5          MR. FREEMAN:  Okay.

6     DIRECT EXAMINATION

7     BY MR. FREEMAN:

8     Q.  Good morning, Mr. Liebowitz.

9     A.  Good morning.

10    Q.  Do you recognize the docket sheet in the matter of *Emerson*

11    *v. Telepicture Productions*?

12    A.  Yes.

13    Q.  And were you the lead counsel of record in that case?

14    A.  Yes.

15    Q.  And was the assigned mediator in this action also the

16    assigned mediator in the *Emerson* action?

17    A.  Yes.

18    Q.  And was there a mediation held on July 22nd, 2019?

19    A.  Yes.

20    Q.  And according to paragraph 5 of the complaint, Mr. Emerson,

21    the plaintiff in that action, was located in New Orleans,

22    Louisiana?

23    A.  Yes.

24    Q.  And did the mediator grant you permission for Mr. Emerson

25    to participate by telephone?

K18VUSHH                      Liebowitz - direct

1    A.  Yes.

2    Q.  And was this grant of permission in writing?

3    A.  No.

4    Q.  And was the mediation successful?

5    A.  Yes.

6           MR. FREEMAN:  Your Honor, I'd like permission to

7    approach the witness to introduce Exhibit B.

8           THE COURT:  All right.  I don't think your questions

9    require the exhibits, so why don't you just --

10          MR. FREEMAN:  Okay.  Fine.  That makes it easier.

11          THE COURT:  And also just watch the form of your

12   questions, please; they should be open-ended, not leading.

13          MR. FREEMAN:  Okay.  Fair enough.

14   BY MR. FREEMAN:

15   Q.  In the matter of *Mottram v. Onion, Inc.*, Mr. Liebowitz,

16   what was your role in that case?

17   A.  Lead counsel.

18   Q.  And who was the assigned mediator in that case?

19   A.  The same mediator in this case.

20   Q.  And was there a mediation held in that proceeding?

21   A.  Yes.

22   Q.  And do you recall when it was?

23   A.  I don't recall the exact date, but --

24   Q.  If I represent that it was July 24th, 2019, would that be

25   accurate?

K18VUSHH                          Liebowitz - direct

1    A.  If that's the date, then that's the date, yes.

2    Q.  And was Mr. Mottram, the plaintiff in that action, located

3    outside the court -- 100 miles outside the courthouse?

4    A.  Yes, he was located more than 100 miles outside the

5    courthouse.

6    Q.  Did you attempt to obtain permission from the mediator for

7    Mr. Mottram, the plaintiff in that action, to appear

8    telephonically?

9    A.  Yes.  I spoke to the mediator orally, and he granted

10   permission for the plaintiff to appear telephonically.

11   Q.  And do you recall whether that mediation was successful?

12   A.  Yes, it was successful.

13   Q.  Okay.  I'd like to turn the Court's attention to the matter

14   of *McGovern v. Q Digital, Inc.*

15             Mr. Liebowitz, do you recall what capacity you served

16   in in that litigation?

17   A.  Yes, I was lead counsel.

18   Q.  And do you recall who the mediator was?

19   A.  Yes, the same mediator as this case.

20   Q.  Was the mediation held on September 25th, 2019?

21   A.  Yes.  If that was the date, yes.

22   Q.  And do you recall where Mr. McGovern was located?

23   A.  Yes.  He was located in Florida, more than 100 miles away

24   from the courthouse.

25   Q.  And do you recall whether you obtained permission from the

1   mediator?

2   A.  Yes, it was done orally.

3   Q.  And was that mediation successful?

4   A.  Yes.

5   Q.  Thank you.

6           I'd like to turn the Court's attention to the matter

7   of *Pereira v. Source Digital*.

8           THE COURT:  Can I just make this a little more

9   efficient?  In *Pereira* and *Sadowski*, the last two cases

10  referenced in your letter, was it the same mediator as in this

11  case?

12          THE WITNESS:  Yes.

13          THE COURT:  Were you lead counsel in both of those

14  cases?

15          THE WITNESS:  Yes.

16          THE COURT:  And did you obtain permission from the

17  mediator for your client to participate by telephone?

18          THE WITNESS:  Yes.

19          THE COURT:  Was that in writing?

20          THE WITNESS:  No.

21          THE COURT:  In both cases it was oral?

22          THE WITNESS:  It was oral.

23          THE COURT:  Okay.  Any other questions?

24  BY MR. FREEMAN:

25  Q.  Also, just one last question.  In *Sadowski v. Seeking*

K18VUSHH                    Liebowitz – cross

1    *Alpha*, did you obtain permission for your associate to appear

2    in your stead?

3    A.  Yes.

4    Q.  And was there any objection by the mediator to that?

5    A.  No objection.

6            MR. FREEMAN:  Thank you, your Honor.

7            No further questions.

8            THE COURT:  All right.  Cross-examination.

9            MR. NEWBERG:  Good morning, your Honor.

10   CROSS-EXAMINATION

11   BY MR. NEWBERG:

12   Q.  Good morning, Mr. Liebowitz.

13   A.  Good morning.

14   Q.  Mr. Liebowitz, I'm going to start with Mr. Freeman's direct

15   here.  *Sadowski*, that's the case *Sadowski v. Seeking Alpha*,

16   *Inc*. that you were talking about?

17   A.  Yes.

18   Q.  And, in fact, you mentioned in your letter to the Court

19   that you cite as a case of yours that this mediator had granted

20   you permission for your client to appear telephonically;

21   correct?

22   A.  Yes.

23   Q.  Is that the full truth?

24   A.  Yes.

25   Q.  Isn't it the case that in *Sadowski*, it was actually your

K18VUSHH                          Liebowitz – cross

1   opponent who wanted his client to be able to appear

2   telephonically for the mediation because it was located far

3   away in Israel?

4   A.  Yes.

5   Q.  And isn't it true that on May 1st, 2019, just two months

6   before you filed this case, they were forced to make a letter

7   motion to this Court because they asked for your consent to

8   have their client appear telephonically, and you refused,

9   stating in an email to them that the rules of the mediation

10  office require parties to appear in person?

11  A.  Yes, they -- however, in the mediation rules --

12          THE COURT:  Yes or no is fine.  Go ahead.

13          MR. NEWBERG:  If I can approach the witness to give

14  him a copy of the letter motion in *Sadowski*.

15          THE COURT:  You may.

16  Q.  Mr. Liebowitz, do you have this May 1st, 2019 letter motion

17  in the *Sadowski* case in front of you?

18  A.  Yes.

19  Q.  And do you recognize that as a letter motion that was filed

20  in that case?

21  A.  Yes.

22  Q.  And where they say, Plaintiff's counsel emailed us

23  yesterday saying he will not agree to a telephonic appearance,

24  contending that the rules of the mediation office requires

25  parties to appear in person, is that an email -- is that an

K18VUSHH                    Liebowitz - cross

1    accurate representation?  Did you send that email?

2    A.  Could you repeat that?

3    Q.  Is it an accurate representation that you emailed the

4    defendant in that case saying you would not agree to a

5    telephonic appearance, contending that the rules of the

6    mediation office requires parties to appear in person for a

7    mediation?

8    A.  Well, they needed to get the mediator's permission to

9    allow --

10            THE COURT:  Mr. Liebowitz, it's a yes-or-no question.

11   Is that an accurate representation of the email?

12            THE WITNESS:  Yes, it's accurate, because I wasn't the

13   mediator.  They needed to get the mediator's permission, and

14   the mediator granted it because the client --

15            THE COURT:  Mr. Liebowitz, it's a simple question.  Is

16   that an accurate --

17            THE WITNESS:  Yes, that's accurate.

18            THE COURT:  Wait till I've asked my question so that

19   we are not talking over each other.

20            Is that an accurate representation of an email that

21   you sent to defendant's counsel in that case?

22            THE WITNESS:  Yes.

23            THE COURT:  Okay.

24            And for the record, this is docket number 21 in the 18

25   CV 9193 docket.

K18VUSHH                    Liebowitz – cross

1    BY MR. NEWBERG:

2    Q.  And why did you refuse consent in that case, Mr. Liebowitz?

3              MR. FREEMAN:  Objection, your Honor.

4              That question was already asked and answered.

5              THE COURT:  I don't think it was asked and answered,

6    but sustained as irrelevant.  Go ahead.

7              MR. NEWBERG:  If I may approach the witness to give

8    him a copy of the email that he sent to defendant's counsel in

9    that case.

10             THE COURT:  You may.

11             This does not come from the docket, I take it.

12             MR. NEWBERG:  That's right.

13             THE COURT:  Why don't we mark this as Defense Exhibit

14   1, is that --

15             MR. NEWBERG:  Yes, please.

16             THE COURT:  All right.  Go ahead.

17   BY MR. NEWBERG:

18   Q.  Mr. Liebowitz, you've just been handed Defense Exhibit 1.

19   I will represent that this was sent to me by defendant's

20   counsel in *Sadowski*, who redacted the mediator's name.  That

21   redaction is not for me.

22             Do you recognize this email that you sent to

23   defendant's counsel in *Sadowski*?

24   A.  Yes.

25   Q.  And where you state, We will not agree to client to appear

K18VUSHH                    Liebowitz - cross

1    via telephone, the rules of the mediation office requires

2    parties to appear.  We can work around their schedules, but

3    they need to appear.  Is that what you wrote to --

4    A.  Yes.

5    Q.  -- defendant's counsel?

6            Is that a yes?

7    A.  Yes.

8    Q.  So just a couple of months prior to filing this case, you'd

9    made the claim in *Sadowski* that not only would permission be

10   needed, that you cannot give permission, and you could not

11   consent, and that clients were required to attend mediation.

12   A.  Yeah, they can't get permission from me, but they could get

13   permission from the mediator, which is what the rules say.

14   Q.  You didn't say that in your email though; is that correct?

15   A.  But opposing counsel just has to look at the mediator's

16   rules and could have contacted the mediator to get permission

17   to have his client appear telephonically.  And that's what they

18   did.  And the mediator -- the same mediator in this case --

19   granted his client to appear telephonically.  And since the

20   rules say that only the mediator could grant permission for his

21   or her client to appear telephonically, that was fine.  He did

22   not need to get my permission, just the mediator's.

23   Q.  You didn't tell him though, Go get the mediator's

24   permission, you just said the rules require your clients to

25   appear in person; correct?

K18VUSHH                    Liebowitz - cross

1    A.  Well, the rules say that you could have the mediator -- you

2    could ask the mediator permission for his or her client to

3    appear telephonically.

4              THE COURT:  Mr. Liebowitz, again, I'm going to ask you

5    to listen to the question.  The question is you didn't say

6    anything about those rules in this email.

7              THE WITNESS:  No, I didn't say that.  I didn't say

8    anything in there.

9              THE COURT:  Thank you.

10   Q.  Now, Mr. Liebowitz, your response to this motion claimed

11   you're quite familiar with the mediation rules of this Court;

12   correct?

13   A.  Yes, I'm familiar.

14   Q.  And you attached some of the rules as an exhibit to your

15   response, right?

16   A.  Yes.

17             MR. NEWBERG:  May I hand the witness --

18             THE COURT:  You have may.

19             Since it's a hearing, we don't necessarily need to be

20   quite as formal, but I assume you move to admit Defense Exhibit

21   1.

22             MR. NEWBERG:  Yes, your Honor.  I'm sorry, when can

23   you mentioned Defense Exhibit 1, I had assumed it was admitted.

24   But you're correct, I should have said, I move to admit Defense

25   Exhibit 1.

1              THE COURT:  All right.  It is admitted.

2              Anything that's already on the docket I'll deem part

3    of the record.  And, for that matter, anything that's docketed

4    in another case, I also can take judicial notice of.

5              So go ahead.

6              (Defendant's Exhibit 1 received in evidence)

7              MR. NEWBERG:  Thank you, your Honor.

8              I'm not sure that I have anything that's not already

9    part of the record.

10   BY MR. NEWBERG:

11   Q.  So, Mr. Liebowitz, I want you to turn to the same page you

12   cite in your response, page 7.  And do you see Section 9(c),

13   where it states that lead counsel must attend the mediation?

14   A.  9(c) says:  Each represented party must be accompanied at

15   mediation by the lawyer who will be primarily responsible for

16   handling the trial of the matter.

17   Q.  And in this case that was you; correct?

18   A.  No.  I -- I have an associate that handles trials for me.

19   Q.  Mr. Liebowitz, was anyone but you admitted in this case to

20   represent plaintiff?

21   A.  At what time?

22   Q.  At any time.

23   A.  Well, I -- I was counsel of record at the time of the

24   mediation.  But I have associate that handles trial matters for

25   me, that take over for trial matters.

K18VUSHH                         Liebowitz – cross

1   Q.  At the time that the mediation was scheduled, was anyone

2   admitted to this case on behalf of plaintiff other than you?

3   A.  At the time I was only the counsel of record.  However --

4           THE COURT:  Just yes or no.

5           Was anyone else admitted at the time of the mediation?

6           THE WITNESS:  No.  If you mean admitted --

7           THE COURT:  Mr. Liebowitz, has anyone other than you

8   entered a notice of appearance in this case on the docket?

9           THE WITNESS:  Oh, no.

10  Q.  And that goes right up to the date of settlement; correct?

11  You were the only person who had filed a notice of appearance

12  who had appeared for the plaintiff in this case?

13  A.  Yes, I was the only counsel of record.

14          THE COURT:  In fact, to this date you are the only

15  counsel who has entered a notice of appearance on the docket in

16  this case; correct?

17          THE WITNESS:  Yes.

18          THE COURT:  And at the conference held on November

19  14th, you entered a notice of appearance on behalf of

20  Mr. Usherson.  Mr. Freeman appeared and made clear that he was

21  appearing on your behalf only, and not on behalf of

22  Mr. Usherson; correct?

23          THE WITNESS:  Yes.

24  BY MR. NEWBERG:

25  Q.  Are you aware of any section in these rules that allow lead

K18VUSHH                    Liebowitz – cross

1    counsel to not attend mediation?

2    A.   Well, from 9(c), when it says, Each represented party must

3    be accompanied at mediation by the lawyer who will be primarily

4    responsible for handling the trial of this matter, Mr. Freeman

5    would have handled the trial of the matter.

6    Q.   So Mr. Freeman, who had not entered an appearance, and

7    never entered an appearance in this case on behalf of

8    plaintiff, was going to be trial counsel?

9    A.   Yes.

10            THE COURT:  All right.

11            And Mr. Freeman didn't appear at the initial

12   conference in this case, did he?

13            THE WITNESS:  No, I don't believe so.

14            THE COURT:  All right.

15            And you have presumably read my initial conference

16   orders at this point?

17            THE WITNESS:  I believe so.

18            THE COURT:  And are you aware that one of the

19   provisions in that order states that, absent leave of Court

20   obtained by letter motion filed before the conference, all

21   pretrial conferences must be attended by the attorney who will

22   serve as principal trial counsel?

23            THE WITNESS:  Yes, I understand that.

24            But oftentimes during cases with my opposing –– with

25   my colleague, we often sometimes switch on who's going to be

K18VUSHH                        Liebowitz - cross

1    trial counsel and who's going to be, you know, lead.  That

2    often happens.

3            THE COURT:  Prior to the initial conference in this

4    case, did you file any letter motion requesting permission for

5    Mr. Freeman to --

6            THE WITNESS:  No.

7            THE COURT:  Or, sorry, excuse me, for you to appear,

8    even though your testimony today is that you were not intending

9    to be a principal trial counsel, did you file a letter motion

10   to that effect?

11           THE WITNESS:  No, I -- no, because it wasn't trial

12   yet.

13           THE COURT:  Go ahead.

14           THE WITNESS:  If and when there would be a trial --

15   BY MR. NEWBERG:

16   Q.  Let's use your term of "trial counsel."  Are you aware of

17   any section in these rules that allow trial counsel to not

18   attend the mediation?

19   A.  I didn't read the whole thing, but from -- I don't

20   believe -- I don't believe so.

21   Q.  And are you aware of any rules that allow trial counsel or

22   lead counsel to ask for permission to not attend the mediation?

23   A.  Could you say that question again?

24   Q.  Are you aware of anything in the rules that would allow --

25   that says trial counsel or lead counsel may ask for permission

K18VUSHH                        Liebowitz - cross

1  to not attend a mediation?

2  A.  I don't think it is in the rules, but from the custom and

3  practice of working with the mediator in this case, and

4  previously granting my colleague James Freeman to appear in my

5  behalf, there was no issue.

6  Q.  But in answering the question, you're unaware of any rule

7  that would allow it?

8           THE COURT:  Just yes or no.

9  A.  I don't believe so.

10 Q.  When precisely did you ask the mediator for permission for

11 you to not attend the October 31st mediation?

12 A.  October 30th.

13 Q.  October 30th.  That's the date you're giving today, October

14 30th?

15 A.  Yeah, October 30th.  It was -- yes.

16 Q.  Did you tell the mediator why you would not be able to

17 attend?

18 A.  This is what I told the mediator:  I told the mediator on

19 October 30th that the parties have reached a settlement in

20 principle.  The parties reached an agreement on the number; and

21 that the parties were then just negotiating nonmonetary terms.

22          I then told the mediator if my client, the plaintiff,

23 can appear telephonically, because he lives in Georgia, and

24 since we were just negotiating the nonmonetary terms of the

25 agreement, the mediator said yes, that the plaintiff could

K18VUSHH                          Liebowitz - cross

1   appear telephonically.

2            I then asked the mediator if my colleague James

3   Freeman could appear instead of me.  He said yes.  And he's

4   done this on -- in terms of having James Freeman appear on my

5   behalf, he's granted that on one other occasion, and he had

6   granted the plaintiffs or my clients in other matters five

7   other times.

8   Q.  When on October 30th did you ask this permission?

9   A.  It was in the early evening.

10           THE COURT:  Is that early evening Eastern time?

11           THE WITNESS:  It was about -- I think it was somewhere

12   around 8 or 7, 7:30.  It was -- it was, I believe, after the

13   time that we had an agreement on the number, the settlement

14   number in the case.  And then that's when you -- when you sent

15   me or the mediator over the settlement agreement.  And I needed

16   to review the terms of --

17           THE COURT:  Mr. Liebowitz, the question was just

18   whether it was Eastern time or California time.  What time was

19   this --

20           THE WITNESS:  Yeah, it was about, I would say, 7:30, 8

21   o'clock Eastern.

22           THE COURT:  Okay.  And where were you at that time?

23           THE WITNESS:  I was in California.

24           THE COURT:  Were you speaking on your cell phone or

25   landline?

1          THE WITNESS:  No, I was speaking on my cell phone.

2          THE COURT:  And did you speak to Mr. Freeman in

3     advance of that call about appearing at the mediation or after

4     call?

5          THE WITNESS:  Well, he knew that I was having the --

6     that this was scheduled for the next day; and that he was

7     prepared to participate in the mediation in good faith.  I was

8     even going to have my sister, who's newly admitted to the bar,

9     also come shadow James at the mediation.

10          And the next day, Mr. Freeman and Ms. Liebowitz came

11     prepared in person --

12          THE COURT:  All right.  That's enough.  Getting beyond

13     the question.

14          And how long was the conversation with the mediator?

15          THE WITNESS:  It was short.

16          THE COURT:  And did you call him or he called you?

17          THE WITNESS:  No, I believe I called him.

18          THE COURT:  Go ahead.

19     BY MR. NEWBERG:

20     Q.  Mr. Liebowitz, are you testifying that you informed the

21     mediator that the parties had had an agreement on the number,

22     and that's why you should be allowed not to go to the

23     mediation?

24     A.  Well, it was -- it was -- just like in previous mediations,

25     I asked the mediator -- you know, the same mediator in this

K18VUSHH                    Liebowitz - cross

1    case -- if the plaintiff could appear telephonically, because

2    he lives in Georgia, more than 100 miles away.  And the costs

3    of traveling all the way to New York would have eaten into a

4    large portion of the settlement number.  And out of judicial,

5    you know, economy and trying to protect my client, you know,

6    from the expense of traveling, the parties agreed on a number.

7            And I asked the mediator, since we had a settlement in

8    principle and we were just negotiating the nonmonetary terms,

9    that, you know, we could get this, you know, done either in the

10   morning or at the mediation; and that there will be no issues,

11   just like in the previous five cases.

12           In the previous five cases, there were no issues at

13   all.  The client appeared telephonically, either I appeared or

14   Mr. Freeman appeared in the other cases.  And we reached an

15   agreement in most of those, and the parties were happy and

16   moved on.

17           THE COURT:  Did you explain all of what you just

18   described to the mediator, that in order to reduce costs

19   because you had an agreement in principle, you wanted --

20           THE WITNESS:  Yeah, well -- yeah, exactly.  I mean,

21   that's -- you know, that's --

22           THE COURT:  Yes or no?

23           THE WITNESS:  Yes.

24           THE COURT:  Did you explain that was --

25           THE WITNESS:  Yes.

K18VUSHH                    Liebowitz - cross

1          THE COURT:  -- your reason -- again, wait for me to
2    finish my question.
3          Did you explain that that was your reason for
4    requesting permission for the client to appear by telephone?
5          THE WITNESS:  Yes.
6          THE COURT:  And did you reference the other five cases
7    involving the same mediator in which that permission had been
8    granted?  In the conversation with the mediator, did you make
9    reference to it?
10         THE WITNESS:  Oh, no, I mean, I didn't mention it.
11   But he -- he knows me, he knows that I had --
12         THE COURT:  Just answer the question.
13         The answer is no.  Okay.
14         Mr. Newberg.
15   BY MR. NEWBERG:
16   Q.  Yes.  I'm going to ask you to answer just the question I'm
17   asking, Mr. Liebowitz.
18         You're aware that day that the mediator is the one who
19   was emailing the parties trying to facilitate a settlement the
20   day before the mediation; correct?
21   A.  Yeah, the mediator facilitated settlement by emailing the
22   counsel, yes.
23   Q.  And when do you believe it was that the parties supposedly
24   had an agreement in principle on a number?
25   A.  It was the night before.  That's when -- that's when you,

K18VUSHH                         Liebowitz - cross

1   Mr. Newberg, sent the settlement agreement over to, I believe,

2   me and the mediator by email with the settlement agreement.

