# 20-2304-cv

## United States Court of Appeals
### *for the*
## Second Circuit

---

ARTHUR USHERSON,

*Plaintiff,*

RICHARD P. LIEBOWITZ, LIEBOWITZ LAW FIRM, PLLC,

*Miscellaneous-Appellants,*

– v. –

BANDSHELL ARTIST MANAGEMENT,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 2 of 2 (Pages JA-267 to JA-534)

BRAD R. NEWBERG
MCGUIREWOODS LLP
*Attorneys for Defendant-Appellee*
1750 Tysons Boulevard, Suite 1800
McLean, Virginia 22102
(703) 712-5000

ROBERT J. ANELLO
BRIAN A. JACOBS
KEVIN GROSSINGER
A. DENNIS DILLON
MORVILLO ABRAMOWITZ GRAND IASON
   & ANELLO P.C.
*Attorneys for Appellants*
565 Fifth Avenue
New York, New York 10017
(212) 880-9600

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... JA-1

Complaint, dated July 10, 2018 ................................ JA-13

    Exhibit A to Complaint -
    Photograph .............................................. JA-17

    Exhibit B to Complaint -
    Photograph on Website ........................... JA-19

Order Regarding Early Mediation and the Initial
    Pretrial Conference, dated July 15, 2019 .............. JA-22

Mediation Referral Order, dated July 15, 2019 ......... JA-25

Defendant's Answer and Affirmative Defenses to
    Plaintiff's Complaint, dated September 25, 2019 .. JA-26

Letter from Richard Liebowitz to the Honorable
    Jesse M. Furman, dated October 4, 2019 .............. JA-32

Notice of Motion for Sanctions, dated
    November 6, 2019 ................................................. JA-33

Memorandum of Law in Support of Defendant's
    Motion for Sanctions, dated November 6, 2019 .... JA-35

Declaration of Brad R. Newberg in Support of
    Defendant's Motion for Sanctions, dated
    November 6, 2019 ................................................. JA-62

    Exhibits to Newberg Declaration ........................... JA-73

Management Plan and Scheduling Order, filed
    November 7, 2019 ................................................ JA-102

ii

Page

Exhibit to Management Plan and Scheduling
Order -
Letter from Richard Liebowitz and Brad R.
Newberg to the Honorable Jesse M. Furman,
dated November 7, 2019 ........................................ JA-108

Letter from Richard Liebowitz to the Honorable
Jesse M. Furman, dated November 13, 2019 ......... JA-111

Management Plan and Scheduling Order, dated
November 14, 2019 ................................................ JA-114

Plaintiff's Memorandum of Law in Opposition to
Sanctions, dated November 18, 2019 .................... JA-120

Declaration of Richard Liebowitz, dated
November 18, 2019 ................................................ JA-130

Exhibit A to Liebowitz Declaration -
Email, dated September 20, 2019 .......................... JA-134

Exhibit B to Liebowitz Declaration -
Procedures of the Mediation Program, dated
June 2, 2017 ............................................................ JA-136

Declaration of James Freeman, dated
November 18, 2019 ................................................ JA-153

Declaration of Rebecca Liebowitz, dated
November 18, 2019 ................................................ JA-157

Defendant's First Amended Answer and Affirmative
Defenses to Plaintiff's Complaint, dated
November 19, 2019 ................................................ JA-160

Letter from Brad R. Newberg to the Honorable
Jesse M. Furman, dated December 4, 2019 ........... JA-168

Memorandum Opinion and Order, dated
December 9, 2019 ................................................... JA-169

iii

**Page**

Reply Memorandum of Law in Support of
Defendant's Motion for Sanctions, dated
November 25, 2019 ................................................ JA-178

Second Declaration of Brad R. Newberg in Support
Defendant's Motion for Sanctions, dated
November 25, 2019 ................................................ JA-193

    Exhibit 1 to Newberg Declaration -
    Excerpts of Transcript of Court Proceedings,
    dated November 14, 2019 ..................................... JA-201

    Exhibit 2 to Newberg Declaration -
    Email, dated October 30, 2019 .............................. JA-207

    Exhibit 3 to Newberg Declaration -
    Emails, dated October 30, 2019 ............................. JA-209

    Exhibit 4 to Newberg Declaration -
    Emails, dated October 30, 2019 ............................. JA-212

    Exhibit 5 to Newberg Declaration -
    Emails, dated October 30, 2019 ............................. JA-215

Declaration of Mark J. McKenna in Support of
Defendant's Motion for Sanctions, dated
November 22, 2019 ................................................ JA-219

Order, dated December 11, 2019 ............................... JA-226

Letter from Richard Liebowitz to the Honorable
Jesse M. Furman, dated December 16, 2019 ......... JA-229

Order, dated December 17, 2019 ............................... JA-232

Letter from Brad R. Newberg to the Honorable
Jesse M. Furman, dated December 19, 2019 ......... JA-233

Order, dated December 20, 2019 ............................... JA-234

iv

                                                                   **Page**

Stipulation of Dismissal of Civil Action with
    Prejudice, dated December 20, 2019 ..................... JA-235

Transcript of Conference, dated November 14, 2019
    (filed on January 6, 2020)..................................... JA-236

Order, dated January 8, 2020 ..................................... JA-266

Letter from Richard Liebowitz to the Honorable
    Jesse M. Furman, dated January 13, 2020 ............. JA-267

Letter from Brad R. Newberg to the Honorable
    Jesse M. Furman, dated January 15, 2020 ............. JA-271

Letter from Brad R. Newberg to the Honorable
    Jesse M. Furman, dated January 17, 2020 ............. JA-274

    Exhibit to Newberg Letter -
    Summary of Fees and Costs Related to Mediation
    and Sanctions ........................................................... JA-276

Letter from Richard Liebowitz to the Honorable
    Jesse M. Furman, dated January 17, 2020 ............. JA-279

    Exhibit to Liebowitz Letter -
    Public Catalog........................................................... JA-282

Letter from Brad R. Newberg to the Honorable
    Jesse M. Furman, dated January 18, 2020 ............. JA-285

    Exhibit to Newberg Letter -
    Excerpts of Transcript of Court Proceedings,
    dated November 14, 2019 ...................................... JA-288

Order, dated January 24, 2020 ................................... JA-294

Affidavit of Arthur Usherson, sworn to
    February 6, 2020 ..................................................... JA-298

    Exhibit A to Usherson Affidavit -
    046 Registration...................................................... JA-306

v

**Page**

Exhibit B to Usherson Affidavit -
Dylan/Redbone Photographs ................................. JA-308

Exhibit C to Usherson Affidavit -
Email, dated February 1, 2019............................. JA-314

Exhibit D to Usherson Affidavit -
Email, dated February 6, 2019............................. JA-316

Exhibit E to Usherson Affidavit -
Emails, dated February 7, 2019 ............................ JA-318

Exhibit F to Usherson Affidavit -
Label for CD1 ........................................................ JA-320

Exhibit G to Usherson Affidavit -
Email, dated June 5, 2019.................................... JA-322

Exhibit H to Usherson Affidavit -
Label for CD2 ........................................................ JA-324

Exhibit I to Usherson Affidavit -
272 Registration.................................................... JA-326

Declaration of Richard Liebowitz, dated
February 6, 2020.................................................... JA-329

Exhibit A to Liebowitz Declaration -
Photographs .......................................................... JA-334

Declaration of James Freeman, dated
February 7, 2020.................................................... JA-336

Letter from Brad R. Newberg to the Honorable
Jesse M. Furman, dated February 10, 2020 ........... JA-342

Transcript of Court Proceedings, dated
January 8, 2020 (filed on February 12, 2020) ....... JA-345

Certificate of Service, dated July 6, 2020.................. JA-491

vi

**Page**

Notice of Appeal, dated July 20, 2020 ...................... JA-492

Letter from Robert J. Anello to Ruby J. Krajick,
    filed July 20, 2020 ................................. JA-493

Proposed Order to Show Cause ................................. JA-494

Declaration of Richard Liebowitz in Support of
    Motion by Proposed Order to Show Cause for
    Stay Pending Appeal, dated July 20, 2020 ............ JA-496

Declaration of Bruce Cotler in Support of Proposed
    Order to Show Cause, dated July 19, 2020............ JA-501

Declaration of Richard Liebowitz, dated
    July 27, 2020.......................................... JA-503

Declaration of Richard Liebowitz, dated
    September 21, 2020 ................................. JA-505

Declaration of Richard Liebowitz, dated
    September 29, 2020 ................................. JA-507

Order, dated October 2, 2020.................................... JA-509

    Exhibit A to Order -
    Letter from David E. Hudson to the Honorable
    Jesse M. Furman, dated July 28, 2020................... JA-512

    Exhibit B to Order -
    Letter from Andrew P. Lycans to the Honorable
    Jesse M. Furman, dated July 29, 2020................... JA-515

    Exhibit C to Order -
    Emails, dated September 9, 2020 ......................... JA-518

Declaration of Richard Liebowitz, dated
    October 15, 2020 ................................. JA-523



**Liebowitz Law Firm, PLLC**
ATTORNEYS FOR THE PHOTOGRAPHIC ARTS

11 SUNRISE PLAZA, STE. 305
VALLEY STREAM, NY 11580
(516) 233-1660
WWW.LIEBOWITZLAWFIRM.COM

January 13, 2020

**VIA ECF**

Honorable Jesse M. Furman
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

Re:     *Usherson v. Bandshell Artist Management,* 1:19-cv-06368 (JMF)

Dear Judge Furman:

We represent Plaintiff Arthur Usherson in the above-captioned case.  We write pursuant to the Court's order to address the amount of sanctions to be awarded, if any.

**Point I:        By Stipulation, Defendant Has Voluntarily Waived its Attorneys' Fees in Connection with this Action, *Including* the Amount of Fees to be Awarded**

Courts may assess attorneys' fees and costs against a party pursuant to the Court's inherent powers.  *Meyer v. Kalanick*, 212 F.Supp.3d 437, 450 (S.D.N.Y. 2016).  Courts may also order a sanctioned party or its attorney "to pay the reasonable expenses – including attorney's fees – incurred because of any noncompliance with [Rule 16]."  Fed. R.Civ.P. 16(f)(2).

However, Defendant signed a stipulation on December 18, 2019 representing that it would "bear its own costs and attorney's fees." The Court ordered the case dismissed on December 20, 2019. [Dkt. #48]  In Plaintiff's view, the Stipulation effectuated a waiver of Defendant's attorneys' fees relating to the present sanctions motion, both in terms of the amount of the sanctions to be awarded and the ability of Defendant to collect such award.  Here, since defense counsel indicated that he has no intention of collecting any award, the only issue is whether the Stipulation effectuates a waiver in terms of the amount to be awarded.

"[W]aiver is the voluntary or intentional relinquishment of a known right, or intentional conduct inconsistent with claiming such a right." *Torain v. Clear Channel Broad., Inc.*, 651 F. Supp. 2d 125, 145 (S.D.N.Y. 2009); *Capitol Records, Inc. v. Naxos of Am., Inc*., 372 F.3d 471, 482 (2d Cir. 2004). Circuit courts have ruled that attorneys' fees can be waived by a stipulation of dismissal. *Brown v. General Motors Corp.,* 722 F.2d 1009, 1012 (2d Cir.1983) (holding that a settlement agreement using broad language to effect a mutual release of claims and accompanied by a stipulation that the case be dismissed "without costs to any party" "is, absent circumstances



Liebowitz ◉ Law Firm, PLLC

indicating otherwise, intended to settle all claims involved in the particular litigation, including a claim for attorney's fees."); *see also Mitchell v. City of Los Angeles*, 753 F.2d 86, 87 (9th Cir. 1984) (finding that attorneys' fees were waived by virtue of stipulation of dismissal).

Plaintiff respectfully avers that in light of the Stipulation, the Court should decline to consider *the amount* of Defendant's fees incurred in prosecuting the sanctions motion. Instead, the amount to be awarded should be calculated by reference to judicial precedent and in light of the circumstances presented in this case.

**Point II:**     **In the Event the Court Determines that Sanctions are Appropriate Under Fed.R.Civ. 16, Then the Amount of Sanctions Should Not Exceed $1000.00**

In cases in this District where sanctions have been imposed against Liebowitz for non-compliance with Rule 16, courts have imposed the amount of $1000.00 as sanctions, payable to the Clerk of Court. *See Polaris Images Corp. v. CBS Interactive, Inc.*, 19-cv-3670 (VEC) (S.D.N.Y. Oct. 9, 2019) [Dkt. 16] (imposing sanctions of $1000 against Mr. Liebowitz under Rule 16(f) for failure to produce licensing fee information in advance of mediation session and failure to timely file proof of service).

Even in cases involving deliberate defiance of a court's order, district courts typically award between $250 and $500, payable to the Clerk of Court. *See, e.g., Huebner v. Midland Credit Mgmt., Inc.,* No. 14 CIV. 6046 BMC, 2015 WL 1966280, at *7 (E.D.N.Y. May 1, 2015), *aff'd*, 897 F.3d 42 (2d Cir. 2018) (imposing sanctions of $500, payable to the clerk of court, for "plaintiff's failure to participate in the Initial Status Conference in good faith and his intentionally misleading the Court and defendant as to his theory of the case"); *JTH Tax, Inc. v. H & R Block E. Tax Servs., Inc.,* No. CIV.A.2:00-CV-51, 2002 WL 34232163, at *1 (E.D. Va. Sept. 23, 2002) (assessing sanctions in the amount of $500.00, payable to the clerk of court, for "deliberate defiance of the Court's order"); *Lee v. Verizon Wireless*, No. 3:07-CV-532(AHN), 2007 WL 3232590, at *2 (D. Conn. Oct. 31, 2007) (imposing $250 in sanctions, payable to clerk of court, where plaintiff's counsel failed to comply with court orders in a timely fashion and to communicate with opposing counsel); *Woo v. City of New York*, No. 93 CIV. 7007(AJP)(HB, 1996 WL 284930, at *1 (S.D.N.Y. May 29, 1996) (imposing $250 in sanctions against attorney for failing to abide by scheduling order and refusing to comply with the initial sanctions order).

Here, we respectfully submit that if the Court finds that any court order was violated, including by my absence at the in-person mediation or by untimely filing of an affidavit of service, then any amount of sanctions awarded pursuant to Rule 16 should not exceed the amount of $1000.00, payable to the Clerk of Court. *See Polaris Images Corp.*

**Point III:**     **In the Event the Court Determines that Sanctions are Appropriate Under the Court's Inherent Authority (or Section 1927), Then the Amount of Sanctions Should Not Exceed $2500.00, Payable to the Clerk of Court**

Defendant has also moved for sanctions pursuant to the Court's inherent power. Because of their "very potency, inherent powers must be exercised with restraint and discretion," *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991). Sanctions are generally appropriate only if a court finds by clear and convincing evidence that a party or attorney "knowingly [made] . . .

Liebowitz ◉ Law Firm, PLLC

materially false or misleading [statements], or knowingly failed to correct false statements, as part of a deliberate and unconscionable scheme to interfere with the Court's ability to adjudicate the case fairly." *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F.Supp.3d 401, 427 (S.D.N.Y. 2016).  Even if repeated representations turn out to be false, a court may not infer that counsel knowingly made those misrepresentations as part of a scheme to tamper with the fair adjudication of this action absent "clear and convincing evidence" and a "particularized showing of bad faith." *Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.*, 327 F. Supp. 3d 673, 688 (S.D.N.Y. 2018).

Here, in the event the Court finds that the inherent authority should be invoked, then the amount of sanctions should not exceed the amount of $2500.00, payable to the Clerk of Court. *See Steeger v. JMS Cleaning Services, LLC*, 2018 WL 1363497 (S.D.N.Y. March 14, 2018) (imposing sanctions of $2,000 against Liebowitz under Rule 11 and the Court's inherent power for failure to serve a notice of an initial case management conference and for omitting certain facts in a letter to the court); *Kerestan v. Merck & Co. Long Term Disability Plan*, No. 05-cv-3469 (BSJ) (AJP), 2008 WL 2627974, at *1 (S.D.N.Y. July 2, 2008) (imposing $3,400 sanction against plaintiff pursuant to court's inherent authority, to be paid to the clerk of court, for failure to appear at scheduled court conference); *but see United States v. McCabe*, 323 F. App'x 580 (9th Cir. 2009) (imposing $10,000 sanction under Court's inherent authority where attorney made material misrepresentations to district court in connection with representation of criminal defendant which obstructed court's inquiry into potential intimidation of government witness); *Egan v. Pineda*, 808 F.3d 1180 (7th Cir. 2015) (imposing $5,000 sanction against attorney under Court's inherent power where complaint contained false allegation that employee was subject to sexual assaults and unwanted physical contact; and attorney's only explanation was that allegation was "an error," and attorney did not seek to correct complaint until six months after being alerted to its falsity).

In light of the above-referenced authorities, even if the Court were to discount my sworn testimony that I received the requisite permissions from the Mediator, such finding would not warrant more than a $2500 sanction, payable to the Clerk of Court. First, the custom and practice evidence plainly shows that even if I turned out to be incorrect about receiving advanced permission from the Mediator (and for the record, I re-affirm that such permissions were in fact granted), I certainly harbored a good faith belief that the Mediator would permit telephonic participation of the client and in-person attendance by my associate. Indeed, there were five past instances in the four months prior to the mediation where the Mediator granted advance permission for my clients to appear telephonically (or, if the Court credits the Mediator's testimony, permitted such participation without any objection or incident). Second, Defendant failed to show any prejudice as a result of the telephonic participation of my client.  Third, any sanctions of $5000.00 or above appear to be reserved for the most egregious of situations, such as where an attorney has obstructed a court's inquiry into potential intimidation of government witness or where an attorney has made knowingly false allegations of sexual assault in court filings.  Here, the record shows that both my client and my law firm actively participated in the Court-ordered mediation (and the dispute surrounds the mode of participation).

Based on the foregoing, if the Court is inclined to impose sanctions pursuant to its inherent authority (or section 1927), then the amount should not exceed $2500.00, payable to the Clerk of Court.  Respectfully, any sanctions award under Rule 16 should be limited to $1000.00.

JA-270

Liebowitz Law Firm, PLLC

Respectfully Submitted,

**/richardliebowitz/**
Richard Liebowitz

*Counsel for Plaintiff Arthur Usherson*

JA-271

**McGuireWoods LLP**
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102-4215
Phone: 703.712.5000
Fax: 703.712.5050
www.mcguirewoods.com

**Brad R. Newberg**
Direct: 703.712.5061

## McGuireWoods

bnewberg@mcguirewoods.com
Fax: 703.712.5187

January 15, 2020

**VIA ECF**
The Honorable Jesse M. Furman
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007
Furman_NYSDChambers@nysd.uscourts.gov

Re:     _Usherson v. Bandshell Artist Management_, 1:19-cv-6368 (JMF)

Dear Judge Furman,

We write, as per the Court's Order, in response to Mr. Liebowitz's January 13, 2020 letter (the "January 13 letter").

As this Court is aware, this case was taken on by McGuireWoods LLP pro bono. As this Court is also aware, and has specifically noted in the past, Mr. Liebowitz has a history of settling cases in an apparent effort to avoid sanctions hearings. In our particular case—and to be very clear, the signed settlement agreement is not confidential in any way—I could not in good conscience advise my client, who was not paying my legal fees (and McGuireWoods has eaten the costs), not to take a dismissal with prejudice where it paid nothing, and in fact was given a full and irrevocable license to use the photograph in question for allowing the dismissal.[1]

Given the above, it would be very easy for the Court to conclude that, _despite this Court's very specific warning to Mr. Liebowitz that settling with the Defendant would not mean the end of the sanctions motion_, that was his intent with this settlement.

Regarding Mr. Liebowitz's January 13 letter, certain initial points must be made. First, the motion itself is for specific violations of multiple Court Orders. This was not a simple discovery issue merely between two parties. The Court Ordered the filing of service of process within a certain time. That was ignored. The Court Ordered the service of licensing information within a certain time. That was ignored. The Court (and the mediation office) Ordered an in person mediation to occur. That Order was not only defied, but stories appear to have been invented to explain the defiance, requiring a three and a half hour hearing where the stories only got more and more preposterous—and of course culminating with the testimony of the mediator,

---

[1] I should also note that the agreement does not say that Defendant will bear its own costs and fees, but rather that it will not file "further motions for costs and legal fees." That being said, there was a stipulation on the bearing of costs and fees with the filed dismissal with prejudice.

January 15, 2020
Page 2

who unwaveringly testified that Mr. Liebowitz's core excuse was false (and that he did not have a practice of granting these permissions with Mr. Liebowitz, bur rather, Mr. Liebowitz had a practice of neither he nor his client showing up).

Second, the January 13 letter focuses on Fed. R. Civ. P. 16.  As is clear from the Motion (Br. p. 2), the motion was brought pursuant to the Court's "inherent powers . . . Rules . . . 16 and 41, and under 28 U.S.C. § 1927."

In any case, the January 13 letter makes no reference to any case which deals remotely with the Court's ability to sanction Mr. Liebowitz due to the settlement.  Instead, it cites four cases, the first two of which are on the general principle of waiver, inapplicable to the issue at hand.  Only one of the other two is from this Circuit, an almost 40-year old case that also does not have anything to do with a sanctions motion, never mind one that existed prior to settlement, but rather was a pro se plaintiff moving the court for attorneys' fees for himself two months after he settled his case.  *See Brown v. General Motors Corp.*, 722 F.2d 1009 (2d Cir. 1983).  The other case cited, a Ninth Circuit case from 1984, similarly does not address the issue at hand whatsoever: whether the Court has the power to sanction a party after the case is settled and what form those sanctions can take.

After failing to cite any materially relevant cases, the January 13 letter makes a massive leap.  Without any reason or case cite, it then claims that, because of the settlement and Plaintiff's dismissal of this case, the Court should not even use Defendant's fees and costs related to the sanctions motion as a proxy for the monetary portion of the Court's sanctions award.

Frankly, when Mr. Liebowitz requested leave to make the January 13 filing, one would have presumed he had some case law to support his position.  Instead, he has none.

Furthermore, the majority of the January 13 letter goes to points for which Mr. Liebowitz received no leave: the amount he should be sanctioned.  Plaintiff and Mr. Liebowitz had the ability to make similar arguments in their response to the sanctions motion and they should not be permitted to expand upon those arguments now.  In any case, the ability to cite a few cases in history where sanctions for non-compliance with rules were a low amount has little relevance when dealing with a motion for the violation of multiple Court Orders, and an attorney who has been sanctioned over and over by this Court, including, among others, sanctions for falsehoods to the Court (resulting in a referral to the Court's grievance committee, *see Berger v, Imagina Consulting, Inc.*, 18-cv-8956-CS) and, still pending in *Wisser v. Vox Media*, 19-cv-01445-LGS, a sanctions motion for allegedly forging a client's signature onto Interrogatory responses.

The January 13 letter also deals with monetary sanctions only.  Respectfully, it is time for this Court to go well beyond monetary sanctions.  Monetary sanctions have done nothing to curb the behavior that has led to the various sanctions awards.  It seems clear that such sanctions are just viewed as a cost of doing business, leading Mr. Liebowitz to expand his number of filings in this Court and in others.

JA-273

January 15, 2020
Page 3

Among the various additional sanctions available to the Court include:  the ability to send this matter to the Court's grievance committee to be added to the proceedings presumably already started there from the *Berger* case; the ability to disbar Mr. Liebowitz from this Court (while Judge Seibel felt the need to send the issue to the grievance committee, "Courts have long recognized an inherently authority to suspend or disbar lawyers" *In re Snyder*, 472 U.S. 634, 643 (1985) (citing cases going back 200 years)); the ability to set requirements and barriers related to the Liebowitz Law Firm or attorneys working with that law firm filing lawsuits (such as our recommendation that, to the extent he is allowed to keep practicing, the service of any lawsuit should include the service of a United States Copyright Office *certified* copy of the deposit copies associated with any copyright registration related to the lawsuit); and, to the extent the Court finds Mr. Liebowitz's January 8 testimony to have been false, the ability to send the matter to the U.S. Attorney's office.

Finally, this Court is aware of my serious concerns regarding Mr. Usherson's awareness of the mediation prior to October 31 and this sanctions motion.  I also note that while it is not entirely clear, it appears Mr. Usherson's signature on the settlement agreement could be an e-signature.  Given the Court's concern that settlements such as these may be entered into to avoid sanctions motions, the Court could consider requiring the in camera production of Mr. Liebowitz's communications with Mr. Usherson, to include those making Mr. Usherson aware of the mediation and the reasons for settlement and Mr. Usherson's transmittal of the signed settlement agreement to Mr. Liebowitz.

Respectfully submitted,

*s/Brad R. Newberg/*
Brad. R. Newberg
*Attorney for Defendant Bandshell Artist Management.*

JA-274

**McGuireWoods LLP**
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102-4215
Phone: 703.712.5000
Fax: 703.712.5050
www.mcguirewoods.com

**Brad R. Newberg**
Direct: 703.712.5061

# McGuireWoods

bnewberg@mcguirewoods.com
Fax: 703.712.5187

January 17, 2020

**VIA ECF**
The Honorable Jesse M. Furman
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007
Furman_NYSDChambers@nysd.uscourts.gov

Re:   _Usherson v. Bandshell Artist Management_, 1:19-cv-6368 (JMF)

Dear Judge Furman,

We write, as per the Court's Order, to submit our costs and fees (had counsel not been pro bono) related solely to the mediation and sanctions motion related to the mediation, so that the Court can consider whether it wishes to use such costs and fees as a proxy for any _monetary portion_ of the sanctions award.

We have taken a very conservative interpretation of the Court's Order and added up only the costs and fees directly related to the mediation and motion. As the Court can see, we have provided details for all work as they appeared on our contemporaneous time entries—that is, the entries the Court sees are precisely what was entered contemporaneously into McGuireWoods' system. We viewed pulling the entries related to the mediation and motion and putting them into a chart to be the most efficient way for the Court to have only those entries, but we can provide the information in whatever other form the Court may wish.

Two attorneys worked on this matter. I was the primary attorney. My 2019 hourly rate was $855.[1] I am a 1997 graduate of the University of Pennsylvania Law School where I was Articles Editor for the Penn Law Review. I clerked in this Court for Hon. Louis L. Stanton. I have been practicing copyright and trademark litigation as the core of my practice since the beginning of my career, and in 2017, the National Law Journal honored me by naming me an Intellectual Property Trailblazer for my career in those fields. Associate Michael Shafer assisted me on this matter. Mr. Shafer is a 2019 graduate of Harvard Law School and his hourly rate was $420.

---

[1] My initial declaration in this motion had a typo stating the year for my rate as 2018. Furthermore, although my hourly rate went up on January 1, 2020, I have kept my rate as $855 for my 2020 entries in the attached exhibit.

JA-275

January 17, 2020
Page 2

The description of our work related to the mediation and sanctions motion is attached. As the Court can see, the costs come to $1,423.99 and the fees (had counsel not been pro bono) come to $84,435.00.  The descriptions should allow the Court to determine if there are any categories it wishes to deduct from these amounts.

I can assure the Court that the amount of work we put into this motion and the hearing is accurate.  One could question why we put so much time into a pro bono matter of limited exposure to our client (especially given that far more time was spent working on this case than just the mediation and sanctions motion).  The answer is that we understood the importance of this issue beyond this case, to both the bar and the Court.  We, of course, leave it to the Court to decide the appropriate sanctions.

If the Court needs any more information, we are happy to provide it.
.

Respectfully submitted,

*s/Brad R. Newberg/*
Brad. R. Newberg
*Attorney for Defendant Bandshell Artist Management.*

## SUMMARY OF FEES AND COSTS RELATED TO MEDIATION AND SANCTIONS

| Date | Name | Rate | Hours | Amount | Description |
|------|------|------|-------|--------|-------------|
| 10/14/19 | Michael A. Shafer | 420.00 | 1.60 | 672.00 | Draft mediation letter |
| 10/15/19 | Michael A. Shafer | 420.00 | 1.20 | 504.00 | Draft mediation statement |
| 10/16/19 | Brad R. Newberg | 855.00 | 1.20 | 1,026.00 | Drafting of mediation statement |
| 10/16/19 | Michael A. Shafer | 420.00 | 0.20 | 84.00 | Draft mediation statement |
| 10/17/19 | Brad R. Newberg | 855.00 | 0.70 | 598.50 | Finalize first draft of mediation statement |
| 10/21/19 | Brad R. Newberg | 855.00 | 0.50 | 427.50 | Discussion of mediation and strategy with client |
| 10/24/19 | Brad R. Newberg | 855.00 | 1.00 | 855.00 | Call with mediator and finalize statement |
| 10/25/19 | Brad R. Newberg | 855.00 | 0.60 | 513.00 | Finalize mediation statement after research |
| 10/30/19 | Brad R. Newberg | 855.00 | 3.10 | 2,650.50 | Prepare for mediation, and discussions with client and mediator after mediator proposal |
| 10/31/19 | Brad R. Newberg | 855.00 | 11.50 | 9,832.50 | Travel to (6.5), prepare for and attend mediation that Defendant did not show for; meet with client to prepare for and discussion mediation; call M. Shafer about motion for sanctions |
| 10/31/19 | Michael A. Shafer | 420.00 | 1.00 | 420.00 | Prepare sanctions motion |
| 11/01/19 | Brad R. Newberg | 855.00 | 3.60 | 3,078.00 | Gathering of materials for sanctions motion, communications to adversary, and communications on and drafting of motion |
| 11/01/19 | Michael A. Shafer | 420.00 | 6.00 | 2,520.00 | Draft motion for sanctions |
| 11/04/19 | Brad R. Newberg | 855.00 | 5.20 | 4,446.00 | Call with opposing counsel on motion and drafting of motion |
| 11/04/19 | Michael A. Shafer | 420.00 | 1.80 | 756.00 | Draft motion for sanctions |

1

Case 1:19-cv-06368-JMF   Document 56-1   Filed 01/17/20   Page 2 of 3

| Date | Name | Rate | Hours | Amount | Description |
|------|------|------|-------|--------|-------------|
| 11/05/19 | Brad R. Newberg | 855.00 | 6.10 | 5,215.50 | Drafting of sanctions motion including review of legal sections, edits to fact sections and declaration, and review of supporting papers |
| 11/05/19 | Michael A. Shafer | 420.00 | 4.00 | 1,680.00 | Draft motion for sanctions, notice of sanctions, and proposed order |
| 11/06/19 | Brad R. Newberg | 855.00 | 3.00 | 2,565.00 | Finalizing draft of sanctions motion |
| 11/06/19 | Michael A. Shafer | 420.00 | 3.50 | 1,470.00 | Finalize motion for sanctions |
| 11/18/19 | Brad R. Newberg | 855.00 | 1.30 | 1,111.50 | Review response in sanctions motion |
| 11/19/19 | Brad R. Newberg | 855.00 | 6.20 | 5,301.00 | Work on reply in sanctions motion, research and drafting |
| 11/20/19 | Brad R. Newberg | 855.00 | 5.50 | 4,702.50 | Finish first draft of sanctions reply with certain research still needed |
| 11/21/19 | Brad R. Newberg | 855.00 | 3.50 | 2,992.50 | Declarations for sanctions reply and research last cases and other cases involving R. Liebowitz |
| 11/21/19 | Michael A. Shafer | 420.00 | 2.00 | 840.00 | Review reply in motion for sanctions; review M. McKenna's declaration |
| 11/22/19 | Brad R. Newberg | 855.00 | 3.00 | 2,565.00 | Review of sanctions reply and declarations before final look |
| 11/25/19 | Brad R. Newberg | 855.00 | 1.00 | 855.00 | Final work on Sanctions Motion reply |
| 01/02/20 | Brad R. Newberg | 855.00 | 4.70 | 4,018.50 | Draft questions and argument for hearing |
| 01/06/20 | Brad R. Newberg | 855.00 | 6.00 | 5,130.00 | Prepare questions and argument for hearing |
| 01/07/20 | Brad R. Newberg | 855.00 | 7.50 | 6,412.50 | Prepare questions, exhibits and argument for hearing (4.0) and travel to hearing (3.5) |
| 01/08/20 | Brad R. Newberg | 855.00 | 8.20 | 7,011.00 | Prepare for hearing (1.1), participate at hearing (3.6), and travel from hearing (3.5) |
| 01/15/20 | Brad R. Newberg | 855.00 | 2.40 | 2,052.00 | Review January 13 letter, research law, and draft response |
| 01/16/20 | Brad R. Newberg | 855.00 | 2.00 | 1,710.00 | Review of cost and fee information and draft of letter to court regarding sanctions |

2

| Date | Name | Rate | Hours | Amount | Description |
|------|------|------|-------|--------|-------------|
| 01/16/20 | Michael A. Shafer | 420.00 | 1.00 | 420.00 | Gathering and formatting cost and fee information for mediation and sanctions |
| | Subtotal Fees: | | | 84,435.00 | |
| | Costs: | | | | |
| | Brad R. Newberg | | | 428.75 | Trip to New York for mediation |
| | Brad R. Newberg | | | 995.24 | Overnight Trip to New York |
| | Subtotal Costs: | | | 1423.99 | |
| | **TOTAL:** | | | **85,858.99** | |

JA-279



Liebowitz Law Firm, PLLC
ATTORNEYS FOR THE PHOTOGRAPHIC ARTS

11 SUNRISE PLAZA, STE. 305
VALLEY STREAM, NY 11580
(516) 233-1660
WWW.LIEBOWITZLAWFIRM.COM

January 17, 2020

**VIA ECF**

Honorable Jesse M. Furman
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

Re:    *Usherson v. Bandshell Artist Management,* 1:19-cv-06368 (JMF)

Dear Judge Furman:

We represent Plaintiff Arthur Usherson in the above-captioned case.  We write in response to the Court's Order, dated January 8, 2020 [Dkt. #52].

**Point I:**    **Paragraph 9 of the Complaint Does Not Identify the Correct Copyright Registration Number; However, the Photograph At Issue Is Registered in Plaintiff's Name Under a Separate Registration**

Paragraph 9 of the Complaint, which identifies the Copyright Registration Number as VAu 1-080-046, is inaccurate. [Dkt. #1]  The photograph at issue in this case (the "Photograph") was not registered as part of the 046 Registration, which was effectuated by Plaintiff on August 2, 2011.  Other similar photographs of the same event and scene (i.e., Bob Dylan at Mariposa Folk Festival on July 16, 1972) were registered as part of the 046 Registration.

Instead, the Photograph was registered in Plaintiff's name under registration number VAu 1-373-272, with effective date of August 22, 2019 (the "272 Registration").  The Photograph is on deposit with the 272 Registration bearing content title "Bob Dylan at Mariposa Folk Festival July 16, 1972 (13).jpg." Notably, the 272 Registration was not effectuated until after this lawsuit was filed, but as demonstrated in Point II below, that fact should not be of critical import in light of the liberal policy accorded to amended pleadings under Rule 15(a)(2).

**Point II:**    **If the Action Remained Pending, Then an Amended Complaint Under Rule 15 – Rather Than Sanctions Under Rule 11 – Would be the Appropriate Procedural Disposition**

Plaintiff and his counsel respectfully submit that administrative mistakes or clerical errors do happen in the copyright registration process.  However, such mistakes are never considered fraudulent or bad faith (absent clear evidence of an intent to deceive).  *See, e.g., Urantia Found. v. Maaherra*, 114 F.3d 955, 963 (9th Cir. 1997) ("inadvertent mistakes on registration certificates



Liebowitz ◎ Law Firm, PLLC

do not invalidate a copyright and thus do not bar infringement actions, unless the alleged infringer has relied to its detriment on the mistake, or the claimant intended to defraud the Copyright Office by making the misstatement."); *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 991 (9th Cir. 2017) ("Good faith mistakes in copyright applications do not preclude an infringement action.").

Moreover, Plaintiff is not aware of any decision where a federal court sanctioned a party or his attorney for identifying the wrong registration number in an initial complaint. Quite to the contrary, the failure to obtain a registration prior to filing suit provides grounds to amend the complaint under Rule 15. *Atkins v. Publications Int'l, Ltd.,* No. 91 CIV. 7427 (KMW), 1992 WL 309581, at *4 (S.D.N.Y. Oct. 15, 1992) (declining to impose sanctions under Rule 11 where plaintiff failed to obtain a copyright registration prior to initiating her copyright infringement claim and noting that leave to amend should be "freely given when justice so requires" under Rule 15).

**Point III.**     **Sanctions are Not Warranted Against Plaintiff's Counsel Because a Finding of Subjective Bad Faith is Foreclosed in Matters of Clerical Error**

In order to impose sanctions *sua sponte* upon an attorney, a district court must make a "finding of bad faith on the part of the attorney." *In re Pennie & Edmonds, LLP,* 323 F.3d 86, 90 (2d Cir.2003). The Second Circuit reasoned that, as opposed to a sanctions proceeding initiated by a party's motion, "when a lawyer's submission . . . is subject to sanction by a *court,* the absence of a 'safe harbor' opportunity" for counsel to reconsider the challenged submission weighs in favor of "avoiding the inhibiting effect of an 'objectively unreasonable' standard." *Pennie & Edmonds,* 323 F.3d at 91 (emphasis supplied). Thus, the Second Circuit concluded that the "bad faith standard applies to a court-initiated show cause order issued where an opportunity for withdrawal or correction is unavailable." *Id.* at 91 n. 4.  Accordingly, in order to sanction Plaintiff's counsel for designating an incorrect copyright registration number in the initial complaint, the Court would need to make a specific showing of bad faith conduct on part of Mr. Liebowitz, the attorney who signed the complaint, respecting the registration itself.

Here, Defendant did not ask the Court to sanction counsel in connection with the copyright registration issue, and certainly did not file any written motion.[1] Instead, the sanctions proceeding concerning paragraph 9 of the complaint was initiated by the Court. [Dkt. #52]  In any event, defendant cannot move for sanctions under Rule 11 without serving Plaintiff's counsel with a formal Rule 11 motion and a 21-day "safe harbor" to correct any pleading deficiency. Fed.R.Civ.P. 11(c)(1)(A).  Defendant failed to serve such motion during the pendency of the action and thus the time to file and serve a Rule 11 motion has passed. *See* Fed. R. Civ. P. 11 advisory committee notes to 1993 amendment ("Ordinarily the [Rule 11] motion should be served promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as untimely.").

---

[1] Indeed, Defense counsel plainly violated the Court's Order [Dkt. #47] by raising the registration issue at the January 8 hearing, which was narrowly limited to the question of whether Mr. Liebowitz obtained certain permissions from the Mediator.  There is no just cause to impose sanctions against Liebowitz while Mr. Newberg, who certainly understood the parameters of the hearing, willfully violated the Court's Order in premeditated fashion during closing argument.

Liebowitz ◉ Law Firm, PLLC

The allegation set forth in paragraph 9 of the complaint is attributable to clerical error, rather than any bad faith intent to deceive. *Class v. E. Airlines Inc*., 117 F.R.D. 511, 512 (S.D.N.Y. 1987) (declining to impose sanctions where discrepancy was merely a clerical error in the doctor's records). Indeed, there would no logical reason why any attorney would purposely seek to identify the incorrect registration number in a complaint.

**Point IV:**     **Sanctions Are Not Appropriate Against Plaintiff (nor Counsel) Because They Are Entitled to Rely On Judicial Precedent Which Holds That the Burden to Retrieve a Certified Deposit Copy Rests on the Alleged Infringer**

As stated at the January 8 hearing, there is no statutory or regulatory requirement which imposes a duty upon the copyright holder (or his counsel) to incur the expense of ordering a certified deposit copy from the Copyright Office.  Moreover, there is no caselaw authority of which Plaintiff is aware which imposes such a duty.  Under these circumstances, sanctions cannot be warranted for an alleged failure on counsel or the party's part to secure a certified deposit copy prior to filing suit.  *See, e.g.*, *Clancey v. Mobil Oil Corp.*, 906 F.Supp. 42, 50 (D.Mass.1995) (holding that Rule 11 sanctions were not warranted where legal precedents were not clearly defined); *Smith & Green Corp. v. Trustees of the Construction Industry & Laborers Health & Welfare Trust*, 244 F.Supp.2d at 1104 (holding that Rule 11 should not be used to raise issues of legal sufficiency that are more properly decided in a dispositive motion).

Moreover, prevailing law in this Circuit holds that the burden to retrieve a certified deposit copy from the U.S. Copyright Office rests upon the alleged infringer..  *See, e.g., Goodman v. Universal Beauty Prod. Inc.*, No. 17-CV-1716 (KBF), 2018 WL 1274855, at *5 (S.D.N.Y. Mar. 9, 2018) ("A full period of discovery has occurred in this case; defendants had the opportunity to request a certified deposit copy from the U.S. Copyright Office and submit it with their opposition to plaintiff's motion for summary judgment. Their failure to submit any evidence, however, prevents them from raising a triable issue on the validity of the registration"); *Masi v. Moguldom Media Grp. LLC*, No. 18 CIV. 2402 (PAC), 2019 WL 3287819, at *4 (S.D.N.Y. July 22, 2019) ("Defendant could have . . . requested a certified deposit copy from the U.S. Copyright Office to support its position on summary judgment."); *Chicoineau v. Bonnier Corp.*, No. 18-cv-3264 (JSR), 2018 WL 6039387, at *2 (S.D.N.Y. Oct. 16, 2018) (implying that Defendant must produce evidence to invalidate registration).  We are not aware, and Defendant has failed to cite, any caselaw which holds that a copyright holder must obtain a certified deposit prior to filing suit.

Based on the foregoing, Plaintiff and his counsel respectfully submit that sanctions are not warranted concerning the registration issue.  Had the case proceeded on the merits, Plaintiff would have sought Court's leave to amend the complaint to correct the pleading deficiency by identifying the 272 Registration.

Respectfully submitted,

**/s/richardliebowitz/**
Richard Liebowitz

*Counsel for Plaintiff Arthur Usherson*

3

JA-282



# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Copyright Number = VAu001373272
Search Results: Displaying 1 of 1 entries



Labeled View

*Arthur Usherson - Bob Dylan at Mariposa Folk Festival July 16, 1972.*

| | |
|---|---|
| **Type of Work:** | Visual Material |
| **Registration Number / Date:** | VAu001373272 / 2019-08-22 |
| **Application Title:** | Arthur Usherson - Bob Dylan at Mariposa Folk Festival July 16, 1972 |
| **Title:** | Arthur Usherson - Bob Dylan at Mariposa Folk Festival July 16, 1972. [Group registration of unpublished photographs. 30 photographs] |
| **Description:** | 30 photographs : Electronic file (eService) |
| **Copyright Claimant:** | Arthur Usherson. Address: 1006 Old Holcomb Bridge Road, Roswell, GA, 30076, United States. |
| **Date of Creation:** | 1972 |
| **Authorship on Application:** | Arthur Usherson; Domicile: United States. Authorship: photographs. |
| **Copyright Note:** | C.O. correspondence. |
| | Regarding title information: Deposit contains complete list of titles that correspond to the individual photographs included in this group. |
| | Regarding group registration: A group of unpublished photographs may be registered on one application with one filing fee only under limited circumstances. ALL of the following are required: 1. All photographs (a) are unpublished AND (b) were created by the same author AND (c) are owned by the same copyright claimant AND 2. The group contains 750 photographs or less AND 3. A |

sequentially numbered list of photographs containing the title and file name for each photograph included in the group must be uploaded along with other required application materials. The list must be submitted in an approved document format such as .XLS or .PDF. The file name for the numbered list must contain the title of the group and the Case Number assigned to the application.

**Photographs:** (20 photographs): Bob Dylan at Mariposa Folk Festival July 16, 1972 (1).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (10).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (11).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (12).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (13).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (14).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (15).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (16).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (17).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (18).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (19).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (2).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (20).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (21).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (22).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (23).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (24).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (25).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (26).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (27).jpg,

(10 photographs): Bob Dylan at Mariposa Folk Festival July 16, 1972 (28).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (29).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (3).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (30).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (4).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (5).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (6).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (7).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (8).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (9).jpg,

**Names:** Usherson, Arthur

Case 20-2304, Document 57, 11/02/2020, 2965869, Page25 of 275

JA-284



**Save, Print and Email ([Help Page](#))**

Select Download Format  [ Full Record ]  [ Format for Print/Save ]

Enter your email address: [_____]  [ Email ]

---

[Help](#)   [Search](#)   [History](#)   [Titles](#)   [Start Over](#)

---

[Contact Us](#)  |  [Request Copies](#)  |  [Get a Search Estimate](#)  |  [Frequently Asked Questions (FAQs) about Copyright](#)  |  [Copyright Office Home Page](#)  |  [Library of Congress Home Page](#)

**McGuireWoods LLP**
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102-4215
Phone: 703.712.5000
Fax: 703.712.5050
www.mcguirewoods.com

**Brad R. Newberg**
Direct: 703.712.5061

## MCGUIREWOODS

bnewberg@mcguirewoods.com
Fax: 703.712.5187

January 18, 2020

**VIA ECF**
The Honorable Jesse M. Furman
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007
Furman_NYSDChambers@nysd.uscourts.gov

Re:     *Usherson v. Bandshell Artist Management*, 1:19-cv-6368 (JMF)

Dear Judge Furman,

We write in response to Mr. Liebowitz's January 17 letter (the "January 17 letter") regarding the issue of copyright registrations in the above-captioned case. We write again as an officer of the Court, despite this case having been settled.

The January 17 letter admits that the photograph upon which Plaintiff sued was not registered with the Copyright registration named in the Complaint as the basis for the lawsuit. The January 17 letter goes on to state that the photograph is actually part of a registration filed instead on August 22, 2019, more than a month after this case was filed.

However, Mr, Liebowitz states that he (and his client) should avoid sanctions on this issue because this was a mere "clerical error." Such an explanation defies belief.

As an initial matter, the January 17 letter does not state how Mr. Liebowitz knows for sure that the photograph is part of the August 22 registration. The only way would be that he is making a statement on personal knowledge, that is that he filed the August 22 registration or it was filed under his direction. That may be true given that Mr. Freeman stated to the Court during the January 8 hearing that the Liebowitz Law Firm handles the copyright filings for its clients unless the photographs had been registered already. More on that below.

As to the clerical error defense, a clerical error would be filing a complaint with, say, a typo in the registration number. Here, there can be no "clerical error." In this case, there was **no** copyright registration at the time of the Complaint being filed. Here, the obvious conclusion is that Mr. Liebowitz realized that the Complaint was not valid and filed a later registration. This further appears to have been done intentionally with the hope of Defendant and the Court not finding out. That would also explain why Mr. Liebowitz blames the undersigned for bringing this issue to the Court's attention (because, he says, the hearing was only to determine if he

January 18, 2020
Page 2

should be sanctioned for one wrongdoing, not another), and goes so far as to claim that it should be up to a defendant to see through his ruse.[1]

The question is why Mr. Liebowitz would have taken such actions?  And, if he could have just moved to amend, why did he not move to amend the Complaint earlier (especially given the tight discovery window of this case)?  The answer is that despite the January 17 letter's statement that Plaintiff could have just amended the complaint under the liberal pleading rules, that is incorrect.  Mr. Liebowitz almost certainly knows this, likely when he filed the second registration, but certainly when I brought this exact issue up to the Court at length in the initial pre-trial conference, two months ago.

As this Court is well aware, in *Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC*, __ U.S. __, __ 139 S. Ct. 881, 892 (2019), the Supreme Court held that an actual copyright registration, and not even a pending application, must exist before a plaintiff can bring a claim on its work.  Since *Fourth Estate*, this Court (including J. Furman) has found that allowing a plaintiff to amend its copyright claims once it obtained a registration would "undermine Congress's choice to maintain registration as a prerequisite to suit."  *Malibu Media, LLC v. Doe*, No. 18-CV-10956 (JMF), 2019 WL 1454317, at *2-3 (S.D.N.Y. Apr. 2, 2019) (J. Furman).  Therefore, Mr. Liebowitz could not possibly have amended Plaintiff's Complaint based on the second registration.  *See also Pickett v. Migos Touring, Inc.*, 18-cv-9775 (AT), 2019 WL 5887742, at * 5 (S.D.N.Y. Nov. 12, 2019); *Xclusive-Lee, Inc. v. Hadid*, 19-cv-520 (PKC) (CLP), 2019 WL 3281013, at *4 (E.D.N.Y. July 18, 2019) (quoting *Malibu Media*, and "declin[ing] to grant Plaintiff leave to amend the complaint to allege registration should its copyright application be approved in the future"); *Izmo, Inc. v. Roadster, Inc.*, No. 18-cv-06092 (NC), 2019 WL 2359228, at *2 (N.D. Cal. June 4, 2019); *Mai Larsen Designs v. Want2Scrap, LLC*, No. 17-CV-1084 (ESC), 2019 WL 2343019, at *6 (W.D. Tex. June 3, 2019).

More importantly—and the reason the January 17 letter requires a response—is that the very claims Mr. Liebowitz is making now are the claims he (and Mr. Freeman) denied in open Court.

During the January 8 hearing, Mr. Freeman stated to the Court that he had no knowledge regarding the registration of the photograph in issue.  As the Court knows, he also filed a sworn declaration with Mr. Liebowitz's sanctions response, claiming no knowledge of even "the existence of this matter" until the night of October 30.  Freeman Decl. ¶ 4.

That leaves Mr. Liebowitz, the only attorney to make an appearance in this case.  Attached as an Exhibit are relevant pages from the November 14 Court conference in this case.  At page 17, the Court can see that I brought this issue front and center, including my suspicion that Mr. Liebowitz knew the copyright registration sued on was invalid or did not contain the

---

[1] In discussing the "burden to retrieve" deposit copies, Mr. Liebowitz merely cites cases wherein a defendant tried to make a claim that a registration was not valid without ever seeking the evidence to make such a claim.  That is completely immaterial to the issue at hand and certainly does not relieve a plaintiff from making truthful filings.  Those cases also do not contest this Court's power to, as part of any sanctions award, require Mr. Liebowitz to serve a defendant certified deposit copies with or soon after the service of any future complaints.

JA-287

January 18, 2020
Page 3

photograph at issue, leading to the second registration, and that, if my suspicions were correct, how the second registration could not cure the Complaint.  Tr. at 17, 19-20.

Mr. Liebowitz did not argue the point or suggest he would be amending Plaintiff's complaint.  Instead, he outright denied that there was an issue:  "I don't know what defense counsel means about other registrations or other photographs.  I will have to see what my office did, *but this is the correct registration*."  Tr. 17-18 (emphasis added).  At no point thereafter, until the January 17 letter, did Mr. Liebowitz go and "check with [his] office" and inform the Court or defense counsel that his statement in open Court was incorrect.

Even at the January 8 hearing, there was still feigned ignorance by Plaintiff's counsel of the invalidity of the first registration and the existence of the second registration.  Now, in what appears to be yet another attempt to move the ball, Mr. Liebowitz suggests that he knew of the existence of the second registration, but claims this whole issue was just "clerical error."

This Court is aware of Mr. Liebowitz's tactics in other cases in an attempt to avoid sanctions.  Blame the other side and claim his errors were no big deal. His January 17 letter can be added to that pile.

Respectfully submitted,

*s/Brad R. Newberg/*
Brad. R. Newberg
*Attorney for Defendant Bandshell Artist Management.*

1

```
     JBEJUSHC                 Conference

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ARTHUR USHERSON,

 4              Plaintiff,

 5          v.                          19 Civ. 6368 JMF

 6   BANDSHELL ARTIST MANAGEMENT,

 7              Defendant.

 8   ------------------------------x

 9

10                                      November 14, 2019
                                        4:00 p.m.
11

12

13   Before:

14                    HON. JESSE M. FURMAN,

15                                      District Judge

16

17                    APPEARANCES

18
     LIEBOWITZ LAW FIRM, PLLC
19        Attorneys for plaintiff
     BY:  RICHARD LIEBOWITZ, Esq.
20        JAMES FREEMAN, Esq.
                    Of counsel
21

22   McGUIRE WOODS, LLP
          Attorneys for defendant
23   BY:  BRAD RICHARD NEWBERG, Esq.
                    Of counsel
24

25
```

16

JBEJUSHC                    Conference

1    needs to testify, how you think it should be handled.  I will

2    issue an order that gives you further guidance on that front.

3              More broadly, I guess we are here for the initial

4    conference.  One option would be to put everything on hold

5    pending adjudication of the sanctions motion and see where that

6    lands us.  I will say I am skeptical of the request to dismiss

7    the complaint on that basis.  I think if sanctions are

8    appropriate, monetary sanctions are presumably the way to go

9    and not dismissal, but so in part for that reason I guess my

10   inclination would not be to hit the pause button.

11             Another option would be to proceed with discovery in

12   the normal course.  I guess the third option is somewhere

13   in-between.  I wanted to raise this.  Mr. Newberg has a

14   footnote in his memorandum of law, suggesting that there may be

15   a threshold issue with respect to the copyright in this case

16   that because it may predate 1989, that it is not a valid

17   copyright in the absence of a registration.  I don't know if

18   you're right about that, and maybe you can elaborate on it.

19             Would that be dispositive of the claims in this case

20   and, if so, is that something we should have early summary

21   judgment motion practice on?  What is your thought?

22             MR. NEWBERG:  Thank you.  Yes, that would be

23   dispositive.  They lose all rights in copyright for publishing,

24   print out, listening, anything regarding your photograph

25   without notice if it was done before 1989.

17

JBEJUSHC                    Conference

1        Additionally, actually just yesterday we also

2   discovered that after this case was filed, Mr. Usherson filed a

3   copyright registration, which it seems to be on these

4   photographs, so now it is unclear whether the registration in

5   the complaint actually does cover the photograph or if it is

6   the new copyright registration.

7        If it is the new copyright registration, it is

8   unequivocal this case must be dismissed with prejudice based on

9   the Supreme Court's recent holding in terms of having to have a

10  registration before you file and the Second Circuit and this

11  Court's holdings that that is a non-curable error.

12       So now we discovered that yesterday.  One of the

13  things I was going to ask your Honor, I think we we need to

14  amend our answer.  I do think that having discovery purely on

15  those aspects early would probably be a very good idea.

16       THE COURT:  Mr. Liebowitz.

17       MR. LIEBOWITZ:  Your Honor, so what defendant doesn't

18  realize is this is an unpublished work.  The VA number is VAU.

19  When it is VAU, it is unpublished.  So defendants say it was

20  published before 1989 is not accurate.  So it was VAU, it is

21  unpublished, and that does not affect any public domain or

22  anything like that.

23       It was unpublished, so there is no issue with

24  registration.  I don't know what defense counsel means about

25  other registrations or other photographs.  I will have to see

18

JBEJUSHC                    Conference

1   what my office did, but this is the correct registration.  It

2   is registered as unpublished, and there are statutory damages

3   and attorney's fees in this case.

4              We believe that if defendant wants to take up these

5   issues during discovery, we want to have discovery as well.  We

6   want to determine why wasn't there a license, why wasn't the

7   photograph taken down.  There are a lot of factors that go into

8   statutory damages, and we believe that the appropriate thing to

9   do at this stage is to just set discovery, set the dates, and

10  let the parties engage and hopefully during that process the

11  parties could eventually get to a settlement number we are

12  willing to live with and we can finally put this matter to

13  rest.

14             MR. NEWBERG:  May I respond briefly, your Honor?

15             THE COURT:  Sure.

16             MR. NEWBERG:  Responding backwards on the point of the

17  facts on the discovery Mr. Liebowitz is talking about, that is

18  normal discovery.  What we are talking about --

19             THE COURT:  Slow down.

20             MR. NEWBERG:  -- is preemptive discovery on the notice

21  on registration.  I can tell Mr. Liebowitz right here on

22  August -- this is a photo, sort of well known folk community

23  photo of Bob Dylan, Leon Redbone and David Bromberg at the

24  Mariposa Folk Festival on July 16, 1972.

25             Taking this backwards, while there is a registration

19

JBEJUSHC                    Conference

1   that was mentioned in the complaint that simply just says
2   unpublished photographs, Nos. 122-208, that is what was for the
3   complaint.  On August 22nd, a very specific registration was
4   issued that says Arthur Usherson, Bob Dylan at Mariposa Folk
5   Festival, July 16, 1972, 30 photographs.  Clearly it is very
6   likely one of these 30 photographs is the photograph in
7   question, which is a photograph of Bob Dylan at the Mariposa
8   Folk Festival, July 16, 1972.

9           As far as the publication, I am well aware the
10  registration says that they're unpublished photographs.  I
11  think that is almost certainly inaccurate.  This is a
12  photograph that has been widely circulated.  I found examples
13  of it ranging back 10 to 20 years, and so if it were
14  unpublished, it would, it would be widely circulated, which may
15  be another reason to take discovery.  Thank you.

16          THE COURT:  If there is a generic registration on day
17  one, and then a more specific registration on day two, I don't
18  know why that would, be but in theory cover the same work?.

19          MR. NEWBERG:  It is possible then it could cover the
20  same work.  We are willing to find out whether these
21  unpublished photographs are composite copies to determine
22  whether or not this is part of it and why there was this new
23  registration.

24          In addition, if you published hundreds or a group of
25  unpublished photographs, a collection, if any of those

20

JBEJUSHC                    Conference

1   photographs, and -- this may be the reason for the new

2   registration -- if any of those photographs actually were

3   published, that takes away the entire copyright registration.

4   So I have 50 unpublished photographs and 10 published, and to

5   put them in as unpublished photographs and try to get them in

6   that way and determine some of them were published, then that

7   copyright is no longer valid.

8           THE COURT:   What do you need to get to the bottom of

9   that and figure out what is going on here?

10          MR. NEWBERG:   In terms of discovery, we need discovery

11  on deposit copies of the photographs were put in for this 2011

12  registration.  We need discovery on Mr. Usherson of when these

13  photographs were published, if they were published, and if they

14  have, how they have been used, and discovery of why this new

15  registration was put in on August 22nd, because if the new

16  registration was essentially the first valid registration for

17  this photograph, then this case is -- and that is a separate

18  issue obviously from the notice, which is another reason for

19  dismissing.

20          If it were found, that is the other part of discovery,

21  if this is a published photograph and it was published without

22  notice prior to 1989, then there is no copyright possibility

23  whatsoever.

24          THE COURT:   What discovery would you need on that

25  aside from the deposition of Mr. Usherson?

JA-294

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                          :
ARTHUR USHERSON,                                          :
                                                          :
                                  Plaintiff,              :           19-CV-6368 (JMF)
                                                          :
                 -v-                                      :           ORDER
                                                          :
BANDSHELL ARTIST MANAGEMENT,                              :
                                                          :
                                  Defendant.              :
                                                          :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        In the colloquy that followed the evidentiary hearing in this case on January 8, 2020,

defense counsel advised the Court that he had reason to believe that Paragraph 9 of the

Complaint, ECF No. 1 — which alleges that the photograph at issue in this case (the

"Photograph") "was registered with United States Copyright Office and was given Copyright

Registration Number VAu 1-080-046" ("Registration 046") — was inaccurate. *See* Tr. of

January 8, 2020 Hearing ("Tr."), at 127.  In response, counsel to Richard Liebowitz and the

Liebowitz Law Firm, James Freeman, represented that Paragraph 9 of the Complaint "was based

on Mr. Usherson's representation that the photograph in this case was under that copyright

registration number"; that counsel had no "reason to doubt the veracity of [Mr. Usherson's]

representations"; and that, before filing suit, counsel verified that Mr. Usherson was the claimant

for Registration 046, but did not take additional steps to confirm that the Photograph was

actually registered.  *Id.* at 140-41.  The Court then ordered Plaintiff's counsel to submit a letter-

brief "indicating, one, whether the photograph at issue in this case was, in fact, registered with

the Copyright Office; and, two, if it was not, why sanctions would not be appropriate based on

the allegation in paragraph 9 of the complaint." *Id.* at 142; *see* ECF No. 52.

Pursuant to the Court's Order, Mr. Liebowitz filed a letter-brief on January 17, 2020.

ECF No. 57.  In his letter, Mr. Liebowitz concedes that Paragraph 9 of the Complaint "is

inaccurate" because the Photograph "was not registered as part of the 046 Registration." *Id.* at 1.

Mr. Liebowitz reports further that "the Photograph was registered in Plaintiff's name under

registration number VAu 1-373-272" ("Registration 272"), with an "effective date of August 22,

2019" — more than one month after this lawsuit was filed. *Id.* at 1; *see also* ECF No. 1

(Complaint filed on July 10, 2019).  Mr. Liebowitz attributes the problem (although it is not clear

if the problem to which he refers is the inaccuracy of Paragraph 9 or the failure to register the

Photograph in the first instance) to "administrative mistake[] or "clerical error[]" — but he does

not elaborate on the nature or source of the purported mistake or error.  ECF No. 57, at 1-2.

Ultimately, Mr. Liebowitz contends that the Court cannot impose sanctions "for designating an

incorrect copyright registration number in the initial complaint" without "a specific showing of

bad faith conduct on [the] part of Mr. Liebowitz, the attorney who signed the complaint,

respecting the registration itself." *Id.* at 2.[1]

Mr. Liebowitz's unsworn letter raises more questions than it answers.  Accordingly, no

later than **January 31, 2020**, Mr. Liebowitz shall file a declaration, sworn under penalty of

perjury, specifying: (1) the nature and cause of the "administrative mistake" or "clerical error" to

---

[1]     Mr. Liebowitz also accuses defense counsel of "violat[ing]" the Court's Order by raising
the registration issue at the January 8, 2020 hearing, "which was narrowly limited to the question
of whether Mr. Liebowitz obtained certain permissions from the Mediator."  ECF No. 57, at 2
n.1.  Not so.  Defense counsel did not seek to introduce evidence with respect to the issue during
the evidentiary hearing itself, which was — per the Court's earlier Order — "narrowly limited."
ECF No. 42.  Instead, as an officer of the Court, he brought it to the Court's attention in the
colloquy that followed the evidentiary hearing.  Tr. at 127.  That was entirely appropriate.

2

which he refers in his January 17, 2020 letter, including who was responsible for the mistake or error; (2) the factual basis for his inclusion of the allegation set forth in Paragraph 9 of the Complaint and the source of that factual basis, including a detailed description of any investigation into the matter that he conducted prior to the filing of the Complaint; (3) what role, if any, he played in the filing of the application for Registration 272, when and by whom that application was filed, and why the decision to obtain that registration was made (including but not limited to whether it was made due to a realization that the Photograph had not been registered); (4) when Mr. Liebowitz became aware that the Photograph was not registered under Registration 046, how he learned of that fact, and whether Mr. Liebowitz knew on November 14, 2019 (the date of the initial pretrial conference in this matter) that the Photograph had been registered after this lawsuit was commenced; and (5) why Mr. Liebowitz failed to advise the Court and defense counsel that Paragraph 9 of the Complaint was inaccurate until his January 17, 2020 letter.

No later than the **same date**, Mr. Freeman shall file a declaration, sworn under penalty of perjury, specifying (1) the factual basis for the representations he made at the January 8, 2020 hearing about the registration of the Photograph, including that the allegation in Paragraph 9 of the Complaint was based on information provided to counsel by Mr. Usherson and that counsel had confirmed, prior to filing the Complaint, that Mr. Usherson was the claimant for Registration 046; and (2) any personal knowledge he has of any "administrative mistake" or "clerical error" related to the allegation in Paragraph 9 of the Complaint, and the basis for such knowledge.  In addition, no later than the **same date**, Mr. Usherson shall also file a declaration, both ***notarized*** and sworn under penalty of perjury, specifying (1) whether, as of the date this lawsuit was filed, he was aware that the Photograph had not been registered; (2) what, if any, information he

3

JA-297

provided to Mr. Liebowitz, Mr. Freeman, or any other attorney from the Liebowitz Law Firm

about the registration of the Photograph and the date(s) on which he provided such information;

and (3) what role, if any, he played in connection with Registration 272, including but not

limited to the decision to seek registration and the actual filing of the registration.

Finally, by the **same date**, Mr. Liebowitz is granted leave (but not required) to file a

supplemental letter, not to exceed three pages, addressing the question of whether sanctions

should be imposed in light of any new information in the aforementioned declarations.  Defense

counsel is granted leave (but not required) to file a letter, not to exceed three pages, responding

to the declarations and any supplemental letter no later than **February 5, 2020**.


SO ORDERED.

Dated: January 24, 2020
       New York, New York

JESSE M. FURMAN
United States District Judge

4

JA-298

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARTHUR USHERSON,

                                        Plaintiff,                    Docket No. 1:19-cv-06368-JMF

        - against -

BANDSHELL ARTIST MANAGEMENT

                                        Defendant.

---

## AFFIDAVIT OF ARTHUR USHERSON

        I, ARTHUR USHERSON, declare under the penalty of perjury that the following is true

and correct to the best of my personal knowledge.

        1.        I am the plaintiff in this action.

        2.        I submit this Declaration in response to the Court's Order, dated January 24, 2020

[Dkt. #59], the pertinent portion which reads:

>        Mr. Usherson shall also file a declaration . . . specifying (1) whether, as of the date
> this lawsuit was filed, he was aware that the Photograph had not been registered; (2)
> what, if any, information he provided to Mr. Liebowitz, Mr. Freeman, or any other
> attorney from the Liebowitz Law Firm about the registration of the Photograph and
> the date(s) on which he provided such information; and (3) what role, if any, he
> played in connection with Registration 272, including but not limited to the decision
> to seek registration and the actual filing of the registration.

**The 046 Registration**

        3.        On August 2, 2011, I personally applied to the U.S. Copyright Office ("USCO")

for protection of my photographs which included several photographs I took of musicians Bob

Dylan and Leon Redbone at the Mariposa Folk Festival on July 16, 1972 (the "Mariposa

Festival").  The Copyright Office assigned the registration number VAu001080046 (the "046

Registration").  Attached as <u>Exhibit A</u> is a true and correct of the 046 Registration, as maintained

by the USCO's website.

4.       Specifically, twelve photographs on deposit with the 046 Registration depicted

Bob Dylan at the Mariposa Festival.  [*bearing JPG content titles*: #0082, #0083, #0215, #0216,

#0217, #0218, #0416, #0436, #0437, #0438, #0439; #0440]  Of those twelve photographs, five

of them depicted Bob Dylan walking or standing with Leon Redbone.  [*bearing JPG content

titles*: #0082, #0083, #0438, #0439; #0440]  (the "Dylan / Redbone Photos").  Attached as

<u>Exhibit B</u> are true and correct copies of the Dylan / Redbone Photos that are on deposit with the

046 Registration.

**<u>Transmission of 046 Registration Materials to Liebowitz Law Firm</u>**

5.       On January 24, 2019, I engaged Richard Liebowitz of Liebowitz Law Firm,

PLLC ("LLF") to be my copyright enforcement attorney.  Shortly thereafter, I was informed that

Zachary Cuff of LLF would serve as my "research analyst" to help me with issues pertaining to

copyright registrations and searches for on-line infringements.

6.       On February 1, 2019, I e-mailed Donna Halperin, LLF's Director of Client

Relations, and Mr. Cuff several screenshots of infringements that I had found on-line by

googling "1972 Mariposa Folk Festival Toronto".  Attached as <u>Exhibit C</u> is a true and correct

copy of the 2/1/19 e-mail I transmitted to LLF.

7.       On February 6, 2019, I e-mailed Ms. Halperin and Mr. Cuff another screenshot

from Facebook of a third-party infringement that I had found involving the identical photograph

at issue in this case.  Attached as <u>Exhibit D</u> is a true and correct copy of the 2/6/19 e-mail I

transmitted to LLF.

       8.      On February 7, 2019, Mr. Cuff responded to my 2/6/19 e-mail, asking me whether

the screenshot I sent him on 2/6/19 included a photograph that was registered and whether I

could send him the registration number.  I responded back to Mr. Cuff the same day, indicating

that the photograph was registered and that I would send him a disk containing all the

photographs that I had already registered. Attached as <u>Exhibit E</u> is a true and correct copy of the

2/7/19 e-mail chain between myself and Mr. Cuff.

       9.      On or about February 11, 2019, I mailed Mr. Cuff a CD-Rom labeled *Copyright*

*Registered Images #0001-#2,093* ("CD1").  CD1 contained all of the JPEG images that were

registered with the Copyright Office in connection with the 046 Registration. I transmitted CD1

to LLF so that Mr. Cuff could search for more infringements on my behalf. Attached as <u>Exhibit</u>

<u>F</u> is a true and correct copy of the label for CD1 which I transmitted to LLF.

**<u>My Discovery of Defendant's Infringement and Authorization to File a Lawsuit</u>**

       10.     On or about June 5, 2019, I discovered the on-line infringement by Defendant

Bandshell Artist Management ("Defendant") of a photograph which depicted Bob Dylan

standing with Leon Redbone at the Mariposa Festival (the "Photograph").  I immediately sent a

screenshot of the Defendant's infringing website (the "Infringing Screenshot"), which is attached

as Exhibit B to the Complaint [Dkt. #1-2] to Richard Liebowitz and Zachary Cuff.  Attached as

<u>Exhibit G </u>is a true and correct copy of the 6/5/2019 email I transmitted to LLF which attached a

copy of the Infringing Screenshot.

JA-301

11.     At the time I transmitted the Infringing Screenshot to LLF, I believed that the Infringing Screenshot included a cropped version of one of the Dylan / Redbone Photos on file with the 046 Registration.

12.     On or about July 8, 2019, I authorized Mr. Liebowitz to file a copyright infringement action against Defendant for unauthorized use of the Photograph, identifying the 046 Registration.

13.     At the time the lawsuit was filed on July 10, 2019, I believed that the Photograph identified in Exhibit A of the Complaint was on deposit with the 046 Registration.  I assumed that the Photograph which Defendant posted without my authorization was a part of the 046 Registration because it was one of a series of a photographs I took of Dylan and Redbone at the Mariposa Folk Festival on July 16, 1972.  Defendant's use of the Photograph was also cropped, which I believe led to some confusion between similar photographs.

**The 272 Registration**

14.     After learning of Defendant's infringement, and realizing that the Dylan / Redbone Photos were being targeted for infringement, I searched my personal archives and compiled some additional images from the Mariposa Festival and placed them on a CD-Rom in JPEG format.  My intent in compiling these additional images was for LLF to register them with the USCO.

15.     Sometime after July 10, 2019, I mailed Mr. Cuff a second CD-Rom, entitled *Bob Dylan at Mariposa Folk Festival, July 16, 1972,* which contained thirty additional photographs taken by me at the Mariposa Festival.  ("CD2").  Attached as Exhibit H is a true and correct copy of the label for CD2 which I transmitted to Mr. Cuff at LLF.

16.     Before or during the pendency of this action, I did not provide any information

pertaining to copyright registrations directly to Mr. Liebowitz, Mr. Freeman[1] or any other

attorney at LLF. Instead, all my communications and transmissions concerning registration

issues were sent to Zachary Cuff, who was the assigned research analyst at LLF, and in some

cases to Ms. Halperin.

17.     On August 22, 2019, LLF applied for a copyright registration on my behalf for the

thirty photographs contained on CD2.  The USCO assigned registration number VAu 1-373-272

to these photographs, with effective date of August 22, 2019 (the "272 Registration").  Attached

as Exhibit I is a true and correct copy of the 272 Registration, as maintained by the USCO

website.

18.     Although I did not play a direct role in the application process for the 272

Registration, which was handled by LLF, I provided CD2 to Mr. Cuff with the intent that the

images contained on CD2 would be registered by LLF with the USCO.

19.     I did not realize that the Photograph at issue in this action was not on deposit with

the 046 Registration - but was instead on deposit with the 272 Registration - until preparing this

declaration in response to the Court's most recent Order.

20.     In retrospect, it is fundamental to see how there was administrative confusion

regarding the Photograph, with respect to being on deposit with the 046 Registration, because it

was very similar to other photos of the identical subject matter that were in fact on deposit with

---

[1]  I did not have any contact with Mr. Freeman until the evening of October 30, 2019, when he
was copied on an e-mail sent to me by Mr. Liebowitz regarding the next day's mediation.

JA-303

046 Registration.  *See* Exhibit B attached hereto.  The confusion was compounded by the fact

that Defendant used a cropped version of the Photograph.

21.     Ultimately, I am the true and rightful author and owner of the Photograph, which

is currently on deposit with the USCO.

Dated:          February __, 2020
                Roswell, GA


                                                    _____

                                                    ARTHUR USHERSON



_____
Notary

JA-304

046 Registration. *See* Exhibit B attached hereto. The confusion was compounded by the fact

that Defendant used a cropped version of the Photograph.

    21.    Ultimately, I am the true and rightful author and owner of the Photograph, which

is currently on deposit with the USCO.

Dated:        February 7, 2020
            Roswell, GA

ARTHUR USHERSON

Notary

LILIANA C GARCIA
NOTARY PUBLIC
Fulton County
State of Georgia
My Comm. Expires Sept. 16, 2022

---------- Forwarded message ---------

From: **Arthur Usherson** <artphotovideo@mindspring.com>

Date: Thu, Feb 6, 2020 at 12:51 PM

Subject: Notary -Signatures

To: Richard Liebowitz <RL@liebowitzlawfirm.com>, Donna Halperin

<dh@liebowitzlawfirm.com>, Christopher Melbourne

<cm@liebowitzlawfirm.com>

OK?



JA-306

# EXHIBIT A

JA-307



## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Copyright Number = VAu001080046
Search Results: Displaying 1 of 1 entries



Labeled View

*Arthur Usherson's Unpublished Photographs from #0001-#2208.*

| | |
|---|---|
| **Type of Work:** | Visual Material |
| **Registration Number / Date:** | VAu001080046 / 2011-08-02 |
| **Application Title:** | Arthur Usherson's Unpublished Photographs from #0001-#2208. |
| **Title:** | Arthur Usherson's Unpublished Photographs from #0001-#2208. |
| **Description:** | CD-ROM of photographs. |
| **Copyright Claimant:** | Arthur Art Usherson. Address: 1006 Old Holcomb Bridge Rd., Roswell, GA, 30076, United States. |
| **Date of Creation:** | 2011 |
| **Authorship on Application:** | Arthur Art Usherson; Domicile: United States; Citizenship: United States. Authorship: photograph(s) |
| **Rights and Permissions:** | Arthur Art Usherson, 1006 Old Holcomb Bridge Rd., Roswell, GA, 30076, (770) 649-8255, (770) 649-8255, artphotovideo@mindspring.com |
| **Names:** | Usherson, Arthur Art |





| **Save, Print and Email (Help Page)** |
|---|
| Select Download Format  Full Record ▾    Format for Print/Save |
| Enter your email address:                    Email |

Help    Search    History    Titles    Start Over

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright
Copyright Office Home Page  |  Library of Congress Home Page

JA-308

# EXHIBIT B

Case 1:19-cv-06368-JMF Document 62-2 Filed 02/07/20 Page 2 of 6



Case 1:19-cv-06368-JMF   Document 62-2   Filed 02/07/20   Page 3 of 6



Case 1:19-cv-06368-JMF    Document 62-2    Filed 02/07/20    Page 4 of 6



Case 1:19-cv-06368-JMF   Document 62-2   Filed 02/07/20   Page 5 of 6



JA-313

Case 1:19-cv-06368-JMF   Document 62-2   Filed 02/07/20   Page 6 of 6



JA-314

# EXHIBIT C

2/5/2020                                    (8017) Webmail :: Infringements - 1972 Mariposa Folk Festival



JA-316

# EXHIBIT D

2/5/2020          (8009) Webmail :: arthur usherson



Hi Zack,  This is an infringement from musician Leon Redbones FB page. Can you see if we can find any kind of contact information for him and document for Arthur if you are successful. document both links. Thank you.

https://www.facebook.com/LeonRedboneOfficial/photos/a.1405320689734472/2192779334321933
type=3&theater
https://www.facebook.com/LeonRedboneOfficial/photos/a.1405320689734472/2192779334321933
type=3

My best,

Donna Halperin, Director of Client Relations
Liebowitz Law Firm, PLLC
t.516-233-1660
f.516-612-2740

Screenshot (41).png~897 KBShow Download

Screenshot (43).png~828 KBShow Download

JA-318

# EXHIBIT E

JA-319

2/5/2020                                   (8008) Webmail :: Re: arthur usherson



**\\\\webair**                                                                zc@liebowitzlawfirm.com

Move to... ⬍

**Folders**

**Inbox (8008)**

Drafts

Sent

Spam

Trash

---

Subject **Re: arthur usherson**

From Arthur Usherson 👤

To Zachary Cuff 👤

Date 2019-02-07 22:16

---

Zac, it was included in the registration – I sent you a disk via USPS toda with all the group regitrations which should arrive on this coming Monday. Please confirm you received it.

Thanks.

Arthur

On 2/7/2019 5:05 PM, Zachary Cuff wrote:

> Hi Arthur,
>
> Thank you for sending this. I managed to find an address in PA. When you get the chance, can you tell me if the picture was registered and if so, can you send over the registration number?
>
> Best,
> Zack
>
> On Wed, Feb 6, 2019, 9:53 PM Donna Halperin <dh@liebowitzlawfirm.com> wrote:
>
>> Hi Zack,  This is an infringement from musician Leon Redbones FB page. Can you see if we can find any kind of contact information for him and document for Arthur if you are successful. document both links. Thank you.
>>
>> https://www.facebook.com/LeonRedboneOfficial/photos/a.1405320689734472/21 type=3&theater
>> https://www.facebook.com/LeonRedboneOfficial/photos/a.1405320689734472/21 type=3
>>
>> My best,
>>
>> Donna Halperin, Director of Client Relations
>> Liebowitz Law Firm, PLLC
>> t.516-233-1660
>> f.516-612-2740

◄ ◄ Message 2 of 15 ► ►

# EXHIBIT F

JA-321



JA-322

# EXHIBIT G

JA-323

2/5/2020          Liebowitz Law Firm PLLC. Mail - David Bromberg - Infringement online - registered image - no permission - no attribution!



Zachary Cuff <zc@liebowitzlawfirm.com>

# David Bromberg - Infringement online - registered image - no permission - no attribution!

1 message

**Arthur Usherson** <artphotovideo@mindspring.com>                    Wed, Jun 5, 2019 at 9:41 AM
To: Richard Liebowitz <RL@liebowitzlawfirm.com>, Zachary Cuff <zc@liebowitzlawfirm.com>

WTF!



**Dylan - Redbone.jpg**
459K

JA-324

# EXHIBIT H

JA-325



JA-326

# EXHIBIT I

JA-327



# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Copyright Number = VAu001373272
Search Results: Displaying 1 of 1 entries



Labeled View

*Arthur Usherson - Bob Dylan at Mariposa Folk Festival July 16, 1972.*

| | |
|---|---|
| **Type of Work:** | Visual Material |
| **Registration Number / Date:** | VAu001373272 / 2019-08-22 |
| **Application Title:** | Arthur Usherson - Bob Dylan at Mariposa Folk Festival July 16, 1972 |
| **Title:** | Arthur Usherson - Bob Dylan at Mariposa Folk Festival July 16, 1972. [Group registration of unpublished photographs. 30 photographs] |
| **Description:** | 30 photographs : Electronic file (eService) |
| **Copyright Claimant:** | Arthur Usherson. Address: 1006 Old Holcomb Bridge Road, Roswell, GA, 30076, United States. |
| **Date of Creation:** | 1972 |
| **Authorship on Application:** | Arthur Usherson; Domicile: United States. Authorship: photographs. |
| **Copyright Note:** | C.O. correspondence. |
| | Regarding title information: Deposit contains complete list of titles that correspond to the individual photographs included in this group. |
| | Regarding group registration: A group of unpublished photographs may be registered on one application with one filing fee only under limited circumstances. ALL of the following are required: 1. All photographs (a) are unpublished AND (b) were created by the same author AND (c) are owned by the same copyright claimant AND 2. The group contains 750 photographs or less AND 3. A sequentially numbered list of photographs containing the title and file name for each photograph included in the group must be uploaded along with other required application materials. The list must be submitted in an approved document format such as .XLS or .PDF. The file name for the numbered list must contain the title of the group and the Case Number assigned to the application. |
| **Photographs:** | (20 photographs): Bob Dylan at Mariposa Folk Festival July 16, 1972 (1).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (10).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (11).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (12).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (13).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (14).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (15).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (16).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (17).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (18).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (19).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (2).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (20).jpg, Bob Dylan at Mariposa Folk |

JA-328

Festival July 16, 1972 (21).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (22).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (23).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (24).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (25).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (26).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (27).jpg,

(10 photographs): Bob Dylan at Mariposa Folk Festival July 16, 1972 (28).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (29).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (3).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (30).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (4).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (5).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (6).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (7).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (8).jpg, Bob Dylan at Mariposa Folk Festival July 16, 1972 (9).jpg,

**Names:** Usherson, Arthur



| Save, Print and Email (**Help Page**) | | |
|---|---|---|
| Select Download Format | Full Record | Format for Print/Save |
| Enter your email address: | | Email |

Help    Search    History    Titles    Start Over

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright
Copyright Office Home Page  |  Library of Congress Home Page

JA-329

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARTHUR USHERSON,

                    Plaintiff,

        - against -

BANDSHELL ARTIST MANAGEMENT

                    Defendant.

---

Docket No. 1:19-cv-06368-JMF

## DECLARATION OF RICHARD LIEBOWITZ

I, RICHARD LIEBOWITZ, declare under the penalty of perjury that the following is true

and correct to the best of my personal knowledge.

1.      I am lead counsel for Plaintiff Arthur Usherson ("Plaintiff") in this action.

2.      I am the founding member of Liebowitz Law Firm, PLLC ("LLF").

3.      I submit this Declaration in response to the Court's Order, dated January 24, 2020

[Dkt. #59], the pertinent portion which reads:

> Mr. Liebowitz shall file a declaration, sworn under penalty of perjury, specifying: (1) the
> nature and cause of the "administrative mistake" or "clerical error" to which he refers in
> his January 17, 2020 letter, including who was responsible for the mistake or error; (2)
> the factual basis for his inclusion of the allegation set forth in Paragraph 9 of the
> Complaint and the source of that factual basis, including a detailed description of any
> investigation into the matter that he conducted prior to the filing of the Complaint; (3)
> what role, if any, he played in the filing of the application for Registration 272, when and
> by whom that application was filed, and why the decision to obtain that registration was
> made (including but not limited to whether it was made due to a realization that the
> Photograph had not been registered); (4) when Mr. Liebowitz became aware that the
> Photograph was not registered under Registration 046, how he learned of that fact, and
> whether Mr. Liebowitz knew on November 14, 2019 (the date of the initial pretrial

JA-330

conference in this matter) that the Photograph had been registered after this lawsuit was commenced; and (5) why Mr. Liebowitz failed to advise the Court and defense counsel that Paragraph 9 of the Complaint was inaccurate until his January 17, 2020 letter.

**Nature of Administrative Mistake**

4.      In February 2019, Plaintiff informed a member of my administrative staff, Zachary Cuff, who was responsible for tracking information about Mr. Usherson's photographs, that the photograph at issue in this action (the "Photograph") was on deposit with the 046 Registration [Declaration of Arthur Usherson, ¶ 8, Ex. E]

5.      In reliance on Mr. Usherson's representation, Mr. Cuff recorded the Photograph in LLF's internal case-tracking system as being associated with the 046 Registration.

6.      I conclude that the mix-up was caused by confusing similarities between the visual elements of photographs taken on the same day, by the same photographer, with the same camera equipment, using similar tone and lighting, and depicting identical subject matter (i.e., Dylan and Redbone).  Attached as Exhibit A is a demonstrative exhibit showing that Mr. Usherson's photographs which are on deposit with the 046 Registration, when viewed in cropped format, are remarkably similar to the Photograph on deposit with the 272 Registration.

7.      It appears that the initial mistake was made by Mr. Usherson, who represented to Mr. Cuff on February 7, 2019 that the Photograph was on deposit with the 046 Registration. [Declaration of Arthur Usherson, ¶ 8, Ex. E]

8.      After Mr. Usherson sent Mr. Cuff and me evidence of the Defendant's infringement, on June 5, 2019  [Declaration of Arthur Usherson, ¶ 10, Ex. G], Mr. Cuff recorded the infringement into LLF's internal case-tracking database.  It appears that Mr. Cuff relied on Mr. Usherson's representation concerning the Photograph because Mr. Cuff recorded the

JA-331

Photograph into LLF's internal database as being associated with the 046 Registration.  Thus, I believe that Mr. Cuff made the same mistake as Mr. Usherson, visually associating the Photograph with similar images that were on deposit with the 046 Registration.

9.      Mr. Cuff had the ability as of June 2019 to double-check whether the Photograph was part of images that were included on a CD-Rom that Mr. Usherson had previously sent to Mr. Cuff in February 2019. [Declaration of Arthur Usherson, ¶ 9, Ex. F]. I don't know whether Mr. Cuff made an attempt to verify or not, but the mistake was not corrected at the time Mr. Cuff entered the case into LLF's system on June 5, 2019.

**Factual Basis for Paragraph 9 of the Complaint**

10.      By the time I went to draft and file the complaint on July 10, 2019, the Photograph remained associated with the 046 Registration in LLF's internal case-tracking system, as recorded by Mr. Cuff on June 5, 2019.

11.      Other than viewing LLF's internal case-tracking system, which indicated that the Photograph was on deposit with the 046 Registration, I did not conduct any further investigation before filing the Complaint.  Mr. Cuff was a long-term employee of LLF whose work I trusted and I reasonably relied on the information that was available in LLF's case-tracking system.

12.      Further, it appears that Mr. Cuff relied on the February 2019 representation provided by Mr. Usherson.  Thus, the factual basis for paragraph 9 was provided by Mr. Usherson, in the first instance, and then by Mr. Cuff, upon whom I relied as a trusted employee of LLF.

**272 Registration**

JA-332

13.     I did not play any role in the filing of the application for 272 Registration.  The application was filed by LLF's internal staff at the request of Mr. Cuff, who had received a CD-Rom of additional images from Mr. Usherson.

14.     At some point after the Complaint was filed in July 2019, Mr. Usherson requested that those additional images be filed with the Copyright Office and we honored that request as it is LLF's ordinary practice to register photographs on behalf of its clients.  The decision to deposit the Photograph in August 2019 as part of the 272 Registration was not made due to any realization that the Photograph had not been previously registered.

**Discovery of Administrative Mistake**

15.     I did not realize that an administrative error had been made concerning the 046 Registration until subsequent to the January 8, 2020 hearing when, in response to the Court's order, I was required to file a letter to address the registration issue raised by Mr. Newberg at the 1/8/20 Hearing.

16.     I learned of the administrative error by reviewing LLF's case-tracking system, reviewing the deposit copy provided by opposing counsel, and reviewing LLF's transmissions with Mr. Usherson concerning the Photograph at issue.

17.     As of November 14, 2019, the date of the initial pretrial conference in this matter, I was not aware of the administrative error concerning the 046 registration and believed in good faith that the Photograph had been registered as part of the 046 Registration.  I did not know that the Photograph was registered in August 2019 as part of the 272 Registration.

**Paragraph 9 of the Complaint**

JA-333

18.     I did not notify the Court or defense counsel about the technical pleading deficiency in Paragraph 9 of the Complaint until my January 17, 2020 letter because I did not know a pleading deficiency existed until after the January 8, 2020 hearing.

19.     Furthermore, this case was dismissed with prejudice on December 20, 2019 [Dkt. # 48] so there would have been no reason to seek leave of Court to amend a pleading in a case that was already dismissed.

Dated:          February 6, 2020
                Valley Stream, New York

                                        **/s/richardliebowitz/**
                                        Richard Liebowitz
                                        Liebowitz Law Firm, PLLC
                                        11 Sunrise Plaza, Suite 305
                                        Valleystream, NY 11580
                                        516-233-1660
                                        RL@LiebowitzLawFirm.com

                                        *Attorneys for Plaintiff*

JA-334

# EXHIBIT A

JA-335

**272 Registration**
[Cropped Version of Infringed Photograph on Deposit]



#13

**046 Registration**
[Cropped Versions of similar photographs on Deposit]



#0483

#0439

#0082



#0440



#0083

JA-336

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARTHUR USHERSON,

                              Plaintiff,

          - against -

BANDSHELL ARTIST MANAGEMENT

                              Defendant.

Docket No. 1:19-cv-06368-JMF

---

## DECLARATION OF JAMES FREEMAN

I, JAMES FREEMAN, declare under the penalty of perjury that the following is true and correct to the best of my personal knowledge.

1.      I am an associate and employee of Liebowitz Law Firm, PLLC (the "LLF") and admitted to practice law in this District.

2.      I am not counsel of record for Plaintiff Arthur Usherson ("Plaintiff") in this action but have served as counsel for LLF and Richard Liebowitz in connection with Defendant Bandshell Artist Management ("Defendant")'s motion for sanctions. [Dkt. #14]

3.      I submit this Declaration in response to the Court's Order, dated January 24, 2020 [Dkt. #59], the pertinent portion which reads:

> Mr. Freeman shall file a declaration, sworn under penalty of perjury, specifying (1) the factual basis for the representations he made at the January 8, 2020 hearing about the registration of the Photograph, including that the allegation in Paragraph 9 of the Complaint was based on information provided to counsel by Mr. Usherson and that counsel had confirmed, prior to filing the Complaint, that Mr. Usherson was the claimant

JA-337

for Registration 046; and (2) any personal knowledge he has of any 'administrative mistake' or 'clerical error' related to the allegation in Paragraph 9 of the Complaint, and the basis for such knowledge.

**My Personal Knowledge of the Existence of the Action**

4.      As I have previously represented to the Court, I had no personal knowledge of the existence of this action until the evening of October 30, 2019.  [*See* 1/8/20 Hearing Tr. 138:16-23]

5.      The first time I learned of the present action was when Mr. Liebowitz sent me an e-mail, dated October 30, 2019 at 8:12 p.m., attaching a copy of the complaint and instructing me to report to "Mediation tomorrow at 12pm at 40 Foley."  He then informed me that if the case did not settle that night, I would need to attend the mediation.

6.      On October 31, 2019 at 4:11 a.m., I received an email from Mr. Liebowitz sent to Brad Newberg and the Mediator, which attached a draft of a proposed settlement agreement "which can be discussed at the mediation."[1]

7.      Then, by email, dated October 31, 2019 at 4:12 a.m., Mr. Liebowitz instructed that I would need to attend the mediation at noon because the case did not settle.

8.      I had no personal knowledge of the complaint [Dkt. #1] at the time it was filed.  I had no role in preparing the complaint or conducting pre-filing due diligence.  I played no role in the copyright registration application processes that are relevant to this action.

---

[1] Opposing counsel, Brad Newberg, also indicated at the 1/8/20 hearing that the first time he saw my name copied on an e-mail in this matter was the early morning of October 31, 2019 [1/8/20 Hearing Tr. 67:22-25]. Until October 31, 2019, I had never been copied on any emails between Liebowitz and Newberg.

JA-338

9.      At no time prior to the January 8, 2020 hearing did I personally conduct an investigation into whether the photograph at issue (the "Photograph") was on deposit with the registration certificate identified in Paragraph 9 of the Complaint (the "046 Registration").

**Factual Basis for Comments Made at January 8, 2020 Hearing re: 046 Registration**

10.      When I first appeared before the Court in November 14, 2019, I specifically stated that I would not be appearing in this action on behalf of Mr. Usherson.  My role was and is limited to opposing Defendant's ancillary motion for sanctions against LLF and Richard Liebowitz.

11.      By Order dated December 20, 2020, this action was dismissed with prejudice; however, the Court maintained jurisdiction to address issues raised by Defendant's motion for sanctions at Dkt. # 14 or other sanctions-related matters. [Dkt. #48]

12.      By Order dated December 20, 2019, the Court scheduled a hearing on Defendant's motion for sanctions which would be "limited to the issues of whether Mr. Liebowitz obtained advance permission from the Mediator for an associate to appear at the mediation instead of Mr. Liebowitz and for Plaintiff to participate in the mediation by telephone." [Dkt. #47]

13.      Consistent with the Court's 12/20/19 Orders referenced in the preceding two paragraphs, when I appeared before the Court on January 8, 2020, I was not prepared to discuss *any* matters pertaining to the copyright registration of the Photograph.

14.      During his closing argument at the 1/8/20 hearing, Mr. Newberg represented to the Court that the Photograph was not on deposit with the 046 Registration.  [1/8/20 Hearing Tr. 127:10-23 ]

JA-339

15.     During my closing argument, the Court asked whether I could comment on the registration issue that Mr. Newberg raised.  [1/8/20 Hearing Tr. 138:24-28]  In response to the Court's query, I stated "I haven't seen the registration issue." [*Id.* at 139:1-2].  In other words, I had no personal knowledge as of January 8, 2020 whether or not the Photograph was on deposit with the 046 Registration.[2]

16.     But I offered my commentary nonetheless based on my *general* knowledge of LLF's custom and practices involving registrations that were processed by LLF's clients. [1/8/20 Hearing Tr. 139:13-16]

17.     Based on my general knowledge of LLF's custom and practices, I stated that LLF did not order a deposit copy.  [1/8/20 Hearing Tr. 139:13-16]  The basis of this statement was my knowledge of LLF's custom and practices, based on about 2.5 years of being employed by LLF. This statement was accurate at the time it was made because LLF did not order a deposit copy for the 046 Registration.

18.     As stated at the 1/8/20 hearing, due to the expense of ordering deposit copies, it is LLF's custom and practice to order deposit copies only where LLF anticipates a summary judgment motion. [*Id.* at 139:19-19]  Again, this statement was based on my general knowledge of LLF's practice, and my personal experience in ordering deposit copies on other select cases in which I have been involved, but not on any specific knowledge relating to this particular case.

19.     Based on my general knowledge of LLF's custom and practices, I also suggested at the hearing that Mr. Usherson must have represented to LLF that the Photograph was on deposit with the 046 Registration.  [*Id.* at 140:20-24]. At the time this statement was made at the

_____

[2] Mr. Newberg confirms this in his statement to the Court: "During the January 8 hearing, Mr. Freeman stated to the Court that he had no knowledge regarding the registration of the photograph in issue." [Dkt. #58, p. 2]

JA-340

1/8/20 hearing, I had no personal knowledge of what Mr. Usherson had specifically represented to LLF in terms of the Photograph or 046 Registration.  But I offered my commentary concerning Mr. Usherson's representations to LLF based on my knowledge of LLF's "ordinary course of practice" for dealing with "rock-and-roll photos" [*Id.* at 140:25-141:1-22]  My statement was accurate at the time it was made because there is documentary evidence and sworn testimony confirming that Mr. Usherson did in fact represent to LLF that the Photograph was on deposit with the Copyright Office prior to the filing of the complaint in this action. [See Declaration of Arthur Usherson, ¶ 8, Ex. E]

20.     My statement at the 1/8/20 hearing that Mr. Liebowitz (or anyone else) was "able to verify" that, prior to filing the Complaint, Mr. Usherson was the claimant for Registration 046, is accurate. [*Id.* at 140:13-19]  This statement was based on my general knowledge that the Copyright Claimant for any given registration is a matter of public record and can be verified at any time by checking the Copyright Office's website.  The public record shows that Mr. Usherson is the Copyright Claimant of the 046 registration as his name, "Arthur Art Usherson" and address are listed on the face of the 046 registration.  [See Declaration of Arthur Usherson, ¶ 3, Ex. A]

21.     As of the 1/8/20 hearing, I had no personal knowledge of what Mr. Liebowitz did to verify whether Mr. Usherson was the Copyright Claimant, but such information was certainly available to Mr. Liebowitz at the time he filed the Complaint and thus he was "able to verify" that through the public record [*Id.* at 140:13-19]

**Post-Hearing Knowledge of Registration Issues**

22.     Subsequent to the January 8, 2020 hearing, I learned that the Photograph was not on deposit with the 046 Registration, but was instead on deposit with a registration that was filed

JA-341

by LLF on August 22, 2019 (the "272 Registration").  I had no personal knowledge of this

administrative mistake until after the January 8, 2020 hearing.

       23.    The basis for my knowledge of the administrative mistake or clerical error

regarding the registration issues is my review of the deposit copy for the 046 Registration that

was transmitted to LLF by Mr. Newberg subsequent to the January 8, 2020 hearing (pursuant to

the Court's order) and the documentary evidence attached to the declarations of Arthur Usherson

and Richard Liebowitz, filed concurrently herewith.  Such review took place after the January 8,

2020 hearing.

                                            Respectfully Submitted:

Dated:        February 7, 2020
                Valley Stream, NY

                                      **s/jameshfreeman/**
                                      James H. Freeman

JA-342

**McGuireWoods LLP**
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102-4215
Phone: 703.712.5000
Fax: 703.712.5050
www.mcguirewoods.com

**Brad R. Newberg**
Direct: 703.712.5061

bnewberg@mcguirewoods.com
Fax: 703.712.5187

**McGuireWoods**

February 10, 2020

**VIA ECF**
The Honorable Jesse M. Furman
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007
Furman_NYSDChambers@nysd.uscourts.gov

Re:    <u>*Usherson v. Bandshell Artist Management*</u>, 1:19-cv-6368 (JMF)

Dear Judge Furman,

I write in response to Plaintiff's February 7 letter and declarations (the "February 7 Submission") regarding the issue of false copyright registration information in the Complaint in the above-captioned case, as per the Court's January 24, 2020 Order [Dkt 59]. I write again as an officer of the Court, despite this case having settled.

To quote the Court, similar to Plaintiff's January 17 submission [Dkt 57], the February 7 Submission "raises more questions than it answers." Mr. Liebowitz has admitted that Plaintiff filed a Complaint falsely alleging that the photograph at issue was registered, and was supposedly part of Registration # VAu 1-080-046. While Mr. Freeman's Declaration claims no knowledge of the issue at hand, the Declarations of Mr. Liebowitz and Mr. Usherson place the blame for the "confusion" and "administrative error" squarely at the feet of a man named Zachary Cuff. Although Mr. Cuff was not mentioned at the initial pre-trial conference when this issue was first raised, or the January 8, 2020 hearing, or in Mr. Liebowitz's January 17, 2020 letter-brief specific to this issue, or at any other time in this case, Mr. Cuff is mentioned approximately 30 times in the Liebowitz and Usherson Declarations filed with the February 7 Submission. Noticeably missing is a declaration from Mr. Cuff.

That a Cuff Declaration is missing is especially noteworthy given that Mr. Liebowitz makes sweeping statements in his Declaration as to what Mr. Cuff probably relied upon and did, yet also states that he does not actually know what Mr. Cuff did and did not do.[1]

---

[1] Upon receiving the February 7 Submission, Defendant's counsel looked up Mr. Cuff on LinkedIn (but did not contact Mr. Cuff), and it appears he may have a new job. To the extent Mr. Liebowitz's answer to why there is no Cuff Declaration is that Mr. Cuff no longer works for him, (a) that should not have been a bar to a Declaration, and (b) it seems particularly convenient to blame a former low-level employee for a sanctionable violation of law.

Atlanta | Austin | Baltimore | Charlotte | Charlottesville | Chicago | Dallas | Houston | Jacksonville | London | Los Angeles - Century City
Los Angeles - Downtown | New York | Norfolk | Pittsburgh | Raleigh | Richmond | San Francisco | Tysons | Washington, D.C.

February 10, 2020
Page 2

In any case, the Liebowitz and Usherson Declarations do not make logical sense.[2]

Mr. Liebowitz has stated that he relies on his clients' truthfulness regarding copyright registrations, and also that he did not personally investigate that the Complaint in this case was accurate, a position he restates at Paragraph 11 of his Declaration.  Similar claims were made at the January 8 hearing: that the Liebowitz Law Firm does not check whether a photograph has actually been registered, but relies on its clients' representations that it is so.

Yet, the Declarations continually refer to "administrative" error being caused by the Liebowitz Law Firm's belief, through Mr. Cuff's review, that the 046 Registration cited in the Complaint contained the photograph at issue because the photograph was taken at the same music festival and contained some of the same musicians as other photographs that were part of the 046 Registration.

First off, the February 7 Submission tries to make the photographs look similar through severe cropping showing only the two overlapping people (Liebowitz Decl., Ex. A).  Even a cursory review of the photograph at issue and the photographs in the 046 Registration would show that the photograph at issue was not a part of the registration.

More importantly, the explanation is at odds with what the Court has previously been told.  Either the Liebowitz Law Firm reviews copyright registrations for accuracy before filing lawsuits or it does not.  If it does not, as Mr. Liebowitz and Mr. Freeman represented in the past (in fact, it is a surprise to learn in these declarations that the Liebowitz Law Firm had the deposit copies of the 046 Registration this whole time), then the idea of an administrative error made while reviewing the images makes no sense.  The administrative error excuse also does not explain why the Liebowitz Law Firm, upon supposedly receiving a second CD of images from its client referring to the same music festival out of the blue after this case was filed, containing the actual photograph at issue, did not check to see if the Complaint was accurate.  This is especially true given that Mr. Liebowitz was asked about this **exact** issue at the initial Court conference on November 14, 2019*, and Mr. Liebowitz assured the Court that the 046 Registration contained the photograph at issue*.  Either Mr. Liebowitz's representations to the Court on November 14 were flat out false or he made those assurances without knowing whether

---

[2] As an initial matter, the Usherson Declaration shows that Mr. Usherson merely transmitted the signature page to Mr. Liebowitz as opposed to the entire Declaration.  In fact, unless there is a typo, the signature page does not follow precisely from the page before it [as there should at least be the word "the" between the Paragraph 20 lines on page 5 and the Paragraph 20 lines starting on Page 6].  Given the history here, those two issues call the entire Declaration into question.

We also note that footnote 1 of Mr. Usherson's Declaration mentions an October 30, 2019 email Mr. Liebowitz sent Mr. Usherson cc'g Mr. Freeman about the mediation.  Given the pending sanctions motion, it is remarkable that neither this email nor any other with Mr. Usherson about the mediation has been submitted as an exhibit in any of Plaintiff's filings related to the motion.

February 10, 2020
Page 3

they were true and did not go back to investigate whether they were true.  His Declaration, at
Paragraphs 17-18, states it was the latter.  That is still inexcusable.

We also note a significant gap in Mr. Usherson's Declaration.  Mr. Usherson states, at
Paragraphs 15, 17-18, that at "[s]ometime" he provided the Liebowitz Law Firm with the second
CD of images that LLF registered as Registration 272.  He says nothing about the circumstances
of this new registration and not a single exhibit shows any email or communication about the
new CD, photos, or registration.  There is no discussion at all as to why he sent the new CD.
Given the seriousness of this issue, the gap in Mr. Usherson's Declaration seems purposeful.

Finally, since our last submission, we have learned that this is not the only case to have
these same issues.  *See Rock v. Enfants Riches Deprimes, LLC*, 17-cv-2618-ALC, 2020 WL
468904 (S.D.N.Y. Jan. 29. 2020) (after motion for summary judgment was granted due to the
photograph at question not actually being in the registration claimed, court awarded defendant
$100,008.13 in attorneys' fees and costs and $10,000 in additional sanctions, and noted Mr.
Liebowitz's responsibility under Rule 11 to ensure his factual contentions were supported).  *See
also Abbey Photography, Inc. v. Advance Publications, Inc.*, 19-cv-02214-RRM (E.D.N.Y. Aug,
28, 2019) [Dkt 14] (minute order requiring Mr. Liebowitz to "explain[] the plaintiff's assertion
of facts about the authorship and registration of the photograph at issue in this litigation in the
instant Complaint that appear to be irreconcilable with the corresponding allegations about the
same photograph asserted by the plaintiff's counsel on behalf of a different plaintiff in the
Southern District of New York [*Clipper v. Wetpaint.com, Inc.*, 17-cv-9217-NRB]"  Mr.
Liebowitz's response [*id.*, Dkt, 16] claimed a "typographical error," which did nothing to explain
why two different plaintiffs, even if related, were suing on the same photograph against different
defendants in different courts.

There may well be more.  Unfortunately, the PACER filing system is not set up to easily
reveal the machinations of an operation such as Mr. Liebowitz's without significant time spent
investigating each of his hundreds of cases separately.  The published opinions regarding the
Liebowitz Law Firm appear to be the tip of the iceberg.[3]

We therefore respectfully recommend that this Court craft a sanctions decision that puts
an end to or significantly alters the way that the Liebowitz Law Firm does business in this Court
(and others).

Respectfully submitted,

*s/Brad R. Newberg/*
Brad. R. Newberg
*Attorney for Defendant Bandshell Artist
Management*

---

[3] *Cf. Chevrestt v. Paddock Publications, Inc.*. 19-cv-5598, N.D. Ill. [Dkt. 11] (an opposition to
Mr. Liebowitz's pro hac vice motion, listing various violations in the Northern District of
Illinois).

**JA-345**

K18VUSHH

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  ARTHUR USHERSON,

4                  Plaintiff,

5           v.                              19 CV 6368 (JMF)

6  BANDSHELL ARTIST MANAGEMENT,

7                  Defendant.               HEARING

8  ------------------------------x
                                            New York, N.Y.
9                                           January 8, 2020
                                            9:30 a.m.
10
   Before:
11
                        HON. JESSE M. FURMAN,
12
                                            District Judge
13
                          APPEARANCES
14
   LIEBOWITZ LAW FIRM
15      Attorneys for Plaintiff
   BY:  RICHARD LIEBOWITZ
16
   LIEBOWITZ LAW FIRM
17      Attorney for Richard Liebowitz
   BY:  JAMES FREEMAN
18
   McGUIRE WOODS
19      Attorneys for Defendant
   BY:  BRAD R. NEWBERG
20      STEPHEN FORESTA

21

22

23

24

25

JA-346

K18VUSHH

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your name for

3     the record.

4          MR. FREEMAN:  Yes.  James Freeman, on behalf of

5     Richard Liebowitz and the Liebowitz Law Firm.

6          MR. LIEBOWITZ:  Good morning, your Honor.

7          Richard Liebowitz, Liebowitz Law Firm.  Good morning.

8          THE COURT:  Good morning.

9          MR. NEWBERG:  Brad Newberg of McGuire Woods.

10         MR. FORESTA:  Good morning, your Honor.

11         Stephen Foresta, also from McGuire Woods, on behalf of

12    defendant.

13         THE COURT:  Good morning as well.

14         And I assume the mediator, whose name I'm not going to

15    use on the record, is here?

16         THE MEDIATOR:  ███████████.

17         THE COURT:  Okay.  Well, you used your own name.

18         All right.  As I said in my order, my plan is to hear

19    from Mr. Liebowitz first, then from Mr. Newberg, and then from

20    the mediator.

21         A couple things to note at the outset:

22         One, as I've made clear, as far as I'm concerned, the

23    hearing is limited to the two issues that I've flagged, namely,

24    whether Mr. Liebowitz obtained advanced permission to send

25    associates from his firm instead of himself to the mediation;

K18VUSHH

1    and whether he obtained advanced permission to have his client

2    participate by telephone, and the veracity of his

3    representations with respect to those issues.

4         I don't intend to allow any inquiry with respect to

5    the substance of the mediation itself.  As far as I'm

6    concerned, that remains within the scope of the confidentiality

7    of mediations generally.

8         Number two.  As I've just indicated, I don't see any

9    reason that the mediator's name needs to be part of the public

10   record.  To the extent that he identified himself a moment ago,

11   I'll have that redacted from the transcript of today's

12   proceeding.  But I would ask you refrain from using his name

13   and just refer to him as "the mediator" so that it's not part

14   of the public record.

15        With that, as I said, my plan is to have Mr. Liebowitz

16   testify first, Mr. Newberg, and then the mediator.  I would

17   think that the mediator should not be in the courtroom for the

18   testimony of those first two witnesses.  I'm open to your views

19   on whether Mr. Newberg should be here for the testimony of

20   Mr. Liebowitz.  But I would think he should or can, as

21   essentially a party or representative of the party in these

22   proceedings, but certainly open to hearing your thoughts on

23   that and anything else that you want to raise.

24        So, first, does anyone disagree that the mediator

25   should not be present?  I'd be inclined to let him go sit in

JA-348

4

K18VUSHH

1 the jury room until his presence is needed.

2    MR. FREEMAN:  Yes, your Honor.

3    For the Liebowitz Law Firm, James Freeman.

4    We would respectfully request that the mediator excuse

5 himself during the cross-examination of counsel.

6    THE COURT:  All right.  Hold on one second.

7    I'll have my deputy just let him sit in the jury room

8 so that he's comfortable until we need to call him.

9    (Pause)

10    THE COURT:  All right.  Go ahead.

11    MR. FREEMAN:  We also have a brief application that

12 we'd like to make to the Court regarding the scope of evidence

13 to be presented at the hearing.  It shouldn't take more than 30

14 seconds.

15    So in our letter of December 16th to the Court, we

16 noted that there was an existing custom and practice of the

17 mediator granting Mr. Liebowitz permission for his clients to

18 appear telephonically in five separate cases that took place

19 between June of 2019 to September 2019.

20    We believe this evidence establishes a custom and

21 practice that's relevant on two independent grounds, the first

22 being that it would establish or help, at least, explain or

23 inform why there's a discrepancy between the mediator's sworn

24 declaration and Mr. Liebowitz's sworn decoration.  If the

25 mediator did grant Mr. Liebowitz, on five separate occasions

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K18VUSHH

1   recently, permission for his clients to appear telephonically,

2   then it could well be that the mediator simply forgot that he

3   did so in this case, because he had routinely granted such

4   permission.  Perhaps it didn't register in his consciousness.

5           THE COURT:  Is the application to permit inquiry

6   into --

7           MR. FREEMAN:  The application is to present evidence

8   of and to ask the mediator, as well, about these five

9   proceedings.

10          THE COURT:  That's totally fine with me.  I think

11  that's within the scope of the two issues that --

12          MR. FREEMAN:  Okay.  Great.

13          THE COURT:  -- the hearing pertains to.

14          MR. FREEMAN:  Thank you, your Honor.

15          THE COURT:  Obviously we're not going to get into the

16  substance of any --

17          MR. FREEMAN:  No, just whether or not permission was

18  granted.

19          THE COURT:  All right.

20          Mr. Newberg, anything from your end?

21          MR. NEWBERG:  No, your Honor.  Thank you.

22          THE COURT:  All right.

23          And with respect to Mr. Newberg's presence, any issues

24  there?

25          MR. FREEMAN:  No issue, your Honor.

JA-350

6

K18VUSHH

1          THE COURT:  Okay.

2          MR. NEWBERG:  Well, obviously I'd like to be heard.

3     But my understanding from the order is that, in part, I appear

4     to cross-examine Mr. Liebowitz; so it would be a good call for

5     me to do that.

6          THE COURT:  That's a good point.

7          Well, in any event, since there is no objection, you

8     will remain regardless.

9          All right.  Mr. Liebowitz, if you could please

10    approach the stand, and my deputy will administer the oath to

11    you in a moment.

12    RICHARD LIEBOWITZ,

13         called as a witness on his own behalf,

14         having been duly sworn, testified as follows:

15         THE COURT:  All right.  You may be seated.

16         MR. FREEMAN:  Just for clarification, Mr. Liebowitz's

17    direct testimony is already in the record.  So we would like to

18    examine at this point the custom and practice evidence.

19         So we'd like to -- with the Court's permission, to

20    approach the witness with Exhibit A, which is the docket sheet

21    and complaint in the matter of *Emerson v. Telepicture*

22    *Productions.*

23         THE COURT:  I was intending to proceed directly to

24    cross, but I suppose, to the extent that we have expanded the

25    scope to include those others, that's fine.  I'll allow it.

JA-351

K18VUSHH                    Liebowitz – direct

1          MR. FREEMAN:  Thank you, your Honor.

2          May I proceed, your Honor?

3          THE COURT:  You may.  But why don't you use the podium

4     over there.

5          MR. FREEMAN:  Okay.

6     DIRECT EXAMINATION

7     BY MR. FREEMAN:

8     Q.  Good morning, Mr. Liebowitz.

9     A.  Good morning.

10    Q.  Do you recognize the docket sheet in the matter of *Emerson*

11    *v. Telepicture Productions*?

12    A.  Yes.

13    Q.  And were you the lead counsel of record in that case?

14    A.  Yes.

15    Q.  And was the assigned mediator in this action also the

16    assigned mediator in the *Emerson* action?

17    A.  Yes.

18    Q.  And was there a mediation held on July 22nd, 2019?

19    A.  Yes.

20    Q.  And according to paragraph 5 of the complaint, Mr. Emerson,

21    the plaintiff in that action, was located in New Orleans,

22    Louisiana?

23    A.  Yes.

24    Q.  And did the mediator grant you permission for Mr. Emerson

25    to participate by telephone?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

|   | K18VUSHH                    Liebowitz – direct |
|---|---|

1   A.  Yes.

2   Q.  And was this grant of permission in writing?

3   A.  No.

4   Q.  And was the mediation successful?

5   A.  Yes.

6          MR. FREEMAN:  Your Honor, I'd like permission to

7   approach the witness to introduce Exhibit B.

8          THE COURT:  All right.  I don't think your questions

9   require the exhibits, so why don't you just --

10          MR. FREEMAN:  Okay.  Fine.  That makes it easier.

11          THE COURT:  And also just watch the form of your

12   questions, please; they should be open-ended, not leading.

13          MR. FREEMAN:  Okay.  Fair enough.

14   BY MR. FREEMAN:

15   Q.  In the matter of *Mottram v. Onion, Inc.*, Mr. Liebowitz,

16   what was your role in that case?

17   A.  Lead counsel.

18   Q.  And who was the assigned mediator in that case?

19   A.  The same mediator in this case.

20   Q.  And was there a mediation held in that proceeding?

21   A.  Yes.

22   Q.  And do you recall when it was?

23   A.  I don't recall the exact date, but --

24   Q.  If I represent that it was July 24th, 2019, would that be

25   accurate?

K18VUSHH                    Liebowitz - direct

1   A.  If that's the date, then that's the date, yes.

2   Q.  And was Mr. Mottram, the plaintiff in that action, located

3   outside the court -- 100 miles outside the courthouse?

4   A.  Yes, he was located more than 100 miles outside the

5   courthouse.

6   Q.  Did you attempt to obtain permission from the mediator for

7   Mr. Mottram, the plaintiff in that action, to appear

8   telephonically?

9   A.  Yes.  I spoke to the mediator orally, and he granted

10  permission for the plaintiff to appear telephonically.

11  Q.  And do you recall whether that mediation was successful?

12  A.  Yes, it was successful.

13  Q.  Okay.  I'd like to turn the Court's attention to the matter

14  of *McGovern v. Q Digital, Inc.*

15          Mr. Liebowitz, do you recall what capacity you served

16  in in that litigation?

17  A.  Yes, I was lead counsel.

18  Q.  And do you recall who the mediator was?

19  A.  Yes, the same mediator as this case.

20  Q.  Was the mediation held on September 25th, 2019?

21  A.  Yes.  If that was the date, yes.

22  Q.  And do you recall where Mr. McGovern was located?

23  A.  Yes.  He was located in Florida, more than 100 miles away

24  from the courthouse.

25  Q.  And do you recall whether you obtained permission from the

**JA-354**

K18VUSHH                    Liebowitz – direct

1    mediator?

2    A.  Yes, it was done orally.

3    Q.  And was that mediation successful?

4    A.  Yes.

5    Q.  Thank you.

6         I'd like to turn the Court's attention to the matter

7    of *Pereira v. Source Digital*.

8         THE COURT:  Can I just make this a little more

9    efficient?  In *Pereira* and *Sadowski*, the last two cases

10   referenced in your letter, was it the same mediator as in this

11   case?

12        THE WITNESS:  Yes.

13        THE COURT:  Were you lead counsel in both of those

14   cases?

15        THE WITNESS:  Yes.

16        THE COURT:  And did you obtain permission from the

17   mediator for your client to participate by telephone?

18        THE WITNESS:  Yes.

19        THE COURT:  Was that in writing?

20        THE WITNESS:  No.

21        THE COURT:  In both cases it was oral?

22        THE WITNESS:  It was oral.

23        THE COURT:  Okay.  Any other questions?

24   BY MR. FREEMAN:

25   Q.  Also, just one last question.  In *Sadowski v. Seeking*

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JA-355

K18VUSHH                    Liebowitz – cross

1   *Alpha*, did you obtain permission for your associate to appear

2   in your stead?

3   A.  Yes.

4   Q.  And was there any objection by the mediator to that?

5   A.  No objection.

6           MR. FREEMAN:  Thank you, your Honor.

7           No further questions.

8           THE COURT:  All right.  Cross-examination.

9           MR. NEWBERG:  Good morning, your Honor.

10  CROSS-EXAMINATION

11  BY MR. NEWBERG:

12  Q.  Good morning, Mr. Liebowitz.

13  A.  Good morning.

14  Q.  Mr. Liebowitz, I'm going to start with Mr. Freeman's direct

15  here.  *Sadowski*, that's the case *Sadowski v. Seeking Alpha*,

16  *Inc.* that you were talking about?

17  A.  Yes.

18  Q.  And, in fact, you mentioned in your letter to the Court

19  that you cite as a case of yours that this mediator had granted

20  you permission for your client to appear telephonically;

21  correct?

22  A.  Yes.

23  Q.  Is that the full truth?

24  A.  Yes.

25  Q.  Isn't it the case that in *Sadowski*, it was actually your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K18VUSHH                    Liebowitz - cross

1    opponent who wanted his client to be able to appear

2    telephonically for the mediation because it was located far

3    away in Israel?

4    A.  Yes.

5    Q.  And isn't it true that on May 1st, 2019, just two months

6    before you filed this case, they were forced to make a letter

7    motion to this Court because they asked for your consent to

8    have their client appear telephonically, and you refused,

9    stating in an email to them that the rules of the mediation

10   office require parties to appear in person?

11   A.  Yes, they -- however, in the mediation rules --

12           THE COURT:  Yes or no is fine.  Go ahead.

13           MR. NEWBERG:  If I can approach the witness to give

14   him a copy of the letter motion in *Sadowski*.

15           THE COURT:  You may.

16   Q.  Mr. Liebowitz, do you have this May 1st, 2019 letter motion

17   in the *Sadowski* case in front of you?

18   A.  Yes.

19   Q.  And do you recognize that as a letter motion that was filed

20   in that case?

21   A.  Yes.

22   Q.  And where they say, Plaintiff's counsel emailed us

23   yesterday saying he will not agree to a telephonic appearance,

24   contending that the rules of the mediation office requires

25   parties to appear in person, is that an email -- is that an

K18VUSHH                    Liebowitz – cross

1   accurate representation?  Did you send that email?

2   A.  Could you repeat that?

3   Q.  Is it an accurate representation that you emailed the

4   defendant in that case saying you would not agree to a

5   telephonic appearance, contending that the rules of the

6   mediation office requires parties to appear in person for a

7   mediation?

8   A.  Well, they needed to get the mediator's permission to

9   allow --

10          THE COURT:  Mr. Liebowitz, it's a yes-or-no question.

11  Is that an accurate representation of the email?

12          THE WITNESS:  Yes, it's accurate, because I wasn't the

13  mediator.  They needed to get the mediator's permission, and

14  the mediator granted it because the client --

15          THE COURT:  Mr. Liebowitz, it's a simple question.  Is

16  that an accurate --

17          THE WITNESS:  Yes, that's accurate.

18          THE COURT:  Wait till I've asked my question so that

19  we are not talking over each other.

20          Is that an accurate representation of an email that

21  you sent to defendant's counsel in that case?

22          THE WITNESS:  Yes.

23          THE COURT:  Okay.

24          And for the record, this is docket number 21 in the 18

25  CV 9193 docket.

JA-358

K18VUSHH                    Liebowitz – cross

1   BY MR. NEWBERG:

2   Q.  And why did you refuse consent in that case, Mr. Liebowitz?

3           MR. FREEMAN:  Objection, your Honor.

4           That question was already asked and answered.

5           THE COURT:  I don't think it was asked and answered,

6   but sustained as irrelevant.  Go ahead.

7           MR. NEWBERG:  If I may approach the witness to give

8   him a copy of the email that he sent to defendant's counsel in

9   that case.

10          THE COURT:  You may.

11          This does not come from the docket, I take it.

12          MR. NEWBERG:  That's right.

13          THE COURT:  Why don't we mark this as Defense Exhibit

14  1, is that --

15          MR. NEWBERG:  Yes, please.

16          THE COURT:  All right.  Go ahead.

17  BY MR. NEWBERG:

18  Q.  Mr. Liebowitz, you've just been handed Defense Exhibit 1.

19  I will represent that this was sent to me by defendant's

20  counsel in *Sadowski*, who redacted the mediator's name.  That

21  redaction is not for me.

22          Do you recognize this email that you sent to

23  defendant's counsel in *Sadowski*?

24  A.  Yes.

25  Q.  And where you state, We will not agree to client to appear

JA-359

K18VUSHH                    Liebowitz - cross

1   via telephone, the rules of the mediation office requires

2   parties to appear.  We can work around their schedules, but

3   they need to appear.  Is that what you wrote to --

4   A.  Yes.

5   Q.  -- defendant's counsel?

6           Is that a yes?

7   A.  Yes.

8   Q.  So just a couple of months prior to filing this case, you'd

9   made the claim in *Sadowski* that not only would permission be

10  needed, that you cannot give permission, and you could not

11  consent, and that clients were required to attend mediation.

12  A.  Yeah, they can't get permission from me, but they could get

13  permission from the mediator, which is what the rules say.

14  Q.  You didn't say that in your email though; is that correct?

15  A.  But opposing counsel just has to look at the mediator's

16  rules and could have contacted the mediator to get permission

17  to have his client appear telephonically.  And that's what they

18  did.  And the mediator -- the same mediator in this case --

19  granted his client to appear telephonically.  And since the

20  rules say that only the mediator could grant permission for his

21  or her client to appear telephonically, that was fine.  He did

22  not need to get my permission, just the mediator's.

23  Q.  You didn't tell him though, Go get the mediator's

24  permission, you just said the rules require your clients to

25  appear in person; correct?

JA-360

16

K18VUSHH                    Liebowitz – cross

1   A.  Well, the rules say that you could have the mediator –– you

2   could ask the mediator permission for his or her client to

3   appear telephonically.

4           THE COURT:  Mr. Liebowitz, again, I'm going to ask you

5   to listen to the question.  The question is you didn't say

6   anything about those rules in this email.

7           THE WITNESS:  No, I didn't say that.  I didn't say

8   anything in there.

9           THE COURT:  Thank you.

10  Q.  Now, Mr. Liebowitz, your response to this motion claimed

11  you're quite familiar with the mediation rules of this Court;

12  correct?

13  A.  Yes, I'm familiar.

14  Q.  And you attached some of the rules as an exhibit to your

15  response, right?

16  A.  Yes.

17          MR. NEWBERG:  May I hand the witness ––

18          THE COURT:  You have may.

19          Since it's a hearing, we don't necessarily need to be

20  quite as formal, but I assume you move to admit Defense Exhibit

21  1.

22          MR. NEWBERG:  Yes, your Honor.  I'm sorry, when can

23  you mentioned Defense Exhibit 1, I had assumed it was admitted.

24  But you're correct, I should have said, I move to admit Defense

25  Exhibit 1.

JA-361

K18VUSHH                    Liebowitz - cross

1          THE COURT:  All right.  It is admitted.

2          Anything that's already on the docket I'll deem part

3     of the record.  And, for that matter, anything that's docketed

4     in another case, I also can take judicial notice of.

5          So go ahead.

6          (Defendant's Exhibit 1 received in evidence)

7          MR. NEWBERG:  Thank you, your Honor.

8          I'm not sure that I have anything that's not already

9     part of the record.

10    BY MR. NEWBERG:

11    Q.  So, Mr. Liebowitz, I want you to turn to the same page you

12    cite in your response, page 7.  And do you see Section 9(c),

13    where it states that lead counsel must attend the mediation?

14    A.  9(c) says:  Each represented party must be accompanied at

15    mediation by the lawyer who will be primarily responsible for

16    handling the trial of the matter.

17    Q.  And in this case that was you; correct?

18    A.  No.  I -- I have an associate that handles trials for me.

19    Q.  Mr. Liebowitz, was anyone but you admitted in this case to

20    represent plaintiff?

21    A.  At what time?

22    Q.  At any time.

23    A.  Well, I -- I was counsel of record at the time of the

24    mediation.  But I have associate that handles trial matters for

25    me, that take over for trial matters.

JA-362

K18VUSHH                    Liebowitz – cross

1  Q.  At the time that the mediation was scheduled, was anyone

2  admitted to this case on behalf of plaintiff other than you?

3  A.  At the time I was only the counsel of record.  However --

4              THE COURT:  Just yes or no.

5              Was anyone else admitted at the time of the mediation?

6              THE WITNESS:  No.  If you mean admitted --

7              THE COURT:  Mr. Liebowitz, has anyone other than you

8  entered a notice of appearance in this case on the docket?

9              THE WITNESS:  Oh, no.

10 Q.  And that goes right up to the date of settlement; correct?

11 You were the only person who had filed a notice of appearance

12 who had appeared for the plaintiff in this case?

13 A.  Yes, I was the only counsel of record.

14             THE COURT:  In fact, to this date you are the only

15 counsel who has entered a notice of appearance on the docket in

16 this case; correct?

17             THE WITNESS:  Yes.

18             THE COURT:  And at the conference held on November

19 14th, you entered a notice of appearance on behalf of

20 Mr. Usherson.  Mr. Freeman appeared and made clear that he was

21 appearing on your behalf only, and not on behalf of

22 Mr. Usherson; correct?

23             THE WITNESS:  Yes.

24 BY MR. NEWBERG:

25 Q.  Are you aware of any section in these rules that allow lead

**JA-363**

K18VUSHH                    Liebowitz – cross

1   counsel to not attend mediation?

2   A.  Well, from 9(c), when it says, Each represented party must

3   be accompanied at mediation by the lawyer who will be primarily

4   responsible for handling the trial of this matter, Mr. Freeman

5   would have handled the trial of the matter.

6   Q.  So Mr. Freeman, who had not entered an appearance, and

7   never entered an appearance in this case on behalf of

8   plaintiff, was going to be trial counsel?

9   A.  Yes.

10          THE COURT:  All right.

11          And Mr. Freeman didn't appear at the initial

12  conference in this case, did he?

13          THE WITNESS:  No, I don't believe so.

14          THE COURT:  All right.

15          And you have presumably read my initial conference

16  orders at this point?

17          THE WITNESS:  I believe so.

18          THE COURT:  And are you aware that one of the

19  provisions in that order states that, absent leave of Court

20  obtained by letter motion filed before the conference, all

21  pretrial conferences must be attended by the attorney who will

22  serve as principal trial counsel?

23          THE WITNESS:  Yes, I understand that.

24          But oftentimes during cases with my opposing -- with

25  my colleague, we often sometimes switch on who's going to be

JA-364

20

K18VUSHH                    Liebowitz – cross

1    trial counsel and who's going to be, you know, lead.  That

2    often happens.

3              THE COURT:  Prior to the initial conference in this

4    case, did you file any letter motion requesting permission for

5    Mr. Freeman to --

6              THE WITNESS:  No.

7              THE COURT:  Or, sorry, excuse me, for you to appear,

8    even though your testimony today is that you were not intending

9    to be a principal trial counsel, did you file a letter motion

10   to that effect?

11             THE WITNESS:  No, I -- no, because it wasn't trial

12   yet.

13             THE COURT:  Go ahead.

14             THE WITNESS:  If and when there would be a trial --

15   BY MR. NEWBERG:

16   Q.  Let's use your term of "trial counsel."  Are you aware of

17   any section in these rules that allow trial counsel to not

18   attend the mediation?

19   A.  I didn't read the whole thing, but from -- I don't

20   believe -- I don't believe so.

21   Q.  And are you aware of any rules that allow trial counsel or

22   lead counsel to ask for permission to not attend the mediation?

23   A.  Could you say that question again?

24   Q.  Are you aware of anything in the rules that would allow --

25   that says trial counsel or lead counsel may ask for permission

JA-365

21

K18VUSHH                    Liebowitz – cross

1    to not attend a mediation?

2    A.  I don't think it is in the rules, but from the custom and

3    practice of working with the mediator in this case, and

4    previously granting my colleague James Freeman to appear in my

5    behalf, there was no issue.

6    Q.  But in answering the question, you're unaware of any rule

7    that would allow it?

8               THE COURT:  Just yes or no.

9    A.  I don't believe so.

10   Q.  When precisely did you ask the mediator for permission for

11   you to not attend the October 31st mediation?

12   A.  October 30th.

13   Q.  October 30th.  That's the date you're giving today, October

14   30th?

15   A.  Yeah, October 30th.  It was -- yes.

16   Q.  Did you tell the mediator why you would not be able to

17   attend?

18   A.  This is what I told the mediator:  I told the mediator on

19   October 30th that the parties have reached a settlement in

20   principle.  The parties reached an agreement on the number; and

21   that the parties were then just negotiating nonmonetary terms.

22           I then told the mediator if my client, the plaintiff,

23   can appear telephonically, because he lives in Georgia, and

24   since we were just negotiating the nonmonetary terms of the

25   agreement, the mediator said yes, that the plaintiff could

K18VUSHH                    Liebowitz - cross

1   appear telephonically.

2          I then asked the mediator if my colleague James

3   Freeman could appear instead of me.  He said yes.  And he's

4   done this on -- in terms of having James Freeman appear on my

5   behalf, he's granted that on one other occasion, and he had

6   granted the plaintiffs or my clients in other matters five

7   other times.

8   Q.  When on October 30th did you ask this permission?

9   A.  It was in the early evening.

10         THE COURT:  Is that early evening Eastern time?

11         THE WITNESS:  It was about -- I think it was somewhere

12  around 8 or 7, 7:30.  It was -- it was, I believe, after the

13  time that we had an agreement on the number, the settlement

14  number in the case.  And then that's when you -- when you sent

15  me or the mediator over the settlement agreement.  And I needed

16  to review the terms of --

17         THE COURT:  Mr. Liebowitz, the question was just

18  whether it was Eastern time or California time.  What time was

19  this --

20         THE WITNESS:  Yeah, it was about, I would say, 7:30, 8

21  o'clock Eastern.

22         THE COURT:  Okay.  And where were you at that time?

23         THE WITNESS:  I was in California.

24         THE COURT:  Were you speaking on your cell phone or

25  landline?

K18VUSHH                    Liebowitz - cross

1          THE WITNESS:  No, I was speaking on my cell phone.

2          THE COURT:  And did you speak to Mr. Freeman in

3   advance of that call about appearing at the mediation or after

4   call?

5          THE WITNESS:  Well, he knew that I was having the --

6   that this was scheduled for the next day; and that he was

7   prepared to participate in the mediation in good faith.  I was

8   even going to have my sister, who's newly admitted to the bar,

9   also come shadow James at the mediation.

10          And the next day, Mr. Freeman and Ms. Liebowitz came

11   prepared in person --

12          THE COURT:  All right.  That's enough.  Getting beyond

13   the question.

14          And how long was the conversation with the mediator?

15          THE WITNESS:  It was short.

16          THE COURT:  And did you call him or he called you?

17          THE WITNESS:  No, I believe I called him.

18          THE COURT:  Go ahead.

19   BY MR. NEWBERG:

20   Q.  Mr. Liebowitz, are you testifying that you informed the

21   mediator that the parties had had an agreement on the number,

22   and that's why you should be allowed not to go to the

23   mediation?

24   A.  Well, it was -- it was -- just like in previous mediations,

25   I asked the mediator -- you know, the same mediator in this

K18VUSHH                    Liebowitz - cross

1   case -- if the plaintiff could appear telephonically, because

2   he lives in Georgia, more than 100 miles away.  And the costs

3   of traveling all the way to New York would have eaten into a

4   large portion of the settlement number.  And out of judicial,

5   you know, economy and trying to protect my client, you know,

6   from the expense of traveling, the parties agreed on a number.

7          And I asked the mediator, since we had a settlement in

8   principle and we were just negotiating the nonmonetary terms,

9   that, you know, we could get this, you know, done either in the

10  morning or at the mediation; and that there will be no issues,

11  just like in the previous five cases.

12         In the previous five cases, there were no issues at

13  all.  The client appeared telephonically, either I appeared or

14  Mr. Freeman appeared in the other cases.  And we reached an

15  agreement in most of those, and the parties were happy and

16  moved on.

17         THE COURT:  Did you explain all of what you just

18  described to the mediator, that in order to reduce costs

19  because you had an agreement in principle, you wanted --

20         THE WITNESS:  Yeah, well -- yeah, exactly.  I mean,

21  that's -- you know, that's --

22         THE COURT:  Yes or no?

23         THE WITNESS:  Yes.

24         THE COURT:  Did you explain that was --

25         THE WITNESS:  Yes.

K18VUSHH                    Liebowitz - cross

1          THE COURT:  -- your reason -- again, wait for me to

2    finish my question.

3          Did you explain that that was your reason for

4    requesting permission for the client to appear by telephone?

5          THE WITNESS:  Yes.

6          THE COURT:  And did you reference the other five cases

7    involving the same mediator in which that permission had been

8    granted?  In the conversation with the mediator, did you make

9    reference to it?

10         THE WITNESS:  Oh, no, I mean, I didn't mention it.

11   But he -- he knows me, he knows that I had --

12         THE COURT:  Just answer the question.

13         The answer is no.  Okay.

14         Mr. Newberg.

15   BY MR. NEWBERG:

16   Q.  Yes.  I'm going to ask you to answer just the question I'm

17   asking, Mr. Liebowitz.

18         You're aware that day that the mediator is the one who

19   was emailing the parties trying to facilitate a settlement the

20   day before the mediation; correct?

21   A.  Yeah, the mediator facilitated settlement by emailing the

22   counsel, yes.

23   Q.  And when do you believe it was that the parties supposedly

24   had an agreement in principle on a number?

25   A.  It was the night before.  That's when -- that's when you,

JA-370

26

K18VUSHH                    Liebowitz - cross

1  Mr. Newberg, sent the settlement agreement over to, I believe,

2  me and the mediator by email with the settlement agreement.

3  Q.  Your answer is October 30th, the night before the mediation

4  on October 30th?

5  A.  Yes.

6  Q.  So as of that time, you were already in Los Angeles;

7  correct?

8  A.  Yeah, I was in California, yes.

9  Q.  So you knew before any supposed agreement on the number,

10  that you would be in Los Angeles and not able to attend the

11  mediation; correct?

12  A.  No, I mean, that's not necessarily true.  I mean, I would

13  have came back.  I mean -- and this is a standard -- very

14  standard for the mediator.  I had a relationship with this

15  mediator --

16          THE COURT:  Mr. Liebowitz, just answer the question.

17          You knew at the time that you were going to be in Los

18  Angeles.

19          THE WITNESS:  Yeah, well, I was going to be in Los

20  Angeles the day before.

21          THE COURT:  When did you make the plan to go to Los

22  Angeles?

23          THE WITNESS:  That I don't know.

24          THE COURT:  When did you go to Los Angeles?

25          THE WITNESS:  I don't know the exact date, but I could

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**JA-371**

K18VUSHH                    Liebowitz – cross

1   tell you that on October 30th I was in Los Angeles.

2               THE COURT:  All right.

3               Am I correct that you appeared at U.S.C. on October

4   26th?

5               THE WITNESS:  Yes.

6               THE COURT:  And that's in California?

7               THE WITNESS:  Yes, that's in California.

8               THE COURT:  Were you in California from October 26th

9   through October 30th?

10              THE WITNESS:  Yes, at least.

11              THE COURT:  And at any point during your

12  communications with the mediator, did you mention that you were

13  in California?

14              THE WITNESS:  I mentioned that on October 30th, that I

15  was in California; and that we had an agreement, settlement in

16  principle.

17              THE COURT:  Just answer the question.

18              THE WITNESS:  Okay.

19              THE COURT:  So your testimony is that on October 30th,

20  you advised the mediator that you were in California?

21              THE WITNESS:  Yes, I was in California.

22              THE COURT:  Okay.

23              And at any point did you tell Mr. Newberg prior to the

24  mediation that you were in California?

25              THE WITNESS:  No, but I was --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JA-372

28

K18VUSHH                    Liebowitz - cross

1          THE COURT:  Just answer the question.

2          THE WITNESS:  No.

3          THE COURT:  All right.

4          And when you scheduled the mediation in this case, did

5     you know that you were going to be out of town?

6          THE WITNESS:  I knew I was going to be out of town at

7     least until the -- my speaking engagement at U.S.C.

8          THE COURT:  Okay.  So you did not know -- your

9     testimony is that when you scheduled the mediation, you did not

10    know you would be out of town on the date of the mediation?

11         THE WITNESS:  Well, no.  Well, I would have came back

12    for the mediation if -- if the parties either didn't have a

13    settlement in principle or -- or the mediator did not allow

14    Mr. Freeman to appear in my behalf.  But, yeah.

15         THE COURT:  And did you have a return ticket to come

16    back from Los Angeles?

17         THE WITNESS:  No, I didn't have a return ticket.

18         THE COURT:  Your testimony is that if you didn't have

19    an agreement on October 30th and you didn't obtain the

20    mediator's permission at 7:30, that you would have immediately

21    gotten on a plane and come back to appear the next day?

22         THE WITNESS:  Yeah.  And also I had -- I had a

23    relationship with this mediator.  He routinely granted --

24         THE COURT:  That's not my question.

25         My question is, is it your testimony that if one or

JA-373

K18VUSHH                    Liebowitz - cross

1    both of those things had not happened, you would have gotten on

2    a plane --

3                THE WITNESS:  I would have came back.

4                THE COURT:  Okay.

5                And that is true even though your testimony is that

6    Mr. Freeman was the lawyer who would be primarily responsible

7    for handling the trial in this matter?

8                THE WITNESS:  Yeah.  But that -- again, that I asked

9    the mediator permission for Mr. Freeman to appear on my behalf,

10   so I did not have to come back.

11               THE COURT:  And did you advise the mediator that

12   Mr. Freeman would be the lawyer who would be primarily

13   responsible for handling trial?

14               THE WITNESS:  I just told him that my colleague,

15   Mr. Freeman, was going to appear on my behalf.

16               THE COURT:  Just yes or no, did you tell him that he

17   was the lawyer who was primarily responsible for handling

18   trial?

19               THE WITNESS:  I don't -- I don't believe so, but --

20               THE COURT:  And did you ever tell Mr. Newberg that?

21               THE WITNESS:  I don't believe so.

22   BY MR. NEWBERG:

23   Q.  Mr. Liebowitz, when was your marketing event in Los

24   Angeles?

25               MR. FREEMAN:  Objection, your Honor, on grounds of

JA-374

K18VUSHH                    Liebowitz – cross

1    relevance.

2              THE COURT:  I think I'll allow it to see where it

3    goes.  Go ahead.

4    Q.  When was your marketing event in Los Angeles?

5    A.  It wasn't a marketing event; it was a -- simply it was a

6    networking event for photographers in California whereby

7    photographers can network and meet one another.  And I was

8    hosting.

9    Q.  And you hosted this networking event, as you've just said;

10   correct?

11   A.  Yes, I hosted it.

12   Q.  And you hosted it on the night of October 30th, did you

13   not?

14   A.  Yes, I did.

15   Q.  So when was this networking event that you hosted set up?

16   A.  I don't know the exact date, but I know it was prior,

17   obviously prior to October 30th.

18   Q.  Was it prior to October?

19   A.  Possibly.

20   Q.  You don't know whether you set up a networking event that

21   you hosted prior to October?

22   A.  Yeah, I don't know the exact date that I set it up.

23   Q.  And you just testified to the Court that if we didn't have

24   a settlement in principle the night of October 30th, that you

25   were prepared to get on a plane that night and fly to New York

**JA-375**

K18VUSHH                    Liebowitz – cross

1   for the mediation; is that correct?

2   A.  Yes, if that -- if I had to do that, then I had to do it.

3   But as I stated previously, I have a custom and practice with

4   this mediator --

5        THE COURT:  Mr. Liebowitz, just answer the question

6   please.  I don't want to remind you again.

7        The question was, Was that your testimony?

8        The answer is yes.

9        Next question.

10  Q.  How old is Mr. Usherson?

11  A.  I don't know.

12  Q.  Approximately?

13  A.  I honestly do not know.

14  Q.  Older than 70?

15  A.  I don't know.

16  Q.  You don't know if he's older than 70?

17  A.  I don't know.

18  Q.  You're aware the photograph he supposedly took in this case

19  was taken approximately 50 years ago; correct?

20  A.  Yes.

21  Q.  You say you asked for permission for Mr. Usherson to attend

22  telephonically around 7:30 or 8 p.m. the night before the

23  mediation; correct?

24  A.  Yes.

25  Q.  Do you know if Mr. Usherson, did he have a plane ticket to

JA-376

K18VUSHH                    Liebowitz - cross

1    come to the mediation?

2    A.  I am not sure.  But if he didn't, he would have jumped on a

3    plane that next morning or that evening and would have came to

4    the mediation.  I mean, this is -- there's no issues; you could

5    always get plane tickets fairly quickly.

6    Q.  So you were expecting that if you didn't get a settlement

7    in principle and permission, that you would have your elderly

8    client try to get plane tickets late in the night before the

9    mediation to get to the mediation the next morning; is that

10   correct gentlemen?

11            MR. FREEMAN:  Objection, your Honor.

12            Calls for speculation as to the age of plaintiff -- of

13   the plaintiff.

14            THE COURT:  Overruled.

15   A.  I don't -- what's the big deal?  I mean, people fly all the

16   time.  It doesn't matter someone's age.

17   Q.  How much involvement did Mr. Freeman have in this case

18   before the October 31st mediation?

19   A.  Yeah, I spoke -- I spoke to him on numerous occasions.

20   Q.  You spoke to him numerous occasions about this case prior

21   to the October 31st --

22   A.  Yes, in my office.

23   Q.  And when was the -- when was the first time, do you

24   remember?

25   A.  I don't know the exact date.

K18VUSHH                    Liebowitz - cross

1   Q.  Was it before October -- it was before you got --

2   supposedly got permission for him to attend around 7:30 or 8

3   o'clock on the night of October 30th?

4   A.  Yes, I spoke to him about it.  And that evening, after I

5   got the permission from the mediator for Mr. Freeman to appear

6   on my behalf, we discussed it in detail, and he was prepared to

7   appear at the mediation and have a good-faith mediation with

8   you, Mr. Newberg, and your client, and would have simply hashed

9   out the nonmonetary terms and probably would have --

10  Q.  Mr. Liebowitz --

11  A.  -- for a very short period of time.

12  Q.  I want you to answer the question I'm asking here.

13          You just testified that you had spoke to Mr. Freeman

14  numerous times about this case before October 30th; correct?

15  A.  Yes, I did.

16  Q.  Okay.  And what did you speak to Mr. Freeman about this

17  case before October 30th?

18  A.  I talked to him about the facts of the case.  This is a

19  pretty simple case; there's not that much to talk about.

20  Q.  And what kind of work, if any, did he do on this case prior

21  to October 31st?

22  A.  He reviewed the case, the complaint.  You know, I can't

23  speculate to what Mr. Freeman reviewed; all I could say is that

24  I spoke to him about it.  And then after I got the mediator's

25  permission for Mr. Freeman to appear on my behalf, I spoke to

K18VUSHH                        Liebowitz – cross

1    Mr. Freeman about it, and he was fully abreast of what was

2    happening; that the parties have agreed to a number in

3    principle; and that we were just hashing out the nonmonetary

4    terms.

5    Q.  But in terms of your -- these various communications before

6    October 30th with Mr. Freeman about the case, do you recall

7    about how many there were?

8    A.  Oh, that I don't know.

9    Q.  But he reviewed the various papers in this case up until

10   that point?

11   A.  Yeah, that's --

12           THE COURT:  In the conversation with Mr. Freeman after

13   your phone call with the mediator, first of all, that

14   conversation was by telephone, I assume?

15           THE WITNESS:  Telephone with who?

16           THE COURT:  With Mr. Freeman.

17           THE WITNESS:  Yes.

18           THE COURT:  And were you using your cell phone?

19           THE WITNESS:  I believe so.

20           THE COURT:  And did you advise him that the mediator

21   had granted permission for him to appear in your place?

22           THE WITNESS:  Yes, like what happened in *Sadowski v.*

23   *Seeking Alpha*.

24           THE COURT:  That's not my question.

25           Did you advise him that the mediator had granted

JA-379

K18VUSHH                    Liebowitz - cross

1    permission for him to appear in your place?

2              THE WITNESS:  Yes.

3              THE COURT:  And did you advise him that the mediator

4    had granted permission for Mr. Usherson to participate by

5    telephone?

6              THE WITNESS:  Yes.

7              MR. NEWBERG:  May I proceed, your Honor?

8              THE COURT:  You may.

9    BY MR. NEWBERG:

10   Q.  So you've now testified, I believe, three times in the last

11   couple of minutes about Mr. Freeman's involvement, review of

12   papers, etc., before October 30th.

13             I want to read you the declaration of James Freeman,

14   which was attached to your response papers in this case.

15             Paragraph 4, Mr. Freeman says:  I was informed as to

16   the existence of this matter at about 8 p.m. on October 30,

17   2019.  Do you wish to change your testimony?

18   A.  No, I mean, listen, Mr. Freeman and I have conversations in

19   my office all the time.  I mean, it is just --

20   Q.  Mr. Liebowitz, you said he reviewed papers in this case; he

21   was aware of the instances of the case; you had multiple

22   conversations, he reviewed multiple things before October 30th.

23   Do you wish to change that testimony?

24   A.  Again, I can't speculate to what Mr. Freeman did.

25   Q.  By the way, if Mr. Freeman was intended to be trial counsel

JA-380

K18VUSHH                    Liebowitz - cross

1    all along, why did you have to ask for permission?

2    A.  I got permission so that -- I wanted to double -- double --

3    you know, just cover myself and make sure that the mediator was

4    on notice that Mr. Freeman was going to appear on my behalf.  I

5    have to do due diligence as a lawyer of this Court.  And I

6    asked the mediator if Mr. Freeman could appear on my behalf,

7    and he said yes.

8         THE COURT:  But the question is it's your testimony

9    and your position that Mr. Freeman was the lawyer primarily

10   responsible for handling trial in this matter; correct?

11        THE WITNESS:  Yes, just like in other cases.

12        THE COURT:  So it's your testimony and position that

13   Mr. Freeman was, in fact, the person required by Rule 9(c) of

14   the mediation rules to appear in person at the mediation; is

15   that correct?

16        THE WITNESS:  Yes.

17        THE COURT:  So the question is given that, why did you

18   seek the mediator's permission for him to appear, if, under the

19   rules, in your view, he was required to be the lawyer to

20   appear?  Do you understand?

21        THE WITNESS:  I believe I understand the question.

22        Yeah, I just wanted to tell the mediator, out of

23   respect for him, that Mr. Freeman was going to appear on, you

24   know, my behalf.  And he said, Yes, that's fine.

25        THE COURT:  But you didn't tell him in that

K18VUSHH                    Liebowitz - cross

1    conversation that Mr. Freeman was actually the lawyer primarily

2    responsible for trial in this matter and therefore --

3                 THE WITNESS:  No, I don't believe so.

4                 THE COURT:  Okay.

5    BY MR. NEWBERG:

6    Q.  Did you ever ask me or any attorney for defendant for any

7    sort of consent for you not to be there?

8    A.  I didn't hear the question.

9    Q.  Did you ever ask me or any other attorney for defendant for

10   consent for you not to be there?

11   A.  No, I didn't.  And the reason for that is because the rules

12   do say that if I got the mediator's permission for the

13   plaintiff, for the client, to appear telephonically, it doesn't

14   say anything in the rules that say that you need to let

15   opposing counsel know.

16                However, I do understand that it is best practice to

17   notify opposing counsel to -- that, you know, who's going to

18   appear, whether the mediator -- whether the client will appear

19   in person.  I understand that.

20                And I know it didn't happen in this case, but I did

21   let the mediator know, and I did get permission from the

22   mediator.  And I'm sorry that I didn't let you know, but I did

23   let the mediator know, and he said yes.

24                THE COURT:  And your testimony is that you advised

25   Mr. Freeman that the mediator had granted you permission to

JA-382

K18VUSHH                    Liebowitz – cross

1    send him and for Mr. Usherson to appear by telephone?

2             THE WITNESS:  Did you say if I let Mr. Freeman know?

3             THE COURT:  Yes.

4             THE WITNESS:  Yes, I let Mr. Freeman know.

5             THE COURT:  Both of those facts, that the mediator had

6    granted you permission --

7             THE WITNESS:  Yes.

8             THE COURT:  -- for him to appear --

9             THE WITNESS:  Yes.

10            THE COURT:  -- and for Mr. Usherson to appear by

11   telephone?

12            THE WITNESS:  Telephone, yes.

13            THE COURT:  Okay.

14        And do you know that Mr. Freeman represented to me in

15   the November 14th conference that he had no knowledge one way

16   or the other as to what clearances were made in terms of

17   telephonic appearances?  Do you know that?

18            THE WITNESS:  Okay.  Well, listen, I mean, people

19   forget things.

20            THE COURT:  So your testimony is that his

21   representation was erroneous, was wrong.

22            THE WITNESS:  Yeah.  I mean, listen, at the end of the

23   day, people forget things, you know?  And, you know, all I know

24   is that I told the mediator that --

25            THE COURT:  My question is, is it your testimony that

JA-383

K18VUSHH                    Liebowitz - cross

1   Mr. Freeman is forgetting or that you're perhaps for getting?

2              THE WITNESS:  Listen, I had a conversation with

3   Mr. Freeman the night before, and discussed about the case.

4   What was discussed on the phone call, I'm not -- my testimony

5   is that we did discuss that.  You know, whether or not, you

6   know, one of us is forgetting or lacking memory of what

7   happened, all I know is that on the night before, on the 30th,

8   I did speak with the mediator.  He granted my client to appear

9   telephonically.

10             THE COURT:  All right.  I got that.

11             THE WITNESS:  And I did ask the mediator whether -- if

12  Mr. Freeman could appear in my behalf, and he said yes.

13             THE COURT:  Did you take any notes of that call?

14             THE WITNESS:  I didn't take any notes.

15             THE COURT:  Did you make a record of the call after

16  the call?

17             THE WITNESS:  No.

18             THE COURT:  Did you send any emails regarding the

19  call?

20             THE WITNESS:  I don't believe so.

21             THE COURT:  All right.

22             Did you text anyone or send any --

23             THE WITNESS:  No, I don't believe so.

24             THE COURT:  You didn't make any written communication

25  with Mr. Freeman or otherwise about the mediator's conversation

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JA-384

K18VUSHH                    Liebowitz – cross

1    with him.

2            THE WITNESS:  No, no record.  I just had a phone call

3    with the mediator and spoke with Mr. Freeman.  And that's ––

4    that's what happened.

5            THE COURT:  Did you tell your sister that you'd have

6    the call with the mediator?

7            THE WITNESS:  No, I don't believe I spoke with my

8    sister.  But my sister is newly admitted; she was going to come

9    shadow Mr. Freeman.

10           THE COURT:  All right.  I got that.

11           And did you communicate with Mr. Usherson on October

12   30th?

13           THE WITNESS:  I believe so.

14           THE COURT:  At what time?

15           THE WITNESS:  I don't know the exact time.

16           THE COURT:  Did you speak with him after your

17   conversation with the mediator?

18           THE WITNESS:  Yeah, I believe that I –– I believe that

19   we spoke regarding, you know, the settlement number and, you

20   know, about hashing out the nonmonetary terms.  I believe that

21   happened.  I'm not sure of the exact date.

22           THE COURT:  Okay.

23           Did you advise Mr. Usherson that he had been granted

24   permission to appear by telephone?

25           THE WITNESS:  Well, if he –– if he –– if he didn't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K18VUSHH                    Liebowitz - cross

1  have to appear in person, then -- then I would have just called

2  him that day and know that he's always around and --

3         THE COURT:  Did you tell him that he needed to be

4  available?

5         THE WITNESS:  Well, I told him that -- yeah, I told

6  him that he had to be prepared for the mediation if the

7  settlement didn't go through, and --

8         THE COURT:  And how did you leave things with the

9  mediator in your October 30th call?  Did you indicate that you

10  would call him back, that you would -- in other words, your

11  testimony is that you had reached a settlement in principle at

12  least on the monetary terms.  How did you leave things with

13  respect to --

14         THE WITNESS:  Yeah.  So simply what happened was I

15  told the mediator that I would get back to him on the

16  nonmonetary terms.

17         THE COURT:  That night?

18         THE WITNESS:  That night or that morning.  And I did

19  send back a redline with some revisions to the agreement.

20         THE COURT:  You sent back to the mediator?

21         THE WITNESS:  I believe the mediator or to

22  Mr. Newberg.

23         THE COURT:  Was there a plan to have a further

24  conversation with the mediator?

25         THE WITNESS:  Well, it was assumed that the next day

JA-386

42

K18VUSHH                    Liebowitz - cross

1    at the mediation, that the parties will just hash out the

2    nonmonetary terms, if it wasn't agreeable.  There were very few

3    revisions.  And, you know, that's that.

4              THE COURT:  Okay.  Mr. Newberg.

5              MR. NEWBERG:  Just to follow up on a couple of your

6    questions, your Honor, and then I'll move on.

7    BY MR. NEWBERG:

8    Q.  Just to clarify in one single question, there is nothing in

9    writing confirming you received these permissions from the

10   mediator; that is correct?

11   A.  No, nothing in writing.

12   Q.  I'm sorry?

13   A.  Nothing in writing.

14             MR. NEWBERG:  And your Honor asked about Mr. Freeman's

15   recollection at the last conference.

16   Q.  Did you review Mr. Freeman's declaration before it was

17   filed in this case?

18   A.  No, I didn't review the declaration.

19   Q.  You didn't review the declaration --

20   A.  No, that's his testimony.  I mean, his recollection and my

21   recollection, often people forget things in this world.  And,

22   you know, lack of memory, you know, sometimes happens.  It

23   happens to all of us.  And --

24             THE COURT:  All right.  You signed the opposition

25   memorandum of law in opposition to defendant's sanctions;

JA-387

K18VUSHH                    Liebowitz - cross

1    correct?

2              THE WITNESS:  I believe so.

3              THE COURT:  And that cites and quotes from

4    Mr. Freeman's declaration; correct?

5              THE WITNESS:  I believe so.

6              THE COURT:  Did you prepare that opposition?

7              THE WITNESS:  I must have.  I mean, I don't know what

8    I saw, you know --

9              THE COURT:  But your testimony is that you did not

10   review Mr. Freeman's declaration before it was filed, and yet

11   you cite it in the memorandum that you filed that same day.

12             THE WITNESS:  Yeah.  I mean, I could have signed it,

13   but I -- I, you know, left the declaration -- you know, his

14   declaration alone.

15             THE COURT:  Who prepared the opposition papers?

16             THE WITNESS:  It was Mr. Freeman and I.

17             THE COURT:  And did you review them before they were

18   signed?

19             THE WITNESS:  I reviewed the opposition, his

20   declaration.  I just assumed, you know, was his -- his

21   testimony and --

22             THE COURT:  Where it cites his declaration, did you

23   look at the declaration to confirm that the citations were

24   accurate?

25             THE WITNESS:  I'm not sure.  Again, Mr. Freeman often

JA-388

K18VUSHH                    Liebowitz - cross

1   prepares things for me, and that's that.  I do often review

2   things, and do, you know, review what my colleague does.  And

3   declarations -- if that's what his declaration was, then that's

4   it.

5          THE COURT:  Okay.

6   BY MR. NEWBERG:

7   Q.  So getting back to just one more question on Mr. Freeman's

8   declaration, you've seen it since; correct?

9   A.  Say again?

10  Q.  Have you seen his sworn declaration?

11  A.  His declaration, I believe so.

12  Q.  Are you aware of anything in that which he signed,

13  presumably after time to think about it, where he mentions

14  anything about being aware that you got these permissions?

15  A.  All I know is that I got the --

16  Q.  It's a yes-or-no question.

17  A.  What was the question?

18  Q.  The question is are you aware of anything in Mr. Freeman's

19  declaration where he says or suggests that he was aware that

20  you got these permissions?

21  A.  I'm not aware.  I don't have the declaration in front of

22  me.  I don't know.

23  Q.  You didn't submit a declaration of Mr. Usherson in these

24  response papers; correct?

25  A.  I don't believe so.

JA-389

K18VUSHH                    Liebowitz - cross

1   Q.  Why not?

2   A.  The matter was between counsel and -- between counsel and

3   the Court.  I mean, I just don't think that getting a client

4   involved is necessary.

5   Q.  The Court asked you and I've asked you various questions

6   today about your communications with Mr. Usherson and when you

7   made him aware.  So you didn't think to have had the

8   declaration for Mr. Usherson backing up your story?

9   A.  I just don't think it's necessary.  I mean, I said what I

10  said and that's it.

11  Q.  So you stated a few times today, a number of times, that

12  this conversation with the mediator where you got these

13  permissions was October 30th; correct?

14  A.  Yes, 30th.

15  Q.  And I'll just ask a question.  Why did you wait till

16  October 30th to get these permissions?

17  A.  Again, it's custom and practice.  The parties reached a

18  settlement in principle on the number.

19  Q.  So is it your testimony that you only asked for these

20  permissions because you thought the parties had reached a

21  settlement in principle on the number?

22  A.  No, not at all.  The client lives 100 miles away in

23  Georgia.  And according to the mediation rules, you could ask

24  the mediator for permission for the client to appear

25  telephonically, and that's what I did.

JA-390

K18VUSHH                    Liebowitz - cross

1  Q.  Why wait until the night of the -- the eve of the mediation

2  to do this?

3  A.  I understand that it's not best practice to do that, but I

4  had a custom and practice with this mediator that in five times

5  prior, he's granted my client's permission to appear

6  telephonically.  And just like in those cases, I assumed that

7  there would be no issue this time.  And there was no issue,

8  because he granted permission for my client to appear

9  telephonically and for Mr. Freeman to appear on my behalf.

10  Q.  So you were so confident in this practice, that you waited

11  until 7:30 or 8 o'clock the night before the mediation, while

12  you were in Los Angeles and your client was in Georgia with no

13  plans, flights, whatsoever, to get back to New York for the

14  next morning?

15  A.  Yeah.  I mean, what's the issue with that?  I mean, I think

16  that, you know, justice system, you want to try to save costs

17  and minimize costs.  And I'm trying to have the best interest

18  of my client to save cost and --

19  Q.  And you couldn't have done that by asking for permission

20  weeks earlier?

21  A.  Yeah, that could have been done, and I understand that was

22  not best practice.  But I had a custom and practice with this

23  mediator, as I said, all along, that he's granted my clients in

24  the past permission to appear telephonically, and in one other

25  occasion to have Mr. Freeman appear on my behalf.

JA-391

K18VUSHH                    Liebowitz - cross

1   Q.  So October 30th, you've testified quite a number of times.

2          Do you remember you told this Court in open court just

3   a few days after the mediation, that you couldn't remember when

4   you asked permission?

5   A.  Yeah, I couldn't, because at the time I didn't remember.

6   Q.  So you're saying now that you couldn't remember that it was

7   the night before the mediation, but you do now, two months

8   later?

9   A.  Yeah.

10  Q.  You didn't put this October 30th date anywhere in your

11  response papers; correct?

12  A.  What do you mean by "response papers"?

13  Q.  In your declaration.  You don't say in your declaration, do

14  you, that you got permission on October 30th?

15  A.  I don't know.  I have to read my response papers.

16  Q.  I'm sorry, did you just say you didn't read --

17  A.  No, I need to review the response papers.  I don't remember

18  sitting here today.

19  Q.  Do you believe you put this October 30th date into your

20  declaration?

21  A.  I honestly don't know.  If I did, I did.  If I didn't, then

22  I didn't.

23  Q.  What about the brief, did you put in the brief at all that

24  you got this permission on October 30th?

25  A.  I don't know, sitting here today.

JA-392

K18VUSHH                    Liebowitz - cross

1    THE COURT:  All right.  Mr. Liebowitz, I'm going to

2    hand you docket number 22 from this case, which is your

3    declaration in this case.  I'll give you a moment to review it,

4    and then I'll follow up after.

5    (Pause)

6    THE COURT:  Anywhere in that declaration do you state

7    that the conversation in which the mediator granted you

8    permission?

9    THE WITNESS:  On line 13.  I say, Prior to October

10   31st, 2019.

11   THE COURT:  Anywhere in that declaration do you state

12   that that conversation took place the night before the --

13   THE WITNESS:  No.

14   THE COURT:  Thank you.

15   BY MR. NEWBERG:

16   Q.  Do you state in that declaration anywhere that the

17   permission occurred on October 30th, night, day?

18   A.  No.  All it said was "prior," which is all that's

19   necessary.

20   Q.  You didn't feel it was necessary to give this Court --

21   which asked you for a specific date -- a specific date?

22   A.  I don't recall if the Court asked for a specific date

23   and -- my declaration is accurate.

24   Q.  So you're saying when you signed this declaration, you knew

25   the specific date, October 30th, but you chose not to put it in

K18VUSHH                    Liebowitz – cross

1   your declaration and just write "prior to the mediation"?

2   A.  Yeah, that's accurate.  October 30th is prior to October

3   31st.

4           THE COURT:  And you appeared in front of me on

5   November 14th; correct?

6           THE WITNESS:  November 14th, I believe so.

7           THE COURT:  All right.

8           And that was two weeks after the mediation.

9           THE WITNESS:  Two weeks after.

10          THE COURT:  And two weeks and a day after the

11  conversation with the mediator that you're describing now.

12          THE WITNESS:  Yes.

13          THE COURT:  And at the time did you say to me in

14  response to my question when did you advise the mediator that

15  Mr. Usherson was not going to appear in person, did you answer,

16  "I don't know the exact date"?

17          THE WITNESS:  Yeah, I didn't know the exact date at

18  the time.

19          THE COURT:  So what refreshed your recollection

20  between November 14th and today?

21          THE WITNESS:  Because I –– I went back in my emails

22  and I saw the emails between the mediator, and I saw that it

23  was October 30th.

24          THE COURT:  And which emails exactly?

25          THE WITNESS:  They were just emails with the –– with

JA-394

50

K18VUSHH                    Liebowitz - cross

1    the mediator.  I think one of them said, Talked to Richard and

2    he will get back to us in the morning, something along those

3    lines.  And on that -- that was October 30th.

4             THE COURT:  I assume you read the defendant's motion

5    for sanctions that was filed on November 6th; is that correct?

6             THE WITNESS:  I don't know the exact date when it was

7    filed.

8             THE COURT:  Did you read the motion before you

9    appeared for the conference on November 14th?

10            THE WITNESS:  I believe so.

11            THE COURT:  Okay.  We discussed the substance of the

12   motion at that conference; correct?

13            THE WITNESS:  I believe so.  I often forget things, so

14   I -- it's possible.

15            THE COURT:  Okay.  Did you look at Mr. Newberg's

16   declaration that he filed in support of the motion?

17            THE WITNESS:  I must have.  But --

18            THE COURT:  Did you look at the attachments to the

19   declaration?

20            THE WITNESS:  I must have.

21            THE COURT:  And the emails that you just referenced,

22   they are attached to the declaration, aren't they?

23            THE WITNESS:  They must be.

24            THE COURT:  So at the time of the conference on

25   November 14th, even though you reviewed those emails, you

JA-395

K18VUSHH                    Liebowitz – cross

1   didn't remember the exact date of your conversation.  But

2   today, having reviewed those same emails, you do.  That's your

3   testimony?

4           THE WITNESS:  Yeah.  Now I know, because I looked at

5   the emails and it refreshed my memory.

6   BY MR. NEWBERG:

7   Q.  Mr. Liebowitz, I'm going to be blunt.  This isn't like it's

8   a random date months before, I can't remember September 7th or

9   September 8th.  We're talking about the night before the

10  mediation.

11          MR. FREEMAN:  Objection, your Honor.  He's just making

12  a statement, not asking a question.

13          THE COURT:  Overruled.

14  A.  Yeah.  I mean, I want to make sure that my statements are

15  accurate to the Court.  And if I don't know the exact date, and

16  I don't know the exact date.  But all I know was prior to

17  October 31st, and I did speak with the mediator on October

18  30th, which is prior to October 31st.

19  Q.  And so your testimony today is that, I remember now.  It

20  was the night right before the mediation, but I just couldn't

21  remember it for the last couple of months?

22  A.  Yeah, I mean I -- I -- now I know it was October 30th; and

23  that was the date that I spoke with the mediator; and that was

24  the date that he granted me permission for my client to appear

25  telephonically and for Mr. Freeman to appear on my behalf.

JA-396

K18VUSHH                    Liebowitz - cross

1    Q.  Putting aside the date of October 30th, that specific, you

2    know, a number.  When the Court asked you in open court when

3    did you receive this permission, you didn't remember it was --

4    oh, it was right before, it was the night before the mediation.

5    You didn't remember that?

6    A.  Yeah, well, I went back to my email after the hearing.  And

7    I don't know the exact date, but I got -- I got permission from

8    the mediator prior to October 31st.  And it's accurate.  And

9    that's true.  I had a telephone call with the mediator on

10   October 30th.

11   Q.  Do you recall -- going back a little bit here.

12           Do you recall on October 4th, 2019, after attempting

13   to get permission for a telephonic mediation, the mediation

14   office wrote the parties to state this was not in accordance

15   with procedures given mediation in this Court?

16   A.  Yeah, I do remember getting some email from the mediation

17   office.

18   Q.  And do you recall they wrote that any permission to deviate

19   from mediation rules in this case would have to come from the

20   Court?

21   A.  Yes, I believe so.

22   Q.  I'm going to hand you --

23           MR. NEWBERG:  This is already in the record as Exhibit

24   3 to my declaration, your Honor.

25   Q.  It's an October 4th string of emails.  And Mr. Liebowitz,

JA-397

K18VUSHH                    Liebowitz - cross

1    you recognize this string of emails?

2    A.  Yes, I recognize.

3    Q.  And do you recognize them being the emails where the

4    mediation office said that telephonic sessions would not be in

5    accordance with the procedures that govern this program; and

6    that you should seek appropriate relief directly from the

7    judge?

8    A.  Yes.  Telephonically meaning -- my interpretation of that

9    meant that -- that the -- yeah, I mean, the reason for this is

10   because I wanted to make sure to, you know -- you know, to have

11   the mediation before the initial conference, you know.  And I

12   thought that this would, you know, be a way to have -- a way to

13   try to resolve the matter before the initial conference.  And I

14   thought it would be successful for all of us to have a

15   telephonic mediation, and that's why I requested it.

16   Q.  But you understood at this point that the mediation office

17   was telling you that if you wanted relief from the rules, your

18   client to attend in person or lead counsel not to attend, any

19   relief from the rules would have to come from the Court?

20          THE COURT:  Yes or no.

21   A.  If that's what the email says, then that's what it says.

22   Q.  Did you understand that?

23   A.  Yes, I understand.

24   Q.  I'm going to hand you a letter that you filed with this

25   Court requesting telephonic mediation.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JA-398

K18VUSHH                    Liebowitz - cross

1          THE COURT:  Docket number 12.

2    Q.  Yes, docket number 12.

3          Is this a letter you wrote the Court asking for

4    permission to have a telephonic mediation?

5    A.  Yes, this is my letter.

6    Q.  Now, in that request, you never asked for you not to have

7    to attend as lead counsel; correct?

8    A.  No.

9    Q.  You simply asked for the conference to be held via

10   telephone, right?

11   A.  Yes.

12   Q.  In fact, you asked that if the mediation could not be

13   telephonic, that more time be given to hold an in-person

14   mediation; correct?

15   A.  Repeat the question.

16   Q.  You asked that if the mediation could not be telephonic,

17   that more time be given to hold an in-person mediation;

18   correct?

19   A.  Yeah.  If that's what I said, then that's what I said.

20          THE COURT:  Now, this was submitted to me on October

21   4th; is that correct?

22          THE WITNESS:  Yes, October 4th.

23          THE COURT:  And the initial conference at that point

24   was scheduled for October 10th; correct?

25          THE WITNESS:  Yes.

JA-399

55

K18VUSHH                    Liebowitz – cross

1        THE COURT:  And are you aware that my order required

2   mediation to be conducted at least two weeks prior to that

3   date?

4        THE WITNESS:  Yes.

5        THE COURT:  And you had not taken steps to comply with

6   that requirement, had you?

7        THE WITNESS:  Well, I don't know the exact date of

8   when counsel appeared, but I know that it was a short period of

9   time, relatively, between when opposing counsel appeared and

10  when the initial conference was scheduled.  And we were not

11  assigned a mediator after opposing counsel appeared.

12        So doing due diligence, I wanted to write to the Court

13  and try to get more time or potentially have the matter be done

14  telephonically, which sometimes is done in this courthouse.

15  And I thought that it would be successful via telephone, and

16  that's the reason why I suggested that to the Court.

17        THE COURT:  But you didn't ask for permission to

18  conduct the mediation after the deadline that I had set by

19  order, did you?  In other words, you didn't seek an extension

20  of the deadline for any of the reasons you just described.

21        THE WITNESS:  We respectfully request to either have

22  the mediation scheduled for October 8 via telephone, or to

23  schedule a mediation for another time in October.

24        THE COURT:  But an October 8th mediation, even if that

25  permission had been granted, was not in compliance with my

K18VUSHH                    Liebowitz - cross

1   order, which required it to be conducted two weeks prior to the

2   initial conference; correct?

3                THE WITNESS:  Yes.  No, that I understand.

4                THE COURT:  All right.  Thank you.

5                THE WITNESS:  But it was -- it was -- opposing counsel

6   appeared, I don't know the exact date, but it was sometime very

7   close to, I believe, the two-week deadline.  And the mediation

8   office did not assign a mediator.

9                THE COURT:  All right.  I got it.  Go ahead.

10  BY MR. NEWBERG:

11  Q.  In any case, the Court rejected your request for a

12  telephonic mediation; correct?

13  A.  Yes, rejected telephonic.

14  Q.  And that was on October 7th, do you remember that?

15  A.  I don't know the exact date.

16  Q.  Let me hand you the Court's order.  This is docket 13.

17               MR. NEWBERG:  It's an ECF docket order, so there's no

18  documents.  I've submitted my ECF notice, your Honor, that was

19  sent to me.

20  Q.  Do you recognize this as the Court's order denying the

21  telephonic mediation?

22  A.  It looks like it, yes.

23  Q.  Okay.  But the Court did give an extension of time to

24  conduct the mediation until October 31st; correct?

25  A.  Yes.

JA-401

K18VUSHH                        Liebowitz – cross

1   Q.  And it says at the bottom:  The parties shall conduct the

2   in-person mediation no later than October 31, 2019.

3   A.  Yes, I see that.

4   Q.  And to be clear, when you say in your response papers that

5   you asked for permission, you're not talking about this

6   permission that was rejected; correct?  You're talking about

7   what you now say was an October 30th permission?

8   A.  I don't understand your question.

9   Q.  Okay.  You said in your papers you asked for permission

10  prior to the mediation.  I just want to be clear whether or not

11  you're referring to this request for permission.

12  A.  Yeah, I -- I -- I said what I said.

13          THE COURT:  But the request for permission that you

14  referenced in your declaration, filed in opposition to the

15  defendant's motion, that was a reference to the request for

16  permission from the mediator to send Mr. Freeman and to have

17  Mr. Usherson participate by telephone, not a reference to this

18  letter that you submitted to me; is that correct?

19          THE WITNESS:  I'm confused.

20          I don't know what you're talking about.

21          THE COURT:  Okay.  Let me show you your declaration

22  and direct your attention to paragraph 13 of that declaration,

23  where you state:  Prior to October 31st, 2019, the mediation

24  date scheduled in this case, I sought and received approval

25  from the mediator for Mr. Usherson to attend, and so forth.

JA-402

K18VUSHH                    Liebowitz - cross

1          That is a reference to your conversation with the

2     mediator, not to this letter that you filed with me; correct?

3          THE WITNESS:  Yeah, this is -- this is -- yeah, this

4     is different.

5          THE COURT:  Okay.

6     BY MR. NEWBERG:

7     Q.  And not to the permission you asked the mediator before you

8     sent this letter to the Court; correct?

9     A.  The phone call with the mediator happened on October 30th.

10    Q.  Okay.  So after receiving this order requiring an in-person

11    mediation, the parties also received an email from the

12    mediation office confirming an in-person mediation; is that

13    correct?

14    A.  I believe so.

15    Q.  And they said on October 7th that Judge Furman has extended

16    the time to mediate to October 31st, and ask the parties to

17    contact the mediator to "arrange for an in-person session, in

18    accordance with the judge's direction."

19          Do you remember receiving those instructions?

20    A.  I believe so, yes.

21    Q.  So after receiving this order from the Court and these

22    instructions from the mediation office, what did you think was

23    required?

24    A.  Yeah.  My interpretation of the order was -- when it said

25    "in-person," is that counsel for the parties need appear in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K18VUSHH                    Liebowitz - cross

1   person, and that was my interpretation.  And then I -- and you

2   look at the S.D.N.Y. mediation rules, the rules say you could

3   ask the -- ask the mediator for permission for his or her party

4   to appear telephonically.  And that's exactly what I did.

5   Q.  That's not what you asked for to the Court.  You just asked

6   the Court for a telephonic mediation; correct?

7   A.  Yeah, telephonic at the time because it was getting close

8   to the initial conference.  And I thought that the mediation

9   with all the parties on the telephone and counsel on telephone

10  would be productive; and that the parties would reach a

11  settlement and try to save some expense and have the mediation

12  prior to the initial conference.

13  Q.  But my question is you didn't tell the Court, when you

14  asked for permission, I just want -- I'm asking for a

15  telephonic conference for lead counsel or the party, you just

16  said a telephonic conference; correct?

17  A.  Yeah, just telephonic conference.

18  Q.  And the Court denied that and said it had to be an

19  in-person mediation; correct?

20  A.  Yeah, in-person.

21  Q.  So who did you think had to be in person?

22  A.  Yeah, in person, according to the mediation rules, is trial

23  person who's going to prepare --

24  Q.  Mr. Liebowitz, you had a court order at this point saying

25  you needed in-person mediation.  Who did you think at the time

JA-404

K18VUSHH                    Liebowitz - cross

1   the Court was referring to when it said you needed to have an

2   in-person mediation?

3   A.  In-person, meaning counsel.

4   Q.  Not parties?

5   A.  Not parties.

6   Q.  And did you ever seek to clarify this with the Court?

7   A.  I didn't seek to clarify it because that's my assumption of

8   what I believed "in-person" meant.  And then according to the

9   mediation rules, which is what I, you know, looked at and have

10  done in the past, and routinely what magistrate judges in this

11  district often do in their rules was say that you could seek

12  the permission from either the mediator or from the assigned

13  magistrate judge, if a party resides more than 100 miles away,

14  they could get their permission for the client to appear

15  telephonically.  And that's what I did.

16          THE COURT:  You didn't seek Mr. Newberg's consent for

17  either of those things, did you?

18          THE WITNESS:  No, because that -- the rules say that

19  you have to get the mediator's permission for the parties to

20  appear telephonically, and that's what I did.

21          THE COURT:  All right.

22          MR. NEWBERG:  Sorry, your Honor.

23          THE COURT:  In the *Sadowski* matter, you declined to

24  grant consent to your adversary for permission for the client

25  to appear by telephone; correct?

JA-405

61

K18VUSHH                    Liebowitz – cross

1           THE WITNESS:  Yeah.  But then the other side got the

2    permission from this mediator, and it was granted, and --

3           THE COURT:  But, in other words, you didn't respond

4    saying, My consent is irrelevant; you need to seek permission

5    from the mediator.  You declined to grant consent; correct?

6           THE WITNESS:  Well, I'm not responsible for them

7    looking at the rules.

8    BY MR. NEWBERG:

9    Q.  Do you recall my email to you after the court order

10   requiring an in-person mediation, giving you various dates and

11   asking you to pick a date that you and Mr. Usherson could be in

12   New York and attend the mediation?

13   A.  I believe I saw that email.

14   Q.  And you immediately, within a few minutes of me sending

15   that email, responded and chose October 31st; correct?

16   A.  I believe, yeah.  Yes.

17   Q.  And that was the last possible day under the Court's order;

18   correct?

19   A.  Yes.

20   Q.  Did you check with Mr. Usherson that October 31st would

21   work for him to get to New York before you chose that date?

22   A.  Yeah, I believe so.

23   Q.  But you had not submitted any emails between you and

24   Mr. Usherson to the Court; correct?

25   A.  No.

JA-406

62

K18VUSHH                    Liebowitz - cross

1   Q.  How did you communicate that to Mr. Usherson?

2   A.  Yes, by telephone.

3   Q.  So by telephone, between 3:29 p.m. on October 7th, and 4:22

4   p.m. on October 7th, you confirmed with Mr. Usherson that he

5   could be in New York on October 31st?

6   A.  Yes, if necessary.  And I did say that -- you know, that

7   often these courts allow parties to appear telephonically if

8   they live more than 100 miles away; and that in this case it

9   shouldn't be a problem.  I had a relationship with this

10  mediator; he's approved clients to appear telephonically five

11  other times; and I was sure that this would not be -- would be

12  the same thing.

13  Q.  So you didn't respond to me when I said, Hey, here's some

14  dates.  When can you and Mr. Usherson be available in New York?

15  You didn't respond saying, Well, I'm going to ask the mediator

16  for Mr. Usherson to appear telephonically.

17  A.  Yeah.  I mean, the rules say you have to get the mediator's

18  permission.

19  Q.  That's not my question.

20          My question is you didn't respond to me when I said,

21  Here's some dates.  When can you and Mr. Usherson be in New

22  York?  You didn't respond to me saying, I'm actually going to

23  ask for him to appear telephonically.

24  A.  Yeah.  If I didn't ask, I didn't ask.  But I didn't believe

25  it was necessary.

JA-407

K18VUSHH                    Liebowitz – cross

1           THE COURT:  Just yes or no.

2           THE WITNESS:  No.

3           THE COURT:  Thank you.

4    Q.  And if you had a networking event scheduled for Los Angeles

5    the night of October 30th, why did you pick the October 31st

6    date?

7    A.  Because I was available then.

8    Q.  You viewed that as an available date, even though you had a

9    marketing event on the night of --

10   A.  It wasn't a marketing event.

11   Q.  I'm sorry, a networking event?

12   A.  Yeah, a networking event.

13   Q.  That you were hosting?

14   A.  Yeah, the night before.  It was no problem.  The next day

15   I'm available.

16          THE COURT:  What time was the networking event

17   scheduled for?

18          THE WITNESS:  I forgot the time, but it was in the

19   early evening.

20   Q.  Do you know when it was over?

21   A.  I don't know the exact time, no.

22   Q.  Do you know when the last flight was out of Los Angeles

23   that night?

24   A.  It was, I think they had a red-eye at, you know, midnight

25   or 1 a.m.  I mean, I don't know.

JA-408

64

K18VUSHH                    Liebowitz - cross

1   Q.  Are you actually aware of that or are you speculating?

2   A.  Yeah.  No, I go to California; I know these flights.

3   Q.  So you believe there was a red-eye coming back after

4   midnight, midnight or 1 a.m.?

5   A.  I believe so.  I mean, this is -- or they add flights from

6   California to New York, I believe it's very often.

7           And -- but, as I said all along, the mediator granted

8   my client to appear telephonically, and granted Mr. Freeman to

9   appear on my behalf, just like in other mediations.

10          THE COURT:  Okay.  I got it.

11  Q.  Not to get into semantics, Mr. Liebowitz, but if you

12  actually got a 1 a.m. red-eye, with the time change, doing the

13  math, you wouldn't have been able to make an early morning

14  mediation --

15  A.  Of course I would.  I think it would have gotten in about

16  6:30.

17          MR. FREEMAN:  Objection, your Honor.

18          It wasn't early morning.  He's misrepresenting the

19  record.  It was a noon mediation.

20          MR. NEWBERG:  I'll strike that.

21          THE COURT:  In any event, it would have to be a

22  supersonic flight to get here by 6 a.m.

23          MR. NEWBERG:  Thank you, your Honor.

24  BY MR. NEWBERG:

25  Q.  I just have a couple more questions.

JA-409

65

K18VUSHH                    Liebowitz - cross

1      I'm going to hand you what I have -- hand you what has

2   been entered already as Exhibit 8 to my declaration in this

3   case.

4          MR. NEWBERG:  Your Honor, I'll mention that this

5   particular exhibit does not have the mediator's name redacted;

6   but since we are not entering it, we're just referring to the

7   record, I assume that's okay for now.

8          THE COURT:  Yes.  The docket contains the document

9   redacted, so that is part of the record.

10         MR. NEWBERG:  Great.  Thank you.

11  BY MR. NEWBERG:

12  Q.  I'm going to present you with an email string here between

13  me and the mediator that goes from 8:15 p.m. to 10:03 p.m. on

14  the night of October 30, 2019, the night before the mediation.

15         Do you see at 8:15 p.m., where he says he talked to

16  you and you'd been tied up?

17  A.  Yes, I see that.

18  Q.  So he doesn't say you're out of town, right?

19  A.  Yeah, I don't see that.

20  Q.  And he says:  Hopefully, we can settle this before need to

21  go to in-person mediation.  Do you see that?

22  A.  Yes.

23  Q.  And then when I say in response to his statement about

24  in-person mediation that I would have assumed Mr. Usherson

25  either flew to New York tonight or is likewise on a very early

JA-410

K18VUSHH                        Liebowitz – cross

1    plane, he responds:  I understand.  Do you see that?

2    A.  Yeah, I see that.

3    Q.  He doesn't say Mr. Usherson is not coming to the

4    deposition, does he?

5    A.  Yeah, I don't see -- he didn't say that.

6    Q.  Even though it's 10:03 p.m. on the night before the

7    mediation?

8    A.  Yeah, I can't speculate to what -- all I see here is that

9    he said "I understand."

10   Q.  And do you see anything in here that there's any indication

11   as of 10:03 p.m. the night before the mediation, that the

12   mediator had any idea that you or your client would not be at

13   the mediation?

14   A.  From this email chain?

15   Q.  Yes.

16   A.  No, I don't -- I don't see that.

17          But it was the mediator's obligation in -- you know,

18   to advise you, and I'm sorry that that didn't happen.  I

19   mean --

20   Q.  So this doesn't refresh your recollection that even on

21   October 30th at 10:03 p.m., the mediator had no idea you and

22   your client would not be attending the mediation?

23   A.  No, I didn't say that he didn't know.  I did tell him.  And

24   just because he said "I understand," I don't know what was

25   going through his mind when he wrote that email.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JA-411

K18VUSHH                    Liebowitz - cross

1    Q.  I'm going to hand you Exhibit 9 to my declaration, which is

2    your email that you've testified about today sending revisions

3    to a proposal.  I'll represent the 4:12 a.m. is eastern time.

4    I assume that was 1:12 a.m. where you were on the west coast.

5            Do you recognize this email?

6    A.  Yes, I do.

7    Q.  And you say:  Attached please find revisions to the

8    agreement which can be discussed at the mediation.

9            Do you see that?

10   A.  Yes, I did.

11   Q.  So even then, you didn't mention you wouldn't be at the

12   mediation; correct?

13   A.  I never said that.  But I copied Mr. Freeman and the

14   mediator and you on the email.

15   Q.  Okay.  But you never said in this email, "I won't be

16   there"?

17   A.  No, because I had the conversation with the mediator the

18   night before.

19   Q.  And you never said in this email, even at 4:12 a.m. the

20   morning of the mediation, "My client won't be there"?

21   A.  No, because I told the mediator the night before.

22   Q.  And you mentioned Mr. Freeman is cc'd on this.  Am I

23   correct in stating this is the very first email in this case

24   that you sent to me where Mr. Freeman was cc'd?

25   A.  Oh, that I don't know.

JA-412

K18VUSHH                    Liebowitz - cross

1  Q.  Are you aware as you sit here today of any other emails you

2  ever sent, any communications you ever sent in this case where

3  Mr. Freeman was cc'd?

4  A.  I don't know.

5  Q.  Do you know why you didn't have Mr. Freeman enter a notice

6  of appearance before the mediation?

7  A.  Yeah.  I mean, sometimes Mr. Freeman makes notice of

8  appearance and sometimes not.  It's never been an issue.

9  Q.  As you sit here today, do you still maintain that when

10 Mr. Freeman put in a sworn declaration that he'd never known

11 about the existence of this matter before 8 p.m. October 30th,

12 that was incorrect?

13 A.  Listen, I -- I don't -- I -- whether -- I believe we had

14 the conversation, you know, we -- we -- our office is --

15 offices are near each other.  And it could have been a brief --

16 you know, I do know that we -- you know, I did say that the

17 mediation, you know, was on the 31st; and that I did tell --

18 ask the mediator if Mr. Freeman could appear on my -- I'm

19 sorry, I did --

20 Q.  My question was why Mr. Freeman didn't enter a notice of

21 appearance.

22 A.  Yeah, because --

23 Q.  I'm sorry.  Actually my question was is it still your

24 testimony that Mr. Freeman's sworn declaration is incorrect?

25 A.  I'm not saying it's incorrect.  It could have been lack of

**JA-413**

K18VUSHH                    Liebowitz - cross

1    memories of what occurred, you know.  Not everyone is perfect

2    in this world.  You know, people forget.  And if I said I had a

3    conversation and he said we didn't, it's -- it's -- at the end

4    of the day, he was at the mediation prepared to settle the

5    case, where there were two lawyers in my firm prepared to

6    settle the case.

7    Q.  But is it your testimony that his sworn declaration is

8    incorrect or you simply don't remember who's correct?

9    A.  I believe the conversation -- I mean it -- it -- it -- it

10   could have been brief.  I mean it -- it -- it -- he was

11   prepared at the mediation that day to settle the case.  He was

12   fully aware of the fact --

13   Q.  That's not my question, Mr. Liebowitz.

14            MR. FREEMAN:  Your Honor, I believe we've already

15   covered this territory previously.  He's asking the same

16   questions over and over.

17            THE COURT:  Overruled.

18            Ask your question again.

19   BY MR. FREEMAN:

20   Q.  My question is, as you sit here today under oath in a court

21   of law, is it your position that Mr. Freeman's sworn

22   declaration is incorrect or that you don't remember who is

23   correct?

24   A.  I'm not saying --

25            THE COURT:  Mr. Liebowitz, let Mr. Newberg finish

K18VUSHH                    Liebowitz - cross

1   please.

2   Q.  Or that you don't remember who is --

3   A.  I'm not saying that his declaration is incorrect at all.

4   Just my memory said that we had the conversation.  If his

5   memory said no, it -- it -- he was fully prepared that day to

6   have the mediation and negotiate in good faith to get to a

7   resolution.  And he was there.  He showed up with two lawyers.

8   It was Mr. Freeman and Ms. Liebowitz, and he was prepared to

9   settle the case that day.

10  Q.  And you've seen the mediator's declaration in this case;

11  correct?

12  A.  I believe so.

13  Q.  And you're aware in it he says you never asked for and he

14  never gave you permission for your client to attend

15  telephonically?

16  A.  I did see that.

17  Q.  And you're aware that in it he says he never gave you

18  permission for you not to attend and to send someone else in

19  your place?

20  A.  Say that again.

21  Q.  Are you aware he says in his declaration he never gave you

22  permission for you not to attend and to send somebody else?

23  A.  Yeah, I did see that.

24          MR. NEWBERG:  That's all I have, your Honor.

25          THE COURT:  All right.

JA-415

K18VUSHH                    Liebowitz - cross

1          I have a couple more questions, and then limited

2     redirect.

3          First, I'm going to show you a document at docket

4     16-2; it's Exhibit 2 to Mr. Newberg's declaration.  And

5     beginning at page 3 of that document, this is an exchange of

6     emails in advance of the October 10th initial conference, the

7     conference of that subsequently adjourned regarding the

8     mediation that you were trying to schedule in that week; is

9     that correct?

10          THE WITNESS:  I don't understand the question.

11          THE COURT:  I'm just trying to set the context.

12          THE WITNESS:  Okay.

13          THE COURT:  This is an exchange of emails between you

14     and Mr. Newberg on October 3rd.

15          THE WITNESS:  Yes.

16          THE COURT:  In advance of what then was a conference

17     scheduled for October 10th.

18          THE WITNESS:  Yes.

19          THE COURT:  Okay.  And directing your attention to the

20     bottom of page 3, this is an email from Mr. Newberg at 10:04

21     a.m. on October 3rd.  He states:  I actually will be in New

22     York -- and for your convenience, I've underlined these -- on

23     Monday for a settlement meeting that will end around 3 p.m.  I

24     could be at the courthouse at 3:30 p.m., but I would have to

25     check with my client that he is available on such short notice.

JA-416

72

K18VUSHH                    Liebowitz - cross

1    Is Mr. Usherson also available then?

2            Correct?

3            THE WITNESS:  Yeah, this is what he said.

4            THE COURT:  All right.  In an email later in the

5    chain, this is further on -- well, let me skip to page 2.  This

6    is an email from you later that morning at 10:28 a.m.  You

7    state at the end of that email:  If you have authority from

8    your client, just the lawyers can be on the phone.

9            Correct?  Page 2.

10           THE WITNESS:  Page 2.

11           THE COURT:  Do you see the email, 10:28 a.m.?

12           THE WITNESS:  Yes.

13           THE COURT:  You state:  We can do via phone if all the

14   parties agree.  And then:  If you have authority from your

15   client, just the lawyers can be on the phone.  Correct?

16           THE WITNESS:  Yes, that's what I said.

17           THE COURT:  That's in reference to the mediation?

18           THE WITNESS:  Yes, it must have been.

19           THE COURT:  And that's actually incorrect; correct?

20   You need permission from the mediator for the client not to

21   appear in person; is that correct?

22           THE WITNESS:  Yeah.  And the reason why I said that is

23   because --

24           THE COURT:  I'm just asking you based on your

25   testimony today, you understand that that is an incorrect

**JA-417**

K18VUSHH                    Liebowitz - cross

1   statement of the mediation rules; that mediation rules require

2   a party to appear in person, but allow a mediator to grant

3   permission to appear telephonically; correct?

4           THE WITNESS:  Yes, if that --

5           THE COURT:  So it is incorrect to say that if you --

6   namely, defense counsel -- have authority from the defendant,

7   then just the lawyers can be on the phone, that's an incorrect

8   statement.

9           THE WITNESS:  Yeah, well, if the mediation -- that was

10  going to allow that, then that's --

11          THE COURT:  Where in the mediation rules is there

12  anything that states that with the permission of the parties,

13  that counsel can participate without the parties in the

14  mediation?

15          THE WITNESS:  I don't think so.

16          But the reason why is because also as a custom and

17  practice with this mediator, that not all the times were the

18  clients on the phone.  And it was between -- sometimes it was

19  just, you know, with the lawyers on the phone.

20          I want to say from the outset that, you know, this --

21  you know, the relationship with the mediator in this case, you

22  know, was very -- it was lax.  And, you know, that's why I

23  think that most of the time it was successful, because --

24          THE COURT:  All right.  Let me stop you there.

25          And then Mr. Newberg responded -- this is at 11:10

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JA-418

74

K18VUSHH                    Liebowitz - cross

1   a.m. -- an email that begins on the bottom of page 1 and

2   continues to page 2, and drawing your attention to the top of

3   page 2, he states:  Also, the Court's rules are clear that all

4   parties must attend mediations without exception, and even

5   suggests that the mediation is pointless without the parties.

6   Our clients cannot simply give us authority.  The rules also

7   say that everyone must be there in person; although if a party

8   has a particular hardship, they may apply to attend

9   telephonically.  Do you see that?

10              THE WITNESS:  Yes.

11              THE COURT:  Then you responded to that email -- this

12  is on page 1 -- at 12:02 p.m. that same day; correct?

13              THE WITNESS:  I responded at 10:28.

14              THE COURT:  Well, you can't respond to an 11:10 email

15  at 10:28.

16              THE WITNESS:  Oh, I'm sorry.

17              THE COURT:  So that defies time/space relations,

18  but --

19              THE WITNESS:  Oh, I'm sorry, 12:02.

20              THE COURT:  Okay.  And you didn't say anything there

21  about the custom and practice with this mediator of allowing

22  clients to appear by telephone, did you?

23              THE WITNESS:  No, I never said that.  It was just

24  assumed that --

25              THE COURT:  All right.

JA-419

75

K18VUSHH                    Liebowitz - cross

1          And you didn't say anything in there about asking for

2     Mr. Newberg's consent to basically disregard that rule and

3     allow mediation with only lawyers, did you?

4          THE WITNESS:  No, I never said that.  But the custom

5     and practice, again, is the mediator --

6          THE COURT:  I got that already.

7          Let's talk a little bit about that custom and

8     practice.  That custom and practice is based on the five cases

9     that are cited in your letter of, I think, December 16th; is

10    that correct? correct?  The five cases that you referenced --

11         THE WITNESS:  If that was the date, that was the date.

12         THE COURT:  All right.  Well, the five cases that

13    Mr. Freeman asked you about earlier this morning?

14         THE WITNESS:  Yes.

15         THE COURT:  And is that the full universe of cases

16    that you had had mediations with this same mediator?

17         THE WITNESS:  I believe so.

18         THE COURT:  Okay.

19         And so in every case that you had had a mediation with

20    this mediator, your client had participated by telephone; is

21    that correct?

22         THE WITNESS:  On those five, and then this one, six,

23    the mediator --

24         THE COURT:  My question is are there any mediations

25    that you've conducted with this mediator where the client

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JA-420

76

K18VUSHH                    Liebowitz - cross

1  participated in person?

2            THE WITNESS:  I don't believe so.

3            THE COURT:  Did you make any sort of record of the

4  permissions that you received in those cases?

5            THE WITNESS:  I am not sure, but it was routine,

6  always --

7            THE COURT:  Is there any written record in your office

8  that you obtained permission?

9            THE WITNESS:  I don't believe so.

10            THE COURT:  Okay.

11            And how did you generate this list?  It was just a

12  list of all the mediations that you'd conducted with the

13  mediator?

14            THE WITNESS:  Yes, I believe so.

15            THE COURT:  Any other questions?

16            MR. NEWBERG:  I do.  Just a couple, your Honor.

17  BY MR. NEWBERG:

18  Q.  I just want to be clear.  You're saying it was the custom

19  and practice with this mediator to not even have clients appear

20  at all, not even on the phone?

21  A.  Sometimes, if -- if I had authority, you know, to settle,

22  then it wasn't necessary to get the client on the phone.  This

23  is very -- the reason why I recommended this mediator is

24  because I thought he was successful in the past, and that --

25  that we would get to a resolution.  And it was a very lax, you

JA-421

K18VUSHH                    Liebowitz - cross

1    know, relationship, and --

2              THE COURT:  I got it.

3              Turning to page 2 of docket number 41, I think that

4    is, is that a list of five cases, just to have it in front of

5    you?  Is it your testimony -- let me ask differently.

6              Did any of those mediations occur without the

7    participation of the client in any way, shape, or form; in

8    other words, by telephone or in person?

9              THE WITNESS:  I believe *Emerson* -- you know, we got to

10   an agreement fairly quickly, so I don't think -- I don't

11   think --

12             THE COURT:  Your recollection is --

13             THE WITNESS:  I don't -- I actually, on that one, I

14   don't even believe that -- oh, on *Emerson*, now I know.  I

15   believe the defense -- the defense counsel was there, not his

16   client, but I think he was -- they were available via

17   telephone.  I know that my client wasn't -- wasn't there.  So

18   in that case, the clients on both sides didn't appear.

19             THE COURT:  But your client didn't participate in any

20   way?

21             THE WITNESS:  No, I mean it was -- I had authority,

22   and he would have been available via telephone.

23             THE COURT:  It's a straightforward question.

24             In any of those five mediations, did the client not

25   appear in any -- at all?  In other words, did you participate

K18VUSHH                    Liebowitz – cross

1   without the participation of the client?

2           THE WITNESS:  They were all available by telephone.

3           THE COURT:  That's not my question.  I'm not asking

4   whether they were available.  I'm asking whether they appeared

5   in connection with the mediation, whether in person or via

6   telephone.

7           THE WITNESS:  That I don't know.  It could have been

8   in some of them, it was just so quick, that it wasn't, you

9   know, necessary to call.  And we were just hashing out the

10  nonmonetary terms.  I don't recall.  But oftentimes these

11  mediations were very short.

12          THE COURT:  Okay.

13          Anything else, Mr. Newberg?

14          MR. NEWBERG:  Yes.

15  BY MR. NEWBERG:

16  Q.  Just on this, I want to be clear what you're testifying in

17  sworn testimony to, Mr. Liebowitz.

18          Without being able to point to an actual case where no

19  clients attended by phone or otherwise, you're claiming that

20  this mediator, a mediator of this Court, was custom and

21  practice to completely violate the Court's mediation rules, is

22  that what you're testifying?

23  A.  I -- I don't understand your question.

24  Q.  You've said it was his custom and practice to not even have

25  clients appear at all, not even by phone.

JA-423

K18VUSHH                    Liebowitz - redirect

1   A.  No, I -- I mean -- if -- if the lawyers have authority to

2   settle on behalf of clients, and the client's available via

3   telephone --

4   Q.  You didn't say that, Mr. Liebowitz, not the client's

5   available by telephone.  You asked me -- the Court asked you

6   about it -- if I had my client's consent, the client wouldn't

7   have to appear at all.  You didn't say, Be available by

8   telephone.  You said not participate; correct?

9   A.  Yeah, well, they are available via telephone.  And if we

10  got to a resolution and it wasn't necessary, I mean they are

11  available via telephone.  I mean this is -- this is what --

12  Q.  That's all I have.

13              THE COURT:  All right.

14              I think we need to take a break -- if not now, then

15  after the redirect, but how much -- do you have any redirect?

16              MR. FREEMAN:  Yeah.  It would just be a couple of

17  minutes.

18              THE COURT:  All right.

19              Let's finish that up quickly, and then we'll take a

20  break.

21              Go ahead.

22  REDIRECT EXAMINATION

23  BY MR. FREEMAN:

24  Q.  Thank you, Mr. Liebowitz.

25              So when did you graduate law school?

JA-424

K18VUSHH                    Liebowitz – redirect

1   A.  I graduated law school, I believe, 2014.

2   Q.  And when did you first file your first case?

3   A.  I believe 2016.

4   Q.  Was it in January 2016?

5   A.  I believe so.

6   Q.  And you were admitted to the bar in September 2015?

7   A.  Yes.

8   Q.  And since that time, January 2016, approximately how many

9   cases has the Liebowitz Law Firm filed?

10  A.  Filed approximately 2,000.

11  Q.  2,000 --

12  A.  2,000 cases countrywide.

13  Q.  And at the time of the mediation, approximately how many

14  cases did you have pending on your docket?

15  A.  At the time of this mediation, it was definitely over 100.

16          THE COURT:  Hold on one second, counsel.

17          (Pause)

18          THE COURT:  All right.  You can proceed, counsel.

19  BY MR. FREEMAN:

20  Q.  Would it surprise you to know that at the time of the

21  mediation, you had -- the Liebowitz Law Firm had over 400 cases

22  pending in federal court?

23  A.  Yeah, that could be.  That could be.

24  Q.  And how many lawyers do you have employed, besides you, at

25  Liebowitz Law Firm?

K18VUSHH                    Liebowitz - redirect

1   A.  So I only have Mr. Freeman and now my sister,

2   Ms. Liebowitz, that just recently got admitted.  But that's it.

3   Q.  So essentially -- would it be accurate to state that you

4   essentially have two lawyers handling over 400 cases at one

5   time?

6   A.  Yes.

7   Q.  And is it your belief that that might explain why there

8   have been administrative failures on your part, as well as the

9   firm's part?

10          THE COURT:  Sustained as to form.

11  Q.  Since November of 2019, have you retained outside counsel

12  to help instruct you in terms of any matter?

13  A.  Yes.  I have retained a counsellor to help out on business

14  management and to help out with, you know, situations that may

15  arise and that could help with the practice.  Because it is --

16  there's a lot of cases, and it's -- we try our best, you know,

17  to -- to try to help, you know, the photography community.

18          And it's -- it's -- we are doing all we can now to fix

19  the mistakes that we've done in the past and make sure that

20  things don't happen again.  And I -- you know, I'm getting

21  advice from an outside lawyer on how to make things better and

22  how to clean up everything.  And I know that, you know, certain

23  things are not best practice, and I understand that.  And I

24  understand that things need to change.  And I am speaking with

25  a reputable lawyer to help out in these situations so that

JA-426

82

K18VUSHH                    Liebowitz - redirect

1    things like this don't happen again; and that all the T's are

2    crossed and I's are dotted.  And I want to make sure that

3    everything is perfect with the courts and that things like this

4    don't happen again.

5            THE COURT:  And just out of curiosity, when you say

6    "things like this," what are you referring to?

7            THE WITNESS:  I'm just talking about, you know, best

8    practices, like, you know, getting things in writing, you know,

9    making sure that everything is calendared, making sure --

10   getting a system of -- a calendaring system, you know, trying

11   to get like a customized one, with the amount of volume that we

12   have, to just make sure everything is on the calendar when

13   things are due, when motions are due, when there's conferences,

14   when there's mediations.

15           And I'm in the process of putting all that together so

16   that, going forward, that nothing is missed and everything is

17   calendared, and making sure that things run smoothly going

18   forward.

19           MR. FREEMAN:  I have no further questions, your Honor.

20           THE COURT:  All right.

21       You may step down, Mr. Liebowitz.

22       (Witness steps down)

23           THE COURT:  Let's, in deference to the court reporter,

24   take a brief break.

25           I would assume that Mr. Newberg's testimony will be

JA-427

K18VUSHH                    Newberg – cross

1    relatively short.

2            MR. FREEMAN:  Yes, very short, your Honor, from our

3    side.

4            THE COURT:  Very good.  In that case, we'll stick with

5    the order.  And I feel a little bad that the mediator has been

6    stuck here all morning, but I think we'll stick with the order

7    in light of that.

8            Let's pick up again in, let's say, seven minutes, and

9    we'll go from there.  Thank you.

10           (Recess)

11           THE COURT:  All right.

12           Mr. Newberg, take the stand, and my deputy will

13   administer the oath to you.

14   BRAD R. NEWBERG,

15       called as a witness on his own behalf,

16       having been duly sworn, testified as follows:

17           THE COURT:  All right.  Cross-examination.

18   CROSS-EXAMINATION

19   BY MR. FREEMAN:

20   Q.  Good morning, Mr. Newberg.

21   A.  Good morning.

22   Q.  So during the cross-examination of Mr. Liebowitz, you had

23   introduced into evidence the procedures of the mediation

24   program, do you recall?

25   A.  Yes.

K18VUSHH                    Newberg - cross

1   Q.  Yes.

2          Is there anything in those rules which require

3   Mr. Liebowitz to advise you, opposing counsel, of whether or

4   not his clients are appearing telephonically or whether or not

5   his associate would appear in his stead?

6          THE COURT:  Counsel, the rules speak for themselves,

7   and you don't need to use the witness to make a legal argument.

8          MR. FREEMAN:  Fair enough.

9          THE COURT:  So let's just stick to the facts and keep

10  this as short as possible.

11         MR. FREEMAN:  Okay.  Great.

12  Q.  So I'd like to direct your attention -- do you recall on

13  November 6 submitting a declaration to the Court in support of

14  defendant's motion for sanctions?

15  A.  Yes, I do.

16  Q.  And do you recall that you -- that there was a paragraph in

17  your declaration where you discussed what happened when you

18  arrived at the mediation at 11:45 a.m.?

19  A.  I do.

20  Q.  And do you recall that you had a discussion with the

21  mediator before Liebowitz Law Firm's attorneys arrived?

22  A.  Yes.

23  Q.  Can you please explain to the Court to the best of your

24  recollection exactly what was said?

25  A.  Sure.  Obviously, besides pleasantries, in terms of this,

JA-429

85

K18VUSHH                    Newberg – cross

1    the subject came up at some point where we were talking, and I

2    mentioned meeting Mr. Liebowitz in person, since I hadn't in

3    the past.  And it is my recollection that at that point, the

4    mediator had said, I just heard, the mediator said, late last

5    night or this morning, that Mr. Liebowitz isn't going to be

6    here.  He was clear he did not give permission for that, but

7    was just sort of told; he didn't say it in any way.

8              I asked him point-blank, I said, That's not

9    acceptable.  I assume Mr. Usherson would be here.

10             And he sort of gave a sigh.  He said, I don't know

11   anything about whether Mr. Usherson is coming or not.  And he

12   suggested that based on his experience with Mr. Liebowitz, but

13   not his experience of granting permission, his experience just

14   of Mr. Liebowitz being Mr. Liebowitz, he said he's not hopeful

15   about Mr. Usherson, but he expected him to be there.

16   Q.  So is it your testimony that Mr. Liebowitz's testimony that

17   he spoke to the mediator about obtaining permission, is your

18   testimony in your declaration, specifically paragraph 46 and

19   47, doesn't it corroborate Mr. Liebowitz's testimony that he

20   obtain permission?

21             MR. FORESTA:  Objection, your Honor.

22             THE COURT:  Sustained.

23   Q.  At the time that the mediator advised you that

24   Mr. Liebowitz would not be attending, did you object to

25   proceeding with the mediation?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JA-430

K18VUSHH                    Newberg – cross

1   A.  I did.  I stated that I did not think -- I stated that

2   there was a court order that there had to be an in-person

3   mediation.  He was expected to be there.  His client was

4   expected to be there.  And I did not think the mediation could

5   proceed without the parties and counsel being there.

6   Q.  And what was the mediator's response to that objection?

7   A.  The mediator's response was that he understood completely.

8   Q.  Did the mediation proceed?

9   A.  I would not really say that the mediation proceeded.

10          You arrived, Mr. Liebowitz's sister.  I made clear my

11  displeasure with the violation of the court rules.  And I spoke

12  to my client.  We decided, You know what?  We're here.  We'll

13  make an offer.  You went to see if you could get your client on

14  the phone --

15          THE COURT:  We're veering beyond the subject matter of

16  the hearing, so next question.

17          MR. FREEMAN:  I got you.  Okay.

18  Q.  I want to move to another topic then.

19  A.  Sure.

20  Q.  After defendant -- after the defendant's motion for

21  sanctions was fully briefed, is it correct that your client

22  settled the case?

23  A.  It is correct.

24  Q.  Yes.

25          And did you, on behalf of your client, sign a

K18VUSHH                    Newberg - cross

1    stipulation stating that all parties would bear their own costs

2    and attorneys' fees?

3                THE COURT:  Sustained.  This is not relevant to the

4    subject matter of this hearing.  And it's also a matter of

5    record if he did or didn't.

6                Can I go back to the conversation that you had with

7    the mediator when you arrived at the mediation.

8                Is it your testimony that he specifically said that he

9    had not granted permission for Mr. Liebowitz not to appear in

10   person?  In other words, can you tell me --

11               THE WITNESS:  I did not ask the question, Did you give

12   permission.  Your Honor, I cannot answer that question with 100

13   percent surety that it would be accurate whether he said the

14   words "I did not grant permission."  It was very clear that he

15   was simply notified.  He did not say he gave permission, and he

16   said -- he said, I was notified.  I don't even necessarily know

17   what that means.  It could have been a voicemail.

18               THE COURT:  And did he say anything about Mr. Freeman

19   or another lawyer appearing instead of Mr. Liebowitz?

20               THE WITNESS:  He said -- when he said, I was informed

21   he's not going to be here, he said he's sending an associate of

22   his.

23               THE COURT:  Go ahead.

24               MR. FREEMAN:  I have no further questions, your Honor.

25               THE COURT:  All right.  Any redirect?

JA-432

K18VUSHH                    Newberg – cross

1          MR. FORESTA:  Nothing, your Honor.

2          THE COURT:  All right.

3          MR. FORESTA:  Thank you.

4          THE COURT:  I have a couple questions, actually.

5          You had a conversation with the mediator after Mr.

6   Liebowitz filed his opposition to your motion; is that correct?

7          THE WITNESS:  That is correct, your Honor.

8          THE COURT:  Am I correct that was on or about November

9   19th?  Does that sound right?

10          THE WITNESS:  That sounds accurate, your Honor.  I

11  would stand by my declaration which was drafted soon

12  thereafter.

13          THE COURT:  I appreciate looking at me, but more

14  important to speak into the microphone.

15          And during that conversation, did the mediator tell

16  you about his communications with Mr. Liebowitz in advance of

17  the mediation?

18          THE WITNESS:  No, he did not.  He actually

19  specifically said that he did not grant permission.  He did not

20  at that point raise this idea of how he was informed.  He just

21  told me that he had granted permission for these two things in

22  other cases, but he was adamant that he did not in this case.

23          THE COURT:  Okay.

24          Did he tell you during that conversation that he had

25  been informed that Mr. Liebowitz would not be appearing in

K18VUSHH                    Newberg - cross

1    person and was sending an associate?

2              THE WITNESS:  I do not recall, but I don't think so.

3              THE COURT:  Okay.

4              All right.  I have no further questions.

5              I think you can step down, and we can put the

6    mediator -- well, either put him out of his misery or put him

7    into further misery, I don't know, but let's call the mediator.

8              (Witness steps down)

9              MR. FREEMAN:  Your Honor, I have a logistical issue to

10   raise with the Court.

11             Regarding the mediator's testimony, we do want to get

12   into the custom and practice evidence.  If it pleases the

13   Court, we'd just like to submit the five docket sheets to the

14   witness at the outset, if that's okay.

15             THE COURT:  That's fine.

16             MR. FREEMAN:  Okay.

17             MR. NEWBERG:  And, your Honor, the order states that

18   you'll go first; and then I don't know who you want --

19   Mr. Liebowitz's counsel, Mr. Freeman, or I -- to go next.

20             THE COURT:  I'm sorry, say that again.

21             MR. NEWBERG:  Your order says that you will be going

22   first.  I assume that's still the process.  And I don't know

23   which of the sides you want to go next.  I don't know if you

24   want to decide that on the fly or now.

25             THE COURT:  I will start, and then why don't I give

JA-434

90

K18VUSHH                     Mediator - direct

1    you, at this stage, thereafter, and then Mr. Freeman

2    thereafter.  All right?

3              MR. NEWBERG:  Thank you.

4              THE COURT:  Sir, you can step up to the witness box.

5    THE MEDIATOR,

6         called as a witness by the Court,

7         having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY THE COURT:

10   Q.  I will provide the name to the court reporter for the

11   record, but will not mention it here to preserve

12   confidentiality.  And I'll refer to you just as "the mediator,"

13   rather than by name.  So thank you for joining us, sir.  And

14   I'm sorry for keeping you waiting all this morning.  I

15   appreciate your presence here and your patience.

16             Let me ask you some questions about your declaration

17   in this matter and your experience with Mr. Liebowitz.

18             Let me start with your relationship and prior

19   experiences with Mr. Liebowitz.

20             First of all, do you have any relationship with him

21   outside of the mediations that you've conducted?

22   A.  No, I've only -- sorry.  I've only met Mr. Liebowitz

23   through the mediation process.

24   Q.  All right.  And approximately how many times have you

25   conducted mediations in his cases?

JA-435

K18VUSHH                    Mediator - direct

1   A.  Approximately a half a dozen or so.

2   Q.  And when was the first time, approximately?

3   A.  Six to nine months ago.

4   Q.  All right.  So in 2019?

5   A.  Yes.

6   Q.  And in each of those -- and in the half dozen or so that

7   you've conducted, how many has he appeared in person?

8   A.  Certainly the majority of them.

9   Q.  And when he did not, who appeared instead?

10  A.  His associate.

11  Q.  And in those cases where his associate -- sorry, by

12  "associate," is it Mr. Freeman who's sitting at the front

13  table?

14  A.  Yes.

15  Q.  In those cases where Mr. Freeman appeared and Mr. Liebowitz

16  did not, did you know in advance that Mr. Freeman would be

17  appearing?

18  A.  I think there were two -- two times that Mr. Freeman

19  appeared.  The first time he -- I had no idea.  And the second

20  time, which would have been this -- this case, I don't think I

21  knew he appeared.  Except after I gave my declaration, just to

22  be clear, I looked at my emails and whatever.  And I noticed

23  just prior to the mediation, that I recognized that

24  Mr. Liebowitz was in L.A. at the time, I think it was 48 hours

25  before the actual mediation.  So it's possible that I could

K18VUSHH                    Mediator - direct

1    have presumed he might not be there.

2    Q.  Okay.  So prior to this case, there had been one other

3    occasion where Mr. Freeman appeared?

4    A.  That's my best recollection.

5    Q.  And in any of the other cases -- put aside this case for a

6    moment -- did you know who was the lawyer who would be

7    primarily responsible for handling trial, if the case were to

8    go to trial?  Was there any discussion about that?

9    A.  There wasn't any discussion about that.

10   Q.  Okay.  And putting aside this case, again, in any of the

11   other cases, did the client appear with Mr. Liebowitz or

12   Mr. Freeman?

13   A.  Sometimes the client appeared.  Sometimes, because of the

14   travel issues, the client didn't appear, but he was -- the

15   client -- I think it was all males -- were always available by

16   phone.  And Mr. Liebowitz had full authority to settle this

17   case.  And if the case was at a point of settlement, I would

18   talk to the client to make sure that Mr. Liebowitz had full

19   authority in that vein.

20   Q.  Okay.  And in the cases -- again, putting this case aside

21   for a moment, where the client did not appear in person, did

22   you know that in advance of the mediation?

23   A.  On a few occasions I did, on some occasions I didn't.

24   Q.  And where you didn't, in other words, you showed up at the

25   mediation expecting the client to be present to find that the

JA-437

93

K18VUSHH                    Mediator - direct

1    client was not?

2    A.   That happened, but I was assured that Mr. Liebowitz had

3    full authority to settle; and that the client would be

4    available on the telephone to answer any questions or to -- if

5    there was going to be a settlement, to affirm that the

6    settlement was in place.

7    Q.   Okay.  But to be clear, my question is prior to this case,

8    there were -- there was at least one mediation where you

9    appeared at the mediation expecting the client to be there,

10   only to find that the client was not present in person?

11   A.   Yes, that's correct.

12   Q.   All right.

13           And are there occasions prior to this case where you

14   arrived at the mediation knowing that the client would not be

15   appearing in person, but participating by telephone?

16   A.   I really don't recall.

17   Q.   All right.

18           In other words, do you recall any -- do you know of

19   any other case Mr. Liebowitz or Mr. Freeman requesting

20   permission from you for the client to participate by telephone?

21   A.   Maybe in one instance.  That was where the client was

22   actually out of the country, would be prohibitively expensive

23   for him to come here for a mediation session.

24   Q.   All right.

25           And on that occasion did you make any record of that

94

K18VUSHH                    Mediator - direct

1    fact?  Do you know if it was memorialized in any fashion?

2    A.  No, it wasn't memorialized.  I actually did -- the

3    mediation turned out to be successful.  And I talked to the

4    client; Mr. Liebowitz got him on the telephone.  I told him to

5    ascertain the settlement was -- was appropriate and agreeable.

6         And I should add that in no instance where in the

7    mediation, when we reached agreement, did Mr. Liebowitz not

8    follow through.

9    Q.  Okay.  Now, in this case, turning to this case, you spoke

10   to Mr. Liebowitz the night before the mediation on October

11   30th; is that correct?

12   A.  I believe it was October 30th.  We actually had a couple of

13   discussions, as well as with the defendant's counsel, because

14   there was a possibility that the case would settle without

15   mediation.  The defendant's counsel was in Virginia or so at

16   the time, and it could settle without actually having a

17   mediation.  Obviously that would be advantageous.

18   Q.  All right.  So I want to focus for a moment on whether

19   there were any communications with Mr. Liebowitz prior to

20   October 30th, so earlier than October 30th.  Do you recall?

21   A.  The only -- to go back a little bit, sometime early October

22   I completed a mediation with Mr. Liebowitz.  And I got a call

23   from him asking if I would mediate a case, they're under some

24   time pressures, name a mediator.  And I said if it's okay with

25   the mediation office, I would do it.

JA-439

K18VUSHH                    Mediator - direct

1      Further asked -- and I think it was on that same phone

2   call -- whether that mediation could take place by telephone,

3   since he knew that the plaintiff -- sorry, the defendant's

4   counsel was in Virginia.  And again, he said there's an expense

5   involved there, and if we can avoid it.

6      And I said as long as the mediation office said it was

7   okay, I had no problem with that.

8      Subsequently, I got a call from the mediation office

9   asking that the mediation be done in person rather than by

10  telephone.  I said that's fine as well.

11      I communicated with, I think, Mr. Liebowitz and

12  defendant's counsel.  And this was something I always ask, give

13  me a couple of dates that are agreeable to you, and I'll look

14  at my calendar and we can then have the mediation.  It's got to

15  be in person.  And I left it to the parties to work out those

16  details.

17  Q.  All right.  And at some point it was then set for October

18  31st at the courthouse; is that correct?

19  A.  That's absolutely correct.

20  Q.  All right.

21      So between the aborted telephone conference, if you

22  will, in early October, and the October 31st -- at any point

23  after the October 31st conference was scheduled, did you have

24  any telephone calls with Mr. Liebowitz prior -- between that

25  date and October 30th?

JA-440

96

K18VUSHH                    Mediator – direct

1    A.  I don't recall that.  The only conversation I had, again,

2    was with the mediation office informing them that the

3    respective parties had agreed on the 31st.

4    Q.  All right.  And then on October 30th, you had one or more

5    than one conversation with Mr. Liebowitz?

6    A.  There were more than one.  And I also talked to Mr. Newberg

7    at that time because, again, the parties weren't all that far

8    apart and, again, can avoid coming in -- if they can avoid

9    coming in, that would be fine.

10   Q.  And on that date, on October 30th, did you know where

11   Mr. Usherson, the plaintiff in this matter, was located?

12   A.  I had no idea.

13   Q.  Did Mr. Liebowitz say anything about the location of

14   Mr. Usherson in his calls with you on October 30th?

15   A.  Not that I recall.

16   Q.  And to your knowledge, I take it, you didn't say anything

17   about Mr. Usherson's whereabouts or residence prior to October

18   30th either?

19   A.  No.

20   Q.  All right.

21          Do you remember when your last conversation was with

22   Mr. Liebowitz on October 30th?

23   A.  It was sometime either late afternoon or early evening.

24   Without going into the specifics, it looks like they could have

25   reached a settlement.  Mr. Newberg had said that -- let's say

JA-441

K18VUSHH                        Mediator - direct

1    the dollar amount was probably acceptable, but he wanted a

2    written settlement agreement.

3    Q.  Let's skip over the substance of the negotiations, if you

4    will, just because that's beyond the scope of what we're doing

5    here.

6              Your testimony is that your last conversation with

7    Mr. Liebowitz was in late afternoon or early evening of October

8    30th?

9    A.  That's correct.

10   Q.  How long did that call last, to your recollection?

11   A.  Less than ten minutes.

12   Q.  And do you know where Mr. Liebowitz was at the time?

13   A.  At the time I did my declaration, I did not.  He has a

14   number that you can't tell, because it's 646, as I remember.  I

15   don't know where that is.  But I believe at one point in time I

16   became aware that he was -- he was out of state.

17   Q.  And your recollection is that at some point prior to the

18   mediation, you became aware that he was out of state?

19   A.  Yes, that's -- my records indicate that.

20   Q.  And your records, is there some email referencing --

21   A.  An email, yeah.

22   Q.  And referencing that he was in Los Angeles?

23   A.  Yes.

24   Q.  And at that time -- do you remember when that email was

25   from and --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JA-442

K18VUSHH                    Mediator - direct

1   A.  It would have been from Mr. Liebowitz saying, Call me,

2   again, trying to see if the dispute had been finalized to a

3   resolution.

4   Q.  And did the email say, Call me, I'm in Los Angeles, or

5   something to that effect?

6   A.  I think it said, Call me, and I had his number.  But I

7   became aware prior to that time, whether it was on the 30th or

8   before that, that he was -- he was out of state.

9   Q.  And I'm just trying to pin down how you became aware of

10  that fact.

11  A.  He may have told me or whatever, you know, I have no

12  present recollection.  But from the email correspondence, it

13  seems to indicate I knew he was in L.A.

14  Q.  All right.

15          And in that last conversation where you said it was

16  less than ten minutes, again, I don't want you to get into the

17  substance of the negotiations, just the, sort of, logistics of

18  the appearances the next day, what did he say and what did you

19  say that you recall?

20  A.  On the 30th, the last conversation?

21  Q.  Yes.

22  A.  On the last conversation I had, I said, again, in

23  substance, that the numbers would be agreeable, the numbers

24  were.  But it's not going to happen prior to the mediation

25  unless both sides have a written stipulation settling all

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JA-443

K18VUSHH                    Mediator - direct

1    matters.  There were some outstanding matters that Mr. Newberg

2    in particular wanted to make sure it was pinned down.

3    Q.  Let me just be clear.  What I'm asking is how did you leave

4    things?  Was there a discussion that you would have a further

5    conversation; that you would resume the conversation at the

6    mediation the next day?

7    A.  The actual last conversation I had with Mr. Newberg

8    explaining where we were, and Mr. Newberg had said that

9    basically unless we have writing, I'll see you tomorrow.

10            I said, Okay.  I'll see you at 11 o'clock tomorrow.

11   Q.  Okay.  And then the communications you had with

12   Mr. Liebowitz on October 30th, did he say anything one way or

13   another about whether he would be appearing at the mediation on

14   the 31st?

15   A.  I frankly don't recall.

16   Q.  You don't recall one way or another?

17   A.  One way or another.

18   Q.  Did he ask your permission not to appear himself?

19   A.  No.  But, again, on prior occasions, because I've done

20   several mediations now, his associate always seemed fully

21   knowledgeable on the cases that he appeared.

22   Q.  All right.  And on those occasions, you had not -- I take

23   it you had, sort of, blessed the arrangement, that is to say

24   proceeded with the mediation, even if Mr. Liebowitz hadn't

25   obtained your advanced permission to send Mr. Freeman?

JA-444

100

K18VUSHH                    Mediator - direct

1   A.  Yeah.  As long as the -- talked to defendant's counsel, as

2   long as I assured them, and Mr. Liebowitz's associate assured

3   them that he had full authority to settle the case, then we can

4   proceed on that basis.

5   Q.  All right.

6           Turning back to October 30th, did Mr. Liebowitz make

7   any reference to Mr. Freeman in your conversations with him?

8   A.  I don't recall.

9   Q.  You don't recall one way or another?

10  A.  One way or the other, sorry.

11  Q.  Did he make any reference to his sister one way or another?

12  A.  His sister?

13  Q.  Yes.

14  A.  I don't recall that at all.

15  Q.  All right.

16          And did he make any reference to Mr. Usherson's

17  participation in the mediation?

18  A.  No.

19  Q.  Did he ask your permission for Mr. Usherson to appear by

20  telephone?

21  A.  No.

22  Q.  And again, your testimony is that he made no reference to

23  Mr. Usherson's whereabouts, where he was?

24  A.  That's correct.  Mr. Usherson's -- where he was was just

25  not part of the conversation.

JA-445

K18VUSHH                        Mediator - direct

1   Q.  All right.

2   A.  I mean, I could add, if you'd like.  The first time I heard

3   anything was at the mediation with Mr. Newberg, who said we

4   picked the 31st specifically because Mr. Usherson would be

5   there and presumably Mr. Liebowitz would be there, but I wasn't

6   part of those conversations.

7   Q.  Okay.  If Mr. Liebowitz had told you that Mr. Usherson

8   would be participating by telephone, would you have made any

9   record of that?

10  A.  You mean written record?

11  Q.  Yes.

12  A.  No.  I might have told Mr. Newberg that, you know, we're

13  proceeding tomorrow, but I usually don't make a written record

14  on pre mediation.

15  Q.  All right.

16          And when you say you might have told Mr. Newberg,

17  would you have told Mr. Newberg or you're not sure?

18  A.  I'm not sure.  But, you know, we had conversations, I say,

19  relating to the substance of it, I might have mentioned it to

20  him.

21  Q.  All right.

22          Let me show you -- one moment.

23          Showing you docket number 16-8, Exhibit 8 to

24  Mr. Newberg's declaration, do you want to just take a quick

25  look at that.  And directing your attention to the bottom of

JA-446

K18VUSHH                    Mediator - direct

1    that exhibit.

2    A.  Talked to Richard.

3    Q.  There's an email from you to Mr. Newberg stating that you

4    had spoken to Richard and he has been tied up.  That's

5    Mr. Liebowitz, I assume?

6    A.  Yeah.

7    Q.  And he will review tonight and get back to us in morning.

8    Hopefully, we can settle this before a need to go to in-person

9    mediation.  You sent that email to Mr. Newberg?

10   A.  Yes.

11   Q.  So that's at 8:15 p.m.

12           Did you send that email following your final

13   conversation with Mr. Liebowitz, do you recall?

14   A.  That would refresh my recollection at that point, yes.

15   Q.  And do you have any recollection of how long after your

16   conversation you would have sent this email?  Was it --

17   A.  Right away.

18   Q.  Very good.

19           And then Mr. Newberg responds with your name, and

20   then, I'm headed to the train station well before 6 a.m.  And

21   to be candid, I would have assumed Mr. Usherson either flew to

22   New York tonight or is likewise on a very early plane.

23           Do you see that?

24   A.  Yes.

25   Q.  And you understood Mr. Usherson was the plaintiff in this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JA-447

K18VUSHH                    Mediator – direct

1  matter?

2  A.  Oh, yes.

3  Q.  And you responded, this is at 10:03 p.m. on October 30th:

4  I understand.  Yes?

5  A.  Yes.

6  Q.  Now, would you have -- if you had known that Mr. Usherson

7  was not planning to attend, would you have said something to

8  that effect in that email?

9  A.  Probably, given what Mr. Newberg said.  But I -- you know,

10  I want to be candid, it's -- it's looking backward.

11  Q.  All right.  Candor is a good thing in this context.

12          And at what point did you -- did you learn that

13  Mr. Usherson was not coming?

14  A.  When the mediation started at 11 a.m.

15  Q.  And turning to that day, who arrived at the mediation

16  first?

17  A.  Mr. Newberg and his client.

18  Q.  And what, if anything, did you say to him at that time

19  regarding Mr. Liebowitz's attendance at the mediation?

20  A.  I don't recall.  I know pretty soon after that,

21  Mr. Liebowitz's colleague came.  So it's clear that

22  Mr. Liebowitz wasn't going to be there.

23          And I was told by Mr. Newberg that they picked that

24  date because all counsel and clients would be there.  And they

25  specifically chose the 31st based on those representations.

JA-448

K18VUSHH                          Mediator - direct

1   Q.  All right.

2           And what, if anything, did you say about Mr. Usherson

3   participating in the mediation, appearing in person?

4   A.  I said nothing about it, nothing at all.  I said, I'm

5   sorry.  I was not a party to the representations between you --

6   meaning Mr. Newberg -- and Mr. Liebowitz as to participation.

7           THE COURT:  Did you say in sum and substance that you

8   doubted that Mr. Usherson would be attending the mediation?

9   A.  I don't recall, again, one way or the other.

10  Q.  Do you recall at that moment if you -- based on your prior

11  experiences with Mr. Liebowitz or your communications, you

12  expected Mr. Usherson to appear in person?

13  A.  Again, your Honor, certain of the mediations, the client

14  was there; and certain of the mediations, the client wasn't

15  there.  I don't want to look backwards at what my assumption

16  was at that time, because I really don't recall.

17  Q.  All right.

18          And how did Mr. Newberg react when he learned that

19  Mr. Liebowitz would not be appearing in person?

20  A.  He was upset.  He said, again, in sum and substance, That's

21  why we picked the 31st; we agreed on that because all parties

22  would be in attendance, and that's the assumption that he acted

23  upon.

24  Q.  And did you say anything to him about when you first

25  learned that Mr. Liebowitz would not be attending in person?

K18VUSHH                    Mediator - direct

1   A.  I don't recall.  It would have been obviously at the

2   mediation.  I think I said something to the effect, you know, I

3   think Richard is out of town, so I'm not sure he's going to be

4   here.  And again, Mr. Newberg reiterated that that was the

5   whole purpose of choosing the 31st.

6   Q.  And did you say anything to Mr. Newberg one way or another

7   about when you learned that Mr. Usherson would not be appearing

8   in person?

9   A.  I didn't learn that until the mediation was on already.

10  Q.  And I don't want to get into the substance of those

11  negotiations, but there did come a time during the mediation

12  when Mr. Usherson was called on the telephone; correct?

13  A.  Yes.  Without getting into the substance of it, there were

14  proposals on the table.  And at the end of the mediation -- we

15  sat around a table.  And Mr. Usherson was on -- was on the

16  telephone rejecting any such proposals.  That was the only

17  time.

18  Q.  Did Mr. Freeman call him from inside the room?  In other

19  words, were you present when he called Mr. Usherson?

20  A.  I don't know whether that was the first call I had with

21  Mr. Usherson or the second call, but, yes, we were in the room

22  when he had the call.

23  Q.  Okay.  When you say the first or the second, did

24  Mr. Freeman indicate he was calling Mr. Usherson before that

25  call?

JA-450

K18VUSHH                    Mediator - cross

1    A.  No, it's just at the -- at the time, Mr. Freeman -- I asked

2    to speak to Mr. Newberg alone, him and his client alone, to

3    ascertain where we were.  So Mr. Freeman was in another room,

4    so I don't know what happened then.

5    Q.  And when you were present and Mr. Freeman called

6    Mr. Usherson, did he say anything about his awareness of the

7    mediation in that call?

8    A.  Mr. Usherson?

9    Q.  Yes.  Did he give any indication about whether he had been

10   aware of the mediation?

11   A.  He was aware of the mediation, I'm sure of that, from the

12   indications of the call.  He had certain expectations on what

13   would happen and didn't.

14   Q.  All right.  Very good.

15          I think that, at least for the moment, is all I wanted

16   to ask.

17          Mr. Newberg, let me turn things over to you.

18   CROSS-EXAMINATION

19   BY MR. NEWBERG:

20   Q.  Thank you.  I'd use your name, but you understand.

21          So on December 12, 2019, at the Court's request, you

22   submitted a declaration in this case; correct?

23          THE COURT:  Mr. Newberg, you've got to slow down a

24   little bit --

25          MR. NEWBERG:  Oh, sorry.

K18VUSHH                    Mediator - cross

1        THE COURT:  -- for the court reporter's benefit.

2   A.  Yes.

3   Q.  On December 12th, you submitted a declaration?

4   A.  Yes, I submitted a declaration.  I presume you have the

5   right date.

6   Q.  Actually, I take that back.  It looks like it was filed

7   December 11th, so my apologies.

8   A.  It was on or about that time, I recall.

9   Q.  And as you sit here today, are you aware of anything in

10  that declaration that would need to be corrected or was untrue?

11  A.  No, again, other than the fact that I -- again, after that

12  time, I went back through the email and I saw something about

13  L.A., and that would be the only thing I would modify.

14  Q.  So but in terms of when you declared that in other cases

15  Mr. Liebowitz has had his client appear telephonically, but you

16  did not give such permission in this case, is that a true

17  statement you still stand by?

18  A.  Yes.

19  Q.  And when you put in your declaration that at no time were

20  you informed that the plaintiff would not appear personally, is

21  that still a true statement that you stand by?

22  A.  That's correct.

23  Q.  And when you declared in other cases Mr. Liebowitz has had

24  an associate appear in his stead, but you did not give such

25  permission in this case, is that a true statement you still

JA-452

K18VUSHH                    Mediator - cross

1   stand by?

2   A.  Yes.

3   Q.  And when Mr. Freeman showed up to the mediation that day,

4   were you aware he hadn't made an appearance in this case?

5   A.  No.

6   Q.  Did anyone ever talk to you about whether Mr. Freeman or

7   Mr. Liebowitz would be trial counsel in this case?

8   A.  No.

9   Q.  Were you aware when Mr. Freeman showed up to the mediation

10  that he had just found out about the existence of this case the

11  night before?

12  A.  No.

13  Q.  I'll represent I'm not aware of any emails or other written

14  communications with you that Mr. Liebowitz had asking for

15  permission for his client to attend telephonically.  Are you

16  aware of the existence of any such email where he asked you for

17  permission in writing for his client to attend the mediation

18  telephonically?

19  A.  Based on my recollection and looking through my emails

20  prior to this day, no.

21  Q.  Mr. Liebowitz has testified about certain permissions.  Are

22  you aware of any emails he sent you following up or confirming

23  a supposed permission for his client to attend the mediation

24  telephonically?

25  A.  I'm not aware of that, no.

K18VUSHH                    Mediator – cross

1    Q.  Are you aware of the existence of any email where he asked

2    you for permission for him to not attend the mediation?

3    A.  Again, I don't recall that there was an email.  But, again,

4    just to clarify the record, I know somewhat prior to the

5    mediation date that he was out of town.  So it's possible that

6    I made a presumption that he might not appear.

7    Q.  But you stand by your declaration that you didn't give him

8    permission to not appear?

9    A.  Not expressly, no.

10   Q.  Now, this is an email exchange that I'm going to hand up to

11   you; it's Exhibit 7 to my November 6 declaration.  This is an

12   email exchange between you and me on October 23rd, a week

13   before the mediation.  Do you recognize it?

14   A.  Yes.

15   Q.  And in it you ask me whether we can have a call the next

16   day, the 24th, it says, "to see if we can settle this matter

17   without you having to come to New York."  Do you see that?

18   A.  Yes.

19   Q.  So is it correct to say that as of that date, late in the

20   evening of October 23rd, 2019, you, at least at that point,

21   expected the mediation to be an in-person mediation with

22   counsel and clients; correct?

23   A.  It would have to be.

24   Q.  You say it would have to be.  Why is that?

25   A.  Because the mediation office, they said -- initially, there

JA-454

K18VUSHH                    Mediator – cross

1   was a suggestion that the mediation would be telephonic rather

2   than in person.  And I was subsequently informed that the

3   office of the mediation wanted the mediation to be an in-person

4   mediation.  And I said fine.  That's when I communicated to you

5   and Mr. Liebowitz, pick a couple of dates that are mutually

6   convenient.

7   Q.  So you were clear, then, based on the mediation office's

8   instruction, that this had to be an in-person mediation with

9   counsel and clients; correct?

10  A.  Correct.

11  Q.  So if Mr. Liebowitz were to ask for these permissions,

12  would you have referred him to the mediation office's

13  instructions that this had to be in person?

14  A.  Mr. Liebowitz knew it had to be in person, because, I mean

15  that was -- that was what the mediation office had said.  And I

16  communicated both to you and Mr. Liebowitz that it would be an

17  in-person mediation.

18  Q.  I'm going to hand you another email string.  This is

19  actually the last exhibit in my December 10th declaration, the

20  second declaration.

21  A.  Thank you.

22  Q.  And this is an email string between me and you on the night

23  of October 30th, 2019, the night before the mediation.  Other

24  than what has been redacted by the Court, do you recognize it?

25  A.  Yes, I do.

JA-455

K18VUSHH                    Mediator – cross

1   Q.  I want to direct you to my last email chronologically, the

2   6:34 p.m. email at the top.

3   A.  Yes.

4   Q.  Do you see where I say:  If we can't settle that night, "we

5   will see Mr. Liebowitz and Mr. Usherson tomorrow."

6           Do you see that?

7   A.  Yes, I do.

8   Q.  And you understood that would mean seeing them at the

9   mediation; correct?

10  A.  That was my -- that would be my understanding.

11  Q.  And you don't recall at any time responding, No,

12  Mr. Liebowitz actually won't be at the mediation?

13  A.  No, I did not.

14  Q.  Because, at least as of this email on October 30th, 2019,

15  the night before the mediation, you had no reason to believe

16  Mr. Liebowitz and Mr. Usherson wouldn't be attending the

17  mediation in person.

18  A.  As I say, I had no reason to believe that Mr. Usherson

19  wouldn't be there.  Again, going back and refreshing my

20  recollection, it's quite possible that I had some doubts that

21  Mr. Liebowitz would be there.

22  Q.  But even if you had thoughts that Mr. Liebowitz might be

23  out of town, as you've testified here today, you did not give

24  him permission to not attend the mediation?

25  A.  No.

JA-456

K18VUSHH                    Mediator - cross

1   Q.  No, you did not give permission?

2   A.  No, I did not.

3   Q.  And your Honor has already asked you about my Exhibit 8.

4   I'm just going to give you a copy.

5            THE WITNESS:  Is it all right if I get my glasses?

6            THE COURT:  Sure.  Are they in the bag?

7            THE WITNESS:  Yes.

8            THE COURT:  My deputy will get the bag, and then you

9   can fish them out.

10           The witness just requested his glasses, so we'll

11  accommodate that.

12           THE WITNESS:  Thank you.

13  A.  Sorry.

14  Q.  No problem.

15           So I'll be brief, since the Court has already asked

16  you about this.  But when I say -- when you say at 8:15 p.m.,

17  Hopefully, we can settle this before need to go to in-person

18  mediation, you say "in-person mediation" because you still

19  expect all counsel and clients to be at that in-person

20  mediation?

21  A.  There's going to be an in-person mediation, there's no

22  doubt about that.

23  Q.  And that email you sent to me at 8:15 was after, as you

24  testified, your last conversation with Mr. Liebowitz of that

25  night?

JA-457

K18VUSHH                    Mediator - cross

1   A.  That's correct.

2   Q.  And then we have a further communication where I mention

3   that I'm assuming Mr. Usherson is already on his way to New

4   York or would be on a very early plane.

5           And you say, I understand.  Correct?

6   A.  That's correct.

7   Q.  And there's nothing between -- there are no conversations

8   you had with Mr. Liebowitz between 8:15 and 10:03 which would

9   have made you believe Mr. Usherson wasn't attending the

10  mediation; correct?

11  A.  I had no reason to believe one way or the other.  It was an

12  in-person mediation.

13  Q.  You have no reason to believe one way or the other because

14  the question of could Mr. -- could Mr. Usherson attend by

15  telephone just didn't come up; correct?

16  A.  It didn't come up, yeah.

17  Q.  And you stated, when the Court was asking you questions,

18  that Mr. Liebowitz has -- has done this before, where you

19  expected the client to appear, and his client didn't show up;

20  correct?

21  A.  That's true.

22  Q.  And in those cases, you couldn't have given advanced

23  permission because you didn't know in advance whether they'd be

24  showing up, right?

25  A.  That's correct.

K18VUSHH                    Mediator - cross

1          On those occasions, I should add, when it was clear

2    that the client would not appear, we talked to defendant's

3    counsel and advised them of that fact at the mediation, what

4    their -- what their response was, should we go ahead with the

5    mediation or is this another problem.

6    Q.  Right.

7          But in terms of if Mr. Liebowitz was to testify there

8    was a practice of you granting advanced permission, the

9    practice would actually be permitting the mediation to go

10   forward when his client didn't show up?

11   A.  That, in substance, is correct.  I mean, as long as

12   Mr. Liebowitz or his associate had full authority *vis-à-vis* the

13   mediation, and his client could be reached by phone, we would

14   go ahead unless there was an objection.

15   Q.  And finally, the Court asked you about Mr. Usherson's

16   awareness of the mediation, and you said when he was on the

17   phone, he seemed aware of it.

18         Do you know whether he was aware prior to the

19   mediation, as opposed to having just been told on the telephone

20   conversation a few minutes earlier, that we're having a

21   mediation?

22   A.  The only time I heard Mr. Usherson was when you were there

23   on the telephone, so I had no -- no idea where he was or what

24   his level of knowledge was.

25   Q.  So you have no reason to believe one way or the other that

**JA-459**

K18VUSHH                    Mediator - cross

1    he was told before October 31st that there would be a mediation

2    that day?

3    A.  That's correct.

4              MR. NEWBERG:  That's all I have, your Honor.

5              THE COURT:  All right.

6              And just to clarify, prior to this case, there had

7    been mediations where the client did not participate in person,

8    and you had blessed that, at least, by proceeding with the

9    mediation in the absence of any objection; is that correct?

10             THE WITNESS:  That's correct.

11             THE COURT:  And prior to this mediation, had

12   Mr. Liebowitz ever sought your permission in advance for the

13   client not to appear in person and to participate by telephone?

14             THE WITNESS:  Again, I can remember one occasion when

15   he informed me that the client was -- was overseas.  And again,

16   I talked to the defendant in the case.  And they were a little

17   upset, but we went ahead and it turned out fine.

18             THE COURT:  All right.  Give me one moment.  I'm going

19   to print a hard copy of one additional email.  Oh, we have it.

20             Now, this is docket number 36, Exhibit 2.  If you

21   could look at that.  That's an email from you to Mr. Newberg on

22   the morning of October 30th at 9:07 a.m.; correct?

23             THE WITNESS:  That's correct.

24             THE COURT:  And it says I -- well, it doesn't say "I,"

25   but, Had a long, frank talk with Mr. Liebowitz last night.  And

JA-460

K18VUSHH                    Mediator - cross

1    I believe that he would settle for -- and then the figure is

2    redacted, and so forth.  Is that correct?

3                THE WITNESS:  That's correct.

4                THE COURT:  So based on this email, is it correct that

5    you had a conversation with Mr. Liebowitz on the night of

6    October 29th?

7                THE WITNESS:  That's correct.

8                THE COURT:  All right.

9                If you could just move closer to the microphone to

10   make sure everyone can hear you, that would be great.

11               And do you remember if, in that conversation, he

12   indicated where he was at the time?

13               THE WITNESS:  Again, I don't believe so.

14               THE COURT:  Okay.  And at that time did he ask for

15   your permission to allow Mr. Freeman to appear on his behalf,

16   instead of appearing personally?

17               THE WITNESS:  I don't recall that.

18               THE COURT:  And at that time, I take it you still

19   believed that Mr. Usherson would be appearing in person, and

20   there was no conversation or discussion of his participation by

21   telephone; is that correct?

22               THE WITNESS:  There was -- there was no discussion of

23   that.  I mean I expected this to settle at some point.  There

24   was no -- there was no discussion of Mr. Usherson or who would

25   appear or who would not appear.

JA-461

117

K18VUSHH                    Mediator - cross

1          THE COURT:  And just to be completely clear, is it

2    correct that until the mediation itself on October 31st, you

3    had not had any conversation with Mr. Liebowitz regarding

4    Mr. Usherson's physical presence at the mediation?

5          THE WITNESS:  That's correct.

6          THE COURT:  And until the -- all right.

7          Very good.

8          MR. NEWBERG:  I have one more question, your Honor.

9    BY MR. NEWBERG:

10   Q.  Sir, are you -- you mentioned that there was one case where

11   you believe Mr. Liebowitz got advanced permission for the

12   client to attend telephonically.  And I just want to be clear,

13   a case called *Sadowski* has come up today, and I just want to be

14   clear whether you're sure that it was Mr. Liebowitz's client,

15   as opposed to the defendant who was in Israel in the *Sadowski*

16   case, who had asked for advanced permission?

17   A.  That's correct.  I remember the *Sadowski* case quite well.

18   Q.  So in that case, it was actually the defendant who asked

19   for advanced permission?

20   A.  It was, yes, because, again, the client -- one of the

21   parties was in Israel.  And that was -- that was the plaintiff.

22   The plaintiff was in Israel, I believe.

23   Q.  All right.  But your belief is that the one case was that

24   *Sadowski* case, where a party was in Israel?

25   A.  It's just -- I mean I just want to be clear.  In *Sadowski*,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JA-462

K18VUSHH                    Mediator - cross

1    the plaintiff was by telephone, because the client was in

2    Israel.

3            I think the other case was the *Onion* case, where the

4    client was overseas.  I believe that's the case -- at least in

5    my mind now, that's what I was referring to.

6    Q.  Okay.  Thank you very much.

7            THE COURT:  All right.  Mr. Freeman.

8            MR. FREEMAN:  If I may approach the witness.  I'd like

9    to hand the docket sheets from those five previous cases, as

10   well as the initial complaint.

11           THE COURT:  Sure.

12           MR. FREEMAN:  Thank you.

13   CROSS-EXAMINATION

14   BY MR. FREEMAN:

15   Q.  Good afternoon, Mediator.

16   A.  Good afternoon.

17           MR. FREEMAN:  So I want to short-circuit this, your

18   Honor, because I know we've covered much of this ground.

19   Q.  So what I've handed you, Mr. Mediator, is five docket

20   sheets and, in addition, the complaint -- initial complaint in

21   the action.  Can you just quickly review and verify that those

22   are the five actions that you served as the mediator?

23   A.  Yes.

24   Q.  Now, with respect to the ones labeled A, B, and C, that

25   would be *Emerson*, *Mottram*, and *McGovern*, I'm just going to,

JA-463

119

K18VUSHH                    Mediator – cross

1   sort of, ask you the same set of questions for each to keep

2   this brief.

3           So in each of these cases, is your recollection that

4   the plaintiff was out of state, was located out of state?

5   A.  I certainly know in *Mottram* --

6   Q.  Right.  That's the one that was in United Kingdom?

7   A.  Yeah.

8   Q.  If it refreshes your recollection, the complaint on

9   paragraph 5 -- it's the same in every complaint, paragraph 5.

10          With *Emerson*, I'll represent to you that it says New

11  Orleans, Louisiana.  Do you want to just confirm that?

12  A.  Yes, I see that.

13  Q.  And then in *McGovern*, which is marked as C --

14  A.  Yes.

15  Q.  -- is Davie, Florida?

16  A.  Yes, I see that.

17  Q.  Now, in each of these cases, *Emerson*, *Mottram*, and

18  *McGovern*, was the mediation successful?

19  A.  Yes.

20  Q.  And is it the case that in each one of those cases, the

21  plaintiff participated via telephone?

22  A.  That's my recollection.

23  Q.  And in each of those cases, did you grant Mr. Liebowitz

24  advanced permission for his clients to appear telephonically?

25  A.  Again, the only one I recall advance was *Mottram*, because

K18VUSHH                    Mediator - cross

1   I -- I was informed that the client was in London, England --

2   or in England at least.  I don't recall the other two that

3   there was advance.

4   Q.  But the mediations proceeded and they were successful?

5   A.  That's correct.

6   Q.  In the case of *McGovern*, is it your recollection that

7   defense counsel also appeared telephonically?

8   A.  That's *Emerson v.* --

9   Q.  This is, I'm sorry, *McGovern v. Q Digital*.

10  A.  I'm not sure of that.

11  Q.  Fair enough.

12          All right.  So let me turn your attention to the case

13  of *Pereira v. Source Digital*; it's marked as D.  If you could

14  turn to the complaint in that action, paragraph 5.

15  A.  Yes.

16  Q.  It states that Mr. Pereira is located in Brooklyn, New

17  York; is that correct?

18  A.  Yes.

19  Q.  And in that case, did you grant Mr. Liebowitz advanced

20  permission for Mr. Pereira to appear telephonically?

21  A.  I don't think it was advanced permission, no.  But I recall

22  that the defendant appeared in this case telephonically.

23  Q.  With respect to *Sadowski v. Seeking Alpha*, this was the

24  case where I appeared in Mr. Liebowitz's stead.  Do you recall

25  that?

JA-465

K18VUSHH                    Mediator - cross

1   A.  Yes.

2   Q.  And if you could turn to paragraph 5 of the complaint in

3   that action, *Sadowski*.

4   A.  Yes.

5   Q.  It says that Mr. Sadowski is located in Hawthorne, New

6   Jersey.  Do you know whether that's within 100 miles of the

7   courthouse, Hawthorne?

8   A.  I have no idea, but I presume it is.

9   Q.  And did you -- did Mr. Liebowitz obtain advanced permission

10  from you for Mr. Sadowski to appear telephonically?

11  A.  No.  I recall this quite well.  Because at least general

12  counsel for the defendant in this action was -- this is the

13  Israel action.  They were in Israel.  He was very upset.  We

14  proceeded.  And his counsel was present.  We proceeded.  But he

15  was upset.

16  Q.  In any of the five actions that we've just referred to, do

17  you believe that the participation of the plaintiff

18  telephonically impaired in any way, shape, or form the

19  mediation?

20            THE COURT:  Sustained.  Next question.

21            MR. FREEMAN:  All right.

22            I have no further questions, your Honor.

23            THE COURT:  All right.  Anything else, Mr. Newberg?

24            MR. NEWBERG:  No, your Honor.

25            THE COURT:  All right.  Mr. Mediator, a lack of using

K18VUSHH

1    your name, you may step down.  I thank you very much for your

2    presence here today.  And again, I apologize for how much time

3    it has taken out of your schedule.

4                THE WITNESS:  Could I leave?

5                THE COURT:  You may leave.  You are excused.

6                THE WITNESS:  Okay.  Thank you.

7                (Witness excused)

8                THE COURT:  All right.

9                So I think in my order I had indicated that you should

10   be prepared to have brief argument after the hearing.

11               It's not the most complicated record.  And candidly,

12   I'm not sure there's much to be gained from oral argument.  So

13   I'm happy to dispense with it, but also happy to give you a few

14   minutes if you want to just emphasize a couple points, but I

15   think I can probably infer what you would emphasize if you were

16   given that opportunity.

17               So since I did tell you you would have some time, I'm

18   happy to give you an opportunity, if you wish to say anything.

19   But, again, I'm not sure it's necessary.

20               So, Mr. Freeman, let me start with you.

21               MR. FREEMAN:  Yes.  We'd like about three to four

22   minutes, your Honor, of summation.

23               THE COURT:  All right.

24               Mr. Newberg?

25               MR. NEWBERG:  Yes, your Honor, I'd like just a few

K18VUSHH                    Summation - Mr. Newberg

1    minutes.

2             THE COURT:  All right.

3             Since it's your motion, why don't we start with you,

4    that's Mr. Newberg.  And then I'll hear from Mr. Freeman.

5             Let's plan to keep it to five minutes or less.

6             Actually, in our new system, we have a fancy new

7    timer.  So we're going to test that out and see how it goes.  I

8    don't know what happens at the end of the time.  You may fall

9    through the floor where the floor may open up, but we'll find

10   out.

11            MR. NEWBERG:  No worries.  I had eight; I'm going to

12   cut it to five on the fly, and we'll see if I can beat the

13   clock.

14            THE COURT:  Okay.  But not too quickly for the court

15   reporter's benefit.

16            Go ahead.

17            MR. NEWBERG:  That may be eight by minutes, sorry.

18            Your Honor, first off, I want to say in representing

19   someone *pro bono*, I can't really refuse a withdrawal with

20   prejudice; so I'm glad the Court has decided to hold this

21   hearing.  We took this on because, as a copyright lawyer for

22   over 20 years, I wanted to see for myself what it was like to

23   be in one of these cases.  It only took a few days to go south.

24            Mr. Liebowitz originally asked the mediation office

25   and this Court for permission to have a telephonic mediation.

JA-468

K18VUSHH                    Summation - Mr. Newberg

1   The mediation office denied that request; this Court denied

2   that request.  The Court was clear.  The mediator even told us

3   that he knew it was clear.  There was no wiggle room or room

4   for interpretation.

5        You have undisputed evidence that he chose the October

6   31st date.  It appears he chose this even knowing he had a

7   networking event in Los Angeles.  He chose it never stating he

8   or his client might not attend.  You don't have a single email

9   in evidence showing that Mr. Liebowitz ever informed his client

10  even about the mediation.  And I think it's astonishing that

11  Mr. Usherson didn't put in a declaration here.  It seems quite

12  possible to me he doesn't still know what's going on.

13       You don't have a single email showing Mr. Liebowitz

14  ever informing opposing counsel or the mediator he would not be

15  at the mediation or he would be sending an associate not

16  admitted to this case in his stead, and his client would not be

17  attending the mediation in person.

18       But you have emails very clearly indicating my

19  expectation and the mediator's expectation, even on the night

20  of October 30th, that he was going to be there, both -- and I

21  say "he," both Mr. Liebowitz and Mr. Usherson.  You have an

22  email from Mr. Liebowitz the morning of the mediation not

23  referencing that he or his client wouldn't be there.

24       You have Mr. Liebowitz before this Court at the last

25  conference, soon after the mediation, and in all his papers in

JA-469

K18VUSHH                    Summation - Mr. Newberg

1    response to this motion, unable to tell the Court when he

2    supposedly received permission for him not to attend at all and

3    for his client to not appear in person.  He was asked by your

4    Honor in open court.  He said he didn't know, and this was

5    right after the mediation.  It's simply implausible.

6         He also chose not to put it into his declaration

7    papers.  He's only chosen now to mention the October 30th date.

8    There's no evidence to contradict the mediator's statements in

9    the mediator's declaration.  In fact, his statement is in line

10   with what the mediator told me at the mediation and in a phone

11   call after the mediation, both of which are in my declaration.

12        The only potential conflict Mr. Liebowitz raises is

13   that while the mediator declares that Mr. Liebowitz never

14   raised that he wouldn't be attending at all, I do recall the

15   mediator telling me at the mediation that he was told at the

16   last minute that Mr. Liebowitz would not be attending.  Again,

17   not permission.  And it's quite possible when he said, I think

18   he might be out of town, that that's what I was inferring to be

19   he won't be here.

20        Now, however, as I stated, the mediator never told me

21   or suggested to me that he gave permission for Mr. Liebowitz

22   not to attend.  And his declaration -- as is in his

23   declaration, he made very clear to me that Mr. Liebowitz never

24   raised the subject that his client not attending at any point.

25   And the first time he found out Mr. Usherson would not be

K18VUSHH                    Summation - Mr. Newberg

1   attending in person was when I did.  That's when Mr. Usherson

2   didn't show up.

3           And the practice that Mr. Freeman mentioned was

4   clearly disputed by the mediator.  He said, No, I didn't have a

5   practice of giving him advanced permission.  There's a practice

6   that he didn't show up, and we tried to go forward with the

7   mediation.

8           So you have the instructions from the mediation

9   office, you have the orders of this Court, you have the emails

10  and communications between counsel, and you have other emails,

11  including with the mediator.  Nothing in the evidence suggests

12  in the slightest that Mr. Liebowitz ever asked for permission

13  to not attend the mediation at all or for his client to not

14  attend in person.  There's no reason for the mediator to lie,

15  and his testimony that he never gave permissions is unwavering.

16          You have my testimony, declaration from my client, and

17  even the declaration and behavior of Mr. Liebowitz's associate,

18  Mr. Freeman, again, not at appearance in this case, but points

19  to the lack of permission.  He never stated at the mediation

20  that he was given permission or that he knew about permission.

21  He never put it into his declaration.

22          Every piece of information points to the conclusion

23  that Mr. Liebowitz simply failed to follow the rules and was

24  hoping this case would settle and go away before having to have

25  a hearing on this.  So we respectfully recommend the strongest

JA-471

K18VUSHH                    Summation - Mr. Newberg

1    sanctions this Court has the power to issue, as prior warnings

2    and sanctions of this Court have clearly not had their intended

3    effect.

4           Finally, I do want to bring one last fact to this

5    Court's attention.  This case was filed -- and it goes to the

6    sanctions.  This case was filed on the premise that the

7    photograph in question was subject to a registration filed with

8    the copyright office, number 1-080-046, which contains over

9    2,000 photographs.

10          Not trusting Mr. Liebowitz's representations, before

11   this case settled, we asked the copyright office to deposit

12   copies associated with that registration.  Your Honor might be

13   aware it takes the copyright office a really long time, so we

14   got them at the end of last week.

15          Unless it's seriously mislabeled, we've been unable to

16   locate the photograph at issue in this case anywhere in the

17   deposit copies; so it appears this entire case might have been

18   a sham.  Therefore, to the extent that Mr. Liebowitz is allowed

19   to continue practicing in this Court, we believe it would be

20   proper to require him in any case in this Court to not only

21   serve licensing information at the beginning of the case, but

22   to also serve certified deposit copies from the U.S. Copyright

23   Office related to any registration alleged in his complaints.

24          Thank you.

25          THE COURT:  Let me just follow up with a couple

JA-472

K18VUSHH                    Summation - Mr. Newberg

1    questions, first about that.

2           Where are there representations made in filings in the

3    Court about the licensing of the copyright?

4           MR. NEWBERG:  It's not the licensing, your Honor.  The

5    complaint --

6           THE COURT:  Registration, excuse me.

7           MR. NEWBERG:  Yes.  The complaint says that it's

8    subject to this registration:  DAU 1-080-046, that's in the

9    complaint.  And that's the sole basis for the complaint.

10           THE COURT:  And that is --

11           MR. NEWBERG:  This is a copy of the deposit.  I have

12    the certified one, which is not-to-be-opened sort of thing, in

13    my office.  I'm happy to give this copy to the Court.

14           THE COURT:  All right.  I would like that.  If you

15    could hand that up, that would be great.

16           And second, in terms of sanctions that you would

17    propose, in the event that I found that sanctions were

18    warranted, what is your proposal?

19           MR. NEWBERG:  Well, your Honor, as you know, we are

20    not in this case; I'm here more, frankly, as an officer of the

21    Court than anything.

22           So if the Court is to award monetary sanctions, I

23    completely leave that to the Court.  And if the Court wants it

24    to be reflective of the time and costs that we've spent on this

25    case or at this motion, I'm happy to give documentation on

JA-473

K18VUSHH                    Summation - Mr. Newberg

1    that.  I'm happy -- obviously we are not in this case anymore.

2    I think any sanctions should go to a court or a *pro bono* fund.

3    We operate one, but any one that the Court would choose.

4         I think that given the prior issues in this Court,

5    that the Court is well aware of, and how close Mr. Liebowitz

6    came to an issue in the *Berger* case, in terms of him being

7    referred to the grievance committee, I certainly think this

8    issue should be referred as well.  And the Court can take

9    whatever is in its inherent powers.  This has gone on for too

10   long.

11        And then, of course, I mentioned the sanctions that I

12   do believe that to the extent he is allowed to participate in

13   cases in this Court, that certified copies of the deposit

14   copies that are associated with registrations should be

15   provided, along with the licensing information that your Honor

16   typically orders at the beginning of these cases.

17        THE COURT:  With respect to the sanctions, first of

18   all, I would ask that by -- I'll give you a week, why don't you

19   file an accounting of the fees and costs that are associated

20   with both the mediation and litigation of your sanctions

21   motion.  I recognize that you've handled this *pro bono*, but,

22   nevertheless, I think you can presumably tally those up.  I

23   intimate no view on whether I'm going to grant that, but I

24   think it would be helpful to have that as part of the record.

25        If I did decide that some sort of monetary sanction

K18VUSHH                    Summation - Mr. Freeman

1    was appropriate, did I understand you correctly that you're not

2    asking that your firm be paid that sanction, that you think it

3    would be more appropriate to either go to the Court or to some

4    sort of charitable or, you know, other kind of --

5              MR. NEWBERG:  Yes, your Honor.  I can tell you that if

6    it went to our firm, what would happen in this case is the

7    costs, which we have decided to eat, instead of passing them on

8    to defendant, any costs typically in this case that we would

9    get, we would be reimbursed for the costs, and all of the

10   attorneys' fees would go to our *pro bono* fund.

11             In this case, I don't even think we would do that; I

12   think costs and fees, if they came to us, would simply go into

13   our *pro bono* fund, and not to the Luke Horowitz Equity

14   Partners, so to speak.

15             But, yes, some sort of legal aid *pro bono* fund, the

16   Court.  I am not requesting that McGuire Woods profit from

17   this, nor do I believe my client, who we represent *pro bono*,

18   should be profiting from this issue.

19             THE COURT:  All right.  Thank you.

20             Mr. Freeman?

21             MR. FREEMAN:  Thank you, your Honor.

22             So let me start by saying that the -- what the

23   Liebowitz Law Firm does is we're in the business of law

24   enforcement.  And specifically, we're in the business of

25   enforcing intellectual property rights of --

K18VUSHH                    Summation - Mr. Freeman

1          THE COURT:  Mr. Freeman --

2          MR. FREEMAN:  This is important to us, your Honor, if

3   I might just have --

4          THE COURT:  But it's not important to me.  I want you

5   to focus on the subject matter of the hearing.

6          MR. FREEMAN:  Okay.  So I'll segue that into let's

7   talk about exactly what this motion for sanctions, the

8   evidentiary standards that are required.

9          The defendant has made a motion for sanctions pursuant

10  to the Court's inherent authority to sanction; and has also

11  made a motion pursuant to Federal Rules of Civil Procedure,

12  specifically, Rule 16.  The evidentiary standards for those two

13  are quite different.

14         The inherent power is not to be invoked pursuant to

15  Supreme Court authority unless there's clear and convincing

16  evidence of bad faith.  In the case of *Rice v. NBC Universal*

17  that your Honor decided this past summer, that was a case where

18  it was essentially just a no-show.  Mr. Liebowitz didn't show

19  up to mediation, Mr. Liebowitz didn't show up to the Court's

20  hearing, and the Court determined that that was bad faith.

21         This is not this case.  This is a case where, you

22  know, it's plain that good-faith efforts were made to

23  participate in mediation.  Well, they could say there wasn't,

24  but look at how much paper and look at how much testimony has

25  been evinced in this proceeding to determine whether or not

K18VUSHH                    Summation - Mr. Freeman

1   there was bad faith or was it just neglect or was it just the

2   case, as we allege, that Mr. Liebowitz was simply following an

3   established custom and practice with the mediator who he had

4   five previous experiences with three to four months prior to

5   this particular mediation.  It certainly does explain --

6             THE COURT:  Let me interrupt and ask you two

7   questions.

8             First of all, am I correct in assuming if I were to

9   find that Mr. Liebowitz's representations to me, both in court

10  and under oath and in his testimony, if I were to find that

11  they were false, that that would be a basis for sanctions

12  pursuant to my inherent authority?  I assume you don't dispute

13  that proposition?

14            MR. FREEMAN:  Let me think about that.  I mean,

15  there's -- if the Court were to find that Mr. Liebowitz has

16  committed -- has testified --

17            THE COURT:  Lied.  Let's put it bluntly.  If I find

18  that he has lied, that would be a grounds for sanctions

19  pursuant to my inherent authority; correct?

20            MR. FREEMAN:  Yes, that would be.

21            THE COURT:  Okay.

22            Second, you filed -- you or Mr. Liebowitz, because

23  he's counsel of record, filed an opposition to the motion for

24  sanctions in this case; correct?

25            MR. FREEMAN:  Yes, the firm did file a motion for

JA-477

K18VUSHH                    Summation - Mr. Freeman

1   opposition -- opposition brief to sanctions.

2           THE COURT:  And give me a moment to call that up.

3   That was filed on November 18th; is that correct?

4           MR. FREEMAN:  Yes.

5           THE COURT:  And anywhere in that submission did you or

6   Mr. Liebowitz make any reference to the custom and practice

7   with this mediator of allowing the client to participate by

8   telephone or allowing an associate to appear on Mr. Liebowitz's

9   behalf?

10          MR. FREEMAN:  No, I don't believe so.  It was raised

11  in the letter to the Court.

12          THE COURT:  The first time that that argument was made

13  was in the December letter in response to the mediator's

14  declaration; correct?

15          MR. FREEMAN:  That's correct.

16          THE COURT:  Okay.  Go ahead.

17          MR. FREEMAN:  So the issue is that if the Court does

18  not find -- if the Court finds here -- I think the evidence

19  here shows that there was clearly a miscommunication between

20  the mediator and between Mr. Liebowitz.

21          The mediator did report to duty on the morning of

22  October 31st, and did inform opposing counsel that

23  Mr. Liebowitz would not be there, according to the sworn

24  declaration of Mr. Newberg.  He also expressed doubt that

25  Mr. Usherson would be there.

K18VUSHH                    Summation - Mr. Freeman

1          It sort of strains credulity to think that, well, no

2     discussion was even had, and that this was just purely

3     speculative meanderings of the mediator.

4          Clearly, there was a communication the night before

5     and the issues were discussed.  In that scenario, it does

6     create what can only be described as a gray area.  And to the

7     extent that they are arguing, Well, Mr. Liebowitz should be

8     submitted to the grievance committee, the grievance committee

9     is typically reserved for situations where there's venal intent

10    or bad-faith intent or an intent to perjure oneself.

11         There's no evidence here that Mr. Liebowitz has said

12    anything on the record that wasn't consistent with his

13    understanding of the discussions with respect to him getting

14    permission from the mediator.  And the fact that we have five

15    cases in which the exact same protocol was followed, I mean, as

16    Mr. Liebowitz stated on the stand, there's no question that he

17    did not follow best practices here; he should have gotten it in

18    writing.  He procrastinated, there's no question, and he does

19    apologize to the Court.  And we apologize to the Court for

20    that, for not following best practices.  But not following best

21    practices and having sanctions imposed against an officer of

22    the Court is two completely different standards.

23         So in this case, Mr. Liebowitz has testified

24    repeatedly, first before the hearing in the court in November,

25    again in his declaration, and again here today, that he had the

JA-479

K18VUSHH                    Summation - Mr. Freeman

1  discussion with the mediator; that he did get the permission;

2  and that was consistent with the custom and practice.  And

3  although the mediator seems to dispute that, the mediator, on

4  several occasions, said he didn't recall precisely what

5  happened.  So we would just simply call the mediator's memory

6  into question.

7           In terms of the court order -- because we have

8  anticipated that, you know, there could be a finding here that

9  even if Mr. Liebowitz did obtain permission from the mediator,

10  that the Court may find, Well, it makes no difference, because

11  the Court had ordered that an in-person mediation take place.

12  And I state this with the most respect and with tremendous

13  humility, but the Court's order, as specific as it was, it did

14  not specifically state attorney and client must appear in

15  person.  And I believe we did cite in our letter, you know, the

16  camp mediation in the Second Circuit has a rule which

17  specifically states attorney and client.

18           So we're not saying that the Court's order lacks

19  specificity, but we're saying that it was open for

20  interpretation; and that in cases where a court order is open

21  for interpretation, you know, the attorney should not be

22  sanctioned for adopting an interpretation which, in the Court's

23  view, it might not have been the best interpretation, but it

24  certainly was open for interpretation as to whether or not the

25  client was absolutely required to attend.

K18VUSHH                    Summation - Mr. Freeman

1          I think we can all agree here that had the court order

2   said attorney and client must appear, it would be clear; we

3   wouldn't even have to have a discussion.  But in this case,

4   Mr. Liebowitz did testify under oath that his understanding was

5   that meant that, at the very least, the lawyer would need to

6   attend in person.

7          With respect to the issue of trial attorney, I could

8   state we've been -- we've only had two trials over 2,000 cases

9   filed.  And in both those trials, I did serve as trial counsel.

10  That's not -- so there is sort of an assumption in our

11  operation that if the case does eventually get to trial, I am

12  going to handle it.  I am 19 years at bar; Mr. Liebowitz is

13  only four years at bar.  So it's just a question of experience

14  in that regard.

15         THE COURT:  You handled those two cases solo or

16  with --

17         MR. FREEMAN:  Yeah, with the case of *Mango v. Buzz*

18  *Feed*, I was lead counsel; I handled it solo.  Mr. Liebowitz was

19  no even counsel of record in that case.  And the other case

20  before Judge Woods, I handled.  This was *Otto v. Hearst*

21  *Communications*.  I did handle the work as lead counsel, but

22  Mr. Liebowitz did do a couple of cross-examinations to get his

23  feet wet.

24         THE COURT:  And you're aware that my initial

25  conference order states unambiguously that absent leave of

JA-481

K18VUSHH                    Summation - Mr. Freeman

1   Court obtained by letter motion filed before the initial

2   conference, that all conferences must be attended by the

3   attorney who will serve as principal trial counsel; correct?

4           MR. FREEMAN:  I am aware of that, your Honor, yes.

5           THE COURT:  So it seems to me that either

6   Mr. Liebowitz and you have violated that order, because

7   Mr. Liebowitz is the only counsel who has entered a notice of

8   appearance and appeared on behalf of Mr. Usherson, until today,

9   or you violated the mediation rules which require very clearly

10  that the lawyer who is primarily responsible for trial has to

11  appear at the mediation.  So it's one or the other, am I

12  correct about that?

13          MR. FREEMAN:  Well, no, this is what -- what I'm

14  saying is that the -- we're not precluding the possibility that

15  Mr. Liebowitz could have served as trial counsel as of the time

16  of the initial case management conference.  It's not fully

17  foreclosed that I'm going to handle automatically every trial.

18          But it could have been Mr. Liebowitz's interpretation

19  the night before mediation, which is several months later, that

20  if the case, you know, passes a certain threshold in terms of

21  the procedure, that I'm going to be called in to do the trial.

22          So we didn't have that discussion, to be clear, but

23  I'm just saying that that's something that, in our custom and

24  practice, I had in the past handled the trial.  So, you know,

25  to the extent that the rules say lead counsel, they don't; they

JA-482

K18VUSHH                    Summation - Mr. Freeman

1   just say, you know, the person who's ultimately going to handle

2   trial.

3           So, again, what we're really saying is, you know, this

4   case presents --

5           THE COURT:  My order also says all counsel are

6   required to register promptly as filing users on ECF.  And you

7   didn't file -- in fact, to this date have not filed --

8           MR. FREEMAN:  I have not because I made clear to the

9   Court at the conference at the outset in November that my

10  participation in this case was going to be to defend the

11  Liebowitz Law Firm and Mr. Liebowitz from the motion for

12  sanctions.  That's been my role in this case.

13          The case is now settled, so I think the question is

14  moot as to whether I will eventually serve as trial counsel.

15  That's the way -- and just to be clear --

16          THE COURT:  Let me ask you, you're not under oath, but

17  you are an officer of the Court, did you know of the existence

18  of this case prior to October 30th, 2019?

19          MR. FREEMAN:  I did not, your Honor.

20          THE COURT:  So the first time you learned about it was

21  the evening before the mediation?

22          MR. FREEMAN:  That's correct, your Honor.

23          THE COURT:  Okay.

24          And then the last question I have for you is can you

25  comment on the registration issue that Mr. Newberg raised?

JA-483

K18VUSHH                    Summation - Mr. Freeman

1          MR. FREEMAN:  I haven't seen the registration issue.

2     I think what he's saying is that -- I'm not sure if he's

3     speculating or whether or not he's actually obtained a

4     certified deposit copy from the copyright office.  But what

5     he's saying is that the photograph is not on deposit with the

6     particular registration, is that -- are you saying that you

7     think or are you saying that you know?

8          MR. NEWBERG:  I'm saying that I know.

9          THE COURT:  I think he's saying he reviewed those that

10    are on file, registered with the copyright office, and this

11    photograph does not appear to be among them.

12         MR. NEWBERG:  That's exactly --

13         MR. FREEMAN:  Well, I mean -- I have not -- we did not

14    order a deposit copy.  And in our custom and practice, we do

15    not order deposit copies because they incur an additional

16    expense.  Typically, what happens is once we get into discovery

17    and once we believe that we're going to proceed with the case

18    to summary judgment, it's at that point that we'll invest, and

19    sometimes it's 600 to $1,000.  At that point we will get the

20    certified deposit copy.

21         We should say, however, that in every case that we

22    file, the client represents to us that it's on deposit, if the

23    client is the one who registered.  More often the case though

24    in the last four years, it's our law firm that files the

25    registration process, and we have employees who handle it.  So

JA-484

K18VUSHH                    Summation - Mr. Freeman

1    we know for sure it's on deposit.

2            I think in this case, you know, it's obvious, we --

3    our law firm did not file the deposit copy.  Mr. Usherson

4    represented to us that he did.  Did we verify that prior to

5    filing?  No.  But I don't believe that we have an obligation to

6    incur the expense of doing that if the client is representing

7    that it's on deposit.

8            THE COURT:  Okay.

9            Paragraph 9 of the complaint in this case says the

10   photograph was registered with United States Copyright Office

11   and was given copyright registration number, and then the

12   number that Mr. Newberg gave before.

13           MR. FREEMAN:  Yes, that's correct.  And that's a

14   matter of public record.

15           So we're able to verify, before we file the case, we

16   could just jump on the copyright office's website, punch in the

17   number, and the copyright registration certificate pops right

18   up.  And we could see that Mr. Usherson was the copyright

19   claimant in that particular case.

20           THE COURT:  But your testimony is that you could

21   not -- that was based on Mr. Usherson's representation that the

22   photograph in this case was under that copyright registration

23   number?

24           MR. FREEMAN:  That is correct, your Honor.

25           We do not -- as an ordinary course of practice, if a

K18VUSHH                    Summation - Mr. Freeman

1    client comes to us, and it's one of these old, you know,

2    rock-and-roll photos that was registered in the '70s or the

3    '80s, obviously our law firm didn't register, the client

4    registered.  The client will say to us, This photograph is on

5    deposit with this registration.  And we take them for their

6    word.  We don't -- we do not verify before filing the case by

7    obtaining a certified deposit copy whether or not it's

8    actually -- and look, I mean, ultimately that -- you know,

9    there's no legal or statutory requirement that we do so.  I

10   mean, it's not -- it's not -- it's the ordinary case that

11   lawyers will rely on what their clients are telling them.  If

12   the client turns out to be lying, I mean, I don't know that

13   that falls on counsel.  I think that falls upon the party.

14          But, I mean, is there any question that -- you know,

15   because you say, Well, the best course of practice would be to

16   make sure with these rock-and-roll photographs that you verify

17   prior to filing.  I don't know that we would debate that.  But,

18   again, there's no statutory or regulatory requirement that we

19   do so.  And ultimately, we are entitled to rely on a client.

20   In this case, the client, this is not the first time that we've

21   represented this client successfully.  So we didn't have any

22   reason to doubt the veracity of his representations.

23          THE COURT:  All right.

24          Mr. Newberg, is this something that you could provide

25   a copy to plaintiff's counsel?

K18VUSHH                    Summation - Mr. Freeman

1          MR. NEWBERG:  I believe we -- well, we have the

2     certified copy, we can make a copy of that.  I believe my

3     associates also already made a copy; so, yes, we can.

4          THE COURT:  All right.  Why don't you do that by

5     overnight mail no later than tomorrow, so for receipt by

6     Friday.

7          By next Friday I want a letter brief from you

8     indicating, one, whether the photograph at issue in this case

9     was, in fact, registered with the copyright office; and, two,

10    if it was not, why sanctions would not be appropriate based on

11    the allegation in paragraph 9 of the complaint.

12         And in that regard, you can distinguish between

13    sanctions on counsel, who signed the complaint, or sanctions on

14    the client, who may have provided the erroneous information, if

15    it was erroneous.  But I want you to address those issues by

16    next Friday.  All right?

17         MR. FREEMAN:  I do have one more point to make, your

18    Honor.

19         THE COURT:  Last point, because I have a meeting that

20    I am running in five minutes, so I will give you one more

21    minute, but go ahead.

22         MR. FREEMAN:  Thank you.

23         So in the case of *Rice v. NBC Universal*, you may

24    recall that the --

25         THE COURT:  I recall it well.  Go ahead.

JA-487

K18VUSHH                    Summation - Mr. Freeman

1      MR. FREEMAN:  Yes, that after the parties fully

2    submitted the brief -- I'm sorry, that before the parties

3    submitted the brief, there was a stipulation and order that the

4    party, the defendant, would bear its own costs and fees.  And

5    then we raised that in passing in the opposition brief, but it

6    wasn't until the motion for reconsideration where we forcefully

7    argue that, Well, look, I mean, if you're a defendant and you

8    waive fees, that means you've waived fees with respect to the

9    sanctions motions as well.  And your Honor held on the motion

10   for reconsideration that it was too little, too late, sort of

11   as a procedural waiver, that we couldn't make that argument

12   because we hadn't made it in a fulsome fashion prior.

13        In this case, the stipulation order came after we

14   briefed, so we never made the argument at all.  So we would ask

15   leave of Court to submit just a one-page letter brief to

16   address the issue as to whether or not the Court -- I'm not

17   sure if this is a question over that the Court has jurisdiction

18   or if it's just a question of waiver, if the defendant

19   knowingly signed a stipulation saying, We waive all attorneys'

20   fees, you know, related to this action, can they be awarded any

21   attorneys' fees at all.  We think that's a critical issue.

22        THE COURT:  Let me interrupt you.

23        He's not seeking fees.  He suggested that perhaps

24   costs/fees could be the measure of sanctions, but he's not

25   asking that I reward them fees; he's asking that I direct that

K18VUSHH                    Summation - Mr. Freeman

1   they be paid either to the Clerk of Court or something like

2   Legal Aid.  So how would the stipulation, even if you're

3   correct about waiver of the fees, apply in this instance?

4           MR. FREEMAN:  Well, I think that because there needs

5   to be, you know, some causal connection between the amount of

6   sanctions awarded and the conduct that is being alleged.

7           So in the cases where Liebowitz Law Firm has been

8   ordered to pay sanctions to the Clerk of Court, it's never been

9   more than the amount of $2,000; in other cases it's been 500,

10  1500.  In this case, he's likely seeking tens of thousands of

11  dollars.

12          THE COURT:  All right.  I'll tell you what, I'll give

13  you until Monday to submit a letter no longer than three pages

14  addressing this issue and, to the extent that I conclude that

15  sanctions are appropriate, what you believe the appropriate

16  sanction would be, either in terms of size or nature.

17          And Mr. Newberg, if you care to reply to that, you can

18  do so by Wednesday.  And I think I'll give you until next

19  Friday then to submit an accounting of your fees and costs so

20  that it takes account of that submission as well.

21          All right?

22          MR. NEWBERG:  Thank you, your Honor.

23          And fees and costs, I assume you just mean related to

24  the sanctions motion; correct?

25          THE COURT:  Fees and costs related to the mediation

JA-489

K18VUSHH

1   and the sanctions motion.

2           MR. NEWBERG:  Thank you, your Honor.

3           THE COURT:  And if you could break it down, again, I

4   may or may not conclude that sanctions are appropriate, may or

5   may not conclude that that is the appropriate basis or way to

6   calculate them, but it would certainly be helpful to have my

7   options as I ponder this.

8           I will reserve judgment on the motion.

9           I'm going to leave the exhibits that you gave the

10  witnesses here for my law clerk to give you if you want them

11  back.  I think they are all part of the record already, but, in

12  any event.

13          All right.  We are concluded.  I'll reserve judgment.

14          Have a good day.  Thank you.

15                          *   *   *

16

17

18

19

20

21

22

23

24

25

JA-490

1              INDEX OF EXAMINATION

2    Examination of:                            Page

3    RICHARD LIEBOWITZ

4    Direct By Mr. Freeman . . . . . . . . . . . 7

5    Cross By Mr. Newberg . . . . . . . . . . . .11

6    Redirect By Mr. Freeman . . . . . . . . . . .79

7    BRAD R. NEWBERG

8    Cross By Mr. Freeman . . . . . . . . . . . .83

9    THE MEDIATOR

10   Direct By The Court . . . . . . . . . . . .90

11   Cross By Mr. Newberg . . . . . . . . . . . 106

12   Cross By Mr. Freeman . . . . . . . . . . . 118

13              DEFENDANT EXHIBITS

14   Exhibit No.                           Received

15    1  . . . . . . . . . . . . . . . . . . . .17

16

17

18

19

20

21

22

23

24

25

JA-491

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARTHUR USHERSON,

                    Plaintiff,

          v.                                          No. 19-CV-6368 (JMF)

BANDSHELL ARTIST MANAGEMENT,

                    Defendant.


## CERTIFICATE OF SERVICE

I, Richard Liebowitz, an attorney, hereby certify that, pursuant to the Court's Opinion & Order dated June 26, 2020 (Dkt. No. 68), a true and correct copy of the Opinion & Order was served via USPS express overnight mail on Thursday, July 2, 2020 upon Plaintiff Arthur Usherson at his address below:

Arthur Usherson
1006 Old Holcomb Bridge Road
Roswell, Georgia 30076


Dated: July 6, 2020
       Valley Stream, NY                    **/s/richardliebowitz/**
                                            Richard Liebowitz, Esq.

                                            Liebowitz Law Firm, PLLC
                                            11 Sunrise Plaza
                                            Suite 305
                                            Valley Stream, NY 11580-6111
                                            (516) 233-1660

                                            *Attorney for Plaintiff Arthur Usherson*

JA-492

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Arthur Usherson (plaintiff);
_____

Richard Liebowitz (appellant); Liebowitz Law Firm, PLLC (appellant)
_____
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

Bandshell Artist Management (defendant)
_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

19 CV 6368 (JMF)(    )
_____ __ _____ _____ ___

**NOTICE OF APPEAL**

Notice is hereby given that the following parties: (1) Richard Liebowitz (attorney for plaintiff and party to this appeal);

(2) Liebowitz Law Firm, PLLC (attorney for plaintiff and party to this appeal)
_____
(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the ☐ judgment ☑ order   entered on: June 26, 2020 [Dkt. No. 68]
_____
(date that judgment or order was entered on docket)

that:

Imposed monetary and non-monetary sanctions on Richard Liebowitz and Liebowitz Law Firm, PLLC
_____
(If the appeal is from an order, provide a brief description above of the decision in the order.)

July 20, 2020
_____
Dated

Robert J. Anello
_____
Name (Last, First, MI)

565 Fifth Avenue
_____
Address

(212) 880-9520
_____
Telephone Number

/s/ Robert J. Anello
_____
Signature [*]

New York   NY              10017
City       State           Zip Code

ranello@maglaw.com
_____
E-mail Address (if available)

_____

[*] Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case. Fed. R. App. P. 3(c)(2). Attach additional sheets of paper as necessary.

Rev. 12/23/13



MORVILLO ABRAMOWITZ G

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
BENJAMIN S. FISCHER
CATHERINE M. FOTI
CHRISTOPHER B. HARWOOD
LAWRENCE IASON
BRIAN A. JACOBS
TELEMACHUS P. KASULIS
JODI MISHER PEIKIN
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG

565 FIFT
NEW YORK, N
(212) 85
FAX: (212)

www.

WRITER'S CO

ranello@

(212)

July

**By Hand Delivery**
Hon. Ruby J. Krajick
Clerk of Court
U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re:   *Arthur Usherson v. Bandshell Artist Management*, No. 19-cv-6368 (JMF)

Dear Ms. Krajick:

I represent Richard Liebowitz and the Liebowitz Law Firm, PLLC ("LLF") in connection with the above-captioned matter.  Mr. Liebowitz was counsel of record for Plaintiff Arthur Usherson.  On June 26, 2020, the Honorable Jesse M. Furman entered an Opinion & Order (Dkt. No. 68) (the "Order") imposing monetary and non-monetary sanctions against Mr. Liebowitz and LLF.  Mr. Liebowitz and LLF will be filing a Notice of Appeal as to the Order and the Court's imposition of sanctions.

Enclosed is a Chase cashier's check (with LLF as remitter) in the amount of $103,517.49, along with a copy of the Order.  The enclosed check represents security for the full monetary sanction set forth in the Order, *see* Order at 54, and, pursuant to Fed. R. Civ. P. 62(b), operates as an automatic stay of the enforcement of the monetary sanction.  The enclosed check should not be construed as a waiver of Mr. Liebowitz and LLF's right to appeal the monetary sanction.

Respectfully submitted,

*/s/ Robert J. Anello*

Robert J. Anello

Encls.

Cc: Hon. Jesse M. Furman

JA-494

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ARTHUR USHERSON,

                    Plaintiff,

        v.                                            No. 19-CV-6368 (JMF)

BANDSHELL ARTIST MANAGEMENT,

                    Defendant.

---

RICHARD LIEBOWITZ; LIEBOWITZ LAW
FIRM, PLLC,

                    Miscellaneous.

---

**[PROPOSED] ORDER TO SHOW CAUSE TO STAY**
**ORDER PENDING APPEAL**

        Upon the Declaration of Brian A. Jacobs, dated July 20, 2020, the Declaration of Richard

Liebowitz, dated July 20, 2020, the Declaration of Bruce Cotler, dated July 19, 2020, and Mr.

Liebowitz and Liebowitz Law Firm ("LLF")'s memorandum of law in support of their motion by

order to show cause for a stay pending appeal:

        **IT IS HEREBY ORDERED** that Defendant Bandshell Artist Management show cause

before this Court on _____, 2020 at _____ ___.m. before the Honorable Jesse

M. Furman, United States District Court Judge, why an order should not be entered (a) granting a

stay of the non-monetary sanctions numbered three, four, five, and six in this Court's Opinion

and Order dated June 26, 2020 (Dkt. No. 68) (the "Order") pending appeal of the Order to the

United States Court of Appeals for the Second Circuit, and (b) in the alternative, in the event that

JA-495

this Court denies the motion for a stay pending appeal, staying the sanctions for sufficient time to allow Mr. Liebowitz and LLF to promptly move in the Second Circuit for a stay pursuant to Federal Rule of Appellate Procedure 8(a)(2) and, assuming such motion is promptly made, until the Second Circuit determines the stay motion.

**IT IS FURTHER ORDERED** that service via email and ECF of a copy of this order and annexed papers upon the Defendant on or before _____ ___.m on _____, 2020, shall be deemed good and sufficient service thereof.

**IT IS FURTHER ORDERED** that Defendant's opposing papers, if any, in response to this order to show cause, shall be served upon counsel for Mr. Liebowitz and LLF on an expedited basis no later than _____, 2020 at _____ ___.m.

**IT IS FURTHER ORDERED** that Mr. Liebowitz and LLF's reply papers, if any, shall be served upon counsel for Defendant on an expedited basis no later than _____, 2020 at _____ ___.m.

**IT IS FURTHER ORDERED** that all aspects of the non-monetary sanctions numbered three, four, five, and six in the Order are stayed pending this Court's resolution of Mr. Liebowitz and LLF's present motion by order to show cause for a stay pending appeal.

**SO ORDERED**:

Dated: _____, 2020
      _____, New York

_____
Hon. Jesse M. Furman
United States District Judge

2

JA-496

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ARTHUR USHERSON,<br><br>        Plaintiff,<br><br>        v.<br><br>BANDSHELL ARTIST MANAGEMENT,<br><br>        Defendant. | No. 19-CV-6368 (JMF) |
| RICHARD LIEBOWITZ; LIEBOWITZ LAW<br>FIRM, PLLC,<br><br>        Miscellaneous. | |

**DECLARATION OF RICHARD LIEBOWITZ IN SUPPORT OF**
**MOTION BY PROPOSED ORDER TO SHOW CAUSE FOR STAY PENDING APPEAL**

        I, Richard Liebowitz, declare the following under penalty of perjury pursuant to 28

U.S.C. § 1746:

        1.     I am a principal of the Liebowitz Law Firm, counsel for Plaintiff Arthur Usherson

in this action.  I submit this Declaration in support of the motion by order to show cause to stay

pending appeal all aspects of non-monetary sanctions three, four, five, and six imposed by this

Court in its June 26, 2020 Opinion and Order (Dkt. No. 68).

        2.     I have had a longstanding and deep interest in photography and in copyright work.

During high school and college, I practiced photography and interned for over four years with

Bruce Cotler (now President of the New York Press Photographers Association, the oldest

organization of its kind in New York).  During the course of that internship, I had the

JA-497

opportunity to accompany numerous professional photographers on news, sports, and other photography events, and in so doing to learn about issues facing professional photographers. In particular, I learned that photographers' copyrighted photographs often were infringed with impunity. These photographers told me that they would sometimes approach lawyers for assistance, but costs almost always proved prohibitive, due in substantial part to lawyers' insistence on large retainers that would eat in to, if not entirely exceed, the expected recovery. I saw a market need for attorneys who could represent photographers in copyright infringement cases, and I went into the law in part hoping to become able to fill that need and to protect copyright holders' rights.

3.       I graduated from Hofstra Law School in May 2014, where I took courses in copyright/entertainment and intellectual property law. I was admitted to the New York State bar in August 2015, and admitted to practice in the Southern District of New York in October 2015. I maintain memberships in several professional associations, including the New York State Bar Association, the New York City Bar Association, the Nassau County Bar Association, and the New York Press Photographers Association. I also have taken copyright law Continuing Legal Education courses.

4.       Given my longstanding interest in copyright work, I established the Liebowitz Law Firm ("LLF") in 2015 to represent copyright holders whose rights had been violated. I did not have or receive any formal training in running a law practice; rather, I learned by doing. In its early days, LLF employed one attorney in addition to me, as well as a few staff members. Today, LLF consists of three attorneys, who are responsible for litigating infringement cases on behalf of copyright plaintiffs, and about a dozen staff members, who are responsible for client relations, office management, copyright registration, and infringement research.

2

JA-498

5.      LLF pursues—entirely on a contingency basis—a high volume of copyright infringement actions with relatively low average anticipated recoveries on behalf of copyright plaintiffs.  LLF's high volume of cases makes it economically feasible for LLF to represent copyright holders notwithstanding the relatively low average recoveries.  Without LLF, many photographers and other artists may not find it economically feasible to protect their federal copyright rights and protect their copyrighted works from infringement.

6.      On average, although I do not track all the relevant data, I estimate that many infringement actions brought by our firm regarding a single photograph (as opposed to multiple photographs) have settled in the low thousands or tens of thousands of dollars.  A high percentage of LLF's cases settle within approximately two to four months of initiation with a monetary recovery for the plaintiff.  A small percentage of LLF's practice involves non-litigation activities, including filing copyright registrations and writing and reviewing licensing agreements, for which LLF generally charges a small fee.

7.      LLF has filed approximately 2,500 copyright infringement cases since its founding.  About half of these cases were filed in district courts within the Second Circuit.

8.      LLF has represented over 1,200 individual clients since its founding.  LLF also represents agencies which may themselves represent hundreds of photographers.  Many of LLF's clients are repeat clients, on whose behalf LLF has brought multiple actions and continues to actively monitor media outlets and other sources for copyright infringements.

9.      LLF obtains new clients primarily through word of mouth from its existing clients.  In addition, LLF obtains new clients through my participating in copyright seminars, photographers' trade shows, and other events during which I am able to meet copyright holders.

10.     LLF has, when necessary during the course of litigation, ordered a deposit copy of

JA-499

a copyrighted work from the U.S. Copyright Office.  Doing so has cost between $200 and

$1,200.  Deposit copies generally are not delivered for several months.  This lengthy delivery

time period has been further extended due to the COVID-19 pandemic.[1]  The deposit copy

sanction imposed by the Court therefore will significantly reduce the net recovery in every case,

and may render the filing of many copyright actions—and LLF's continued operation—

financially untenable.  The deposit copy sanction may cause LLF and its clients to run into

statute of limitations and other problems in cases where deposit copies do not timely arrive.

Indeed, the deposit copy sanction already is inhibiting LLF's practice.  On June 30, 2020, in another

action, I was directed to file a deposit copy of the work at issue by July 8, 2020.  *Krieger v. Alison

Lou LLC*, No. 20-CV-2628, Dkt. 17, at 2–3 (S.D.N.Y. June 30, 2020).  I sought modification of the

order, explaining that timely compliance would be impossible given the lengthy processing time

required to obtain a deposit copy.  *Id.* at Dkt. 19.  Notwithstanding this, my application for

modification was denied.  *Id.* at Dkt. 21.

     11.    The other non-monetary sanctions imposed by the Court—the requirement that I

serve a copy of the Court's sanctions order on current and future clients and in current and future

actions—also will cause severe harm to my practice.  The sanctions will damage my relationship

with my current clients, on whom I rely to obtain new clients, by impugning my legal abilities,

advocacy, and character.  They will damage my relationship with any new clients, and will do so

from the very beginning of the attorney-client relationship, because I must share the Court's

order heavily criticizing me at the exact moment a prospective client makes the decision to retain

me.  The sanctions will damage my relationship with judges and mediators and potentially

---

[1] *See* U.S. Copyright Office, "Operations Updates During the COVID-19 Pandemic," *available at* https://www.copyright.gov/coronavirus/ (accessed July 20, 2020) ("Staff of the Records Research and Certification Section continue to offer search, records certification, and other services but there will likely be unavoidable delays in processing times.").

JA-500

prejudice any actions before them, including in courts where I have experienced no substantial problems, by forcing me to portray myself and my practice in the worst possible light at the outset of every proceeding.  The aforementioned order in *Krieger v. Alison Lou LLC*, with which timely compliance is impossible, illustrates the harm these non-monetary sanctions already are having upon me, my practice, and my clients.

12.     Since the motion for sanctions was filed in this case, I have worked to improve my organizational practices and those of my firm.  In November 2019, on my own initiative, I retained a recognized expert in the field of legal ethics.  On the expert's recommendation, LLF has deployed new practice management software, which helps the firm manage case calendaring and alerts, case documents and discovery, copyright registration information, and other important case details.  All of LLF's cases initiated since January 2020 are managed on the new system.  Further, I have maintained my relationship with the expert, and continue to call on him as legal, ethical, and organizational issues arise.

13.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: July 20, 2020
       New York, NY

_Richard Liebowitz_
                                        Richard Liebowitz

JA-501

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ARTHUR USHERSON, | |
| Plaintiff, | |
| v. | No. 19-CV-6368 (JMF) |
| BANDSHELL ARTIST MANAGEMENT, | |
| Defendant. | |
| | |
| RICHARD LIEBOWITZ; LIEBOWITZ LAW FIRM, PLLC, | |
| Miscellaneous. | |

**DECLARATION OF BRUCE COTLER IN SUPPORT OF**
**PROPOSED ORDER TO SHOW CAUSE**

I, Bruce Cotler, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.  I am a professional photographer and the President of the New York Press Photographers Association ("NYPPA"). I have held that position for approximately six years, and was Vice President and a member of the Board of Trustees for several years beforehand. The NYPPA, established in 1915, is a professional and social organization for New York's working press photographers, students of photography, and others in related fields.

2.  I have known Richard Liebowitz for approximately 15 years, since he was a teenager. He interned for me for several years, starting when he was in high school, accompanying me on shoots before he could even drive. We have kept in touch ever since. In

recent years, Mr. Liebowitz has successfully represented me in copyright actions seeking recovery for infringements of my own work.

3.      In the course of my work as a professional photographer and my involvement with NYPPA, I have interacted with numerous other photographers and have had extensive exposure to the difficulties of copyright protection and enforcement.  In my experience, copyright infringement is a serious problem for individual photographers and other artists.  When photographers' photographs improperly are used without license, the relatively low value of the infringement claim often makes it economically infeasible to bring an action.  Even the lawyers who would consider bringing small copyright claims often require thousands of dollars in retainers—sometimes up to $10,000 or more—which deters individual photographers with meritorious claims and who wish to bring an action.  Moreover, many photographers have limited resources, which makes meeting the upfront costs of litigation very difficult.

4.      In this context, Mr. Liebowitz and the Liebowitz Law Firm ("LLF"), by offering representation on a contingency arrangement, have successfully represented and obtained recoveries for many individual photographers—including me and other photographers affiliated with the NYPPA—who otherwise likely would not have been able to protect their copyrighted works from infringement.

5.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: July __19__, 2020
          New York, NY

_____
                                    Bruce Cotler

2

JA-503

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARTHUR USHERSON,

                              Plaintiff,

          - against -

BANDSHELL ARTIST MANAGEMENT

                              Defendant.

Docket No. 1:19-cv-06368-JMF

### <u>DECLARATION OF RICHARD LIEBOWITZ</u>

I, RICHARD LIEBOWITZ, declare under the penalty of perjury, pursuant to 28 U.S.C.

§ 1746, that the following is true and correct to the best of my personal knowledge:

1.      I am lead counsel for Plaintiff Arthur Usherson ("Plaintiff") and the founding

member of Liebowitz Law Firm, PLLC ( "LLF").

2.      Sanction Three imposed upon me and LLF by the Court's Opinion and Order

dated June 26, 2020 (the "Order") (Dkt. No. 68), requires that I serve a copy of the Order on

every one of LLF's current clients.  In order to identify the required recipients, I have relied upon

an LLF internal email list—which I have reviewed for accuracy and to the best of my knowledge

believe to be complete—to which LLF adds each new client upon engagement.  I attest that on

July 27, 2020, I served by email a copy of the Order on every one of LLF's clients identified in

this manner.

3.      Sanction Four imposed upon me and LLF requires that I file a copy of the Court's

Order on the docket of all currently pending cases brought by me or LLF.  In order to identify

JA-504

these cases, I have searched on Pacer, in every federal judicial district around the country, for my name as counsel of record.  There are a small number of cases filed by my firm in which I am not counsel of record; in order to identify those cases, I relied on my firm's internal records.  In every case I identified on Pacer or in my internal records in this manner, I filed the Court's Order.  I then double-checked these filings against my firm's internal case management system.  To the best of my knowledge, this method has identified every currently pending case brought by me and LLF, and I attest that pursuant to Sanction Four I have filed the Court's Order in all cases that I so identified.

     4.     I declare under penalty of perjury that the foregoing is true and correct.

Respectfully Submitted:

Dated:     July 27, 2020
          Valley Stream, NY

**s/richardliebowitz/**
Richard Liebowitz

JA-505

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARTHUR USHERSON,

Plaintiff,

- against -

BANDSHELL ARTIST MANAGEMENT

Defendant.

Docket No. 1:19-cv-06368-JMF

---

**<u>DECLARATION OF RICHARD LIEBOWITZ</u>**

I, RICHARD LIEBOWITZ, declare that the following is true and correct to the best of my personal knowledge.

1.     I am the managing partner of the Liebowitz Law Firm, PLLC (the "LLF") and admitted to practice law in this District.

2.     On June 26, 2020, the Court ordered me to file a copy of the Court's 6/26/20 Opinion and Order on the docket of "any currently pending case that was brought by Mr. Liebowitz or his firm" no later than July 27, 2020.  *Usherson v. Bandshell Artist Mgmt.*, No. 19-CV-6368 (JMF), 2020 WL 3483661, at *22 (S.D.N.Y. June 26, 2020) (the "Order").

3.     On September 21, 2020, it came to my attention that I neglected to file the Order in the case of *Smith v. MCR Publishing, Inc.*, 2:20-cv-271-WKW, which was pending in the Middle District of Alabama, Northern Division, as of June 26, 2020. This case was transferred

JA-506

from the Southern District of Alabama on April 28, 2020 and, regretfully, overlooked filing the Order in this case.

4.      I do not currently have an ECF username and password for the Middle District of Alabama, thus on September 21, 2020, I emailed the Courtroom Deputy a copy of the Order so the clerk can file it on the docket.

5.      On September 11, 2020, Judge Keith Watkins ordered me to notify the Court by September 18, 2020 that I had neglected to file the Order in *Smith v. MCR Publishing*.  However, I did not learn of Judge Watkins' order until today, because my e-mail address was not registered with the Middle of District of Alabama and I was not receiving ECF bounces of that particular case.

Respectfully Submitted:

Dated:      September 21, 2020
            Valley Stream, NY

**s/richardliebowitz/**
Richard Liebowitz

JA-507

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ARTHUR USHERSON, | |
| Plaintiff, | Docket No. 1:19-cv-06368-JMF |
| - against - | |
| BANDSHELL ARTIST MANAGEMENT | |
| Defendant. | |

### DECLARATION OF RICHARD LIEBOWITZ

I, RICHARD LIEBOWITZ, declare that the following is true and correct to the best of my personal knowledge.

1.      I am the managing partner of the Liebowitz Law Firm, PLLC (the "LLF") and admitted to practice law in this District.

2.      On June 26, 2020, the Court ordered me to file a copy of the Court's 6/26/20 Opinion and Order on the docket of "any currently pending case that was brought by Mr. Liebowitz or his firm" no later than July 27, 2020.  *Usherson v. Bandshell Artist Mgmt.*, No. 19-CV-6368 (JMF), 2020 WL 3483661, at *22 (S.D.N.Y. June 26, 2020) (the "Order").

3.      On September 29, 2020, it came to my attention that I regretfully overlooked filing the Order in the case of *Stokes v. True Colors Bar, Inc.*, 1:19-cv-2696, which was pending in the Eastern District of New York.

JA-508

4.      On September 29, 2020, after learning that the Order had not yet been filed, I

promptly filed the Order in the Stokes case.

5.      I sincerely apologize to the Court for this oversight.

Respectfully Submitted:

Dated:       September 29, 2020
             Valley Stream, NY

**s/richardliebowitz/**
Richard Liebowitz

JA-509

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                      :
ARTHUR USHERSON,                                      :
                                                      :
                                  Plaintiff,          :          19-CV-6368 (JMF)
                                                      :
                        -v-                           :          ORDER
                                                      :
BANDSHELL ARTIST MANAGEMENT,                          :
                                                      :
                                  Defendant.          :
                                                      :
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        On June 26, 2020, the Court issued a fifty-four-page Opinion and Order — familiarity

with which is assumed — imposing a range of monetary and non-monetary sanctions on

Plaintiff's counsel Richard Liebowitz and his firm, the Liebowitz Law Firm, PLLC.  *See*

*Usherson v. Bandshell Artist Mgmt.*, No. 19-CV-6368 (JMF), 2020 WL 3483661 (S.D.N.Y.

June 26, 2020) (ECF No. 68).  To the extent relevant here, the Opinion and Order required Mr.

Liebowitz and his firm (1) no later than July 27, 2020, to serve a copy of the Opinion and Order

"on every one of the firm's current clients "and for Mr. Liebowitz to file a declaration attesting

to such service on ECF; (2) no later than July 27, 2020, to file a copy of the Opinion and Order

"on the docket of any currently pending case that was brought by Mr. Liebowitz or his firm" and

for Mr. Liebowitz to file a declaration attesting to the same on ECF; and (3) to file a copy of the

Opinion and Order on the docket in "any action that is filed within one year of the date of th[e]

Opinion and Order."  *Id.* at *22 (emphasis omitted).

        On July 27, 2020, following the denial by this Court of Mr. Liebowitz's request for stay

of the Opinion and Order pending appeal, *see Usherson v. Bandshell Artist Mgmt.*, No. 19-CV-

6368 (JMF), 2020 WL 4228754 (S.D.N.Y. July 22, 2020) (ECF No. 81), as well as the Second

JA-510

Circuit's denial of his request for an immediate stay, *see Usherson v. Bandshell Artist Mgmt.*, No. 20-2304, ECF No. 24 (2d Cir. July 27, 2020),[1] Mr. Liebowitz filed a declaration attesting that he had (1) "served by email a copy of the Order on every one of LLF's clients identified" in "an LLF internal email list — which [he] ha[d] reviewed for accuracy and to the best of [his] knowledge believe[d] to be complete"; and (2) "file[d] a copy of the Court's Order on the docket of all currently pending cases brought by [him] or LLF." ECF No. 82 ¶¶ 2-3. Mr. Liebowitz further attested that he identified "all currently pending cases brought by [him] or LLF" by "search[ing] on Pacer, in every federal judicial district around the country, for [his] name as counsel of record"; by "rel[ying] on [his] firm's internal records" for the "small number of cases filed by my firm in which I am not counsel of record"; and then "double-check[ing] these filings against [his] firm's internal case management system." *Id.* ¶ 3.

Notwithstanding these representations, on September 21 and 29, 2020, Mr. Liebowitz filed declarations with the Court identifying cases brought by him or his firm in which he had "neglected to file the Order," and only belatedly complied with its requirements. ECF No. 83 ¶ 3; *see* ECF No. 84. The Court has also received two letters and an email, attached here as Exhibits A through C, concerning compliance with the Court's Opinion and Order.[2]

In light of these developments, **no later than October 15, 2020**, Mr. Liebowitz shall file a sworn declaration that:

---

[1]     The Second Circuit subsequently also denied Mr. Liebowitz's request for stay pending appeal. *See Usherson v. Bandshell Artist Mgmt.*, No. 20-2304, ECF No. 47 (2d Cir. Aug. 21, 2020).

[2]     The Court received a voicemail from an individual who expressed similar concerns about Mr. Liebowitz's compliance, or lack thereof, with the Court's Opinion and Order, based on communications with third persons. The caller expressed a desire not to be involved any further. Given that, and given that the caller's information was only second-hand, the Court declines to place any weight on the caller's information.

(1) explains how, notwithstanding the process described in his declaration of July 27, 2020, he overlooked the cases that he or his firm concededly brought described in his declarations of September 21, and 29, 2020, and describes what steps, if any, he has taken (and when), or what steps he will take, to identify any other such cases;

(2) describes with particularity how the "LLF internal email list" Mr. Liebowitz used to identify the clients to whom he provided the Opinion and Order was compiled, who is responsible for maintaining it, and how (and how often) it is updated; explains whether it is possible that there are any clients of Mr. Liebowitz or his firm that would not be on that list; and, if so, describes what steps, if any, he has taken (and when), or what steps he will take, to identify any such clients;

(3) responds to the letter addressed to the Court from Mr. Hudson dated July 28, 2020, by:

a. identifying whether there are any cases in which he or his firm is acting as counsel, in any way (i.e., directly or indirectly), but has not entered a formal notice of appearance and in which he has not, as of the date of this Order, either filed the Opinion and Order or shared the Opinion and Order with the client;

b. if so, showing cause why that should not be treated as a violation of the Opinion and Order; and

c. either way, showing cause why the Opinion and Order should not be modified to require its filing in *any* case where Mr. Liebowitz or his firm is involved as counsel, whether or not he or his firm has entered a formal notice of appearance.

Defense counsel may (but is not required to) respond to Mr. Liebowitz's declaration by **October 21, 2020**. (If defense counsel has any information that speaks to the issues referenced above and, more broadly, to Mr. Liebowitz's compliance with the Opinion and Order, he is encouraged to share that information with the Court.) No reply may be filed absent leave of Court.

SO ORDERED.

Dated: October 2, 2020
      New York, New York
                                  JESSE M. FURMAN
                                United States District Judge

3

JA-512

# EXHIBIT A

# HULL BARRETT

A T T O R N E Y S

AUGUSTA   AIKEN   EVANS

**DAVID E. HUDSON**
~ LICENSED IN GEORGIA

DHUDSON@HULLBARRETT.COM

July 28, 2020

Hon. Jesse M. Furman
United States District Court Judge
United States Courthouse
40 Foley Square
New York, NY 10007

RE:  ***Usherson v. Bandshell Artist Management***
      **Civil Action No. 19-06368**
      **Richard Liebowitz**

Dear Judge Furman:

By way of introduction I am counsel for the Defendant in the case of *Bill Wisser v. Morris Communications Company*, Civil Action File No. CV118-150, Southern District of Georgia. This is a case alleging copyright infringement first filed by Mr. Liebowitz on behalf of Wisser in the Southern District of New York. Case No. 1:18-CV-150-JFH-BKE. Subsequently it was transferred to the Southern District of Georgia on jurisdictional grounds. Although Mr. Liebowitz has not appeared in the case *pro hac vice*, he has participated in it through settlement discussions and signing interrogatory answers. For formal appearances in the case, he has used other attorneys to represent the Plaintiff.

Once I became aware of your sanction order, 2020 U.S. Dist. LEXIS 112368 (June 26, 2020), I inquired of Mr. Liebowitz whether he would file that order in the *Wisser* case and inform Mr. Wisser of the order. His reply to me was that he is not counsel of record in the Georgia case.

Be that as it may, the *Wisser* case is one that was "brought" by Mr. Liebowitz and there is no reason to think that he does not still represent Mr. Wisser and have a financial interest in the case. He has not filed a copy of the Court's order in the *Wisser* case here in Georgia, and I have no reason to know whether or not he served his client with the order.

HULL BARRETT, P.C., 801 BROAD STREET, 7TH FLOOR, AUGUSTA, GEORGIA 30901
TELEPHONE: (706) 722-4481   FAX: (706) 722-9779
MAILING ADDRESS: POST OFFICE BOX 1564, AUGUSTA, GEORGIA 30903-1564

JA-514

Hon. Jesse M. Furman
July 28, 2020
Page 2

Respectfully,

David E. Hudson
Attorney for Morris Visitor Publications

DEH/nhb

cc:     R. L. Liebowitz, Esq.      (via email)
        Dorsey Carson, Esq.        (via email)

00310858.doc.v1

JA-515

# EXHIBIT B

July 29, 2020



**CRITCHFIELD
CRITCHFIELD
& JOHNSTON**
ATTORNEYS

ANDREW P. LYCANS
lycans@ccj.com

225 N. MARKET STREET
P.O. BOX 599
WOOSTER, OHIO 44691
T: 330.264.4444
F: 330.263.9278

4996 FOOTE ROAD
MEDINA, OHIO 44256
T: 330.723.6404
F: 330.721.7644

138 E. JACKSON STREET
MILLERSBURG, OHIO 44654
T: 330.674.3055
F: 330.674.4469

10 S. GAY STREET
P.O. BOX 469
MT. VERNON, OHIO 43050
T: 740.397.4040
F: 740.397.6775

60 W. SECOND STREET
P.O. BOX 127
ASHLAND, OHIO 44805
T: 419.289.6888
F: 419.281.2461

CRITCHFIELD, CRITCHFIELD &
JOHNSTON, LTD.

**WWW.CCJ.COM**

The Honorable Jesse M. Furman
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

  RE: *Arthur Usherson v. Bandshell Artist Management*
    U.S. District Court, Southern District of New York
    Case No.: 1:19-CV-6368

Dear Judge Furman,

I am defending The Triple H Magazine, Inc. in a copyright infringement lawsuit filed by Attorney Richard Liebowitz. The lawsuit is pending in the United States District Court for the Northern District of Ohio and is styled *George Matula v. The Triple H Magazine, Inc.,* Case No. 5:20-cv-00876.

Pursuant to the Opinion and Order issued in the above referenced case on June 26, 2020, Attorney James Freeman of the Liebowitz Law Firm, PLLC filed a Notice of Order in the Northern District of Ohio case on July 28, 2020. I have enclosed a copy of that Notice (omitting the attached Opinion and Order) for your reference.

In reviewing the Opinion and Order, I noted that Mr. Liebowitz and his firm were ordered to file a copy of this Opinion and Order on the docket of any currently pending case that was brought by Mr. Liebowitz or his firm and that Mr. Liebowitz was to file a declaration attesting to his compliance with the order within 30 days.

I feel it is my obligation to point out that the Notice was filed 32 days after the Opinion and Order was issued. I am bringing this to the Court's attention, in part, because I reviewed the docket in Case No. 1:19-CV-6368, which includes a Declaration of Richard Liebowitz filed July 27, 2020, in which Attorney Liebowitz states that he had "filed" the Court's Order in his pending cases as directed.

I do realize that the Notice filed in my case is dated July 27, 2020. However, it had not been filed at the time the Declaration was filed in the case pending before this Court.

Sincerely,

Andrew P. Lycans

APL/tlm
Enclosure

Case 20-2304, Document 57, 11/02/2020, 2965869, Page258 of 275

JA-517

Case 1:19-cv-06368-JMF   Document 85   Filed 10/05/20   Page 9 of 14
Case: 5:20-cv-00876-BYP   Doc #: 35   Filed: 07/28/20   1 of 62.   PageID #: 108

## NOTICE OF ORDER

On June 26, 2020, in another action, the Honorable Jesse M. Furman of the United States District Court for the Southern District of New York entered an Opinion and Order directing that Richard Liebowitz and Liebowitz Law Firm, PLLC file a copy of that Opinion and Order in all currently pending cases.  A copy of Judge Furman's order is attached hereto.

Mr. Liebowitz and LLF strongly contest Judge Furman's factual findings and legal conclusions, and have appealed the Opinion and Order to the United States Court of Appeals for the Second Circuit.

Dated: July 27, 2020                                    Respectfully Submitted,
       Valley Stream, New York

                                                       LIEBOWITZ LAW FIRM, PLLC

                                                       /s/Jameshfreeman/
                                                       James Freeman
                                                       11 Sunrise Plaza, Ste. 305
                                                       Valley Stream, NY 11580
                                                       JF@LiebowitzLawFirm.com
                                                       (516) 233-1660

# EXHIBIT C

JA-519

| | |
|---|---|
| **From:** | Ricardo Guise |
| **To:** | Furman NYSD Chambers |
| **Subject:** | Lukaszewicz v. WSN Inc. |
| **Date:** | Wednesday, September 9, 2020 12:21:30 PM |

Your Honor:

I hope you and your family are well.

Allow me to bring your attention to the email below one of my co-workers received from Richard Liebowitz, and her response.

We found his claim and general approach so fantastical that we decided to do some research on him, and found your judgement from June 26.

It seems Mr. Liebowitz has not learned his lesson and apparently continues to harass companies with spurious claims. The fact that he is doing so at this particular time when most publishers are attempting to keep their companies afloat is particularly galling.

Can something be done to stop these internet trolls?

Thank you in advance,

Ricardo Guise
President & Publisher
World Screen
rguise@worldscreen.com
Phone: (212) 924-7620
http://www.worldscreen.com

Begin forwarded message:

**From:** Mansha Daswani <mdaswani@worldscreen.com>
**Subject: Re: Lukaszewicz v. WSN Inc.**
**Date:** September 4, 2020 at 12:41:26 PM EDT
**To:** rl@liebowitzlawfirm.com

Dear Mr. Liebowitz
We are in receipt of your email notifying WSN INC that we are "in default" on a legal complaint. This summons (nor any other notification) was never received at the registered address of WSN INC. Was it sent by certified mail? Also, please be aware we have not been at our physical office since March due to COVID-19.

We therefore find it surprising that you have immediately threatened legal action without any prior communication about this alleged copyright infringement on the website worldscreen.com over an image owned by Adam Lukaszewicz.

If any copyright infringement did take place, it was entirely innocent and unwilling. As a good-faith gesture, the potentially infringing image has been removed from the website, and any other location on our server.

As a next step, we ask that you provide the following information:

— Proof that you have the right to represent Mr. Lukaszewicz in this action. (We read with interest the recent ruling against you detailing "repeated violations of court orders and outright dishonesty."
https://www.scribd.com/embeds/469163224/content?
start_page=1&view_mode=scroll&access_key=key-
WDP5cFoOJQpQmOKXgf72)

As such, please submit documentation that Mr. Lukaszewicz continues to retain you as his legal representation, even following this June 2020 ruling.

— Proof that from the time the photo was taken in 2016 until the time it was registered with the copyright office in 2020, Mr. Lukaszewicz never made this image available on Pixabay or any other free photo library. We are content owners ourselves and are not in the business of taking images off the open internet to use in our publishing platforms. All of our artwork is sourced from the companies we cover or platforms such as Pixabay and Shutterstock. With the wealth of visually similar images available on Pixabay, it is inconceivable that we would have taken an image from a travel blog. We are a 35-year-old media organization and have nothing but the utmost respect for copyright holders.

— Clarification on how there is a case of infringement when the usage—which is clearly in diminimis as it appears solely as a thumbnail deep inside the WorldScreen.com archive and indeed appears nowhere else on our site or on the Google image cache—predates the copyright registration by two years.

Thank you again for notifying us of this alleged infringement. We respect and appreciate the fair and reasonable application of copyright law and hope to close this matter prior to both parties investing more time and resources—especially at a time when independently owned companies like ours are suffering irretrievable losses due to the COVID-19 pandemic.

Best,
Mansha Daswani

---



**Mansha Daswani** | Editor & Associate Publisher | (212) 4630340 |
@worldscreen | WorldScreen.com

---

Begin forwarded message:

**From:** Richard Liebowitz

<rl@liebowitzlawfirm.com>
**Subject: Fwd: Lukaszewicz v. WSN Inc.**
**Date:** September 4, 2020 at 12:26:37 AM EDT
**To:** sweaver@worldscreen.com

Dear Sir or Madam,

Did you receive the below legal complaint? You are
currently in default. Please call me at 516-233-1660 to
discuss. Thank you.

Best,

Richard Liebowitz
Liebowitz Law Firm, PLLC
516-233-1660
www.LiebowitzLawFirm.com


---------- Forwarded message ---------
From: **Richard Liebowitz**
<RL@liebowitzlawfirm.com>
Date: Wed, May 27, 2020 at 3:42 PM
Subject: Lukaszewicz v. WSN Inc.
To: Jeffrey Teitel <jteitel@lawyerservicebureau.com>


Hi Jeff,

Please serve attached via the SOS. Thank you.

Best,

Richard Liebowitz
Liebowitz Law Firm, PLLC
516-233-1660
www.LiebowitzLawFirm.com

<WSN- Summons Stamped.pdf>

<Lukaszewicz v. WSN- Complaint Stamped.pdf>

<Exhibit B- WSN Stamped.pdf>

<Exhibit A- WSN Stamped.pdf>

<WSN- CC.pdf>

JA-522

JA-523

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARTHUR USHERSON,

                              Plaintiff,

        - against -

BANDSHELL ARTIST MANAGEMENT

                              Defendant.

Docket No. 1:19-cv-06368-JMF

---

## DECLARATION OF RICHARD LIEBOWITZ

        I, RICHARD LIEBOWITZ, declare under the penalty of perjury, pursuant to 28 U.S.C.

§ 1746, that the following is true and correct to the best of my personal knowledge:

        1.        I am lead counsel for Plaintiff Arthur Usherson ("Plaintiff") in this action and the

founding member of Liebowitz Law Firm, PLLC ("LLF").

        2.        I submit this Declaration in response to the Court's Order, dated October 5, 2020.

Dkt. 85.

**Procedural History**

        3.        On June 26, 2020, this Court issued an Opinion and Order (the "June 26 Order")

that imposed six monetary and non-monetary sanctions on LLF and me.  Dkt. 68.  Sanction Four

requires that I file a copy of the Court's June 26 Order on the docket of all currently pending

cases brought by LLF or me.

        4.        On July 27, 2020, as required, I filed a declaration attesting to my compliance

with the Court's June 26 Order as to Sanction Four.  Dkt. 82, ¶ 3.

JA-524

5.      On September 21 and 29, 2020, I filed further declarations informing the Court that I had filed the June 26 Order in two additional matters.  Dkts. 83, 84.

6.      On October 5, 2020, the Court issued an Order (the "October 5 Order") requiring that I "file a sworn declaration that: (1) explains how, notwithstanding the process described in [my] declaration of July 27, 2020, [I] overlooked the cases that [I] or [my] firm concededly brought described in [my] declarations of September 21, and 29, 2020, and describes what steps, if any, [I have] taken (and when), or what steps [I] will take, to identify any other such cases; (2) "describes with particularity how the 'LLF internal email list' [I] used to identify the clients to whom [I] provided the Opinion and Order was compiled, who is responsible for maintaining it, and how (and how often) it is updated; explains whether it is possible that there are any clients of [mine] or [my] firm that would not be on that list; and, if so, describes what steps, if any, [I have] taken (and when), or what steps [I] will take, to identify any such clients"; and (3) "responds to the letter addressed to the Court from Mr. Hudson dated July 28, 2020, by: [a.] identifying whether there are any cases in which [I] or [my] firm is acting as counsel, in any way (i.e., directly or indirectly), but ha[ve] not entered a formal notice of appearance and in which [I have] not, as of the date of this Order, either filed the Opinion and Order or shared the Opinion and Order with the client; [b.] if so, showing cause why that should not be treated as a violation of the Opinion and Order; and [c.] either way, showing cause why the Opinion and Order should not be modified to require its filing in *any* case where [I] or [my] firm is involved as counsel, whether or not [I] or [my] firm has entered a formal notice of appearance."  Dkt. 85.

**Case Tracking Errors**

7.      Prior to filing my July 27 declaration, in order to comply with Sanction Four, I generated a list of all cases filed by me and LLF using Pacer.  In Pacer's advanced search

2

function, I first ran the search phrase "Richard Liebowitz" to generate a master list.  I then limited that list by district, by searching in each district in which I knew I or my firm had filed cases, and also at times limiting by "attorney."[1]  As I worked through each such district to file the June 26 Order, I double-checked the filings against my firm's internal case management system.

8.      Pursuant to this process, I timely filed the June 26 Order in over approximately 400 cases brought by LLF and pending in districts across the country.

9.      Notwithstanding the process described above and despite my good-faith effort, I did not timely file the June 26 Order in some cases due to human error and shortcomings in the search process I used to identify the set of cases in which I was required to file the Order.  In particular, although I double-checked my district-by-district filings against my firm's internal case management system, I did not do the reverse, that is, I did not use my firm's internal case management system to identify any districts or cases missing from my Pacer searches.  I also did not run separate searches in districts other than those in which I knew my firm or I had filed cases.

10.      As described in the following paragraphs, I have made efforts to correct my oversights and the shortcomings in my search process, and to ensure my good-faith compliance with Sanction Four.  As described below, in addition to the cases specifically cited in my September 21 and September 29 declarations to this Court, I have identified other cases in which I did not timely file the June 26 Order.

---

[1] Acting at my direction, my associate James Freeman handled the filings in LLF's cases in the Southern District of New York.  Mr. Freeman also filed the June 26 Order in a small number of LLF cases in which he has entered an appearance, but I have not.

3

JA-526

11.     Since July 27, 2020, I have filed the Court's June 26 Order in the following cases, which I neglected to do following my original searches either because I did not search the districts in which the cases are pending (as in the cases pending in Tennessee and Oregon), or simply missed the case in the lists generated by Pacer following my original searches (as most likely happened in the cases of *Cuffaro*, *Stokes*, and *Plastik*).  At least one of these cases was brought to my attention by my counsel (*Cuffaro*) and two were brought to my attention by a United States Magistrate Judge (*Stokes* and *Plastik*):

- *Cuffaro v. Fashionisto*, No. 19-CV-7265 (S.D.N.Y.) (filed 7/28/2020);

- *Stokes v. True Colors Bar, Inc.*, No. 19-CV-2696 (E.D.N.Y.) (filed 9/29/2020);

- *Plastik v. Westbury Music Fair, Inc.*, No. 19-CV-2820 (E.D.N.Y.) (filed 10/6/2020);

- *Castle v. Kingsport Pub. Corp.*, No. 19-CV-92 (E.D. Tenn.) (filed 9/22/2020);

- *Sands v. Jones Media, Inc.*, No. 19-CV-304 (E.D. Tenn.) (filed 10/13/2020);

- *Guthridge v. Gannett Satellite Info. Network, LLC*, No. 20-CV-2137 (W.D. Tenn.) (filed 10/13/2020);

- *Guthridge v. Beale Street Blues Co., Inc.*, No. 20-CV-2189 (W.D. Tenn.) (filed 10/13/2020);

- *Usherson v. Third Man Records, LLC*, No. 20-CV-390 (M.D. Tenn.) (filed 10/13/2020);

- *Stokes v. TRAX Nashville*, No. 19-CV-809 (M.D. Tenn.) (filed 10/13/2020);

- *Peterson v. Decker*, No. 19-CV-812 (M.D. Tenn.) (filed 10/13/2020);

- *Stross v. Smith Rock Masonry Co. LLC*, No. 19-CV-1394 (D. Or.) (filed 10/13/2020); and

- *Fortune v. Combined Comms., Inc.*, No.19-CV-1236 (D. Or.) (filed 10/13/2020).

12.     In addition to the errors described above, understanding that I was only to file the June 26 Order in "pending" cases, I did not timely file the June 26 Order in another set of cases

4

for which Pacer listed the case as "closed" as of July 27, 2020, and therefore, I understood, were not "pending." As I subsequently realized, however, in some of those cases, motions remained pending, and for avoidance of doubt I should have filed the June 26 Order in such cases. Since July 27, 2020, I have filed the June 26 Order in the following cases in this category:

- *Craig v. PopMatters Media, Inc.*, No. 18-CV-1713 (S.D. Ill.) (filed 7/28/2020);

- *Yang v. Mic Network Inc.*, No. 18-CV-7628 (S.D.N.Y.) (filed 8/3/2020);

- *Walsh v. Townsquare Media, Inc.*, No. 19-CV-4958 (S.D.N.Y.) (filed 8/3/2020);

- *Vila v. J Brand, Inc.*, No. 20-CV-2107 (S.D.N.Y.) (filed 10/15/2020); and

- *Marano v. The Metropolitan Museum of Art*, No. 19-CV-8606 (S.D.N.Y.) (filed 10/15/2020).

13.     An additional category of some 70 cases that were "pending" as of the date of the June 26 Order but were not "pending" as of July 27, 2020 because such cases had been settled, dismissed, or terminated in a default judgment between June 26, 2020 and July 27, 2020 also has been addressed. Although these cases had no ongoing motion practice or other activity, and thus were not "pending" on July 27, 2020, I have nevertheless filed the June 26 Order in such cases, which are listed in Appendix A.

14.     I did not timely file the June 26 Order in another set of cases because I believed that I was no longer counsel of record and therefore not required by the June 26 Order to file the Order. I subsequently recognized that filing was in fact required in these cases. Since July 27, 2020, I filed the June 26 Order in the following cases in this category:

- *Zucker v. Cruz Bay Pub., Inc.*, No. 19-CV-1166 (D. Colo.) (filed 7/29/2020);

- *Colwell v. IHeartMedia, Inc.*, No. 19-CV-1857 (D. Colo.) (filed 7/29/2020);

- *Adlife Marketing & Comms. Co., Inc. v. Kroger Co.*, No. 20-CV-137 (D. Colo.) (filed 7/29/2020);

- *Gutman v. Momma Dora Medicinals, Co.*, No. 20-CV-1048 (D. Colo.) (filed 7/29/2020);

- *Jamieson v. Hoven Vision LLC*, No. 20-CV-1122 (D. Colo.) (filed 7/29/2020);

- *Guarneros v. Denver Green Party*, No. 19-CV-139 (D. Colo.) (filed 7/29/2020);

- *Mondragon v. Nosrak LLC*, No. 19-CV-1437 (D. Colo.) (filed 7/29/2020);

- *Stross v. Premium Source Inc.*, No. 19-CV-2496 (D. Colo.) (filed 7/29/2020);

- *Giannopoulos v. Premium Source Inc.*, No. 19-CV-3615 (D. Colo.) (filed 7/29/2020);

- *Thorn v. J&B  Importers Inc.*, No. 20-CV-222 (D. Colo.) (filed 7/29/2020);

- *Chisolm v. Glob. Graphics & Designs Inc.*, No. 20-CV-344 (D. Colo.) (filed 7/29/2020);

- *Sparks v. C3 Real Estate Sols., LLC*, No. 20-CV-693 (D. Colo.) (filed 7/29/2020);

- *Takeshige v. Rich Broad. LLC*, No. 20-CV-1262 (D. Colo.) (filed 7/29/2020);

- *Bechler v. SD Bullion, Inc.*, No. 20-CV-1335 (D. Colo.) (filed 7/29/2020);

- *Longwell v. Swift Comms., Inc.*, No. 20-CV-1432 (D. Colo.) (filed 7/29/2020);

- *Geerds v. San Francisco Bay View Inc.*, No. 19-CV-6465 (N.D. Cal.) (filed 7/29/2020);

- *Zharkov v. 3DBIN, Inc.*, No. 19-CV-5616 (N.D. Cal.) (filed 7/29/2020); and

- *Wisser v. Morris Comms. Co., LLC*, No. 18-CV-150 (S.D. Ga.) (filed 8/5/2020 by local counsel).

15.     Finally, subsequent to July 27, 2020, I identified an additional set of cases in which I have filed or am promptly working to file the June 26 Order.  Several of these cases involve situations in which I had not entered a formal appearance in the case, or lacked filing credentials.  I have filed or am working to promptly file the June 26 Order in the following cases in this category:

- *Matula v. Triple H Mag., Inc.*, No. 20-CV-876 (N.D. Ohio) (filed 7/28/2020);

6

- *Hanson v. GA Dreamworks Realty LLC*, No. 20-CV-61 (S.D. Ga.) (sent to clerk to request filing on 10/13/2020);[2]

- *Redinger v. Magic City Organics, LLC*, No. 20-CV-564 (N.D. Ala.) (sent to clerk to request filing on 10/13/2020);

- *Cianelli v. Nourison Indus., Inc.*, No. 19-CV-19147 (D.N.J.) (filed 10/14/2020);

- *Verch v. Elevare Skin, LLC*, No. 20-CV-4819 (C.D. Cal.) (filed by local counsel on 10/13/2020);

- *Dvir v. Norsan Media*, No. 20-CV-393 (M.D. Fla.) (filed by local counsel on 10/15/2020);

- *Mancha v. Gray Media Group, Inc.*, No. 20-CV-363 (M.D. Fla.) (filed by local counsel on 10/15/2020);

- *Zlozower v. Magnet Mag., Inc.*, No. 19-CV-1434 (E.D. Pa.) (filed 10/13/2020);

- *Radabaugh v. Clay Turner Realty LLC*, No. 20-CV-58 (S.D. Ga.) (filed 8/3/2020 by local counsel);

- *Tejada v. CSI Measurement, LLC*, No. 20-CV-324 (W.D. Okla.) (filed 8/12/2020 after requesting and obtaining ECF credentials); and

- *Causi v. Sports Art Illustrated Inc.*, No. 19-CV-20819 (S.D. Fla.) (filed by local counsel on 10/15/2020).

**LLF's Client List**

16.     LLF's client list is compiled pursuant to the following process: (1) the client

completes LLF's standard retainer agreement, which includes a space for the client to provide an

email address; (2)  LLF's Director of Client Relations receives and reviews the retainer

agreement; and (3) she inputs the client's information, including email address, into Quickbase

---

[2] On October 13, 2020, the clerk for the Northern District of Alabama replied to my request, informing me that I could file in the case only if I obtained pro hac admission and ECF credentials in that district.  This case is closed, and accordingly I respectfully request this Court's permission to satisfy its June 26 Order by sending that Order to counsel of record, which I did by email on October 14, 2020.

and Clio, LLF's internal client tracking systems.  LLF's client list is therefore updated each time

a new retainer agreement is signed.

17.    Although the Director of Client Relations is responsible for entering client

information into LLF's internal client tracking systems, I am ultimately responsible for

maintaining LLF's client list.

18.    Based on my review of LLF's client list and my conversations with LLF's

Director of Client Relations, I do not believe that there are any of my or my firm's clients that

are not on LLF's client list.

**Mr. Hudson's July 28, 2020 Letter**

19.    There are a small number of cases outside this District, including the case referred

to in Mr. Hudson's July 28 letter, in which I did not file this Court's June 26 Order because

(1) neither I nor LLF initiated the case, (2) neither I nor LLF entered a notice of appearance in

the case, and (3) the case is being handled by a third-party lawyer.  These cases are connected to

LLF because LLF has a retainer agreement with the client, and LLF likely discovered the

infringement.

20.    In addition to the case in which Mr. Hudson appears, these cases are:

- *Miller v. Hollywood Unlocked, Inc.*, No. 20-CV-5936 (C.D. Cal.) (filed 10/13/2020);

- *O'Brien v. Beverly Hills Lifestyle Mag., Inc.*, No. 20-CV-3707 (C.D. Cal.) (filed 10/13/2020);

- *Ma v. Kendall Jenner, Inc.*, No. 20-CV-3011 (C.D. Cal.) (filed 10/13/2020);

- *Wexler v. B. Scott Media*, No. 19-CV-3465 (C.D. Cal.) (filed 10/13/2020); and

- *De Rouw v. Int'l Sustainable Dev. Inst., Inc.*, No. 19-CV-10198 (D. Mass.) (filed by local counsel on 10/15/2020).

21.     At the time, I did not believe that my decision not to file the June 26 Order in the above-referenced cases was in violation of the Order, which requires that I "file a copy of this Opinion and Order on the docket of any currently pending case that was *brought* by [me] or [my] firm." Dkt. 68 (emphasis added).  Although I do not believe my decision not to file the June 26 Order in such cases should be treated as a violation of the Order, this Court's subsequent October 5 Order makes clear to me that I should have filed the June 26 Order in any cases where I or my firm is involved, even if I or my firm was not counsel of record, and that I should continue to do so for the period the Order remains in effect.

22.     I have taken steps to accomplish the filing of the June 26 Order in all such cases listed above in paragraph 20 by providing the Order to counsel of record with a request that it be promptly filed, and I intend to do so in comparable cases as long as the June 26 Order remains in effect.  Accordingly, no modification of the June 26 Order is necessary.  Previously, notwithstanding that I did not construe the June 26 Order as requiring filing in these cases, in response to Mr. Hudson's July 28 letter, the lawyer appearing for the plaintiff in that case did file the June 26 Order on August 5, 2020.  *See Wisser v. Morris Visitor Pubs, Inc.*, No. 18-CV-150 (S.D. Ga.) (Dkt. 48).

JA-532

23.    I apologize to this Court for my errors in compliance.  I have sought to comply with this Court's June 26 Order in good faith and will continue to do so as long as it remains in effect.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my personal knowledge:

Dated:        October 15, 2020
              Valley Stream, New York

**/s/richardliebowitz/**
Richard Liebowitz

Liebowitz Law Firm, PLLC
11 Sunrise Plaza, Suite 305
Valley Stream, NY 11580
516-233-1660
RL@LiebowitzLawFirm.com

*Attorneys for Plaintiff*

10

### Appendix A

- *Vila v. Mango USA, Inc.*, No. 20-CV-64 (E.D.N.Y.) (filed 10/15/2020);
- *Ayiomamitis v. New Greek TV Inc.*, No. 20-CV-885 (E.D.N.Y.) (filed 10/15/2020);
- *Verch v. Brainjolt LLC*, No. 20-CV-1591 (E.D.N.Y.) (filed 10/15/2020);
- *Harbus v. Clean & Sober Media LLC*, No. 20-CV-1914 (E.D.N.Y.) (filed 10/15/2020);
- *Trinkhaus v. The King & I Sales and Distribution Company, Inc.*, No. 20-CV-2056 (E.D.N.Y.) (filed 10/15/2020);
- *Wexler v. Outer Boro Media LLC*, No. 20-CV-2080 (E.D.N.Y.) (filed 10/15/2020);
- *Barron v. DraftExpress Inc.*, No. 20-CV-2352 (E.D.N.Y.) (filed 10/15/2020);
- *Plastik v. Meruelo Media, LLC*, No. 20-CV-2556 (E.D.N.Y.) (filed 10/15/2020);
- *Wexler v. Cobalt Boats, LLC*, No. 20-CV-2655 (E.D.N.Y.) (filed 10/15/2020);
- *Hirsch v. Colle, Hochberg & Grey LLC*, No. 18-CV-12311 (S.D.N.Y.) (filed 10/15/2020);
- *Polaris Images Corporation v. Hollywoodlife.com, LLC*, No. 19-CV-398 (S.D.N.Y.) (filed 10/15/2020);
- *Nall v. Discovery Comms., LLC*, No. 19-CV-571 (S.D.N.Y.) (filed 10/15/2020);
- *Idir v. La Calle TV, LLC*, No. 19-CV-6251 (S.D.N.Y.) (filed 10/15/2020);
- *Aurichio v. Queerty, Inc.*, No. 19-CV-6253 (S.D.N.Y.) (filed 10/15/2020);
- *Verch v. The Trustees of Columbia University in The City Of New York*, No. 19-CV-08728, (S.D.N.Y.) (filed 10/15/2020);
- *Yang v. Guest of a Guest, Inc.*, No. 19-CV-9531 (S.D.N.Y.) (filed 10/15/2020)     ;
- *Verch v. BDG Media, Inc.*, No. 19-CV-9618 (S.D.N.Y.) (filed 10/15/2020);
- *Verch v. IESE USA, Inc.*, No. 19-CV-10258 (S.D.N.Y.) (filed 10/15/2020);
- *Schiffman v. Townsquare Media, Inc.*, No. 19-CV-10467 (S.D.N.Y.) (filed 10/15/2020);
- *Capital Art, Inc. v. Bonhams & Butterfields Auctioneers Corp.*, No. 20-CV-180 (S.D.N.Y.) (filed 10/15/2020);
- *Dermansky v. Cable News Network, Inc.*, No. 20-CV-1615 (S.D.N.Y.) (filed 10/15/2020);
- *Barbera v. Christian Siriano Holdings LLC*, No. 20-CV-1619 (S.D.N.Y.) (filed 10/15/2020);
- *Yang v. Dino Bones Productions, Inc.*, No. 20-CV-2340 (S.D.N.Y.) (filed 10/15/2020);
- *Zharkov v. Forbes Media, LLC*, No. 20-CV-2399 (S.D.N.Y.) (filed 10/15/2020);
- *McGovern v. Zuiker Press, LLC*, No. 20-CV-2629 (S.D.N.Y.) (filed 10/15/2020);
- *Landau v. The Architect's Newspaper, LLC*, No. 20-CV-3299 (S.D.N.Y.) (filed 10/15/2020);
- *Trinkhaus v. Inter-Continental Hotels Corp.*, No. 20-CV-3694 (S.D.N.Y.) (filed 10/15/2020);
- *Trinkhaus v. AFAR Media LLC*, No. 20-CV-3695 (S.D.N.Y.) (filed 10/15/2020);
- *Jackson v. Toteme LLC*, No. 20-CV-3756 (S.D.N.Y.) (filed 10/15/2020);
- *Ciamei v. Artemest USA, Inc.*, No. 20-CV-3820 (S.D.N.Y.) (filed 10/15/2020);

- *Flanagan v. Grocery Delivery E-Servs. USA Inc*., No. 20-CV-3822 (S.D.N.Y.) (filed 10/15/2020);
- *Gattoni v. Microsoft Corp*. No. 20-CV-3909 (S.D.N.Y.) (filed 10/15/2020);
- *Ramales v. JHud Prods., Inc.*, No. 20-CV-3927 (S.D.N.Y.) (filed 10/15/2020);
- *Krieger v. Dolce & Gabbana USA Inc*., No. 20-CV-4054 (S.D.N.Y.) (filed 10/15/2020);
- *Alfred v. Slam Media Inc*., No. 20-CV-4106 (S.D.N.Y.) (filed 10/15/2020);
- *Pires v. Beverage Media Grp., Inc*., No. 20-CV-4107 (S.D.N.Y.) (filed 10/15/2020);
- *Alvarado v. H Code Media, Inc*., No. 20-CV-4150 (S.D.N.Y.) (filed 10/15/2020);
- *Stridiron v. Assoc. Newspapers (U.S.A.) Ltd.*, No. 20-CV-4282 (S.D.N.Y.) (filed 10/15/2020);
- *Sayoga v. Variety Media, LLC*, No. 20-CV-4551 (S.D.N.Y.) (filed 10/15/2020);
- *Mateo v. Justin Bieber Brands, LLC*, No. 20-CV-4662 (S.D.N.Y.) (filed 10/15/2020);
- *Paciullo v. Mother Brand LLC*, No. 20-CV-4785 (S.D.N.Y.) (filed 10/15/2020);
- *Benham v. Matthews & Assocs. LLC*, No. 20-CV-2309 (W.D. Tenn.) (filed 10/15/2020);
- *Brickman v. Bonneville Int'l Corp.*, No. 19-CV-1804 (W.D. Wash.) (filed by local counsel on 10/15/2020);
- *Verch v. Six Foods LLC*, No. 20-CV-3458 (N.D. Cal.) (filed by local counsel on 10/14/2020);
- *Verch v. Duetto Res., Inc*., No. 19-CV-5099 (N.D. Cal.) (sent to local counsel for filing on 10/15/2020);
- *Verch v. Toolfarm.com, Inc*., No. 20-CV-2491 (N.D. Cal.) (filed by local counsel on 10/14/2020);
- *Verch v. Chapel Hills Vision, P.C*., No. 19-CV-2286 (D. Colo.) (filed 10/15/2020);
- *Miller v. Bahakel Comms., Ltd*., No. 20-CV-791 (D. Colo.) (filed 10/15/2020);
- *Wagar v. Big R Holdings, Inc*., No. 20-CV-178 (D. Colo.) (filed 10/15/2020);
- *Au v. Generator Source LLC*, No. 20-CV-196 (D. Colo.) (filed 10/15/2020);
- *Integral Images Inc v. Megababe LLC*, No. 20-CV-773 (E.D. Wis.) (filed 10/15/2020);
- *Martez v. Gryppers, Inc*., No. 19-CV-140 (E.D.N.C.) (filed 10/15/2020);
- *Benham v. Tech. Partners, LLC*, No. 20-CV-257 (W.D.N.C.) (filed by chambers 10/15/2020);
- *Russo v. Invesprise LLC*, No. 19-CV-1332 (W.D. Pa.) (filed 10/15/2020);
- *Burns v. Living Easy Ariz. Real Estate LLC*, No. 20-CV-865 (D. Az.) (filed 10/15/2020);
- *Martinka v. Primo Experiences, Inc*., No. 20-CV-33 (W.D.N.Y.) (filed 10/15/2020);
- *Wagar v. Marriott Int'l, Inc*., No. 20-CV-59 (W.D.N.Y.) (filed 10/15/2020);
- *Taggart v. Graham Media Grp., Inc*., No. 20-CV-406 (S.D. Tex.) (filed 10/15/2020);
- *Bee Creek Photography v. ALRE LLC*, No. 20-CV-1908 (S.D. Tex.) (filed 10/15/2020);
- *Dodson v. Free Speech Sys., LLC*, No. 19-CV-511 (W.D. Tex.) (filed 10/15/2020);
- *Cat & Dogma, LLC v. Target Corp.*, No. 19-CV-1002 (W.D. Tex.) (filed 10/15/2020); and
- *Goldsmith v. Alfavor Petroleum Corp.*, No. 20-CV-598 (W.D. Tex.) (filed 10/15/2020).