# 20-2304-cv

## United States Court of Appeals

*for the*

## Second Circuit

—————————————

ARTHUR USHERSON,

*Plaintiff,*

RICHARD P. LIEBOWITZ, LIEBOWITZ LAW FIRM, PLLC,

*Miscellaneous-Appellants,*

– v. –

BANDSHELL ARTIST MANAGEMENT,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLANTS

ROBERT J. ANELLO
BRIAN A. JACOBS
KEVIN GROSSINGER
A. DENNIS DILLON
MORVILLO ABRAMOWITZ GRAND IASON
  & ANELLO P.C.
*Attorneys for Appellants*
565 Fifth Avenue
New York, New York 10017
(212) 880-9600

**CORPORATE DISCLOSURE STATEMENT
PURSUANT TO RULE 26.1 OF THE
<u>FEDERAL RULES OF APPELLATE PROCEDURE</u>**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the

Liebowitz Law Firm, PLLC, an Appellant in this action, states that it does not have

a corporate parent, and there is no publicly held corporation that owns 10 percent

or more of the company's stock.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................1

STATEMENT OF JURISDICTION...................................................2

ISSUES PRESENTED........................................................................3

STATEMENT OF THE CASE.............................................................4

STATEMENT OF FACTS ..................................................................6

    A.    Mr. Liebowitz's Background and Law Practice ...................6

    B.    The Complaint and the Mediation Referral ...........................8

    C.    Bandshell's Motion for Sanctions and Mr. Liebowitz's Response.......9

    D.    The Mediator's Declaration and Mr. Liebowitz's Letter Brief..........14

    E.    The District Court Orders a Hearing and the Parties Settle the Case ................................................16

    F.    The Evidentiary Hearing and Post-Hearing Submissions...................17

    G.    The District Court's Sanctions Order....................................21

        1.    The District Court's Erroneous Finding that Mr. Liebowitz Lied Regarding Receiving Permission from the Mediator for Mr. Usherson to Appear by Telephone ..............................22

        2.    The Registration of the Photograph ..........................................24

        3.    The District Court's Imposition of Sanctions ...........................26

    H.    The Notice of Appeal and Amended Sanctions ..................................27

SUMMARY OF ARGUMENT ..............................................................28

STANDARD OF REVIEW ...................................................................29

ARGUMENT ........................................................................................31

I.  THE DISTRICT COURT ABUSED ITS DISCRETION BY BASING
    SANCTIONS ON CLEARLY ERRONEOUS FINDINGS OF FACT ........31

    A.  The District Court Abused Its Discretion By Finding that Mr.
        Liebowitz Lied in Bad Faith About Getting Permission for Mr.
        Usherson to Participate in the Mediation by Telephone ....................31

    B.  The District Court Abused its Discretion By Finding that Mr.
        Liebowitz Supposedly Brought and Maintained this Case in Bad
        Faith By Falsely Alleging that the Photograph was Registered
        Prior to the Suit and Not Conducting a Reasonable Investigation......43

II. THE DISTRICT COURT ABUSED ITS DISCRETION BY IMPOSING
    EXCESSIVE MONETARY SANCTIONS ..................................................48

    A.  The Excessive $83,517.49 Sanction....................................................49

    B.  The Punitive $20,000 Sanction ...........................................................53

III. THE DISTRICT COURT ABUSED ITS DISCRETION BY IMPOSING
     OVERBROAD NON-MONETARY SANCTIONS ....................................56

IV. THE CASE SHOULD BE REASSIGNED TO A DIFFERENT DISTRICT
    JUDGE IF REMAND IS REQUIRED..........................................................60

CONCLUSION ...................................................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ametex Fabrics, Inc. v. Just In Materials, Inc.*,
  140 F.3d 101 (2d Cir. 1998) ........................................................... 36, 42

*Blue v. U.S. Dep't of Army*,
  914 F.2d 525 (4th Cir. 1990) .................................................................51

*Cooter & Gell v. Hartmarx Corp.*,
  496 U.S. 384 (1990) ..............................................................................30

*Cortes-Ramos v. Martin-Morales*,
  956 F.3d 36 (1st Cir. 2020) ....................................................................47

*Cruz v. Cox Media Grp., LLC*,
  444 F. Supp. 3d 457 (E.D.N.Y. 2020) .....................................................7

*Doe v. Menefee*,
  391 F.3d 147 (2d Cir. 2004) ...................................................................37

*Eastway Const. Corp. v. City of N.Y.*,
  821 F.2d 121 (2d Cir. 1987) ...................................................................53

*Enmon v. Prospect Capital Corp.*,
  675 F.3d 138 (2d Cir. 2012) ............................................... 30, 31, 51, 57

*Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*,
  139 S. Ct. 881 (2019) .............................................................................47

*Goldman v. Barrett*,
  ___ F. App'x ___, 2020 WL 5415472 (2d Cir. Sept. 10, 2020) ...........49

*Goldman v. Barrett*,
  No. 15-CV-9223 (PGG), 2019 WL 4572725 (S.D.N.Y. Sept. 20, 2019) ..... 49, 50

*Goodman v. Univ. Beauty Prods. Inc.*,
  No. 17-CV-1716 (KBF), 2018 WL 1274855 (S.D.N.Y. Mar. 9, 2018)...............58

*Goodyear Tire & Rubber Co. v. Haeger*,
    137 S. Ct. 1178 (2017) ........................................................................52

*Gucci Am., Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014) ...............................................................55

*Hammer v. Amazon.com*,
    392 F. Supp. 2d 423 (E.D.N.Y. 2005)................................................57

*Iantosca v. Elie Tahari, Ltd.*,
    No. 19-CV-4527 (MKV), 2020 WL 5603538 (S.D.N.Y. Sept. 18, 2020)...... 7, 58

*In re Hartford Textile Corp.*,
    681 F.2d 895 (2d Cir. 1982) ...............................................................57

*In re Martin-Trigona*,
    592 F. Supp. 1566 (D. Conn. 1984) ...................................................57

*In re Martin-Trigona*,
    763 F.2d 140 (2d Cir. 1985) ...............................................................57

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
    512 U.S. 821 (1994) ...........................................................................61

*Izmo, Inc. v. Roadster, Inc.*,
    No. 18-CV-06092 (NMC), 2019 WL 2359228 (N.D. Cal. June 4, 2019) ..........47

*Mackler Prods., Inc. v. Cohen*,
    146 F.3d 126 (2d Cir. 1998) .................................................. 30, 53, 55

*Mackler Prods., Inc. v. Cohen*,
    225 F.3d 136 (2d Cir. 2000) .................................................. 53, 60, 61

*Malibu Media, LLC v. Doe*,
    No. 18-CV-10956 (JMF), 2019 WL 1454317 (S.D.N.Y. Apr. 2, 2019)..............47

*Mango v. BuzzFeed, Inc.*,
    356 F. Supp. 3d 368 (S.D.N.Y. 2019) ..................................................7

*Mango v. Buzzfeed, Inc.*,
    970 F.3d 167 (2d Cir. 2020) .................................................................7

iv

*Merritt v. United States*,
    960 F.2d 15 (2d Cir. 1992) ...................................................................59

*Mone v. Comm'r*,
    774 F.2d 570 (2d Cir. 1985) ...............................................................56

*Perez v. Danbury Hosp.*,
    347 F.3d 419 (2d Cir. 2003) ...............................................................30

*Ramashwar v. Espinoza*,
    No. 05-CV-2021 (AJP), 2006 WL 36752 (S.D.N.Y. Jan. 6, 2006) ....................52

*Salovaara v. Eckert*,
    222 F.3d 19 (2d Cir. 2000) ...................................................................48

*Schlaifer Nance & Co., Inc. v. Estate of Warhol*,
    194 F.3d 323 (2d Cir. 1999) ............................................ 29, 30, 31, 42, 46, 48, 60

*Shafii v. British Airways, PLC*,
    83 F.3d 566 (2d Cir. 1996) ...................................................................46

*Sullivan v. Am. Airlines, Inc.*,
    424 F.3d 267 (2d Cir. 2005) ...............................................................46

*Tse v. UBS Fin. Servs., Inc.*,
    568 F. Supp. 2d 274 (S.D.N.Y. 2008) ................................................52

*United States v. Elcom Ltd.*,
    203 F. Supp. 2d 1111 (N.D. Cal. 2002) .................................................6

*United States v. Parse*,
    789 F.3d 83 (2d Cir. 2015) ...................................................................37

*United States v. Stewart*,
    433 F.3d 273 (2d Cir. 2006) ...............................................................37

*Urbont v. Sony Music Entm't*,
    831 F.3d 80 (2d Cir. 2016) ...................................................................58

*Usherson v. Bandshell Artist Mgmt.*,
    No. 19-CV-6368 (JMF), 2020 WL 3483661 (S.D.N.Y. June 26, 2020) ..............5

*Usherson v. Bandshell Artist Mgmt.*,
    No. 19-CV-6368 (JMF), 2020 WL 4228754 (S.D.N.Y. July 22, 2020) ...............5

*VHT, Inc. v. Zillow Grp., Inc.*,
    No. 15-CV-1096 (JLR), 2020 WL 2307492 (W.D. Wash. May 8, 2020) ..........47

*Wolters Kluwer Fin. Servs. v. Scivantage*,
    564 F.3d 110 (2d Cir. 2009) .................................................. 30, 31, 36, 45, 46, 53

*Zervos v. Verizon New York, Inc.*,
    252 F.3d 163 (2d Cir. 2001) .....................................................................30

## Statutes

17 U.S.C. § 410 ...........................................................................................58

28 U.S.C. § 1291 ...........................................................................................3

28 U.S.C. § 1331 ...........................................................................................2

28 U.S.C. § 1338 ...........................................................................................2

28 U.S.C. § 1927 .................................................................................... 5, 26

## Rules

Fed. R. Civ. P. 16 ................................................................................... 5, 26

Fed. R. Evid. 404 ........................................................................................42

## Other Authorities

Ben Depoorter, *If You Build It, They Will Come*,
    33 Berkeley Tech. L.J. 711 (2018) ......................................................7

Jessica Silbey *et al.*, *Existential Copyright & Professional Photography*,
    95 Notre Dame L. Rev. 263 (2019) ......................................................7

## PRELIMINARY STATEMENT

This is an appeal of an extraordinary sanctions order on a small law firm and its founding partner who represent photographers and other artists on a contingency fee basis in cases aimed at protecting their work from infringement. Such cases vindicate photographers' federally protected copyrights that can often go undefended due to the high costs of litigation and the modest potential recoveries.

Appellants Richard Liebowitz and his firm, the Liebowitz Law Firm ("LLF"), brought the instant case on behalf of photographer-plaintiff Arthur Usherson alleging that Appellee Bandshell Artist Management ("Bandshell") had infringed one of Mr. Usherson's photographs of the musicians Bob Dylan and Leon Redbone at a festival. The District Court referred the matter to mediation, but the mediation was unsuccessful. Just days later, Bandshell moved for sanctions based on the fact that two of Mr. Liebowitz's associates came to the mediation in his place, and Mr. Usherson participated only by telephone.