3   Q.   Your answer is October 30th, the night before the mediation

4   on October 30th?

5   A.   Yes.

6   Q.   So as of that time, you were already in Los Angeles;

7   correct?

8   A.   Yeah, I was in California, yes.

9   Q.   So you knew before any supposed agreement on the number,

10  that you would be in Los Angeles and not able to attend the

11  mediation; correct?

12  A.   No, I mean, that's not necessarily true.  I mean, I would

13  have came back.  I mean -- and this is a standard -- very

14  standard for the mediator.  I had a relationship with this

15  mediator --

16            THE COURT:  Mr. Liebowitz, just answer the question.

17            You knew at the time that you were going to be in Los

18  Angeles.

19            THE WITNESS:  Yeah, well, I was going to be in Los

20  Angeles the day before.

21            THE COURT:  When did you make the plan to go to Los

22  Angeles?

23            THE WITNESS:  That I don't know.

24            THE COURT:  When did you go to Los Angeles?

25            THE WITNESS:  I don't know the exact date, but I could

K18VUSHH                    Liebowitz – cross

1   tell you that on October 30th I was in Los Angeles.

2               THE COURT:  All right.

3               Am I correct that you appeared at U.S.C. on October

4   26th?

5               THE WITNESS:  Yes.

6               THE COURT:  And that's in California?

7               THE WITNESS:  Yes, that's in California.

8               THE COURT:  Were you in California from October 26th

9   through October 30th?

10              THE WITNESS:  Yes, at least.

11              THE COURT:  And at any point during your

12  communications with the mediator, did you mention that you were

13  in California?

14              THE WITNESS:  I mentioned that on October 30th, that I

15  was in California; and that we had an agreement, settlement in

16  principle.

17              THE COURT:  Just answer the question.

18              THE WITNESS:  Okay.

19              THE COURT:  So your testimony is that on October 30th,

20  you advised the mediator that you were in California?

21              THE WITNESS:  Yes, I was in California.

22              THE COURT:  Okay.

23              And at any point did you tell Mr. Newberg prior to the

24  mediation that you were in California?

25              THE WITNESS:  No, but I was --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K18VUSHH                          Liebowitz - cross

1              THE COURT:  Just answer the question.

2              THE WITNESS:  No.

3              THE COURT:  All right.

4              And when you scheduled the mediation in this case, did

5     you know that you were going to be out of town?

6              THE WITNESS:  I knew I was going to be out of town at

7     least until the -- my speaking engagement at U.S.C.

8              THE COURT:  Okay.  So you did not know -- your

9     testimony is that when you scheduled the mediation, you did not

10    know you would be out of town on the date of the mediation?

11             THE WITNESS:  Well, no.  Well, I would have came back

12    for the mediation if -- if the parties either didn't have a

13    settlement in principle or -- or the mediator did not allow

14    Mr. Freeman to appear in my behalf.  But, yeah.

15             THE COURT:  And did you have a return ticket to come

16    back from Los Angeles?

17             THE WITNESS:  No, I didn't have a return ticket.

18             THE COURT:  Your testimony is that if you didn't have

19    an agreement on October 30th and you didn't obtain the

20    mediator's permission at 7:30, that you would have immediately

21    gotten on a plane and come back to appear the next day?

22             THE WITNESS:  Yeah.  And also I had -- I had a

23    relationship with this mediator.  He routinely granted --

24             THE COURT:  That's not my question.

25             My question is, is it your testimony that if one or

K18VUSHH                          Liebowitz - cross

1   both of those things had not happened, you would have gotten on

2   a plane --

3          THE WITNESS:  I would have came back.

4          THE COURT:  Okay.

5          And that is true even though your testimony is that

6   Mr. Freeman was the lawyer who would be primarily responsible

7   for handling the trial in this matter?

8          THE WITNESS:  Yeah.  But that -- again, that I asked

9   the mediator permission for Mr. Freeman to appear on my behalf,

10  so I did not have to come back.

11         THE COURT:  And did you advise the mediator that

12  Mr. Freeman would be the lawyer who would be primarily

13  responsible for handling trial?

14         THE WITNESS:  I just told him that my colleague,

15  Mr. Freeman, was going to appear on my behalf.

16         THE COURT:  Just yes or no, did you tell him that he

17  was the lawyer who was primarily responsible for handling

18  trial?

19         THE WITNESS:  I don't -- I don't believe so, but --

20         THE COURT:  And did you ever tell Mr. Newberg that?

21         THE WITNESS:  I don't believe so.

22  BY MR. NEWBERG:

23  Q.  Mr. Liebowitz, when was your marketing event in Los

24  Angeles?

25         MR. FREEMAN:  Objection, your Honor, on grounds of

K18VUSHH                    Liebowitz - cross

1   relevance.

2              THE COURT:  I think I'll allow it to see where it

3   goes.  Go ahead.

4   Q.  When was your marketing event in Los Angeles?

5   A.  It wasn't a marketing event; it was a -- simply it was a

6   networking event for photographers in California whereby

7   photographers can network and meet one another.  And I was

8   hosting.

9   Q.  And you hosted this networking event, as you've just said;

10  correct?

11  A.  Yes, I hosted it.

12  Q.  And you hosted it on the night of October 30th, did you

13  not?

14  A.  Yes, I did.

15  Q.  So when was this networking event that you hosted set up?

16  A.  I don't know the exact date, but I know it was prior,

17  obviously prior to October 30th.

18  Q.  Was it prior to October?

19  A.  Possibly.

20  Q.  You don't know whether you set up a networking event that

21  you hosted prior to October?

22  A.  Yeah, I don't know the exact date that I set it up.

23  Q.  And you just testified to the Court that if we didn't have

24  a settlement in principle the night of October 30th, that you

25  were prepared to get on a plane that night and fly to New York

K18VUSHH                         Liebowitz - cross

1   for the mediation; is that correct?

2   A.   Yes, if that -- if I had to do that, then I had to do it.

3   But as I stated previously, I have a custom and practice with

4   this mediator --

5             THE COURT:   Mr. Liebowitz, just answer the question

6   please.   I don't want to remind you again.

7             The question was, Was that your testimony?

8             The answer is yes.

9             Next question.

10  Q.   How old is Mr. Usherson?

11  A.   I don't know.

12  Q.   Approximately?

13  A.   I honestly do not know.

14  Q.   Older than 70?

15  A.   I don't know.

16  Q.   You don't know if he's older than 70?

17  A.   I don't know.

18  Q.   You're aware the photograph he supposedly took in this case

19  was taken approximately 50 years ago; correct?

20  A.   Yes.

21  Q.   You say you asked for permission for Mr. Usherson to attend

22  telephonically around 7:30 or 8 p.m. the night before the

23  mediation; correct?

24  A.   Yes.

25  Q.   Do you know if Mr. Usherson, did he have a plane ticket to

K18VUSHH                    Liebowitz - cross

1    come to the mediation?

2    A.  I am not sure.  But if he didn't, he would have jumped on a

3    plane that next morning or that evening and would have came to

4    the mediation.  I mean, this is -- there's no issues; you could

5    always get plane tickets fairly quickly.

6    Q.  So you were expecting that if you didn't get a settlement

7    in principle and permission, that you would have your elderly

8    client try to get plane tickets late in the night before the

9    mediation to get to the mediation the next morning; is that

10   correct gentlemen?

11              MR. FREEMAN:  Objection, your Honor.

12              Calls for speculation as to the age of plaintiff -- of

13   the plaintiff.

14              THE COURT:  Overruled.

15   A.  I don't -- what's the big deal?  I mean, people fly all the

16   time.  It doesn't matter someone's age.

17   Q.  How much involvement did Mr. Freeman have in this case

18   before the October 31st mediation?

19   A.  Yeah, I spoke -- I spoke to him on numerous occasions.

20   Q.  You spoke to him numerous occasions about this case prior

21   to the October 31st --

22   A.  Yes, in my office.

23   Q.  And when was the -- when was the first time, do you

24   remember?

25   A.  I don't know the exact date.

K18VUSHH                          Liebowitz - cross

1    Q.  Was it before October -- it was before you got --

2    supposedly got permission for him to attend around 7:30 or 8

3    o'clock on the night of October 30th?

4    A.  Yes, I spoke to him about it.  And that evening, after I

5    got the permission from the mediator for Mr. Freeman to appear

6    on my behalf, we discussed it in detail, and he was prepared to

7    appear at the mediation and have a good-faith mediation with

8    you, Mr. Newberg, and your client, and would have simply hashed

9    out the nonmonetary terms and probably would have --

10   Q.  Mr. Liebowitz --

11   A.  -- for a very short period of time.

12   Q.  I want you to answer the question I'm asking here.

13          You just testified that you had spoke to Mr. Freeman

14   numerous times about this case before October 30th; correct?

15   A.  Yes, I did.

16   Q.  Okay.  And what did you speak to Mr. Freeman about this

17   case before October 30th?

18   A.  I talked to him about the facts of the case.  This is a

19   pretty simple case; there's not that much to talk about.

20   Q.  And what kind of work, if any, did he do on this case prior

21   to October 31st?

22   A.  He reviewed the case, the complaint.  You know, I can't

23   speculate to what Mr. Freeman reviewed; all I could say is that

24   I spoke to him about it.  And then after I got the mediator's

25   permission for Mr. Freeman to appear on my behalf, I spoke to

K18VUSHH                         Liebowitz - cross

1    Mr. Freeman about it, and he was fully abreast of what was

2    happening; that the parties have agreed to a number in

3    principle; and that we were just hashing out the nonmonetary

4    terms.

5    Q.  But in terms of your -- these various communications before

6    October 30th with Mr. Freeman about the case, do you recall

7    about how many there were?

8    A.  Oh, that I don't know.

9    Q.  But he reviewed the various papers in this case up until

10   that point?

11   A.  Yeah, that's --

12           THE COURT:  In the conversation with Mr. Freeman after

13   your phone call with the mediator, first of all, that

14   conversation was by telephone, I assume?

15           THE WITNESS:  Telephone with who?

16           THE COURT:  With Mr. Freeman.

17           THE WITNESS:  Yes.

18           THE COURT:  And were you using your cell phone?

19           THE WITNESS:  I believe so.

20           THE COURT:  And did you advise him that the mediator

21   had granted permission for him to appear in your place?

22           THE WITNESS:  Yes, like what happened in *Sadowski v.*

23   *Seeking Alpha*.

24           THE COURT:  That's not my question.

25           Did you advise him that the mediator had granted

1   permission for him to appear in your place?

2            THE WITNESS:  Yes.

3            THE COURT:  And did you advise him that the mediator

4   had granted permission for Mr. Usherson to participate by

5   telephone?

6            THE WITNESS:  Yes.

7            MR. NEWBERG:  May I proceed, your Honor?

8            THE COURT:  You may.

9   BY MR. NEWBERG:

10  Q.  So you've now testified, I believe, three times in the last

11  couple of minutes about Mr. Freeman's involvement, review of

12  papers, etc., before October 30th.

13           I want to read you the declaration of James Freeman,

14  which was attached to your response papers in this case.

15           Paragraph 4, Mr. Freeman says:  I was informed as to

16  the existence of this matter at about 8 p.m. on October 30,

17  2019.  Do you wish to change your testimony?

18  A.  No, I mean, listen, Mr. Freeman and I have conversations in

19  my office all the time.  I mean, it is just --

20  Q.  Mr. Liebowitz, you said he reviewed papers in this case; he

21  was aware of the instances of the case; you had multiple

22  conversations, he reviewed multiple things before October 30th.

23  Do you wish to change that testimony?

24  A.  Again, I can't speculate to what Mr. Freeman did.

25  Q.  By the way, if Mr. Freeman was intended to be trial counsel

K18VUSHH                    Liebowitz - cross

1     all along, why did you have to ask for permission?

2     A.   I got permission so that -- I wanted to double -- double --

3     you know, just cover myself and make sure that the mediator was

4     on notice that Mr. Freeman was going to appear on my behalf.  I

5     have to do due diligence as a lawyer of this Court.  And I

6     asked the mediator if Mr. Freeman could appear on my behalf,

7     and he said yes.

8              THE COURT:  But the question is it's your testimony

9     and your position that Mr. Freeman was the lawyer primarily

10    responsible for handling trial in this matter; correct?

11             THE WITNESS:  Yes, just like in other cases.

12             THE COURT:  So it's your testimony and position that

13    Mr. Freeman was, in fact, the person required by Rule 9(c) of

14    the mediation rules to appear in person at the mediation; is

15    that correct?

16             THE WITNESS:  Yes.

17             THE COURT:  So the question is given that, why did you

18    seek the mediator's permission for him to appear, if, under the

19    rules, in your view, he was required to be the lawyer to

20    appear?  Do you understand?

21             THE WITNESS:  I believe I understand the question.

22             Yeah, I just wanted to tell the mediator, out of

23    respect for him, that Mr. Freeman was going to appear on, you

24    know, my behalf.  And he said, Yes, that's fine.

25             THE COURT:  But you didn't tell him in that

K18VUSHH                         Liebowitz - cross

1    conversation that Mr. Freeman was actually the lawyer primarily

2    responsible for trial in this matter and therefore --

3                 THE WITNESS:  No, I don't believe so.

4                 THE COURT:  Okay.

5    BY MR. NEWBERG:

6    Q.  Did you ever ask me or any attorney for defendant for any

7    sort of consent for you not to be there?

8    A.  I didn't hear the question.

9    Q.  Did you ever ask me or any other attorney for defendant for

10   consent for you not to be there?

11   A.  No, I didn't.  And the reason for that is because the rules

12   do say that if I got the mediator's permission for the

13   plaintiff, for the client, to appear telephonically, it doesn't

14   say anything in the rules that say that you need to let

15   opposing counsel know.

16                 However, I do understand that it is best practice to

17   notify opposing counsel to -- that, you know, who's going to

18   appear, whether the mediator -- whether the client will appear

19   in person.  I understand that.

20                 And I know it didn't happen in this case, but I did

21   let the mediator know, and I did get permission from the

22   mediator.  And I'm sorry that I didn't let you know, but I did

23   let the mediator know, and he said yes.

24                 THE COURT:  And your testimony is that you advised

25   Mr. Freeman that the mediator had granted you permission to

K18VUSHH                          Liebowitz - cross

1    send him and for Mr. Usherson to appear by telephone?

2              THE WITNESS:  Did you say if I let Mr. Freeman know?

3              THE COURT:  Yes.

4              THE WITNESS:  Yes, I let Mr. Freeman know.

5              THE COURT:  Both of those facts, that the mediator had

6    granted you permission --

7              THE WITNESS:  Yes.

8              THE COURT:  -- for him to appear --

9              THE WITNESS:  Yes.

10             THE COURT:  -- and for Mr. Usherson to appear by

11   telephone?

12             THE WITNESS:  Telephone, yes.

13             THE COURT:  Okay.

14        And do you know that Mr. Freeman represented to me in

15   the November 14th conference that he had no knowledge one way

16   or the other as to what clearances were made in terms of

17   telephonic appearances?  Do you know that?

18             THE WITNESS:  Okay.  Well, listen, I mean, people

19   forget things.

20             THE COURT:  So your testimony is that his

21   representation was erroneous, was wrong.

22             THE WITNESS:  Yeah.  I mean, listen, at the end of the

23   day, people forget things, you know?  And, you know, all I know

24   is that I told the mediator that --

25             THE COURT:  My question is, is it your testimony that

K18VUSHH                    Liebowitz - cross

1    Mr. Freeman is forgetting or that you're perhaps for getting?

2              THE WITNESS:  Listen, I had a conversation with

3    Mr. Freeman the night before, and discussed about the case.

4    What was discussed on the phone call, I'm not -- my testimony

5    is that we did discuss that.  You know, whether or not, you

6    know, one of us is forgetting or lacking memory of what

7    happened, all I know is that on the night before, on the 30th,

8    I did speak with the mediator.  He granted my client to appear

9    telephonically.

10             THE COURT:  All right.  I got that.

11             THE WITNESS:  And I did ask the mediator whether -- if

12   Mr. Freeman could appear in my behalf, and he said yes.

13             THE COURT:  Did you take any notes of that call?

14             THE WITNESS:  I didn't take any notes.

15             THE COURT:  Did you make a record of the call after

16   the call?

17             THE WITNESS:  No.

18             THE COURT:  Did you send any emails regarding the

19   call?

20             THE WITNESS:  I don't believe so.

21             THE COURT:  All right.

22             Did you text anyone or send any --

23             THE WITNESS:  No, I don't believe so.

24             THE COURT:  You didn't make any written communication

25   with Mr. Freeman or otherwise about the mediator's conversation

K18VUSHH                          Liebowitz - cross

1   with him.

2              THE WITNESS:  No, no record.  I just had a phone call

3   with the mediator and spoke with Mr. Freeman.  And that's --

4   that's what happened.

5              THE COURT:  Did you tell your sister that you'd have

6   the call with the mediator?

7              THE WITNESS:  No, I don't believe I spoke with my

8   sister.  But my sister is newly admitted; she was going to come

9   shadow Mr. Freeman.

10             THE COURT:  All right.  I got that.

11             And did you communicate with Mr. Usherson on October

12  30th?

13             THE WITNESS:  I believe so.

14             THE COURT:  At what time?

15             THE WITNESS:  I don't know the exact time.

16             THE COURT:  Did you speak with him after your

17  conversation with the mediator?

18             THE WITNESS:  Yeah, I believe that I -- I believe that

19  we spoke regarding, you know, the settlement number and, you

20  know, about hashing out the nonmonetary terms.  I believe that

21  happened.  I'm not sure of the exact date.

22             THE COURT:  Okay.

23             Did you advise Mr. Usherson that he had been granted

24  permission to appear by telephone?

25             THE WITNESS:  Well, if he -- if he -- if he didn't

K18VUSHH                          Liebowitz - cross

1    have to appear in person, then -- then I would have just called

2    him that day and know that he's always around and --

3              THE COURT:  Did you tell him that he needed to be

4    available?

5              THE WITNESS:  Well, I told him that -- yeah, I told

6    him that he had to be prepared for the mediation if the

7    settlement didn't go through, and --

8              THE COURT:  And how did you leave things with the

9    mediator in your October 30th call?  Did you indicate that you

10   would call him back, that you would -- in other words, your

11   testimony is that you had reached a settlement in principle at

12   least on the monetary terms.  How did you leave things with

13   respect to --

14             THE WITNESS:  Yeah.  So simply what happened was I

15   told the mediator that I would get back to him on the

16   nonmonetary terms.

17             THE COURT:  That night?

18             THE WITNESS:  That night or that morning.  And I did

19   send back a redline with some revisions to the agreement.

20             THE COURT:  You sent back to the mediator?

21             THE WITNESS:  I believe the mediator or to

22   Mr. Newberg.

23             THE COURT:  Was there a plan to have a further

24   conversation with the mediator?

25             THE WITNESS:  Well, it was assumed that the next day

K18VUSHH                    Liebowitz - cross

1   at the mediation, that the parties will just hash out the

2   nonmonetary terms, if it wasn't agreeable.  There were very few

3   revisions.  And, you know, that's that.

4          THE COURT:  Okay.  Mr. Newberg.

5          MR. NEWBERG:  Just to follow up on a couple of your

6   questions, your Honor, and then I'll move on.

7   BY MR. NEWBERG:

8   Q.  Just to clarify in one single question, there is nothing in

9   writing confirming you received these permissions from the

10  mediator; that is correct?

11  A.  No, nothing in writing.

12  Q.  I'm sorry?

13  A.  Nothing in writing.

14         MR. NEWBERG:  And your Honor asked about Mr. Freeman's

15  recollection at the last conference.

16  Q.  Did you review Mr. Freeman's declaration before it was

17  filed in this case?

18  A.  No, I didn't review the declaration.

19  Q.  You didn't review the declaration --

20  A.  No, that's his testimony.  I mean, his recollection and my

21  recollection, often people forget things in this world.  And,

22  you know, lack of memory, you know, sometimes happens.  It

23  happens to all of us.  And --

24         THE COURT:  All right.  You signed the opposition

25  memorandum of law in opposition to defendant's sanctions;

1    correct?

2            THE WITNESS:  I believe so.

3            THE COURT:  And that cites and quotes from

4    Mr. Freeman's declaration; correct?

5            THE WITNESS:  I believe so.

6            THE COURT:  Did you prepare that opposition?

7            THE WITNESS:  I must have.  I mean, I don't know what

8    I saw, you know --

9            THE COURT:  But your testimony is that you did not

10   review Mr. Freeman's declaration before it was filed, and yet

11   you cite it in the memorandum that you filed that same day.

12           THE WITNESS:  Yeah.  I mean, I could have signed it,

13   but I -- I, you know, left the declaration -- you know, his

14   declaration alone.

15           THE COURT:  Who prepared the opposition papers?

16           THE WITNESS:  It was Mr. Freeman and I.

17           THE COURT:  And did you review them before they were

18   signed?

19           THE WITNESS:  I reviewed the opposition, his

20   declaration.  I just assumed, you know, was his -- his

21   testimony and --

22           THE COURT:  Where it cites his declaration, did you

23   look at the declaration to confirm that the citations were

24   accurate?

25           THE WITNESS:  I'm not sure.  Again, Mr. Freeman often

K18VUSHH                          Liebowitz - cross

1   prepares things for me, and that's that.  I do often review

2   things, and do, you know, review what my colleague does.  And

3   declarations -- if that's what his declaration was, then that's

4   it.

5             THE COURT:  Okay.

6   BY MR. NEWBERG:

7   Q.  So getting back to just one more question on Mr. Freeman's

8   declaration, you've seen it since; correct?

9   A.  Say again?

10  Q.  Have you seen his sworn declaration?

11  A.  His declaration, I believe so.

12  Q.  Are you aware of anything in that which he signed,

13  presumably after time to think about it, where he mentions

14  anything about being aware that you got these permissions?