The case between Mr. Usherson and Bandshell settled, but the District Court retained jurisdiction to adjudicate Bandshell's sanctions motion. Following a hearing on the motion, while not finding the attendance of Mr. Liebowitz's associates to be sanctionable, the District Court found—based on a clearly erroneous assessment of the record—that Mr. Liebowitz had lied in bad faith about

getting permission from the mediator for Mr. Usherson to appear by telephone, and that Mr. Liebowitz and LLF supposedly had initiated the case in bad faith because the photograph at issue had not been registered with the U.S. Copyright Office prior to the suit.

On the basis of these erroneous findings, the District Court issued a draconian sanctions order against Mr. Liebowitz and LLF requiring that they pay over $100,000 to the Clerk of Court, serve the order on all their clients, file the order in all their cases nationwide, continue to file the order in every new case for a year, and for a year obtain deposit files from the U.S. Copyright Office to file with any new cases alleging copyright infringement.

In imposing these extreme sanctions, the District Court failed to act with the restraint this Court requires.  Because the District Court's order was based on multiple clearly erroneous factual findings and was dramatically disproportionate to the alleged misconduct, it fails the exacting version of the abuse-of-discretion standard of review this Court applies to sanctions and needs to be reversed.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction over the underlying copyright action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a).  The copyright dispute settled on December 20, 2019, but the District Court retained jurisdiction to

2

adjudicate the pending motion for sanctions. (JA-235.)[1] On June 26, 2020, the

District Court issued an Opinion and Order imposing sanctions (SPA-1–61), which

the District Court modified in an Opinion and Order dated July 22, 2020 (SPA-72

n.7). Appellants filed a timely notice of appeal on July 20, 2020. (JA-492.) This

Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether the District Court abused its discretion by imposing

sanctions based on clearly erroneous factual findings that Mr. Liebowitz lied to the

District Court in bad faith regarding getting permission for Mr. Usherson to appear

at the mediation by telephone, and that Mr. Liebowitz brought and maintained the

suit in bad faith by alleging that the photograph at issue was registered prior to suit

without reasonably investigating.

2. Whether the District Court abused its discretion by imposing

excessive monetary sanctions that did not reflect the amounts incurred solely as a

result of the alleged misconduct.

3. Whether the District Court abused its discretion by imposing

overbroad non-monetary sanctions, to remain in effect for a year, that were

---

[1] "JA" refers to the joint appendix filed with this brief, and "SPA" refers to the special appendix filed with this brief.

nationwide in scope and that alter the burden of proof in copyright infringement cases brought by Appellants.

4.      Whether the District Court's pejorative language in its sanctions order regarding Appellants and the unique nature of sanctions proceedings requires reassignment to a different judge.

## STATEMENT OF THE CASE

Richard Liebowitz and LLF appeal from a sanctions order entered on June 26, 2020 (the "Sanctions Order") (as modified by an Order dated July 22, 2020), by the Honorable Jesse M. Furman of the United States District Court for the Southern District of New York.  (SPA-1, 62.)

On July 10, 2019, Appellants filed Complaint 19 Civ. 6368 (JMF) alleging that Bandshell had infringed Mr. Usherson's copyrighted photograph.  On July 15, 2019, the District Court referred the case to mediation.  On October 31, 2019, an unsuccessful mediation took place, where Mr. Usherson was represented by two of Mr. Liebowitz's associates and Mr. Usherson was available by telephone.

On November 6, 2019, Bandshell filed a motion for sanctions based on the failure of Messrs. Usherson and Liebowitz to appear in person at the mediation and seeking, *inter alia*, certain attorneys' fees and costs.  On December 17, 2019, after receiving submissions from the parties, the District Court ordered a hearing on the sanctions motion for January 8, 2020.  On December 20, 2019, the District Court

endorsed a stipulation of dismissal providing that each side would bear its own costs and attorneys' fees, but retained jurisdiction to adjudicate the sanctions motion.

On January 8, 2020, the District Court held a hearing on the sanctions motion at which Mr. Liebowitz, Bandshell's counsel, and the mediator all testified.

On June 26, 2020, after receiving further submissions from the parties, the District Court entered the Sanctions Order imposing six sanctions pursuant to Federal Rule of Civil Procedure 16(f), 28 U.S.C. § 1927, and the District Court's inherent powers. *Usherson v. Bandshell Artist Mgmt.*, No. 19-CV-6368 (JMF), 2020 WL 3483661 (S.D.N.Y. June 26, 2020); (SPA-54).

On July 20, 2020, Appellants filed a timely notice of appeal. (JA-492.) On the same date, Appellants moved in the District Court to stay enforcement of the Sanctions Order pending appeal. (JA-494.) The District Court denied the motion on July 22, 2020, and modified one of the sanctions. *Usherson v. Bandshell Artist Mgmt.*, No. 19-CV-6368 (JMF), 2020 WL 4228754 (S.D.N.Y. July 22, 2020); (SPA-72–75). On July 23, 2020, Appellants moved this Court for an interim stay and stay pending appeal, which the Court denied on July 27 and August 21, 2020.

5

## STATEMENT OF FACTS

### A. Mr. Liebowitz's Background and Law Practice

Mr. Liebowitz developed a deep interest in photography in high school and college, when a multi-year internship exposed him to numerous professional photographers and photography events. (JA-496–97.) Mr. Liebowitz later went to law school hoping to start a copyright practice that would represent photographers in infringement cases, where he saw a particular need for lawyers who could provide representation on a low-cost basis to artists who otherwise would be unable to enforce their federally-protected copyrights. (JA-497.)

After graduating from Hofstra Law School in May 2014 and being admitted to the New York State bar in 2015, Mr. Liebowitz established his law firm, LLF. (JA-497.) Since opening LLF's doors, Mr. Liebowitz has aggressively championed small-dollar claims, on a contingency basis, on behalf of artists whose copyrights otherwise could have gone unprotected, given the limited nature of their potential recoveries and the high cost of litigation. (JA-497–98.) Attorneys like Mr. Liebowitz who take on modest-value contingency fee cases for freelance artists address a widely recognized need to combat the pervasive infringement of copyrights online. *See, e.g.*, *United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111,

1132 (N.D. Cal. 2002) ("piracy of intellectual property has reached epidemic proportions" in internet age); (JA-502).[2]

Mr. Liebowitz started LLF despite his relative inexperience. (JA-497.) LLF began with one attorney in addition to Mr. Liebowitz and a few staff members, and has grown to three attorneys and a dozen staff members. (JA-497.) LLF has represented over 1,200 clients in at least 2,500 copyright infringement cases, about half of which have been filed in district courts within the Second Circuit. (JA-498.) LLF's high volume of cases makes it economically feasible for LLF to represent copyright holders notwithstanding the modest average recoveries, typically in the low thousands or tens of thousands of dollars. (JA-498.)[3]

---

[2] *See, e.g.*, Jessica Silbey *et al.*, *Existential Copyright & Professional Photography*, 95 Notre Dame L. Rev. 263, 267 (2019) ("The current, online environment makes infringements too numerous to fight exhaustively."); Ben Depoorter, *If You Build It, They Will Come*, 33 Berkeley Tech. L.J. 711, 712 (2018) ("The time, effort, and legal costs involved with [copyright] litigation outweigh the resources available to many copyright holders[,] especially in light of the modest amounts at stake in most disputes").

[3] LLF has achieved substantial successes on behalf of its artist-clients, not only through favorable settlements but also at summary judgment and trial. *See, e.g.*, *Iantosca v. Elie Tahari, Ltd.*, No. 19-CV-4527 (MKV), 2020 WL 5603538 (S.D.N.Y. Sept. 18, 2020); *Cruz v. Cox Media Grp., LLC*, 444 F. Supp. 3d 457 (E.D.N.Y. 2020); *Mango v. BuzzFeed, Inc.*, 356 F. Supp. 3d 368 (S.D.N.Y. 2019), *aff'd*, 970 F.3d 167 (2d Cir. 2020).

**B. The Complaint and the Mediation Referral**

The Complaint in this case alleges that Bandshell infringed Mr. Usherson's copyright to a photograph of the musicians Bob Dylan and Leon Redbone (the "Photograph") taken at a 1972 festival. (JA-13; *see* JA-18 (Photograph).) The Complaint, which LLF filed on July 10, 2019, alleges that the Photograph was registered with the U.S. Copyright Office under registration number VAu 1-080-046 (the "046 Registration"), and that Bandshell published the Photograph in violation of the Copyright Act on the David Bromberg Quintet & Band's Facebook page. (JA-14–15.)

Shortly thereafter, the District Court referred the case to mediation, set an initial pretrial conference for October 10, 2019, and directed that the mediation take place at least two weeks prior to the conference. (JA-22.) Bandshell obtained counsel, Brad R. Newberg of McGuireWoods LLP, who took the case pro bono because, as he later explained, "as a copyright lawyer for over 20 years, I wanted to see for myself what it was like to be in one of these cases." (JA-467.)

On October 4, 2019, with the initial conference six days away, the mediation had not taken place. Mr. Liebowitz filed a letter stating that "[t]he mediation office did not assign a mediator because for some reason the mediation case track was terminated on July 29, 2019." (JA-32.) Mr. Liebowitz explained that he had "found a mediator that can do the mediation on October 8, 2019 via telephone to

8

accomplish it before the October 10 Court conference" and requested an adjournment so that the mediation could go forward on that date. (JA-32.)

On October 7, 2019, the District Court responded, writing that it was, "to put it mildly, somewhat perturbed by counsel's statement that '[t]he mediation office did not assign a mediator because for some reason the mediation case track was terminated on July 29, 2019,'" because this practice is routine and does not "mean that the mediation would not be scheduled." (JA-3–4.) Nevertheless, recognizing that "early mediation in the normal course (i.e., in person) makes sense," the District Court adjourned the initial conference until November 14, 2019, and ordered the parties to conduct "the in-person mediation no later than October 31, 2019." (JA-4.)

On October 7, 2019, a mediator (the "Mediator") who had conducted "a few prior mediations involving Mr. Liebowitz" was assigned, and the mediation was thereafter scheduled for October 31. (JA-4, 227.) Two of Mr. Liebowitz's associates appeared at the mediation in person, and Mr. Usherson appeared via telephone. (JA-154–55, 157–58.)

### C. Bandshell's Motion for Sanctions and Mr. Liebowitz's Response

On November 6, 2019, following the unsuccessful mediation, Bandshell moved for sanctions against Mr. Usherson and Mr. Liebowitz "for repeatedly

9

violating court orders, especially the Order in this case requiring an in-person mediation by October 31, 2019." (JA-33, 40.)[4]

In his declaration, Mr. Newberg stated that the day before the mediation, October 30, 2019, in response to an unacceptable settlement offer from Mr. Usherson, he had sent the Mediator a proposed settlement agreement. (JA-67.) The Mediator responded in an email at 8:15 p.m., writing that he had "[t]alked to Richard [Liebowitz] and he has been tied up. He will review [the settlement agreement] tonight and get back to us in morning [sic]. Hopefully we can settle this before need [sic] to go in person mediation." (JA-93.) Bandshell's counsel responded, at 9:36 p.m., "I'm headed to the train station well before 6:00 am. And to be candid, I would have assumed Mr[.] Usherson either flew to NY tonight or is likewise on a very early plane." (JA-93.) At 10:03 p.m., the Mediator responded, "I understand." (JA-93.) At 4:12 a.m. on October 31, 2019, Mr. Liebowitz emailed Bandshell's counsel and the Mediator a revised settlement agreement to "be discussed at the mediation." (JA-94.)