15  A.  All I know is that I got the --

16  Q.  It's a yes-or-no question.

17  A.  What was the question?

18  Q.  The question is are you aware of anything in Mr. Freeman's

19  declaration where he says or suggests that he was aware that

20  you got these permissions?

21  A.  I'm not aware.  I don't have the declaration in front of

22  me.  I don't know.

23  Q.  You didn't submit a declaration of Mr. Usherson in these

24  response papers; correct?

25  A.  I don't believe so.

1   Q.   Why not?

2   A.   The matter was between counsel and -- between counsel and

3   the Court.  I mean, I just don't think that getting a client

4   involved is necessary.

5   Q.   The Court asked you and I've asked you various questions

6   today about your communications with Mr. Usherson and when you

7   made him aware.  So you didn't think to have had the

8   declaration for Mr. Usherson backing up your story?

9   A.   I just don't think it's necessary.  I mean, I said what I

10  said and that's it.

11  Q.   So you stated a few times today, a number of times, that

12  this conversation with the mediator where you got these

13  permissions was October 30th; correct?

14  A.   Yes, 30th.

15  Q.   And I'll just ask a question.  Why did you wait till

16  October 30th to get these permissions?

17  A.   Again, it's custom and practice.  The parties reached a

18  settlement in principle on the number.

19  Q.   So is it your testimony that you only asked for these

20  permissions because you thought the parties had reached a

21  settlement in principle on the number?

22  A.   No, not at all.  The client lives 100 miles away in

23  Georgia.  And according to the mediation rules, you could ask

24  the mediator for permission for the client to appear

25  telephonically, and that's what I did.

K18VUSHH                          Liebowitz - cross

1   Q.  Why wait until the night of the -- the eve of the mediation
2   to do this?
3   A.  I understand that it's not best practice to do that, but I
4   had a custom and practice with this mediator that in five times
5   prior, he's granted my client's permission to appear
6   telephonically.  And just like in those cases, I assumed that
7   there would be no issue this time.  And there was no issue,
8   because he granted permission for my client to appear
9   telephonically and for Mr. Freeman to appear on my behalf.
10  Q.  So you were so confident in this practice, that you waited
11  until 7:30 or 8 o'clock the night before the mediation, while
12  you were in Los Angeles and your client was in Georgia with no
13  plans, flights, whatsoever, to get back to New York for the
14  next morning?
15  A.  Yeah.  I mean, what's the issue with that?  I mean, I think
16  that, you know, justice system, you want to try to save costs
17  and minimize costs.  And I'm trying to have the best interest
18  of my client to save cost and --
19  Q.  And you couldn't have done that by asking for permission
20  weeks earlier?
21  A.  Yeah, that could have been done, and I understand that was
22  not best practice.  But I had a custom and practice with this
23  mediator, as I said, all along, that he's granted my clients in
24  the past permission to appear telephonically, and in one other
25  occasion to have Mr. Freeman appear on my behalf.

K18VUSHH                        Liebowitz - cross

1   Q.  So October 30th, you've testified quite a number of times.

2           Do you remember you told this Court in open court just

3   a few days after the mediation, that you couldn't remember when

4   you asked permission?

5   A.  Yeah, I couldn't, because at the time I didn't remember.

6   Q.  So you're saying now that you couldn't remember that it was

7   the night before the mediation, but you do now, two months

8   later?

9   A.  Yeah.

10  Q.  You didn't put this October 30th date anywhere in your

11  response papers; correct?

12  A.  What do you mean by "response papers"?

13  Q.  In your declaration.  You don't say in your declaration, do

14  you, that you got permission on October 30th?

15  A.  I don't know.  I have to read my response papers.

16  Q.  I'm sorry, did you just say you didn't read --

17  A.  No, I need to review the response papers.  I don't remember

18  sitting here today.

19  Q.  Do you believe you put this October 30th date into your

20  declaration?

21  A.  I honestly don't know.  If I did, I did.  If I didn't, then

22  I didn't.

23  Q.  What about the brief, did you put in the brief at all that

24  you got this permission on October 30th?

25  A.  I don't know, sitting here today.

K18VUSHH                          Liebowitz - cross

1          THE COURT:  All right.  Mr. Liebowitz, I'm going to

2     hand you docket number 22 from this case, which is your

3     declaration in this case.  I'll give you a moment to review it,

4     and then I'll follow up after.

5          (Pause)

6          THE COURT:  Anywhere in that declaration do you state

7     that the conversation in which the mediator granted you

8     permission?

9          THE WITNESS:  On line 13.  I say, Prior to October

10    31st, 2019.

11         THE COURT:  Anywhere in that declaration do you state

12    that that conversation took place the night before the --

13         THE WITNESS:  No.

14         THE COURT:  Thank you.

15    BY MR. NEWBERG:

16    Q.  Do you state in that declaration anywhere that the

17    permission occurred on October 30th, night, day?

18    A.  No.  All it said was "prior," which is all that's

19    necessary.

20    Q.  You didn't feel it was necessary to give this Court --

21    which asked you for a specific date -- a specific date?

22    A.  I don't recall if the Court asked for a specific date

23    and -- my declaration is accurate.

24    Q.  So you're saying when you signed this declaration, you knew

25    the specific date, October 30th, but you chose not to put it in

K18VUSHH                        Liebowitz – cross

1    your declaration and just write "prior to the mediation"?

2    A.  Yeah, that's accurate.  October 30th is prior to October

3    31st.

4            THE COURT:  And you appeared in front of me on

5    November 14th; correct?

6            THE WITNESS:  November 14th, I believe so.

7            THE COURT:  All right.

8            And that was two weeks after the mediation.

9            THE WITNESS:  Two weeks after.

10           THE COURT:  And two weeks and a day after the

11   conversation with the mediator that you're describing now.

12           THE WITNESS:  Yes.

13           THE COURT:  And at the time did you say to me in

14   response to my question when did you advise the mediator that

15   Mr. Usherson was not going to appear in person, did you answer,

16   "I don't know the exact date"?

17           THE WITNESS:  Yeah, I didn't know the exact date at

18   the time.

19           THE COURT:  So what refreshed your recollection

20   between November 14th and today?

21           THE WITNESS:  Because I -- I went back in my emails

22   and I saw the emails between the mediator, and I saw that it

23   was October 30th.

24           THE COURT:  And which emails exactly?

25           THE WITNESS:  They were just emails with the -- with

50

K18VUSHH                          Liebowitz - cross

1    the mediator.  I think one of them said, Talked to Richard and

2    he will get back to us in the morning, something along those

3    lines.  And on that -- that was October 30th.

4              THE COURT:  I assume you read the defendant's motion

5    for sanctions that was filed on November 6th; is that correct?

6              THE WITNESS:  I don't know the exact date when it was

7    filed.

8              THE COURT:  Did you read the motion before you

9    appeared for the conference on November 14th?

10             THE WITNESS:  I believe so.

11             THE COURT:  Okay.  We discussed the substance of the

12   motion at that conference; correct?

13             THE WITNESS:  I believe so.  I often forget things, so

14   I -- it's possible.

15             THE COURT:  Okay.  Did you look at Mr. Newberg's

16   declaration that he filed in support of the motion?

17             THE WITNESS:  I must have.  But --

18             THE COURT:  Did you look at the attachments to the

19   declaration?

20             THE WITNESS:  I must have.

21             THE COURT:  And the emails that you just referenced,

22   they are attached to the declaration, aren't they?

23             THE WITNESS:  They must be.

24             THE COURT:  So at the time of the conference on

25   November 14th, even though you reviewed those emails, you

K18VUSHH                         Liebowitz - cross

1   didn't remember the exact date of your conversation.  But

2   today, having reviewed those same emails, you do.  That's your

3   testimony?

4              THE WITNESS:  Yeah.  Now I know, because I looked at

5   the emails and it refreshed my memory.

6   BY MR. NEWBERG:

7   Q.  Mr. Liebowitz, I'm going to be blunt.  This isn't like it's

8   a random date months before, I can't remember September 7th or

9   September 8th.  We're talking about the night before the

10  mediation.

11             MR. FREEMAN:  Objection, your Honor.  He's just making

12  a statement, not asking a question.

13             THE COURT:  Overruled.

14  A.  Yeah.  I mean, I want to make sure that my statements are

15  accurate to the Court.  And if I don't know the exact date, and

16  I don't know the exact date.  But all I know was prior to

17  October 31st, and I did speak with the mediator on October

18  30th, which is prior to October 31st.

19  Q.  And so your testimony today is that, I remember now.  It

20  was the night right before the mediation, but I just couldn't

21  remember it for the last couple of months?

22  A.  Yeah, I mean I -- I -- now I know it was October 30th; and

23  that was the date that I spoke with the mediator; and that was

24  the date that he granted me permission for my client to appear

25  telephonically and for Mr. Freeman to appear on my behalf.

K18VUSHH                          Liebowitz - cross

1   Q.  Putting aside the date of October 30th, that specific, you

2   know, a number.  When the Court asked you in open court when

3   did you receive this permission, you didn't remember it was --

4   oh, it was right before, it was the night before the mediation.

5   You didn't remember that?

6   A.  Yeah, well, I went back to my email after the hearing.  And

7   I don't know the exact date, but I got -- I got permission from

8   the mediator prior to October 31st.  And it's accurate.  And

9   that's true.  I had a telephone call with the mediator on

10  October 30th.

11  Q.  Do you recall -- going back a little bit here.

12          Do you recall on October 4th, 2019, after attempting

13  to get permission for a telephonic mediation, the mediation

14  office wrote the parties to state this was not in accordance

15  with procedures given mediation in this Court?

16  A.  Yeah, I do remember getting some email from the mediation

17  office.

18  Q.  And do you recall they wrote that any permission to deviate

19  from mediation rules in this case would have to come from the

20  Court?

21  A.  Yes, I believe so.

22  Q.  I'm going to hand you --

23          MR. NEWBERG:  This is already in the record as Exhibit

24  3 to my declaration, your Honor.

25  Q.  It's an October 4th string of emails.  And Mr. Liebowitz,

K18VUSHH                    Liebowitz - cross

1   you recognize this string of emails?

2   A.  Yes, I recognize.

3   Q.  And do you recognize them being the emails where the

4   mediation office said that telephonic sessions would not be in

5   accordance with the procedures that govern this program; and

6   that you should seek appropriate relief directly from the

7   judge?

8   A.  Yes.  Telephonically meaning -- my interpretation of that

9   meant that -- that the -- yeah, I mean, the reason for this is

10  because I wanted to make sure to, you know -- you know, to have

11  the mediation before the initial conference, you know.  And I

12  thought that this would, you know, be a way to have -- a way to

13  try to resolve the matter before the initial conference.  And I

14  thought it would be successful for all of us to have a

15  telephonic mediation, and that's why I requested it.

16  Q.  But you understood at this point that the mediation office

17  was telling you that if you wanted relief from the rules, your

18  client to attend in person or lead counsel not to attend, any

19  relief from the rules would have to come from the Court?

20          THE COURT:  Yes or no.

21  A.  If that's what the email says, then that's what it says.

22  Q.  Did you understand that?

23  A.  Yes, I understand.

24  Q.  I'm going to hand you a letter that you filed with this

25  Court requesting telephonic mediation.

K18VUSHH                      Liebowitz - cross

1          THE COURT:  Docket number 12.

2     Q.  Yes, docket number 12.

3          Is this a letter you wrote the Court asking for

4     permission to have a telephonic mediation?

5     A.  Yes, this is my letter.

6     Q.  Now, in that request, you never asked for you not to have

7     to attend as lead counsel; correct?

8     A.  No.

9     Q.  You simply asked for the conference to be held via

10    telephone, right?

11    A.  Yes.

12    Q.  In fact, you asked that if the mediation could not be

13    telephonic, that more time be given to hold an in-person

14    mediation; correct?

15    A.  Repeat the question.

16    Q.  You asked that if the mediation could not be telephonic,

17    that more time be given to hold an in-person mediation;

18    correct?

19    A.  Yeah.  If that's what I said, then that's what I said.

20         THE COURT:  Now, this was submitted to me on October

21    4th; is that correct?

22         THE WITNESS:  Yes, October 4th.

23         THE COURT:  And the initial conference at that point

24    was scheduled for October 10th; correct?

25         THE WITNESS:  Yes.

K18VUSHH                           Liebowitz - cross

1        THE COURT:  And are you aware that my order required

2    mediation to be conducted at least two weeks prior to that

3    date?

4        THE WITNESS:  Yes.

5        THE COURT:  And you had not taken steps to comply with

6    that requirement, had you?

7        THE WITNESS:  Well, I don't know the exact date of

8    when counsel appeared, but I know that it was a short period of

9    time, relatively, between when opposing counsel appeared and

10   when the initial conference was scheduled.  And we were not

11   assigned a mediator after opposing counsel appeared.

12       So doing due diligence, I wanted to write to the Court

13   and try to get more time or potentially have the matter be done

14   telephonically, which sometimes is done in this courthouse.

15   And I thought that it would be successful via telephone, and

16   that's the reason why I suggested that to the Court.

17       THE COURT:  But you didn't ask for permission to

18   conduct the mediation after the deadline that I had set by

19   order, did you?  In other words, you didn't seek an extension

20   of the deadline for any of the reasons you just described.

21       THE WITNESS:  We respectfully request to either have

22   the mediation scheduled for October 8 via telephone, or to

23   schedule a mediation for another time in October.

24       THE COURT:  But an October 8th mediation, even if that

25   permission had been granted, was not in compliance with my

K18VUSHH                      Liebowitz - cross

1   order, which required it to be conducted two weeks prior to the

2   initial conference; correct?

3           THE WITNESS:  Yes.  No, that I understand.

4           THE COURT:  All right.  Thank you.

5           THE WITNESS:  But it was -- it was -- opposing counsel

6   appeared, I don't know the exact date, but it was sometime very

7   close to, I believe, the two-week deadline.  And the mediation

8   office did not assign a mediator.

9           THE COURT:  All right.  I got it.  Go ahead.

10  BY MR. NEWBERG:

11  Q.  In any case, the Court rejected your request for a

12  telephonic mediation; correct?

13  A.  Yes, rejected telephonic.

14  Q.  And that was on October 7th, do you remember that?

15  A.  I don't know the exact date.

16  Q.  Let me hand you the Court's order.  This is docket 13.

17          MR. NEWBERG:  It's an ECF docket order, so there's no

18  documents.  I've submitted my ECF notice, your Honor, that was

19  sent to me.

20  Q.  Do you recognize this as the Court's order denying the

21  telephonic mediation?

22  A.  It looks like it, yes.

23  Q.  Okay.  But the Court did give an extension of time to

24  conduct the mediation until October 31st; correct?

25  A.  Yes.

K18VUSHH                        Liebowitz - cross

1   Q.  And it says at the bottom:  The parties shall conduct the

2   in-person mediation no later than October 31, 2019.

3   A.  Yes, I see that.

4   Q.  And to be clear, when you say in your response papers that

5   you asked for permission, you're not talking about this

6   permission that was rejected; correct?  You're talking about

7   what you now say was an October 30th permission?

8   A.  I don't understand your question.

9   Q.  Okay.  You said in your papers you asked for permission

10  prior to the mediation.  I just want to be clear whether or not

11  you're referring to this request for permission.

12  A.  Yeah, I -- I -- I said what I said.

13         THE COURT:  But the request for permission that you

14  referenced in your declaration, filed in opposition to the

15  defendant's motion, that was a reference to the request for

16  permission from the mediator to send Mr. Freeman and to have

17  Mr. Usherson participate by telephone, not a reference to this

18  letter that you submitted to me; is that correct?

19         THE WITNESS:  I'm confused.

20         I don't know what you're talking about.

21         THE COURT:  Okay.  Let me show you your declaration

22  and direct your attention to paragraph 13 of that declaration,

23  where you state:  Prior to October 31st, 2019, the mediation

24  date scheduled in this case, I sought and received approval

25  from the mediator for Mr. Usherson to attend, and so forth.

K18VUSHH                    Liebowitz - cross

1          That is a reference to your conversation with the

2    mediator, not to this letter that you filed with me; correct?

3          THE WITNESS:  Yeah, this is -- this is -- yeah, this

4    is different.

5          THE COURT:  Okay.

6    BY MR. NEWBERG:

7    Q.  And not to the permission you asked the mediator before you

8    sent this letter to the Court; correct?

9    A.  The phone call with the mediator happened on October 30th.

10   Q.  Okay.  So after receiving this order requiring an in-person

11   mediation, the parties also received an email from the

12   mediation office confirming an in-person mediation; is that

13   correct?

14   A.  I believe so.

15   Q.  And they said on October 7th that Judge Furman has extended

16   the time to mediate to October 31st, and ask the parties to

17   contact the mediator to "arrange for an in-person session, in

18   accordance with the judge's direction."

19          Do you remember receiving those instructions?

20   A.  I believe so, yes.

21   Q.  So after receiving this order from the Court and these

22   instructions from the mediation office, what did you think was

23   required?

24   A.  Yeah.  My interpretation of the order was -- when it said

25   "in-person," is that counsel for the parties need appear in

1    person, and that was my interpretation.  And then I -- and you

2    look at the S.D.N.Y. mediation rules, the rules say you could

3    ask the -- ask the mediator for permission for his or her party

4    to appear telephonically.  And that's exactly what I did.

5    Q.  That's not what you asked for to the Court.  You just asked

6    the Court for a telephonic mediation; correct?

7    A.  Yeah, telephonic at the time because it was getting close

8    to the initial conference.  And I thought that the mediation

9    with all the parties on the telephone and counsel on telephone

10   would be productive; and that the parties would reach a

11   settlement and try to save some expense and have the mediation

12   prior to the initial conference.

13   Q.  But my question is you didn't tell the Court, when you

14   asked for permission, I just want -- I'm asking for a

15   telephonic conference for lead counsel or the party, you just

16   said a telephonic conference; correct?

17   A.  Yeah, just telephonic conference.

18   Q.  And the Court denied that and said it had to be an

19   in-person mediation; correct?

20   A.  Yeah, in-person.

21   Q.  So who did you think had to be in person?

22   A.  Yeah, in person, according to the mediation rules, is trial

23   person who's going to prepare --

24   Q.  Mr. Liebowitz, you had a court order at this point saying

25   you needed in-person mediation.  Who did you think at the time

K18VUSHH                         Liebowitz - cross

1   the Court was referring to when it said you needed to have an

2   in-person mediation?

3   A.   In-person, meaning counsel.

4   Q.   Not parties?

5   A.   Not parties.

6   Q.   And did you ever seek to clarify this with the Court?

7   A.   I didn't seek to clarify it because that's my assumption of

8   what I believed "in-person" meant.  And then according to the

9   mediation rules, which is what I, you know, looked at and have

10  done in the past, and routinely what magistrate judges in this

11  district often do in their rules was say that you could seek

12  the permission from either the mediator or from the assigned

13  magistrate judge, if a party resides more than 100 miles away,

14  they could get their permission for the client to appear

15  telephonically.  And that's what I did.

16          THE COURT:  You didn't seek Mr. Newberg's consent for

17  either of those things, did you?

18          THE WITNESS:  No, because that -- the rules say that

19  you have to get the mediator's permission for the parties to

20  appear telephonically, and that's what I did.

21          THE COURT:  All right.

22          MR. NEWBERG:  Sorry, your Honor.

23          THE COURT:  In the *Sadowski* matter, you declined to

24  grant consent to your adversary for permission for the client

25  to appear by telephone; correct?

K18VUSHH                        Liebowitz – cross

1      THE WITNESS:  Yeah.  But then the other side got the

2  permission from this mediator, and it was granted, and --

3      THE COURT:  But, in other words, you didn't respond

4  saying, My consent is irrelevant; you need to seek permission

5  from the mediator.  You declined to grant consent; correct?

6      THE WITNESS:  Well, I'm not responsible for them

7  looking at the rules.

8  BY MR. NEWBERG:

9  Q.  Do you recall my email to you after the court order

10 requiring an in-person mediation, giving you various dates and

11 asking you to pick a date that you and Mr. Usherson could be in

12 New York and attend the mediation?

13 A.  I believe I saw that email.

14 Q.  And you immediately, within a few minutes of me sending

15 that email, responded and chose October 31st; correct?

16 A.  I believe, yeah.  Yes.

17 Q.  And that was the last possible day under the Court's order;

18 correct?

19 A.  Yes.

20 Q.  Did you check with Mr. Usherson that October 31st would

21 work for him to get to New York before you chose that date?

22 A.  Yeah, I believe so.

23 Q.  But you had not submitted any emails between you and

24 Mr. Usherson to the Court; correct?

25 A.  No.

K18VUSHH                          Liebowitz - cross

Q.   How did you communicate that to Mr. Usherson?

A.   Yes, by telephone.

Q.   So by telephone, between 3:29 p.m. on October 7th, and 4:22

p.m. on October 7th, you confirmed with Mr. Usherson that he

could be in New York on October 31st?

A.   Yes, if necessary.  And I did say that -- you know, that

often these courts allow parties to appear telephonically if

they live more than 100 miles away; and that in this case it

shouldn't be a problem.  I had a relationship with this

mediator; he's approved clients to appear telephonically five

other times; and I was sure that this would not be -- would be

the same thing.

Q.   So you didn't respond to me when I said, Hey, here's some

dates.  When can you and Mr. Usherson be available in New York?

You didn't respond saying, Well, I'm going to ask the mediator

for Mr. Usherson to appear telephonically.

A.   Yeah.  I mean, the rules say you have to get the mediator's

permission.

Q.   That's not my question.

          My question is you didn't respond to me when I said,

Here's some dates.  When can you and Mr. Usherson be in New

York?  You didn't respond to me saying, I'm actually going to

ask for him to appear telephonically.

A.   Yeah.  If I didn't ask, I didn't ask.  But I didn't believe

it was necessary.

K18VUSHH                        Liebowitz - cross

1          THE COURT:  Just yes or no.

2          THE WITNESS:  No.

3          THE COURT:  Thank you.

4    Q.  And if you had a networking event scheduled for Los Angeles

5    the night of October 30th, why did you pick the October 31st

6    date?