---

[4] Under the applicable mediation rules, communications made during or for the mediation process should remain confidential (JA-139, 170), but Bandshell's motion exposed numerous communications with the Mediator (JA-67–68). On November 20, 2019, the District Court ordered that the filings regarding the sanctions motion be temporarily sealed, and on December 9, 2019, determined that it would publicly file redacted versions of the parties' sanctions submissions. (JA-176.)

On October 31, 2019, Bandshell's counsel arrived at the mediation at 11:45 a.m. (JA-69.) According to Bandshell's counsel's declaration, at that point, "for the first time," the Mediator said that Mr. Liebowitz's associate would be attending the mediation instead of Mr. Liebowitz, and the Mediator "did not know whether, but doubted Mr. Usherson would be attending." (JA-69.)

Principally based on Messrs. Liebowitz's and Usherson's absence from the mediation, Bandshell asked that the District Court grant sanctions against them "in the form of 1) Bandshell's costs, and ten hours of legal fees, in preparing for and traveling to mediation, 2) involuntary dismissal of this case under the Federal Rules and the Court's inherent authority, 3) Bandshell's fees in preparing this Motion; 4) whatever sanctions the Court deems appropriate to address Plaintiff's and Mr. Liebowitz's failure to comply with the July 15 Orders, and 5) any other sanctions that the Court may deem appropriate to deter future misconduct." (JA-59.) On the same day, the Mediator filed a report stating that the mediation had been unsuccessful. (JA-4.)

On November 14, 2019, Mr. Liebowitz filed a letter containing an initial response in opposition to Bandshell's sanctions motion. (JA-111.) Mr. Liebowitz argued that because Mr. Usherson "lives in Roswell, Georgia, which is approximately 865 miles from the Courthouse," he "obtained permission from the . . . [M]ediator . . . to appear at the scheduled mediation by telephone."

11

(JA-112.)  The letter said that "this is routine practice in S.D.N.Y. mediation sessions where the actual parties are located out-of-state and where the travel expenses to get to New York might eat greatly into any settlement amount." (JA-112.)

The District Court held an initial conference that same day, November 14, 2019.  (JA-4.)  The District Court declined "to consider" Mr. Liebowitz's letter because "it is not a formal response," and directed Mr. Liebowitz to file a formal opposition.  (JA-237.)  Nevertheless, the Court requested that Bandshell's counsel summarize the issues and that Mr. Liebowitz give a further "informal" response. (JA-238–39.)  Mr. Liebowitz again referenced the practice that when parties "are a hundred miles away from the courthouse, you can appear telephonically," and said that "[w]hen I spoke to the mediator, he said yes."  (JA-242.)

At this point, the District Court cautioned Mr. Liebowitz to be "very, very, very careful about the representations you make to me" because "you're already in a lot of hot water in this Court, and I think you know that."  (JA-242.)  The Court then asked Mr. Liebowitz when he had advised the Mediator that "Mr. Usherson was not going to appear in person."  (JA-242.)  Mr. Liebowitz responded, "I don't know the exact date, but it was before the mediation, and he said yes."  (JA-242.) Mr. Liebowitz also confirmed that he had spoken directly with the Mediator by telephone.  (JA-242.)

12

At the same conference, Bandshell raised a separate issue, namely, the possibility that the Photograph had been part of a later registration rather than the 046 Registration.  (JA-252.)  Mr. Liebowitz responded that he would "have to see what [his] office did, but this is the correct registration."  (JA-252–53.)

On November 18, 2020, Mr. Liebowitz filed a formal opposition to Bandshell's sanctions motion, including a declaration.  (JA-120, 130.)  In his declaration, Mr. Liebowitz stated that Mr. Usherson "resides in Roswell, Georgia, more than 100 miles from the S.D.N.Y. courthouse."  (JA-132.)  Mr. Liebowitz said that he had "personally participated in dozens of mediations in this Circuit" and it "is routine practice in this District for clients who reside more than 100 miles from the courthouse to participate in mediation by telephone" because "it is prejudicial for an out-of-state plaintiff to have to incur the time and out-of-pocket travel expense to appear in person," a prejudice that here "is exacerbated by the monetary value of the case, which is relatively modest."  (JA-132.)  In accordance with this asserted practice of clients participating in mediations by telephone, Mr. Liebowitz wrote that "[p]rior to October 31, 2019," he "sought and received approval from . . . the . . . [M]ediator[] for Mr. Usherson to attend the mediation via telephone" and obtained the Mediator's "consent via telephone."  (JA-132.)

13

### D. The Mediator's Declaration and Mr. Liebowitz's Letter Brief

On December 9, 2019, the District Court ordered that "the Mediator shall submit a declaration detailing any and all communications with Liebowitz regarding Liebowitz's personal attendance at the mediation"—an issue on which the District Court ultimately declined to impose sanctions (SPA-30 n.3)—"and Plaintiff's participation by telephone in the mediation." (JA-173.) To the extent relevant to this appeal, the District Court ordered the Mediator to specify "whether (and if so, when and how) he gave Liebowitz permission . . . for Plaintiff not to appear at the mediation in person and to appear by telephone instead." (JA-173.)

The Mediator provided his declaration to the District Court, which filed it on December 11, 2019. (JA-226.) In his declaration, the Mediator affirmed that he had initially agreed, on Mr. Liebowitz's request, to "conduct the mediation telephonically" in its entirety. (JA-227.) After this agreement had been "communicated to mediation" (presumably meaning the mediation office), however, the Mediator "received a call informing [him] that it was office policy for mediations to be in person." (JA-227.) The Mediator then "informed the parties and requested that they confer and give [him] a date for an in person mediation," and Mr. Liebowitz later informed the Mediator that the parties had agreed to October 31, 2019. (JA-227.)

14

The day before the mediation, October 30, 2019, the Mediator "conferred with the attorneys for both parties as to the status of negotiations" and expressed his view that "[w]hile the parties were somewhat close to resolving the matter no ultimate agreement was reached." (JA-227.) That evening, the Mediator said he "talked to Mr. Liebowitz and was informed that the mediation was on." (JA-227.) Although the Mediator said that Mr. Liebowitz did not inform the Mediator "that he would not personally appear but through an associate," the Mediator confirmed that he had "mediated a few prior mediations involving Mr. Liebowitz where on at least one occasion that office appeared by an associate without incident." (JA-227.)

With respect to whether Mr. Usherson had permission to appear by telephone, the Mediator stated: "At no time was I informed that the plaintiff would not personally appear but would be available by telephone. I should say that in a few prior mediations [Mr. Liebowitz's] client appeared by telephone without incident. On this occasion no discussion was had by me as to client appearance." (JA-227.) The Mediator continued, stating that "[i]t was only on the day of the mediation that I was informed by [Bandshell's] counsel that the October 31[] date was agreed to specially because both attorneys and more importantly their respective client [sic] would personally appear. Frankly this was news to me." (JA-227.)

15

Mr. Liebowitz thereafter filed a letter arguing that the Mediator's declaration corroborated key aspects of Mr. Liebowitz's own declaration, including Mr. Liebowitz's statement that they had spoken prior to the mediation and that Mr. Liebowitz got permission in the present case (given the Mediator's admission that clients appeared by telephone in past cases). (JA-229–30.) Mr. Liebowitz cited five prior cases in which the same Mediator had allowed Mr. Liebowitz's clients to appear by telephone. (JA-230.)

**E. The District Court Orders a Hearing and the Parties Settle the Case**

In an Order dated December 17, 2019, the District Court set an evidentiary hearing for January 8, 2020 (the "January 8 Hearing") at which "Liebowitz, Newberg, and the Mediator" would testify. (JA-232.) The District Court specified that the hearing would be "narrowly limited to whether (and if so, when and how) the Mediator gave Liebowitz permission (1) not to appear personally at the October 31, 2019 mediation (and to send an associate instead) and (2) for Plaintiff himself not to appear at the mediation in person and to participate by telephone instead." (JA-232.) The District Court further stated that it would "treat the declarations already submitted by these witnesses as their direct testimony." (JA-232.)

On December 18, 2019, the parties settled the case and filed a stipulation of dismissal, which provided that each side would "bear its own costs and attorney's

16

fees." (JA-235.) The District Court directed, however, that it "retain[ed] jurisdiction to adjudicate Bandshell's pending motion for sanctions and any other sanctions-related matters." (JA-234–35.)

### F. The Evidentiary Hearing and Post-Hearing Submissions

At the January 8 Hearing, the District Court heard testimony from Mr. Liebowitz, counsel for Bandshell, and the Mediator. (JA-232.) As to whether Mr. Usherson had permission to appear by telephone, Mr. Liebowitz's and the Mediator's recollections differed.

Mr. Liebowitz testified that he asked the Mediator the night before the mediation if his client "can appear telephonically, because he lives in Georgia," and "the mediator said yes, that the plaintiff could appear telephonically." (JA-365–66; *see also* JA-383.)

The Mediator, by contrast, testified that Mr. Liebowitz did not ask for permission for Mr. Usherson to appear by telephone. (JA-444.) When asked, however, whether the Mediator "expected Mr. Usherson to appear in person," based on the Mediator's "prior experiences with Mr. Liebowitz," the Mediator responded, "certain of the mediations, the client was there; and certain of the mediations, the client wasn't there. I don't want to look backwards at what my assumption was at that time, because I really don't recall." (JA-448.)

Much of the testimony at the January 8 Hearing concerned the issue of whether Mr. Liebowitz had received permission for his associates to attend the mediation in his place, an issue the District Court later concluded was too "muddled" to make factual findings as to bad faith by clear and convincing evidence.  (SPA-30 n.3.)

In a closing statement, counsel for Bandshell advised the District Court of "one last fact," namely, Bandshell's assertion that the Photograph had not been part of the 046 Registration, as alleged in the Complaint.  (JA-471.)  Mr. Liebowitz's associate James Freeman responded that they had not "seen the registration issue" because they relied on "Mr. Usherson's representation that the [P]hotograph" was part of the 046 Registration.  (JA-483–85.)

Following the hearing, the District Court ordered Mr. Liebowitz to file a letter addressing whether the allegation in the Complaint that the Photograph was registered under the 046 Registration was accurate and if not, whether "sanctions are warranted on this basis against either Plaintiff's counsel or Plaintiff himself."  (JA-266.)

On January 17, 2020, Mr. Liebowitz filed a letter acknowledging that the Complaint's allegation that the Photograph was registered as part of the 046 Registration was "inaccurate," and explaining that Mr. Usherson had in fact registered the Photograph, just under a different registration number (the "272

Registration") registering "similar photographs" that was "effectuated . . . after this lawsuit was filed." (JA-279.) Mr. Liebowitz argued that "administrative mistakes or clerical errors" should not be the basis for sanctions. (JA-279.) Bandshell responded in a letter arguing that Mr. Liebowitz and LLF had long known the Photograph was not registered under the 046 Registration, as incorrectly alleged in the Complaint. (JA-285–87.)