7    A.  Because I was available then.

8    Q.  You viewed that as an available date, even though you had a

9    marketing event on the night of --

10   A.  It wasn't a marketing event.

11   Q.  I'm sorry, a networking event?

12   A.  Yeah, a networking event.

13   Q.  That you were hosting?

14   A.  Yeah, the night before.  It was no problem.  The next day

15   I'm available.

16          THE COURT:  What time was the networking event

17   scheduled for?

18          THE WITNESS:  I forgot the time, but it was in the

19   early evening.

20   Q.  Do you know when it was over?

21   A.  I don't know the exact time, no.

22   Q.  Do you know when the last flight was out of Los Angeles

23   that night?

24   A.  It was, I think they had a red-eye at, you know, midnight

25   or 1 a.m.  I mean, I don't know.

K18VUSHH                    Liebowitz - cross

1    Q.  Are you actually aware of that or are you speculating?

2    A.  Yeah.  No, I go to California; I know these flights.

3    Q.  So you believe there was a red-eye coming back after

4    midnight, midnight or 1 a.m.?

5    A.  I believe so.  I mean, this is -- or they add flights from

6    California to New York, I believe it's very often.

7              And -- but, as I said all along, the mediator granted

8    my client to appear telephonically, and granted Mr. Freeman to

9    appear on my behalf, just like in other mediations.

10             THE COURT:  Okay.  I got it.

11   Q.  Not to get into semantics, Mr. Liebowitz, but if you

12   actually got a 1 a.m. red-eye, with the time change, doing the

13   math, you wouldn't have been able to make an early morning

14   mediation --

15   A.  Of course I would.  I think it would have gotten in about

16   6:30.

17             MR. FREEMAN:  Objection, your Honor.

18             It wasn't early morning.  He's misrepresenting the

19   record.  It was a noon mediation.

20             MR. NEWBERG:  I'll strike that.

21             THE COURT:  In any event, it would have to be a

22   supersonic flight to get here by 6 a.m.

23             MR. NEWBERG:  Thank you, your Honor.

24   BY MR. NEWBERG:

25   Q.  I just have a couple more questions.

1          I'm going to hand you what I have -- hand you what has

2     been entered already as Exhibit 8 to my declaration in this

3     case.

4          MR. NEWBERG:  Your Honor, I'll mention that this

5     particular exhibit does not have the mediator's name redacted;

6     but since we are not entering it, we're just referring to the

7     record, I assume that's okay for now.

8          THE COURT:  Yes.  The docket contains the document

9     redacted, so that is part of the record.

10         MR. NEWBERG:  Great.  Thank you.

11    BY MR. NEWBERG:

12    Q.  I'm going to present you with an email string here between

13    me and the mediator that goes from 8:15 p.m. to 10:03 p.m. on

14    the night of October 30, 2019, the night before the mediation.

15         Do you see at 8:15 p.m., where he says he talked to

16    you and you'd been tied up?

17    A.  Yes, I see that.

18    Q.  So he doesn't say you're out of town, right?

19    A.  Yeah, I don't see that.

20    Q.  And he says:  Hopefully, we can settle this before need to

21    go to in-person mediation.  Do you see that?

22    A.  Yes.

23    Q.  And then when I say in response to his statement about

24    in-person mediation that I would have assumed Mr. Usherson

25    either flew to New York tonight or is likewise on a very early

K18VUSHH                          Liebowitz - cross

1   plane, he responds:  I understand.  Do you see that?

2   A.  Yeah, I see that.

3   Q.  He doesn't say Mr. Usherson is not coming to the

4   deposition, does he?

5   A.  Yeah, I don't see -- he didn't say that.

6   Q.  Even though it's 10:03 p.m. on the night before the

7   mediation?

8   A.  Yeah, I can't speculate to what -- all I see here is that

9   he said "I understand."

10  Q.  And do you see anything in here that there's any indication

11  as of 10:03 p.m. the night before the mediation, that the

12  mediator had any idea that you or your client would not be at

13  the mediation?

14  A.  From this email chain?

15  Q.  Yes.

16  A.  No, I don't -- I don't see that.

17          But it was the mediator's obligation in -- you know,

18  to advise you, and I'm sorry that that didn't happen.  I

19  mean --

20  Q.  So this doesn't refresh your recollection that even on

21  October 30th at 10:03 p.m., the mediator had no idea you and

22  your client would not be attending the mediation?

23  A.  No, I didn't say that he didn't know.  I did tell him.  And

24  just because he said "I understand," I don't know what was

25  going through his mind when he wrote that email.

K18VUSHH                          Liebowitz - cross

1   Q.  I'm going to hand you Exhibit 9 to my declaration, which is

2   your email that you've testified about today sending revisions

3   to a proposal.  I'll represent the 4:12 a.m. is eastern time.

4   I assume that was 1:12 a.m. where you were on the west coast.

5             Do you recognize this email?

6   A.  Yes, I do.

7   Q.  And you say:  Attached please find revisions to the

8   agreement which can be discussed at the mediation.

9             Do you see that?

10  A.  Yes, I did.

11  Q.  So even then, you didn't mention you wouldn't be at the

12  mediation; correct?

13  A.  I never said that.  But I copied Mr. Freeman and the

14  mediator and you on the email.

15  Q.  Okay.  But you never said in this email, "I won't be

16  there"?

17  A.  No, because I had the conversation with the mediator the

18  night before.

19  Q.  And you never said in this email, even at 4:12 a.m. the

20  morning of the mediation, "My client won't be there"?

21  A.  No, because I told the mediator the night before.

22  Q.  And you mentioned Mr. Freeman is cc'd on this.  Am I

23  correct in stating this is the very first email in this case

24  that you sent to me where Mr. Freeman was cc'd?

25  A.  Oh, that I don't know.

K18VUSHH                    Liebowitz - cross

1    Q.  Are you aware as you sit here today of any other emails you

2    ever sent, any communications you ever sent in this case where

3    Mr. Freeman was cc'd?

4    A.  I don't know.

5    Q.  Do you know why you didn't have Mr. Freeman enter a notice

6    of appearance before the mediation?

7    A.  Yeah.  I mean, sometimes Mr. Freeman makes notice of

8    appearance and sometimes not.  It's never been an issue.

9    Q.  As you sit here today, do you still maintain that when

10   Mr. Freeman put in a sworn declaration that he'd never known

11   about the existence of this matter before 8 p.m. October 30th,

12   that was incorrect?

13   A.  Listen, I -- I don't -- I -- whether -- I believe we had

14   the conversation, you know, we -- we -- our office is --

15   offices are near each other.  And it could have been a brief --

16   you know, I do know that we -- you know, I did say that the

17   mediation, you know, was on the 31st; and that I did tell --

18   ask the mediator if Mr. Freeman could appear on my -- I'm

19   sorry, I did --

20   Q.  My question was why Mr. Freeman didn't enter a notice of

21   appearance.

22   A.  Yeah, because --

23   Q.  I'm sorry.  Actually my question was is it still your

24   testimony that Mr. Freeman's sworn declaration is incorrect?

25   A.  I'm not saying it's incorrect.  It could have been lack of

K18VUSHH                          Liebowitz – cross

1   memories of what occurred, you know.  Not everyone is perfect

2   in this world.  You know, people forget.  And if I said I had a

3   conversation and he said we didn't, it's -- it's -- at the end

4   of the day, he was at the mediation prepared to settle the

5   case, where there were two lawyers in my firm prepared to

6   settle the case.

7   Q.  But is it your testimony that his sworn declaration is

8   incorrect or you simply don't remember who's correct?

9   A.  I believe the conversation -- I mean it -- it -- it -- it

10  could have been brief.  I mean it -- it -- it -- he was

11  prepared at the mediation that day to settle the case.  He was

12  fully aware of the fact --

13  Q.  That's not my question, Mr. Liebowitz.

14          MR. FREEMAN:  Your Honor, I believe we've already

15  covered this territory previously.  He's asking the same

16  questions over and over.

17          THE COURT:  Overruled.

18          Ask your question again.

19  BY MR. FREEMAN:

20  Q.  My question is, as you sit here today under oath in a court

21  of law, is it your position that Mr. Freeman's sworn

22  declaration is incorrect or that you don't remember who is

23  correct?

24  A.  I'm not saying --

25          THE COURT:  Mr. Liebowitz, let Mr. Newberg finish

K18VUSHH                    Liebowitz - cross

1    please.

2    Q.  Or that you don't remember who is --

3    A.  I'm not saying that his declaration is incorrect at all.

4    Just my memory said that we had the conversation.  If his

5    memory said no, it -- it -- he was fully prepared that day to

6    have the mediation and negotiate in good faith to get to a

7    resolution.  And he was there.  He showed up with two lawyers.

8    It was Mr. Freeman and Ms. Liebowitz, and he was prepared to

9    settle the case that day.

10   Q.  And you've seen the mediator's declaration in this case;

11   correct?

12   A.  I believe so.

13   Q.  And you're aware in it he says you never asked for and he

14   never gave you permission for your client to attend

15   telephonically?

16   A.  I did see that.

17   Q.  And you're aware that in it he says he never gave you

18   permission for you not to attend and to send someone else in

19   your place?

20   A.  Say that again.

21   Q.  Are you aware he says in his declaration he never gave you

22   permission for you not to attend and to send somebody else?

23   A.  Yeah, I did see that.

24            MR. NEWBERG:  That's all I have, your Honor.

25            THE COURT:  All right.

K18VUSHH                        Liebowitz - cross

1          I have a couple more questions, and then limited

2     redirect.

3          First, I'm going to show you a document at docket

4     16-2; it's Exhibit 2 to Mr. Newberg's declaration.  And

5     beginning at page 3 of that document, this is an exchange of

6     emails in advance of the October 10th initial conference, the

7     conference of that subsequently adjourned regarding the

8     mediation that you were trying to schedule in that week; is

9     that correct?

10          THE WITNESS:  I don't understand the question.

11          THE COURT:  I'm just trying to set the context.

12          THE WITNESS:  Okay.

13          THE COURT:  This is an exchange of emails between you

14     and Mr. Newberg on October 3rd.

15          THE WITNESS:  Yes.

16          THE COURT:  In advance of what then was a conference

17     scheduled for October 10th.

18          THE WITNESS:  Yes.

19          THE COURT:  Okay.  And directing your attention to the

20     bottom of page 3, this is an email from Mr. Newberg at 10:04

21     a.m. on October 3rd.  He states:  I actually will be in New

22     York -- and for your convenience, I've underlined these -- on

23     Monday for a settlement meeting that will end around 3 p.m.  I

24     could be at the courthouse at 3:30 p.m., but I would have to

25     check with my client that he is available on such short notice.

K18VUSHH                          Liebowitz - cross

1    Is Mr. Usherson also available then?

2           Correct?

3           THE WITNESS:  Yeah, this is what he said.

4           THE COURT:  All right.  In an email later in the

5    chain, this is further on -- well, let me skip to page 2.  This

6    is an email from you later that morning at 10:28 a.m.  You

7    state at the end of that email:  If you have authority from

8    your client, just the lawyers can be on the phone.

9           Correct?  Page 2.

10          THE WITNESS:  Page 2.

11          THE COURT:  Do you see the email, 10:28 a.m.?

12          THE WITNESS:  Yes.

13          THE COURT:  You state:  We can do via phone if all the

14   parties agree.  And then:  If you have authority from your

15   client, just the lawyers can be on the phone.  Correct?

16          THE WITNESS:  Yes, that's what I said.

17          THE COURT:  That's in reference to the mediation?

18          THE WITNESS:  Yes, it must have been.

19          THE COURT:  And that's actually incorrect; correct?

20   You need permission from the mediator for the client not to

21   appear in person; is that correct?

22          THE WITNESS:  Yeah.  And the reason why I said that is

23   because --

24          THE COURT:  I'm just asking you based on your

25   testimony today, you understand that that is an incorrect

1    statement of the mediation rules; that mediation rules require

2    a party to appear in person, but allow a mediator to grant

3    permission to appear telephonically; correct?

4              THE WITNESS:  Yes, if that --

5              THE COURT:  So it is incorrect to say that if you --

6    namely, defense counsel -- have authority from the defendant,

7    then just the lawyers can be on the phone, that's an incorrect

8    statement.

9              THE WITNESS:  Yeah, well, if the mediation -- that was

10   going to allow that, then that's --

11             THE COURT:  Where in the mediation rules is there

12   anything that states that with the permission of the parties,

13   that counsel can participate without the parties in the

14   mediation?

15             THE WITNESS:  I don't think so.

16             But the reason why is because also as a custom and

17   practice with this mediator, that not all the times were the

18   clients on the phone.  And it was between -- sometimes it was

19   just, you know, with the lawyers on the phone.

20             I want to say from the outset that, you know, this --

21   you know, the relationship with the mediator in this case, you

22   know, was very -- it was lax.  And, you know, that's why I

23   think that most of the time it was successful, because --

24             THE COURT:  All right.  Let me stop you there.

25             And then Mr. Newberg responded -- this is at 11:10

K18VUSHH                          Liebowitz - cross

1    a.m. -- an email that begins on the bottom of page 1 and

2    continues to page 2, and drawing your attention to the top of

3    page 2, he states:  Also, the Court's rules are clear that all

4    parties must attend mediations without exception, and even

5    suggests that the mediation is pointless without the parties.

6    Our clients cannot simply give us authority.  The rules also

7    say that everyone must be there in person; although if a party

8    has a particular hardship, they may apply to attend

9    telephonically.  Do you see that?

10                  THE WITNESS:  Yes.

11                  THE COURT:  Then you responded to that email -- this

12   is on page 1 -- at 12:02 p.m. that same day; correct?

13                  THE WITNESS:  I responded at 10:28.

14                  THE COURT:  Well, you can't respond to an 11:10 email

15   at 10:28.

16                  THE WITNESS:  Oh, I'm sorry.

17                  THE COURT:  So that defies time/space relations,

18   but --

19                  THE WITNESS:  Oh, I'm sorry, 12:02.

20                  THE COURT:  Okay.  And you didn't say anything there

21   about the custom and practice with this mediator of allowing

22   clients to appear by telephone, did you?

23                  THE WITNESS:  No, I never said that.  It was just

24   assumed that --

25                  THE COURT:  All right.

1      And you didn't say anything in there about asking for

2  Mr. Newberg's consent to basically disregard that rule and

3  allow mediation with only lawyers, did you?

4      THE WITNESS:  No, I never said that.  But the custom

5  and practice, again, is the mediator --

6      THE COURT:  I got that already.

7      Let's talk a little bit about that custom and

8  practice.  That custom and practice is based on the five cases

9  that are cited in your letter of, I think, December 16th; is

10  that correct? correct?  The five cases that you referenced --

11      THE WITNESS:  If that was the date, that was the date.

12      THE COURT:  All right.  Well, the five cases that

13  Mr. Freeman asked you about earlier this morning?

14      THE WITNESS:  Yes.

15      THE COURT:  And is that the full universe of cases

16  that you had had mediations with this same mediator?

17      THE WITNESS:  I believe so.

18      THE COURT:  Okay.

19      And so in every case that you had had a mediation with

20  this mediator, your client had participated by telephone; is

21  that correct?

22      THE WITNESS:  On those five, and then this one, six,

23  the mediator --

24      THE COURT:  My question is are there any mediations

25  that you've conducted with this mediator where the client

 1    participated in person?

 2              THE WITNESS:  I don't believe so.

 3              THE COURT:  Did you make any sort of record of the

 4    permissions that you received in those cases?

 5              THE WITNESS:  I am not sure, but it was routine,

 6    always --

 7              THE COURT:  Is there any written record in your office

 8    that you obtained permission?

 9              THE WITNESS:  I don't believe so.

10              THE COURT:  Okay.

11              And how did you generate this list?  It was just a

12    list of all the mediations that you'd conducted with the

13    mediator?

14              THE WITNESS:  Yes, I believe so.

15              THE COURT:  Any other questions?

16              MR. NEWBERG:  I do.  Just a couple, your Honor.

17    BY MR. NEWBERG:

18    Q.  I just want to be clear.  You're saying it was the custom

19    and practice with this mediator to not even have clients appear

20    at all, not even on the phone?

21    A.  Sometimes, if -- if I had authority, you know, to settle,

22    then it wasn't necessary to get the client on the phone.  This

23    is very -- the reason why I recommended this mediator is

24    because I thought he was successful in the past, and that --

25    that we would get to a resolution.  And it was a very lax, you

K18VUSHH                         Liebowitz - cross

1   know, relationship, and --

2            THE COURT:  I got it.

3            Turning to page 2 of docket number 41, I think that

4   is, is that a list of five cases, just to have it in front of

5   you?  Is it your testimony -- let me ask differently.

6            Did any of those mediations occur without the

7   participation of the client in any way, shape, or form; in

8   other words, by telephone or in person?

9            THE WITNESS:  I believe *Emerson* -- you know, we got to

10  an agreement fairly quickly, so I don't think -- I don't

11  think --

12           THE COURT:  Your recollection is --

13           THE WITNESS:  I don't -- I actually, on that one, I

14  don't even believe that -- oh, on *Emerson*, now I know.  I

15  believe the defense -- the defense counsel was there, not his

16  client, but I think he was -- they were available via

17  telephone.  I know that my client wasn't -- wasn't there.  So

18  in that case, the clients on both sides didn't appear.

19           THE COURT:  But your client didn't participate in any

20  way?

21           THE WITNESS:  No, I mean it was -- I had authority,

22  and he would have been available via telephone.

23           THE COURT:  It's a straightforward question.

24           In any of those five mediations, did the client not

25  appear in any -- at all?  In other words, did you participate

K18VUSHH                          Liebowitz - cross

1    without the participation of the client?

2            THE WITNESS:  They were all available by telephone.

3            THE COURT:  That's not my question.  I'm not asking

4    whether they were available.  I'm asking whether they appeared

5    in connection with the mediation, whether in person or via

6    telephone.

7            THE WITNESS:  That I don't know.  It could have been

8    in some of them, it was just so quick, that it wasn't, you

9    know, necessary to call.  And we were just hashing out the

10   nonmonetary terms.  I don't recall.  But oftentimes these

11   mediations were very short.

12           THE COURT:  Okay.

13           Anything else, Mr. Newberg?

14           MR. NEWBERG:  Yes.

15   BY MR. NEWBERG:

16   Q.  Just on this, I want to be clear what you're testifying in

17   sworn testimony to, Mr. Liebowitz.

18           Without being able to point to an actual case where no

19   clients attended by phone or otherwise, you're claiming that

20   this mediator, a mediator of this Court, was custom and

21   practice to completely violate the Court's mediation rules, is

22   that what you're testifying?

23   A.  I -- I don't understand your question.

24   Q.  You've said it was his custom and practice to not even have

25   clients appear at all, not even by phone.

K18VUSHH                          Liebowitz - redirect

1    A.  No, I -- I mean -- if -- if the lawyers have authority to

2    settle on behalf of clients, and the client's available via

3    telephone --

4    Q.  You didn't say that, Mr. Liebowitz, not the client's

5    available by telephone.  You asked me -- the Court asked you

6    about it -- if I had my client's consent, the client wouldn't

7    have to appear at all.  You didn't say, Be available by

8    telephone.  You said not participate; correct?

9    A.  Yeah, well, they are available via telephone.  And if we

10   got to a resolution and it wasn't necessary, I mean they are

11   available via telephone.  I mean this is -- this is what --

12   Q.  That's all I have.

13              THE COURT:  All right.

14              I think we need to take a break -- if not now, then

15   after the redirect, but how much -- do you have any redirect?

16              MR. FREEMAN:  Yeah.  It would just be a couple of

17   minutes.

18              THE COURT:  All right.

19              Let's finish that up quickly, and then we'll take a

20   break.

21              Go ahead.

22   REDIRECT EXAMINATION

23   BY MR. FREEMAN:

24   Q.  Thank you, Mr. Liebowitz.

25              So when did you graduate law school?

K18VUSHH                    Liebowitz - redirect

1    A.  I graduated law school, I believe, 2014.

2    Q.  And when did you first file your first case?

3    A.  I believe 2016.

4    Q.  Was it in January 2016?

5    A.  I believe so.

6    Q.  And you were admitted to the bar in September 2015?

7    A.  Yes.

8    Q.  And since that time, January 2016, approximately how many

9    cases has the Liebowitz Law Firm filed?

10   A.  Filed approximately 2,000.

11   Q.  2,000 --

12   A.  2,000 cases countrywide.

13   Q.  And at the time of the mediation, approximately how many

14   cases did you have pending on your docket?

15   A.  At the time of this mediation, it was definitely over 100.

16            THE COURT:  Hold on one second, counsel.

17            (Pause)

18            THE COURT:  All right.  You can proceed, counsel.

19   BY MR. FREEMAN:

20   Q.  Would it surprise you to know that at the time of the

21   mediation, you had -- the Liebowitz Law Firm had over 400 cases

22   pending in federal court?

23   A.  Yeah, that could be.  That could be.

24   Q.  And how many lawyers do you have employed, besides you, at

25   Liebowitz Law Firm?

K18VUSHH                    Liebowitz - redirect

1   A.  So I only have Mr. Freeman and now my sister,

2   Ms. Liebowitz, that just recently got admitted.  But that's it.

3   Q.  So essentially -- would it be accurate to state that you

4   essentially have two lawyers handling over 400 cases at one

5   time?

6   A.  Yes.

7   Q.  And is it your belief that that might explain why there

8   have been administrative failures on your part, as well as the

9   firm's part?

10          THE COURT:  Sustained as to form.

11  Q.  Since November of 2019, have you retained outside counsel

12  to help instruct you in terms of any matter?

13  A.  Yes.  I have retained a counsellor to help out on business

14  management and to help out with, you know, situations that may

15  arise and that could help with the practice.  Because it is --

16  there's a lot of cases, and it's -- we try our best, you know,

17  to -- to try to help, you know, the photography community.