In an Order dated January 24, 2020, the District Court wrote that Mr. Liebowitz's "unsworn letter raises more questions than it answers" and ordered Mr. Liebowitz to file a declaration answering several specific questions about the registration issue, including the factual basis for his inclusion of the relevant paragraph in the Complaint alleging that the Photograph was registered under the 046 Registration, his role in the subsequent 272 Registration, and when he became aware that the Photograph was not registered under the 046 Registration. (JA-295–96.) The District Court also required declarations from Mr. Freeman and Mr. Usherson. (JA-296.)

On February 7, 2020, Messrs. Liebowitz, Freeman, and Usherson filed declarations. (JA-298, 329, 336.) In his declaration, Mr. Liebowitz stated that— since the January 8 Hearing—he had learned that Zachary Cuff, an administrative employee of LLF, had been told in February 2019 by Mr. Usherson that the Photograph was part of the 046 Registration and had erroneously recorded the

19

same in LLF's case-tracking systems.  (JA-330.)  Mr. Liebowitz said that he had

relied on this internal note when drafting the Complaint.  (JA-331.)  Mr. Liebowitz

also explained that he played no role in the Photograph's subsequent registration in

the 272 Registration, which took place at Mr. Usherson's request and was handled

as a routine matter by LLF's staff.  (JA-332.)  Mr. Liebowitz represented that he

was not aware of this error at the November 14, 2019 initial pretrial conference and

"believed in good faith that he Photograph had been registered as part of the 046

Registration."  (JA-332.)

Mr. Usherson's declaration corroborated Mr. Liebowitz's account.

(JA-298.)  Mr. Usherson stated that in 2011, he personally had registered, as part

of the 046 Registration, a series of photographs he took at a 1972 music festival

portraying Bob Dylan and Leon Redbone.  (JA-298–99.)  Mr. Usherson also

explained that after he retained Mr. Liebowitz and LLF in early 2019, he shared

with Mr. Cuff several instances of what he believed to be infringements of his

copyrights, including a use of the Photograph.  (JA-299–300.)  In February 2019,

Mr. Cuff asked Mr. Usherson to confirm the Photograph was registered and for the

registration number.  (JA-300.)  Mr. Usherson confirmed to Mr. Cuff that the

Photograph was registered under the 046 Registration, and mailed Mr. Cuff a CD

containing all photographs associated with the 046 Registration.  (JA-300.)

Months later, Mr. Usherson affirmed, he alerted Mr. Liebowitz and Mr. Cuff to what he believed to be Bandshell's infringing use of the Photograph, which at that time Mr. Usherson still believed to be part of the 046 Registration. (JA-300–01.) This alleged infringement was the basis for the Complaint. (JA-301.) Mr. Usherson also explained that, because he understood his photographs of the 1972 festival to be targets for infringement, sometime after filing the Complaint, he asked Mr. Cuff to register an additional 30 photographs of the festival (which included the Photograph). (JA-301–02.) Mr. Usherson affirmed that he had, until shortly before preparing his February 2020 declaration, consistently believed the Photograph had been registered in 2011 in the 046 Registration. (JA-302.) Mr. Usherson attributed the error to the similarities between the Photograph and other photographs in the 046 Registration. (JA-302–03; *see* JA-335 (juxtaposing Photograph with similar photographs in 046 Registration).)

## G. The District Court's Sanctions Order

On June 26, 2020, the District Court issued an Opinion and Order (SPA-1–61), finding that clear and convincing evidence supported three findings: (1) that Appellants violated multiple court orders; (2) that Mr. Liebowitz misrepresented in bad faith that he had received permission from the Mediator for Mr. Usherson to appear at the mediation by telephone; and (3) that Mr. Liebowitz falsely alleged that the Photograph was registered in the Complaint and failed to reasonably

investigate the issue.  (SPA-25, 29, 38.)  Only the latter two findings are at issue in

this appeal.[5]

Notably, before turning to its findings, the District Court began its opinion

by reciting the various pejorative ways in which Mr. Liebowitz has been described

by other courts, including as "a copyright troll," a "clear and present danger to the

fair and efficient administration of justice," a "legal lamprey[]," and an "example

of the worst kind of lawyering."  (SPA-1–2; *see also* SPA-55–61 (citing other

courts' adverse findings regarding Appellants).)

### 1. The District Court's Erroneous Finding that Mr. Liebowitz Lied Regarding Receiving Permission from the Mediator for Mr. Usherson to Appear by Telephone

Turning to the matter at hand, the District Court wrote that, "based on a

careful review of the record, including an evaluation of the witnesses' demeanor at

the January 8, 2020 hearing, the Court finds by clear and convincing evidence" that

Mr. Liebowitz's representations regarding receiving permission from the Mediator

for Mr. Usherson to attend by telephone "were false and made in bad faith."

(SPA-29–30.)  The District Court gave several reasons for this conclusion.  First,

---

[5] Appellants did not dispute the finding regarding the violation of court orders before the District Court and do not challenge it here.  The District Court acknowledged that "Mr. Liebowitz's failures to obey court orders can arguably be explained (though not justified) by his relative inexperience, heavy caseload, and inadequate case management practices."  (SPA-37.)

the District Court stated, "Mr. Liebowitz's claims are contradicted by the Mediator," in testimony that the District Court found "credible, based not only [on] its observations of the Mediator's demeanor at the hearing and his lack of any stake in this matter, but also on the fact that it is corroborated by Mr. Newberg's testimony and documentary evidence." (SPA-30.)

Second, as to that corroboration, the District Court cited in particular "the Mediator's email exchange with Mr. Newberg shortly after the Mediator's final phone call with Mr. Liebowitz on October 30th," which it found "makes plain that the Mediator had no clue that Mr. Usherson (and Mr. Liebowitz, for that matter) would not be attending the mediation in person the next day." (SPA-30.)

Third, the District Court found that Mr. Liebowitz's own testimony was not credible, "based in part on its assessment of his demeanor at the hearing and in part on the content of the testimony." (SPA-31.) The District Court gave two examples of portions of Mr. Liebowitz's testimony that, in the District Court's view, "were patently incredible": Mr. Liebowitz's explanation that he and Mr. Usherson would have booked flights to New York on short notice if the Mediator had denied the requests regarding their appearances (SPA-31), and Mr. Liebowitz's initial inability, at the November 14, 2019 conference, to recall the date on which he had received permission from the Mediator for Mr. Usherson to

23

appear by telephone, even though he later recalled that this happened the day before the mediation (SPA-32).

The District Court also found Mr. Liebowitz's testimony not credible "because, in contrast to the Mediator's and Mr. Newberg's testimony, there is absolutely no evidence to corroborate it." (SPA-32.) Finally, the District Court found Mr. Liebowitz's testimony "internally inconsistent," in particular regarding Mr. Liebowitz's different assertions about his understanding of what the mediation rules require, and also found inconsistent Mr. Liebowitz's assertions regarding what the District Court termed Mr. Liebowitz's defense that the Mediator's "custom and practice" was to permit Mr. Liebowitz's clients to appear by telephone. (SPA-33–34.)

For these reasons, the District Court found "by clear and convincing evidence that Mr. Liebowitz lied—repeatedly and under oath—by claiming that he sought and obtained the Mediator's consent for Mr. Usherson to participate in the mediation by telephone" (SPA-35) and that these representations were "made in bad faith" (SPA-30).

## 2. The Registration of the Photograph

The District Court separately found that "the evidence clearly and convincingly shows that Mr. Liebowitz brought—and maintained—this case in bad faith by willfully disregarding the fact that the case was fatally flawed from its

24

inception." (SPA-38.) "[T]he Complaint" alleged that "the Photograph was registered as part of the 046 Registration," the District Court wrote, but in fact, the "Photograph was not registered until August 22, 2019, almost a month and a half after the lawsuit was filed." (SPA-38.)

The District Court then addressed Mr. Liebowitz's two responses to this defect: that it was a technical pleading deficiency and that he did not know about it. As to the first, the District Court found that Mr. Liebowitz "is wrong in suggesting that he could have cured the Section 411(a) violation through amendment," citing one of the District Court's own recent decisions (among others). (SPA-38–39.) As to the second, the District Court found that "the evidence clearly and convincingly shows that Mr. Liebowitz *did* know about the untimely registration, at least as of August 22, 2019, when his firm registered the Photograph under the 272 Registration, if not earlier." (SPA-40 (emphasis in original).) The District Court then found that LLF, at least, "had knowledge that the Photograph and not been registered prior to the filing of the Complaint," and "it is hard to believe that Mr. Liebowitz, as lead counsel for Plaintiff and the founding member of Liebowitz Law Firm . . . was unaware of the fact himself." (SPA-41 (internal quotation marks omitted).) "In any event," the District Court concluded, "even if Mr. Liebowitz did not personally know that the Photograph had not been registered when this case was filed, he certainly should have known—and his lack

of knowledge is attributable to an inexcusable failure to conduct a reasonable investigation before and during the case." (SPA-41.)

### 3. The District Court's Imposition of Sanctions

On the basis of its factual findings, the District Court, acting pursuant to three sources of authority—Rule 16(f) of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the District Court's inherent authority—imposed a set of six sanctions upon Appellants. (SPA-51.)

First, for a monetary sanction, the District Court concluded that the appropriate measure was "the reasonable attorney's fees and costs Bandshell would have incurred in connection with the mediation and the sanctions motion." (SPA-49.) Relying on Bandshell's counsel's hourly rates, with a slight reduction in the associate's rate, and based on an accounting submitted by Bandshell, the District Court found that fees of $83,517.49 were reasonable (even though Bandshell's counsel was working pro bono) and imposed a sanction in that amount on Appellants for "misrepresenting that the Mediator gave permission for Mr. Usherson not to attend the mediation in person and for his multiple other violations of the Court's Orders." (SPA-49–50.) In addition, the District Court ordered Appellants to pay $20,000 "for falsely alleging that the Photograph was registered, not conducting a reasonable investigation prior to filing the lawsuit and after being put on notice of the registration issue, and maintaining the suit thereafter."

(SPA-50–51.)  The District Court ordered that these monetary sanctions be paid to the Clerk of Court.  (SPA-50, 54.)

The District Court also imposed non-monetary sanctions requiring that Appellants serve the Sanctions Order on Mr. Usherson, serve the Order on all of their current clients, file a copy of the Order in all their pending cases, file a copy of the Order in all new cases brought for a year, and obtain and attach to the complaint in any new copyright infringement case brought for a year "a copy of the deposit files maintained by the U.S. Copyright Office reflecting prior registration of the relevant copyrighted work or works at issue."  (SPA-54.)  In addition, the District Court sent the Sanctions Order to the "Chair of the Court's Grievance Committee to take whatever action the Committee deems appropriate."  (SPA-1–2, 54.)