18          And it's -- it's -- we are doing all we can now to fix

19  the mistakes that we've done in the past and make sure that

20  things don't happen again.  And I -- you know, I'm getting

21  advice from an outside lawyer on how to make things better and

22  how to clean up everything.  And I know that, you know, certain

23  things are not best practice, and I understand that.  And I

24  understand that things need to change.  And I am speaking with

25  a reputable lawyer to help out in these situations so that

1    things like this don't happen again; and that all the T's are

2    crossed and I's are dotted.  And I want to make sure that

3    everything is perfect with the courts and that things like this

4    don't happen again.

5              THE COURT:  And just out of curiosity, when you say

6    "things like this," what are you referring to?

7              THE WITNESS:  I'm just talking about, you know, best

8    practices, like, you know, getting things in writing, you know,

9    making sure that everything is calendared, making sure --

10   getting a system of -- a calendaring system, you know, trying

11   to get like a customized one, with the amount of volume that we

12   have, to just make sure everything is on the calendar when

13   things are due, when motions are due, when there's conferences,

14   when there's mediations.

15             And I'm in the process of putting all that together so

16   that, going forward, that nothing is missed and everything is

17   calendared, and making sure that things run smoothly going

18   forward.

19             MR. FREEMAN:  I have no further questions, your Honor.

20             THE COURT:  All right.

21        You may step down, Mr. Liebowitz.

22             (Witness steps down)

23             THE COURT:  Let's, in deference to the court reporter,

24   take a brief break.

25             I would assume that Mr. Newberg's testimony will be

K18VUSHH                    Newberg - cross

1  relatively short.

2          MR. FREEMAN:  Yes, very short, your Honor, from our

3  side.

4          THE COURT:  Very good.  In that case, we'll stick with

5  the order.  And I feel a little bad that the mediator has been

6  stuck here all morning, but I think we'll stick with the order

7  in light of that.

8          Let's pick up again in, let's say, seven minutes, and

9  we'll go from there.  Thank you.

10         (Recess)

11         THE COURT:  All right.

12         Mr. Newberg, take the stand, and my deputy will

13 administer the oath to you.

14 BRAD R. NEWBERG,

15     called as a witness on his own behalf,

16     having been duly sworn, testified as follows:

17         THE COURT:  All right.  Cross-examination.

18 CROSS-EXAMINATION

19 BY MR. FREEMAN:

20 Q.  Good morning, Mr. Newberg.

21 A.  Good morning.

22 Q.  So during the cross-examination of Mr. Liebowitz, you had

23 introduced into evidence the procedures of the mediation

24 program, do you recall?

25 A.  Yes.

1    Q.  Yes.

2            Is there anything in those rules which require

3    Mr. Liebowitz to advise you, opposing counsel, of whether or

4    not his clients are appearing telephonically or whether or not

5    his associate would appear in his stead?

6            THE COURT:  Counsel, the rules speak for themselves,

7    and you don't need to use the witness to make a legal argument.

8            MR. FREEMAN:  Fair enough.

9            THE COURT:  So let's just stick to the facts and keep

10   this as short as possible.

11           MR. FREEMAN:  Okay.  Great.

12   Q.  So I'd like to direct your attention -- do you recall on

13   November 6 submitting a declaration to the Court in support of

14   defendant's motion for sanctions?

15   A.  Yes, I do.

16   Q.  And do you recall that you -- that there was a paragraph in

17   your declaration where you discussed what happened when you

18   arrived at the mediation at 11:45 a.m.?

19   A.  I do.

20   Q.  And do you recall that you had a discussion with the

21   mediator before Liebowitz Law Firm's attorneys arrived?

22   A.  Yes.

23   Q.  Can you please explain to the Court to the best of your

24   recollection exactly what was said?

25   A.  Sure.  Obviously, besides pleasantries, in terms of this,

K18VUSHH                         Newberg - cross

1    the subject came up at some point where we were talking, and I

2    mentioned meeting Mr. Liebowitz in person, since I hadn't in

3    the past.  And it is my recollection that at that point, the

4    mediator had said, I just heard, the mediator said, late last

5    night or this morning, that Mr. Liebowitz isn't going to be

6    here.  He was clear he did not give permission for that, but

7    was just sort of told; he didn't say it in any way.

8          I asked him point-blank, I said, That's not

9    acceptable.  I assume Mr. Usherson would be here.

10         And he sort of gave a sigh.  He said, I don't know

11   anything about whether Mr. Usherson is coming or not.  And he

12   suggested that based on his experience with Mr. Liebowitz, but

13   not his experience of granting permission, his experience just

14   of Mr. Liebowitz being Mr. Liebowitz, he said he's not hopeful

15   about Mr. Usherson, but he expected him to be there.

16   Q.  So is it your testimony that Mr. Liebowitz's testimony that

17   he spoke to the mediator about obtaining permission, is your

18   testimony in your declaration, specifically paragraph 46 and

19   47, doesn't it corroborate Mr. Liebowitz's testimony that he

20   obtain permission?

21         MR. FORESTA:  Objection, your Honor.

22         THE COURT:  Sustained.

23   Q.  At the time that the mediator advised you that

24   Mr. Liebowitz would not be attending, did you object to

25   proceeding with the mediation?

K18VUSHH                         Newberg - cross

1    A.  I did.  I stated that I did not think -- I stated that

2    there was a court order that there had to be an in-person

3    mediation.  He was expected to be there.  His client was

4    expected to be there.  And I did not think the mediation could

5    proceed without the parties and counsel being there.

6    Q.  And what was the mediator's response to that objection?

7    A.  The mediator's response was that he understood completely.

8    Q.  Did the mediation proceed?

9    A.  I would not really say that the mediation proceeded.

10           You arrived, Mr. Liebowitz's sister.  I made clear my

11   displeasure with the violation of the court rules.  And I spoke

12   to my client.  We decided, You know what?  We're here.  We'll

13   make an offer.  You went to see if you could get your client on

14   the phone --

15           THE COURT:  We're veering beyond the subject matter of

16   the hearing, so next question.

17           MR. FREEMAN:  I got you.  Okay.

18   Q.  I want to move to another topic then.

19   A.  Sure.

20   Q.  After defendant -- after the defendant's motion for

21   sanctions was fully briefed, is it correct that your client

22   settled the case?

23   A.  It is correct.

24   Q.  Yes.

25           And did you, on behalf of your client, sign a

1    stipulation stating that all parties would bear their own costs

2    and attorneys' fees?

3           THE COURT:  Sustained.  This is not relevant to the

4    subject matter of this hearing.  And it's also a matter of

5    record if he did or didn't.

6           Can I go back to the conversation that you had with

7    the mediator when you arrived at the mediation.

8           Is it your testimony that he specifically said that he

9    had not granted permission for Mr. Liebowitz not to appear in

10   person?  In other words, can you tell me --

11          THE WITNESS:  I did not ask the question, Did you give

12   permission.  Your Honor, I cannot answer that question with 100

13   percent surety that it would be accurate whether he said the

14   words "I did not grant permission."  It was very clear that he

15   was simply notified.  He did not say he gave permission, and he

16   said -- he said, I was notified.  I don't even necessarily know

17   what that means.  It could have been a voicemail.

18          THE COURT:  And did he say anything about Mr. Freeman

19   or another lawyer appearing instead of Mr. Liebowitz?

20          THE WITNESS:  He said -- when he said, I was informed

21   he's not going to be here, he said he's sending an associate of

22   his.

23          THE COURT:  Go ahead.

24          MR. FREEMAN:  I have no further questions, your Honor.

25          THE COURT:  All right.  Any redirect?

K18VUSHH                         Newberg - cross

1              MR. FORESTA:  Nothing, your Honor.

2              THE COURT:  All right.

3              MR. FORESTA:  Thank you.

4              THE COURT:  I have a couple questions, actually.

5         You had a conversation with the mediator after Mr.

6    Liebowitz filed his opposition to your motion; is that correct?

7              THE WITNESS:  That is correct, your Honor.

8              THE COURT:  Am I correct that was on or about November

9    19th?  Does that sound right?

10             THE WITNESS:  That sounds accurate, your Honor.  I

11   would stand by my declaration which was drafted soon

12   thereafter.

13             THE COURT:  I appreciate looking at me, but more

14   important to speak into the microphone.

15        And during that conversation, did the mediator tell

16   you about his communications with Mr. Liebowitz in advance of

17   the mediation?

18             THE WITNESS:  No, he did not.  He actually

19   specifically said that he did not grant permission.  He did not

20   at that point raise this idea of how he was informed.  He just

21   told me that he had granted permission for these two things in

22   other cases, but he was adamant that he did not in this case.

23             THE COURT:  Okay.

24        Did he tell you during that conversation that he had

25   been informed that Mr. Liebowitz would not be appearing in

K18VUSHH                    Newberg - cross

1    person and was sending an associate?

2                 THE WITNESS:  I do not recall, but I don't think so.

3                 THE COURT:  Okay.

4                 All right.  I have no further questions.

5                 I think you can step down, and we can put the

6    mediator -- well, either put him out of his misery or put him

7    into further misery, I don't know, but let's call the mediator.

8                 (Witness steps down)

9                 MR. FREEMAN:  Your Honor, I have a logistical issue to

10   raise with the Court.

11                Regarding the mediator's testimony, we do want to get

12   into the custom and practice evidence.  If it pleases the

13   Court, we'd just like to submit the five docket sheets to the

14   witness at the outset, if that's okay.

15                THE COURT:  That's fine.

16                MR. FREEMAN:  Okay.

17                MR. NEWBERG:  And, your Honor, the order states that

18   you'll go first; and then I don't know who you want --

19   Mr. Liebowitz's counsel, Mr. Freeman, or I -- to go next.

20                THE COURT:  I'm sorry, say that again.

21                MR. NEWBERG:  Your order says that you will be going

22   first.  I assume that's still the process.  And I don't know

23   which of the sides you want to go next.  I don't know if you

24   want to decide that on the fly or now.

25                THE COURT:  I will start, and then why don't I give

K18VUSHH                        Mediator - direct

1   you, at this stage, thereafter, and then Mr. Freeman

2   thereafter.  All right?

3              MR. NEWBERG:  Thank you.

4              THE COURT:  Sir, you can step up to the witness box.

5   THE MEDIATOR,

6        called as a witness by the Court,

7        having been duly sworn, testified as follows:

8   DIRECT EXAMINATION

9   BY THE COURT:

10  Q.  I will provide the name to the court reporter for the

11  record, but will not mention it here to preserve

12  confidentiality.  And I'll refer to you just as "the mediator,"

13  rather than by name.  So thank you for joining us, sir.  And

14  I'm sorry for keeping you waiting all this morning.  I

15  appreciate your presence here and your patience.

16             Let me ask you some questions about your declaration

17  in this matter and your experience with Mr. Liebowitz.

18             Let me start with your relationship and prior

19  experiences with Mr. Liebowitz.

20             First of all, do you have any relationship with him

21  outside of the mediations that you've conducted?

22  A.  No, I've only -- sorry.  I've only met Mr. Liebowitz

23  through the mediation process.

24  Q.  All right.  And approximately how many times have you

25  conducted mediations in his cases?

K18VUSHH                          Mediator - direct

1   A.   Approximately a half a dozen or so.

2   Q.   And when was the first time, approximately?

3   A.   Six to nine months ago.

4   Q.   All right.  So in 2019?

5   A.   Yes.

6   Q.   And in each of those -- and in the half dozen or so that

7   you've conducted, how many has he appeared in person?

8   A.   Certainly the majority of them.

9   Q.   And when he did not, who appeared instead?

10  A.   His associate.

11  Q.   And in those cases where his associate -- sorry, by

12  "associate," is it Mr. Freeman who's sitting at the front

13  table?

14  A.   Yes.

15  Q.   In those cases where Mr. Freeman appeared and Mr. Liebowitz

16  did not, did you know in advance that Mr. Freeman would be

17  appearing?

18  A.   I think there were two -- two times that Mr. Freeman

19  appeared.  The first time he -- I had no idea.  And the second

20  time, which would have been this -- this case, I don't think I

21  knew he appeared.  Except after I gave my declaration, just to

22  be clear, I looked at my emails and whatever.  And I noticed

23  just prior to the mediation, that I recognized that

24  Mr. Liebowitz was in L.A. at the time, I think it was 48 hours

25  before the actual mediation.  So it's possible that I could

K18VUSHH                          Mediator - direct

1   have presumed he might not be there.

2   Q.  Okay.  So prior to this case, there had been one other

3   occasion where Mr. Freeman appeared?

4   A.  That's my best recollection.

5   Q.  And in any of the other cases -- put aside this case for a

6   moment -- did you know who was the lawyer who would be

7   primarily responsible for handling trial, if the case were to

8   go to trial?  Was there any discussion about that?

9   A.  There wasn't any discussion about that.

10  Q.  Okay.  And putting aside this case, again, in any of the

11  other cases, did the client appear with Mr. Liebowitz or

12  Mr. Freeman?

13  A.  Sometimes the client appeared.  Sometimes, because of the

14  travel issues, the client didn't appear, but he was -- the

15  client -- I think it was all males -- were always available by

16  phone.  And Mr. Liebowitz had full authority to settle this

17  case.  And if the case was at a point of settlement, I would

18  talk to the client to make sure that Mr. Liebowitz had full

19  authority in that vein.

20  Q.  Okay.  And in the cases -- again, putting this case aside

21  for a moment, where the client did not appear in person, did

22  you know that in advance of the mediation?

23  A.  On a few occasions I did, on some occasions I didn't.

24  Q.  And where you didn't, in other words, you showed up at the

25  mediation expecting the client to be present to find that the

K18VUSHH                          Mediator - direct

1    client was not?

2    A.  That happened, but I was assured that Mr. Liebowitz had

3    full authority to settle; and that the client would be

4    available on the telephone to answer any questions or to -- if

5    there was going to be a settlement, to affirm that the

6    settlement was in place.

7    Q.  Okay.  But to be clear, my question is prior to this case,

8    there were -- there was at least one mediation where you

9    appeared at the mediation expecting the client to be there,

10   only to find that the client was not present in person?

11   A.  Yes, that's correct.

12   Q.  All right.

13          And are there occasions prior to this case where you

14   arrived at the mediation knowing that the client would not be

15   appearing in person, but participating by telephone?

16   A.  I really don't recall.

17   Q.  All right.

18          In other words, do you recall any -- do you know of

19   any other case Mr. Liebowitz or Mr. Freeman requesting

20   permission from you for the client to participate by telephone?

21   A.  Maybe in one instance.  That was where the client was

22   actually out of the country, would be prohibitively expensive

23   for him to come here for a mediation session.

24   Q.  All right.

25          And on that occasion did you make any record of that

K18VUSHH                        Mediator - direct

1    fact?  Do you know if it was memorialized in any fashion?

2    A.  No, it wasn't memorialized.  I actually did -- the

3    mediation turned out to be successful.  And I talked to the

4    client; Mr. Liebowitz got him on the telephone.  I told him to

5    ascertain the settlement was -- was appropriate and agreeable.

6         And I should add that in no instance where in the

7    mediation, when we reached agreement, did Mr. Liebowitz not

8    follow through.

9    Q.  Okay.  Now, in this case, turning to this case, you spoke

10   to Mr. Liebowitz the night before the mediation on October

11   30th; is that correct?

12   A.  I believe it was October 30th.  We actually had a couple of

13   discussions, as well as with the defendant's counsel, because

14   there was a possibility that the case would settle without

15   mediation.  The defendant's counsel was in Virginia or so at

16   the time, and it could settle without actually having a

17   mediation.  Obviously that would be advantageous.

18   Q.  All right.  So I want to focus for a moment on whether

19   there were any communications with Mr. Liebowitz prior to

20   October 30th, so earlier than October 30th.  Do you recall?

21   A.  The only -- to go back a little bit, sometime early October

22   I completed a mediation with Mr. Liebowitz.  And I got a call

23   from him asking if I would mediate a case, they're under some

24   time pressures, name a mediator.  And I said if it's okay with

25   the mediation office, I would do it.

1              Further asked -- and I think it was on that same phone

2      call -- whether that mediation could take place by telephone,

3      since he knew that the plaintiff -- sorry, the defendant's

4      counsel was in Virginia.  And again, he said there's an expense

5      involved there, and if we can avoid it.

6              And I said as long as the mediation office said it was

7      okay, I had no problem with that.

8              Subsequently, I got a call from the mediation office

9      asking that the mediation be done in person rather than by

10     telephone.  I said that's fine as well.

11             I communicated with, I think, Mr. Liebowitz and

12     defendant's counsel.  And this was something I always ask, give

13     me a couple of dates that are agreeable to you, and I'll look

14     at my calendar and we can then have the mediation.  It's got to

15     be in person.  And I left it to the parties to work out those

16     details.

17     Q.  All right.  And at some point it was then set for October

18     31st at the courthouse; is that correct?

19     A.  That's absolutely correct.

20     Q.  All right.

21             So between the aborted telephone conference, if you

22     will, in early October, and the October 31st -- at any point

23     after the October 31st conference was scheduled, did you have

24     any telephone calls with Mr. Liebowitz prior -- between that

25     date and October 30th?

1   A.  I don't recall that.  The only conversation I had, again,

2   was with the mediation office informing them that the

3   respective parties had agreed on the 31st.

4   Q.  All right.  And then on October 30th, you had one or more

5   than one conversation with Mr. Liebowitz?

6   A.  There were more than one.  And I also talked to Mr. Newberg

7   at that time because, again, the parties weren't all that far

8   apart and, again, can avoid coming in -- if they can avoid

9   coming in, that would be fine.

10  Q.  And on that date, on October 30th, did you know where

11  Mr. Usherson, the plaintiff in this matter, was located?

12  A.  I had no idea.

13  Q.  Did Mr. Liebowitz say anything about the location of

14  Mr. Usherson in his calls with you on October 30th?

15  A.  Not that I recall.

16  Q.  And to your knowledge, I take it, you didn't say anything

17  about Mr. Usherson's whereabouts or residence prior to October

18  30th either?

19  A.  No.

20  Q.  All right.

21       Do you remember when your last conversation was with

22  Mr. Liebowitz on October 30th?

23  A.  It was sometime either late afternoon or early evening.

24  Without going into the specifics, it looks like they could have

25  reached a settlement.  Mr. Newberg had said that -- let's say

1  the dollar amount was probably acceptable, but he wanted a

2  written settlement agreement.

3  Q.  Let's skip over the substance of the negotiations, if you

4  will, just because that's beyond the scope of what we're doing

5  here.

6            Your testimony is that your last conversation with

7  Mr. Liebowitz was in late afternoon or early evening of October

8  30th?

9  A.  That's correct.

10 Q.  How long did that call last, to your recollection?

11 A.  Less than ten minutes.

12 Q.  And do you know where Mr. Liebowitz was at the time?

13 A.  At the time I did my declaration, I did not.  He has a

14 number that you can't tell, because it's 646, as I remember.  I

15 don't know where that is.  But I believe at one point in time I

16 became aware that he was -- he was out of state.

17 Q.  And your recollection is that at some point prior to the

18 mediation, you became aware that he was out of state?

19 A.  Yes, that's -- my records indicate that.

20 Q.  And your records, is there some email referencing --

21 A.  An email, yeah.

22 Q.  And referencing that he was in Los Angeles?

23 A.  Yes.

24 Q.  And at that time -- do you remember when that email was

25 from and --

K18VUSHH                    Mediator - direct

A.  It would have been from Mr. Liebowitz saying, Call me,

again, trying to see if the dispute had been finalized to a

resolution.

Q.  And did the email say, Call me, I'm in Los Angeles, or

something to that effect?

A.  I think it said, Call me, and I had his number.  But I

became aware prior to that time, whether it was on the 30th or

before that, that he was -- he was out of state.

Q.  And I'm just trying to pin down how you became aware of

that fact.

A.  He may have told me or whatever, you know, I have no

present recollection.  But from the email correspondence, it

seems to indicate I knew he was in L.A.

Q.  All right.

         And in that last conversation where you said it was

less than ten minutes, again, I don't want you to get into the

substance of the negotiations, just the, sort of, logistics of

the appearances the next day, what did he say and what did you

say that you recall?

A.  On the 30th, the last conversation?

Q.  Yes.

A.  On the last conversation I had, I said, again, in

substance, that the numbers would be agreeable, the numbers

were.  But it's not going to happen prior to the mediation

unless both sides have a written stipulation settling all

K18VUSHH                        Mediator - direct

1    matters.  There were some outstanding matters that Mr. Newberg

2    in particular wanted to make sure it was pinned down.

3    Q.  Let me just be clear.  What I'm asking is how did you leave

4    things?  Was there a discussion that you would have a further

5    conversation; that you would resume the conversation at the

6    mediation the next day?

7    A.  The actual last conversation I had with Mr. Newberg

8    explaining where we were, and Mr. Newberg had said that

9    basically unless we have writing, I'll see you tomorrow.

10             I said, Okay.  I'll see you at 11 o'clock tomorrow.

11   Q.  Okay.  And then the communications you had with

12   Mr. Liebowitz on October 30th, did he say anything one way or

13   another about whether he would be appearing at the mediation on

14   the 31st?

15   A.  I frankly don't recall.

16   Q.  You don't recall one way or another?

17   A.  One way or another.

18   Q.  Did he ask your permission not to appear himself?

19   A.  No.  But, again, on prior occasions, because I've done

20   several mediations now, his associate always seemed fully

21   knowledgeable on the cases that he appeared.

22   Q.  All right.  And on those occasions, you had not -- I take

23   it you had, sort of, blessed the arrangement, that is to say

24   proceeded with the mediation, even if Mr. Liebowitz hadn't

25   obtained your advanced permission to send Mr. Freeman?

K18VUSHH                           Mediator - direct

1    A.  Yeah.  As long as the -- talked to defendant's counsel, as

2    long as I assured them, and Mr. Liebowitz's associate assured

3    them that he had full authority to settle the case, then we can

4    proceed on that basis.

5    Q.  All right.

6            Turning back to October 30th, did Mr. Liebowitz make

7    any reference to Mr. Freeman in your conversations with him?