### H. The Notice of Appeal and Amended Sanctions

On July 20, 2020, Appellants filed a timely notice of appeal.  (JA-492.)  On the same date, Appellants moved in the District Court for a stay pending appeal as to the enforcement of the non-monetary sanctions as well for as an interim stay to permit this Court to consider a stay motion, if necessary.  (JA-494.)[6]

---

[6] As to the monetary sanction, Appellants timely delivered to the Clerk of Court a cashier's check, which "operates as an automatic stay of the enforcement of the monetary sanction."  (JA-493.)  As to the non-monetary sanctions, Appellants sent the Sanctions Order to Mr. Usherson and current clients and filed the Order in their

On July 22, 2020, the District Court denied the motion for a stay pending appeal and also denied Appellants' interim stay request. (SPA-62, 75.) In response to Mr. Liebowitz's argument that the deposit-copy sanction could result in the statute of limitations barring certain clients' claims, the District Court made a minor modification to the Sanctions Order to address such cases. (SPA-75.)

## SUMMARY OF ARGUMENT

*First*, the District Court abused its discretion by ordering sanctions based on the clearly erroneous factual findings that Mr. Liebowitz (1) lied to the District Court in bad faith about getting permission from the Mediator for Mr. Usherson to attend the mediation by telephone, and (2) falsely alleged in the Complaint that the Photograph was registered prior to suit without reasonably investigating the matter, again acting in bad faith. The limited evidence at the sanctions hearing, including the Mediator's vague testimony and emails, did not clearly and convincingly establish either of these facts.

*Second*, the District Court abused its discretion by imposing a massive monetary sanction that the District Court improperly calculated based on the

---

pending cases (although did not file in every case on a timely basis). (JA-491, 503.) On July 27, September 21 and 29, and October 15, 2020, Mr. Liebowitz filed declarations regarding his compliance with the Sanctions Order. (JA-503, 505, 507, 523.) The October 15 declaration responded to questions the District Court raised in an Order dated October 5 regarding Mr. Liebowitz's compliance with the Sanctions Order. (JA-12.)

totality of the fees Bandshell incurred in connection with the sanctions motion, notwithstanding that Bandshell was represented by pro bono counsel, and only prevailed with respect to some of the sanctions sought. A portion of the monetary sanction also was improperly punitive and imposed without the necessary procedural protections.

*Third*, the District Court abused its discretion by imposing severe non-monetary sanctions with a nationwide impact and that effectively alter the burden of proof in copyright cases for LLF's clients.

*Fourth*, to the extent remand is required, the Court should remand the case to a different judge in order to preserve the appearance of justice, due to the unique nature of sanctions and the fact that the current district judge, in addition to using pejorative language to describe Mr. Liebowitz, already has stated that "Mr. Liebowitz's shenanigans have surely consumed enough of this Court's time and resources as it is." (SPA-1–2, 64.)

## STANDARD OF REVIEW

This Court reviews "all aspects of a District Court's decision to impose sanctions for abuse of discretion." *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 333 (2d Cir. 1999). This Court has recognized that

> [a] troublesome aspect of a trial court's power to impose sanctions, either as a result of a finding of contempt, pursuant to the court's inherent power, or under a variety of rules . . . is that the trial court may act as accuser, fact finder and sentencing judge, not subject to restrictions of

29

> any procedural code and at times not limited by any rule of law
> governing the severity of sanctions that may be imposed.

*Mackler Prods., Inc. v. Cohen*, 146 F.3d 126, 128 (2d Cir. 1998) ("*Mackler I*").

Thus, this Court's decisions consistently have cautioned that this Court must

"ensure that any such decision is made with restraint and discretion." *Schlaifer*

*Nance*, 194 F.3d at 334. As such, this Court's review of a District Court's

imposition of sanctions is "more exacting than under the ordinary abuse-of-

discretion standard." *Wolters Kluwer Fin. Servs. v. Scivantage*, 564 F.3d 110,

113–14 (2d Cir. 2009) (quoting *Perez v. Danbury Hosp.*, 347 F.3d 419, 423 (2d

Cir. 2003)).

"A district court would necessarily abuse its discretion if it based its ruling

on an erroneous view of the law or on a clearly erroneous assessment of the

evidence." *Schlaifer Nance*, 194 F.3d at 333 (quoting *Cooter & Gell v. Hartmarx*

*Corp.*, 496 U.S. 384, 405 (1990)). An assessment of the evidence is clearly

erroneous where the reviewing court "is left with the definite and firm conviction

that a mistake has been committed." *Zervos v. Verizon New York, Inc.*, 252 F.3d

163, 168 (2d Cir. 2001) (internal quotation mark omitted).

"Imposition of sanctions under a court's inherent powers requires a specific

finding that an attorney acted in bad faith," *Wolters Kluwer*, 564 F.3d at 114, and

sanctions under 28 U.S.C. § 1927 likewise require a finding of bad faith, *see*

*Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 143 (2d Cir. 2012). A finding of

bad faith is appropriate only if "there is clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes." *Wolters Kluwer*, 564 F.3d at 114 (addressing inherent power); *see Enmon*, 675 F.3d at 143 (addressing Section 1927). "Conduct is entirely without color when it lacks any legal or factual basis; it is colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the attorney whose conduct is at issue." *Wolters Kluwer*, 564 F.3d at 114. "A finding of bad faith, and a finding that conduct is without color or for an improper purpose, must be supported by a high degree of specificity in the factual findings." *Id.*; *Schlaifer Nance*, 194 F.3d at 338.

## **ARGUMENT**

### **POINT I**

### **THE DISTRICT COURT ABUSED ITS DISCRETION BY BASING SANCTIONS ON CLEARLY ERRONEOUS FINDINGS OF FACT**

#### **A. The District Court Abused Its Discretion By Finding that Mr. Liebowitz Lied in Bad Faith About Getting Permission for Mr. Usherson to Participate in the Mediation by Telephone**

The District Court abused its discretion when it found, purportedly by clear and convincing evidence, that Mr. Liebowitz's representation that the Mediator granted permission for Mr. Usherson to participate in the mediation by telephone was "false and made in bad faith." (SPA-29–30, 35.) The District Court offered multiple reasons for its finding (beyond the Mediator's "demeanor")—that the

31

Mediator was credible because (a) he lacked a stake in the outcome, (b) his testimony was corroborated by Mr. Newberg's, and (c) his testimony was corroborated by documents, and that Mr. Liebowitz was not credible because his testimony (a) defied belief and (b) was internally inconsistent—but each reason falls apart upon scrutiny.

First, the District Court said that it credited the Mediator based on the Mediator's "lack of any stake in this matter." (SPA-30.) But it cannot fairly be said that the Mediator lacked any stake in this matter when the Mediator's testimony directly addressed his own past noncompliance with the relevant mediation and local rules (JA-434–66), and thus put at "stake" the Mediator's reputation and future work for the court. Bandshell's counsel highlighted at the hearing the fact that Mr. Liebowitz's defense included the argument "that this mediator, a mediator of this court, [had a] custom and practice to completely violate the Court's mediation rules." (JA-422.) Also striking is that the Mediator, although he had initially agreed to conduct the entire mediation by telephone (and further testified that he had conducted prior mediations in which clients appeared by phone), had to be "inform[ed] . . . that it was office policy for mediations to be in person." (JA-227, 436–38.) The District Court even redacted the Mediator's name from the record, referring to him simply as "the mediator," explaining only that it did not "see any reason that the mediator's name needs to be part of the

public record" (JA-347), a move that surely helped preserve the Mediator's reputation and ability to serve as a mediator in future cases. Under these circumstances, the District Court should have acknowledged that the Mediator was not a neutral witness, but in any event erred in finding that the Mediator lacked "any" stake whatsoever.

The District Court also relied on the fact that the Mediator's testimony was supposedly "corroborated by Mr. Newberg's testimony." (SPA-30.) Mr. Newberg's testimony, to an important degree, however, contradicted the Mediator's. Mr. Newberg said, in a sworn statement, that the Mediator stated to him on the day of the mediation that the Mediator "doubted Mr. Usherson would be attending" the mediation (JA-69), which casts doubt on the Mediator's own declaration in which he affirmed that he was at "no time" informed "that [Mr. Usherson] would not personally appear but would be available by telephone" (JA-227). When the District Court confronted the Mediator on this point at the hearing, the Mediator's testimony only added to the ambiguity, raising further questions about his credibility. The District Court asked the Mediator whether he had said to Mr. Newberg that he "doubted that Mr. Usherson would be attending the mediation," and the Mediator said, "I don't recall, again, one way or the other." (JA-448.) The District Court pressed this point, asking whether, "based on your prior experiences with Mr. Liebowitz or your communications, you expected Mr.

33

Usherson to appear in person," and the Mediator said that at "certain of the
mediations, the client was there; and certain of the mediations, the client wasn't
there." (JA-448.) The Mediator also said, "I don't *want to look backwards* at what
my assumption was at that time, because I really don't recall." (JA-448 (emphasis
added).)

The Mediator's failure of memory on a key point—whether he informed Mr.
Newberg that Mr. Usherson would not likely be attending the mediation—goes to
the heart of whether the District Court should have credited the Mediator's
testimony that he in fact never gave permission for Mr. Usherson to appear by
telephone. The District Court's explanation that it found the Mediator's testimony
credible partly because it was "corroborated by Mr. Newberg's testimony"
(SPA-30), in the absence of any discussion of these discrepancies, is not
supportable.

The District Court's statement that the Mediator's testimony was
"corroborated by . . . documentary evidence" (SPA-30) also does not hold up. In
particular, the District Court explained that the Mediator's testimony was
corroborated by the email exchange between the Mediator and Mr. Newberg on the
night before the mediation, in which Mr. Newberg stated that he "would have
assumed Mr. Usherson either flew to NY tonight or is likewise on a very early
plane" and the Mediator responded, "I understand." (SPA-30–31.) The District

Court found that these emails corroborated the Mediator's testimony because "[a]t no point in these emails did the Mediator reveal any awareness that either Mr. Usherson or Mr. Liebowitz would not be attending in person the next day—much less that he had given them both permission not to attend *that very night*." (SPA-31 (emphasis in original).)

An equally likely reading of the emails, however, is that Mr. Newberg harbored doubts about whether Mr. Usherson would attend in person—why else send an email speculating about Mr. Usherson's travel plans—and the Mediator himself already knew Mr. Usherson would not be attending, but was not prepared to share that fact with Mr. Newberg (and risk blowing up the mediation), and so responded blandly with "I understand." (JA-93.) That reading is corroborated to an extent by Mr. Newberg's own declaration stating that the Mediator told Mr. Newberg the next morning that he doubted Mr. Usherson would show up for the mediation, a point the Mediator somehow forgot. (JA-69.)

The Mediator's own testimony at the hearing sheds no light one way or the other: When the Mediator was asked whether he would have said something more in the "I understand" email if he had truly known Mr. Usherson would not attend, the Mediator initially testified "[p]robably," but then retreated, saying "I want to be candid," and again expressing no interest in "looking backward"—the phrase he apparently uses when he does not recall something. (JA-447.) In any case, the

October 30 email exchange—resting entirely on the Mediator's cryptic two-word response, which the Mediator "candid[ly]" did not wish to examine in his testimony—is an extraordinarily thin reed for the District Court to use to prop up and corroborate the Mediator's testimony.