8    A.  I don't recall.

9    Q.  You don't recall one way or another?

10   A.  One way or the other, sorry.

11   Q.  Did he make any reference to his sister one way or another?

12   A.  His sister?

13   Q.  Yes.

14   A.  I don't recall that at all.

15   Q.  All right.

16           And did he make any reference to Mr. Usherson's

17   participation in the mediation?

18   A.  No.

19   Q.  Did he ask your permission for Mr. Usherson to appear by

20   telephone?

21   A.  No.

22   Q.  And again, your testimony is that he made no reference to

23   Mr. Usherson's whereabouts, where he was?

24   A.  That's correct.  Mr. Usherson's -- where he was was just

25   not part of the conversation.

1    Q.  All right.

2    A.  I mean, I could add, if you'd like.  The first time I heard

3    anything was at the mediation with Mr. Newberg, who said we

4    picked the 31st specifically because Mr. Usherson would be

5    there and presumably Mr. Liebowitz would be there, but I wasn't

6    part of those conversations.

7    Q.  Okay.  If Mr. Liebowitz had told you that Mr. Usherson

8    would be participating by telephone, would you have made any

9    record of that?

10   A.  You mean written record?

11   Q.  Yes.

12   A.  No.  I might have told Mr. Newberg that, you know, we're

13   proceeding tomorrow, but I usually don't make a written record

14   on pre mediation.

15   Q.  All right.

16          And when you say you might have told Mr. Newberg,

17   would you have told Mr. Newberg or you're not sure?

18   A.  I'm not sure.  But, you know, we had conversations, I say,

19   relating to the substance of it, I might have mentioned it to

20   him.

21   Q.  All right.

22          Let me show you -- one moment.

23          Showing you docket number 16-8, Exhibit 8 to

24   Mr. Newberg's declaration, do you want to just take a quick

25   look at that.  And directing your attention to the bottom of

K18VUSHH                    Mediator - direct

1    that exhibit.

2    A.  Talked to Richard.

3    Q.  There's an email from you to Mr. Newberg stating that you

4    had spoken to Richard and he has been tied up.  That's

5    Mr. Liebowitz, I assume?

6    A.  Yeah.

7    Q.  And he will review tonight and get back to us in morning.

8    Hopefully, we can settle this before a need to go to in-person

9    mediation.  You sent that email to Mr. Newberg?

10   A.  Yes.

11   Q.  So that's at 8:15 p.m.

12        Did you send that email following your final

13   conversation with Mr. Liebowitz, do you recall?

14   A.  That would refresh my recollection at that point, yes.

15   Q.  And do you have any recollection of how long after your

16   conversation you would have sent this email?  Was it --

17   A.  Right away.

18   Q.  Very good.

19        And then Mr. Newberg responds with your name, and

20   then, I'm headed to the train station well before 6 a.m.  And

21   to be candid, I would have assumed Mr. Usherson either flew to

22   New York tonight or is likewise on a very early plane.

23        Do you see that?

24   A.  Yes.

25   Q.  And you understood Mr. Usherson was the plaintiff in this

1    matter?

2    A.  Oh, yes.

3    Q.  And you responded, this is at 10:03 p.m. on October 30th:

4    I understand.  Yes?

5    A.  Yes.

6    Q.  Now, would you have -- if you had known that Mr. Usherson

7    was not planning to attend, would you have said something to

8    that effect in that email?

9    A.  Probably, given what Mr. Newberg said.  But I -- you know,

10   I want to be candid, it's -- it's looking backward.

11   Q.  All right.  Candor is a good thing in this context.

12          And at what point did you -- did you learn that

13   Mr. Usherson was not coming?

14   A.  When the mediation started at 11 a.m.

15   Q.  And turning to that day, who arrived at the mediation

16   first?

17   A.  Mr. Newberg and his client.

18   Q.  And what, if anything, did you say to him at that time

19   regarding Mr. Liebowitz's attendance at the mediation?

20   A.  I don't recall.  I know pretty soon after that,

21   Mr. Liebowitz's colleague came.  So it's clear that

22   Mr. Liebowitz wasn't going to be there.

23          And I was told by Mr. Newberg that they picked that

24   date because all counsel and clients would be there.  And they

25   specifically chose the 31st based on those representations.

K18VUSHH                    Mediator - direct

1    Q.  All right.

2              And what, if anything, did you say about Mr. Usherson

3    participating in the mediation, appearing in person?

4    A.  I said nothing about it, nothing at all.  I said, I'm

5    sorry.  I was not a party to the representations between you --

6    meaning Mr. Newberg -- and Mr. Liebowitz as to participation.

7              THE COURT:  Did you say in sum and substance that you

8    doubted that Mr. Usherson would be attending the mediation?

9    A.  I don't recall, again, one way or the other.

10   Q.  Do you recall at that moment if you -- based on your prior

11   experiences with Mr. Liebowitz or your communications, you

12   expected Mr. Usherson to appear in person?

13   A.  Again, your Honor, certain of the mediations, the client

14   was there; and certain of the mediations, the client wasn't

15   there.  I don't want to look backwards at what my assumption

16   was at that time, because I really don't recall.

17   Q.  All right.

18             And how did Mr. Newberg react when he learned that

19   Mr. Liebowitz would not be appearing in person?

20   A.  He was upset.  He said, again, in sum and substance, That's

21   why we picked the 31st; we agreed on that because all parties

22   would be in attendance, and that's the assumption that he acted

23   upon.

24   Q.  And did you say anything to him about when you first

25   learned that Mr. Liebowitz would not be attending in person?

K18VUSHH                           Mediator - direct

1   A.  I don't recall.  It would have been obviously at the

2   mediation.  I think I said something to the effect, you know, I

3   think Richard is out of town, so I'm not sure he's going to be

4   here.  And again, Mr. Newberg reiterated that that was the

5   whole purpose of choosing the 31st.

6   Q.  And did you say anything to Mr. Newberg one way or another

7   about when you learned that Mr. Usherson would not be appearing

8   in person?

9   A.  I didn't learn that until the mediation was on already.

10  Q.  And I don't want to get into the substance of those

11  negotiations, but there did come a time during the mediation

12  when Mr. Usherson was called on the telephone; correct?

13  A.  Yes.  Without getting into the substance of it, there were

14  proposals on the table.  And at the end of the mediation -- we

15  sat around a table.  And Mr. Usherson was on -- was on the

16  telephone rejecting any such proposals.  That was the only

17  time.

18  Q.  Did Mr. Freeman call him from inside the room?  In other

19  words, were you present when he called Mr. Usherson?

20  A.  I don't know whether that was the first call I had with

21  Mr. Usherson or the second call, but, yes, we were in the room

22  when he had the call.

23  Q.  Okay.  When you say the first or the second, did

24  Mr. Freeman indicate he was calling Mr. Usherson before that

25  call?

K18VUSHH                          Mediator - cross

1    A.  No, it's just at the -- at the time, Mr. Freeman -- I asked

2    to speak to Mr. Newberg alone, him and his client alone, to

3    ascertain where we were.  So Mr. Freeman was in another room,

4    so I don't know what happened then.

5    Q.  And when you were present and Mr. Freeman called

6    Mr. Usherson, did he say anything about his awareness of the

7    mediation in that call?

8    A.  Mr. Usherson?

9    Q.  Yes.  Did he give any indication about whether he had been

10   aware of the mediation?

11   A.  He was aware of the mediation, I'm sure of that, from the

12   indications of the call.  He had certain expectations on what

13   would happen and didn't.

14   Q.  All right.  Very good.

15           I think that, at least for the moment, is all I wanted

16   to ask.

17           Mr. Newberg, let me turn things over to you.

18   CROSS-EXAMINATION

19   BY MR. NEWBERG:

20   Q.  Thank you.  I'd use your name, but you understand.

21           So on December 12, 2019, at the Court's request, you

22   submitted a declaration in this case; correct?

23           THE COURT:  Mr. Newberg, you've got to slow down a

24   little bit --

25           MR. NEWBERG:  Oh, sorry.

K18VUSHH                          Mediator - cross

1        THE COURT:  -- for the court reporter's benefit.

2   A.  Yes.

3   Q.  On December 12th, you submitted a declaration?

4   A.  Yes, I submitted a declaration.  I presume you have the

5   right date.

6   Q.  Actually, I take that back.  It looks like it was filed

7   December 11th, so my apologies.

8   A.  It was on or about that time, I recall.

9   Q.  And as you sit here today, are you aware of anything in

10  that declaration that would need to be corrected or was untrue?

11  A.  No, again, other than the fact that I -- again, after that

12  time, I went back through the email and I saw something about

13  L.A., and that would be the only thing I would modify.

14  Q.  So but in terms of when you declared that in other cases

15  Mr. Liebowitz has had his client appear telephonically, but you

16  did not give such permission in this case, is that a true

17  statement you still stand by?

18  A.  Yes.

19  Q.  And when you put in your declaration that at no time were

20  you informed that the plaintiff would not appear personally, is

21  that still a true statement that you stand by?

22  A.  That's correct.

23  Q.  And when you declared in other cases Mr. Liebowitz has had

24  an associate appear in his stead, but you did not give such

25  permission in this case, is that a true statement you still

K18VUSHH                    Mediator - cross

1    stand by?

2    A.  Yes.

3    Q.  And when Mr. Freeman showed up to the mediation that day,

4    were you aware he hadn't made an appearance in this case?

5    A.  No.

6    Q.  Did anyone ever talk to you about whether Mr. Freeman or

7    Mr. Liebowitz would be trial counsel in this case?

8    A.  No.

9    Q.  Were you aware when Mr. Freeman showed up to the mediation

10   that he had just found out about the existence of this case the

11   night before?

12   A.  No.

13   Q.  I'll represent I'm not aware of any emails or other written

14   communications with you that Mr. Liebowitz had asking for

15   permission for his client to attend telephonically.  Are you

16   aware of the existence of any such email where he asked you for

17   permission in writing for his client to attend the mediation

18   telephonically?

19   A.  Based on my recollection and looking through my emails

20   prior to this day, no.

21   Q.  Mr. Liebowitz has testified about certain permissions.  Are

22   you aware of any emails he sent you following up or confirming

23   a supposed permission for his client to attend the mediation

24   telephonically?

25   A.  I'm not aware of that, no.

K18VUSHH                          Mediator - cross

1   Q.  Are you aware of the existence of any email where he asked

2   you for permission for him to not attend the mediation?

3   A.  Again, I don't recall that there was an email.  But, again,

4   just to clarify the record, I know somewhat prior to the

5   mediation date that he was out of town.  So it's possible that

6   I made a presumption that he might not appear.

7   Q.  But you stand by your declaration that you didn't give him

8   permission to not appear?

9   A.  Not expressly, no.

10  Q.  Now, this is an email exchange that I'm going to hand up to

11  you; it's Exhibit 7 to my November 6 declaration.  This is an

12  email exchange between you and me on October 23rd, a week

13  before the mediation.  Do you recognize it?

14  A.  Yes.

15  Q.  And in it you ask me whether we can have a call the next

16  day, the 24th, it says, "to see if we can settle this matter

17  without you having to come to New York."  Do you see that?

18  A.  Yes.

19  Q.  So is it correct to say that as of that date, late in the

20  evening of October 23rd, 2019, you, at least at that point,

21  expected the mediation to be an in-person mediation with

22  counsel and clients; correct?

23  A.  It would have to be.

24  Q.  You say it would have to be.  Why is that?

25  A.  Because the mediation office, they said -- initially, there

K18VUSHH                    Mediator - cross

1    was a suggestion that the mediation would be telephonic rather

2    than in person.  And I was subsequently informed that the

3    office of the mediation wanted the mediation to be an in-person

4    mediation.  And I said fine.  That's when I communicated to you

5    and Mr. Liebowitz, pick a couple of dates that are mutually

6    convenient.

7    Q.  So you were clear, then, based on the mediation office's

8    instruction, that this had to be an in-person mediation with

9    counsel and clients; correct?

10   A.  Correct.

11   Q.  So if Mr. Liebowitz were to ask for these permissions,

12   would you have referred him to the mediation office's

13   instructions that this had to be in person?

14   A.  Mr. Liebowitz knew it had to be in person, because, I mean

15   that was -- that was what the mediation office had said.  And I

16   communicated both to you and Mr. Liebowitz that it would be an

17   in-person mediation.

18   Q.  I'm going to hand you another email string.  This is

19   actually the last exhibit in my December 10th declaration, the

20   second declaration.

21   A.  Thank you.

22   Q.  And this is an email string between me and you on the night

23   of October 30th, 2019, the night before the mediation.  Other

24   than what has been redacted by the Court, do you recognize it?

25   A.  Yes, I do.

K18VUSHH                          Mediator - cross

1   Q.  I want to direct you to my last email chronologically, the

2   6:34 p.m. email at the top.

3   A.  Yes.

4   Q.  Do you see where I say:  If we can't settle that night, "we

5   will see Mr. Liebowitz and Mr. Usherson tomorrow."

6              Do you see that?

7   A.  Yes, I do.

8   Q.  And you understood that would mean seeing them at the

9   mediation; correct?

10  A.  That was my -- that would be my understanding.

11  Q.  And you don't recall at any time responding, No,

12  Mr. Liebowitz actually won't be at the mediation?

13  A.  No, I did not.

14  Q.  Because, at least as of this email on October 30th, 2019,

15  the night before the mediation, you had no reason to believe

16  Mr. Liebowitz and Mr. Usherson wouldn't be attending the

17  mediation in person.

18  A.  As I say, I had no reason to believe that Mr. Usherson

19  wouldn't be there.  Again, going back and refreshing my

20  recollection, it's quite possible that I had some doubts that

21  Mr. Liebowitz would be there.

22  Q.  But even if you had thoughts that Mr. Liebowitz might be

23  out of town, as you've testified here today, you did not give

24  him permission to not attend the mediation?

25  A.  No.

K18VUSHH                    Mediator - cross

1   Q.  No, you did not give permission?

2   A.  No, I did not.

3   Q.  And your Honor has already asked you about my Exhibit 8.

4   I'm just going to give you a copy.

5           THE WITNESS:  Is it all right if I get my glasses?

6           THE COURT:  Sure.  Are they in the bag?

7           THE WITNESS:  Yes.

8           THE COURT:  My deputy will get the bag, and then you

9   can fish them out.

10          The witness just requested his glasses, so we'll

11  accommodate that.

12          THE WITNESS:  Thank you.

13  A.  Sorry.

14  Q.  No problem.

15          So I'll be brief, since the Court has already asked

16  you about this.  But when I say -- when you say at 8:15 p.m.,

17  Hopefully, we can settle this before need to go to in-person

18  mediation, you say "in-person mediation" because you still

19  expect all counsel and clients to be at that in-person

20  mediation?

21  A.  There's going to be an in-person mediation, there's no

22  doubt about that.

23  Q.  And that email you sent to me at 8:15 was after, as you

24  testified, your last conversation with Mr. Liebowitz of that

25  night?

K18VUSHH                      Mediator - cross

1   A.  That's correct.

2   Q.  And then we have a further communication where I mention

3   that I'm assuming Mr. Usherson is already on his way to New

4   York or would be on a very early plane.

5            And you say, I understand.  Correct?

6   A.  That's correct.

7   Q.  And there's nothing between -- there are no conversations

8   you had with Mr. Liebowitz between 8:15 and 10:03 which would

9   have made you believe Mr. Usherson wasn't attending the

10  mediation; correct?

11  A.  I had no reason to believe one way or the other.  It was an

12  in-person mediation.

13  Q.  You have no reason to believe one way or the other because

14  the question of could Mr. -- could Mr. Usherson attend by

15  telephone just didn't come up; correct?

16  A.  It didn't come up, yeah.

17  Q.  And you stated, when the Court was asking you questions,

18  that Mr. Liebowitz has -- has done this before, where you

19  expected the client to appear, and his client didn't show up;

20  correct?

21  A.  That's true.

22  Q.  And in those cases, you couldn't have given advanced

23  permission because you didn't know in advance whether they'd be

24  showing up, right?

25  A.  That's correct.

1          On those occasions, I should add, when it was clear

2     that the client would not appear, we talked to defendant's

3     counsel and advised them of that fact at the mediation, what

4     their -- what their response was, should we go ahead with the

5     mediation or is this another problem.

6     Q.   Right.

7          But in terms of if Mr. Liebowitz was to testify there

8     was a practice of you granting advanced permission, the

9     practice would actually be permitting the mediation to go

10    forward when his client didn't show up?

11    A.   That, in substance, is correct.  I mean, as long as

12    Mr. Liebowitz or his associate had full authority *vis-à-vis* the

13    mediation, and his client could be reached by phone, we would

14    go ahead unless there was an objection.

15    Q.   And finally, the Court asked you about Mr. Usherson's

16    awareness of the mediation, and you said when he was on the

17    phone, he seemed aware of it.

18         Do you know whether he was aware prior to the

19    mediation, as opposed to having just been told on the telephone

20    conversation a few minutes earlier, that we're having a

21    mediation?

22    A.   The only time I heard Mr. Usherson was when you were there

23    on the telephone, so I had no -- no idea where he was or what

24    his level of knowledge was.

25    Q.   So you have no reason to believe one way or the other that

1    he was told before October 31st that there would be a mediation

2    that day?

3    A.   That's correct.

4              MR. NEWBERG:  That's all I have, your Honor.

5              THE COURT:  All right.

6              And just to clarify, prior to this case, there had

7    been mediations where the client did not participate in person,

8    and you had blessed that, at least, by proceeding with the

9    mediation in the absence of any objection; is that correct?

10             THE WITNESS:  That's correct.

11             THE COURT:  And prior to this mediation, had

12   Mr. Liebowitz ever sought your permission in advance for the

13   client not to appear in person and to participate by telephone?

14             THE WITNESS:  Again, I can remember one occasion when

15   he informed me that the client was -- was overseas.  And again,

16   I talked to the defendant in the case.  And they were a little

17   upset, but we went ahead and it turned out fine.

18             THE COURT:  All right.  Give me one moment.  I'm going

19   to print a hard copy of one additional email.  Oh, we have it.

20             Now, this is docket number 36, Exhibit 2.  If you

21   could look at that.  That's an email from you to Mr. Newberg on

22   the morning of October 30th at 9:07 a.m.; correct?

23             THE WITNESS:  That's correct.

24             THE COURT:  And it says I -- well, it doesn't say "I,"

25   but, Had a long, frank talk with Mr. Liebowitz last night.  And

K18VUSHH                        Mediator - cross

1      I believe that he would settle for -- and then the figure is

2      redacted, and so forth.  Is that correct?

3                  THE WITNESS:  That's correct.

4                  THE COURT:  So based on this email, is it correct that

5      you had a conversation with Mr. Liebowitz on the night of

6      October 29th?

7                  THE WITNESS:  That's correct.

8                  THE COURT:  All right.

9                  If you could just move closer to the microphone to

10     make sure everyone can hear you, that would be great.

11                 And do you remember if, in that conversation, he

12     indicated where he was at the time?

13                 THE WITNESS:  Again, I don't believe so.

14                 THE COURT:  Okay.  And at that time did he ask for

15     your permission to allow Mr. Freeman to appear on his behalf,

16     instead of appearing personally?

17                 THE WITNESS:  I don't recall that.

18                 THE COURT:  And at that time, I take it you still

19     believed that Mr. Usherson would be appearing in person, and

20     there was no conversation or discussion of his participation by

21     telephone; is that correct?

22                 THE WITNESS:  There was -- there was no discussion of

23     that.  I mean I expected this to settle at some point.  There

24     was no -- there was no discussion of Mr. Usherson or who would

25     appear or who would not appear.

K18VUSHH                        Mediator - cross

1        THE COURT:  And just to be completely clear, is it

2    correct that until the mediation itself on October 31st, you

3    had not had any conversation with Mr. Liebowitz regarding

4    Mr. Usherson's physical presence at the mediation?

5        THE WITNESS:  That's correct.

6        THE COURT:  And until the -- all right.

7    Very good.

8        MR. NEWBERG:  I have one more question, your Honor.

9    BY MR. NEWBERG:

10   Q.  Sir, are you -- you mentioned that there was one case where

11   you believe Mr. Liebowitz got advanced permission for the

12   client to attend telephonically.  And I just want to be clear,

13   a case called *Sadowski* has come up today, and I just want to be

14   clear whether you're sure that it was Mr. Liebowitz's client,

15   as opposed to the defendant who was in Israel in the *Sadowski*

16   case, who had asked for advanced permission?

17   A.  That's correct.  I remember the *Sadowski* case quite well.

18   Q.  So in that case, it was actually the defendant who asked

19   for advanced permission?

20   A.  It was, yes, because, again, the client -- one of the

21   parties was in Israel.  And that was -- that was the plaintiff.

22   The plaintiff was in Israel, I believe.

23   Q.  All right.  But your belief is that the one case was that

24   *Sadowski* case, where a party was in Israel?

25   A.  It's just -- I mean I just want to be clear.  In *Sadowski*,

K18VUSHH                              Mediator - cross

1    the plaintiff was by telephone, because the client was in

2    Israel.

3            I think the other case was the *Onion* case, where the

4    client was overseas.  I believe that's the case -- at least in

5    my mind now, that's what I was referring to.

6    Q.  Okay.  Thank you very much.

7            THE COURT:  All right.  Mr. Freeman.

8            MR. FREEMAN:  If I may approach the witness.  I'd like

9    to hand the docket sheets from those five previous cases, as

10   well as the initial complaint.

11           THE COURT:  Sure.

12           MR. FREEMAN:  Thank you.

13   CROSS-EXAMINATION

14   BY MR. FREEMAN:

15   Q.  Good afternoon, Mediator.

16   A.  Good afternoon.

17           MR. FREEMAN:  So I want to short-circuit this, your

18   Honor, because I know we've covered much of this ground.

19   Q.  So what I've handed you, Mr. Mediator, is five docket

20   sheets and, in addition, the complaint -- initial complaint in

21   the action.  Can you just quickly review and verify that those

22   are the five actions that you served as the mediator?