In sum, the reasons the District Court gave for crediting the Mediator's testimony—lack of stake in the matter, corroboration by Mr. Newberg's testimony, and corroboration by documents—do not withstand scrutiny. The District Court's bare and unexplained reference to the Mediator's "demeanor," standing alone, hardly provides a sufficient basis to justify the serious finding that Mr. Liebowitz lied to the Court, particularly under the "more exacting" standard of review that applies to the imposition of sanctions. *Wolters Kluwer*, 564 F.3d at 113–14. How the Court could have credited the Mediator based on his demeanor is unclear, where the Court asked the Mediator point blank whether he would "stand by [his] declaration" that he had not given Mr. Liebowitz permission not to appear, and the Mediator testified, "Not expressly, no." (JA-453.) The reasons the District Court gave for its findings would not even satisfy a "preponderance of the evidence" standard, much less the applicable "clear and convincing" standard.

On this record, the District Court abused its discretion in imposing sanctions on Mr. Liebowitz for lying based on the Mediator's testimony. *See Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 111 (2d Cir. 1998) (reversing

sanction because "sanctioning [the attorney] for the consequences of a statement that may have been correct, or at least may have represented mere confusion . . . and not bad faith obstructionism, constitutes an abuse of discretion"); *see also United States v. Parse*, 789 F.3d 83, 113–18 (2d Cir. 2015) (vacating district court's determination discrediting attorneys' testimony regarding the attorneys' knowledge of a prospective juror's true identity, notwithstanding the district court's superior vantage point to assess the credibility of the attorneys' testimony); *Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004) ("[W]e have found the trial court's credibility determinations vulnerable where they were founded on factual inferences that the evidence did not permit."); *cf. United States v. Stewart*, 433 F.3d 273, 315 (2d Cir. 2006) (perjury "conviction may not be obtained solely on the uncorroborated oath of one witness" (internal quotation marks omitted)).

Beyond crediting the Mediator's testimony for reasons that do not withstand scrutiny, the District Court compounded its error by discrediting Mr. Liebowitz's testimony for several equally unpersuasive reasons. In particular, the District Court pointed to two instances in which, in its view, Mr. Liebowitz's testimony "defie[d] belief," but neither conclusion holds water.

First, the District Court found unbelievable Mr. Liebowitz's assertion that, had the Mediator denied the request to have Mr. Usherson participate by telephone, Mr. Liebowitz would have arranged at the last minute for Mr. Usherson to fly to

New York (where two LLF associates attended in person). (SPA-31.) But Mr. Liebowitz would have been justified in believing that the Mediator was unlikely to deny his request. The same Mediator, after all, had previously agreed that the entire mediation with Mr. Usherson could be by telephone, and had conducted multiple mediations in which Mr. Liebowitz's clients participated by telephone "without incident." (JA-227.) In addition, the mediation rules provide that individuals such as Mr. Usherson who live more than 100 miles from the courthouse may request to participate by telephone, and those requests were, in Mr. Liebowitz's experience, routinely granted. (JA-132, 144.) Although the better practice would have been for Mr. Usherson to be prepared to travel if necessary, Mr. Liebowitz's testimony that he would have arranged travel on short notice in the unlikely event the Mediator denied the request was not so incredible as to defy belief, as the District Court concluded.

Second, the District Court cited the fact that Mr. Liebowitz was unable to recall, at the November 14 initial conference, precisely when he had obtained permission from the Mediator for Mr. Usherson to appear by telephone, and yet, two months later, could recall that the conversation happened on October 30th. (SPA-32.) The District Court was troubled by Mr. Liebowitz's explanation that his memory had been refreshed by the emails attached to Mr. Newberg's initial declaration, because that declaration was filed before the November 14 conference,

38

and thus should have refreshed Mr. Liebowitz's memory in advance of the conference. (SPA-32.) The District Court itself acknowledged at the November 14 conference, however, that Mr. Liebowitz had only filed a short informal response to Bandshell's motion, and gave him the chance to prepare an additional "formal" response. (JA-237–39.) Mr. Liebowitz reasonably may have examined Mr. Newberg's declaration and the supporting materials more closely in preparing that formal response after the November 14 conference, and closer examination of the relevant emails could have refreshed Mr. Liebowitz's recollection as to when he received permission from the Mediator. The District Court's conclusion that Mr. Liebowitz's testimony "defie[d] belief" went too far, particularly given the District Court's unwillingness to scrutinize the Mediator's own testimony—which conflicted with Mr. Newberg's, refused to stand by a sworn declaration, and would not "look backward" at key events—with comparable rigor.

The District Court next found that "Mr. Liebowitz's testimony was also incredible because there is absolutely no evidence to corroborate it." (SPA-32–33.) The District Court's conclusion again ignores that Mr. Liebowitz's testimony regarding receiving permission from the Mediator was corroborated by the facts that multiple prior mediations with the same Mediator had proceeded without the client's in-person attendance (JA-227), the Mediator admitted that he had previously agreed to conduct the entire mediation by telephone (JA-227), and the

39

Mediator told Mr. Newberg (and later forgot) that he doubted Mr. Usherson would be appearing in person (JA-69, 448).

The District Court next gave two examples of ways in which, in its view, Mr. Liebowitz's testimony was "internally inconsistent" (SPA-33), but again, the District Court's assessment goes too far. First, the District Court highlighted how Mr. Liebowitz initially said he received the Mediator's permission for Mr. Usherson to appear telephonically, but then later asserted that neither the Court's orders nor the mediation rules actually required Mr. Usherson to appear in person in the first place. (SPA-33–34.) Mr. Liebowitz's hardly novel presentation of arguments in the alternative should not undermine his credibility with respect to the key question of whether the Mediator granted permission for Mr. Usherson to participate by telephone.

Second, the District Court returned to what it termed Mr. Liebowitz's "custom and practice" defense. Noting that this "defense appeared for the first time in Mr. Liebowitz's December 16th letter," the District Court found that it was an "odd fit given Mr. Liebowitz's initial and principal story: that he requested and obtained the Mediator's explicit consent." (SPA-35.) Because the Mediator's "alleged custom and practice do not shed any light on whether, as Mr. Liebowitz actually claimed, he affirmatively consented," the District Court wrote, the "custom and practice" defense appeared to be "nothing more than an after-the-fact

40

justification, conjured up by Mr. Liebowitz when it became apparent that the Court was not inclined to buy into his initial story." (SPA-35.)

The District Court's crabbed analysis, however, does not accord with the record. Prior to Mr. Liebowitz's December 16 letter, several of Mr. Liebowitz's substantive responses to Bandshell's sanctions motions discussed the "practice" of parties participating in mediations by telephone when they live more than 100 miles from the courthouse. (JA-112, 121, 123, 131–32, 154.) At the November 14 initial conference, Mr. Liebowitz's associate stated to the District Court "that the ordinary custom and practice is for the attorneys, particularly where the plaintiff is out of state, for magistrate judges or mediators to permit leave for the party to appear telephonically." (JA-244–45.) The Mediator's own sworn declaration, filed on December 11, admitted, without prompting, that "I should say that in a few prior mediations [Mr. Liebowitz's] client appeared by telephone without incident." (JA-227.)

This record established, well before Mr. Liebowitz's December 16 letter, that the "practice" of having clients who live far away participate in mediations by telephone was commonplace both in the district generally and in mediations involving the Mediator and Mr. Liebowitz specifically. For the District Court to conclude that the "custom and practice" argument was an "after-the-fact

41

justification, conjured up by Mr. Liebowitz" in the December 16 letter (SPA-35) ignores the prior record.

For the District Court to say these practices "do not shed any light on whether [the Mediator] affirmatively consented" to Mr. Usherson's appearance by telephone, and that Mr. Liebowitz was mistaken in believing he got that consent, also ignores the basic rule of evidence that proof of prior acts can be offered to prove "absence of mistake." *See* Fed. R. Evid. 404(b). As a matter of common sense, that the Mediator had permitted Mr. Liebowitz's clients to appear by telephone five times previously, and that the district's rules specifically contemplate such a practice for clients like Mr. Usherson who live far away, together have a tendency to make it more probable that the Mediator gave affirmative consent for Mr. Usherson to appear by telephone.

For these reasons, the District Court's finding that Mr. Liebowitz lied in bad faith regarding getting permission for Mr. Usherson to appear by telephone was based on a clearly erroneous view of the evidence. Because the finding was based "on a clearly erroneous assessment of the evidence," the District Court "necessarily abuse[d] its discretion," *Schlaifer Nance*, 194 F.3d at 333, and the Sanctions Order should be vacated on this basis alone. *See Ametex Fabrics*, 140 F.3d at 110 ("[U]pon this record, we hold that the district court had an insufficient basis to conclude from the evidence that [the attorney] lied to the court and that the

42

district court finding to that effect was clearly erroneous.  We reverse the district court's sanction").

### B.  The District Court Abused its Discretion By Finding that Mr. Liebowitz Supposedly Brought and Maintained this Case in Bad Faith By Falsely Alleging that the Photograph was Registered Prior to the Suit and Not Conducting a Reasonable Investigation

The District Court also erred by concluding that "the evidence clearly and convincingly shows that Mr. Liebowitz brought—and maintained—this case in bad faith by willfully disregarding the fact that the case was fatally flawed from its inception."  (SPA-38.)

The record demonstrates that Mr. Usherson believed that the Photograph at issue was part of the 046 Registration when Mr. Liebowitz initiated the action on his behalf and continued to believe so until after an official deposit copy of the Photograph was obtained in January 2020.  (JA-301–03, 330–32, 339–41, 484–85.)  Years earlier, Mr. Usherson had obtained copyright registration of over 2,000 photographs he took at a 1972 music festival, which included five similar photographs of Bob Dylan and Leon Redbone, and, in June 2019, mistakenly concluded that Bandshell was using a cropped version of one of the photographs contained within the 046 Registration.  (JA-298–301.)  At the same time, after the present lawsuit had been filed, and aware that his photographs were targets of infringement, Mr. Usherson sent to one of Mr. Liebowitz's employees a CD containing a set of thirty additional photographs from the same festival for

43

registration, and LLF's staff registered those photographs in August 2020 (under the 272 Registration). (JA-301.) According to their testimony, neither Mr. Liebowitz nor Mr. Usherson knew the Photograph was in fact part of the 272 Registration rather than the 046 Registration until Bandshell obtained an official deposit copy. (JA-301–03, 330–32, 339–41, 484–85; *see* JA-335 (juxtaposing the Photograph with five similar photographs in the 046 Registration).) This testimony was uncontroverted.