23   A.  Yes.

24   Q.  Now, with respect to the ones labeled A, B, and C, that

25   would be *Emerson*, *Mottram*, and *McGovern*, I'm just going to,

K18VUSHH                          Mediator - cross

1   sort of, ask you the same set of questions for each to keep

2   this brief.

3               So in each of these cases, is your recollection that

4   the plaintiff was out of state, was located out of state?

5   A.   I certainly know in *Mottram* --

6   Q.   Right.  That's the one that was in United Kingdom?

7   A.   Yeah.

8   Q.   If it refreshes your recollection, the complaint on

9   paragraph 5 -- it's the same in every complaint, paragraph 5.

10              With *Emerson*, I'll represent to you that it says New

11  Orleans, Louisiana.  Do you want to just confirm that?

12  A.   Yes, I see that.

13  Q.   And then in *McGovern*, which is marked as C --

14  A.   Yes.

15  Q.   -- is Davie, Florida?

16  A.   Yes, I see that.

17  Q.   Now, in each of these cases, *Emerson*, *Mottram*, and

18  *McGovern*, was the mediation successful?

19  A.   Yes.

20  Q.   And is it the case that in each one of those cases, the

21  plaintiff participated via telephone?

22  A.   That's my recollection.

23  Q.   And in each of those cases, did you grant Mr. Liebowitz

24  advanced permission for his clients to appear telephonically?

25  A.   Again, the only one I recall advance was *Mottram*, because

K18VUSHH                          Mediator - cross

1    I -- I was informed that the client was in London, England --

2    or in England at least.  I don't recall the other two that

3    there was advance.

4    Q.   But the mediations proceeded and they were successful?

5    A.   That's correct.

6    Q.   In the case of *McGovern*, is it your recollection that

7    defense counsel also appeared telephonically?

8    A.   That's *Emerson v.* --

9    Q.   This is, I'm sorry, *McGovern v. Q Digital*.

10   A.   I'm not sure of that.

11   Q.   Fair enough.

12          All right.  So let me turn your attention to the case

13   of *Pereira v. Source Digital*; it's marked as D.  If you could

14   turn to the complaint in that action, paragraph 5.

15   A.   Yes.

16   Q.   It states that Mr. Pereira is located in Brooklyn, New

17   York; is that correct?

18   A.   Yes.

19   Q.   And in that case, did you grant Mr. Liebowitz advanced

20   permission for Mr. Pereira to appear telephonically?

21   A.   I don't think it was advanced permission, no.  But I recall

22   that the defendant appeared in this case telephonically.

23   Q.   With respect to *Sadowski v. Seeking Alpha*, this was the

24   case where I appeared in Mr. Liebowitz's stead.  Do you recall

25   that?

1    A.  Yes.

2    Q.  And if you could turn to paragraph 5 of the complaint in

3    that action, *Sadowski*.

4    A.  Yes.

5    Q.  It says that Mr. Sadowski is located in Hawthorne, New

6    Jersey.  Do you know whether that's within 100 miles of the

7    courthouse, Hawthorne?

8    A.  I have no idea, but I presume it is.

9    Q.  And did you -- did Mr. Liebowitz obtain advanced permission

10   from you for Mr. Sadowski to appear telephonically?

11   A.  No.  I recall this quite well.  Because at least general

12   counsel for the defendant in this action was -- this is the

13   Israel action.  They were in Israel.  He was very upset.  We

14   proceeded.  And his counsel was present.  We proceeded.  But he

15   was upset.

16   Q.  In any of the five actions that we've just referred to, do

17   you believe that the participation of the plaintiff

18   telephonically impaired in any way, shape, or form the

19   mediation?

20              THE COURT:  Sustained.  Next question.

21              MR. FREEMAN:  All right.

22              I have no further questions, your Honor.

23              THE COURT:  All right.  Anything else, Mr. Newberg?

24              MR. NEWBERG:  No, your Honor.

25              THE COURT:  All right.  Mr. Mediator, a lack of using

K18VUSHH

1     your name, you may step down.  I thank you very much for your

2     presence here today.  And again, I apologize for how much time

3     it has taken out of your schedule.

4               THE WITNESS:  Could I leave?

5               THE COURT:  You may leave.  You are excused.

6               THE WITNESS:  Okay.  Thank you.

7               (Witness excused)

8               THE COURT:  All right.

9               So I think in my order I had indicated that you should

10    be prepared to have brief argument after the hearing.

11              It's not the most complicated record.  And candidly,

12    I'm not sure there's much to be gained from oral argument.  So

13    I'm happy to dispense with it, but also happy to give you a few

14    minutes if you want to just emphasize a couple points, but I

15    think I can probably infer what you would emphasize if you were

16    given that opportunity.

17              So since I did tell you you would have some time, I'm

18    happy to give you an opportunity, if you wish to say anything.

19    But, again, I'm not sure it's necessary.

20              So, Mr. Freeman, let me start with you.

21              MR. FREEMAN:  Yes.  We'd like about three to four

22    minutes, your Honor, of summation.

23              THE COURT:  All right.

24              Mr. Newberg?

25              MR. NEWBERG:  Yes, your Honor, I'd like just a few

K18VUSHH                    Summation - Mr. Newberg

1    minutes.

2              THE COURT:  All right.

3              Since it's your motion, why don't we start with you,

4    that's Mr. Newberg.  And then I'll hear from Mr. Freeman.

5              Let's plan to keep it to five minutes or less.

6              Actually, in our new system, we have a fancy new

7    timer.  So we're going to test that out and see how it goes.  I

8    don't know what happens at the end of the time.  You may fall

9    through the floor where the floor may open up, but we'll find

10   out.

11             MR. NEWBERG:  No worries.  I had eight; I'm going to

12   cut it to five on the fly, and we'll see if I can beat the

13   clock.

14             THE COURT:  Okay.  But not too quickly for the court

15   reporter's benefit.

16             Go ahead.

17             MR. NEWBERG:  That may be eight by minutes, sorry.

18             Your Honor, first off, I want to say in representing

19   someone *pro bono*, I can't really refuse a withdrawal with

20   prejudice; so I'm glad the Court has decided to hold this

21   hearing.  We took this on because, as a copyright lawyer for

22   over 20 years, I wanted to see for myself what it was like to

23   be in one of these cases.  It only took a few days to go south.

24             Mr. Liebowitz originally asked the mediation office

25   and this Court for permission to have a telephonic mediation.

1   The mediation office denied that request; this Court denied

2   that request.  The Court was clear.  The mediator even told us

3   that he knew it was clear.  There was no wiggle room or room

4   for interpretation.

5        You have undisputed evidence that he chose the October

6   31st date.  It appears he chose this even knowing he had a

7   networking event in Los Angeles.  He chose it never stating he

8   or his client might not attend.  You don't have a single email

9   in evidence showing that Mr. Liebowitz ever informed his client

10  even about the mediation.  And I think it's astonishing that

11  Mr. Usherson didn't put in a declaration here.  It seems quite

12  possible to me he doesn't still know what's going on.

13       You don't have a single email showing Mr. Liebowitz

14  ever informing opposing counsel or the mediator he would not be

15  at the mediation or he would be sending an associate not

16  admitted to this case in his stead, and his client would not be

17  attending the mediation in person.

18       But you have emails very clearly indicating my

19  expectation and the mediator's expectation, even on the night

20  of October 30th, that he was going to be there, both -- and I

21  say "he," both Mr. Liebowitz and Mr. Usherson.  You have an

22  email from Mr. Liebowitz the morning of the mediation not

23  referencing that he or his client wouldn't be there.

24       You have Mr. Liebowitz before this Court at the last

25  conference, soon after the mediation, and in all his papers in

1    response to this motion, unable to tell the Court when he

2    supposedly received permission for him not to attend at all and

3    for his client to not appear in person.  He was asked by your

4    Honor in open court.  He said he didn't know, and this was

5    right after the mediation.  It's simply implausible.

6          He also chose not to put it into his declaration

7    papers.  He's only chosen now to mention the October 30th date.

8    There's no evidence to contradict the mediator's statements in

9    the mediator's declaration.  In fact, his statement is in line

10   with what the mediator told me at the mediation and in a phone

11   call after the mediation, both of which are in my declaration.

12         The only potential conflict Mr. Liebowitz raises is

13   that while the mediator declares that Mr. Liebowitz never

14   raised that he wouldn't be attending at all, I do recall the

15   mediator telling me at the mediation that he was told at the

16   last minute that Mr. Liebowitz would not be attending.  Again,

17   not permission.  And it's quite possible when he said, I think

18   he might be out of town, that that's what I was inferring to be

19   he won't be here.

20         Now, however, as I stated, the mediator never told me

21   or suggested to me that he gave permission for Mr. Liebowitz

22   not to attend.  And his declaration -- as is in his

23   declaration, he made very clear to me that Mr. Liebowitz never

24   raised the subject that his client not attending at any point.

25   And the first time he found out Mr. Usherson would not be

K18VUSHH                    Summation - Mr. Newberg

1   attending in person was when I did.  That's when Mr. Usherson

2   didn't show up.

3        And the practice that Mr. Freeman mentioned was

4   clearly disputed by the mediator.  He said, No, I didn't have a

5   practice of giving him advanced permission.  There's a practice

6   that he didn't show up, and we tried to go forward with the

7   mediation.

8        So you have the instructions from the mediation

9   office, you have the orders of this Court, you have the emails

10  and communications between counsel, and you have other emails,

11  including with the mediator.  Nothing in the evidence suggests

12  in the slightest that Mr. Liebowitz ever asked for permission

13  to not attend the mediation at all or for his client to not

14  attend in person.  There's no reason for the mediator to lie,

15  and his testimony that he never gave permissions is unwavering.

16       You have my testimony, declaration from my client, and

17  even the declaration and behavior of Mr. Liebowitz's associate,

18  Mr. Freeman, again, not at appearance in this case, but points

19  to the lack of permission.  He never stated at the mediation

20  that he was given permission or that he knew about permission.

21  He never put it into his declaration.

22       Every piece of information points to the conclusion

23  that Mr. Liebowitz simply failed to follow the rules and was

24  hoping this case would settle and go away before having to have

25  a hearing on this.  So we respectfully recommend the strongest

1    sanctions this Court has the power to issue, as prior warnings

2    and sanctions of this Court have clearly not had their intended

3    effect.

4            Finally, I do want to bring one last fact to this

5    Court's attention.  This case was filed -- and it goes to the

6    sanctions.  This case was filed on the premise that the

7    photograph in question was subject to a registration filed with

8    the copyright office, number 1-080-046, which contains over

9    2,000 photographs.

10            Not trusting Mr. Liebowitz's representations, before

11   this case settled, we asked the copyright office to deposit

12   copies associated with that registration.  Your Honor might be

13   aware it takes the copyright office a really long time, so we

14   got them at the end of last week.

15            Unless it's seriously mislabeled, we've been unable to

16   locate the photograph at issue in this case anywhere in the

17   deposit copies; so it appears this entire case might have been

18   a sham.  Therefore, to the extent that Mr. Liebowitz is allowed

19   to continue practicing in this Court, we believe it would be

20   proper to require him in any case in this Court to not only

21   serve licensing information at the beginning of the case, but

22   to also serve certified deposit copies from the U.S. Copyright

23   Office related to any registration alleged in his complaints.

24            Thank you.

25            THE COURT:  Let me just follow up with a couple

K18VUSHH                    Summation - Mr. Newberg

1      questions, first about that.

2              Where are there representations made in filings in the

3      Court about the licensing of the copyright?

4              MR. NEWBERG:  It's not the licensing, your Honor.  The

5      complaint --

6              THE COURT:  Registration, excuse me.

7              MR. NEWBERG:  Yes.  The complaint says that it's

8      subject to this registration:  DAU 1-080-046, that's in the

9      complaint.  And that's the sole basis for the complaint.

10             THE COURT:  And that is --

11             MR. NEWBERG:  This is a copy of the deposit.  I have

12     the certified one, which is not-to-be-opened sort of thing, in

13     my office.  I'm happy to give this copy to the Court.

14             THE COURT:  All right.  I would like that.  If you

15     could hand that up, that would be great.

16             And second, in terms of sanctions that you would

17     propose, in the event that I found that sanctions were

18     warranted, what is your proposal?

19             MR. NEWBERG:  Well, your Honor, as you know, we are

20     not in this case; I'm here more, frankly, as an officer of the

21     Court than anything.

22             So if the Court is to award monetary sanctions, I

23     completely leave that to the Court.  And if the Court wants it

24     to be reflective of the time and costs that we've spent on this

25     case or at this motion, I'm happy to give documentation on

K18VUSHH                    Summation - Mr. Newberg

1    that.  I'm happy -- obviously we are not in this case anymore.

2    I think any sanctions should go to a court or a *pro bono* fund.

3    We operate one, but any one that the Court would choose.

4              I think that given the prior issues in this Court,

5    that the Court is well aware of, and how close Mr. Liebowitz

6    came to an issue in the *Berger* case, in terms of him being

7    referred to the grievance committee, I certainly think this

8    issue should be referred as well.  And the Court can take

9    whatever is in its inherent powers.  This has gone on for too

10   long.

11             And then, of course, I mentioned the sanctions that I

12   do believe that to the extent he is allowed to participate in

13   cases in this Court, that certified copies of the deposit

14   copies that are associated with registrations should be

15   provided, along with the licensing information that your Honor

16   typically orders at the beginning of these cases.

17             THE COURT:  With respect to the sanctions, first of

18   all, I would ask that by -- I'll give you a week, why don't you

19   file an accounting of the fees and costs that are associated

20   with both the mediation and litigation of your sanctions

21   motion.  I recognize that you've handled this *pro bono*, but,

22   nevertheless, I think you can presumably tally those up.  I

23   intimate no view on whether I'm going to grant that, but I

24   think it would be helpful to have that as part of the record.

25             If I did decide that some sort of monetary sanction

1   was appropriate, did I understand you correctly that you're not

2   asking that your firm be paid that sanction, that you think it

3   would be more appropriate to either go to the Court or to some

4   sort of charitable or, you know, other kind of --

5        MR. NEWBERG:  Yes, your Honor.  I can tell you that if

6   it went to our firm, what would happen in this case is the

7   costs, which we have decided to eat, instead of passing them on

8   to defendant, any costs typically in this case that we would

9   get, we would be reimbursed for the costs, and all of the

10  attorneys' fees would go to our *pro bono* fund.

11       In this case, I don't even think we would do that; I

12  think costs and fees, if they came to us, would simply go into

13  our *pro bono* fund, and not to the Luke Horowitz Equity

14  Partners, so to speak.

15       But, yes, some sort of legal aid *pro bono* fund, the

16  Court.  I am not requesting that McGuire Woods profit from

17  this, nor do I believe my client, who we represent *pro bono*,

18  should be profiting from this issue.

19       THE COURT:  All right.  Thank you.

20       Mr. Freeman?

21       MR. FREEMAN:  Thank you, your Honor.

22       So let me start by saying that the -- what the

23  Liebowitz Law Firm does is we're in the business of law

24  enforcement.  And specifically, we're in the business of

25  enforcing intellectual property rights of --

1          THE COURT:  Mr. Freeman --

2          MR. FREEMAN:  This is important to us, your Honor, if

3     I might just have --

4          THE COURT:  But it's not important to me.  I want you

5     to focus on the subject matter of the hearing.

6          MR. FREEMAN:  Okay.  So I'll segue that into let's

7     talk about exactly what this motion for sanctions, the

8     evidentiary standards that are required.

9          The defendant has made a motion for sanctions pursuant

10    to the Court's inherent authority to sanction; and has also

11    made a motion pursuant to Federal Rules of Civil Procedure,

12    specifically, Rule 16.  The evidentiary standards for those two

13    are quite different.

14         The inherent power is not to be invoked pursuant to

15    Supreme Court authority unless there's clear and convincing

16    evidence of bad faith.  In the case of *Rice v. NBC Universal*

17    that your Honor decided this past summer, that was a case where

18    it was essentially just a no-show.  Mr. Liebowitz didn't show

19    up to mediation, Mr. Liebowitz didn't show up to the Court's

20    hearing, and the Court determined that that was bad faith.

21         This is not this case.  This is a case where, you

22    know, it's plain that good-faith efforts were made to

23    participate in mediation.  Well, they could say there wasn't,

24    but look at how much paper and look at how much testimony has

25    been evinced in this proceeding to determine whether or not

K18VUSHH                    Summation - Mr. Freeman

1    there was bad faith or was it just neglect or was it just the

2    case, as we allege, that Mr. Liebowitz was simply following an

3    established custom and practice with the mediator who he had

4    five previous experiences with three to four months prior to

5    this particular mediation.  It certainly does explain --

6              THE COURT:  Let me interrupt and ask you two

7    questions.

8              First of all, am I correct in assuming if I were to

9    find that Mr. Liebowitz's representations to me, both in court

10   and under oath and in his testimony, if I were to find that

11   they were false, that that would be a basis for sanctions

12   pursuant to my inherent authority?  I assume you don't dispute

13   that proposition?

14             MR. FREEMAN:  Let me think about that.  I mean,

15   there's -- if the Court were to find that Mr. Liebowitz has

16   committed -- has testified --

17             THE COURT:  Lied.  Let's put it bluntly.  If I find

18   that he has lied, that would be a grounds for sanctions

19   pursuant to my inherent authority; correct?

20             MR. FREEMAN:  Yes, that would be.

21             THE COURT:  Okay.

22             Second, you filed -- you or Mr. Liebowitz, because

23   he's counsel of record, filed an opposition to the motion for

24   sanctions in this case; correct?

25             MR. FREEMAN:  Yes, the firm did file a motion for

1    opposition -- opposition brief to sanctions.

2            THE COURT:  And give me a moment to call that up.

3    That was filed on November 18th; is that correct?

4            MR. FREEMAN:  Yes.

5            THE COURT:  And anywhere in that submission did you or

6    Mr. Liebowitz make any reference to the custom and practice

7    with this mediator of allowing the client to participate by

8    telephone or allowing an associate to appear on Mr. Liebowitz's

9    behalf?

10           MR. FREEMAN:  No, I don't believe so.  It was raised

11   in the letter to the Court.

12           THE COURT:  The first time that that argument was made

13   was in the December letter in response to the mediator's

14   declaration; correct?

15           MR. FREEMAN:  That's correct.

16           THE COURT:  Okay.  Go ahead.

17           MR. FREEMAN:  So the issue is that if the Court does

18   not find -- if the Court finds here -- I think the evidence

19   here shows that there was clearly a miscommunication between

20   the mediator and between Mr. Liebowitz.

21           The mediator did report to duty on the morning of

22   October 31st, and did inform opposing counsel that

23   Mr. Liebowitz would not be there, according to the sworn

24   declaration of Mr. Newberg.  He also expressed doubt that

25   Mr. Usherson would be there.

1      It sort of strains credulity to think that, well, no

2  discussion was even had, and that this was just purely

3  speculative meanderings of the mediator.

4      Clearly, there was a communication the night before

5  and the issues were discussed.  In that scenario, it does

6  create what can only be described as a gray area.  And to the

7  extent that they are arguing, Well, Mr. Liebowitz should be

8  submitted to the grievance committee, the grievance committee

9  is typically reserved for situations where there's venal intent

10  or bad-faith intent or an intent to perjure oneself.

11      There's no evidence here that Mr. Liebowitz has said

12  anything on the record that wasn't consistent with his

13  understanding of the discussions with respect to him getting

14  permission from the mediator.  And the fact that we have five

15  cases in which the exact same protocol was followed, I mean, as

16  Mr. Liebowitz stated on the stand, there's no question that he

17  did not follow best practices here; he should have gotten it in

18  writing.  He procrastinated, there's no question, and he does

19  apologize to the Court.  And we apologize to the Court for

20  that, for not following best practices.  But not following best

21  practices and having sanctions imposed against an officer of

22  the Court is two completely different standards.

23      So in this case, Mr. Liebowitz has testified

24  repeatedly, first before the hearing in the court in November,

25  again in his declaration, and again here today, that he had the

1  discussion with the mediator; that he did get the permission;

2  and that was consistent with the custom and practice.  And

3  although the mediator seems to dispute that, the mediator, on

4  several occasions, said he didn't recall precisely what

5  happened.  So we would just simply call the mediator's memory

6  into question.

7          In terms of the court order -- because we have

8  anticipated that, you know, there could be a finding here that

9  even if Mr. Liebowitz did obtain permission from the mediator,

10 that the Court may find, Well, it makes no difference, because

11 the Court had ordered that an in-person mediation take place.

12 And I state this with the most respect and with tremendous

13 humility, but the Court's order, as specific as it was, it did

14 not specifically state attorney and client must appear in

15 person.  And I believe we did cite in our letter, you know, the

16 camp mediation in the Second Circuit has a rule which

17 specifically states attorney and client.

18         So we're not saying that the Court's order lacks

19 specificity, but we're saying that it was open for

20 interpretation; and that in cases where a court order is open

21 for interpretation, you know, the attorney should not be

22 sanctioned for adopting an interpretation which, in the Court's

23 view, it might not have been the best interpretation, but it

24 certainly was open for interpretation as to whether or not the

25 client was absolutely required to attend.

K18VUSHH                    Summation - Mr. Freeman

1          I think we can all agree here that had the court order

2     said attorney and client must appear, it would be clear; we

3     wouldn't even have to have a discussion.  But in this case,

4     Mr. Liebowitz did testify under oath that his understanding was

5     that meant that, at the very least, the lawyer would need to

6     attend in person.

7          With respect to the issue of trial attorney, I could

8     state we've been -- we've only had two trials over 2,000 cases

9     filed.  And in both those trials, I did serve as trial counsel.

10    That's not -- so there is sort of an assumption in our

11    operation that if the case does eventually get to trial, I am

12    going to handle it.  I am 19 years at bar; Mr. Liebowitz is

13    only four years at bar.  So it's just a question of experience

14    in that regard.