Notwithstanding this record, the District Court found that Mr. Liebowitz "brought—and maintained—this case in bad faith" and failed reasonably to investigate the Photograph's registration. (SPA-38.) The District Court's analysis on this point was internally inconsistent. First, the District Court wrote that "the evidence clearly and convincingly shows that Mr. Liebowitz *did* know about the untimely registration, at least as of August 22, 2019, when his firm registered the Photograph under the 272 Registration, if not earlier." (SPA-40 (emphasis in original).) In the same paragraph, however, the District Court walked back its finding, writing that, because Mr. Usherson sent a CD that included the Photograph to Mr. Liebowitz's firm for the firm to register, Mr. Liebowitz's "*firm* thus had knowledge that the Photograph had not been registered prior to the filing of the Complaint," and concluding that "it is hard to believe that Mr. Liebowitz . . . was unaware of the fact himself." (SPA-41 (emphasis added).) Then, in the next

paragraph, stepping further back, the District Court wrote that "even if Mr. Liebowitz did not personally know that the Photograph had not been registered when this case was filed, he certainly should have known—and his lack of knowledge is attributable to an inexcusable failure to conduct a reasonable investigation before and during the case." (SPA-41.)

What the District Court found "inexcusable," however, boils down to the fact that Mr. Liebowitz—who was running a massive law practice with hundreds of pending cases (JA-424–25, 498)—did not conduct a more extensive investigation into two registration numbers that covered similar photographs from the same series. The Photograph of Dylan and Redbone in the 272 Registration, and the photographs of Dylan and Redbone in the 046 Registration (JA-308–13, 335) are enough alike that even the photographer himself submitted a sworn declaration attesting to his belief that the Photograph was within the timely 046 Registration until he saw deposit copies in January 2020. (JA-301–03.)

This record is more consistent with Mr. Liebowitz making a mistake, rather than acting in bad faith. A finding of bad faith is appropriate only if "there is clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes," *Wolters Kluwer*, 564 F.3d at 114, but the District Court did not explain how Mr. Liebowitz's mistake with respect to the registration demonstrates the bad faith of either Mr. Liebowitz or LLF under either of these

prongs. As noted, "[c]onduct is entirely without color when it lacks any legal or factual basis," but is "colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the attorney whose conduct is at issue." *Id*. Here, Mr. Liebowitz's conduct was more than colorable; the photographer himself submitted a sworn declaration that he believed the photograph was part of the 046 Registration until February 2020, and many similar photographs from the same series were in fact part of that registration. (JA-301–03.) These facts provide at least "some legal and factual support" for Mr. Liebowitz and LLF, which is sufficient to show that their conduct—including the fact that they did not investigate the matter further—was not "entirely without color." *Wolters Kluwer*, 564 F.3d at 114.

Nor was the conduct, in light of this record, motivated by an improper purpose; the District Court certainly did not find such an improper purpose with the requisite "high degree of specificity." *Id.*; *Schlaifer Nance*, 194 F.3d at 338; *see Shafii v. British Airways, PLC*, 83 F.3d 566, 571 (2d Cir. 1996) (affirming denial of sanctions under Section 1927 because district court lacked "a clear showing of bad faith"), *overruled on other grounds by Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 274 (2d Cir. 2005).

The District Court separately criticized Mr. Liebowitz for arguing that the defect in the Complaint's allegation with respect to registration could be cured

46

through an amendment, asserting that "there is a strong argument" that this suggestion "is itself made in bad faith," given "recent law" (namely, the District Court's own prior decision in *Malibu Media, LLC v. Doe*, No. 18-CV-10956 (JMF), 2019 WL 1454317, at *1 (S.D.N.Y. Apr. 2, 2019), holding, based on *Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881 (2019), that where a plaintiff "improperly filed suit before a copyright was registered," the suit "must be dismissed notwithstanding a plaintiff's post-registration amendment"). (SPA-39.)

Even the District Court's *Malibu Media* opinion, however, acknowledges that "the Court parts ways with several courts that have held that a post-registration amendment can cure the defect in a complaint filed before a copyright claim was registered within the meaning of Section 411(a)." 2019 WL 1454317, at *3 (citing pre-*Fourth Estate* cases). Moreover, post-*Fourth Estate* decisions, even when reaching the same conclusion as *Malibu Media*, have recognized the Supreme Court did not speak "squarely" on this point. *See, e.g.*, *VHT, Inc. v. Zillow Grp., Inc.*, No. 15-CV-1096 (JLR), 2020 WL 2307492, at *7 (W.D. Wash. May 8, 2020); *Izmo, Inc. v. Roadster, Inc.*, No. 18-CV-06092 (NMC), at *2 (N.D. Cal. June 4, 2019); *cf. Cortes-Ramos v. Martin-Morales*, 956 F.3d 36, 43–45 (1st Cir. 2020) (holding, where plaintiff had not registered alleged infringed work until after filing

complaint, that remand was required for consideration whether plaintiff could cure by supplementing pleadings).

Sanctions are not permitted unless an argument "lacks *any* legal or factual basis" or there is "utterly no basis" for the attorneys' "subjective belief in the merits" of their position. *Schlaifer Nance*, 194 F.3d at 337, 340 (emphasis in original); *see Salovaara v. Eckert*, 222 F.3d 19, 35 (2d Cir. 2000) (noting that even if the attorney had improperly reasserted a claim, "such conduct alone is insufficient to warrant sanctions"). Even if Mr. Liebowitz's position that amendment to the Complaint could cure the registration defect would be unlikely to succeed (particularly with the *Malibu Media* judge), it cannot be said that the position lacks *any* basis whatsoever.

In sum, the District Court's conclusion that Mr. Liebowitz acted in bad faith with respect to the registration allegation was an abuse of discretion.

## POINT II

### THE DISTRICT COURT ABUSED ITS DISCRETION BY IMPOSING EXCESSIVE MONETARY SANCTIONS

Because the District Court based its sanctions on clearly erroneous factual findings, it should not have imposed sanctions at all. Even assuming some level of sanction was sustainable, however, the District Court's monetary sanction of $103,517.49 was excessive. The sanction has two components: an $83,517.49 portion imposed on Appellants "for misrepresenting that the Mediator gave

permission for Mr. Usherson not to attend the mediation in person" and for "multiple other violations of the Court's Orders," and a $20,000 portion imposed "for falsely alleging that the Photograph was registered" and "not conducting a reasonable investigation after being put on notice."  (SPA-49–50.)  Both of these sanctions are an abuse of discretion.

### A. The Excessive $83,517.49 Sanction

The District Court acknowledged that the $83,517.49 sanction was calculated based on Bandshell's attorneys' "fees and costs attributable to the mediation and sanctions motion."  (SPA-50.)  Several defects, however, exist in the District Court's use of this number.

First, time entries by pro bono counsel do not reasonably serve as the basis for such a large sanctions award payable to the court.  As the District Court acknowledged (SPA-48–49), although some courts in this Circuit have stated the fact of a party's pro bono representation should not affect the amount of a sanction of attorney's fees, the "[c]ase law is not 'clear' on this question."  *Goldman v. Barrett*, No. 15-CV-9223 (PGG), 2019 WL 4572725, at *7 n.9 (S.D.N.Y. Sept. 20, 2019), *aff'd*, 2020 WL 5415472 (2d Cir. Sept. 10, 2020).  In *Goldman*, for example (a Rule 11 case), the district court found that a sanctions award based on fees and costs in bringing a sanctions motion would be "excessive," given that the defendant's representation by pro bono counsel meant it had in fact expended no

funds. *Id.* at *7. The same logic should apply here: Bandshell's counsel acted pro bono and disclaimed any need for or right to the fee-based sanction. (JA-474.) Without the economic constraint provided by a paying client, counsel could devote a large number of hours with confidence that those hours would only increase the size of the sanction, rather than the client's bill. The District Court should not have based such a large sanction on counsel's self-determined hours.

Second, even if pro bono hours can serve as an appropriate metric in some cases where those hours are expended litigating a substantive matter, the majority of the time entries by Bandshell's counsel related to work performed in connection with the sanctions motion itself, rather than the underlying lawsuit. (JA-276–78.) Courts should not penalize parties for defending themselves against sanctions motions by basing sanctions largely on the time spent on those motions. In its submission to the District Court, Bandshell's counsel asserted that it had expended over 110 hours of time as a result of the purported misconduct. (JA-276–78.) In a cover letter, Bandshell's counsel acknowledged that "[o]ne could question why we put so much time into a pro bono matter of limited exposure to our client," and "[t]he answer is that we understood the importance of this issue beyond this case, to both the bar and the Court." (JA-275.) A paying client likely would not have agreed to pursue such a strategy. Sanctions should not be substantially increased

just because the movant decides the case involves an issue of "importance." (JA-275.)

In fact, fees incurred litigating sanctions motions should not be the basis for a sanction at all. As the Fourth Circuit has recognized, "[l]itigants should be able to defend themselves from the imposition of sanctions without incurring additional sanctions." *Blue v. U.S. Dep't of Army*, 914 F.2d 525, 548 (4th Cir. 1990). Permitting a sanction to be based on the attorneys' fees of the party pursuing sanctions perversely encourages parties facing sanctions motions to avoid asserting creative arguments in defense, and also perversely encourages parties seeking sanctions to do so on every conceivable basis, no matter how meritorious, in the hopes of full reimbursement. Although this Court has authorized sanctions based on the costs, in part, of litigating a sanctions motion, *see, e.g.*, *Enmon*, 675 F.3d at 148–49, that case is distinguishable, because it involved an "extraordinary pattern of misrepresentations," *id.* at 148, in a lengthy and complex litigation.

Third, even if pro bono fees incurred in litigating a sanctions motion theoretically could serve as a proper basis on which to calculate a monetary sanction, the District Court's sanction in this case was still far too high because the District Court failed to account for the fact that the District Court found that one of the two issues at the hearing did not warrant sanctions. The Supreme Court recently confirmed that although "[a] district court has broad discretion to calculate

51

fee awards" to sanction a litigant for bad-faith conduct, "such an order is limited to the fees the innocent party incurred *solely* because of the misconduct." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1184 (2017) (emphasis added). Here, the sanctions hearing was "narrowly limited" to two issues: whether the Mediator gave Mr. Liebowitz permission to send an associate to the mediation, and whether the Mediator gave permission for Mr. Usherson to appear by telephone. (JA-232.)  The District Court ultimately imposed sanctions based on the second issue (and others), but not the first.  (SPA-30 n.3.)

Even if a monetary sanction appropriately could be based on the pro bono fees a party incurs litigating a successful sanctions motion, Bandshell's sanctions motion was not completely successful, where the District Court rejected one of the two primary bases for sanctions considered at the hearing.  (*See supra* at 18.)  The District Court should have excluded at least half of Bandshell's $83,517.49 in total fees on this basis alone (although even a sanction in half the amount ordered would still be excessive and disproportionate to the conduct).  *See Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 329 (S.D.N.Y. 2008) (Lynch, J.) (limiting Rule 37 discovery sanctions award to half of the fees and costs incurred, where the court had rejected half of the claims for sanctions); *Ramashwar v. Espinoza*, No. 05-CV-2021 (AJP), 2006 WL 36752, at *9 (S.D.N.Y. Jan. 6, 2006) (significantly discounting attorneys' fees sought for Rule 11 motion because "defendants were

only partially successful"); *see also Eastway Const. Corp. v. City of N.Y.*, 821 F.2d 121, 122–23 (2d Cir. 1987) (court must "exercise [its] discretion to award only that portion of a defendant's attorney's fee thought to be reasonable to serve the sanctioning purpose").

### B. The Punitive $20,000 Sanction

The District Court's additional $20,000 sanction also falters because it was punitive in nature and imposed without affording Mr. Liebowitz and LLF the necessary protections of criminal procedure.