15          THE COURT:  You handled those two cases solo or

16    with --

17          MR. FREEMAN:  Yeah, with the case of *Mango v. Buzz

18    Feed*, I was lead counsel; I handled it solo.  Mr. Liebowitz was

19    no even counsel of record in that case.  And the other case

20    before Judge Woods, I handled.  This was *Otto v. Hearst

21    Communications*.  I did handle the work as lead counsel, but

22    Mr. Liebowitz did do a couple of cross-examinations to get his

23    feet wet.

24          THE COURT:  And you're aware that my initial

25    conference order states unambiguously that absent leave of

K18VUSHH                        Summation - Mr. Freeman

1    Court obtained by letter motion filed before the initial

2    conference, that all conferences must be attended by the

3    attorney who will serve as principal trial counsel; correct?

4              MR. FREEMAN:  I am aware of that, your Honor, yes.

5              THE COURT:  So it seems to me that either

6    Mr. Liebowitz and you have violated that order, because

7    Mr. Liebowitz is the only counsel who has entered a notice of

8    appearance and appeared on behalf of Mr. Usherson, until today,

9    or you violated the mediation rules which require very clearly

10   that the lawyer who is primarily responsible for trial has to

11   appear at the mediation.  So it's one or the other, am I

12   correct about that?

13             MR. FREEMAN:  Well, no, this is what -- what I'm

14   saying is that the -- we're not precluding the possibility that

15   Mr. Liebowitz could have served as trial counsel as of the time

16   of the initial case management conference.  It's not fully

17   foreclosed that I'm going to handle automatically every trial.

18             But it could have been Mr. Liebowitz's interpretation

19   the night before mediation, which is several months later, that

20   if the case, you know, passes a certain threshold in terms of

21   the procedure, that I'm going to be called in to do the trial.

22             So we didn't have that discussion, to be clear, but

23   I'm just saying that that's something that, in our custom and

24   practice, I had in the past handled the trial.  So, you know,

25   to the extent that the rules say lead counsel, they don't; they

1  just say, you know, the person who's ultimately going to handle

2  trial.

3          So, again, what we're really saying is, you know, this

4  case presents --

5          THE COURT:  My order also says all counsel are

6  required to register promptly as filing users on ECF.  And you

7  didn't file -- in fact, to this date have not filed --

8          MR. FREEMAN:  I have not because I made clear to the

9  Court at the conference at the outset in November that my

10  participation in this case was going to be to defend the

11  Liebowitz Law Firm and Mr. Liebowitz from the motion for

12  sanctions.  That's been my role in this case.

13          The case is now settled, so I think the question is

14  moot as to whether I will eventually serve as trial counsel.

15  That's the way -- and just to be clear --

16          THE COURT:  Let me ask you, you're not under oath, but

17  you are an officer of the Court, did you know of the existence

18  of this case prior to October 30th, 2019?

19          MR. FREEMAN:  I did not, your Honor.

20          THE COURT:  So the first time you learned about it was

21  the evening before the mediation?

22          MR. FREEMAN:  That's correct, your Honor.

23          THE COURT:  Okay.

24          And then the last question I have for you is can you

25  comment on the registration issue that Mr. Newberg raised?

1          MR. FREEMAN:  I haven't seen the registration issue.

2    I think what he's saying is that -- I'm not sure if he's

3    speculating or whether or not he's actually obtained a

4    certified deposit copy from the copyright office.  But what

5    he's saying is that the photograph is not on deposit with the

6    particular registration, is that -- are you saying that you

7    think or are you saying that you know?

8          MR. NEWBERG:  I'm saying that I know.

9          THE COURT:  I think he's saying he reviewed those that

10   are on file, registered with the copyright office, and this

11   photograph does not appear to be among them.

12         MR. NEWBERG:  That's exactly --

13         MR. FREEMAN:  Well, I mean -- I have not -- we did not

14   order a deposit copy.  And in our custom and practice, we do

15   not order deposit copies because they incur an additional

16   expense.  Typically, what happens is once we get into discovery

17   and once we believe that we're going to proceed with the case

18   to summary judgment, it's at that point that we'll invest, and

19   sometimes it's 600 to $1,000.  At that point we will get the

20   certified deposit copy.

21         We should say, however, that in every case that we

22   file, the client represents to us that it's on deposit, if the

23   client is the one who registered.  More often the case though

24   in the last four years, it's our law firm that files the

25   registration process, and we have employees who handle it.  So

1    we know for sure it's on deposit.

2              I think in this case, you know, it's obvious, we --

3    our law firm did not file the deposit copy.  Mr. Usherson

4    represented to us that he did.  Did we verify that prior to

5    filing?  No.  But I don't believe that we have an obligation to

6    incur the expense of doing that if the client is representing

7    that it's on deposit.

8              THE COURT:  Okay.

9              Paragraph 9 of the complaint in this case says the

10   photograph was registered with United States Copyright Office

11   and was given copyright registration number, and then the

12   number that Mr. Newberg gave before.

13             MR. FREEMAN:  Yes, that's correct.  And that's a

14   matter of public record.

15             So we're able to verify, before we file the case, we

16   could just jump on the copyright office's website, punch in the

17   number, and the copyright registration certificate pops right

18   up.  And we could see that Mr. Usherson was the copyright

19   claimant in that particular case.

20             THE COURT:  But your testimony is that you could

21   not -- that was based on Mr. Usherson's representation that the

22   photograph in this case was under that copyright registration

23   number?

24             MR. FREEMAN:  That is correct, your Honor.

25             We do not -- as an ordinary course of practice, if a

K18VUSHH                    Summation - Mr. Freeman

1   client comes to us, and it's one of these old, you know,

2   rock-and-roll photos that was registered in the '70s or the

3   '80s, obviously our law firm didn't register, the client

4   registered.  The client will say to us, This photograph is on

5   deposit with this registration.  And we take them for their

6   word.  We don't -- we do not verify before filing the case by

7   obtaining a certified deposit copy whether or not it's

8   actually -- and look, I mean, ultimately that -- you know,

9   there's no legal or statutory requirement that we do so.  I

10  mean, it's not -- it's not -- it's the ordinary case that

11  lawyers will rely on what their clients are telling them.  If

12  the client turns out to be lying, I mean, I don't know that

13  that falls on counsel.  I think that falls upon the party.

14          But, I mean, is there any question that -- you know,

15  because you say, Well, the best course of practice would be to

16  make sure with these rock-and-roll photographs that you verify

17  prior to filing.  I don't know that we would debate that.  But,

18  again, there's no statutory or regulatory requirement that we

19  do so.  And ultimately, we are entitled to rely on a client.

20  In this case, the client, this is not the first time that we've

21  represented this client successfully.  So we didn't have any

22  reason to doubt the veracity of his representations.

23          THE COURT:  All right.

24          Mr. Newberg, is this something that you could provide

25  a copy to plaintiff's counsel?

1     MR. NEWBERG:  I believe we -- well, we have the

2     certified copy, we can make a copy of that.  I believe my

3     associates also already made a copy; so, yes, we can.

4     THE COURT:  All right.  Why don't you do that by

5     overnight mail no later than tomorrow, so for receipt by

6     Friday.

7     By next Friday I want a letter brief from you

8     indicating, one, whether the photograph at issue in this case

9     was, in fact, registered with the copyright office; and, two,

10    if it was not, why sanctions would not be appropriate based on

11    the allegation in paragraph 9 of the complaint.

12    And in that regard, you can distinguish between

13    sanctions on counsel, who signed the complaint, or sanctions on

14    the client, who may have provided the erroneous information, if

15    it was erroneous.  But I want you to address those issues by

16    next Friday.  All right?

17    MR. FREEMAN:  I do have one more point to make, your

18    Honor.

19    THE COURT:  Last point, because I have a meeting that

20    I am running in five minutes, so I will give you one more

21    minute, but go ahead.

22    MR. FREEMAN:  Thank you.

23    So in the case of *Rice v. NBC Universal*, you may

24    recall that the --

25    THE COURT:  I recall it well.  Go ahead.

1            MR. FREEMAN:  Yes, that after the parties fully

2      submitted the brief -- I'm sorry, that before the parties

3      submitted the brief, there was a stipulation and order that the

4      party, the defendant, would bear its own costs and fees.  And

5      then we raised that in passing in the opposition brief, but it

6      wasn't until the motion for reconsideration where we forcefully

7      argue that, Well, look, I mean, if you're a defendant and you

8      waive fees, that means you've waived fees with respect to the

9      sanctions motions as well.  And your Honor held on the motion

10      for reconsideration that it was too little, too late, sort of

11      as a procedural waiver, that we couldn't make that argument

12      because we hadn't made it in a fulsome fashion prior.

13            In this case, the stipulation order came after we

14      briefed, so we never made the argument at all.  So we would ask

15      leave of Court to submit just a one-page letter brief to

16      address the issue as to whether or not the Court -- I'm not

17      sure if this is a question over that the Court has jurisdiction

18      or if it's just a question of waiver, if the defendant

19      knowingly signed a stipulation saying, We waive all attorneys'

20      fees, you know, related to this action, can they be awarded any

21      attorneys' fees at all.  We think that's a critical issue.

22            THE COURT:  Let me interrupt you.

23            He's not seeking fees.  He suggested that perhaps

24      costs/fees could be the measure of sanctions, but he's not

25      asking that I reward them fees; he's asking that I direct that

1      they be paid either to the Clerk of Court or something like

2      Legal Aid.  So how would the stipulation, even if you're

3      correct about waiver of the fees, apply in this instance?

4               MR. FREEMAN:  Well, I think that because there needs

5      to be, you know, some causal connection between the amount of

6      sanctions awarded and the conduct that is being alleged.

7               So in the cases where Liebowitz Law Firm has been

8      ordered to pay sanctions to the Clerk of Court, it's never been

9      more than the amount of $2,000; in other cases it's been 500,

10     1500.  In this case, he's likely seeking tens of thousands of

11     dollars.

12              THE COURT:  All right.  I'll tell you what, I'll give

13     you until Monday to submit a letter no longer than three pages

14     addressing this issue and, to the extent that I conclude that

15     sanctions are appropriate, what you believe the appropriate

16     sanction would be, either in terms of size or nature.

17              And Mr. Newberg, if you care to reply to that, you can

18     do so by Wednesday.  And I think I'll give you until next

19     Friday then to submit an accounting of your fees and costs so

20     that it takes account of that submission as well.

21              All right?

22              MR. NEWBERG:  Thank you, your Honor.

23              And fees and costs, I assume you just mean related to

24     the sanctions motion; correct?

25              THE COURT:  Fees and costs related to the mediation

K18VUSHH

1   and the sanctions motion.

2           MR. NEWBERG:  Thank you, your Honor.

3           THE COURT:  And if you could break it down, again, I

4   may or may not conclude that sanctions are appropriate, may or

5   may not conclude that that is the appropriate basis or way to

6   calculate them, but it would certainly be helpful to have my

7   options as I ponder this.

8           I will reserve judgment on the motion.

9           I'm going to leave the exhibits that you gave the

10  witnesses here for my law clerk to give you if you want them

11  back.  I think they are all part of the record already, but, in

12  any event.

13          All right.  We are concluded.  I'll reserve judgment.

14          Have a good day.  Thank you.

15                          *    *    *

16

17

18

19

20

21

22

23

24

25

1              INDEX OF EXAMINATION

2    Examination of:                              Page

3    RICHARD LIEBOWITZ

4    Direct By Mr. Freeman  . . . . . . . . . . . . 7

5    Cross By Mr. Newberg . . . . . . . . . . . . .11

6    Redirect By Mr. Freeman  . . . . . . . . . . .79

7    BRAD R. NEWBERG

8    Cross By Mr. Freeman . . . . . . . . . . . . .83

9    THE MEDIATOR

10   Direct By The Court  . . . . . . . . . . . . .90

11   Cross By Mr. Newberg . . . . . . . . . . . . 106

12   Cross By Mr. Freeman . . . . . . . . . . . . 118

13                DEFENDANT EXHIBITS

14   Exhibit No.                              Received

15    1   . . . . . . . . . . . . . . . . . . . .17

16

17

18

19

20

21

22

23

24

25

# Exhibit AA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARTHUR USHERSON,

                              Plaintiff,

                    v.                                    No. 19-CV-6368 (JMF)

BANDSHELL ARTIST MANAGEMENT,

                              Defendant.

---

## CERTIFICATE OF SERVICE

I, Richard Liebowitz, an attorney, hereby certify that, pursuant to the Court's Opinion & Order
dated June 26, 2020 (Dkt. No. 68), a true and correct copy of the Opinion & Order was served
via USPS express overnight mail on Thursday, July 2, 2020 upon Plaintiff Arthur Usherson at
his address below:

Arthur Usherson
1006 Old Holcomb Bridge Road
Roswell, Georgia 30076

Dated: July 6, 2020
          Valley Stream, NY                          /s/richardliebowitz/
                                                     Richard Liebowitz, Esq.

                                                     Liebowitz Law Firm, PLLC
                                                     11 Sunrise Plaza
                                                     Suite 305
                                                     Valley Stream, NY 11580-6111
                                                     (516) 233-1660

                                                     *Attorney for Plaintiff Arthur Usherson*

# Exhibit AB

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ARTHUR USHERSON,

                      Plaintiff,

                  v.

BANDSHELL ARTIST MANAGEMENT,

                      Defendant.

                            No. 19-CV-6368 (JMF)

---

RICHARD LIEBOWITZ; LIEBOWITZ LAW
FIRM, PLLC,

                    Miscellaneous.

---

**DECLARATION OF RICHARD LIEBOWITZ IN SUPPORT OF**
**MOTION BY PROPOSED ORDER TO SHOW CAUSE FOR STAY PENDING APPEAL**

      I, Richard Liebowitz, declare the following under penalty of perjury pursuant to 28

U.S.C. § 1746:

      1.      I am a principal of the Liebowitz Law Firm, counsel for Plaintiff Arthur Usherson

in this action.  I submit this Declaration in support of the motion by order to show cause to stay

pending appeal all aspects of non-monetary sanctions three, four, five, and six imposed by this

Court in its June 26, 2020 Opinion and Order (Dkt. No. 68).

      2.      I have had a longstanding and deep interest in photography and in copyright work.

During high school and college, I practiced photography and interned for over four years with

Bruce Cotler (now President of the New York Press Photographers Association, the oldest

organization of its kind in New York).  During the course of that internship, I had the

opportunity to accompany numerous professional photographers on news, sports, and other photography events, and in so doing to learn about issues facing professional photographers. In particular, I learned that photographers' copyrighted photographs often were infringed with impunity. These photographers told me that they would sometimes approach lawyers for assistance, but costs almost always proved prohibitive, due in substantial part to lawyers' insistence on large retainers that would eat in to, if not entirely exceed, the expected recovery. I saw a market need for attorneys who could represent photographers in copyright infringement cases, and I went into the law in part hoping to become able to fill that need and to protect copyright holders' rights.

3.      I graduated from Hofstra Law School in May 2014, where I took courses in copyright/entertainment and intellectual property law. I was admitted to the New York State bar in August 2015, and admitted to practice in the Southern District of New York in October 2015. I maintain memberships in several professional associations, including the New York State Bar Association, the New York City Bar Association, the Nassau County Bar Association, and the New York Press Photographers Association. I also have taken copyright law Continuing Legal Education courses.

4.      Given my longstanding interest in copyright work, I established the Liebowitz Law Firm ("LLF") in 2015 to represent copyright holders whose rights had been violated. I did not have or receive any formal training in running a law practice; rather, I learned by doing. In its early days, LLF employed one attorney in addition to me, as well as a few staff members. Today, LLF consists of three attorneys, who are responsible for litigating infringement cases on behalf of copyright plaintiffs, and about a dozen staff members, who are responsible for client relations, office management, copyright registration, and infringement research.

5.      LLF pursues—entirely on a contingency basis—a high volume of copyright infringement actions with relatively low average anticipated recoveries on behalf of copyright plaintiffs.  LLF's high volume of cases makes it economically feasible for LLF to represent copyright holders notwithstanding the relatively low average recoveries.  Without LLF, many photographers and other artists may not find it economically feasible to protect their federal copyright rights and protect their copyrighted works from infringement.

6.      On average, although I do not track all the relevant data, I estimate that many infringement actions brought by our firm regarding a single photograph (as opposed to multiple photographs) have settled in the low thousands or tens of thousands of dollars.  A high percentage of LLF's cases settle within approximately two to four months of initiation with a monetary recovery for the plaintiff.  A small percentage of LLF's practice involves non-litigation activities, including filing copyright registrations and writing and reviewing licensing agreements, for which LLF generally charges a small fee.

7.      LLF has filed approximately 2,500 copyright infringement cases since its founding.  About half of these cases were filed in district courts within the Second Circuit.

8.      LLF has represented over 1,200 individual clients since its founding.  LLF also represents agencies which may themselves represent hundreds of photographers.  Many of LLF's clients are repeat clients, on whose behalf LLF has brought multiple actions and continues to actively monitor media outlets and other sources for copyright infringements.

9.      LLF obtains new clients primarily through word of mouth from its existing clients.  In addition, LLF obtains new clients through my participating in copyright seminars, photographers' trade shows, and other events during which I am able to meet copyright holders.

10.      LLF has, when necessary during the course of litigation, ordered a deposit copy of

3

a copyrighted work from the U.S. Copyright Office. Doing so has cost between $200 and $1,200. Deposit copies generally are not delivered for several months. This lengthy delivery time period has been further extended due to the COVID-19 pandemic.[1] The deposit copy sanction imposed by the Court therefore will significantly reduce the net recovery in every case, and may render the filing of many copyright actions—and LLF's continued operation—financially untenable. The deposit copy sanction may cause LLF and its clients to run into statute of limitations and other problems in cases where deposit copies do not timely arrive. Indeed, the deposit copy sanction already is inhibiting LLF's practice. On June 30, 2020, in another action, I was directed to file a deposit copy of the work at issue by July 8, 2020. *Krieger v. Alison Lou LLC*, No. 20-CV-2628, Dkt. 17, at 2–3 (S.D.N.Y. June 30, 2020). I sought modification of the order, explaining that timely compliance would be impossible given the lengthy processing time required to obtain a deposit copy. *Id.* at Dkt. 19. Notwithstanding this, my application for modification was denied. *Id.* at Dkt. 21.

11.    The other non-monetary sanctions imposed by the Court—the requirement that I serve a copy of the Court's sanctions order on current and future clients and in current and future actions—also will cause severe harm to my practice. The sanctions will damage my relationship with my current clients, on whom I rely to obtain new clients, by impugning my legal abilities, advocacy, and character. They will damage my relationship with any new clients, and will do so from the very beginning of the attorney-client relationship, because I must share the Court's order heavily criticizing me at the exact moment a prospective client makes the decision to retain me. The sanctions will damage my relationship with judges and mediators and potentially

---

[1] *See* U.S. Copyright Office, "Operations Updates During the COVID-19 Pandemic," *available at* https://www.copyright.gov/coronavirus/ (accessed July 20, 2020) ("Staff of the Records Research and Certification Section continue to offer search, records certification, and other services but there will likely be unavoidable delays in processing times.").

prejudice any actions before them, including in courts where I have experienced no substantial problems, by forcing me to portray myself and my practice in the worst possible light at the outset of every proceeding. The aforementioned order in *Krieger v. Alison Lou LLC*, with which timely compliance is impossible, illustrates the harm these non-monetary sanctions already are having upon me, my practice, and my clients.

12. Since the motion for sanctions was filed in this case, I have worked to improve my organizational practices and those of my firm. In November 2019, on my own initiative, I retained a recognized expert in the field of legal ethics. On the expert's recommendation, LLF has deployed new practice management software, which helps the firm manage case calendaring and alerts, case documents and discovery, copyright registration information, and other important case details. All of LLF's cases initiated since January 2020 are managed on the new system. Further, I have maintained my relationship with the expert, and continue to call on him as legal, ethical, and organizational issues arise.

13. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: July 20, 2020
     New York, NY

<br>

                                    _____
                                         Richard Liebowitz

# Exhibit AC

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ARTHUR USHERSON, | |
| Plaintiff, | |
| v. | No. 19-CV-6368 (JMF) |
| BANDSHELL ARTIST MANAGEMENT, | |
| Defendant. | |
| | |
| RICHARD LIEBOWITZ; LIEBOWITZ LAW FIRM, PLLC, | |
| Miscellaneous. | |

### DECLARATION OF BRUCE COTLER IN SUPPORT OF
### PROPOSED ORDER TO SHOW CAUSE

I, Bruce Cotler, declare the following under penalty of perjury pursuant to 28 U.S.C.

§ 1746:

1.      I am a professional photographer and the President of the New York Press

Photographers Association ("NYPPA").  I have held that position for approximately six years,

and was Vice President and a member of the Board of Trustees for several years beforehand.

The NYPPA, established in 1915, is a professional and social organization for New York's

working press photographers, students of photography, and others in related fields.

2.      I have known Richard Liebowitz for approximately 15 years, since he was a

teenager.  He interned for me for several years, starting when he was in high school,

accompanying me on shoots before he could even drive.  We have kept in touch ever since.  In

recent years, Mr. Liebowitz has successfully represented me in copyright actions seeking recovery for infringements of my own work.

3.    In the course of my work as a professional photographer and my involvement with NYPPA, I have interacted with numerous other photographers and have had extensive exposure to the difficulties of copyright protection and enforcement. In my experience, copyright infringement is a serious problem for individual photographers and other artists. When photographers' photographs improperly are used without license, the relatively low value of the infringement claim often makes it economically infeasible to bring an action. Even the lawyers who would consider bringing small copyright claims often require thousands of dollars in retainers—sometimes up to $10,000 or more—which deters individual photographers with meritorious claims and who wish to bring an action. Moreover, many photographers have limited resources, which makes meeting the upfront costs of litigation very difficult.

4.    In this context, Mr. Liebowitz and the Liebowitz Law Firm ("LLF"), by offering representation on a contingency arrangement, have successfully represented and obtained recoveries for many individual photographers—including me and other photographers affiliated with the NYPPA—who otherwise likely would not have been able to protect their copyrighted works from infringement.

5.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: July 19, 2020
        New York, NY

_____
                    Bruce Cotler

2