In determining whether a sanction is punitive in nature, this Court examines both the amount of the sanction and its character, including "whether the sanction is intended to be compensatory or punitive; whether it is payable to the court or to the injured party; whether it is based on past wrongful conduct or is intended to coerce future compliance; and whether any opportunity to purge the sanction is provided." *Mackler Prods., Inc. v. Cohen*, 225 F.3d 136, 142 (2d Cir. 2000) ("*Mackler II*"); *see Wolters Kluwer*, 564 F.3d at 117 (listing additional factor of "whether the size of the required payment was substantial"). Where those factors indicate a substantively criminal punishment, the sanctioned party is entitled to "notice and the opportunity to be heard, the right to a public trial, assistance of counsel, presumption of innocence, the privilege against self-incrimination, and the requirement of proof beyond a reasonable doubt." *Mackler I*, 146 F.3d at 128.

Here, the additional $20,000 sanction the District Court imposed is demonstrably punitive:  The District Court ordered that it be paid to the court, it was based on past wrongful conduct, and the District Court gave Mr. Liebowitz and LLF no opportunity to purge (i.e., avoid the sanction by forbearing from future similar conduct).

As to whether the sanction was based on past wrongful conduct or to coerce future compliance, the District Court asserted that the sanction was meant to "provide adequate deterrence."  (SPA-51.)  The District Court failed, however, to offer any explanation for how the additional $20,000 sanction could have any distinct impact beyond the impact of the $83,517.49 sanction.  (SPA-51.)  Further, the District Court stated the $20,000 sanction was imposed for the past conduct of "falsely alleging that the Photograph was registered, not conducting a reasonable investigation prior to filing the lawsuit and after being put on notice of the registration issue, and maintaining the suit thereafter."  (SPA-50.)

As to whether the District Court gave Mr. Liebowitz and LLF the opportunity to purge, the District Court included no "purge provision" to show its sanction's deterrent, rather than punitive, intent.  To the contrary, the District Court did the opposite by requiring Mr. Liebowitz and LLF to include deposit files from the U.S. Copyright Office reflecting prior registration of the relevant copyrighted work for all copyright infringement cases they file within one year of the Sanctions

Order. (SPA-54.) The presence of this drastic non-monetary sanction only confirms that the District Court did not conceive of the $20,000 sanction as deterring Mr. Liebowitz and LLF from filing cases without checking prior registration.

On the whole, because the $20,000 punitive sanction was a retrospective punishment, the District Court abused its discretion by failing to ensure Mr. Liebowitz and LLF had the full panoply of criminal procedural protections. *Mackler I*, 146 F.3d at 130; *see Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 144 (2d Cir. 2014).

This Court's decision in *Mackler I* is instructive. There, this Court considered a similar situation in which the district court, acting pursuant to its inherent authority, sanctioned an attorney for his role in purported misrepresentations to the court in two distinct amounts: a compensatory award, and an additional sanction of $10,000 payable to the court. *Mackler I*, 146 F.3d at 128. This Court found that the $10,000 sanction was punitive in nature and remanded for failure to apply the associated procedural safeguards, citing, among other things, the facts that the sanction was sizable, imposed in addition to the compensatory sanction and for prior wrongful conduct, payable to the court, and carried no opportunity to purge, *id.* at 129–31, all factors present in this case.

This Court should vacate the punitive $20,000 sanction.

**POINT III**

**THE DISTRICT COURT ABUSED ITS DISCRETION BY IMPOSING OVERBROAD NON-MONETARY SANCTIONS**

This Court has warned that because the power to sanction "carries with it the potential for abuse," statutes authorizing sanctions "should be construed narrowly and with great caution, so as not to stifle the enthusiasm or chill the creativity that is the very lifeblood of the law." *Mone v. Comm'r*, 774 F.2d 570, 574 (2d Cir. 1985) (internal quotation marks omitted).

Here, however—setting aside that the clearly erroneous factual findings that warrant categorical reversal—the District Court abused its discretion when it imposed the non-monetary sanctions because those sanctions are far from restrained. To the contrary, the two final sanctions apply to any case filed within a year of the District Court's Sanctions Order, on a nationwide basis, and require that Appellants file both a copy of the Order, and also file a copy of the official deposit files maintained by the U.S. Copyright Office reflecting prior registration of the relevant copyrights at issue. (SPA-54.) These overbroad sanctions were an abuse of discretion.

The first of these sanctions requires that Appellants file the District Court's Sanctions Order in any case they initiate within a year of the Order. But even in cases of egregious conduct beyond that at issue here, courts have not imposed sanctions with a national scope. For example, in *Enmon*, a law firm made

56

numerous material misrepresentations and frivolous arguments in connection with several motions and other filings, but the sanctions affirmed by this Court, in relevant part, merely required that the sanctions order be submitted "with any future *pro hac vice* applications in the *Southern District of New York*," rather than on a nationwide basis. 675 F.3d at 144–48 (emphasis added).

In the small number of cases in which courts have imposed nationwide sanctions, such decisions have involved parties, unlike Mr. Liebowitz, who either repetitively litigated the specific matter despite contrary authority, or made outrageous and repeated use of the court system to harass apparent personal enemies. *See, e.g.*, *In re Hartford Textile Corp.*, 681 F.2d 895, 896–97 (2d Cir. 1982); *Hammer v. Amazon.com*, 392 F. Supp. 2d 423, 433 (E.D.N.Y. 2005); *In re Martin-Trigona*, 592 F. Supp. 1566, 1569–70 (D. Conn. 1984), *aff'd*, 763 F.2d 140 (2d Cir. 1985). Mr. Liebowitz's law practice does not exhibit the incessant re-litigation or malicious claims at issue in the cited cases. To the contrary, Mr. Liebowitz has established a successful practice that has provided a realistic prospect of recovery to copyright plaintiffs in infringement cases with relatively modest value. (JA-497–98, 502; *see supra* n.3.)

The second of these sanctions—which requires LLF to obtain and file official deposit files with every copyright infringement case brought for a year—is even more troubling, because it not only hamstrings LLF's practice and efforts to

57

vindicate its clients' rights, but also impermissibly shifts the burden of proof in LLF's cases in a way that contravenes Congress's intent and this Court's settled law.

Under federal law, "the certificate of a registration . . . shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c); (SPA-76). In keeping with this presumption, "[a]lthough the plaintiff bears the burden of proving copyright ownership," once registration is shown, "the party challenging the validity of the copyright registration has the burden to prove the contrary." *Urbont v. Sony Music Entm't*, 831 F.3d 80, 89 (2d Cir. 2016) (quotation marks omitted).

A common method of challenging the validity of a plaintiff's registration is through proof—as in this case—that the work alleged to be infringed is not in fact on deposit under the registration alleged, as shown by an official deposit copy maintained by the U.S. Copyright Office; under Congress's statutory scheme, failure to do so can result in judgment for the plaintiff. *See, e.g.*, *Iantosca v. Elie Tahari, Ltd.*, No. 19-CV-4527 (MKV), 2020 WL 5603538, *4 (S.D.N.Y. Sept. 18, 2020) ("It is the Defendant's obligation, during discovery, to contact the USCO and request deposit copies to be used to rebut the validity of the copyright registration."); *Goodman v. Univ. Beauty Prods. Inc*., No. 17-CV-1716 (KBF), 2018 WL 1274855, at *5 (S.D.N.Y. Mar. 9, 2018) (granting summary judgment

58

where plaintiff submitted copyright registration and defendant, having "had the opportunity to request [and submit] a certified deposit copy," failed to do so).

The District Court's deposit-copy sanction turns this scheme on its head. In the ordinary case, the burden would be on the defendant who wishes to challenge the validity of a plaintiff's copyright registration to obtain and submit the deposit files from the U.S. Copyright Office. Under the District Court's scheme, however, the burden to obtain the deposit files falls on Mr. Liebowitz and LLF—and, thus, their clients—before they have even filed suit.

The District Court abused its discretion when it imposed a sanction that has the effect of altering the burden of proof for all of Appellants' clients for a year. *See, e.g.*, *Merritt v. United States*, 960 F.2d 15, 18 (2d Cir. 1992) (stating, in determining allocation of burden of proof under Administrative Procedure Act, "where, as here, congressional intent is clear, it must govern our decision"). The sanction also imposes a substantial practical burden: Deposit copies may cost Appellants' clients between $200 and $1,200 in an individual case, which eats into any recovery. (JA-499.)

At a minimum, if not vacated, this sanction should be modified to require that when LLF itself (and not its client) registers the work at issue, only an affirmation confirming the same need be filed with the complaint (rather than an official deposit copy obtained from the U.S. Copyright Office). That the District

Court did not entertain such a common-sense limit only confirms that the sanction was not imposed with the "restraint and discretion" this Court requires. *Schlaifer Nance*, 194 F.3d at 334.

## POINT IV

### THE CASE SHOULD BE REASSIGNED TO A DIFFERENT DISTRICT JUDGE IF REMAND IS REQUIRED

If this Court determines that remand of any portion of the District Court's Sanctions Order, rather than reversal, is necessary, Mr. Liebowitz and LLF respectfully request that the case be reassigned to a different district judge. *See Mackler II*, 225 F.3d at 146–47 (overturning sanctions and granting request for reassignment on remand).

The District Court's statements made in the course of the sanctions litigation indicate that reassignment is necessary to "preserve the appearance of justice." *Id.* at 147. The District Court's Sanctions Order, rather than beginning with a description of the conduct in the present case, begins instead with a litany of names Mr. Liebowitz has been called by *other* courts, including "a copyright troll," a "clear and present danger to the fair and efficient administration of justice," a "legal lamprey[]," and an "example of the worst kind of lawyering." (SPA-1–2.) The District Court also expressed with disdain how "Mr. Liebowitz's shenanigans have surely consumed enough of this Court's time and resources as it is"

(SPA-64), making it unlikely that yet further proceedings before the same district judge would have the "appearance of justice."

This pejorative language, when combined with the "unique nature of sanctions proceedings (in which 'the offended judge [is] solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct')" and the likely "limited nature" of any remand, are "unusual" enough to justify reassignment. *Mackler II*, 225 F.3d at 147 (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994)).

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should reverse the District Court's order imposing sanctions or, at a minimum, reduce the excessive monetary sanction, vacate the non-monetary sanctions, and remand the case to a different district judge.

Dated:      November 2, 2020
           New York, N.Y.

/s/ Robert J. Anello
Robert J. Anello
Brian A. Jacobs
Kevin Grossinger
A. Dennis Dillon

MORVILLO ABRAMOWITZ GRAND IASON
  & ANELLO P.C.
565 Fifth Avenue
New York, New York 10017
Tel: (212) 856-9600
Fax: (212) 856-9494
ranello@maglaw.com
bjacobs@maglaw.com
kgrossinger@maglaw.com
ddillon@maglaw.com

*Counsel to Richard Liebowitz and
Liebowitz Law Firm, PLLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 13,998 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated:      November 2, 2020
           New York, New York

                                By:   /s/ Kevin Grossinger
                                   Kevin Grossinger